```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                     NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,)  CRIMINAL CASE NO.
           Plaintiff,         )  RDB-20-139
 4                            )
          vs.                 )  JURY TRIAL DAY 8
 5                            )  KIARA HAYNES (CONT.)
     ANDRE RICARDO BRISCOE,    )  SERGEANT EDWARD HOWARD
 6         Defendant.         )  JENNIFER BENTON, BRIAN LEWIS
     _____)  DAVID AZUR, TONYA HARRIS
 7

 8            BEFORE THE HONORABLE RICHARD D. BENNETT
                   UNITED STATES DISTRICT JUDGE
 9                   THURSDAY, JUNE 2, 2022
                      BALTIMORE, MARYLAND
10
     For the Plaintiff:
11     Dana Brusca, AUSA

12     Paul Budlow, AUSA

13
     For the Defendant:
14     Teresa Whalen, Esq.

15     William Purpura, Esq.

16

17   Also Present:  Javon Weaver, Special Agent ATF

18     Jeffrey Kelly, Special Agent, FBI

19     Andrew Murray, Paralegal

20     Robert Cadle, Paralegal

21       (Computer-aided transcription of stenotype notes.)

22   _____

23                        Reported by:

24             Melissa L. Clark, RPR
           Federal Official Court Reporter
25          101 W. Lombard Street, 4th Floor
             Baltimore, Maryland  21201
```

```
 1                    P R O C E E D I N G S
 2          THE CLERK:  The United States District Court for the
 3  District of Maryland is now in session.  The Honorable Richard
 4  D. Bennett is presiding.
 5          THE COURT:  Good morning, everyone.
 6       (Collective greetings.)
 7          THE COURT:  As I understand it, we still have
 8  Ms. Haynes out of the courtroom here, and I understand we have
 9  an evidentiary issue essentially with respect to a transcript
10  of a May 9, 2015, telephone call between Kiara Haynes and
11  Shawn Gardner.  And I have Mr. Demetriou, my law clerk, he's
12  been doing a wonderful job on this case, presented to me two
13  different variations, and I don't see what the variations are.
14  You all have to alert me to what the variations are.
15          MR. BUDLOW:  Yes.  Happy to do that, Your Honor.
16          THE COURT:  I read through it, but I don't have time
17  to try to read line by line, but apparently, just show me,
18  Mr. Budlow, what the dispute is.
19          MR. BUDLOW:  Sure.  If you go to page 2 --
20          THE COURT:  Yes.
21          MR. BUDLOW:  -- the second to last box.
22          THE COURT:  Okay.  Hold on a second.  Okay.  We're
23  at...
24          MR. BUDLOW:  The last line and a couple of words at
25  the very bottom of the larger paragraph, where it ends with
```

1    "Set the house on fire," and then it starts with, "Come on,

2    run."

3           THE COURT:  Okay.  I see "set the house on fire."

4    And the Defense version says, "Come on, run.  Get away.  When

5    I tell you to run, you stupid MFer, run."

6           MR. BUDLOW:  Right.

7           THE COURT:  And the Government's doesn't have that,

8    and it's --

9           MR. BUDLOW:  Right.  That's the only difference that

10   we object to, and I don't want to spend too long with that.  I

11   do --

12          THE COURT:  You don't think that's an accurate --

13          MR. BUDLOW:  No, it's not that it's not accurate.

14   We don't think it's relevant.  So last night when we were

15   reviewing the transcript, and very late last night, we

16   identified a few areas of dispute, and I just want to point

17   out that, as has been the case throughout this case, Defense

18   was very professional.  We're able to communicate --

19          THE COURT:  I understand.

20          MR. BUDLOW:  -- and resolve all of the issues but

21   this one.  So this one issue remains.

22        Very briefly, Your Honor, this is the Government's

23   position on this issue.  Ms. Haynes, during this call, is with

24   another person, physically, where she is.  Earlier in the

25   call, it seemed pretty clear that that's one of her children.

1    During this call where it ends with "Set the house on fire" at

2    that moment when she says, "Set the house on fire," there's no

3    doubt she is speaking to Mr. Gardner.

4        However, when she then says, "Come on, run.  Get away.

5    When I tell you to run," et cetera, she's speaking to another

6    person, and if you continue to listen after that, which is not

7    in any of these transcripts, she continues to complain that

8    that person, despite her being where she was, and a car

9    coming, that person ran across the street.  And so even if it

10   isn't her child, which we think from context it is, and she's

11   speaking to in a particularly harsh way, it has -- this line,

12   in the Government's view, "Come on, run, et cetera," just

13   isn't relevant to the rest of the call regardless of who she's

14   speaking to.

15           **THE COURT:**  And it would be your -- the view of the

16   Government is it would be confusing in the context of the

17   conversation between Haynes and Gardner, because it's not

18   really directed at Gardner in any way, those words.

19           **MR. BUDLOW:**  Right.  We think it would be confusing,

20   and we also think that it would paint -- I mean, it's hard to

21   paint this particular witness in a negative light more so than

22   the facts are.  However, now we're getting into her parenting

23   and her cursing at her children, and that does not seem to be

24   relevant.

25           **THE COURT:**  Well, as to that, the Defense is free to

1   attack the credibility of Kiara Haynes in terms of any of her

2   emotional issues or lack thereof, but I guess Ms. -- that's a

3   separate matter, but in terms of, "Come on, run.  Get away.

4   When I tell you to run, you stupid MFer, run," it's in the

5   context of a person she was with, and she's directing that to

6   someone else and not Mr. Gardner, according to the Government.

7        Is that reasonably a correct position from your point of

8   view?

9        **MS. WHALEN:**  I included that, because I think that

10  it seems as if she's telling herself -- she's walking herself

11  off the ledge.  She's telling Gardner that she was going

12  across the street trying to make sure that she did not do what

13  she was intending to do, which was burn the house down.  And

14  so I think we have a dispute as to the relevance.

15       Beyond that, I think --

16       **THE COURT:**  Well, I just -- I understand.  "Set the

17  house on fire," everyone agrees up to that point.  "Come on,

18  run, get away.  When I tell you to run, et cetera," the

19  Government proffered that has nothing to do with her

20  conversation with Gardner.  It's not directed to him in any

21  way at all.  She's talking to someone else.

22       **MS. WHALEN:**  And I think that that is something they

23  can bring out in her testimony.

24       **THE COURT:**  Well, is that correct or not?

25       **MS. WHALEN:**  No, I don't think it is correct.  I

1   think she's talking --

2          THE COURT:  Well, then I'll have to listen to it and

3   I'll determine whether it's correct or not, and if so, I'll

4   strike it.  I mean, that's --

5          MS. WHALEN:  That's fine.

6          THE COURT:  -- that's confusing and it's not -- it's

7   confusing and it's not the purpose of the Court to have the

8   jury be confused.  So if you want, I'll listen to it right

9   now.

10          MS. WHALEN:  Your Honor, that's fine.  An

11   alternative theory, however, I -- well, an alternative theory

12   is that it is talking -- if she's actually talking about

13   stalking and murdering people with her son there, it does go

14   to an emotional -- a lack of emotion.

15          THE COURT:  Well, I'm just going to the language of

16   the tape, first of all, the transcript.

17          MS. WHALEN:  Sure.

18          THE COURT:  If it is abundantly clear to me --

19   apparently the Government says it is abundantly clear.  The

20   Defense is not willing to acknowledge that.  I'll listen to it

21   and make a determination.  And if that's the case, with all

22   due respect to the Defense, all that serves to do is confuse.

23          MS. WHALEN:  That's fine, Your Honor.

24          THE COURT:  And it's not the purpose to confuse the

25   jury.

```
1          Having said that, the matter of her mental health and
2     emotional state is certainly relevant in terms of attacking
3     her credibility.  And you're certainly free to do that in
4     terms of parenting or whatever.  It's who she is and what
5     we're dealing with.
6          So if you really contend that, "Come on, run.  Get away.
7     When I tell you to run," may or may not be directed to
8     Mr. Gardner, I guess I'll have to take the time to listen to
9     it.
10             MS. WHALEN:  Your Honor, would you like to do that
11    now?
12             THE COURT:  That's fine.  That's fine.  Why don't we
13    just let the jury know that -- in fairness to the jury, Mr.
14    Gurevich, can you go and let the jury know there is an
15    evidentiary matter I'm dealing with to save time.
16             THE CLERK:  I've already let them know.
17             THE COURT:  Oh, you've already done that.  Okay.
18    Good.  Thank you.  Well, you're doing a good job too then,
19    both of you.
20             MS. WHALEN:  Your Honor, if it saves time, Mr.
21    Purpura just mentioned if we just want to say that the
22    relevance really is it goes to her emotional or mental state,
23    then I think it is relevant.  And no --
24             THE COURT:  The phrase, "Come on, run.  Get away,"
25    if it's directed to someone else, it has nothing to do with
```

1    her emotional state, or whether she's quick-tempered or

2    whatever, it's just a matter of -- this is a transcript -- the

3    -- which exhibit are we talking about, the actual recording

4    itself, is this --

5              **MR. BUDLOW:**  It's 75D.

6              **THE COURT:**  75 -- I have that we we're dealing with

7    this exhibit at the end of the day yesterday, Defendant's

8    Exhibit 75 --

9              **MS. WHALEN:**  Yes, Your Honor, we were.

10             **THE COURT:**  -- which is in evidence, the recording --

11   this recording is in evidence already, and the only issue is

12   these 75G for identification -- 75T for identification only in

13   terms of those words being added.  And I guess the best way to

14   do this is to find a way, if Mr. Cadle can do this, to get to

15   that point, and I'll listen to it.

16        But the other line of inquiry is appropriate and the

17   Government objection is overruled as to that.  You're

18   certainly free to attack her emotional state.

19             **MR. BUDLOW:**  Your Honor, I will add, while he's

20   setting that up, not to take extra time, that if they didn't

21   include the line after run and that they're -- depending on

22   the Court's view, there is additional conversation about the

23   run, and it being in a parking lot right after the part that

24   you won't hear because the Defense --

25             **THE COURT:**  Well, again, the basic point is, this is

```
1     being directed by Ms. Haynes to someone else, not to

2     Mr. Gardner, essentially.

3               MR. BUDLOW:  Right.  That's our view, and I'm just

4     pointing out that that aspect continues after the part you're

5     going to hear in a little bit, because they cut that out.

6               THE COURT:  I mean, it's the same context if a

7     lawyer was having a conversation with me and suddenly yelled

8     at one of his or her children and said, "Judge, that wasn't

9     directed at you, it was directed at one of my kids."  You

10    know, I've got the context.  We're laughing.  I got the

11    context.  Let me just listen to it, and I'll make a

12    determination.

13         See if we can get to the point --

14         (Recording played but not reported.)

15              THE COURT:  All right.  I'm satisfied the phrase

16    "Come across the street" has actually been deleted from that.

17    So it's perfectly clear to me it's directed to someone in

18    terms of crossing the street having nothing to do with the

19    direction to Mr. Gardner, and indeed there's words that are

20    missing in terms of run across the street.

21         So it seems to me that the accurate transcript as to this

22    relevance is, "Set the house on fire."  The only question is

23    when the jury has this recording, this recording has in it,

24    "Run across the street, come on and run," it has nothing to do

25    with the conversation with Gardner, and I don't know whether
```

1    we are able to correct that or not.

2              MS. WHALEN:  Mr. Cadle has corrected that, I

3    believe, because we knew early this morning --

4              **THE COURT:**  Okay.  We can correct that then.  That

5    will end with "Set the house on fire"; correct?

6              MS. WHALEN:  Yes, we're okay.

7              **THE COURT:**  Then the objection for the record is

8    sustained, by the Government as to that.  But as to the other

9    line of inquiry, it's perfectly appropriate and Ms. Whalen can

10   explore it in terms of the emotional state and -- of

11   Ms. Haynes.

12       Okay.  Is there anything else from the point of view of

13   the Government before we bring the jury in?

14             **MS. BRUSCA:**  No.

15             **THE COURT:**  From the Defense, Ms. Whalen, anything

16   else?

17             **MS. WHALEN:**  No, thank you.

18             **THE COURT:**  All right.  Let's bring Ms. Haynes back

19   in first.

20        By the way, as for the record, we have -- well, these

21   were for identification only, the transcripts, they're not

22   coming into evidence.  But we've already put on the record the

23   additional language that I've deleted, so it's been preserved

24   on the record.  We preserve that in case this becomes an

25   issue.

```
1         I note for purposes of today, Counsel, we're going to
2    finish with Kiara Haynes, then we have Corporal Howard and
3    Sergeant Benton from the Cambridge Police Department, and then
4    Tonya Harris, and apparently it's not anticipated as it was
5    yesterday that Agent Kelly is going to testify.
6         Is that right.
7              MS. BRUSCA:  I think -- did I leave out Detective
8    Lewis on there.  Detective Lewis, Brian Lewis is going to go
9    before Tonya, I believe.
10        Did I leave that out?
11             THE COURT:  Whatever, I just -- I'm sorry, in terms
12   of the witnesses today, Haynes, Howard, Benton, Harris, and
13   we're not anticipating Kelly.  Is that right?
14             MS. BRUSCA:  Not Kelly, but who you left out was
15   Detective Brian Lewis who will be recalled for the purposes of
16   the statement.
17             THE COURT:  Okay.  That's fine.
18             MS. BRUSCA:  Thank you.
19             MR. BUDLOW:  Before Harris, right?
20             MS. BRUSCA:  Yes.
21             THE COURT:  Detective Brian Lewis is being called
22   back to the witness stand, you're saying?
23             MS. BRUSCA:  Correct, Your Honor.
24             THE COURT:  Mr. Gurevich, we will re-swear her when
25   she comes.
```

```
 1              THE CLERK:  Yes, Your Honor.
 2              THE COURT:  With that, Ms. Haynes, if you'll take
 3     the witness stand, we'll re-swear you when the jury comes back
 4     in.  Thank you very much.
 5          Thank you, marshal.
 6          (Witness resumes stand.)
 7              THE COURT:  And with that, we will get the jury.
 8              THE CLERK:  All rise for the jury.
 9          (Jury enters courtroom 10:02 a.m.)
10              THE COURT:  Good morning, everyone.
11          (Collective greetings.)
12              THE COURT:  Nice to see you all.  Good morning and
13     nice to see you all.  Here I get you early, and we still don't
14     start until after 10:00.  Again, because of the retrofitting
15     and precautions we're taking, we can't have bench conferences,
16     and there was an evidentiary matter that came up.  There was
17     no purpose for you all to come in and listen to all this white
18     noise and try to do all of that.
19          So we're ready to go now, and with that, if you'll
20     re-swear Ms. Haynes.
21          Ms. Haynes, we need to have you re-sworn.
22              THE CLERK:  Please stand and raise your right hand.
23              THE COURT:  Please stand.
24          KIARA HAYNES, having been duly sworn, was examined and
25     testified as follows:
```

```
 1              THE WITNESS:  Yes.
 2              THE CLERK:  You may have a seat.
 3         Just restate your name for the record, please.
 4              THE WITNESS:  Kiara Haynes.
 5              THE COURT:  Thank you, Mr. Gurevich.
 6         With that, Ms. Whalen, you may continue with your
 7    cross-examination.
 8              MS. WHALEN:  Thank you, Your Honor.
 9              C R O S S - E X A M I N A T I O N (cont.)
10    BY MS. WHALEN:
11    Q.   Ms. Haynes, you just took an oath to tell the truth;
12    correct?
13    A.   Yes.  And if I could, I want to correct something that I
14    said yesterday.
15              THE COURT:  Well, just -- you just respond to
16    Ms. Whalen's questions, okay?
17              THE WITNESS:  Okay.
18    BY MS. WHALEN:
19    Q.   So Ms. Haynes, the oath that you took was essentially the
20    same oath that you took before the Grand Jury in July of 2020,
21    right?
22    A.   Yes.
23    Q.   And you told us yesterday that you lied before the Grand
24    Jury, right?
25    A.   Yes.
```

```
1    Q.   And the Grand Jury was a group of people, maybe not

2    seated like this in this courtroom, but a group of people much

3    like what you're testifying to in front of right now, right?

4    A.   Yes.

5    Q.   Now, yesterday I showed you a timeline --

6    A.   Yes.

7    Q.   -- do you recall that?

8         And at the bottom of the timeline, there were some spaces

9    for trial preparation.

10        Do you recall that?

11   A.   Yes.

12   Q.   And how many times in May -- strike that.

13        How many times did you meet with prosecutors and go over

14   what you're going to testify to?

15   A.   I think it was twice.

16   Q.   And do you think that was May of 2020?

17   A.   Yes.

18   Q.   Do you have a recollection now of the exact dates?

19   A.   No, I don't.

20   Q.   Now, the night before Ms. Jeffrey and her son were

21   killed, you were at your house when Mr. Briscoe left to go

22   over to hang with Jen, right?

23   A.   Yes.

24   Q.   And you then met up with -- or Theresa Cobb came over to

25   party with you, right?
```

```
 1    A.   Yes.
 2    Q.   So you were drinking that night?
 3    A.   Yes.
 4    Q.   Using drugs that night?
 5    A.   Yes.
 6    Q.   What drugs were you using?
 7    A.   Molly, marijuana, probably Percocet.
 8    Q.   I'm sorry, say that again.
 9    A.   Molly, marijuana, and probably Percocet.
10    Q.   Okay.  All, sort of, at the same time or one after the
11    other or how do you do that?
12    A.   Probably one after the other.
13    Q.   She stayed quite a while, right?
14    A.   Yes.
15    Q.   And at some point, roughly 4:00 or 5:00 in the morning,
16    you realized Mr. Briscoe isn't coming home, right?
17    A.   Yes.
18    Q.   And that's when you got on the phone trying to get him
19    there, right?
20    A.   Yes.
21    Q.   And you hadn't really slept because you're partying with
22    Theresa Cobb, right?
23    A.   Right.
24    Q.   So the next morning you have been up all night partying,
25    right?
```

```
 1      A.    Yes.
 2      Q.    So when you're talking to Shawn Gardner the next morning,
 3      you're sleepy, right?
 4      A.    Yes.
 5      Q.    The next day you called Tiera Haynes to take you to
 6      return the gun; is that correct?
 7      A.    I'm pretty sure it was that same day if it was 5 o'clock
 8      in the morning.
 9      Q.    Thank you for correcting me.  But we're talking about
10      later in that day you called Tiera to take you to return the
11      gun; is that correct?
12      A.    Yes.
13      Q.    And when you told us you were at Tiffany's that same day,
14      sort of, towards the evening hours, you actually saw drugs on
15      a big scale with a clock, right?
16      A.    Yes.
17      Q.    What room was that in at Tiffany's place?
18      A.    Her bedroom.
19      Q.    Her bedroom, okay?
20      A.    Yes.
21      Q.    Okay.  Thank you.
22              MS. WHALEN:  Your Honor, with the Court's permission
23      we'd like to pass out transcripts.
24              THE COURT:  All right.  That's fine.  This is of
25      what -- the date of what call, Ms. Whalen, just so I'm clear?
```

1      **MS. WHALEN:**  May 1st, 2015, Your Honor.

2      **THE COURT:**  May 1st, 2015.  That is Defendant's

3    Exhibit 74, and these transcripts are with respect to

4    Defendant's Exhibit 74.

5      Is that correct, Ms. Whalen?

6      **MS. WHALEN:**  Yes, Your Honor.

7      **THE COURT:**  All right.  Again, ladies and gentlemen,

8    just with the Government transcripts, these are what the

9    Defense believes are on the tape.  These items are not in

10   evidence.  They're meant to assist you right now, but the

11   recording will be in evidence and you can listen to it during

12   your deliberations.

13     (Recording played but not reported.)

14     **MS. WHALEN:**  And with the Court's permission --

15   sorry, I didn't finish my statement.  With the Court's

16   permission, we'll pass out another transcript.

17     **THE COURT:**  And this is having to do with --

18     **MS. WHALEN:**  This is having to do --

19     **THE COURT:**  Defendant's Exhibit 75, the May 9 call.

20     **MS. WHALEN:**  That's correct, Your Honor.  Thank you.

21     **THE COURT:**  Thank you.

22     Does everyone have -- some of the jurors don't have the

23   draft transcript.  This is the second one relating to

24   Defendant's Exhibit 75, which was introduced into evidence

25   yesterday, the May 9, 2015, telephone call between Ms. Haynes

```
 1    and Mr. Gardner.
 2            MS. WHALEN:  Thank you, Your Honor.
 3         (Recording played but not reported.)
 4            MS. WHALEN:  And the second clip, please.
 5         (Recording played but not reported.)
 6            MS. WHALEN:  And the next clip, please, Mr. Cadle.
 7         (Recording played but not reported.)
 8            MS. WHALEN:  Court's indulgence one moment.
 9         And the next clip, please.
10         (Recording played but not reported.)
11            MS. WHALEN:  And the final clip, please.
12         (Recording played but not reported.)
13    BY MS. WHALEN:
14    Q.   You sure were mad when you were talking to Mr. Gardner,
15    right?
16    A.   Yes.
17    Q.   And you were expressing to him how you felt about
18    Ms. Jeffery, right?
19    A.   Yes.
20    Q.   And that was -- well, May 9th was just two weeks before
21    she was killed, right?
22    A.   Yes.
23    Q.   And did you have your child with you when you were saying
24    all of this to Mr. Gardner?
25    A.   Yes.
```

```
 1     Q.   Right there next to you, right?
 2     A.   He probably was in his room or something.  I'm not sure.
 3     Q.   Okay.  No problem talking about killing somebody else in
 4     front of your child, right?
 5     A.   Like I said, he probably was in his room.
 6     Q.   Okay.
 7     A.   But also that videotape that you played where you said I
 8     wanted -- I said, I wanted to -- I been catching bodies since
 9     I was five.  No, I said, "She said she was catching bodies
10     since she was five."
11     Q.   Okay.  So that was Ms. Jeffrey's talking like she was
12     tough, right?
13     A.   Yes.
14     Q.   You never, ever told law enforcement that you threatened
15     to kill Jennifer Jeffrey and her child; did you?
16     A.   No, but I never threatened to kill her child.
17     Q.   You never, ever told law enforcement that you dressed up
18     in black and you went over to her house two days before and
19     had thoughts of killing her then, right?
20     A.   That's not what happened.  That's what I said, but that's
21     not what happened.  I can tell you what happened.
22     Q.   So now we have another lie.
23          Is that what it is?
24     A.   No, you have the truth.
25     Q.   How many times -- strike that.
```

```
 1           Have you counted how many times you've lied about this
 2    event?
 3    A.   Yes.
 4    Q.   How many times?
 5    A.   I'm not sure, but I'm telling the truth now.
 6    Q.   But you've counted them?
 7    A.   Well, no, I have not counted, but I know I've lied a lot,
 8    yes, I have.
 9    Q.   A lot, right?
10    A.   Yes.
11    Q.   You never told law enforcement that, "Killing is in my
12    blood," right?
13    A.   No.
14    Q.   And you never told law enforcement that, "The next person
15    who I let close and crosses me, I'm going to kill," right?
16    A.   I don't remember saying that because I was venting, like
17    I said.  On the phone message, I was venting.  I was upset.
18    Q.   Ms. Haynes, you just heard that?
19    A.   Yes.  I'm not saying I didn't say it, but why would I --
20    how can I tell them something I don't remember saying.
21    Q.   Fair enough.  You remember saying it now, right?
22    A.   Yes, I heard my voice.
23    Q.   And you were angry and meant what you said to
24    Mr. Gardner?
25    A.   No, I was venting as I stated in the call.
```

```
 1   Q.   All right.  Ms. Haynes, did law enforcement at any
 2   point -- I don't care which officer, which prosecutor, did
 3   anybody ask you if you had threatened Jennifer Jeffrey before
 4   she was killed?
 5   A.   I don't recall.
 6             MS. WHALEN:  Thank you.
 7             THE COURT:  Thank you, Ms. Whalen.  Thank you very
 8   much.
 9        And with that, redirect, Mr. Budlow?
10             MR. BUDLOW:  Thank you.
11             R E D I R E C T  E X A M I N A T I O N
12   BY MR. BUDLOW:
13   Q.   That was your voice we just heard on those calls,
14   Ms. Haynes?
15   A.   Yes.
16   Q.   You said all of those things?
17   A.   Yes.
18   Q.   And a lot of what you said was true?
19   A.   Yes.
20   Q.   You were jealous; correct?
21   A.   Yes.
22   Q.   Angry?
23   A.   Yes.
24   Q.   You said you wanted Jennifer dead?
25   A.   Yes.
```

```
1    Q.   Did you shoot Jen?

2    A.   No, I did not.

3    Q.   Who did?

4    A.   Andre Briscoe, the Defendant.

5    Q.   How do you know?

6    A.   Because he told me he did it and I provided him with the

7    gun.

8    Q.   When you left -- when the Defendant left for Jen's house

9    that morning, you testified earlier that you called him and he

10   didn't answer?

11   A.   Yes.

12   Q.   That you changed your mind?

13   A.   Yes.

14   Q.   Why did you change your mind?

15   A.   Because K was home, and I did not want anything to happen

16   to the baby.

17   Q.   Now, you, on cross-examination, talked about what you

18   hope happens as a result of your cooperation.

19        Do you remember that?

20   A.   Yes.

21   Q.   You were aware that you still face a maximum sentence of

22   life in prison?

23   A.   Yes.

24   Q.   And the Government's made no promise to you about what

25   sentence you'll receive?
```

```
 1    A.    Yes.
 2    Q.    And the judge can sentence you to any amount he thinks is
 3    appropriate?
 4    A.    Yes.
 5    Q.    And when you took the stand this morning, you mentioned
 6    something about your testimony yesterday that you wanted to
 7    make a correction?
 8    A.    Yes.
 9    Q.    What happened when you left here yesterday in terms of
10    that testimony?
11    A.    I remembered she asked me on the 8th did I tell the
12    complete truth about Andre's plan to kill Jennifer Jeffrey and
13    her son, and I said yes.  But I did not tell the complete
14    truth to the Government until the 10th of September, and I
15    just had gotten my dates confused.
16    Q.    And when you said "she," are you referring to a question
17    by Ms. Whalen from yesterday?
18    A.    Yes.
19    Q.    And when you say 8th, could you tell us what days, the
20    full date?
21    A.    March the 8th.
22    Q.    And when did you realize that you thought you testified
23    to something inaccurately yesterday?
24    A.    On the ride -- on the way back to the prison.
25    Q.    And did you communicate that information to your
```

1    attorney?

2    A.   Yes.

3    Q.   And is it your understanding that she communicated that

4    information to counsel?

5    A.   Yes.

6    Q.   Why, if you have lied so much in the past, did you want

7    to correct that testimony today?

8    A.   Because I came here to tell the truth.  I've been living

9    with this for seven years now and it felt good to get it off

10   of my chest.

11   Q.   You were asked some questions about your interviews on

12   both March the 8th, 2021, and April 15th, 2021?

13   A.   Yes.

14   Q.   Do you remember being asked about those yesterday?

15   A.   Yes.

16   Q.   And when Defense Counsel asked you -- I think I'm

17   accurate, but I believe you were asked if the first time the

18   jail call between you and Tariek came up was during your

19   interview with law enforcement on April 15th when the call was

20   played for you.

21        Do you remember being asked about that?

22   A.   Yes.

23   Q.   Isn't it, in fact, true that you brought up that jail

24   call on March 8th, 2021?

25   A.   Yes.

```
1    Q.   And to your knowledge, at the time you brought that call

2    up, did anybody on the investigative team have any idea about

3    that jail call?

4    A.   No.

5    Q.   And they found it after you told them about it?

6    A.   Yes.

7              MR. BUDLOW:   Thank you.   That's all I have, Your

8    Honor.

9              THE COURT:   Thank you very much, Mr. Budlow.

10        Recross just on these points, Ms. Whalen?

11              R E C R O S S - E X A M I N A T I O N

12   BY MS. WHALEN:

13   Q.   You were driving home -- or excuse me, back to prison

14   last night and you realized you made a mistake about a date?

15   A.   Yes.

16   Q.   Okay.   Ms. Haynes, the truth is really based upon who

17   you're talking to, right?

18   A.   No.   The truth is the truth all of the time.

19   Q.   And your truth to law enforcement for years was different

20   than what you've testified to yesterday, right?

21   A.   Yes.

22              MS. WHALEN:   Thank you.   That's all I have.

23              THE COURT:   Thank you very much, Ms. Whalen.

24        Ms. Haynes, you may step down.

25        Marshal, you will take her back to the custody area.
```

1        You should not discuss your testimony with anyone, Ms.

2    Haynes, in the event you are called back to the witness stand

3    before this trial concludes.

4        Thank you very much.

5              **THE WITNESS:**  Thank you.

6              **THE COURT:**  Next witness, Mr. Budlow.

7              **MR. BUDLOW:**  Yes.  Thank you, Your Honor.  The next

8    witness is Corporal Edward Howard.

9              **THE COURT:**  Come forward, sir, and be sworn.

10             **THE CLERK:**  Please remain standing and raise your

11   right hand for me, please.

12   **SERGEANT EDWARD HOWARD,** having been duly sworn, was

13   examined and testified as follows:

14             **THE WITNESS:**  Yes.

15             **THE CLERK:**  Have a seat.  And while speaking clearly

16   into the microphone, can you please state and spell your full

17   name for the record.

18             **THE WITNESS:**  Sergeant Edward L. Howard,

19   H-o-w-a-r-d, with the Cambridge Police Department.

20              D I R E C T   E X A M I N A T I O N

21   **BY MR. BUDLOW:**

22   Q.   Good morning, Sergeant Howard.  I said you were a

23   corporal.  You're now a sergeant?

24   A.   I was up for promotion about two months ago.

25   Q.   Congratulations.

```
 1     A.    Thank you, sir.

 2     Q.    How are you employed?

 3     A.    I'm currently employed with the Cambridge Police

 4     Department as a road shift supervisor as well as an assistant

 5     supervisor to our entry team.

 6     Q.    How long have you been with the Cambridge Police

 7     Department?

 8     A.    This July will be going on 11 years.

 9     Q.    And very briefly, generally, what are your prior

10     assignments?

11     A.    When I first came out of the academy, I was assigned to

12     the road for approximately a year and a half.  Spent

13     approximately six and a half, seven years doing narcotics

14     investigations and I've been on the entry team for

15     approximately ten years.

16     Q.    What was your assignment in June of 2015?

17     A.    I was assigned to our criminal investigations division

18     and I was still a member of the entry team at that time.

19     Q.    And were you working on June the 5th, 2015?

20     A.    Yes, sir.

21     Q.    Did you become aware of an operation or a search warrant

22     that was going to be executed at the Greenwood Avenue

23     Apartments?

24     A.    Yes, sir.

25     Q.    And had you learned about that the night before on June
```

```
 1    the 4th?
 2    A.   We received a message that we had an operation, but we
 3    didn't know the details of exactly what we were doing until
 4    the briefing the next day.
 5    Q.   And when you say "The briefing," there was a meeting at
 6    the Cambridge Police Department on June 5th in the morning?
 7    A.   Yes, sir.
 8    Q.   And that's when you received additional information about
 9    that op -- what you guys would call an operation?
10    A.   Yes, sir.
11    Q.   Were detectives from Baltimore Police Department present?
12    A.   Yes, sir.
13    Q.   And did you get an overview of what they were
14    investigating and where you were going and who you were
15    looking for?
16    A.   Yes, sir.
17    Q.   And who were you looking for?
18    A.   We were advised that we were looking for a male subject
19    by the name of Andre Briscoe.
20    Q.   And were you already familiar with the Greenwood Avenue
21    Apartment Complex?
22    A.   Yes, sir.
23    Q.   Following the meeting, what did you and the team do,
24    generally?
25    A.   After the meeting, the team briefs on the particular
```

1    members' assignment for that, and then we proceed to the

2    location to execute the search warrant.

3    Q.    Showing you Government's Exhibit 4.1, do you recognize

4    this sort of U-shaped development?

5    A.    Yes, that is the 500 block of the Greenwood complex.

6    Q.    And I'm now showing you Government's Exhibit 4.2.  Is

7    that 502 Greenwood?

8    A.    Yes, sir.

9    Q.    And is that one of the buildings in the U-shape that we

10   just saw?

11   A.    Yes, sir.

12   Q.    And where was the at least initial thought as to where

13   you were going to be executing the search warrant within this

14   building?

15   A.    We were directed to the bottom floor apartment on the

16   right-hand side.

17   Q.    And that U-shape is not one continuous building, it's

18   separate buildings; correct?

19   A.    Correct.  There is a cut-out where there is dumpsters

20   placed between the first part of the U and the back part of

21   the U, and then on the other side there is a walkway to the

22   600 side of Greenwood Avenue.

23   Q.    And each building is laid out generally the same?

24   A.    Yes, sir.

25   Q.    Okay.  And if we could just go through it quickly.  There

```
1    is three levels?

2    A.   Yes, sir.

3    Q.   And there is an apartment on each level?

4    A.   Yes, sir.

5    Q.   So looking at this exhibit in front of you, there would

6    be -- to the left of the staircase is -- there's one apartment

7    on the left on the first floor, one on the second floor, one

8    on the third, and then the same on the right?

9    A.   Yes, sir.

10   Q.   And did -- was the search warrant executed at Apartment

11   101 initially?

12   A.   Yes, sir.

13   Q.   And was the person that you were looking for Andre

14   Briscoe present?

15   A.   No, sir.

16   Q.   After it was learned that Mr. Briscoe was not in

17   Apartment 101, what happened next?

18   A.   The team backed out of that apartment and detectives as

19   well as officers began engaging in knock and talks.

20   Q.   Could you give us a sense, at least, of the first entry?

21   Without going through all of the procedures, how loud is the

22   initial entry in terms of law enforcement's noise that they're

23   making right before entry?

24   A.   The knock is very loud.  It's a forceful knock, almost as

25   if somebody is kicking the door to make persons inside the
```

```
 1    residence as well as in the surrounding area know that we are
 2    the police and we announce, "Cambridge Police search warrant"
 3    in order to inform everybody that we are the police, and the
 4    nature for being at that residence.
 5    Q.   And did officers then move to some of the other
 6    apartments within this building interacting with residents?
 7    A.   Yes, sir.
 8    Q.   And was the level of volume and force the same at those
 9    apartments?
10    A.   No, sir.
11    Q.   And why is that?
12    A.   One, we didn't have a warrant for those residents at that
13    time.  We conduct ourselves in a more business-like manner.
14    It's a cordial knock.  It's loud enough almost as to announce
15    to your friend, "Hey, I'm over here for dinner or whatnot."
16    It's a very cordial and polite process.
17    Q.   And was the search warrant executed at the -- was this
18    101 on the bottom left?
19    A.   Yes.
20    Q.   And then were you aware that officers checked 102 on the
21    bottom right and 201 on the middle left for Mr. Briscoe and he
22    wasn't at any of those locations?
23    A.   That's correct, sir.
24    Q.   And do you recall officers, including yourself,
25    approaching Apartment 202, which would be second floor right
```

```
 1    side?

 2    A.    Yes, sir.

 3    Q.    And who, generally, was there, do you recall, outside of

 4    the building -- sorry, outside of the apartment?

 5    A.    It was members of our entry team.  We were assisting with

 6    the knock and talks, but the persons immediately at the door

 7    were representatives from Baltimore City Police Department.

 8    Q.    And describe what happened next.

 9    A.    Again, it was a cordial knock at the door.  We waited for

10    a response when the door was opened.

11    Q.    And then what happened?

12    A.    The detective from Baltimore and the male party that

13    answered the door had a cordial conversation.

14    Q.    And did you observe the person that answered the door

15    inside at all?  Could you see him?

16    A.    Yes.

17    Q.    And could you see if he did or said anything when first

18    interacting with the officers?

19    A.    He completely opened the door and motioned towards the

20    couch that was sitting right in the door, the door jamb view.

21    Q.    When -- and did officers go in following his motion?

22    A.    They stepped in, yes.

23    Q.    And did you go in?

24    A.    Eventually, yes.

25    Q.    And were guns initially drawn at the crossing of the
```

```
1    threshold into that apartment?

2    A.   No, sir.

3    Q.   What happened after you walked in?

4    A.   When we walked in, we observed the male party who

5    answered the door, as well as another male party on the couch.

6    Then a third male party came into view and quickly entered

7    into one of the back bedrooms.

8    Q.   And then what happened to the back bedroom door?

9    A.   The back bedroom door was slammed and shut forcefully.

10   Q.   So your initial entry, you saw three individuals?

11   A.   Correct.

12   Q.   Okay.  So one who answered the door, one was on the

13   couch?

14   A.   Yes, sir.

15   Q.   And did you later come to learn the identity of the

16   person on the couch?

17   A.   Yes.

18   Q.   And who was that?

19   A.   Mr. Andre Briscoe.

20   Q.   And do you see him in the courtroom?

21   A.   Yes, sir.

22   Q.   Can you point to him?

23             MR. PURPURA:  We'll stipulate he identified

24   Mr. Briscoe.

25             THE COURT:  The record will reflect the witness has
```

```
 1        identified the Defendant, Andre Briscoe.

 2        BY MR. BUDLOW:

 3        Q.   When you entered and one of the individuals, not the

 4        Defendant, ran to the back and slammed the door, how did that

 5        change the conduct of law enforcement at that time?

 6        A.   We perceived it as a threat, because that individual's

 7        demeanor did not match the calm nature of the two persons

 8        initially at the door and the entryway.

 9        Q.   What did officers then do?

10        A.   Officers drew their weapons and gave commands for the

11        individual to come out and show his hands.

12        Q.   Did anyone come out of that bedroom?

13        A.   Yes.

14        Q.   How many people?

15        A.   Two.

16        Q.   And when they came out, did they comply?

17        A.   Yes.

18        Q.   Okay.  Were those individuals, as well as the others,

19        initially detained?

20        A.   Yes, sir.

21        Q.   And by detained, you mean placed in restraints or

22        handcuffs?

23        A.   Yes, sir.

24        Q.   Did you also see a person that you knew from prior

25        experience named Tonya Harris at that house?
```

```
 1    A.    Yes, sir.
 2    Q.    And when I say "prior experience," you hadn't arrested
 3    her previously; had you?
 4    A.    No, sir.
 5    Q.    What was the nature, very generally, of your interaction
 6    with her previously?
 7    A.    She was having problems with her child at school and I
 8    was trying to alleviate.  It was more of a civil matter and
 9    trying to get her some assistance with the child and the
10    problem that he was having.
11    Q.    This was an elementary school-age child?
12    A.    Yes, ma'am.
13    Q.    Did you speak to Ms. Harris that day?
14    A.    I did.
15    Q.    When she first came out -- I should say, when you first
16    saw her, can you describe her demeanor?
17    A.    She was very upset, yelling.
18    Q.    Could you tell who she was upset with or yelling at?
19    A.    She appeared to be yelling at the persons within the
20    residence.
21    Q.    Not you?
22    A.    No.
23    Q.    All right.  Back to the person on the couch that you've
24    identified as the Defendant, once the individuals came out
25    from the back room, was he also placed in cuffs?
```

```
1    A.    Yes.

2    Q.    What, if anything -- and were you involved in that?

3    A.    I was myself and Corporal Daniel.

4    Q.    And had you seen him previously before he was placed in

5    cuffs on the couch?

6    A.    Yes.

7    Q.    Do you remember if he was sitting or lying or something

8    else?

9    A.    He was definitely siting.  There was a sheet there.  What

10   appeared to be someone had been sleeping there.

11   Q.    And did you engage in any routine or, sort of, quick

12   search as you placed him in cuffs?

13   A.    Yes.  After he was stood up and placed in cuffs, we did a

14   cursory check of the couch to make sure that there's no

15   weapons or anything of that nature that the subject can get

16   to, and then he was seated back on the couch.

17   Q.    When you did that cursory search for weapons, did you

18   find anything?

19   A.    When we sat him back down on the couch, I noticed that he

20   was sitting on a cell phone.

21   Q.    What did you do with the phone?

22   A.    I inquired if the phone was his and asked him if I could

23   move it.

24   Q.    What did he respond, first when you inquired if it was

25   his?
```

```
1    A.    He identified the phone as being his, and he gave me

2    consent to move it so it would not be damaged.

3    Q.    And what did you do, ultimately, with that phone?

4    A.    I sat it on a table within his reach, and the detectives

5    from Baltimore were notified of him, as well as the phone.

6    Q.    When you entered the residence, you saw him sitting on

7    the couch?  Was anybody else on that couch?

8    A.    Anybody else on the couch?  No.

9    Q.    When you interacted with the Defendant, would you

10   describe him as cooperative?

11   A.    Absolutely.

12   Q.    How long do you think you remained in the apartment that

13   day?

14   A.    I was probably on scene better part of an hour.

15   Q.    Was the Defendant there the entire time?

16   A.    While he was my responsibility, yes.

17   Q.    No, but you were in there for more than an hour.  My

18   question is, was the Defendant there that whole hour?

19   A.    At some point, he was transported by other members.

20   Q.    And you remained?

21   A.    Yes.

22   Q.    And when he was transported, was he still in handcuffs?

23   A.    I wasn't there when he was transported, I was relieved of

24   my assignment and tasked with something else.  I couldn't

25   advise that.
```

```
 1              MR. BUDLOW:  May I approach, Your Honor?

 2              THE COURT:  Yes, certainly.

 3       BY MR. BUDLOW:

 4       Q.   Showing you Government's Exhibit 4.16, do you recognize

 5       this item?

 6       A.   Yes, sir.

 7       Q.   What is that?

 8       A.   It is the cell phone that was recovered from the couch.

 9            (Counsel confer.)

10              MR. BUDLOW:  Thank you, Sergeant.  That's all I

11       have.

12              THE COURT:  Thank you, Mr. Budlow.

13            Cross-examination, Ms. Whalen?

14              MS. WHALEN:  Thank you, Your Honor.

15              C R O S S  -  E X A M I N A T I O N

16       BY MS. WHALEN:

17       Q.   Sergeant Howard, you knew the Greenwood Apartments and

18       were familiar with them, right?

19       A.   That's correct, ma'am.

20       Q.   And you had been there on other occasions; correct?

21       A.   Yes, ma'am.

22       Q.   And you knew that there had been drug activity in or

23       around those apartments; is that correct?

24       A.   Yes, ma'am.

25       Q.   And when you were executing the search warrant, your plan
```

```
1    -- I mean, you collectively, all of the officers, the plan
2    was, of course, to first secure the apartment; right?
3    A.   The initial apartment, yes, ma'am.
4    Q.   All right.  Let's focus just on Apartment 201.  When you
5    went inside, at first you were cordial and everything was
6    fairly calm, right?
7    A.   201 or 202, ma'am?  201 or 202?  I had --
8    Q.   What was the apartment that you found Mr. Briscoe?
9    A.   202.
10   Q.   Pardon me.  202, let's focus on that, please.
11   A.   Yes, ma'am.
12   Q.   When you first went in, you said that things were cordial
13   and fairly calm; is that correct?
14   A.   Yes, ma'am.
15   Q.   But within seconds, was it, you saw an individual run to
16   the back?  Was that right?
17   A.   Yes.  After the initial conversation at the door, I would
18   say it was seconds, yes, ma'am.
19   Q.   And that was not Mr. Briscoe, right?
20   A.   No, ma'am.
21   Q.   He was -- you told us now he was sitting on the couch; is
22   that correct?
23   A.   Yes.
24   Q.   And he was actually, when you first went in, lying on the
25   couch; isn't that right?
```

```
1    A.   I don't remember seeing him in a laying position.  I know
2    when he came into my view, because I was not the initial
3    officer at the door, he was in a seated position.
4    Q.   You have testified about these events in the past at a
5    separate hearing, right?
6    A.   Yes.
7    Q.   Would it help you to refresh your recollection as to
8    whether he was lying or sitting by looking at a document?
9    A.   Yes, ma'am.
10   Q.   All right.  I'm going to show you what will be marked as
11   Defendant's Exhibit 128.
12           THE COURT:  All right.  This is for identification
13   only, Ms. Whalen?
14           MS. WHALEN:  It is, Your Honor.  Thank you.
15           THE COURT:  Okay.  Thank you.
16   BY MS. WHALEN:
17   Q.   I'm going to direct you down to the last answer on this
18   document.
19   A.   Yes, ma'am.
20   Q.   Does that help you remember that he was laying at first?
21   A.   Yes, it -- the couch was set up in a sleeping
22   arrangement-type configuration, yes.
23           MR. BUDLOW:  Page number was that.
24           MS. WHALEN:  128, sorry.
25   BY MS. WHALEN:
```

1    Q.   And he was calm; correct?

2    A.   Yes, ma'am.

3    Q.   Unlike the person who ran to the back, right?

4    A.   Yes, ma'am.

5    Q.   And the person who ran to the back was Tony Harris; is

6    that correct?

7    A.   I don't know the name of the male.  I just had contact

8    with the female subject prior.

9    Q.   When you go into an apartment, after you make sure that

10   everything is secure and no one is in danger, then a search

11   happens; correct?

12   A.   If a search warrant was obtained, yes.

13   Q.   And in this case there was a search warrant, right?

14   A.   Yes.

15   Q.   And you've been trained, have you not, in searching

16   apartments, houses, whatever it may be, right?

17   A.   Yes, ma'am.

18   Q.   You want to look for any drugs in any place they could be

19   hidden; correct?

20   A.   If that's what the warrant is for, yes, ma'am.

21   Q.   So this warrant, if you recall, if you don't, it's fine,

22   but this was for drugs and weapons, right?

23   A.   I had nothing to do with the authoring of that warrant,

24   so I couldn't tell you verbatim what was typed in that

25   affidavit for that judge.

1    Q.   And clear, though, that if you're in someone's apartment,

2    you're looking for weapons to make sure that you guys are safe

3    and everyone is safe; correct?

4    A.   On the initial entry, yes.  If it's in plain view, we're

5    not going to necessarily go toss the house looking for weapons

6    without proper paperwork, no, ma'am.

7    Q.   Sure.  And I'm assuming you had proper paperwork,

8    Sergeant.  So with the proper paperwork, if you saw a weapon

9    anywhere in the apartment, you, meaning the collective group

10   of officers, are going to take that weapon, right?

11   A.   Yes, ma'am.

12   Q.   Now, in your experience, people hide drugs or weapons in

13   all kinds of places, right?

14   A.   That's correct.

15   Q.   Sometimes in freezers, right?

16   A.   Yes, ma'am.

17   Q.   Sometimes in drawers?

18   A.   Yes, ma'am.

19   Q.   And sometimes under furniture?

20   A.   Yes, ma'am.

21   Q.   And so it would be important to search every location in

22   that apartment to see if you can find whatever it is you're

23   looking for; correct?

24   A.   That is correct.

25   Q.   And throughout the entire time that you were present at

1    Apartment 202, Mr. Briscoe's demeanor never really changed,

2    right?

3    A.   That's correct, ma'am.

4    Q.   You cuffed him, placed him sitting back down on the

5    couch; correct?

6    A.   Yes, ma'am.

7    Q.   And he was calm with you when you found the phone and sat

8    it aside, right?

9    A.   Yes, ma'am.

10   Q.   And he was pretty much compliant with whatever you asked

11   him to do, right?

12   A.   Yes, he never gave us any trouble.

13   Q.   Now, when you were at the apartment complex, you

14   indicated you went into a different house -- or apartment at

15   one point, right?

16   A.   Yes.

17   Q.   And how long would you say that you all were at that

18   apartment complex before -- let me -- if I may -- before you

19   went into Apartment 202?

20   A.   I would say we were there roughly 30, maybe 40 minutes

21   after the execution of the initial warrant.

22   Q.   And so Apartment 101, you banged very loudly to make sure

23   everyone knew you were police and you were coming in, right?

24   A.   That's correct.

25   Q.   And then the other apartment you knocked, right?

```
 1    A.    Correct.
 2    Q.    But there were a lot of police on those steps in varying
 3    locations; correct?
 4    A.    That's correct.  It's a small landing.
 5    Q.    And no one that you recall came out of the apartments and
 6    ran, right?
 7    A.    No.
 8          MS. WHALEN:  Thank you, Sergeant Howard.  That's all
 9    I have.
10          THE WITNESS:  Yes, ma'am.
11          THE COURT:  Thank you very much, Ms. Whalen.
12       Any further questions, Mr. Budlow?
13          MR. BUDLOW:  Very, very briefly.
14          R E D I R E C T   E X A M I N A T I O N
15    BY MR. BUDLOW:
16    Q.    This was not a drug warrant, right?
17    A.    No.
18    Q.    And in executing search warrants in your career --
19    A.    Yes, sir.
20    Q.    -- have you ever missed the drugs?
21    A.    Absolutely.
22          MR. BUDLOW:  That's all I have.
23          THE COURT:  Thank you very much, Mr. Budlow.
24       Sergeant Howard, you may step down, sir.  You shouldn't
25    discuss your testimony with anyone in the event that you're
```

```
 1    called back to the witness stand until this trial concludes
 2    next week.
 3                THE WITNESS:  Yes, Your Honor.
 4                MS. WHALEN:  Your Honor, could I collect the exhibit
 5    up there?
 6                THE COURT:  Sure.  Sure.
 7          (Counsel confer.)
 8                THE COURT:  Next witness will be --
 9                MR. BUDLOW:  Thank you, Your Honor.
10                THE COURT:  -- Sergeant Benton from the Cambridge
11    Police Department?
12                MR. BUDLOW:  Yes, Jennifer Benton.
13                THE COURT:  All right.
14          Yes, Your Honor.  If you'll come forward here please and
15    be sworn.  Thank you.
16                THE CLERK:  Please remain standing and raise your
17    right hand for me, please.
18          SERGEANT JENNIFER BENTON, having been duly sworn, was
19    examined and testified as follows:
20                THE WITNESS:  Yes.
21                THE CLERK:  You may have a seat.
22          And while speaking clearly into the microphone, can you
23    please state and spell your full name for the record.
24                THE WITNESS:  Sergeant Jennifer Benton, B, as in
25    boy, e-n-t-o-n.
```

1          **THE COURT:**   Good morning, Sergeant Benton.   I

2     overlooked doing this with Sergeant Howard previously.   I just

3     forgot to do this.   The standing order of this Court provides

4     that masks are to be worn in all public areas of the

5     courthouse as a continued precaution as to the COVID-19

6     pandemic, but in the discretion of a Presiding Judge in a

7     courtroom, if persons have been fully vaccinated, meaning two

8     vaccinations, they can pull their mask down while speaking.

9          Have you been vaccinated?

10          **THE WITNESS:**   Yes, Your Honor.

11          **THE COURT:**   So if you would like, you can pull your

12     mask down while you're testifying.   You don't have to.   It's

13     strictly up to you.

14          **THE WITNESS:**   Yes.

15          **THE COURT:**   You can take your mask off now if you

16     want, you're free to do so.   Thank you very much.

17          Mr. Budlow, you may proceed.

18          **MR. BUDLOW:**   Thank you, Your Honor.

19            D I R E C T   E X A M I N A T I O N

20     **BY MR. BUDLOW:**

21     Q.   Good morning, Sergeant Benton.

22     A.   Good morning.

23     Q.   How are you employed?

24     A.   With the Cambridge Police Department.

25     Q.   How long have you been a member of the Cambridge Police

```
 1       Department?
 2       A.   A little over 17 years.
 3       Q.   And what's your current assignment?
 4       A.   I'm a road sergeant.
 5            THE COURT:   Keep your voice up into the microphone,
 6       please.  I'm sorry.
 7            THE WITNESS:   I'm sorry.
 8       BY MR. BUDLOW:
 9       Q.   You're a senior road sergeant?
10       A.   I'm a road sergeant, yes.
11       Q.   In June of 2015, what was your assignment?
12       A.   Detective.
13       Q.   Were you involved in the execution of a search warrant at
14       502 Greenwood Avenue in Cambridge on June 5th, 2015?
15       A.   Yes, I was.
16       Q.   What was your role?
17       A.   I was to respond to document, photograph, and collect any
18       evidence.
19       Q.   Showing you 4.1, is that the complex where the search
20       warrant was executed?
21       A.   Yes, it is.
22       Q.   And 4.2, is that the building where it was executed?
23       A.   Yes.
24       Q.   Did you document that scene by taking photographs?  Not
25       this photograph.  When you did the search warrant --
```

```
 1    A.    Yes.

 2    Q.    -- did you document the scene by taking photographs?

 3    A.    Yes, I did.

 4    Q.    And did that include taking overall photos at the time of

 5    entry, as well as photographs at the seizure of evidence?

 6    A.    Correct.

 7    Q.    Showing you Government's Exhibit 4.5, maybe.  Starting

 8    with page 1, can you describe that photograph, what it is?

 9    A.    That would be the main door, the only door to 502

10    Greenwood Avenue, Apartment 202.

11    Q.    Page 2?

12    A.    That would be a photograph taken from the threshold of

13    the door that you just saw looking into the living room, two

14    couches and an end table.

15    Q.    So this doorknob is the entry door?

16    A.    That's correct.

17    Q.    And immediately in front of that entry door as it's open

18    is a couch facing away from the door?

19    A.    Yes.

20    Q.    Another couch facing you?

21    A.    Yes.

22    Q.    And what's this area back here where I have my cursor?

23    A.    That is the area that would lead you to the three

24    bedrooms and the bathroom.

25    Q.    Is that the beginning of a hallway there?
```

```
 1     A.    Yes, it is.

 2     Q.    And what is to the right of this photograph?

 3     A.    A kitchen and dining area.

 4     Q.    All right.  Turn to page 12.  Let me get there first.

 5     What's on page 12?

 6     A.    This would be an image from the kitchen pointed towards

 7     the front entry of 502, 202.

 8     Q.    And the couch facing away from the door is visible?

 9     A.    Yes.

10     Q.    Page 4.  Give me one sec.  Okay.  Page 4.

11     A.    Okay.  This would be a depiction of the kitchen dining

12     area to the right of the main entrance.

13     Q.    Page 17?

14     A.    So this would be a picture of the main bathroom of the

15     apartment, which is to the right of the entrance to that

16     hallway that you depicted earlier.

17     Q.    So on page 1 where you were -- or page 2 when you were

18     looking in, you could see a hallway.  There is, if you would

19     go to that hallway and turn right, the view?

20     A.    Yes.

21     Q.    So there is a bathroom directly in front.  Could you tell

22     us what these two doors are to the left?

23     A.    So where you have your cursor right now, just immediately

24     left to the doorway of the bathroom, that is the first bedroom

25     that I've labeled as Bedroom No. 1, and then you can see as
```

1    closest to this picture to the far left, another bedroom which

2    would be Bedroom No. 2.

3    Q.   Now, some evidence was seized from one of the bedrooms in

4    this -- during this search.  Which bedroom was it?

5    A.   That would be Bedroom No. 1.

6    Q.   So the back, the last bedroom on the left?

7    A.   Correct.

8    Q.   All right.  Turning to Page 32, what does page 32 depict?

9    A.   So if you were to -- Bedroom No. 3, if you were to turn

10   around from the bathroom where you were just standing, you

11   would be looking down that hallway to the Bedroom No. 3.

12   Q.   And so where this officer is with the vest on the left

13   side of the photo, what's in that direction?

14   A.   The return into the living room towards the front of the

15   apartment.

16   Q.   And the end of the hallway where my cursor is here is

17   Bedroom 3?

18   A.   Correct.

19   Q.   Was suspected drugs and drug paraphernalia seized during

20   this search?

21   A.   Yes.

22   Q.   Turning to page -- and you said from which bedroom?

23   A.   Bedroom No. 1.

24   Q.   Turning to page 38, can you describe what bedroom this

25   was in, and what's depicted?

1    A.    So this would be through -- excuse me, from Bedroom No.

2    1, and this is an image of a Newport cigarette box and a clear

3    baggie with some white substance that was pulled from it.

4    Q.    Page 39?

5    A.    This is a reference of where that item was located.  It's

6    a top drawer dresser when you come into Bedroom No. 1,

7    immediately to your right.

8    Q.    Let me scroll through three photos and ask you about

9    them, 49, 48, and 47.  Tell us what's depicted in those

10   photographs and where are the scenes from?

11   A.    So this is a -- what I've labeled as a long pill bottle.

12   It had an assortment of different pills, tablets in there.

13   And that was -- that particular one was to the left of that

14   same dresser that I was referencing behind a chair.  To the

15   right of the bed, to the left of the little dresser.

16   Q.    All right.  Moving to page 56, and then I'll show you 57

17   before going back to 56.  What's depicted in those two

18   photographs?

19   A.    So what you'll see here is from Bedroom No. 1, there was

20   a TV, entertainment center.  You're looking at a pair of what

21   I call Muck boots, and in the right shoe is clear plastic

22   baggies contained in a plastic bag.  So there are several

23   little baggies, and then to the left shoe, that's just debris

24   when it was picked up, a paper towel came out that had a glass

25   smoking device wrapped in it.

```
1    Q.   Page 58 and 59?

2    A.   Okay.  That is the paper towel with the glass smoking

3    device wrapped in it.

4    Q.   And those were found inside this left, what you described

5    a Muck boot that's depicted on page 57; is that right?

6    A.   Yes.

7    Q.   Turning to page 60.  This is -- what does this depict?

8    A.   So where the Muck boots were in front of that where the

9    toes are --

10   Q.   Turning back quickly to 57, it shows the Muck boots.  Was

11   there a box in front?

12   A.   Correct.  That's a shoebox.  In the shoebox were

13   suspected used, unused Latex gloves.

14   Q.   Turning -- I'm going to do both, 61 and 62?

15   A.   Okay.  Little difficult to see, but if you see where the

16   glove is, there is a container that's being held that's also

17   black in color, that contained items for Narcan and unused

18   syringe, syringes.

19   Q.   Go to Government Exhibit 4.17 specifically to page 13.

20   This is photograph of that same piece of evidence?

21   A.   Yes, it is.

22   Q.   Describe what we're looking at.

23   A.   So the black container that had the syringes and the

24   locks on, which is Narcan.

25   Q.   All right.  And that's what was obscured by the black
```

1    glove, you're saying?

2    A.    Yes.

3    Q.    Going back to Government's Exhibit 4.5 page 66, one

4    second.

5          What's depicted on page 66?

6    A.    So that's a little red bag that has a plastic baggie with

7    a cotton swab.

8    Q.    And where was that seized from?

9    A.    That one, if I could just reference, I believe front

10   Bedroom No. 1.  The exact location was behind the bed.

11   Q.    Going to page 67 and I'm also going to show you 70.

12   A.    Okay.

13   Q.    Back to 67.  What's 67?

14   A.    So that was a bag purse that I called it, and that was

15   located also in Bedroom No. 1, and there is a cell phone that

16   has a little heart on it.

17   Q.    Was there also a black plastic bag inside that purse?

18   A.    The second image from that.

19   Q.    Turn to page 70.

20   A.    Yes.  That black plastic bag also had a pill bottle with

21   unknown white tablets.

22   Q.    All right.  While you were in that bedroom, Bedroom No.

23   1, did you observe any mail?

24   A.    I did.

25   Q.    Turning to page 41, is the mail depicted somewhat in this

 1    photograph?

 2    A.   Yes, there is an envelope there, but on top of the

 3    dresser is where the brunt of that mail was.

 4    Q.   All right.  I'm going to go to page 43 and show you --

 5    I'll show you three -- there's 43, 44, 45.  We'll go back to

 6    43.  What do those generally depict?

 7    A.   That is mail from District Court displaying the name of

 8    Terrill Harris.

 9    Q.   And I left out 46.  Is that also another document with

10    the name Terrill Harris?

11    A.   Correct.

12    Q.   Now, going to page 55, is that another document that you

13    found inside Bedroom No. 1?

14    A.   Yes.

15    Q.   And whose names -- what are the names on that document?

16    A.   James Ripka and Tony Harris.

17    Q.   And was any other mail found inside that bedroom?

18    A.   No.

19    Q.   Again, going back to Government's Exhibit 4.17, this is

20    an exhibit of 20 photographs.  Are you familiar with the

21    exhibit?

22    A.   Yes, I am.

23    Q.   Does it depict some of the evidence that you seized from

24    Bedroom No. 1 on June 5th, 2015?

25    A.   Yes.

```
1     Q.   Going to Photograph 2, can you describe generally what we

2     see here?

3     A.   So those are the items of the Newport cigarette with the

4     clear baggie below it with this white substance.  There is a

5     small digital scale to the left.

6     Q.   It's this that I'm zoomed in on?

7     A.   Correct.  Now, you'll see the -- up above you'll see

8     these little clear plastic baggies with the apple on it, that

9     contains smaller, little individual baggies, which those

10    plastic bags to the right of that, those baggies were in that?

11    Q.   These baggies, the little tiny bags inside a Ziploc bag

12    were inside these sandwich bags?

13    A.   Yes.

14    Q.   Got it.

15    A.   Then the other two plastic bags you see to, like, the

16    left and the right of the Newport cigarette box and the scale,

17    those are our bags for packaging.

18    Q.   This bag here on the left?

19    A.   Yes.

20    Q.   And this bag here on the right?

21    A.   Yes, minus the little baggies in there.

22    Q.   And where is all of the evidence in photograph 2 or 4.17

23    seized from?

24    A.   The top drawer of the dresser in Bedroom No. 1.

25              MR. BUDLOW:  May I approach, Your Honor?
```

```
 1              THE COURT:  Certainly.
 2              MR. BUDLOW:  4.7.
 3              THE COURT:  This is exhibit number what, I'm sorry?
 4              MR. BUDLOW:  4.7.
 5              THE COURT:  Thank you.
 6    BY MR. BUDLOW:
 7    Q.   Can you tell us what that is?
 8    A.   This is a bag containing the items that are up on the
 9    screen:  The digital scale, Newport box, the white bag with
10    white substance and the plastic bags, baggies with the little
11    baggies in it.
12    Q.   4.8?
13    A.   This is -- I'm sorry, this is the long pill bottle that
14    was located in Bedroom No. 1 with the label obscured.
15    Q.   4.9?
16    A.   So this is the black plastic baggie that contained an
17    unlabeled pill bottle with white tablets that came from the
18    black purse bag from Bedroom No. 1.
19    Q.   And is that 4.10 on the Government's exhibit?
20    A.   Yes.
21    Q.   Okay.  I may have misidentified that, 4.9?
22    A.   Okay.  4.9 is the contents of the large pill bottle.
23    Each individual pill was separated into smaller plastic
24    baggies.
25    Q.   4.12?
```

```
1    A.    Do you want me to take it out?

2    Q.    No, you can just look at it and describe it.

3    A.    So in this bag contains the black case that had the

4    Narcan and syringes in it.

5    Q.    Thank you.  And 4.13, 4.13?

6    A.    This is -- in this brown bag is copper mesh used, just

7    fresh copper mesh.

8    Q.    And where was that found again, that was also from the

9    bedroom?

10   A.    Bedroom number one, let me just double-check here,

11   Bedroom No. 1.

12   Q.    All right.  And there was a piece of mail that we looked

13   at, photographs of 4.15 in the name of Terrill Harris.  Is

14   that that piece of mail?

15   A.    Correct.

16   Q.    4.14?

17   A.    This is the little red bag that had the suspected CDS and

18   the cotton swab, cotton ball.

19   Q.    And then 4.11 -- you do not have to take these out -- are

20   these the Muck boots?

21   A.    Yes.

22   Q.    And did you check inside of them earlier this morning?

23   A.    I did.

24   Q.    And what's inside the boot on the right?

25   A.    The clear plastic baggies, that green item that you were
```

1    seeing in that right heel area.

2    Q.   And they're still in there?

3    A.   Yes.

4         (Counsel confer.)

5    **BY MR. BUDLOW:**

6    Q.   Sergeant Benton, was that evidence that we just examined

7    both in the photographs and that I showed you, was that seized

8    and also submitted for chemical analysis?

9    A.   Some of those items, yes.

10   Q.   And who did the testing?

11   A.   Maryland State Police.

12   Q.   As to the suspected smoking device that was in the left

13   Muck boot --

14   A.   Yes.

15   Q.   -- what were the results of the analysis of that pipe?

16   A.   That came back as a Schedule 2 cocaine.

17   Q.   As to the remaining items, was cocaine, heroin, Fentanyl,

18   or any opioid detected?

19   A.   No.

20   Q.   I'm specifically showing you page -- maybe -- 38 of

21   Government's Exhibit 4.5.  For the record, I'll agree red is

22   hard to read.

23        Was that also tested, that white substance?

24   A.   Yes, it was.

25   Q.   And was it negative?

```
 1    A.   Yes, it was negative.
 2              MR. BUDLOW:   Thank you, Sergeant Benton.  That's all
 3    I have, Your Honor.
 4              THE COURT:   Thank you, Mr. Budlow.
 5         Cross-Examination, Ms. Whalen?
 6              MS. WHALEN:  Thank you, Your Honor.
 7              C R O S S - E X A M I N A T I O N
 8    BY MS. WHALEN:
 9    Q.   Sergeant Benton, you were not present when the initial
10    tactical unit went into the apartment; is that correct?
11    A.   That's correct.
12    Q.   You came back later or some time after entry had been
13    made, right?
14    A.   After entry was made.
15    Q.   And your job, your specific job was to photograph and
16    collect evidence; correct?
17    A.   Correct.
18    Q.   And I think it probably goes without saying that you
19    consider yourself thorough in doing that or at least back in
20    2015 doing that particular job, right?
21    A.   Yes.
22    Q.   And you guys were all trained to search and what to look
23    for in searches; correct?
24    A.   Yes.
25    Q.   So you're trained to look in areas that might be unusual
```

```
 1    to make sure that things aren't hidden in there, right?
 2    A.   Correct.
 3    Q.   So I think you told us that -- I'm going to show you
 4    what's 4.5.  I believe the red number is 72.  Let me go out a
 5    little bit for you.  Okay.  Maybe if I turn it this way, it's
 6    more oriented to --
 7              THE COURT:  This is Defendant's Exhibit 72?  I'm
 8    sorry.
 9              MS. WHALEN:  No, this is Government, Your Honor.
10              THE COURT:  Government Exhibit 4.5.
11              MS. WHALEN:  4.5, I believe --
12              THE COURT:  All right.  Thank you.
13              MS. WHALEN:  -- it's Photograph 72.
14    BY MS. WHALEN:
15    Q.   You had, I believe, testified -- tell us, again, what
16    this is.
17    A.   It's a black container that had Narcan in it.
18    Q.   And this was all behind a bed, right?
19    A.   I believe that particular container was in the closet.
20    Q.   Was there something --
21    A.   It was in the closet of Bedroom No. 1.
22    Q.   I apologize.
23         Was there something that you found behind the bed?
24    A.   Yes.
25    Q.   What was that?
```

```
1    A.   That was the pills.

2    Q.   The pills.  And I'm going to show you what's been marked

3    as 4.9.

4              MS. WHALEN:  If I could approach, Your Honor.

5              THE COURT:  Certainly.

6    BY MS. WHALEN:

7    Q.   Sergeant, take a look at 4.9 and let us know if that

8    appears to be, of course, the pills that were seized at the --

9    in the bedroom there.

10   A.   Yes.

11   Q.   All right.  And were they packaged in the manner in which

12   they are currently?

13   A.   No.

14   Q.   How were they packaged?

15   A.   They were in a long pill bottle, orange in color, with no

16   clear label on it.

17   Q.   And I'm going to try to show you 4.5 again.  It's this

18   red that we're all having trouble reading, but I believe it's

19   61.  If you could take a look at this photograph, does that

20   depict the bottle that you're speaking of, the long bottle?

21   A.   That's correct.

22   Q.   Now, whole different type of pills in that bottle;

23   correct?

24   A.   Correct.

25   Q.   Now, when you're trained to search, you look for, really,
```

```
 1    any evidence that could be evidence of a crime, right?
 2    A.   Yes.
 3    Q.   So, for instance, drugs may be something that you're
 4    looking for, right?
 5    A.   Yes.
 6    Q.   Weapons may be something that you're looking for;
 7    correct?
 8    A.   Yes.
 9    Q.   And then, you know, if there's something else in what we
10    call plain view, meaning you just happen to see it because
11    you're there and it appears to be evidence of criminal
12    conduct, you take it, right?
13    A.   Yes.
14    Q.   And so in this particular case, you and other officers
15    searched for anything you could find in the apartment, right?
16    A.   I should clarify.  I was not there to search.  I was
17    there to photograph and collect evidence.
18    Q.   All right.  And the other officers that were there to
19    search were trained officers; correct?
20    A.   That's correct.
21    Q.   How many were there, if you know?
22    A.   There were several.
23         On scene?
24    Q.   Yes.  What does several mean, if you can approximate?
25    A.   Five to eight.
```

```
 1              MS. WHALEN:  Court's indulgence one moment?

 2              THE COURT:  Certainly.

 3              MS. WHALEN:  Thank you, Sergeant Benton.

 4         No further questions.

 5              THE COURT:  Thank you.

 6         Any redirect, Mr. Budlow?

 7              MR. BUDLOW:  No, Your Honor.

 8              THE COURT:  Thank you, Sergeant Benton.  You're

 9    excused.  You should not discuss your testimony with anyone in

10    the unlikely event -- just put it on the table, they'll get

11    it.

12              THE WITNESS:  Okay.

13              THE COURT:  You should not discuss your testimony

14    with anyone in the unlikely event you're called back to the

15    witness stand.

16         Thank you very much.

17              THE WITNESS:  Thank you, Your Honor.

18              MR. BUDLOW:  Your Honor, may I approach the witness

19    stand to get the evidence?

20              THE COURT:  Sure.  Sure.

21         The next witness for the Government will be who, Ms.

22    Brusca?

23              MS. BRUSCA:  It will be Detective Brian Lewis, Your

24    Honor.

25              THE COURT:  All right.  Detective Brian Lewis is
```

1    coming back to the witness stand.  He was the fourth witness

2    last week; correct?

3              **MS. BRUSCA:**  He was, exactly, Your Honor.

4              **THE COURT:**  How long will he be?  It might be an

5    appropriate point to take a break.

6              **MS. BRUSCA:**  I was going to request one myself if

7    the Court would --

8              **THE COURT:**  That's fine.  We'll take our late

9    morning recess now, and then we will reconvene in about ten

10   minutes.

11        This Court stands in recess.

12             **THE CLERK:**  All rise.  Court's in recess.

13        (Jury exits courtroom 11:13 a.m.)

14        (Short recess taken.)

15             **THE CLERK:**  This Court resumes its session.  The

16   Honorable Richard D. Bennett, presiding.

17             **THE COURT:**  All right.  We are ready for the next

18   witness.  It will be Detective Lewis.  Hold just one second if

19   I can before we bring the jury back in.  Detective Lewis was

20   witness number 4, the fourth witness, and he testified before

21   me, before the Court here -- let me get the day of his

22   testimony.

23             **MS. BRUSCA:**  I believe it was the 25th, Your Honor.

24             **THE COURT:**  He was on May the 25th, which was last

25   Wednesday -- was last Wednesday.  And then I indicated to him

```
 1        that he should not discuss his testimony with anyone in the
 2        event he was called back to the witness stand.
 3            He's now being called back to the witness stand.  So I
 4        just -- if I understand the context of it, because obviously,
 5        there's this sequestration order in effect.  So to the extent
 6        someone is called back to the witness stand, I have to make
 7        sure I inquire as to the compliance with the sequestration
 8        order in terms of discussion with a witness.
 9            You're certainly free to call any witness back, but
10        neither side is free to discuss detailed testimony of other
11        witnesses.  So what is the proffer here --
12                 MS. BRUSCA:  Sure, Your Honor.
13                 THE COURT:  -- with Detective Lewis coming back on
14        the witness stand.
15                 MS. BRUSCA:  So Detective Lewis is coming back to
16        testify solely with respect to the Defendant's 2015 statement
17        following the search at the Cambridge apartment.
18                 THE COURT:  Okay.
19                 MS. BRUSCA:  And so that's what -- we haven't
20        discussed other folks' testimony with him.  We have just -- we
21        have prepared him to testify today.
22                 THE COURT:  You told him that would be the topic
23        of --
24                 MS. BRUSCA:  Correct.  It will.
25            (Counsel confer.)
```

```
 1              MS. BRUSCA:  I mean, we talked to him about the
 2    interview.  He has reviewed videotape.
 3              THE COURT:  All right.  I don't have time to go
 4    through my notes.  Was that discussed with him previously in
 5    his testimony?
 6              MS. BRUSCA:  No, Your Honor.
 7              THE COURT:  It was not.  It's a topic that was not
 8    discussed with him?
 9              MS. BRUSCA:  Correct.
10              THE COURT:  So you're going to inquire of him as to
11    what his testimony would be in terms of any statements made by
12    the Defendant in his presence.
13              MS. BRUSCA:  Correct.
14              THE COURT:  Yes, Mr. Purpura.
15              MR. PURPURA:  Your Honor, that was agreed.  And I
16    think we might have advised the Court, or we may not.  We
17    agree with the Government that his testimony is bifurcated to
18    that extent, so today's date is only the statements come in on
19    2015, the interview, Andre Briscoe.
20              THE COURT:  Okay.  I beg your pardon?
21              MR. PURPURA:  It will be the interview of Mr.
22    Briscoe in 2015.
23              THE COURT:  June 5, 2015 --
24              MR. PURPURA:  Correct.
25              THE COURT:  -- in connection with the Cambridge
```

```
 1    search?
 2              MR. PURPURA:  Yes.  That's it.  That's it alone.
 3              THE COURT:  Okay.  I'm just trying to cross a T and
 4    dot an I here --
 5              MR. PURPURA:  I appreciate that.
 6              THE COURT:  -- in fairness to the Defendant.
 7              MR. PURPURA:  And I know there is limitations on
 8    what I can and cannot do in cross-examination.  I've already
 9    told the Government --
10              THE COURT:  Yes.
11              MR. PURPURA:  -- that my cross will be limited to
12    what they've indicated, and they've highlighted what would be
13    -- what they thought --
14              THE COURT:  Yes, just so we're clear in terms of the
15    matter of the comments by the Defendant.  And essentially, we
16    have been down this path before.
17         Hold on one second here.  Just to make sure we're still
18    here on the same wavelength, it has to do with the
19    admissibility, or lack thereof, of alleged self-serving
20    statements by the Defendant.  And the Court has previously
21    ruled and granted a Government motion with respect to they're
22    not being admissible.  And the case law on this quite clearly
23    is that a Defendant's out-of-court statements against him,
24    under Rule 801(d)(2)(A) of the Federal rules of evidence are
25    not hearsay, as they're statements of a party opponent.
```

1        But on the other hand, as the United States Court of

2   Appeal from the 4th Circuit, *United States versus Wilkerson* at

3   84 F.3rd 692, Fourth Circuit 1996 has clearly ruled, the rules

4   do not, however, provide an exception for self-serving

5   exculpatory statements made by a party to which you're being

6   sought for admission by that same party.

7        And the -- we've already dealt with this before in terms

8   of whether or not the -- any rule of completeness under

9   Rule 106 comes into play.  And as far as I'm concerned, I've

10  defined the parameters here, and I expect them to be complied

11  with, and that's where we are.

12           **MR. PURPURA:**  Just so the Court's completely aware,

13  if you recall at the motion hearing, the Government had an

14  exhibit, it was Exhibit A, and they had in yellow what they

15  thought they were going to play, and I'm confining and I --

16           **THE COURT:**  Okay.  That's fine.

17           **MR. PURPURA:**  -- and I can confine this on my Cross

18  what they felt --

19           **THE COURT:**  I think we're fine on this.

20           **MR. PURPURA:**  Fine.  Thank you.

21           **THE COURT:**  Because of our precautions with the

22  COVID and retrofitting the courtroom and the difficulties we

23  all agree we'd had with this headset and white noise, it

24  doesn't seem to work, so we have to have the jury leave when

25  we have any heavy evidentiary discussions.

```
 1          So with that, I think we're ready to bring the jury back

 2   in and then we'll call Detective Brian Lewis back to the

 3   witness stand.

 4          MS. BRUSCA:  Thank you, Your Honor.

 5          THE COURT:  Thank you very much, Counsel.

 6          THE CLERK:  All rise for the jury.

 7      (Jury enters courtroom 11:38 a.m.)

 8          THE COURT:  Thank you, ladies and gentlemen.

 9      And with that, we're now ready to go with the next

10   witness.  And I believe we're calling Detective Brian Lewis

11   back to the witness stand now on another topic.  And I know he

12   testified last week and he's returning to the witness stand,

13   and the Government's next witness is Detective Brian Lewis.

14          MS. BRUSCA:  Thank you, Your Honor.  The Government

15   calls Brian Lewis.  Thank you very much.

16          THE COURT:  Good morning, again, Detective Lewis.

17   Nice to see you.

18          THE WITNESS:  Good morning, Your Honor.

19          THE COURT:  If you'll be sworn please, sir.

20          THE CLERK:  Remain standing and raise your right

21   hand for me, please.

22      DETECTIVE BRIAN LEWIS, having been duly sworn, was

23   examined and testified as follows:

24          THE WITNESS:  I do.

25          THE CLERK:  Would you please restate your name for
```

1   the record?

2           **THE WITNESS:**  Sure.  Detective Brian Lewis,

3   Baltimore City Police Department, homicide unit.

4           **THE COURT:**  And Detective Lewis, as I think I went

5   over with you last week -- I've forgotten it once or twice

6   with some of the witnesses, but as I indicated previously,

7   last week, the standing orders of the Court provide that masks

8   are to be worn in all public areas of the courthouse with the

9   exception of in the courthouse.  In the discretion of the

10  Presiding Judge if a person has been fully vaccinated, they

11  can pull their masks down while speaking or testifying.  I

12  cannot recall.  Have you been fully vaccinated, sir?

13          **THE WITNESS:**  Yes, Your Honor, I have.

14          **THE COURT:**  All right.  So you can pull your mask

15  down while testifying, you don't have to.  It's perfectly up

16  to you.

17      And with that, you may proceed, Ms. Brusca.

18          **MS. BRUSCA:**  Thank you, Your Honor.

19               D I R E C T   E X A M I N A T I O N

20  **BY MS. BRUSCA:**

21  Q.   Hello, Detective Lewis.

22  A.   Good morning.

23  Q.   When you testified last week, you described that as part

24  of your investigation, following the murders, you began

25  tracking the Defendant's phone; is that correct?

```
 1    A.   Yes.
 2    Q.   And do you recall on what date you did that?
 3    A.   I believe it was June 4th of 2015.
 4    Q.   And what phone number were you obtaining data to locate?
 5    A.   (443) 621-2413.
 6    Q.   And that was the number subscribed to Defendant?
 7    A.   Yes.
 8    Q.   Were you able to track that phone number overnight to an
 9    apartment complex in Cambridge, Maryland?
10    A.   Yes.
11    Q.   And was that the building at 502 Greenwood Avenue?
12    A.   Yes, it was.
13    Q.   Was the Defendant actually found inside of an apartment
14    at 502 Greenwood Avenue?
15    A.   Yes, he was.
16    Q.   Which apartment was it?
17    A.   I believe it was 201.
18    Q.   201 or 202?
19    A.   I'm sorry, 202.
20    Q.   And were you there when the Defendant was first found
21    within Apartment 202?
22    A.   No, I was not.
23    Q.   Where were you?
24    A.   I was in transit between the Cambridge Police Department
25    and coming back to the apartment complex.
```

```
1    Q.   And when did you see the Defendant on June 5, 2015?

2    A.   Like I said, I was in the apartment complex parking lot,

3    and he was in the -- I believe, a Cambridge Police Department

4    patrol car being ready to be transported back to the Cambridge

5    Police Department.

6    Q.   Did you interact with the Defendant at all while you were

7    at Greenwood Avenue?

8    A.   No, ma'am.

9    Q.   And do you recall about what time it was that you saw the

10   Defendant getting ready to be transported?

11   A.   I believe it was somewhere between 9:30 and 10 o'clock

12   that morning.

13   Q.   When was the first time you spoke to the Defendant that

14   day?

15   A.   My partner and I, Detective Parker and I first spoke to

16   him, I believe it was, about 2 o'clock that afternoon.

17   Q.   2 o'clock, June 5, 2015?

18   A.   Yes.

19   Q.   And when you spoke to the Defendant, can you describe the

20   room where you spoke to him?

21   A.   Sure.  The Cambridge Police Department provided an

22   interview room for us.  The room consisted of a table and, I

23   believe, three or four chairs.

24        Mr. Briscoe was seated across from us from the table, but

25   again that was in the room, four walls, a door.  The door, I
```

```
 1    believe, had a window so that you could look inside.  And
 2    again, the room was equipped with audio and video equipment to
 3    record the statement.
 4    Q.   And I'm not sure if we said it, but this was a room
 5    where?
 6    A.   At the Cambridge Police Department.
 7    Q.   And you said the room was audio and video recorded.  Is
 8    there an audio and video recording of your interview with the
 9    Defendant on June 5, 2015?
10    A.   Yes, there is.
11    Q.   Have you reviewed it?
12    A.   I'm sorry?
13    Q.   Have you reviewed that recording?
14    A.   Yes, uh-huh.
15    Q.   And how would you describe the quality?
16    A.   The video is good.  You can clearly see myself, Detective
17    Parker, and Mr. Briscoe in the room that I described.  The
18    audio is low at certain points in the interview.  It's -- when
19    I say "low," I mean, the volume of the audio is, kind of, low
20    and kind of difficult to hear at first, and then it kind of
21    increases over the time of the interview.
22    Q.   And about how long did the interview on June 5th, 2015,
23    last?
24    A.   If memory serves me right, it was about two hours, maybe
25    a little less than two hours.
```

```
 1   Q.   So when you -- and the whole two hours were recorded?

 2   A.   Yes, ma'am.

 3   Q.   So when you say that the recording was low volume and

 4   hard to hear at first, can you describe whether you can hear

 5   the words at all or sometimes or always?

 6   A.   You can hear the words sometimes, I would say.  I know I

 7   remember myself and Detective Parker asked Mr. Briscoe to try

 8   to keep his voice up so that we could.  But while we were

 9   there in the room with him, we could hear what he was saying.

10   Again, the audio from the interview is low and there are times

11   when it's hard to make out what's being said, to include

12   myself and Detective Parker, as well as Mr. Briscoe.

13   Q.   And so in preparation for your testimony today, have you

14   reviewed that recording a number of times?

15   A.   Yes, ma'am.

16   Q.   And have you used tools to speed it up and slow it down

17   and make it louder and things like that?

18   A.   Yes.

19   Q.   To try to get your best recollection of what happened?

20   A.   Yes, ma'am.

21   Q.   And about how many hours do you think that it would take

22   to understand that interview if you were to watch it from

23   start to finish?

24   A.   Real time, like I said, it was about two hours to

25   interview to review and go over.  Anywhere from five to seven
```

1   hours, maybe longer.  Again, just for rewinding and trying to

2   slow it down to make out everything.

3   Q.   And so today when you testified, you're going to give a

4   summary of that -- of the two hours rather than playing it in

5   full here today.  Is that what we're trying to do?

6   A.   Yes, ma'am.

7   Q.   So when you were in the room at Cambridge, you described

8   three or four chairs.  Who sat where within the room during

9   the interview?

10  A.   Sure.  So Mr. Briscoe was on the opposite side of the

11  table as myself and Detective Parker.  Detective Parker was

12  directly across from Mr. Briscoe, and I was to Detective

13  Parker's right, on the same side as Detective Parker, again,

14  across from Mr. Briscoe.

15  Q.   Was there anyone else in the room?

16  A.   No.

17  Q.   And when you sat down with the Defendant, what was the

18  first thing that you and Detective Parker did?

19  A.   After sitting down with him, we proceeded to gain basic

20  information by filling out an information form.

21  Q.   And what's the purpose of filling out an information

22  form?

23  A.   One, to make sure that the person that we're speaking to

24  -- and again, there is just, in general, not this one

25  particular case, but, in general, it's to make sure that the

```
 1    person is coherent and understands what's going on.
 2         The other is to make sure that we're getting accurate
 3    information as far as addresses and phone numbers and next of
 4    kin and that sort of thing.
 5    Q.   And with respect to this Defendant, what was his demeanor
 6    when he was answering information on the witness sheet?
 7    A.   He was coherent.  He advised us that he had been drinking
 8    the night before, I believe, but he did say he understood what
 9    was happening at that time.
10    Q.   And again, what time about did the interview start?
11    A.   This was about 2 o'clock in the afternoon.
12    Q.   Okay.  And so he advised that he had been drinking the
13    night previous, the night prior?
14    A.   Yes, ma'am.
15    Q.   And how many people would you say you've interviewed
16    while you've been a homicide detective, Detective Lewis?
17    A.   Hundreds.
18    Q.   And so you are trained and you've had experience
19    recognizing signs of intoxication?
20    A.   Yes.
21    Q.   The Defendant in this case, was he able to answer the
22    questions that you were asking him?
23    A.   Yes.
24    Q.   And did he seem intoxicated to you?
25    A.   No.
```

1    Q.   All right.   And I'm going to pull up Government's 4.22.

2              **THE COURT:**   Government's 4.22.

3              **MS. BRUSCA:**   Mr. Gurevich, can I ask you to clear

4    that?   Sorry, I'm not sure why those arrows won't go away.

5              **THE CLERK:**   I'm sorry, Counsel, clear what?

6              **MS. BRUSCA:**   Those arrows.

7              **THE COURT:**   Just touch the bottom of the screen.

8    They should go off, Detective Lewis, on your screen there.

9    There we go.

10             **MS. BRUSCA:**   Thank you, Judge.

11   **BY MS. BRUSCA:**

12   Q.   So what is Government's Exhibit 4.22, Detective Lewis?

13   A.   This is the personal information sheet that I explained

14   just a few minutes ago, again, that the police department

15   uses.

16   Q.   And so what address did the Defendant provide while you

17   were talking to him on June 5th, 2015?

18   A.   3442 Ravenwood Avenue, Baltimore, Maryland.

19   Q.   And did he give a phone number?

20   A.   He did.   He gave actually a cell phone number of

21   (443) 621-2413.

22   Q.   And that was the same number that you had tracked --

23   A.   Yes, ma'am.

24   Q.   -- to Cambridge?

25   A.   Yes, ma'am.

```
 1    Q.   The same one that was listed as the contact for Poo in
 2    Ms. Jennifer Jeffrey's flip phone?
 3    A.   Yes, ma'am.
 4    Q.   And with respect to next of kin, who did the Defendant
 5    identify as his next of kin?
 6    A.   His grandmother, Ms. Lillian Harris.
 7    Q.   And did the Defendant provide contact information for
 8    Ms. Harris?
 9    A.   He did not.
10    Q.   And what about his -- a second relative?
11    A.   He advised us his girlfriend, Tiffany Jackson.
12    Q.   And did he provide contact information for Ms. Jackson?
13    A.   He gave us a cell phone number and didn't give us an
14    exact address, but he advised us that she lived in the Perkins
15    Projects.
16    Q.   Did he refuse to give you an address, or he said he
17    didn't remember?
18    A.   From what I remember, he said that he didn't remember off
19    the top.  He just knew it was Perkins Projects.
20    Q.   And while the Defendant was being interviewed, was he
21    restrained in any way?
22    A.   Initially, he was handcuffed.
23    Q.   And then when were the handcuffs removed?
24    A.   I believe it was during the Advice of Rights or it may
25    have been between doing the personal information and the
```

1    Advice of Rights sheet, but if memory serves, I believe it was

2    during the Advice of Rights sheet.

3    Q.   Okay.  And so we'll talk about the Advice of Rights in a

4    moment.  Before we do, can you just tell us the time that the

5    witness information sheet was completed on June 5th, 2015?

6    A.   1:50 p.m.

7    Q.   All right.  And then you said you believed the handcuffs

8    were removed during the Advice of Rights.

9         What's an Advice of Rights?

10   A.   It's the Miranda warning that officers give to persons

11   that are in police custody, and prior to giving any type of

12   statement to the police, the person is advised of their

13   rights.

14   Q.   And shown on the screen is Government's 4.19.  Can you

15   please explain what this document is?

16   A.   Sure.  This is the -- again, the Advice of Rights for

17   Mr. Briscoe.  We, myself and Detective Parker, did not have an

18   Advice of Rights sheet from Baltimore.  The Cambridge Police

19   Department provided an Advice of Rights form for us.

20   Q.   And how is this Advice of Rights form, how was it used

21   with respect to advising the Defendant on June 5th, 2015?

22   A.   Sure.  So we advised Mr. Briscoe that we were going to

23   read him his rights and that we were going to go by each right

24   one at a time and that at the end, we were going to put a line

25   next to each right that was read and we were going to ask him

```
 1    to put his initials only to acknowledge that he understood

 2    what was being read to him or read out loud to him.

 3    Q.   And that was for each Item 1 through 5 on this Advice of

 4    Miranda Rights form?

 5    A.   Yes.

 6    Q.   And at the bottom there, can you read the bottom

 7    sentence?

 8    A.   Sure.  "I have read or have read these rights read to me

 9    and I fully understand each of my rights."

10    Q.   And then whose signature is below that line?

11    A.   Mr. Briscoe.

12    Q.   And what's the date and time it was signed?

13    A.   June 5th, 2015, at 2 o'clock.

14    Q.   And did the Defendant agree to speak to you that day?

15    A.   Yes, he did.

16    Q.   And so can you explain what the bottom portion of

17    Government's 4.19 was?

18    A.   Sure.  So once we've gone through the Advice of Rights,

19    we then explain to -- or explained to Mr. Briscoe that before

20    he said anything or agreed, we want to make sure that No. 1,

21    that he fully understood the rights and if he still wanted to

22    speak to us without having an attorney present at that

23    particular time.

24    Q.   And did the Defendant appear to understand his rights?

25    A.   Yes.
```

```
 1    Q.    And at the bottom there, whose signature is it
 2    documenting the waiver of those rights by the Defendant?
 3    A.    Mr. Briscoe.
 4    Q.    And the seconds line "witnessed by"?
 5    A.    Myself.
 6    Q.    And what times were those signatures placed on the form?
 7    A.    2:01 p.m. and 2:02 p.m.
 8    Q.    Now, you testified, I believe, that the interview lasted
 9    about two hours or a little less?
10    A.    Yes.
11    Q.    And during that time, were there any breaks?
12    A.    Yes, there was.
13    Q.    What was that for?
14    A.    One to relieve myself, to go to the bathroom and, two, we
15    had Mr. Briscoe's cell phone that we had brought back in
16    because, again, we had been discussing certain things about
17    certain people and text messages and things like that, so we
18    want to go over those things with him.
19    Q.    So just to make sure I understand, during the two hours
20    when you first started the interview, did the Defendant or you
21    have the Defendant's phone in the room?
22    A.    The phone was outside the room.
23    Q.    So when you say there was a break, can you just describe
24    what happened during the break?
25    A.    Sure.  We went out, got the Defendant's phone, Mr.
```

```
 1   Briscoe, and we brought it back into the room.
 2   Q.   Okay.  And do you remember about how far into the
 3   interview that was?
 4   A.   I believe it was about halfway.  I want to say about an
 5   hour.
 6   Q.   I'm going to show you Government's 4.21.  I think it's a
 7   seven-page exhibit, and who's shown in that first picture
 8   there?
 9   A.   That's my partner, Detective Parker, and Mr. Briscoe
10   sitting in the interview room.
11   Q.   And what's laying on the table next to Detective Parker?
12   A.   That is the cell phone.
13   Q.   And page 2?
14   A.   Mr. Briscoe taking the cell phone up.
15   Q.   And you can see, is there a time stamp at the top of
16   these clips right here on Government's 21?
17   A.   Yes, it's timestamped 1445 and 45 seconds, 2:45 p.m.
18   Q.   About 45 minutes into this interview?
19   A.   About 45 minutes, yes.
20   Q.   And just to be clear, this is the room shown here at
21   Cambridge Police Department?
22   A.   Yes, it is.
23   Q.   And page 3, what's happening?
24   A.   I believe at this point, Mr. Briscoe is attempting to
25   power up the phone and waiting for it to turn on.
```

```
1    Q.   And 4?
2    A.   At this point he is -- has the phone powered up and just
3    looking at the face of it.
4    Q.   And then ultimately, what does the Defendant do with the
5    phone?
6    A.   He gives it back to Detective Parker.
7    Q.   So we're going to go back to the first part of the
8    interview without the phone and then move on to the second,
9    but that was the only time that you stepped out of the room,
10   was about 45 minutes in or so?
11   A.   Yes, ma'am.
12   Q.   So, just generally, can you describe the topics that you
13   covered when you spoke to the Defendant on June 5th, 2015?
14   A.   Sure.  We spoke about Mr. Briscoe's relationship with the
15   victim, the female victim, Ms. Jennifer Jeffrey.  We spoke
16   about the relationship with, I believe, his cousin Kiara.  We
17   also spoke about his whereabouts during that time period.
18   Also, we spoke about his -- I believe, his girlfriend, Ms.
19   Tiffany -- her last name is escaping me, but Ms. Tiffany, his
20   relationship with her and her location as far as where she
21   lives in Baltimore.
22   Q.   And so when you first started speaking to the Defendant,
23   did you show the photographs?
24   A.   Yes.  Yes, I did.  I showed photographs of both
25   Ms. Jennifer Jeffrey and her son, K.B., III.
```

```
 1    Q.   And did the Defendant indicate whether he recognized the
 2    people in the photos?
 3    A.   Initially, he recognized K.B., III, Jennifer's son.
 4    Initially, he did not recognize Jennifer's picture and then
 5    he -- I believe he said that she had lost a lot of weight.
 6    Q.   And that day, did you speak to the Defendant about how he
 7    met Jennifer?
 8    A.   Yes.  He said that he met her through his cousin Kiara
 9    and that was around Valentine's Day, around the 14th of
10    February in 2015.
11    Q.   And did the Defendant tell you where he met Jennifer
12    Jeffrey for the first time?
13    A.   Down in Cambridge.  Kiara had brought Jennifer down to
14    Cambridge to meet her cousins.
15    Q.   And did the Defendant indicate whether there was any sort
16    of occasion for that meeting?
17    A.   I don't know if -- I can't remember if there was a
18    special occasion or not, but I know that he wasn't the only
19    one, meaning, his family -- as far as his family was
20    concerned, there were several cousins that got to meet
21    Jennifer and Kiara that day.
22    Q.   And with respect to how frequently the Defendant saw
23    Jennifer after the first meeting, what did the Defendant tell
24    you?
25    A.   He said about once a week that he would see Jennifer or
```

1    she would come down to Cambridge and he would come up to

2    Baltimore, but he said it was about once a week.

3    Q.   And did the Defendant explain if he was alone or with

4    other people during these trips?

5    A.   Sometimes he was with his cousin Tony, Tony Harris,

6    because at some point Jennifer and Tony Harris established a

7    romantic relationship.

8    Q.   So after the meeting in February, the Defendant told you

9    he would see Jennifer about once a week?

10   A.   Yes.

11   Q.   And those meetings, you said, would occur in Baltimore

12   and in Cambridge?

13   A.   Yes.

14   Q.   And where did the Defendant tell you he would stay when

15   he was in Baltimore?

16   A.   He said sometimes he would stay with Jennifer, sometimes

17   he would stay at Kiara's house, sometimes he would stay with

18   his girlfriend, Tiffany.

19   Q.   And did the Defendant tell you where Jennifer would stay

20   when she would come down to Cambridge?

21   A.   Sometimes with him.

22   Q.   Sometimes not?

23   A.   Sometimes not, yes.

24   Q.   Now, did the Defendant tell you at some point there was a

25   change in how frequently he saw Jennifer Jeffrey?

86

A.    Yes.  Mr. Briscoe told us that the -- I guess the
romantic relationship between Tony and Jennifer had cooled
off, that things weren't as -- I guess as good as in the
beginning, and the frequency had gone from about once a week
to about once every other week or so.

Q.    Did the Defendant discuss the nature of his relationship
with Ms. Jeffrey during this time?

A.    He just said that they were cool.  He knew that that was
Tony's girl, that, you know, he was just really cool with her,
they got along well, and it was really nothing more than that,
they were just good friends.

Q.    And so with respect to physical intimacy with Ms.
Jeffrey, the Defendant said what?

A.    He said that he did not have a physical or intimate
relationship with her.

Q.    Now, what, if anything, did the Defendant say about how
frequently he saw Jen's son?

A.    He said that he saw him on more than one occasion when he
would come up and that K.B., III saw him on more than one
occasion, so they saw each other quite a bit.

Q.    Initially, when he was describing his relationship with
Jennifer, did the Defendant say anything about drugs?

A.    I'm sorry, about what?  I'm sorry.

Q.    About drugs?

A.    Initially?

```
 1    Q.    Yes.

 2    A.    No.

 3    Q.    At some point did the Defendant say something about

 4    drugs?

 5    A.    Yes.

 6    Q.    And what was that?

 7    A.    That Jennifer was selling and that she was, you know,

 8    trying to sell drugs down there, meaning the Eastern

 9    Shore/Cambridge, but at some point he had said that, you know,

10    they didn't want it because the drugs are no good.

11    Q.    And so let's break that into two different parts.  You

12    said the Defendant said they didn't want the drugs because

13    they were no good?

14    A.    Yes.

15    Q.    In other words, a plural, more than one person?

16    A.    Yes.

17    Q.    And he said the -- he gave -- the reason, he said, was

18    because the drugs were no good?

19    A.    Correct.

20    Q.    Did he say whether or not he owed Jennifer money at the

21    time of her death?

22    A.    When we spoke to him, he said that she didn't owe him

23    anything and he didn't owe her anything.

24    Q.    And you said the Defendant told you she was trying to

25    sell heroin.  Was he more specific about Jennifer's role or
```

1    not?

2    A.   He told us that not only was she trying to sell down

3    there, but she was selling in other places as well, to include

4    Baltimore.

5    Q.   And what about money, did the Defendant say anything

6    about Jennifer having money?

7    A.   Just that she was getting money from selling the drugs.

8    Q.   Now, during the time period of May of 2015, did the

9    Defendant say anything about Jennifer's supplier?

10   A.   I believe he said that there were two people possibly

11   dealing with her.

12   Q.   And Detective Lewis, would it be helpful if I show you a

13   portion of the transcript you earlier reviewed?

14   A.   Sure.

15        **MS. BRUSCA:**  All right.  May I approach, Your Honor?

16        **THE COURT:**  Yes.  Document which is not -- this is

17   not a document in evidence.  You're just showing him to

18   refresh his recollection; correct, Ms. Brusca?

19        **MS. BRUSCA:**  Correct, Your Honor.  And I believe it

20   has been marked for identification purposes only as 420T.

21   **BY MS. BRUSCA:**

22   Q.   And having looked at the transcript, Detective Lewis,

23   does that help you refresh your recollection about what the

24   Defendant said --

25   A.   Yes.

```
 1    Q.    -- regarding whether Jennifer was looking for money in
 2    early May 2015?
 3    A.    Yes.
 4    Q.    And what was that?
 5    A.    It was to try to get money together to collect for CJ who
 6    was locked up in Towson.
 7    Q.    And at some point during the interview, did the Defendant
 8    actually use CJ's name?
 9    A.    I believe he referred to him as CJ.
10    Q.    And apart from CJ, did the Defendant tell you the names
11    of any other individuals with whom Jennifer had been dealing?
12    A.    The second name, I believe, was Tyrell or Tarrell.
13    Q.    And turning now to a different topic -- well, actually
14    before we do that, those are the only two times.  Did the
15    Defendant indicate whether Jennifer was just dealing generally
16    with more than those two people?
17    A.    I'm sorry, say that again.
18    Q.    Sure.  Apart from those two names, did the Defendant
19    indicate whether Jennifer was dealing with more than just
20    those two people?
21    A.    No.  I mean, yes, yes, she was.
22    Q.    Okay.
23    A.    Yes.
24    Q.    But those are more generic references?
25    A.    Yes.  Those were the only two names specifically that he
```

1    had named.

2    Q.    All right.  Now, turning to where the Defendant was the

3    week prior to June 5th, 2015, the date of the interview, what

4    did the Defendant tell you?

5    A.    That he had come up to Baltimore from Cambridge, and that

6    he was going over to his girl's house, Tiffany's house, and he

7    went over to Tiffany's with Ki, meaning Kiara, that evening, I

8    believe it was.  From -- hung out at Tiffany's for a little

9    while, and at some point, Kiara wanted to go home.  And

10   because it was late, he didn't want to have her go home by

11   herself, so he actually left with Kiara and took Kiara back to

12   her place.

13   Q.    And once he left Tiffany's and got back to Kiara's, where

14   did the Defendant tell you he went?

15   A.    From Kiara's place, he then went to Jennifer's place.

16   Q.    And how long was the Defendant at Jennifer's place,

17   according to him?

18   A.    He said that he was there the rest of the night, from

19   about midnight until the next day -- next morning, excuse me.

20   Q.    Did the Defendant tell you how he got to Jennifer's?

21   A.    I believe -- no, no.  He said that he got a ride up from

22   his cousin from Eastern Shore to get to Baltimore.  He and

23   Kiara got a hack over to Tiffany's.  And then he took Tiffany

24   back -- I'm sorry, took Kiara back to her home.  And then from

25   her home, I believe, he said he got a hack to Jen's.

```
1     Q.   Did he tell you how far Jennifer was from Kiara's?

2     A.   Just a few blocks away.

3     Q.   All right.  So I just want to make sure because I

4     think -- was it sort of a point of clarification --

5     A.   Sure.

6     Q.   -- for you during the interview where the Defendant was

7     on the 26th?

8     A.   Yes.

9     Q.   So you said he started out at Tiffany's house?

10    A.   Yes.

11    Q.   Did he tell you the neighborhood that Tiffany was in?

12    A.   He just said Perkins Projects.

13    Q.   Who was the Defendant with, did he say, at Tiffany's?

14    A.   He said Tiffany and I believe a cousin and a few other

15    people.

16    Q.   Was that, you said, Ki?

17    A.   Ki, I'm sorry.  Yes, Ki.

18    Q.   And so from Tiffany's how, where did the Defendant go?

19    A.   From Tiffany's, he went back to Kiara's house with Kiara,

20    because she wanted to go home, but he didn't want her to go by

21    herself.

22    Q.   Okay.  From there he went to?

23    A.   To Jen's by himself.

24    Q.   And spent the night?

25    A.   Yes.
```

```
1    Q.   Did the Defendant tell you the next morning where he
2    went?
3    A.   Yes, he said he went back to Kiara's house and spent some
4    time with her.
5    Q.   And did the Defendant tell you what he and Kiara did
6    while they were at Kiara's house that morning, which is
7    Wednesday, May 27th?
8    A.   Yes, he said that she was fussing at him because she was
9    upset that he had gone over to Jen's place, and he actually
10   asked her why she came over acting stupid, referencing coming
11   over to Jennifer's house in the late hours of the day that he
12   went over to see Jen.
13   Q.   Did the Defendant tell you during the interview the
14   nature of his relationship with his cousin Kiara?
15   A.   Yes, he did.
16   Q.   And what was that?
17   A.   He said they were kissing cousins.
18   Q.   And so from that morning at Kiara's house, the Defendant
19   told you Kiara had been fussing at him?
20   A.   Yes.
21   Q.   And then did he tell you whether they ultimately sort of
22   reconciled?
23   A.   Yes, yes, he did.
24   Q.   Did he describe how that came about?
25   A.   He said initially that she was, again, fussing at him,
```

1    that she was crying a little bit, but ultimately they end up

2    having sex.

3    Q.   And from Kiara's house, did the Defendant tell you if he

4    went anywhere?

5    A.   Back from Kiara's house, he said him and Kiara caught a

6    hack so that he could get to Tiffany's house.  And from

7    there -- I'm sorry.

8    Q.   That's fine.  So did he tell you where he and Kiara

9    picked up the hack?

10   A.   So I asked him, you know, "Did the hack come to Kiara's

11   apartment?  Does she live in an apartment building?"  And she

12   said No, they actually walked out and they walked a little

13   bit, so it was close to the apartment, but not exactly in

14   front of the apartment building where she lived.

15   Q.   And he told you the hack went -- he and Kiara took the

16   hack toward where?

17   A.   East Baltimore towards Perkins Projects.

18   Q.   Where did the hack stop?

19   A.   Somewhere on Broadway Street about a block or two before

20   Perkins Projects or before Tiffany's place.

21   Q.   And who got out there?

22   A.   Mr. Briscoe said he got out there.

23   Q.   And what did Kiara do, according to the Defendant?

24   A.   She continued with the hack over to a cousin's house

25   further east.

```
1    Q.   All right.  So, now, turning to who the Defendant told
2    you about being at Tiffany's house that afternoon on May 27th,
3    did the Defendant tell you who was at Tiffany's house?
4    A.   Yes.  He mentioned that Tiffany was there along with her
5    son along with some homeboys that he hadn't seen in a while,
6    and a cousin.
7    Q.   Did the Defendant -- did you ask for any names of the
8    homeboys?
9    A.   Yes.
10   Q.   And what did the Defendant say?
11   A.   He didn't provide any names.  He just said that I could
12   speak to Tiffany and, I believe, her son.
13   Q.   How long did the Defendant tell you he stayed at
14   Tiffany's?
15   A.   He said he was there for a while before he went back to
16   Cambridge.
17   Q.   Did the Defendant tell you how he got back to Cambridge?
18   A.   I believe he said it was his cousin that came and got him
19   and they drove back.
20   Q.   And did the Defendant -- how did the Defendant refer to
21   his cousin during that conversation?
22   A.   I believe he called them either June or Junior, something
23   like that.
24   Q.   And at that point, were you aware what Junior's real name
25   was?
```

1   A.   No, I asked and he said that he didn't know all of his

2   cousins', you know, first and last names.

3   Q.   So did he ever give you a name for Junior?

4   A.   No.  He just said Junior or June, because I think at one

5   point I thought he said June.  I believed he was referring to

6   a female, but it was actually a male.

7   Q.   Now, did the Defendant describe for you what time of day

8   he went from Tiffany's back to Cambridge?

9   A.   I believe he said it was evening or nighttime, that the

10  sun was down.

11  Q.   And what about once he got back to Cambridge, did the

12  Defendant provide any information about what he did once he

13  returned to Cambridge?

14  A.   I believe he said he stayed with family, but he didn't

15  specify who that was.

16  Q.   And did the Defendant tell you where he would stay,

17  generally, when he was in Cambridge?

18  A.   Between his cousin's and, I believe, another girl, but

19  again, didn't specify where.

20  Q.   And would it be helpful if I just showed you a portion of

21  that transcript again?

22  A.   Sure.

23  Q.   So what did the Defendant tell you about where he stayed

24  when he was in Cambridge?

25  A.   That he would stay at his grandmother's or baby girl's.

```
 1    Q.   In addition to his cousin?

 2    A.   Yes.

 3    Q.   Did you talk to the Defendant about the last time that he

 4    had been in touch with Jennifer?

 5    A.   Yes.

 6    Q.   And what did the Defendant tell you about that?

 7    A.   Said that he was at Kiara's when he was texting Jennifer

 8    about heading back, I believe, or heading back to Cambridge.

 9    Q.   About leaving Kiara's?

10    A.   Yes.

11    Q.   Is that what the Defendant said?

12    A.   Yes.

13    Q.   And the Defendant told you he was texting with Jennifer

14    about that?

15    A.   Yes.

16    Q.   Did the Defendant indicate whether he spoke to Jennifer

17    again?

18    A.   No, he said he didn't talk to her again.

19    Q.   Did you ask the Defendant about the text messages?

20    A.   Yes.

21    Q.   What did you ask him?

22    A.   I asked if he still had the messages in his phone and if

23    we could see those messages.

24    Q.   And what did the Defendant say?

25    A.   He said he had to reboot his phone or something like
```

```
1    that, to that effect.
2    Q.   Do you recall, when you were asking the Defendant about
3    those text messages, if you had already given the Defendant's
4    phone to him during the interview?
5    A.   At that time, no.
6    Q.   So this is the first half of the interview?
7    A.   Correct.
8    Q.   Before you got the Defendant's phone?
9    A.   Correct.
10   Q.   And you asked him if he had the text messages, and he
11   said, "I just rebooted my phone"?
12   A.   Correct.
13   Q.   Now, turning to the Defendant's relationship with his
14   cousin Kiara, did the Defendant indicate if Kiara had a role
15   in the Defendant's trip to Baltimore the week prior?
16   A.   Yeah, he told us that she had given him $50 to make his
17   way up to Baltimore from Cambridge.
18   Q.   And did the Defendant explain how he got to Cambridge?
19   A.   Yes, he explained that one of his cousins drove him up.
20   Q.   And what was the name of that cousin?
21   A.   Dev, I believe.
22   Q.   Does the Defendant have any additional information about
23   Dev?
24   A.   No.
25   Q.   He didn't have any or how did that go?
```

```
1    A.   He just -- again, he gave us Dev from what I remember.

2    He didn't provide any other information about Dev.

3    Q.   And did the Defendant talk about the incident when Kiara

4    came knocking on Jennifer's door?

5    A.   Yes, he did.

6    Q.   And what did he say?

7    A.   He said that it was late and, you know, Kiara came over

8    and she was banging on the door very loudly.  He said she was

9    there between 10 and 20 minutes.

10   Q.   And then the next morning, as you already testified, he

11   went back to Kiara's house?

12   A.   Yes.

13   Q.   All right.  And so apart from what we've just covered,

14   towards the end of the interview, were there any additional

15   steps that you took to execute warrants with respect to the

16   Defendant?

17   A.   Yes.  So we explained to Mr. Briscoe that we had a search

18   and seizure warrant for his DNA and that we wanted to take

19   some swabs and swab his mouth to ultimately compare his DNA to

20   any possible DNA that was left at the crime scene.

21   Q.   And I apologize if you said it, Detective Lewis, what was

22   the Defendant's attitude about that?

23   A.   He was fine with it.  He was -- you know, he offered no

24   type of resistance to it.  Matter of fact, I think he said,

25   "Please, you know, take it."  I mean, he was okay with us
```

```
 1      taking it, but, again, we did have a signed search and seizure
 2      warrant for it, for the DNA.
 3      Q.   Now, I just want to go back and clarify one point.  The
 4      morning when the Defendant returned to Kiara's house after
 5      being at Jennifer's house the morning of Wednesday, May 27th,
 6      the Defendant told you he was texting with Jennifer; is that
 7      correct?
 8      A.   Yes.
 9      Q.   And you said what was the content, according to the
10      Defendant, of those text messages?
11      A.   Yes.
12      Q.   What did he say about them?
13      A.   Oh, I'm sorry.
14      Q.   That's okay.
15      A.   What was the question, I'm sorry?
16      Q.   What were they texting about, according to the Defendant?
17      A.   I believe that he was telling her that he was leaving
18      Kiara's house and heading back to Cambridge.
19      Q.   And did the Defendant say if Jennifer said anything back
20      to him in those text messages?
21      A.   Yes, that she would call him later.
22      Q.   And did the Defendant tell you whether Jennifer had ever
23      called?
24      A.   He said she did not call.
25      Q.   That they never talked?
```

```
1    A.   They never talked, right.

2              MS. BRUSCA:  Nothing further, Your Honor.

3              THE COURT:   Thank you very much, Ms. Brusca.

4         Cross-examination, Mr. Purpura.

5              MR. PURPURA:  Thank you, Your Honor.

6          C R O S S  -  E X A M I N A T I O N

7    BY MR. PURPURA:

8    Q.   Detective Lewis, good afternoon again.

9    A.   Good afternoon, Counselor.

10   Q.   Detective Lewis, I think you just began your Direct

11   Examination when you indicated that you had a warrant, a

12   tracking warrant, for Mr. Briscoe's phone; is that correct?

13   A.   Yes, sir.

14   Q.   And is that the same phone that was later seized in

15   Cambridge?

16   A.   Yes.

17   Q.   And it's the same phone that we saw in that little video

18   clip as well; correct?

19   A.   Yes.

20   Q.   And you indicated that the warrant, you believe, and I'm

21   not holding you to it, back in 2015, was June 4th signed;

22   correct?

23   A.   I believe so.

24   Q.   So at that point, on June 4th, I guess -- how do you --

25   how do you track, just technically, what happens at that
```

1    point?

2    A.   The police department, the Baltimore Police Department,

3    has a unit that's called the advanced technical team, and they

4    have the equipment to track signals, I guess, based upon the

5    cell site information that is being transmitted back and forth

6    between the cell phones and the towers themselves.  What that

7    equipment is, I specifically couldn't tell you.

8    Q.   In addition, I think it's a little more advanced than

9    that as well.  Even if you're not using the phone, they can

10   ping the phone, as long as the phone is on for the location

11   data.  That's GPS data at that point; correct?

12   A.   I believe so.  Again, I'm not an expert in that field,

13   but I believe so.

14   Q.   Regardless what it was indicative of was that Andre

15   Briscoe's phone on June 4th, 2015, was turned on, right?

16   A.   I believe so, yes.

17   Q.   Now, in homicide you've dealt, obviously, many, many

18   years -- and thank you for your service, again -- in homicide,

19   you've come across when people commit a horrendous crime and

20   they get rid of their phones completely, right?

21   A.   That happens, yes.

22   Q.   When Mr. Briscoe had the phone, and the phone was turned

23   on, so you were able to track him; correct?

24   A.   Yes, sir.

25   Q.   Now, you indicated that there was some basic information.

1    There was an information sheet that you had -- that you asked

2    questions from to begin this interview, probably many, many

3    others; correct?

4    A.   Yes, sir.

5    Q.   And No. 1, you want to see, in fact, if Mr. Briscoe

6    understood and was coherent.  That's why you asked him these

7    fairly simple questions; correct?

8    A.   Yes, sir.

9    Q.   And, in fact, as you indicated, he did appear to be

10   coherent and he did clearly appear to understand your

11   questions as well, right?

12   A.   That's right.

13   Q.   Even though he might have been drinking the night before,

14   that had really no effect, whatsoever, based on your many,

15   many years of experience; correct?

16   A.   Yes, sir.

17   Q.   I think he said he had about four hours of sleep.  He did

18   look a little sleepy, but that clearly didn't affect his

19   ability to understand and respond; would you agree?

20   A.   Yes, sir.

21   Q.   And the next would be whether he has given you accurate

22   information, like, does he give you the right name of Andre

23   Briscoe or does he say, you know, Andre Brown or some other

24   alias, right?

25   A.   Yes.

```
1    Q.   And you've had that happen before; correct?

2    A.   Sure.  Yes, sir.

3    Q.   Thank you.

4    A.   Yes.

5    Q.   And, in fact, Andre Briscoe gave you the correct

6    information, his name.  He gave you an address.  He had

7    trouble with his grandmother's phone number and so he couldn't

8    give you that, but he gave you Tiffany Jackson's phone number;

9    correct?

10   A.   Yes.

11   Q.   And Tiffany Jackson's phone number was (443) 563-3915.

12   That's what's on the form, and to your knowledge, that's

13   accurate as well; correct?

14   A.   Yes, sir.

15   Q.   And Tiffany Jackson, so we know, is the woman who

16   eventually he told you about down in Perkins Projects.  He's

17   known her for a year, and he said he was literally there just

18   before he came back to Cambridge a couple weeks ago?

19   A.   Yes, sir.

20   Q.   I'm sorry, these questions are long, but I apologize for

21   that.  You also indicated there's three basic -- or you had

22   certain categories you wanted to check off in this interview.

23   No. 1 was his relationship with Jennifer; correct?

24   A.   Yes.

25   Q.   And just generally you can -- Mr. Briscoe did tell you
```

1    about his relationship with Jennifer; correct?

2    A.   Yes.

3    Q.   The next was Kiara Haynes; correct?

4    A.   Yes, sir.

5    Q.   And Mr. Briscoe did tell you about his relationship with

6    Kiara Haynes; correct?

7    A.   He did.

8    Q.   Next, specifically, you wanted to know about his

9    whereabouts on the 26th of May of 2015, the 27th of May of

10   2015, and the 28th of May of 2015; correct?

11   A.   Yes, sir.

12   Q.   And he did answer those questions as well; correct?

13   A.   He did.

14   Q.   And finally, as we just spoke about, was Tiffany Jackson,

15   and he gave you her phone number and he answered questions as

16   to Tiffany Jackson as well; correct?

17   A.   Yes, sir.

18   Q.   You had a warrant -- you didn't have an arrest warrant

19   for Mr. Briscoe; did you?

20   A.   No, sir.

21   Q.   The warrant you had was -- and the warrant you had was

22   for his DNA; correct?

23   A.   That's right.

24   Q.   And the DM is accomplished -- to accomplish that warrant,

25   I believe, in 2015, you would take a swab and you would swab

1   his mouth and then you would put it in the clean container and

2   save it for later lab analysis.  Is that what it was?

3   A.   Yes, sir.

4   Q.   Now, I think that was near the very end of the interview

5   when you spoke to Mr. Briscoe about the DNA, obtaining his

6   DNA, and as you indicated, he was very compliant about that,

7   right?

8   A.   Yes.

9   Q.   In addition he said, "I'll give you my semen too," right?

10  A.   Yes, he did.

11  Q.   You don't collect that, right?

12  A.   No, we don't.

13  Q.   The interview, as you indicated, lasts approximately a

14  little under two hours, right?

15  A.   Yes.

16  Q.   And you also indicated that you saw a picture -- I seem

17  to lose things.  Excuse me.

18       I'm showing you Government's Exhibit 4.21, page 1.  Are

19  the -- so this is a still of the video; correct?

20  A.   Yes, sir.

21  Q.   And you reviewed the video and the video worked well,

22  right?

23  A.   Yes, it did.  Yes, it did.

24  Q.   The problem was that there was some -- as you indicated,

25  some trouble with the recording in that it would take --

```
 1    either Mr. Briscoe would be talking too softly or perhaps you
 2    or your partner might have talked too softly and so there was
 3    some trouble in the recording; correct?
 4    A.   Yes, sir.
 5    Q.   But you've dealt with those problems in the past in many,
 6    many, many cases; correct?
 7    A.   We've had issues in the past.
 8    Q.   Okay.  So what's been created is an exhibit which you've
 9    looked at briefly to refresh your recollection, and I'm now
10    going to bring up to you Defense Exhibit No. 54, which --
11              MR. BUDLOW:  ID only?
12              MR. PURPURA:  Absolutely ID only.  Unless you guys
13    want to --
14              MR. BUDLOW:  ID only.
15              THE COURT:  What exhibit number is this,
16    Mr. Purpura?  54?
17              MR. PURPURA:  Fifty-four.
18              THE COURT:  All right.
19              MR. PURPURA:  ID only.
20              THE COURT:  All right.  ID only.  Identification
21    only.
22              MR. PURPURA:  Thank you.
23              THE COURT:  It's not being introduced into evidence.
24    BY MR. PURPURA:
25    Q.   Just take a look at the front page, is that --
```

```
 1    A.    Just the cover page where it says --

 2    Q.    You can look at the whole thing.  I'm just trying to

 3    shorten this up.  If I say this is the transcript that the

 4    Government and I have agreed upon as an exhibit transcript,

 5    that accurately would reflect the recordings?

 6    A.    Yes, sir.

 7    Q.    And I'm going to ask you a couple questions now from

 8    that.  And feel free, and I'll give you the page number and

 9    everything else, just to take a look at it, okay.  Now you

10    went through -- I'm sorry.

11              MS. BRUSCA:  May I, Your Honor?

12              THE COURT:  Yes, sure.

13         (Counsel confer.)

14    BY MR. PURPURA:

15    Q.    Initially after going through some basic questions with

16    Mr. Briscoe, you then, as we've heard before on 4.19, you went

17    through the Advice of the Miranda Rights with Mr. Briscoe;

18    correct?

19    A.    Yes, sir.

20    Q.    And as you indicated, those are his initials, right?

21    A.    Yes.

22    Q.    He signed it as well, dated it; correct?

23    A.    Yes.

24    Q.    And you're confident he understood exactly what he was

25    being asked; is that correct?
```

```
 1    A.    Yes, sir.

 2    Q.    And at no time -- at no time in the two-hour

 3    conversation, at no time did he ever stop and say, "I want a

 4    lawyer," right?

 5    A.    No, he did not.

 6    Q.    And in the beginning, before he even started, he didn't

 7    sit there and think about, should I have a lawyer?  He never

 8    even said that; did he?

 9    A.    He did not.

10    Q.    And he never requested a lawyer?

11    A.    No.

12    Q.    And to your knowledge, before June 5th, 2015, did he have

13    any legal counsel at all on this issue?

14    A.    As far as I know, no.

15    Q.    And, you know -- and you knew at that point, because he

16    was a target at that point, you know that this was not his --

17    I use the word "rodeo," this was not his first time being

18    arrested; correct?

19    A.    Yes.

20    Q.    So to your knowledge he's been through that process

21    before, so this is a man who really should know his rights,

22    whether he should or should not have a lawyer; correct?

23    A.    I would agree.

24    Q.    Thank you.

25          So you asked him, first of all, about K.B., you showed a
```

1    photograph of K.B., and he was able to identify K.B.; correct?

2    A.   Yes, sir.

3    Q.   He didn't say that "I don't really know him.  I never saw

4    him before," right?

5    A.   Correct.

6    Q.   Okay.  And then you showed him a picture of Jennifer

7    Jeffrey and he looked at that and at first he said, "That's

8    not familiar," right?

9    A.   I don't know if he said, "That's not familiar."  I know

10   he paused trying to figure out who that was.

11   Q.   And then his trouble appeared to be that she lost a lot

12   of weight --

13   A.   Yes.

14   Q.   -- between that photograph and --

15   A.   Yes.

16   Q.   -- 2015?

17   A.   Yes, sir.

18   Q.   But then he did eventually say, "Yes, that's Jennifer

19   Jeffrey, just a larger picture of her?"

20   A.   Yes, sir.

21   Q.   And that was accurate, that was her photograph; right?

22   Yes?

23   A.   Yes, it was.

24   Q.   And it was accurate, that was K.B.'s photograph; correct?

25   A.   Yes.

1    Q.   And he told you in the beginning that he went -- that he

2    saw her sometime in February, started -- met her sometime in

3    February.  I think he even used Valentine's Day as a mark when

4    he first, kind of, met Jennifer Jeffrey; correct?

5    A.   Yes.

6    Q.   And that, based on your investigation, was accurate as

7    well; is that correct?

8    A.   Yes.

9    Q.   He indicated that he saw her, approximately, one time a

10   week, sometimes on the Eastern Shore and sometimes in

11   Baltimore?

12   A.   That's right, yes.

13   Q.   And again, based on your investigation, that was accurate

14   as well; is that correct?

15   A.   Yes, sir.

16   Q.   He said the first time he met her was through his cousin

17   Kiara Haynes; correct?

18   A.   Yes.

19   Q.   And he said the first time he met her was on the Eastern

20   Shore; correct --

21   A.   I believe so, yes.

22   Q.   -- in Cambridge?

23        And that was accurate, as well, based on your

24   investigation; is that correct?

25   A.   Yes, sir.

```
1    Q.   He told you about -- there was a sexual relationship
2    between his cousin Tony and Jennifer Jeffrey; correct?
3    A.   Yes.
4    Q.   And based on your investigation, that was accurate as
5    well; correct?
6    A.   That's right.
7    Q.   And he told you that that sexual relationship between his
8    cousin Tony -- that's Tony Harris -- and Jennifer Jeffrey was
9    somewhat cooled off by May or June of 2015; correct?
10   A.   I believe it was April, May, but yes.
11   Q.   April, May 2015?
12   A.   Yes.
13   Q.   And based on your investigation, that was also correct?
14   The relationship did cool off between Jennifer and Tony;
15   correct?
16              MS. BRUSCA:  Objection.  Basis.
17              THE COURT:  Sustained.  It's sustained.  You have to
18   state the basis to this witness's knowledge as to that.
19              MR. PURPURA:  Based on his investigation, if he
20   knows.
21              THE COURT:  Well, but in terms of the knowledge he
22   gains through investigations, just lay a foundation as to
23   whether or not he inquired as to that.
24        Objection is sustained.  You have to lay a foundation for
25   him to opine as to that, so you have to lay a foundation for
```

```
 1        it.
 2        BY MR. PURPURA:
 3        Q.   Before you went up and did this interview and after you
 4        did this interview, you investigated Andre Briscoe; correct?
 5        A.   Yes.
 6        Q.   And this is a homicide investigation; correct?
 7        A.   That's right.
 8        Q.   And you did this with your partner; correct?
 9        A.   That's right.
10        Q.   And you both did the best -- you were the lead on this
11        particular case; correct?
12        A.   That's right.
13        Q.   And you both, yourself and Detective Parker, did the best
14        you could under the circumstances of this investigation;
15        correct?
16        A.   Yes, sir.
17        Q.   And you followed a lot of leads; is that correct?
18        A.   That's fair to say, yes.
19        Q.   And you interviewed a lot of people; is that correct?
20        A.   Yes.
21        Q.   And so when I asked you -- based on your investigation,
22        are you calling upon your memory of all of the people you
23        interviewed, all of the leads you followed and your entire
24        investigation?
25             Is that correct?
```

```
 1     A.    Yes, sir.

 2     Q.    Thank you.

 3           Now, you wanted to know when Andre Briscoe was up in

 4     Baltimore right around -- well, you wanted him to tell you

 5     whether he was in Baltimore recently and when he saw Jennifer

 6     Jeffrey the last time; correct?

 7     A.    Yes, sir.

 8     Q.    And you actually had, I think, a calendar you pulled up

 9     on your cell phone; correct?

10     A.    That's right.

11     Q.    Okay.  And he told you that the date that he went up

12     there based on him saying a couple days what -- anyway, long

13     story short is that you all concluded he went up there on the

14     26th; correct?

15     A.    Yes.

16     Q.    And based on your investigation, that's accurate;

17     correct?

18     A.    Yes.

19     Q.    And right in that same colloquy between you and

20     Mr. Briscoe, you asked him what time?  When, on the 26th, did

21     he go see Jennifer Jeffrey, and how long did he stay at

22     Jennifer Jeffrey's?

23           Do you remember that?

24     A.    I do.

25     Q.    And what he told you was that he arrived sometime around
```

1    midnight and left sometime early the next morning; correct?

2    A.   Yes, sir.

3         **MR. PURPURA:**   Putting up Government's Exhibit 11.1

4    which do you want to see cell tower?

5         **MR. BUDLOW:**   Yes.

6    **BY MR. PURPURA:**

7    Q.   Showing you Government's Exhibit 11.1, and this is from

8    the time period of roughly 12:25 a.m. on the 27th through 5:15

9    a.m. on the 27th.   It will be indicative that the cell phone

10   of Mr. Briscoe was in the vicinity of Jennifer Jeffrey's

11   house.  Would that be consistent of what he told you when you

12   interviewed him five years earlier?

13   A.   Yes.

14   Q.   And he also, specifically, told you where he was in

15   Jennifer Jeffrey's house.  He told you that he was in the

16   bedroom with her and that he was sitting on a white chair;

17   correct?

18   A.   Yes, he did.

19   Q.   And early in the investigation, this is early June 5th,

20   2015, when he said he was in the bedroom, you and your partner

21   were thinking that there was more going on at this point than

22   him just sitting there.  Is that fair to say?

23   A.   We asked if there was a physical relationship going on

24   with him and Jennifer.

25   Q.   And he told you there wasn't; correct?

```
 1    A.    That's right.
 2    Q.    And, again, based on your investigation, have you
 3    reviewed the autopsy report?
 4            MS. BRUSCA:  Objection.
 5            MR. PURPURA:  Excuse me.
 6            THE COURT:  I can't hear you.
 7            MS. BRUSCA:  Withdrawn for that one, Your Honor.
 8            THE COURT:  I can't hear you.  I'm sorry.
 9            MS. BRUSCA:  Withdrawn for that one, Your Honor.  I
10    withdraw my objection.
11            THE COURT:  Okay.
12    BY MR. PURPURA:
13    Q.    As part of your investigation, have you reviewed the
14    autopsy report of Jennifer Jeffrey?
15    A.    I did.
16    Q.    And was there any seminal fluid found in the anal area,
17    vaginal area, or oral area?
18    A.    No, sir.
19    Q.    Again, that would be consistent of what Andre Briscoe
20    told you when you interviewed him back on June 5th, 2015;
21    correct?
22    A.    Yes, sir.
23    Q.    You reviewed the photographs as part of your
24    investigation, in particular, Exhibit 2.8 of Jennifer
25    Jeffrey's house.  Sorry.  I should put it up there.
```

```
1          Do you recognize that?
2    A.   Yes, I do.
3    Q.   Okay.  And that would be the white chair that Andre
4    Briscoe said that he was seated in in Jennifer Jeffrey's
5    bedroom; is that correct, sir?
6    A.   Yes.
7    Q.   And then Mr. Briscoe told you about Kiara coming to
8    Jennifer Jeffrey's house early in the morning around 4 or
9    5 o'clock in the morning and banging on the door; correct?
10   A.   Yes.
11   Q.   And he said that the banging, the incident lasted for
12   about 10 to 15 minutes; correct?
13   A.   Yes, sir.
14   Q.   He also indicated that either Ms. Jeffrey or her
15   roommate, her niece called 911; correct?
16   A.   Yes.
17   Q.   And, in fact, as the investigator, you were able to
18   confirm that, in fact, someone did call 911 about this
19   incident; correct?
20   A.   Yes.
21   Q.   And you also interviewed -- in addition to the many
22   people you interviewed, you interviewed the niece of Brittany
23   and -- is that her last name?
24        You interviewed Brittany Street as well?
25   A.   I believe her first name is Brianna.
```

```
 1    Q.   Brianna, Brianna Street, did you --

 2    A.   Yes.

 3    Q.   Thank you.

 4         And she confirmed about this (knocking) banging on the

 5    door and the argument that went on with Kiara early in the

 6    morning; correct?

 7    A.   Yes, sir.

 8    Q.   And, again, that's consistent with exactly what Andre

 9    Briscoe told you without counsel on June 5th, 2015; correct?

10    A.   Yes, sir.

11    Q.   He told you once he left Jennifer's that he went back to

12    Kiara's house; correct?

13    A.   Yes.

14    Q.   And did you -- based on this, did you have cell phone

15    data at that point?

16    A.   I believe the 5th of June --

17    Q.   Well, strike that.  I apologize.

18         During your investigation, as the homicide detective, did

19    you have cell phone information or cell site information which

20    confirmed that, in fact, Andre Briscoe did go from Jennifer

21    Jeffrey's house back to Kiara's house sometime in the morning

22    hours?

23    A.   I don't think that it picked up specific addresses in

24    Baltimore, especially since -- given the distance between

25    Ms. Jeffrey's home and Ms. Kiara's home.
```

```
 1      Q.   Fair enough.

 2           But Andre Briscoe did tell you that he went back to

 3      Kiara's house; correct?

 4      A.   Yes.

 5      Q.   He was somewhat upset that she was banging on the door,

 6      right?

 7      A.   Yes.

 8      Q.   And then they made up, apparently, and had sex.  That's

 9      what he told you, right?

10      A.   Yes.

11      Q.   And then he did tell you that sometime early afternoon on

12      the 27th, he went over to Perkins Projects; correct?

13      A.   I thought he said later in the evening.  I thought he

14      said after the afternoon, it was later in the evening.

15      Q.   All right.  Whether it's -- if you recall -- if you can

16      find it, please, please help me out.  But if not, the bottom

17      line is that he did tell you that he went over to Tiffany

18      Jackson's house and, again, we're on the 27th of May; correct?

19      A.   Yes.

20      Q.   And he said he spent -- he stayed at Tiffany Jackson's

21      house until late in the evening, correct, if you remember?

22      A.   So I'm looking at page 23 of the transcript and --

23      Q.   Yeah, I was, too.

24           (Counsel confer.)

25             THE WITNESS:  On page 27 of the transcript, I
```

```
 1    believe it said that it was -- he didn't leave until later
 2    that night from Tiffany's to go back to Cambridge.
 3    BY MR. PURPURA:
 4    Q.   Can you look at page 26, please?
 5    A.   Sure.
 6    Q.   26, line 1149.
 7    A.   Yes, sir, I have it.
 8    Q.   And so does that refresh your recollection that it was --
 9    does it appear to be the afternoon?
10    A.   Yes, they said it's still daylight.
11    Q.   Okay.  Thank you.
12         And at the same time you asked him about who picked you
13    up; correct?
14    A.   Yes.
15    Q.   And the person that he told you who picked him up was
16    Junior; correct?
17    A.   Yes.
18    Q.   And at that point, you didn't know who Junior was; is
19    that correct?
20    A.   That's right.
21    Q.   But you now know who Junior is today, right?
22    A.   Yes.
23    Q.   And Junior is Wane Briscoe; correct?
24    A.   Yes.
25    Q.   And this is a picture -- Defense Exhibit 123, that's a
```

```
 1     picture of Wane Briscoe; correct?

 2              MS. BRUSCA:  Objection.  Basis?

 3     BY MR. PURPURA:

 4     Q.   If you know.  Do you know?

 5     A.   I do not.

 6              THE COURT:  Sustained.

 7              MR. PURPURA:  No problem.

 8     BY MR. PURPURA:

 9     Q.   But again, he specifically told you that it was Junior?

10     I think he even said his cousin that picked him up; correct?

11     A.   Yes, he just referred to him -- initially, I thought he

12     said June.  That's why I asked if it was male or female, but

13     it was established that it was Junior, but that was the only

14     name that I had.

15     Q.   And he said -- and you asked him, "Which cousin was that

16     that picked you up," and his response was Junior?

17     A.   Yes.

18     Q.   Okay.  And then you asked him if Junior's male or female,

19     and he told you male, right?

20     A.   Yes.

21     Q.   He didn't give you someone else's name, to your

22     knowledge, a false name?  He didn't say that Tommy Jones

23     picked me up or Bill Purpura picked me up; did he?

24     A.   Well, I asked him if he knew Junior's whole name.  He

25     said he didn't know, he just knew him as Junior.
```

```
 1    Q.   He didn't know his cousin's full name, he knew him as
 2    Junior?
 3    A.   Correct.
 4    Q.   And his -- but Ms. Brusca asked you about the cell phone
 5    and showed you some pictures of the cell phone.  And Mr.
 6    Briscoe was holding the cell phone in his hand, and Mr.
 7    Briscoe told you that he just rebooted the cell phone;
 8    correct?
 9    A.   Yes, but that was prior to -- prior to getting the phone.
10    Q.   Prior to actually giving him the phone so he could turn
11    it on, right?
12    A.   Correct.
13    Q.   Now, do you know what rebooting -- do you know the
14    difference between rebooting and resetting a cell phone?
15    A.   Do I know what the difference is?
16    Q.   Yes.
17    A.   I guess powering on a phone as opposed to resetting the
18    information from the phone.
19    Q.   So rebooting is basically -- my phone is off right now.
20    To reboot you just going to power it back on again, correct,
21    that's your knowledge of rebooting?
22    A.   Yes.
23    Q.   Sometimes when you have cable TV and it's not working,
24    you got to try to reboot that as well by popping the plug out,
25    right?
```

```
1    A.    Sure.

2    Q.    It doesn't affect the data; does it?

3    A.    Not that I'm aware of, no.

4    Q.    I mean, on planes, sometimes some of us turn our phones

5    off completely, then when we land, we turn it back on again,

6    right?

7    A.    Sure.

8    Q.    Reboot, right?

9    A.    Sure.

10   Q.    You got all of your messages right back, right?

11   A.    Correct.

12   Q.    I know sometimes the names in these cases are difficult,

13   and especially when someone is traveling from Tiffany's to

14   Kiara's to Jennifer's, you know, it gets confusing.  Is that

15   fair to say?

16   A.    That's fair.

17   Q.    Okay.  And so you all, you, Detective Lewis, and

18   Detective Parker, you kind of went over that multiple times

19   with Mr. Briscoe to get it straight in your minds as well,

20   right?

21   A.    That's right.

22   Q.    And eventually you did have it straight when he gave you

23   the information he had.  He started at Perkins, went to

24   Kiara's; correct?

25   A.    Yes.
```

```
1    Q.   Went to Jennifer's?

2    A.   Yes.

3    Q.   Spent the five hours there, came back to Kiara's?

4    A.   That's right.

5    Q.   Then back to Perkins, right?

6    A.   Yes.

7    Q.   Eventually, he did tell you about drug dealing; correct?

8    A.   That's right.

9    Q.   He told you that, in fact, Jen was Tony's, cousin Tony

10   Harris's connect; correct?

11   A.   Say that again, I'm sorry.

12   Q.   That Jen, Jennifer was Tony Harris's connection?

13   A.   I don't recall him telling me specifically.  I know that

14   they -- he said that she was selling and that she was trying

15   to sell to them down in Cambridge.  I don't remember her --

16   him saying specifically to who, though.

17   Q.   Let me see if I can find it for you.  He told -- but he

18   told you that the product that she had was bad product;

19   correct?

20   A.   Yes.

21   Q.   Actually -- no strike that.  And then you asked him about

22   a gun.  Do you remember that?

23           MS. BRUSCA:  Objection.  Misstates.

24           THE COURT:  Overruled.

25           THE WITNESS:  Could you ask me that again, Counsel?
```

```
 1    I'm sorry.

 2    BY MR. PURPURA:

 3    Q.   You asked him about a gun?

 4    A.   No, sir.

 5    Q.   Turn to page 47, please.

 6         You're -- strike that.  I'm sorry.  You're correct.  Turn

 7    to page 47 anyway.

 8    A.   I'm there.

 9    Q.   The conversation about a gun came up when Andre said to

10    you, "I don't even own a gun," right?  That's line 2086.

11    A.   Yes.

12    Q.   And then you asked him, "If you needed to get one, could

13    you," right?

14    A.   That's right.

15    Q.   And what he said -- he didn't say, "No, I could never get

16    a gun;" did he?

17    A.   No, he did not.

18    Q.   What did he say?

19    A.   He said, "Yeah, I'm pretty sure I could."

20    Q.   Thank you.  He was polite and cooperative --

21    A.   Yes.

22    Q.   -- the entire two hours; correct?

23    A.   Yes.

24    Q.   And then after the interview was complete, you all came

25    back to Baltimore; correct?
```

```
 1    A.    That's right.
 2    Q.    And Andre Briscoe remained in Cambridge on whatever
 3    charge Cambridge had on those drugs in the house to your
 4    knowledge, right?
 5    A.    Yes, sir.
 6              MR. PURPURA:  I have no further questions.
 7              THE COURT:  Thank you, Mr. Purpura.
 8         Any redirect, Ms. Brusca?
 9              MS. BRUSCA:  We will have a little bit of redirect,
10    Your Honor.  Do you want --
11              THE COURT:  I guess we better break for lunch then
12    if you have --
13              MR. PURPURA:  Judge, if she only has five minutes,
14    why not let her finish?
15              MS. BRUSCA:  I think it will be a little more than
16    five minutes.
17              THE COURT:  I can't hear you.  I'm sorry.
18              MS. BRUSCA:  I believe it will be a little more than
19    five minutes, Your Honor.
20              THE COURT:  Okay.  I suspect it would be.  All
21    right.  With that, we will take our recess.
22         You shouldn't discuss your testimony with anyone,
23    Detective Lewis, while you're having lunch, and we'll see you
24    back on the witness stand at 2 o'clock.
25              THE WITNESS:  Yes, sir.
```

1          **THE CLERK:**  This Court stands in recess.

2      (Jury exits courtroom 12:55 p.m.)

3          **THE CLERK:**  This Court resumes its session.  The

4    Honorable Richard D. Bennett, presiding.

5          **THE COURT:**  I understand we had a little excitement

6    about the order of witnesses, but we've gotten that resolved

7    now; is that correct?

8          **MS. BRUSCA:**  I think so, Your Honor, we -- I think

9    we are hoping and expecting to rest tomorrow, but somebody who

10   we thought we would call on Monday is not available, that's

11   David Azur, so we're going to call him today since he is

12   available this afternoon.

13         **THE COURT:**  All right.  Well, you know, with all due

14   respect, wherever he is -- you know, the tail doesn't wag the

15   dog here, I guess, to put it bluntly.  So, you know, a

16   person's got to be there.  We'll order him to be here, so it's

17   as simple as that.  If you need a witness, I'll issue a

18   subpoena for a witness.  I'm not going to -- the Court

19   calendar can't be at the mercy of one person.

20         **MS. BRUSCA:**  No, no.  I mean, it was -- I apologize,

21   maybe I put it poorly.  What I meant was, we're happy because

22   we think we're going to be able to rest tomorrow, and I think

23   this witness is in the scheme of things --

24         **THE COURT:**  Okay.  So the next witness will be David

25   Azur from ATF.

 1          **MR. PURPURA:**  And I have no objection.  We weren't

 2     informed that he was testifying this afternoon.  We'll be

 3     ready to go forward.

 4          **THE COURT:**  Okay.  The very next witness coming up

 5     right this minute is whom?

 6          **MS. BRUSCA:**  Detective Lewis will come back to the

 7     stand.

 8          **THE COURT:**  Okay.  I'm sorry, that's right.  Okay.

 9     Yes.  Bring Detective Lewis back in and we'll be fine.

10          **MS. BRUSCA:**  Thank you, Your Honor.

11          **THE COURT:**  That's right.  We have redirect with

12     Detective Lewis.

13          **MS. BRUSCA:**  Yes.

14          **THE COURT:**  Thank you.  Detective Lewis, if you'll

15     come forward here, sir.

16        (Witness resumes stand.)

17          **THE COURT:**  With that, Mr. Gurevich, if you want to

18     get the jury.  Thank you.

19          **THE CLERK:**  All rise for the jury.

20        (Jury enters courtroom 2:15 p.m.)

21          **THE COURT:**  Good afternoon, everyone, and we're

22     ready to continue with the redirect examination of Detective

23     Lewis.

24        Detective Lewis, you're obviously still under oath, sir.

25        Ms. Brusca?

```
 1                  MS. BRUSCA:  Thank you, Your Honor.
 2              R E D I R E C T   E X A M I N A T I O N
 3    BY MS. BRUSCA:
 4    Q.   Detective Lewis, you said that the Defendant told you on
 5    the morning of Wednesday, May 27th, 2015, he never spoke to
 6    Jennifer Jeffrey, that's right?
 7    A.   Yes.
 8    Q.   And he said that they were texting; is that correct?
 9    A.   Yes.
10    Q.   That she never hit him back?
11    A.   Correct.
12              MR. PURPURA:  Objection, Your Honor.  This is not
13    redirect.  This is --
14              MS. BRUSCA:  I'll rephrase, Your Honor.
15              THE COURT:  It's within the realm of 611 to proceed,
16    and you can recross on this, Mr. --
17              MR. PURPURA:  Thank you.
18              THE COURT:  -- Purpura.  You're certainly given the
19    latitude to recross.
20              MS. BRUSCA:  Thank you, Your Honor.
21    BY MS. BRUSCA:
22    Q.   And based on your investigation, Detective Lewis, that
23    wasn't true; was it?
24    A.   That's right.
25    Q.   When was the last phone call between Jennifer Jeffrey and
```

```
 1    the Defendant?
 2    A.   It was 11:41 that day, meaning the 27th.  And I believe
 3    that the amount of time on the call was 111 seconds.
 4    Q.   And you also asked the Defendant during the interview for
 5    his address; is that right?
 6    A.   Yes.
 7    Q.   And what address did he provide?
 8    A.   He provided 3443 Ravenwood Avenue in Baltimore.
 9    Q.   And based on your investigation, including what the
10    Defendant told you on that very day, did the Defendant stay at
11    that address?
12    A.   No.
13    Q.   In fact, he told you he moved to Cambridge; isn't that
14    right?
15    A.   Yes.
16    Q.   And did the Defendant tell you why Kiara and Jen came
17    down to Cambridge for the first time in connection with his
18    move?
19    A.   That he hadn't seen -- that he hadn't seen Kiara in a
20    while.
21    Q.   And she wanted to see him?
22    A.   And she wanted to see him, yes.
23    Q.   Now, when you asked the Defendant where he stayed in
24    Cambridge, did he give you addresses?
25    A.   No.
```

1    Q.  Did he give you the name of the cousin with whom he said

2    he sometimes stayed?

3    A.  I think he said baby girl or something like that.

4    Q.  So he said a baby girl and a cousin?

5    A.  A baby girl and a cousin, yes.

6    Q.  Did he give you their names?

7    A.  No.  No.

8    Q.  Did he give you their addresses?

9    A.  No.

10   Q.  And with respect to next of kin --

11          **MS. BRUSCA:**  May I just grab a board, Your Honor,

12   from the front.

13          **THE COURT:**  Sure.  What exhibit is that?  I know

14   that's a blow-up exhibit.

15          **MS. BRUSCA:**  This is 17.8A.

16          **THE COURT:**  17.8A.

17   **BY MS. BRUSCA:**

18   Q.  And on this board, does the Defendant list anybody on his

19   next of kin?

20   A.  Lillian Harris, he said was his grandmother.

21   Q.  His grandmother.

22       And did he have contact information for her?

23   A.  He did not.

24   Q.  And what about the 12 or 14 other people on 17.8A?

25   A.  No.  When we went over the information sheet, he provided

1    Ms. Lillian Harris's name, and he gave his girlfriend, Tiffany

2    Jackson, I think the last name was.

3    Q.   He didn't give any aunts or uncles?

4    A.   No, ma'am.

5    Q.   He didn't give any first cousins or second cousins?

6             **MR. PURPURA:**  Objection.

7             **THE COURT:**  Sustained.  Sustained.

8    **BY MS. BRUSCA:**

9    Q.   And based on your investigation, did you know how big the

10   Defendant's family was?

11   A.   Initially, no.  As the investigation progressed, I got to

12   learn that there were quite a few members of his family.

13   Q.   And the two folks that were next of kin were Lillian

14   Harris and Tiffany Jackson?

15   A.   Yes.

16   Q.   I believe you testified that the Defendant told you he

17   was picked up from Tiffany Jackson's house by Junior; is that

18   correct?

19   A.   Yes.

20   Q.   And did he tell you Junior's name?

21   A.   No.

22   Q.   What about that Junior was his first cousin?

23   A.   I'm sorry?

24   Q.   What about that Junior was his first cousin?

25   A.   I believe he did say that.

```
1    Q.   And what about where Junior lived?
2               MR. PURPURA:  Objection.
3               THE COURT:  Overruled.
4    BY MS. BRUSCA:
5    Q.   What about where Junior lived?
6    A.   He did not.
7    Q.   What about Junior's phone number?
8               MR. PURPURA:  Objection.
9               THE COURT:  Overruled.
10              MR. PURPURA:  It wasn't asked --
11              THE COURT:  Overruled.  Overruled.
12   BY MS. BRUSCA:
13   Q.   And what about the intersection where Defendant told you
14   he picked up a hack to get from Defendant's house back to
15   Tiffany Jackson's on the morning of May 27th, did the
16   Defendant tell you that?
17   A.   No.
18   Q.   And you were asked on cross-examination if the Defendant
19   told you what time of day he returned to Tiffany Jackson's
20   house on May 27th; is that right?
21   A.   Yes.
22   Q.   And you said that the Defendant told you it was daylight;
23   is that right?
24   A.   Yes.
25   Q.   If I could -- he also told you more specifically that it
```

```
 1    wasn't even afternoon; is that right?
 2    A.   Yes.
 3    Q.   And noon is at 12:00 p.m.; is that right?
 4    A.   Yes.
 5    Q.   When you talked to the Defendant about who was at Tiffany
 6    Jackson's, did the Defendant provide you the name of his
 7    homeboys?
 8    A.   No.
 9    Q.   What about their phone numbers?
10    A.   No.
11    Q.   What about their addresses?
12    A.   No.
13    Q.   And turning to the day before, on Tuesday, May 26th, the
14    Defendant told you he had been at Tiffany's house with Kiara;
15    is that right?
16    A.   Yes.
17    Q.   And you testified that he told you that Kiara didn't want
18    to go home by herself, so he dropped Kiara off; is that right?
19    A.   That's right.
20    Q.   Did he tell you it took him two hours to get from
21    Tiffany's to Kiara's?
22    A.   Yes.
23    Q.   He told you it took him two hours to go across Baltimore?
24    A.   No, I never got a specific time, no.  He just told me
25    where he was going from one place to the next.  There was
```

```
1    never any specific time.

2    Q.   Did he tell you if he stopped anywhere along the way?

3    A.   No.

4    Q.   Now, Detective Lewis, have you investigated sex crimes?

5    A.   Have I investigated a what?  I'm sorry.

6    Q.   Sex crimes.

7    A.   No.

8    Q.   Are you aware whether having no semen means there was no

9    sex?

10        MR. PURPURA:  Objection.

11        THE COURT:  Sustained.  He's already said he hasn't

12   investigated sex crimes.  Objection sustained.  It's an

13   improper line of questioning.

14        MS. BRUSCA:  All right.

15   BY MS. BRUSCA:

16   Q.   Based on your investigation, did you believe that the

17   Defendant was having sex with Jennifer Jeffrey?

18        MR. PURPURA:  Objection.

19        THE COURT:  Sustained.

20        MS. BRUSCA:  No further questions, Your Honor.

21        THE COURT:  All right.  Mr. Purpura, recross on some

22   of these points you were concerned about?

23        MR. PURPURA:  If I could have one second, Judge.  I

24   apologize.

25             R E C R O S S  -  E X A M I N A T I O N
```

**BY MR. PURPURA:**

Q.   Ms. Brusca asked you about Junior.  When you asked Andre

Briscoe, "Who picked you up," he indicated it was his cousin

Junior; is that correct?

A.   Yes, but, again, I heard him -- initially, I thought he

said June, and that's why I asked if June was male or female.

Q.   Right.  And Ms. Brusca showed you the board with the

family and the nicknames, and you see a nickname for Wane

Briscoe?

A.   Yes, sir.

Q.   And what did the Government put down as the nickname for

Wane Briscoe?

A.   Junior.

Q.   Is it difficult for a homicide detective like yourself to

find out which cousin Andre Briscoe was referring to as

Junior?

A.   Please ask me that again, I'm sorry.

Q.   Would it be difficult for a homicide detective to figure

out which of the cousins was referred to as Junior?

A.   There is no straight answer to that question, and I say

that because No. 1, the size of his family.  And 2, depending

on who I was speaking to at the time, there was no one to

offer Junior's name.  But I guess the direct answer that

you're looking for, I would say in this particular case, no.

Q.   Thank you.

1          And Ms. Brusca asked you, did Andre Briscoe ever give you

2     Junior's telephone number?  Do you remember that, she asked

3     you that?

4     A.   Yes, yes, she did.

5     Q.   Did you ever ask for Junior's telephone number?

6     A.   No, I think I asked what his name was, but I never got a

7     name.

8     Q.   And you didn't ask for any other information about

9     Junior, other than what his full -- what his Government name

10    would be; correct?

11    A.   Correct.

12    Q.   3442 Ravenwood Avenue, that is Andre Briscoe's aunt's

13    house in 2015?

14    A.   He advised me that was his grandmother's house.

15    Q.   His grandmother's then?

16    A.   Yes.

17    Q.   And the person he noted as his grandmother and as a

18    contact person was the very head person on this Government

19    Exhibit, Lillian Harris; correct?

20    A.   Yes, sir.

21              **MR. PURPURA:**  Thank you.  No further questions.

22              **THE COURT:**  All right.  Thank you, Mr. Purpura.

23         Detective Lewis, you may step down.  Again, you shouldn't

24    discuss your testimony with anyone in the event you're called

25    back a third time to the witness stand.  I doubt that will be

```
 1     the case, but just don't discuss this testimony until this
 2     case concludes.
 3               THE WITNESS:  Yes, Your Honor.
 4               THE COURT:  Thank you very much.
 5               THE WITNESS:  Thank you.
 6               THE COURT:  All right.  With that, Ms. Brusca, the
 7     next Government witness.
 8               MS. BRUSCA:  It will be -- the Government calls Dave
 9     Azur.
10               THE COURT:  Would you come forward here, sir, and be
11     sworn for one second.
12         Wait one second.  Thank you, Mr. Gurevich.  Swear the
13     witness, please.
14               THE CLERK:  Raise your right hand for me, please.
15               DAVID AZUR, having been duly sworn, was examined and
16     testified as follows:
17               THE WITNESS:  Yes, sir, I do.
18               THE CLERK:  While speaking clearly into the
19     microphone, can you please state and spell your full name for
20     the record.
21               THE WITNESS:  Sure.  My name is David Azur.  It's
22     D-a-v-i-d, A-z-u-r.
23               THE COURT:  Mr. Azur, sir, under the -- I'm Judge
24     Bennett, the Presiding Judge here.  Under the standing orders
25     of the Court, masks are to be worn in all public areas of the
```

```
1    courthouse with the exception of in the courtroom if, in the

2    discretion of the Presiding Judge, a person has been fully

3    vaccinated, so I'm inquiring of the vaccination status of

4    anyone who comes in.

5         Have you been fully vaccinated, sir?

6              THE WITNESS:  Yes, Your Honor.

7              THE COURT:  All right.  So you don't have to, but

8    you can pull your mask down when responding to the Government

9    questions.

10             THE WITNESS:  Thank you, Your Honor.

11             THE COURT:  Thank you.

12        D I R E C T   E X A M I N A T I O N

13   BY MS. BRUSCA:

14   Q.   Hi, Detective Azur.

15   A.   Good afternoon, ma'am.

16   Q.   How are you employed?

17   A.   I'm sorry?

18   Q.   How are you employed?

19   A.   I am a detective with the Baltimore Police Department.  I

20   have been with the police department for almost 29 years.  The

21   last 14 and a half years, I've been assigned to the ATF as a

22   task force officer where I investigate federal firearm and

23   narcotic violations.

24   Q.   And what was your assignment in May 2020?

25   A.   I was assigned to the ATF as a task force officer.
```

```
 1   Q.   On May 22nd, 2020, did you participate in the arrest and

 2   later interview of the Defendant, Andre Briscoe?

 3   A.   Yes, I did.

 4   Q.   And do you see Mr. Briscoe in the courtroom?

 5   A.   To the --

 6            MR. PURPURA:  We'll stipulate again.

 7            THE COURT:  The record will reflect the witness has

 8   identified the Defendant, Andre Briscoe.

 9            MS. BRUSCA:  Thank you.

10   BY MS. BRUSCA:

11   Q.   And was the Defendant arrested pursuant to a Federal

12   search warrant?

13   A.   Federal arrest warrant, yes.

14   Q.   Excuse me.  Thank you.

15        And can you walk us through the arrest that morning,

16   starting --

17            THE COURT:  What is the date of this, again, Ms.

18   Brusca?  I'm sorry.

19            MS. BRUSCA:  May 22, 2020, Your Honor.

20            THE COURT:  All right.  Thank you.

21   BY MS. BRUSCA:

22   Q.   And can you walk us through the arrest that morning,

23   starting with how the Defendant was taken into custody?

24   A.   Sure.  So when we execute an arrest warrant, we have a

25   team that does it.  Agent Weaver is the case agent on the team
```

 1    for this case, and he compiled a team of us that would go out

 2    and conduct the arrest.  There were maybe eight or ten of us,

 3    perhaps, on the arrest team.

 4         The Defendant was at work.  We staged in the morning,

 5    talked about how we're going to do the arrest.  He was

 6    apparently a construction worker at a construction site, so we

 7    went to the construction site.  There was -- either Agent

 8    Weaver or another agent had conversations with the Defendant's

 9    supervisor, had made arrangements for the supervisor to go

10    pick up the Defendant and bring him back to the central

11    location where there was, like, a trailer, like, an office.

12         While we were staged in separate vehicles in the parking

13    lot around that area, the supervisor went and got the

14    Defendant in, like, a four-wheeler or Gator type of vehicle

15    and returned to the location.  As he returned to the location,

16    the supervisor got out of the vehicle, and the arrest team

17    converged on the Gator and placed the Defendant under arrest.

18    Q.   And at the time of his arrest, was the Defendant advised

19    of his rights?

20    A.   Yes.

21    Q.   And who advised him of his Miranda Rights?

22    A.   Agent Weaver.

23    Q.   Were you present?

24    A.   I was.

25    Q.   And did you see Agent Weaver use anything to assist him

1    in his advisement?

2    A.   He read from a card.

3    Q.   And I'm going to put up on the overhead Government's

4    Exhibit 17.16.  If I can provide the Court a copy, this is a

5    new one if you'd like.

6         And how was this advisement card used to advise the

7    Defendant of his rights?

8    A.   It was read to him.

9    Q.   And whose signature is there under the waiver section?

10   A.   That is the Defendant's.

11   Q.   So the Defendant agreed to speak with you?

12   A.   Yes.

13   Q.   And whose signature is under the witness line?

14   A.   That is Agent Weaver's.

15   Q.   And below that?

16   A.   That is mine.

17   Q.   And what time on May 22nd?

18   A.   I signed at 9:08 a.m.

19   Q.   Did the Defendant indicate if he understood his rights?

20   A.   Yes, he did.

21   Q.   And was he transported to another location for the

22   interview?

23   A.   From the arrest scene, he was transported to the ATF

24   office.

25   Q.   And who transported him?

1    A.    Agent Weaver and myself.

2    Q.    And do you recall about how long after the arrest the

3    interview took place?

4    A.    Perhaps an hour.

5    Q.    And was the Defendant then interviewed?

6    A.    Yes.

7    Q.    Was the interview recorded?

8    A.    Yes, it was.

9    Q.    And at that time, was the Defendant advised a second time

10    of his rights?

11    A.    Yes, he was.

12    Q.    Oh, I think what I -- okay.  All right.

13         And can you describe the room where the interview took

14    place?

15    A.    Sure.  It's a small interview room.  There is a table, a

16    wooden table, with a chair on one side of it and two chairs on

17    the other side and one door that enters and exists.

18    Q.    Was there anyone else present during?

19    A.    Just myself and Agent Weaver.

20    Q.    And was the Defendant told he had to participate in the

21    interview?

22    A.    No.

23    Q.    All right.  I'm going to play now Government's

24    Exhibit 18.8.

25              **MS. BRUSCA:**  And before we do that, Your Honor, if I

1    could pass out 18.8T.

2            **THE COURT:**  Once again, same rule applies.  The

3    recording comes into evidence.  The transcript is just for

4    your edification and for your benefit.  You determine what you

5    hear or don't hear.  This is what the Government believes is

6    on the tape.

7            **MS. BRUSCA:**  I'm now playing Government's

8    Exhibit 18.8, which is approximately 45 minutes, I think a

9    little less.

10           **THE COURT:**  I'm sorry, about how long is this going

11   to be?

12           **MS. BRUSCA:**  About 45 minutes, Your Honor.

13           **THE COURT:**  About 45 minutes.  That's fine.  All

14   right.

15        (Recording played but not reported.)

16           **THE COURT:**  All right.  That will end the tape.

17           **MS. BRUSCA:**  That ends the tape, Your Honor.

18           **THE COURT:**  The record will reflect that the

19   Government's Exhibit 18.8 was played in its entirety and has

20   now been completed, and the tape is in evidence.

21           **MS. BRUSCA:**  Thank you.

22   **BY MS. BRUSCA:**

23   Q.   And TFO Azur, to avoid any doubt, whose voices do we hear

24   primarily on that call?

25   A.   Agent Weaver and --

```
1              THE COURT:  You have to keep your voice up, sir, and
2     speak into the microphone.
3              THE WITNESS:  Yes, Your Honor, I'm sorry.
4         Agent Weaver's voice and the Defendant's voice.
5              MS. BRUSCA:  No further questions, Your Honor.
6              THE COURT:  Any questions of Officer Azur,
7     Mr. Purpura?
8              MR. PURPURA:  Your Honor, it's 3:30.  I do have some
9     questions, whatever the Court wants me to do.
10             THE COURT:  You all want to take a break?  Yeah, I
11    think -- one of the jurors would like to have a break, so
12    we'll take a ten-minute recess, start again in ten minutes.
13        Mr. Azur, you should not talk with anyone about your
14    testimony during the break.
15             THE WITNESS:  Yes.
16             THE COURT:  Thank you very much.
17             THE CLERK:  All rise.  Court stands in recess.
18        (Jury exits courtroom 3:31 p.m.)
19        (Short recess taken.)
20             THE CLERK:  This Court resumes its session.  The
21    Honorable Richard D. Bennett is presiding.
22             THE COURT:  All right.  With that, we'll bring the
23    jury back in.
24             THE CLERK:  All rise for the jury.
25        (Jury enters courtroom 3:52 p.m.)
```

1          **THE COURT:**  Thank you, Mr. Gurevich.

2          And with that, we'll continue now with Detective Azur

3     with cross-examination.

4          Mr. Purpura?

5              **MR. PURPURA:**  Your Honor, thank you.

6              C R O S S  -  E X A M I N A T I O N

7     **BY MR. PURPURA:**

8     Q.   Good afternoon, Detective.

9     A.   Good afternoon, sir.

10    Q.   Detective, I'm just going to take you back briefly to

11    May 22nd, 2020.  This is the takedown, the arrest of Andre

12    Briscoe.  You indicated there was eight to ten task force

13    officers involved in the arrest of Mr. Briscoe?

14    A.   Or special agents.

15    Q.   Or special agents.  Thank you.

16         And the construction site just -- was it in Baltimore

17    City, Baltimore County?

18    A.   It was in Baltimore County.

19    Q.   And at that point, you knew that Mr. Briscoe was

20    employed, working construction; correct?

21    A.   That's what I was told.

22    Q.   You were told this, I assume -- there is, as you

23    mentioned, a meeting.  You all get together to say, "What are

24    we going to do?  How are we going to do it;" correct?

25    A.   Yes, that's correct.

```
 1    Q.   So you go to the construction site, you speak -- someone

 2    speaks to the supervisor there and Mr. Briscoe is not in

 3    eyesight at that point?

 4    A.   That's correct.

 5    Q.   And then the plan is that the supervisor is going to go

 6    out under some ruse, say, "We need you back" wherever and put

 7    him in the Gator and bring them back to you-all; correct?

 8    A.   Yes.

 9    Q.   So he does that, you see Mr. Briscoe coming back.  He's

10    sitting in the Gator.  A Gator is a -- I guess we all know

11    what it is.  It's green and it's got four wheels and it's

12    open, right?

13    A.   Yes, that's correct.

14    Q.   And so when he comes back, the supervisor, I would

15    assume, gets out of the Gator and Mr. Briscoe was still in the

16    Gator at that point?

17    A.   Yes, that is correct.

18    Q.   And that's for the -- I would assume, again, for the

19    supervisor's safety?

20    A.   Yes.

21    Q.   And so at that point, eight to ten or whatever number of

22    agents and task force officers come out and arrest

23    Mr. Briscoe; correct?

24    A.   Yes, that is correct.

25    Q.   At any point, did Mr. Briscoe attempt to get up from that
```

```
 1    Gator and run?

 2    A.   No, he did not.

 3    Q.   At any point, did Mr. Briscoe resist the arrest of you

 4    ATF agents and task force officers?

 5    A.   No, he did not.

 6    Q.   He was then handcuffed; correct?

 7    A.   Yes.

 8    Q.   And then he was taken in a vehicle to the ATF field

 9    office?

10    A.   Yes, that is correct.

11    Q.   The ATF field office -- we just heard the conversation,

12    which was recorded, to your knowledge, would be either, I

13    guess, three years now, ATF task officer?

14    A.   Fourteen.

15    Q.   My mistake, sorry.

16         Fourteen years.  Is it video-equipped as well?

17    A.   There is video-equipped, but the video equipment did not

18    work.

19    Q.   Okay.  So the only thing we have is the recording itself;

20    correct?

21    A.   Yes, that is correct.

22    Q.   Now, specifically as to you, what part did you have in

23    this investigation?

24    A.   I did not conduct any part of the investigation itself.

25    I was asked to assist, to be part of the arrest team, which I
```

```
1    was, and then Agent Weaver asked if I would sit in on the

2    interview as well.

3    Q.   And not to minimize anything you did, but what you did

4    was, on May 22nd, we already heard, you were involved in the

5    arrest team of Andre Briscoe, and that was a success; correct?

6    A.   Yes.

7    Q.   And the second thing you did, as part of this

8    investigation, was that you sat in on the interview of Andre

9    Briscoe; correct?

10   A.   Yes, that is correct.

11   Q.   And other than that, respectfully, you don't know

12   anything else about this case?

13   A.   I do not.  I was not part of the investigation.

14   Q.   Obviously -- and the person who conducted the

15   interview -- I don't think I heard you at all.  Did you ask

16   any questions?

17   A.   No, I did not.

18   Q.   So it was Special Agent Weaver, the gentleman to my left,

19   who conducted the entire interview; correct?

20   A.   Yes, that is correct.

21   Q.   And it's -- Special Agent Weaver, to your knowledge, is

22   the case agent on this particular case; correct?

23   A.   Yes, that is correct.

24   Q.   All right.  You were present, though, when Mr. Briscoe

25   was advised of his rights?
```

```
1              THE COURT:  What exhibit number is that?
2              MR. PURPURA:  Sorry, 17.6, Your Honor.
3              THE WITNESS:  Yes, I was present.
4    BY MR. PURPURA:
5    Q.  And, in fact, it appears to you -- I'm asking.  I should
6    make that a question.
7         Did it appear to you that Mr. Briscoe understood what his
8    rights were?
9    A.  Yes.
10   Q.  And did it appear to you that he voluntarily agreed to
11   waive his rights and sign the agreement?
12   A.  Yes.
13   Q.  From when he first came in and when you first had him
14   there, did he ask for a lawyer at that point?
15   A.  No, he did not.
16   Q.  Did he tell you that he had a lawyer any time between
17   2015 and 2020?
18   A.  No, he did not.
19   Q.  And other than actually listening to what was said by
20   Mr. Briscoe during the interview itself, you don't really have
21   any other direct knowledge of this investigation; is that also
22   correct?
23   A.  No.  That is correct.
24   Q.  You may have participated in a search warrant
25   execution -- may or may not have participated in a search
```

1    warrant execution, but other than that you have no knowledge

2    of the investigation?

3    A.   That is correct.

4    Q.   So you have no knowledge if he was being truthful or

5    untruthful about going to Perkins, the projects, or any of

6    that information; do you?

7    A.   No, I do not.

8    Q.   Did you, at all, at least review his 2015 statement to

9    Baltimore City homicide detectives Parker and Lewis?

10   A.   No, I have not seen that statement.

11   Q.   So you don't know if it's consistent or inconsistent with

12   what he told those detectives?

13   A.   I do not, no.

14            **MR. PURPURA:**  All right.  And with that, I have no

15   further questions.

16            **THE COURT:**  Thank you, Mr. Purpura.

17        Detective Azur, you may step down.  You shouldn't discuss

18   your testimony with anyone in the event you would be called

19   back to the witness stand before this trial concludes.

20        Thank you very much.

21            **THE WITNESS:**  Yes.  Thank you, Your Honor.

22            **THE COURT:**  All right.  The next witness, Mr.

23   Budlow?

24            **MR. BUDLOW:**  Thank you, Your Honor.  The

25   Government's next witness is Tonya Harris.

1           **THE COURT:**  All right.  Ms. Harris, come forward

2      here, please.

3           **THE CLERK:**  Right here to the witness stand.

4      And if you would just remain standing and raise your

5      right hand for me, please.

6      **TONYA HARRIS**, having been duly sworn, was examined and

7      testified as follows:

8           **THE WITNESS:**  Yes.

9           **THE COURT:**  And while speaking clearly into the

10     microphone, can you please state and spell your full name for

11     the record.

12          **THE WITNESS:**  Tonya Harris, T-o-n-y-a, H-a-r-r-i-s.

13          **THE COURT:**  Ms. Harris, good afternoon.  I'm Judge

14     Bennett, the Presiding Judge here.  As I've been discussing

15     with other witnesses, the standing orders of this Court

16     provide that in all public areas of the courthouse, masks are

17     to be worn.  But in the discretion of the Presiding Judge in

18     the courtroom, if persons have been fully vaccinated, they can

19     pull their masks down while speaking, they don't have to, and

20     they can take their masks off while speaking.

21     Have you been fully vaccinated?

22          **THE WITNESS:**  No, I have not.

23          **THE COURT:**  All right.  Then you should keep your

24     mask on at all times and keep your voice up and speak clearly

25     into the microphone for the benefit of Ms. Clark, the court

```
 1        reporter.  Thank you very much.

 2            Mr. Budlow?

 3                MR. BUDLOW:  Thank you.

 4                D I R E C T   E X A M I N A T I O N

 5        BY MR. BUDLOW:

 6        Q.   Good afternoon, Ms. Harris.

 7        A.   Good afternoon.

 8        Q.   Could you tell us where you live, what part of Maryland?

 9        A.   Cambridge.

10        Q.   And how old are you?

11        A.   Thirty-one.

12        Q.   Do you have the same phone number now you had in 2015?

13        A.   Yes.

14        Q.   And what is that?

15        A.   (443) 205- --

16                THE COURT:  You have to keep your voice up and speak

17        into the microphone.

18                THE WITNESS:  I'm sorry, (443) 205-9101.

19                THE COURT:  91?

20                THE WITNESS:  9101.

21                THE COURT:  Thank you.

22        BY MR. BUDLOW:

23        Q.   9101?

24        A.   Yes.

25        Q.   Even though you are answering my questions, because the
```

```
 1    microphone is where the jury is, maybe look towards them.

 2    A.   Okay.

 3    Q.   Do you have any children?

 4    A.   Yes.

 5    Q.   Just tell us how many and their ages.

 6    A.   Four.  One is 14, 12, 6, and 2.

 7    Q.   Do you have any siblings?

 8    A.   Yes.

 9    Q.   How many?

10    A.   Five.  No, four, I'm sorry.

11    Q.   Tell us their names.

12    A.   I have an older sister.  Her name is Keisha.  A sister

13    named Victoria, older brother named Terrell, and a twin

14    brother, his name is Tony.

15    Q.   And where did you grow up?

16    A.   All over Maryland.  Mainly Baltimore and Cambridge.

17    Q.   And who were you raised by?

18    A.   My grandmother, Lillian Harris.

19    Q.   Do you know the Defendant, Andre Briscoe, seated to the

20    right in the blue shirt?

21    A.   Yes.

22    Q.   Are you related to Mr. Briscoe?

23    A.   Yes, we're first cousins.

24    Q.   And how is it that you're first cousins?  Who's --

25    A.   Our fathers are brothers.
```

```
1    Q.   Did you grow up with the Defendant?

2    A.   Yes.

3    Q.   And where?

4    A.   In Baltimore.

5    Q.   In other places, too?

6    A.   Yes.

7    Q.   So when you said, "We moved around," did the Defendant

8    move around, too?

9    A.   Yes.

10   Q.   What's the age difference?

11   A.   I think he's, like, I want to say, ten years older than

12   me or something like that.

13   Q.   How many kids, and not necessarily all children, but of

14   that generation lived in that house at one time?

15   A.   All of us, so, like, 15, maybe 16 people.

16   Q.   Was that group close as children?

17   A.   Yes.

18   Q.   Were you close with the Defendant when you were younger?

19   A.   Yes, he was -- like, I'm closer to him more than I am my

20   brothers, so yes.

21   Q.   And did you become closer with him as an adult than you

22   were as a child?

23   A.   Yes.

24   Q.   When was it, if you recall, that you became closer to the

25   Defendant?
```

```
 1    A.    Maybe 2013, something like that, when he --
 2    Q.    Do you remember -- well, that's a terrible question.
 3          I want to draw your attention to the time when you were
 4    pregnant with your daughter Ryan.
 5    A.    Yes.
 6    Q.    Did you become -- were you close with the Defendant at
 7    that time?
 8    A.    Yes.
 9    Q.    And from February to 2015, if you know, did the Defendant
10    have a regular job?
11    A.    No, not that I recall.
12    Q.    Do you know where he was living at that time?
13    A.    Baltimore.
14    Q.    Where were you living?
15    A.    Cambridge.
16    Q.    502 Greenwood?
17    A.    Yes.
18    Q.    How long had you been there in 2015?
19    A.    Over five years, maybe like seven.  I'll stretch and say
20    seven.
21    Q.    And who was living there?
22    A.    Me, my two children at the time, and my father.
23    Q.    And how about your mother?
24    A.    Yes, she was there.
25    Q.    Now, had she lived there and then --
```

```
 1    A.    I put her out, but she was --

 2    Q.    Why did you put her out?

 3    A.    She steals bad.

 4    Q.    You said she steals?

 5    A.    Yes.

 6    Q.    Are you currently employed?

 7    A.    Yes.

 8    Q.    Where do you work?

 9    A.    McDonald's.

10    Q.    What's your title there?

11    A.    Manager.

12    Q.    And how long have you been at the McDonald's as a

13    manager, or how long have you been there total?

14    A.    Eight years.

15    Q.    And how long have you been a manager?

16    A.    Seven.

17    Q.    Okay.  Do both of your parents have drug addictions?

18    A.    Yes.

19    Q.    And do you know what the drugs of choice are?

20    A.    Heroin and crack cocaine.

21    Q.    So back to the Defendant, in early 2015 through June of

22    2015, do you know what he was doing for money?

23          Just yes or no initially.

24    A.    Yes.

25    Q.    How do you know?
```

```
 1    A.    I mean, it's just the family, you know, like, it's...

 2    Q.    In early 2015, did the Defendant ask you for money?

 3    A.    Yes.

 4    Q.    What did he tell you it was for?

 5    A.    To reup.

 6    Q.    To reup?

 7    A.    Get on, yeah.

 8    Q.    And how much did he ask for?

 9    A.    It was a couple of hundred.  I think it was around tax

10    time, so it probably would have been, like, 1200, something

11    like that.

12    Q.    What does it mean to reup?

13    A.    To buy drugs.

14    Q.    Ms. Harris, do you -- did you then and do you now have

15    any rules about drugs in your house?

16    A.    It's not allowed.

17    Q.    Was the Defendant aware of those rules?

18    A.    Yes, he knows.

19    Q.    Now, how is it that you can have those rules in your

20    house if your father lived with you, and you said that he was

21    an addict?

22    A.    Because my father will go out and get high.  Like, he

23    know not to get high in my house, so he will go out and get

24    high wherever he would -- wherever he get his drugs at, that's

25    where he use it at.
```

```
 1    Q.   Now, back to the Defendant, in this spring of 2015, did

 2    he spend time regularly at your home?

 3    A.   Sometimes when I was at work, he would pop up.

 4    Q.   Did he ever spend the night?

 5    A.   No, it wasn't likely.

 6    Q.   I heard no, but I didn't hear what you said after that.

 7    A.   No, it wasn't likely for him to spend a night.

 8    Q.   Ms. Harris, do you love your cousin Andre Briscoe?

 9    A.   Yes.

10    Q.   And you said you got closer to him in the 2013 and '14

11    timeframe.  Did he ask you about having a role in your

12    daughter's life?

13    A.   Yes, he's Ryan's godfather.

14    Q.   Did he ask you to be Ryan's godfather?

15    A.   Yes.

16    Q.   And you said he is Ryan's godfather?

17    A.   He is.

18    Q.   Did other family members, besides the Defendant, hang at

19    your house specifically in the spring of 2015?

20    A.   My twin, Tony.  My parents, of course, well, maybe my

21    father.  And that was really about it.

22    Q.   Now, you were working full-time at the time?

23    A.   Yes.

24    Q.   Would you ever see Al Harris at your house?

25    A.   Yeah.
```

```
 1    Q.   And what about Junior?

 2    A.   He would stop by.

 3    Q.   And then your older brother, he has a nickname?

 4    A.   Fats.

 5    Q.   Is Fats or Fatman the same person?

 6    A.   Yes.

 7    Q.   Would he be at your house sometime in the spring of 2015?

 8    A.   Yes.

 9    Q.   Do you know a person named Kiara Haynes?

10    A.   Yes.

11    Q.   Can you tell us when and how you met Ms. Haynes?

12    A.   I met her, I don't know the date, but one night when I

13    got off work.  It was, like, late, around like 12:00 a.m.

14    Q.   And who was she with?

15    A.   She was with Poo, Tony, Jennifer.  It was the four of

16    them at my house.

17    Q.   And when you say "Poo," you're referring to the

18    Defendant?

19    A.   Yes.

20    Q.   And was this in early 2015?

21    A.   Yes.

22    Q.   And is Ms. Haynes also related to you?

23    A.   Yes, she's my cousin.

24    Q.   The same, first cousin like the Defendant or a more

25    distant cousin?
```

```
1     A.   Distant.

2     Q.   Are your grandmothers sisters?

3     A.   Yes.

4     Q.   Had you ever met her previously to your memory?

5     A.   No.

6     Q.   Had you ever met Jen prior to that day?

7     A.   No.

8     Q.   The Defendant and Ms. Haynes, to your knowledge, are they

9     also cousins?

10    A.   Yes.

11    Q.   Did you become aware that their relationship was more

12    than just cousins?

13    A.   Yes.

14    Q.   And how did you learn of that?

15    A.   Andre told me.

16    Q.   Now, you said that night that you met Ms. Haynes you also

17    met Ms. Jeffrey?

18    A.   Yes.

19    Q.   And this was at your home?

20    A.   Yes.

21    Q.   Do you know if Ms. Jeffrey and Tony, your twin brother,

22    had already met before that night?

23    A.   Yes, they did.

24    Q.   Now, following that night when you first met Kiara and

25    Jen, would you see them in Cambridge only?
```

```
1    A.   Yes.

2    Q.   And where would you see them?

3    A.   At my grandmother's house.

4    Q.   Is that on Hughlett?

5    A.   Yes.

6    Q.   And who would you see them with?

7    A.   Andre and Tony, if you could find Tony, my twin.

8    Q.   Say it again.

9    A.   Andre and Tony.

10   Q.   In the spring of 2015, to your knowledge, were your

11   parents using drugs?

12   A.   Yes.

13   Q.   And was your mom using heroin?

14   A.   Yes.

15   Q.   And was your father both using heroin and crack?

16   A.   Yes.

17   Q.   Around that same time, did you ever talk to the Defendant

18   about his source for drugs?

19   A.   Yes.

20   Q.   Who was part of that conversation?

21   A.   It was a group.  I mean, it was me, him, Tone -- no, I

22   don't think Tony was there, just me and him.  We always --

23   Q.   Go ahead.

24   A.   Me and him always talk like it was -- that was my

25   replacement for my other two brothers.
```

```
 1              THE COURT:  You need to speak more clearly into the

 2     microphone so the jury can understand you, please.

 3              THE WITNESS:  That was my replacement for my

 4     brothers was him, so we talked frequently.

 5     BY MR. BUDLOW:

 6     Q.   And what did you learn about where the Defendant was

 7     getting his drugs?

 8     A.   Where did I learn it?

 9     Q.   Sorry.  Did he tell you where he was getting his drugs

10     from?

11     A.   Yes.

12     Q.   Who did he tell you he was getting them from?

13     A.   Jennifer.

14     Q.   And have you heard the term "plug" before?

15     A.   She the plug.

16     Q.   And is that what he said to you?

17     A.   Yes.

18     Q.   Did you learn if Jen was also the plug for Tony?

19     A.   Yes.

20     Q.   And how did you learn that?

21     A.   At the same -- the same conversation, him and Tony got

22     the same stuff, they were --

23     Q.   To your knowledge, did your father act as a tester for

24     heroin?

25     A.   Yes.
```

```
 1    Q.   And was that in exchange for free drugs?

 2    A.   Yes.

 3    Q.   All right.  Moving to June the 5th, 2015, do you remember

 4    the police searching your apartment?

 5    A.   Yes.

 6    Q.   Did you know that the Defendant and Tony were even in

 7    your house at the time of the search warrant?

 8    A.   No, I did not.

 9    Q.   Were they there when you went to sleep the evening

10    before?

11    A.   No.

12    Q.   And where were you physically located within the

13    apartment when the search occurred?

14    A.   In a back bedroom, my bedroom.

15    Q.   When you went to bed that night who else was in the

16    house, to your knowledge?

17    A.   My father, my two kids, my boyfriend and me.  That was

18    it.  Oh, Damonte.

19    Q.   And you said your boyfriend.  Is that Ronnell Bivens?

20    A.   Yes.

21    Q.   Now, in terms of the layout of your home, when you walk

22    straight in, there's a hallway with eventually three bedrooms;

23    correct?

24    A.   Yes.

25    Q.   The one straight ahead, so the middle bedroom --
```

```
1     A.   Is my children room.

2     Q.   -- whose bedroom is that?

3     A.   My children room, yes.

4     Q.   If you turn right into the hallway on the left, there's a

5     bedroom.  Whose bedroom is that?

6     A.   It's the room my father stayed in.

7     Q.   And if you turn left and go straight, there's another

8     bedroom at the end of the hallway.  Whose is that?

9     A.   My bedroom.

10    Q.   You mentioned Damonte was also there?

11    A.   Yes.

12    Q.   Who is that?

13    A.   My cousin.

14    Q.   Tell us what happened when you heard -- or what you first

15    heard that morning of the search.

16    A.   I heard a loud knock on the door.  I got up, and all I

17    heard was, "Everybody get down, everybody get down."  And when

18    I walked into the living room.  I had a bunch of police

19    surrounding me with guns pointed at me, and I'm like eight and

20    a half months pregnant, so I'm terrified, like, "What's going

21    on?"  And then I see my uncle Alfred Harris, my twin, Tony

22    Harris; Andre, and Damonte in the living room.

23    Q.   What did you do?

24    A.   I went off.

25    Q.   Okay.  Actually, before you went off, were you told to
```

```
1    get down?

2    A.   Yes.

3    Q.   Were you able to get down?

4    A.   I couldn't get down.  I'm eight and a half months

5    pregnant.

6    Q.   And did you tell the officers that?

7    A.   Yes.

8    Q.   And then you said you went off.  Do you mean yelling at

9    people?

10   A.   Yes.

11   Q.   Who were you yelling at?

12   A.   Tony and Andre.

13   Q.   And did you learn from them how they got in?

14   A.   Yes.

15   Q.   What did they tell you?

16   A.   My dad let them in.

17   Q.   You said your dad let them in?

18   A.   Yes.

19   Q.   Did you hear Tony say anything to the police?

20   A.   Yeah, they wasn't going to find anything.

21   Q.   Did you speak to Detective Howard or Corporal Howard that

22   day?

23   A.   Yes.

24   Q.   Was your brother Terrill Harris, Jr., Fatman, present in

25   your apartment at the time of the search?
```

```
 1      A.    No, he was not.

 2      Q.    Before the police left, did you see him?

 3      A.    Outside, yes.

 4      Q.    What was he doing outside?

 5      A.    Walking around.

 6      Q.    Did he come --

 7            MR. PURPURA:  I'm sorry, I can't hear.

 8            MR. BUDLOW:  Sorry, I'll repeat it.

 9      BY MR. BUDLOW:

10      Q.    Did you say waking around?

11      A.    Yes, he was walking around.

12      Q.    All right.  So you looked outside the window?

13      A.    The door was wide open.

14      Q.    Did he come in the apartment at some point?

15      A.    After everyone left, yes.

16      Q.    And when you say everyone, you mean after the police

17      left?

18      A.    Yes.

19      Q.    When he came in, describe what you saw him do.

20      A.    He walked past me and went straight to the back bedroom

21      where my father slept.

22      Q.    The room where your father slept?

23      A.    Yes.

24      Q.    When he came back, did he say anything to you?  Just yes

25      or no.
```

```
 1     A.   Yes.
 2     Q.   When he said something to you, was he talking about what
 3     he was then doing?
 4     A.   Yes.
 5     Q.   And what did he say?
 6     A.   They didn't get it and -- he was like, "See, they didn't
 7     get it" and left out like right past me.
 8     Q.   You said he said, "See, they didn't get it"?
 9     A.   They didn't get it, yeah.
10     Q.   And when he said, "see," was he showing you or holding
11     anything?
12     A.   He had put it in his pocket, but he never showed me what
13     it was.
14     Q.   What did he do next?
15     A.   He walked right past me and went down the stairs.
16     Q.   Out?
17     A.   Out the door.
18     Q.   Did you watch where he went?
19     A.   No.
20     Q.   Did you see Wane that day, or Junior?
21     A.   Yes.
22     Q.   Where did you see Wane?
23     A.   They were together.  Terrill pulled up in the car with
24     Wane.
25     Q.   And did Wane come inside?
```

```
1    A.    No.

2    Q.    Do you know if they left together?

3    A.    No, not that I know of.

4    Q.    Ms. Harris, do you remember when you learned that

5    Jennifer Jeffrey had died?

6    A.    Yes.

7    Q.    Do you know when that was?

8    A.    Facebook post.

9    Q.    Do you know either what dates or when it was in relation

10   to when the bodies were found?

11   A.    No, I don't remember the date to be exact, no.

12   Q.    And did you ever meet Jen's son, Tone Tone?

13   A.    Yes.

14   Q.    Where was that?

15   A.    At my grandmother's house.   He --

16   Q.    Once or more than once?

17   A.    Yes, more than once.   But the first time I really

18   encountered him was at my grandmother's house.

19   Q.    Around that time when you learned that they had died, do

20   you know where the Defendant was living?

21   A.    With Kizzy, if I'm not mistaken.

22   Q.    And did Kizzy live down the street from you in Cambridge?

23   A.    It's an apartment complex, so it was like, I live at 502,

24   she live at 618 or 620, something like that.   So it would be,

25   like, the next block over, but yes, it's down the street.
```

1    Q.   After the Defendant was arrested, do you remember having

2    a telephone call with him while he was detained at the

3    detention center?

4    A.   Yes.

5            **MR. BUDLOW:**  Your Honor, at this time I would ask

6    the members of the jury and counsel to pull out the exhibit

7    binders and take a look at 6.12T for identification purposes.

8    And I'm going to --

9            **THE COURT:**  So this is Exhibit 6.12T, which was the

10   tape that will be -- recording that will be placed into

11   evidence, and 6.12T is the transcript for identification only.

12           **MR. BUDLOW:**  At this time, Your Honor, momentarily I

13   will play 6.12.

14           **THE COURT:**  All right.  Give them time to get it.

15   Just wait a second, Mr. Budlow.  All right.  If everybody has

16   been able to find it there in their books, just give everyone

17   a minute here.

18       All right.  With that, I think we're ready, and you may

19   proceed, Mr. Budlow.

20       (Recording played but not reported.)

21   **BY MR. BUDLOW:**

22   Q.   Ms. Harris, do you recognize the voices?

23   A.   Yes.

24   Q.   Whose voices did you hear?

25   A.   Me and Poo's.

```
 1    Q.   All right.  Did you also talk to Tony while he was locked
 2    up sometime on June the 7th, 2015?
 3    A.   Yes.
 4    Q.   And during your call with Tony, did he relay a message to
 5    you from the Defendant?
 6    A.   Yes.
 7    Q.   And did that message relate to Kiara?
 8    A.   Yes.
 9         MR. BUDLOW:  Your Honor, I'd ask that we now turn to
10    Exhibit 6.13T for identification?
11         THE COURT:  All right.  Government's 6.13 will come
12    into the evidence, the recording, and the transcripts again,
13    is for identification only to assist the jury.
14         (Recording played but not reported.)
15    BY MR. BUDLOW:
16    Q.   Could you identify the voices on that call, please?
17    A.   Yes.
18    Q.   Who is that?
19    A.   Tony Harris and myself.
20    Q.   Did you hear the message that he gave you from the
21    Defendant?
22    A.   Yes.
23    Q.   Did you tell Kiara to throw her phone away?
24    A.   Yes.
25    Q.   You relayed that message to her?
```

```
1    A.    Uh-huh.

2    Q.    Yes?

3    A.    Yes.

4    Q.    I want to draw your attention to around Valentine's Day

5    2016.  Did the Defendant come to your house?

6    A.    Yes.

7    Q.    How do you remember it was -- was it on Valentine's Day?

8    A.    It might have been a couple days -- a day after because

9    -- no, it was the 16th.

10   Q.    Do you remember what you were doing when he came over?

11   A.    Getting ready to go on my date.

12   Q.    With who?

13   A.    My children's -- my children's father.

14   Q.    Tell the members of the jury what happened when the

15   Defendant came to your house.

16   A.    He had been drinking and he came and sat down at the

17   table, and I sat across from him.

18   Q.    Let me stop you.  How do you know he had been drinking?

19   A.    He had alcohol in his hand.

20   Q.    And was there anything else about him?  In other words,

21   anything in your observations that made you think he had been

22   drinking?

23   A.    You could smell the alcohol on him.  He was -- the bottle

24   was open.  It wasn't for me.

25   Q.    So you said you walked in and sat down.  Did you go to
```

1   the door or did he just come in?

2   A.   He came in.

3   Q.   And where were you when he came in?

4   A.   I either was leaving out or I was already in the living

5   room.  I don't remember exactly what I was doing, but...

6   Q.   Remember to keep your voice --

7   A.   I'm sorry.

8   Q.   -- sort of aimed towards the microphone.

9   A.   I either was leaving out or was in the living room.  I

10  don't remember exactly what I was doing, but we ended up at

11  the table talking.

12  Q.   Was anyone else in the house at the time?

13  A.   The kids were in the back.  My baby --

14  Q.   Okay.  Tell the members of the jury what happened next.

15  A.   Andre sat down, we were taking, and then he said that he

16  keep having dreams.

17           **THE COURT:**  Keep your voice up into the microphone,

18  please.

19           **THE WITNESS:**  Andre had sat down at the table and

20  said he kept having dreams, and I was like, "What dreams?"

21  And he said he had a dream of Jennifer grabbing his nuts.

22  **BY MR. BUDLOW:**

23  Q.   What did you say to him?

24  A.   I was like, "Why are you having that dream?"  I was like,

25  "You said as if you killed her," and that's when he started

```
1    crying, and he said he did.  And I said, "In order for you to
2    do something like that, you would have to be a monster," and
3    then he continued to cry.
4    Q.   What did he say after you told him he would have to be a
5    monster?
6    A.   He really didn't say nothing.  He just cried.  You know,
7    he was like, "I did it."
8    Q.   How many times did he say, "I did it"?
9    A.   Like, three times.  Then he put his hands like this, you
10   know, because the bottle was in front of him.  He did his
11   hands like this (indicating).
12   Q.   And when you say, "He put his hands like this," I could
13   barely see because of the screen, what did he do?
14   A.   Like, this over his face (indicating).
15   Q.   And did he put his head down?
16   A.   Yeah.
17   Q.   Did he ever use the word "kill"?
18   A.   Yeah, it -- yes.
19   Q.   And what did he say?
20   A.   He said, "I killed her."
21   Q.   What was his emotional state when he was telling you
22   this?
23   A.   He had been drinking, but he was fine.
24   Q.   What did you do after he told you that?
25   A.   I got up from the table and I left out the house and -- I
```

```
 1    was upset and I walked -- it's two flights of steps, so I walk

 2    down the stairs, and I got into the car.  And my baby's father

 3    asked me what was wrong.  And I told him, "Nothing.  Don't

 4    worry about it," like, brushed it off as if it was nothing.

 5    Q.   Do you know why he asked you what was wrong?

 6    A.   Because he could clearly see I was upset.

 7    Q.   And how were you showing that you were upset, do you

 8    know?

 9    A.   Because I was crying.

10    Q.   Did you see the Defendant the next day?

11    A.   Yes.

12    Q.   Did you bring up this conversation?

13    A.   Yes.

14    Q.   Tell the members of the jury about that, please.

15    A.   I was like?  "Do you remember what you said to me last

16    night?"  And he was like, "No."  And then I told him what he

17    said to me, and he just looked at me and just brushed it off,

18    so I brushed it off.

19    Q.   When you said he just looked at you and he brushed it

20    off, did he say anything?

21    A.   He was like, "I didn't say that."

22    Q.   And did you say anything back?

23    A.   I said, "That's what you told me."

24    Q.   Over that summer of 2016, did you notice any change in

25    the Defendant's behavior?
```

```
 1      A.   Yes.

 2      Q.   How so?

 3      A.   He became a monster.

 4      Q.   What about in terms of his emotional state?

 5      A.   He was just not his self.

 6      Q.   Prior to June 5th, 2015, when had you seen him cry last?

 7      A.   I've never really seen him emotional.  Then that upcoming

 8  year, like --

 9      Q.   That summer, did you ever see him crying again?

10      A.   No, not really.

11      Q.   Prior to the Defendant telling you about his dreams about

12  Jen, had he previously told you about nightmares?

13      A.   No.

14      Q.   In the years that you knew the Defendant, did he ever

15  tell you he had an issue with recurring bad dreams or

16  nightmares?

17      A.   No.

18      Q.   And you said that you were close with the Defendant; is

19  that right?

20      A.   Yes.

21      Q.   Has he or anyone in the family ever told you that he was

22  sexually abused as a child?

23      A.   Never.

24      Q.   Or that sexual abuse was causing him nightmares?

25      A.   Never.
```

1    Q.   Did someone before today ask you about your knowledge of

2    the supposed sexual abuse?

3         Yes or no?  Sorry.

4    A.   Yes.

5    Q.   Who was that?

6    A.   Some man named Mike that came to the house to speak

7    with --

8    Q.   And did he tell you he was a Defense investigator?

9    A.   He was working for Poo's team, yes.

10   Q.   How many times did Mike come to your house?

11   A.   Like five.

12   Q.   And you also spoke to Ms. Whalen on the telephone; didn't

13   you?

14   A.   Yes.

15   Q.   Now, let's get back to Mr. MaGee, did he tell you his

16   personal beliefs about this case?

17   A.   Yes.

18   Q.   What did he tell you about your personal beliefs --

19             **MR. PURPURA:**  Objection.

20             **THE COURT:**  Sustained.

21   **BY MR. BUDLOW:**

22   Q.   Did he tell you --

23             **MR. PURPURA:**  Objection.

24             **MR. BUDLOW:**  I didn't --

25             **THE COURT:**  He hasn't finished the question yet.

```
 1            Phrase the question, Mr. Budlow.
 2    BY MR. BUDLOW:
 3    Q.   Yes.  Did he tell you --
 4            THE COURT:  First of all, Defense investigator, what
 5    is the name of this person?
 6            MR. BUDLOW:  Mike is what the witness described him
 7    as.
 8    BY MR. BUDLOW:
 9    Q.   Does Mike MaGee sound familiar, Ms. Harris?
10    A.   Yes.
11            THE COURT:  I'm sorry, what is the last name?
12            MR. BUDLOW:  MaGee, but I don't know the spelling.
13            THE COURT:  All right.  Okay.
14            MR. BUDLOW:  Counsel, could you help with the
15    spelling?
16            THE COURT:  All right.  Go ahead, Mr. Budlow.
17    BY MR. BUDLOW:
18    Q.   Did Mike tell you about his interviews with others?
19    A.   Yes.
20    Q.   And was this during a meeting when you were telling him
21    that the Defendant had --
22            MR. PURPURA:  Objection.  Objection.  This is direct
23    examination 611C, and it's hearsay.
24            MR. BUDLOW:  I asked when it occurred.
25            THE COURT:  Just --
```

```
1              MR. PURPURA:  He's testifying.

2              THE COURT:  All right.  The witness can go out in

3        the hallway for a second here.

4            And ladies and gentlemen, you all can go into the jury

5        room, and I'll address this now and see if you can come back.

6        We'll be finished for the day here with you.

7              (Witness exits stand.)

8              (Jury exits courtroom 4:31 p.m.)

9              THE COURT:  All right.  Mr. Budlow, if you will just

10       proffer in terms of this line of questioning what you're going

11       to ask this witness, and then I'll hear from the -- deal with

12       the objections.

13             MR. BUDLOW:  Yes, Your Honor.  And with the Court's

14       permission, I'll proffer also what I had asked that was

15       sustained, but just so you have the context, not that I plan

16       on going back.

17             THE COURT:  Okay.  That's fine.  Go ahead.

18             MR. BUDLOW:  The witness would testify that on,

19       approximately, five occasions Mr. MaGee came to her house, and

20       she let him in, and she willingly sat for an interview.  And

21       that he told her, after she had told him about these

22       confessions, he told her one that he believed that the

23       Defendant was innocent.

24           Two, that he had personally interviewed the leader of BGF

25       who told him that he had greenlit the murders, and I use the
```

1    term greenlit because we use it --

2         THE COURT:  Okay.  I understand.

3         MR. BUDLOW:  I'm not saying the witness said

4    greenlit to me.  That's the first thing she said.

5         She also said that the Defendant -- she asked the

6    Defendant questions about whether or not she was aware of his

7    sexual abuse as a child.

8         THE COURT:  The investigator asked Ms. Harris

9    whether she was aware of any sexual abuse of the Defendant

10   when he was a child?

11        MR. BUDLOW:  Yes.  And whether or not the nightmares

12   that he had were related to that.

13        THE COURT:  Okay.

14        MR. BUDLOW:  Let me make sure that that's -- yeah,

15   that's it.  The personal beliefs, the statements of other

16   witnesses, not necessarily accurate.

17        THE COURT:  Well, first of all, so you're clear, the

18   matter of Mr. MaGee, apparently, he's been represented as an

19   investigator for the Defense team.  His expression of his own

20   personal belief is clearly not admissible here.

21        It is of no relevance as to what his personal belief is,

22   first under 401, and secondarily it will be highly prejudicial

23   under Rule 403.

24        So you cannot inquire of this witness and have her state

25   that Mr. MaGee opined his own personal belief as to the guilt

1   or innocence of the Defendant.

2       As to the matter of inquiring specifically as to gang

3   membership and the matter of inquiring as to her knowledge or

4   lack thereof of any sexual abuse, I'll be glad to hear from

5   the Defendant -- Defense Counsel on that.

6           **MR. PURPURA:**  Just one second.

7           **THE COURT:**  That's what I understand.  The proffer

8   is as to the matter of gang membership.  She replied in the

9   negative in terms of any knowledge of that.  Correct?

10          **MR. BUDLOW:**  No, I don't think she was asked about

11  gang membership.  She says that she was told by the

12  investigator that BGF is responsible for killing the victims

13  in this case because the Defense investigator personally

14  interviewed -- the leader of BGF told him that he authorized

15  --

16          **THE COURT:**  Well that's not going to be admissible

17  either in terms of that's clearly hearsay.  Not only can he

18  not opine in terms of the guilt or innocence of the Defendant,

19  but we're not going to have her summarize what he stated in

20  terms of his investigation in terms of any drug -- any gang

21  membership.

22      With respect to the inquiry as to the matter of child

23  abuse, that's a matter about which she would have knowledge,

24  and I'll be glad to hear from you, Mr. Purpura, but your

25  objection is --

1    **MR. PURPURA:**  If that was the only question, I have

2    no objection.

3         **THE COURT:**  Okay.  All right.  Well, then she can

4    certainly go into that.

5         Mr. Budlow, you can't go -- first of all, you cannot go

6    into the investigator making comments and making

7    representations.  She did not adopt those comments, and

8    there's merely that investigator's viewpoint, and we're not

9    going to have that filtrate here into the courtroom, and it's

10   no basis for it.  You can indicate that he asked her various

11   questions and that she replied in the negative in terms of her

12   -- but we're not going to have -- we're not going to have her

13   summarize what the investigator said about his view of gang

14   membership, so that's not going to be admissible.

15        **MR. BUDLOW:**  Understood, Your Honor.

16        I would ask to continue along the lines of this, which is

17   hopefully abiding -- definitely abiding by your ruling, not to

18   elicit any of the substance, but to confirm that he did tell

19   personal beliefs without saying what they were --

20        **THE COURT:**  No, no.  I'm not going to -- we're not

21   going to --

22        **MR. BUDLOW:**  Okay.  Then two --

23        **THE COURT:**  He's not going to be able to -- if

24   you're saying did he give his own personal beliefs as to the

25   Defendant, that's not admissible.  It's not relevant in any

1   way, shape, or form.  We're not going to get into that one way

2   or the other.

3          **MR. BUDLOW:**  Understood.

4       The second point, which I think I know the answer, but

5   I'm going to ask anyway, is that he told her the -- not what

6   they were, but the fact that he conducted interviews and what

7   he learned in those interviews.  And the reason the Government

8   is doing this -- and again I'm not going to belabor this -- is

9   that --

10         **THE COURT:**  Okay.  Fine.  He's representing that

11  he's got this information, and he's learned about this from

12  some gang membership involvement; correct?

13         **MR. BUDLOW:**  Sure.  And, of course, we all know that

14  the Defense investigator shouldn't be providing any

15  information to a witness, but we've already heard about this

16  Defense investigator during the cross-examination of Kiara

17  Haynes.  And so they're putting questions out there that

18  this -- that people are stating things to the investigator,

19  but the Defense investigator is going around planting ideas in

20  people's minds.

21         **THE COURT:**  I understand that, and that is attacking

22  the Defense strategy and the Defense team.  He is not a

23  witness here, so we're not going to have you impeach the --

24         **MR. BUDLOW:**  Understood.

25         **THE COURT:**  -- the Defense team or bring in the

1    credibility, the credibility of Defense Counsel, including her

2    representing that she spoke with Ms. Whalen.  That's placing

3    the opposing counsel's credibility at issue, and we're not

4    going to permit that.  But you certainly -- you certainly can

5    question -- and I will make sure she understands when she

6    comes back on the witness stand before the jury comes back

7    that she's not to in any way summarize what he said to her,

8    apparently, in terms of what his representations were that she

9    can say and testify as to his questions about whether or not

10   she has any knowledge of Andre Briscoe ever saying to her that

11   he was abused as a child, and that's certainly a fair line of

12   inquiry, and she can respond in the negative saying, no, she

13   never has heard any of that.

14            **MR. BUDLOW:**  And, Your Honor, to be clear --

15            **THE COURT:**  Go ahead.

16            **MR. BUDLOW:**  -- and I'll be happy for you to

17   instruct, but in terms of the first part related to the

18   Defense investigator, I don't plan on going through that in

19   any way, so...

20            **THE COURT:**  All right.  Well, I'm going to make sure

21   she understands that when she comes back on the witness stand.

22            **MR. PURPURA:**  Again --

23            **THE COURT:**  And by the way, if the Defense

24   investigator Mr. MaGee testifies, then that's another matter

25   in terms of --

```
 1          MR. BUDLOW:  Yes.

 2          THE COURT:  -- his own credibility and -- not only

 3   his own credibility, but the matter of his misconduct.  And so

 4   it's perfectly clear, if Mr. MaGee takes the witness stand,

 5   you're going to be able to challenge his credibility, and I'll

 6   determine whether or not he's engaged in misconduct or not, so

 7   that may or may not end this inquiry, but it isn't going to

 8   come through this witness.

 9          MR. BUDLOW:  Understood.

10          MR. PURPURA:  Judge, respectfully, the entire line

11   of questioning, what the investigator asked or not, is not

12   relevant to her testimony.

13          THE COURT:  It certainly isn't relevant to this

14   witness, but all I'm saying is if the Defense investigator

15   Michael MaGee is going to be a witness here --

16          MR. PURPURA:  I agree.  I agree.

17          THE COURT:  All right.

18          MR. PURPURA:  I agree.  If he is, then go at it, but

19   at this point, there should be no questions about what the

20   investigator asked.  Nothing.

21          MR. BUDLOW:  I'm not --

22          THE COURT:  He's not going to.  He's not going to.

23          MR. BUDLOW:  I'm moving on.

24          THE COURT:  He's moving on.

25          MR. BUDLOW:  Including the questions related to
```

1    sexual abuse.

2            **THE COURT:**  Just address the Court, both of you.

3            **MR. BUDLOW:**  Yes.

4            **THE COURT:**  He's not going to do that.  Mr. Budlow

5    understands my instruction.  He's going to inquire -- he's

6    going to inquire of the witness as to whether or not there was

7    inquiry by the investigator as to the matter of contentions of

8    sexual abuse as a child.  And this witness, apparently, is

9    going to say she's never heard the Defendant ever make

10   comments about being abused as a child.  And that's a fair

11   line of inquiry with respect to what's been proffered by the

12   Defense.  And this witness can respond to that question, and

13   that's the extent.

14       Mr. Budlow is not going to ask what the investigator said

15   to her, just a line of inquiry.

16           **MR. BUDLOW:**  Respectfully, Your Honor, I think I

17   asked that a little earlier of the witness, so I'm not even

18   going to touch it.

19           **THE COURT:**  All right.  That's fine.  That's fine.

20           **MR. BUDLOW:**  I'm not going to touch it.  If I could

21   take --

22           **THE COURT:**  Go ahead.  I'm trying to hear what else

23   Mr. Purpura wants to proffer to the Court.

24           **MR. PURPURA:**  I don't think -- all of the questions

25   that I did object to in the beginning, and I know the Court

1   didn't really know where --

2          THE COURT:  Well, I sustained two of them as I

3   recall.

4          MR. PURPURA:  -- Government's Counsel was going.  So

5   I'm asking the Court to strike -- instruct the jury to

6   disregard any comments about what an investigator may or may

7   not have said in this particular case.

8          THE COURT:  I'm not going to strike -- there's been

9   no answer to it.  I sustained the objection.  There was no

10  answer to strike.

11      What am I striking?  Am I striking the fact the question

12  was asked?

13          MR. PURPURA:  Yeah, at this point --

14          THE COURT:  I'm not going to strike that.

15          MR. BUDLOW:  -- the questions are like evidence.

16          THE COURT:  I'm not going to strike that.  Based

17  upon the proffer of the Government, there is nothing to

18  strike.  There was no evidence that came in, and I sustained

19  the objection.

20          MR. PURPURA:  All right.  Thank you, Judge.

21          THE COURT:  All right.  Thank you.

22          MR. BUDLOW:  If I could just take 30 seconds of the

23  Court's time.  My reference to Ms. Whalen was not trying to

24  impugn her credibility, but it was in response to Ms. Whalen's

25  pretty regular questioning of witnesses that they've never

1    talked before, and here was a witness that she --

2          **THE COURT:**  We're going to let that go.  We're

3    finished.  We'll bring the witness back in and we will -- I'll

4    make sure the witness understands this.

5        Is there MaGee -- Mr. MaGee -- we'll deal with that

6    later.  I want to deal with this at the end of the day here.

7          **MR. PURPURA:**  And, again, you should --

8          **THE COURT:**  We'll deal with this later, Mr. Purpura.

9      Ms. Harris, come back up here to the witness stand,

10   please.  Thank you very much.

11      (Witness resumes stand.)

12        **THE COURT:**  Ms. Harris, we're out of the presence of

13   the jury.  I just want to make sure you understand, Mr. Budlow

14   is just going to inquire generally and already has with

15   respect to any inquiry about you ever hearing from

16   Mr. Briscoe, the Defendant, as to any child abuse as a child,

17   okay?

18        **THE WITNESS:**  Okay.

19        **THE COURT:**  But you are not to in any way talk about

20   what Mr. MaGee, the Defense investigator, said to you.

21      Do you understand?

22        **THE WITNESS:**  Okay.

23        **THE COURT:**  Nothing that he said to you is to be

24   repeated by you for the jury here.

25      Do you understand that?

```
 1              THE WITNESS:  Yes.

 2              THE COURT:  All right.  With that, I think we're

 3    clear and we can bring the jury back in.

 4              THE CLERK:  All rise for the jury.

 5         (Jury enters courtroom 4:43 p.m.)

 6              THE COURT:  Thank you all very much.

 7         We just have about ten more minutes to go, but I

 8    definitely had to deal with an evidentiary issue, so best time

 9    for you to leave to deal with that.

10         Again, because of the retrofitting of the Court and the

11    Plexiglas.  We really can't have bench conferences up here.

12         So with that, you may continue, Mr. Budlow.

13              MR. BUDLOW:  Thank you, Your Honor.

14    BY MR. BUDLOW:

15    Q.   I'm going to move on to that board in front of you,

16    Ms. Harris, which is Government's Exhibit 17.7B.

17         Do you see a guy on there named Junior?

18    A.   Yes.

19    Q.   Do you know his real name?

20    A.   Wane Briscoe.

21    Q.   How do you know that?

22    A.   That's my cousin.

23    Q.   Is it a secret?

24    A.   No.

25    Q.   What's his father's name?
```

```
1    A.    Wane Briscoe, Sr.

2    Q.    Do you know if the Defendant knows everyone's name on

3    that chart?

4    A.    Yes.

5    Q.    Not just nicknames, but their real names?

6    A.    Yes.

7    Q.    Showing you Government's Exhibit 7.4, do you recognize

8    the phone number to the right of the avatar?

9    A.    Yes.

10   Q.    And whose phone number is that?

11   A.    Twin, my Tony.  Tony, my twin, sorry.

12   Q.    You call him twin as a nickname?

13   A.    That's what we call each other, yes.

14   Q.    All right.  So did you learn that the Defendant was

15   arrested in May or May 26th of 2020?

16   A.    Yes.

17   Q.    And around that same time, were you interviewed by

18   Special Agent Weaver and a Cambridge Police Department officer

19   last name Dickerson?

20   A.    Yes.

21   Q.    Were you truthful during your interview with them?

22   A.    No.

23   Q.    Did you tell them about what the Defendant told you at

24   your kitchen table on Valentines Day?

25   A.    No, not in that interview.
```

```
1    Q.   Say it a little louder, sorry.

2    A.   No, not in that interview, no.

3              MR. PURPURA:  I'm sorry, I couldn't hear you.

4              THE WITNESS:  No, I did not.

5    BY MR. PURPURA:

6    Q.   Were you truthful about the dreams?

7    A.   No.

8    Q.   How so?

9    A.   I withheld information from them.

10   Q.   Why weren't you truthful during that interview?

11   A.   Because that's my -- he's my cousin and family was --

12   like, family always supposed to stick together, and that's

13   what I believe.

14   Q.   Was that the only reason you weren't truthful?

15   A.   Most of the time, like, out of fear because I have

16   children, and I want to protect mine.

17   Q.   Fear of who?

18   A.   I mean, Poo.

19   Q.   But he had just been --

20   A.   He just been locked up, but it's still -- you don't know

21   who everybody knows.  You don't know who people know.

22   Q.   Did you know how long he would be incarcerated for?

23   A.   No, I did not.

24   Q.   And so that was May in 2020, right?

25   A.   Yes.
```

```
 1    Q.   In July of 2020, did you call Special Agent Weaver on the
 2    phone?
 3    A.   Yes.
 4    Q.   Where were you when you called him?
 5    A.   At work, I believe --
 6    Q.   Why did you call him?
 7    A.   -- or I was just leaving work.
 8    Q.   Again, speaking into the microphone, tell the members of
 9    the jury why you called Special Agent Weaver in July of 2020.
10    A.   I was just leaving work or I was at work and then, I
11    believe, I had to call him back.  I don't remember how it was,
12    but I know I called.  And it was just this feeling that -- I
13    had, like, a strange feeling, a baby scent, a laugh that just
14    kept occurring, and something just told me to call him.
15    Q.   You said a baby scent and a laugh?
16    A.   Yeah, like, a baby laugh.
17    Q.   Why did that cause you to call Special Agent Weaver?
18    A.   Because I have a little boy, and I was just thinking
19    about my son.  You know, Troy is 14.  And all I could think
20    about is my children.
21    Q.   Did your son know Tone Tone?
22    A.   Yes.
23    Q.   And do you remember when they met?
24    A.   At my grandmother's house.
25    Q.   So what did you do when you -- you said you wanted to
```

```
 1    call Agent Weaver; did you?

 2    A.   Yes.

 3    Q.   And how did you have his number?

 4    A.   He had gave it to me on a piece of Post-It paper.

 5    Q.   What did you tell Special Agent Weaver?

 6    A.   I told him I lied to him.  I wasn't truthful when he

 7    interviewed me, and I wanted to just be truthful now.

 8    Q.   Did you have a longer telephone call with him later that

 9    evening?

10    A.   Yes.

11    Q.   And did you ultimately testify in Grand Jury?

12    A.   Yes, I did.

13    Q.   So the day that you're at work and you had the baby smell

14    and you called Special Agent Weaver, did you know that that

15    day was Tone Tone's birthday?

16    A.   Not until he told me.

17              MR. BUDLOW:   Thank you, Ms. Harris.

18         That's all I have, Your Honor.

19              THE COURT:   Thank you very much, Mr. Budlow.

20         Cross-examine, Mr. Purpura?

21              MR. PURPURA:   Judge, it's 11 minutes to 5:00, do you

22    want me to start now or do you want to call it a day?

23              THE COURT:   We can -- that's probably an appropriate

24    point to stop.

25         All right.  Ms. Harris, you should not discuss your
```

1    testimony with anyone until tomorrow morning when you return

2    to the witness stand.  We're going to make every effort to

3    start promptly at 9:30 tomorrow, and so you should not discuss

4    your testimony with anyone until you come back on the witness

5    stand.

6         Do you understand that?

7              THE WITNESS:  Yes.

8              THE COURT:  Thank you very much.

9              THE WITNESS:  You're welcome.

10             THE COURT:  I just need to go over a few things with

11   counsel here, so you'll be excused.  Thank you very much.

12   We'll wait for you to exit the courtroom here.

13        Thank you.

14        (Witness exists stand.)

15             THE COURT:  All right.  Ladies and gentlemen, with

16   that, we'll be concluding -- we're going to get started

17   promptly at 9:30 tomorrow, and we're going to take a shorter

18   lunch break sometime.  We won't take quite a whole hour and

19   Ms. Tee's restaurant is open downstairs; is it not?

20             THE CLERK:  Yes, Your Honor.

21             THE COURT:  Okay.  So you can get sandwiches

22   downstairs, but we have a little bit of a quicker window for

23   lunch tomorrow.  And then around 3:15, we're going to have to

24   stop because I've got, you know, a wedding rehearsal in the

25   evening, I apologize.

```
1            I'm going to go over some scheduling matters now with
2       counsel.  So with that, you all are excused.  Thank you very
3       much.
4            (Jury exits courtroom 4:50 p.m.)
5            THE COURT:  Okay.  With that, what do we project
6       tomorrow?
7            Mr. Purpura, how long do you think you'll be with Tonya
8       Harris on cross-examination.
9            MR. PURPURA:  Probably about 45 minutes.
10           THE COURT:  Okay.  All right.  And then what are the
11      next witnesses for the Government, Ms. Brusca?
12           MS. BRUSCA:  Thank you, Your Honor.  We have --
13           THE COURT:  Keep your voice up, if you will.  I'm
14      sorry.
15           MS. BRUSCA:  Sure, Your Honor.
16           We have Agent Kelly from the FBI, possibly Agent Will
17      Filbert from the FBI.  Who else?  Jeremy Monkers from BPD.  I
18      think I'm doing it out of order.  I think it will be reversed.
19      And we think that's probably it.
20           THE COURT:  So you're going to have three more
21      witnesses after Ms. Harris finishes.  So it's anticipated that
22      we'll have cross-examination of Ms. Harris.  You'll put these
23      other three witnesses, cross-examination, obviously, and then
24      the Government will rest.
25           And then we will deal with any Rule 29 motions, Mr.
```

1    Purpura.  And we may or may not get to the Rule 29 motions

2    today -- I mean, tomorrow.  We'll have to wait and see.

3         And then we would then proceed with the Defense case

4    starting Monday.  That's basically the schedule that I can

5    see.

6         Does that sound right to the Government?

7              **MS. BRUSCA:**  Yes, Your Honor.

8              **THE COURT:**  Hopefully we can get witness testimony

9    finished, and we may not deal with Rule 29 motions until

10   Monday morning.  We'll just have to wait and see.

11             **MR. PURPURA:**  Judge --

12             **THE COURT:**  Mr. Purpura, yes.

13             **MR. PURPURA:**  I was going to tell you the

14   cross-examination of the last three witnesses will be very

15   short.

16             **THE COURT:**  Okay.  So it looks like --

17             **MR. PURPURA:**  There may be no cross at all.

18             **THE COURT:**  So we will get to Rule 29 motions, which

19   means that you will need to be ready with any Defense

20   witnesses you want to call tomorrow, Mr. Purpura.

21             **MR. PURPURA:**  I don't think -- we can't, and the

22   reason we can't be ready tomorrow is because the Government

23   said they were going to finish -- up until this morning or

24   today --

25             **MR. BUDLOW:**  Yesterday.

1        **MR. PURPURA:**   -- today, because I was happy today

2    you told me.  You anticipated finishing today, Mr. Budlow.

3    And you suggested -- and so they've been telling us Monday

4    they'd finish.  We just don't have the witnesses in line.

5        **THE COURT:**  All right.  Well, what we're going to do

6    then is we'll use that time, since we're going to stop a

7    little bit earlier tomorrow because of my commitment for a

8    wedding rehearsal -- not my wedding rehearsal.  I'm presiding

9    over a wedding.  We're smiling here.  That we will finish with

10   the case.  We'll clearly have Rule 29 motions, we'll be ready

11   on the Rule 29 motions.  And we will then proceed with the

12   Defense case as of Monday morning.

13       Now, you will have witnesses ready on Monday, okay?

14       MS. WHALEN:  Yes.

15       **THE COURT:**  And with respect to the Defense here on

16   that, I would -- if you'll stand, Mr. Briscoe.  I always make

17   sure the record is clear.  We have plenty of time to talk

18   about this.  You have a privilege -- you are not to respond to

19   me in any way, sir.  I'm just trying to make sure that you're

20   understanding what I'm going to say to you.  You have a

21   privilege against self-incrimination under the Fifth

22   Amendment.  And in the event that a witness -- no one -- the

23   Government cannot call you as a witness.  I cannot call you as

24   a witness, nor can any inference be drawn against you when --

25   there is an instruction that I specifically give the jury in

1    the event that a Defendant does not testify, advising them

2    that they should not consider in any way the fact that a

3    Defendant did or did not testify or put on any evidence, and I

4    explained to the jury that the burden is always upon the

5    prosecution to prove guilt beyond a reasonable doubt, and that

6    burden never shifts to a criminal defendant.

7         The burden is never upon a criminal defendant to prove

8    his innocence, the burden is always upon the Government to

9    prove guilt beyond a reasonable doubt.  I want to make sure

10   you understand that, because you have plenty of time to think

11   about whether you're going to testify or not, and I'm trying

12   to make sure that you -- your lawyers have worked very hard on

13   this case, and we have plenty of time to think about this, but

14   I just want to make sure that we start early with that

15   consideration.  This is not something that is forced upon you

16   at the last minuet, and I try to make sure that a defendant

17   has plenty of time to think about it so the record is clear in

18   that regard.

19        Is there anything else from the point of view of the

20   Government on this matter, Ms. Brusca, on any matter right

21   now?

22        **MS. BRUSCA:**  No, Your Honor.  I just was going to

23   ask because I haven't done it in front of Your Honor before.

24   Rule 29, we're going to make orally.

25        **THE COURT:**  Yes, the Defense makes an oral motion.

1    You do not need -- you know --

2            MS. BRUSCA:  Good.  Thank you.

3            THE COURT:  -- and the Government responds, and you

4    can respond in argument.  You don't need to submit memoranda,

5    that's fine.  And I'll be ready to deal with that.  And

6    obviously, you know, as is clearly understood here in terms of

7    under a Rule 29 motion, pursuant to Rule 29(c)(1)(3), the

8    Defendant is not required to move for a judgment of acquittal

9    at the conclusion of the Government's case and may await a

10   jury verdict, but the standard is if, upon view of the

11   evidence in the light most favorable to the Government, any

12   rational trier of facts could find the Defendant guilty beyond

13   a reasonable doubt, that standard having been set by the

14   Fourth Circuit in *United States versus Tresvant*,

15   T-r-e-s-v-a-n-t, at 677 F.2nd 1018, a Fourth Circuit opinion

16   in 1982, and having been reiterated numerous times since then,

17   including the *Wolfson* case in 1997 at 115 F.3rd 1185.  So that

18   will be the schedule for tomorrow.

19         Is there anything further from the point of view of the

20   Government?

21            MS. BRUSCA:  No, Your Honor.

22            THE COURT:  Anything further from the point of view

23   of the Defense?

24            MS. WHALEN:  No.  Thank you, Your Honor.

25            THE COURT:  All right.  I just would like to clarify

```
 1        one matter here, if I can.  I want to make sure Mr. Purpura
 2        has time on this.
 3                    MR. PURPURA:  I'm sorry?
 4                    THE COURT:  I'm just trying to clarify in terms of
 5        the evidentiary issue that we address, and I have addressed
 6        here.  The Defense investigator is named Michael MaGee,
 7        M-a-G-e-e; is that correct?
 8                    MR. PURPURA:  That's correct.
 9                    THE COURT:  And is he -- he's not an employee of the
10        Public Defender's Office; is he?
11                    MR. PURPURA:  He's not.  He's an ex-Baltimore City
12        police officer.
13                    THE COURT:  He's a former Baltimore City police
14        officer, who was apparently retained by Defense Counsel in
15        terms of conducting an investigation; is that right?
16                    MS. WHALEN:  That's correct.
17                    THE COURT:  All right.  Okay.  I just want to make
18        sure the record is clear on that in the event that I follow up
19        on any of this at a later date.
20            So with that, this matter is -- this matter is concluded
21        and we now stand adjourned for the day, and I'll see you all
22        tomorrow.  We'll start at 9:30.
23                    THE CLERK:  All rise.  Court stands adjourned.
24            (Court adjourned at 4:56 p.m.)
25
```

```
 1                    I N D E X   P A G E

 2        WITNESS:                                 PAGE
          KIARA HAYNES (CONT.)
 3          By Ms. Whalen                          13, 25
            By Mr. Budlow                              21
 4
          SERGEANT EDWARD HOWARD
 5          By Mr. Budlow                          26, 44
            By Ms. Whalen                              38
 6
          JENNIFER BENTON
 7          By Mr. Budlow                              46
            By Ms. Whalen                              59
 8
          BRIAN LEWIS
 9          By Ms. Brusca                          70, 128
            By Mr. Purpura                        100, 135
10
          DAVID AZUR
11          By Ms. Brusca                             139
            By Mr. Purpura                            146
12
          TONYA HARRIS
13          By Mr. Budlow                             153

14
                             K E Y
15
          K.        = Kester
16
          K.B.      = Kester Brown
17
          K.B., III = Kester Brown, III
18

19
        REPORTER NOTE:  Quotation marks are used for clarity and do
20                      not necessarily reflect a direct quote.

21
                I, Melissa L. Clark, RPR, do hereby certify that the
22      foregoing is a correct transcript from the stenographic record
        of proceedings in the above-entitled matter.
23

24               _____/S/_____
                       Melissa L. Clark
25                  Official Court Reporter
```

Melissa L. Clark, RPR - Federal Official Court Reporter

## $

**$50** [1] - 97:16

## '

**'14** [1] - 158:10

## /

**/S** [1] - 200:24

## 1

**1** [24] - 48:8, 49:17, 49:25, 50:5, 50:23, 51:2, 51:6, 51:19, 53:10, 53:15, 53:23, 54:13, 54:24, 55:24, 56:14, 56:18, 57:11, 60:21, 80:3, 80:20, 102:5, 103:23, 105:18, 135:21
**10** [3] - 72:11, 98:9, 116:12
**100** [1] - 200:9
**101** [5] - 1:24, 30:11, 30:17, 31:18, 43:22
**1018** [1] - 198:15
**102** [1] - 31:20
**106** [1] - 68:9
**10:00** [1] - 12:14
**10:02** [1] - 12:9
**10th** [1] - 23:14
**11** [2] - 27:8, 192:21
**11.1** [2] - 114:3, 114:7
**111** [1] - 129:3
**1149** [1] - 119:6
**115** [1] - 198:17
**1185** [1] - 198:17
**11:13** [1] - 64:13
**11:38** [1] - 69:7
**11:41** [1] - 129:2
**12** [4] - 49:4, 49:5, 130:24, 153:6
**1200** [1] - 157:10
**123** [1] - 119:25
**128** [3] - 40:11, 40:24, 200:9
**12:00** [2] - 133:3, 159:13
**12:25** [1] - 114:8
**12:55** [1] - 126:2
**13** [2] - 52:19, 200:3
**135** [1] - 200:9
**139** [1] - 200:11
**14** [4] - 130:24, 138:21, 153:6, 191:19
**1445** [1] - 82:17

**146** [1] - 200:11
**14th** [1] - 84:9
**15** [2] - 116:12, 154:15
**153** [1] - 200:13
**15th** [2] - 24:12, 24:19
**16** [1] - 154:15
**16th** [1] - 171:9
**17** [2] - 47:2, 49:13
**17.16** [1] - 141:4
**17.6** [1] - 149:2
**17.7B** [1] - 188:16
**17.8A** [3] - 130:15, 130:16, 130:24
**18.8** [3] - 142:24, 143:8, 143:19
**18.8T** [1] - 143:1
**1982** [1] - 198:16
**1996** [1] - 68:3
**1997** [1] - 198:17
**1:50** [1] - 79:6
**1st** [2] - 17:1, 17:2

## 2

**2** [16] - 1:9, 2:19, 48:11, 49:17, 50:2, 55:1, 55:22, 58:16, 72:16, 72:17, 76:11, 80:13, 82:13, 125:24, 135:21, 153:6
**2.8** [1] - 115:24
**20** [2] - 54:20, 98:9
**201** [6] - 31:21, 39:4, 39:7, 71:17, 71:18
**2013** [2] - 155:1, 158:10
**2015** [59] - 2:10, 17:1, 17:2, 17:25, 27:16, 27:19, 47:11, 47:14, 54:24, 59:20, 65:16, 66:19, 66:22, 66:23, 71:3, 72:1, 72:17, 73:9, 73:22, 77:17, 79:5, 79:21, 80:13, 83:13, 84:10, 88:8, 89:2, 90:3, 100:21, 101:15, 104:9, 104:10, 104:25, 108:12, 109:16, 111:9, 111:11, 114:20, 115:20, 117:9, 128:5, 136:13, 149:17, 150:8, 152:12, 155:9, 155:18, 156:21, 156:22, 157:2, 158:1, 158:19, 159:7, 159:20, 161:10,

163:3, 170:2, 175:6
**2016** [2] - 171:5, 174:24
**202** [12] - 31:25, 39:7, 39:9, 39:10, 43:1, 43:19, 48:10, 49:7, 71:18, 71:19, 71:21
**2020** [11] - 13:20, 14:16, 138:24, 139:1, 139:19, 145:11, 149:17, 189:15, 190:24, 191:1, 191:9
**2021** [3] - 24:12, 24:24
**2022** [1] - 1:9
**205** [1] - 152:15
**205-9101** [1] - 152:18
**2086** [1] - 124:10
**21** [2] - 82:16, 200:3
**21201** [1] - 1:25
**22** [1] - 139:19
**22nd** [4] - 139:1, 141:17, 145:11, 148:4
**23** [1] - 118:22
**25** [1] - 200:3
**25th** [2] - 64:23, 64:24
**26** [3] - 119:4, 119:6, 200:5
**26th** [6] - 91:7, 104:9, 113:14, 113:20, 133:13, 189:15
**27** [1] - 118:25
**27th** [12] - 92:7, 94:2, 99:5, 104:9, 114:8, 114:9, 118:12, 118:18, 128:5, 129:2, 132:15, 132:20
**28th** [1] - 104:10
**29** [9] - 138:20, 194:25, 195:1, 195:9, 195:18, 196:10, 196:11, 197:24, 198:7
**29(c)(1)(3** [1] - 198:7
**2:01** [1] - 81:7
**2:02** [1] - 81:7
**2:15** [1] - 127:20
**2:45** [1] - 82:17

## 3

**3** [4] - 50:9, 50:11, 50:17, 82:23
**30** [2] - 43:20, 186:22
**32** [2] - 50:8
**3442** [2] - 77:18, 136:12
**3443** [1] - 129:8

**38** [3] - 50:24, 58:20, 200:5
**39** [1] - 51:4
**3:15** [1] - 193:23
**3:30** [1] - 144:8
**3:31** [1] - 144:18
**3:52** [1] - 144:25

## 4

**4** [5] - 49:10, 64:20, 83:1, 116:8
**4.1** [2] - 29:3, 47:19
**4.10** [1] - 56:19
**4.11** [1] - 57:19
**4.12** [1] - 56:25
**4.13** [2] - 57:5
**4.14** [1] - 57:16
**4.15** [1] - 57:13
**4.16** [1] - 38:4
**4.17** [3] - 52:19, 54:19, 55:22
**4.19** [3] - 79:14, 80:17, 107:16
**4.2** [2] - 29:6, 47:22
**4.21** [2] - 82:6, 105:18
**4.22** [3] - 77:1, 77:2, 77:12
**4.5** [7] - 48:7, 53:3, 58:21, 60:4, 60:10, 60:11, 61:17
**4.7** [2] - 56:2, 56:4
**4.8** [1] - 56:12
**4.9** [5] - 56:15, 56:21, 56:22, 61:3, 61:7
**40** [1] - 43:20
**401** [1] - 179:22
**403** [1] - 179:23
**41** [1] - 53:25
**420T** [1] - 88:20
**43** [3] - 54:4, 54:5, 54:6
**44** [2] - 54:5, 200:5
**443** [5] - 71:5, 77:21, 103:11, 152:15, 152:18
**45** [9] - 54:5, 82:17, 82:18, 82:19, 83:10, 143:8, 143:12, 143:13, 194:9
**46** [2] - 54:9, 200:7
**47** [3] - 51:9, 124:5, 124:7
**48** [1] - 51:9
**49** [1] - 51:9
**4:00** [1] - 15:15
**4:31** [1] - 178:8
**4:43** [1] - 188:5
**4:50** [1] - 194:4
**4:56** [1] - 199:24

**4th** [7] - 1:24, 28:1, 68:2, 71:3, 100:21, 100:24, 101:15

## 5

**5** [7] - 16:7, 66:23, 72:1, 72:17, 73:9, 80:3, 116:9
**500** [1] - 29:5
**502** [8] - 29:7, 47:14, 48:9, 49:7, 71:11, 71:14, 155:16, 168:23
**54** [2] - 106:10, 106:16
**55** [1] - 54:12
**56** [2] - 51:16, 51:17
**563-3915** [1] - 103:11
**57** [3] - 51:16, 52:5, 52:10
**58** [1] - 52:1
**59** [2] - 52:1, 200:7
**5:00** [2] - 15:15, 192:21
**5:15** [1] - 114:8
**5th** [18] - 27:19, 28:6, 47:14, 54:24, 73:22, 77:17, 79:5, 79:21, 80:13, 83:13, 90:3, 108:12, 114:19, 115:20, 117:9, 117:16, 163:3, 175:6

## 6

**6** [1] - 153:6
**6.12** [1] - 169:13
**6.12T** [3] - 169:7, 169:9, 169:11
**6.13** [1] - 170:11
**6.13T** [1] - 170:10
**60** [1] - 52:7
**600** [1] - 29:22
**61** [2] - 52:14, 61:19
**611** [1] - 128:15
**611C** [1] - 177:23
**618** [1] - 168:24
**62** [1] - 52:14
**620** [1] - 168:24
**621-2413** [2] - 71:5, 77:21
**66** [2] - 53:3, 53:5
**67** [3] - 53:11, 53:13
**677** [1] - 198:15
**692** [1] - 68:3

## 7

**7.4** [1] - 189:7
**70** [3] - 53:11, 53:19,

200:9
**72** [3] - 60:4, 60:7, 60:13
**74** [2] - 17:3, 17:4
**75** [4] - 8:6, 8:8, 17:19, 17:24
**75D** [1] - 8:5
**75G** [1] - 8:12
**75T** [1] - 8:12
**7th** [1] - 170:2

## 8

**8** [1] - 1:4
**801(d)(2)(A** [1] - 67:24
**84** [1] - 68:3
**8th** [5] - 23:11, 23:19, 23:21, 24:12, 24:24

## 9

**9** [3] - 2:10, 17:19, 17:25
**91** [1] - 152:19
**9101** [2] - 152:20, 152:23
**911** [2] - 116:15, 116:18
**9:08** [1] - 141:18
**9:30** [4] - 72:11, 193:3, 193:17, 199:22
**9th** [1] - 18:20

## A

**A-z-u-r** [1] - 137:22
**a.m** [7] - 12:9, 64:13, 69:7, 114:8, 114:9, 141:18, 159:13
**abiding** [2] - 181:17
**ability** [1] - 102:19
**able** [12] - 3:18, 10:1, 71:8, 76:21, 101:23, 109:1, 116:17, 126:22, 165:3, 169:16, 181:23, 184:5
**above-entitled** [1] - 200:22
**absolutely** [3] - 37:11, 44:21, 106:12
**abundantly** [2] - 6:18, 6:19
**abuse** [9] - 175:24, 176:2, 179:7, 179:9, 180:4, 180:23, 185:1, 185:8, 187:16
**abused** [3] - 175:22, 183:11, 185:10
**academy** [1] - 27:11

**accomplish** [1] - 104:24
**accomplished** [1] - 104:24
**according** [5] - 5:6, 90:17, 93:23, 99:9, 99:16
**accurate** [5] - 3:12, 3:13, 9:21, 24:17, 76:2, 102:21, 103:13, 109:21, 109:24, 110:6, 110:13, 110:23, 111:4, 113:16, 179:16
**accurately** [1] - 107:5
**acknowledge** [2] - 6:20, 80:1
**acquittal** [1] - 198:8
**act** [1] - 162:23
**acting** [1] - 92:10
**activity** [1] - 38:22
**actual** [1] - 8:3
**add** [1] - 8:19
**added** [1] - 8:13
**addict** [1] - 157:21
**addictions** [1] - 156:17
**addition** [4] - 96:1, 101:8, 105:9, 116:21
**additional** [5] - 8:22, 10:23, 28:8, 97:22, 98:14
**address** [10] - 77:16, 78:14, 78:16, 103:6, 129:5, 129:7, 129:11, 178:5, 185:2, 199:5
**addressed** [1] - 199:5
**addresses** [5] - 76:3, 117:23, 129:24, 130:8, 133:11
**adjourned** [3] - 199:21, 199:23, 199:24
**admissibility** [1] - 67:19
**admissible** [5] - 67:22, 179:20, 180:16, 181:14, 181:25
**admission** [1] - 68:6
**adopt** [1] - 181:7
**adult** [1] - 154:21
**advanced** [2] - 101:3, 101:8
**Advice** [13] - 78:24, 79:1, 79:2, 79:3, 79:8, 79:9, 79:16, 79:18, 79:19, 79:20,

80:3, 80:18, 107:17
**advise** [2] - 37:25, 141:6
**advised** [13] - 28:18, 66:16, 76:7, 76:12, 78:11, 78:14, 79:12, 79:22, 136:14, 140:18, 140:21, 142:9, 148:25
**advisement** [2] - 141:1, 141:6
**advising** [2] - 79:21, 197:1
**affect** [2] - 102:18, 122:2
**affidavit** [1] - 41:25
**afternoon** [18] - 72:16, 76:11, 94:2, 100:8, 100:9, 118:11, 118:14, 119:9, 126:12, 127:2, 127:21, 133:1, 138:15, 145:8, 145:9, 151:13, 152:6, 152:7
**age** [2] - 35:11, 154:10
**Agent** [24] - 1:16, 1:17, 11:5, 139:25, 140:7, 140:22, 140:25, 141:14, 142:1, 142:19, 143:25, 144:4, 148:1, 148:18, 148:21, 189:18, 191:1, 191:9, 191:17, 192:1, 192:5, 192:14, 194:16
**agent** [2] - 139:25, 140:8, 148:22
**agents** [4] - 145:14, 145:15, 146:22, 147:4
**ages** [1] - 153:5
**ago** [3] - 26:24, 77:14, 103:18
**agree** [9] - 58:21, 66:17, 68:23, 80:14, 102:19, 108:23, 184:16, 184:18
**agreed** [5] - 66:15, 80:20, 107:4, 141:11, 149:10
**agreement** [1] - 149:11
**agrees** [1] - 5:17
**ahead** [6] - 161:23, 163:25, 177:16, 178:17, 183:15, 185:22

**aided** [1] - 1:21
**aimed** [1] - 172:8
**AI** [1] - 158:24
**alcohol** [2] - 171:19, 171:23
**alert** [1] - 2:14
**Alfred** [1] - 164:21
**alias** [1] - 102:24
**alleged** [1] - 67:19
**alleviate** [1] - 35:8
**allowed** [1] - 157:16
**almost** [3] - 30:24, 31:14, 138:20
**alone** [2] - 67:2, 85:3
**alternative** [2] - 6:11
**Amendment** [1] - 196:22
**AMERICA** [1] - 1:3
**amount** [2] - 23:2, 129:3
**anal** [1] - 115:16
**analysis** [3] - 58:8, 58:15, 105:2
**Andre** [38] - 22:4, 28:19, 30:13, 33:19, 34:1, 66:19, 101:14, 102:22, 102:23, 103:5, 112:4, 113:3, 115:19, 116:3, 117:8, 117:20, 118:2, 124:9, 125:2, 135:2, 135:15, 136:1, 136:12, 139:2, 139:8, 145:11, 148:5, 148:8, 153:19, 158:8, 160:15, 161:7, 161:9, 164:22, 165:12, 172:15, 172:19, 183:10
**ANDRE** [1] - 1:5
**Andre's** [1] - 23:12
**Andrew** [1] - 1:18
**angry** [2] - 20:23, 21:22
**announce** [2] - 31:2, 31:14
**answer** [9] - 22:10, 40:17, 76:21, 104:12, 135:20, 135:23, 182:4, 186:9, 186:10
**answered** [2] - 32:13, 32:14, 33:5, 33:12, 104:15
**answering** [2] - 76:6, 152:25
**anticipated** [3] - 11:4, 194:21, 196:2

**anticipating** [1] - 11:13
**anyway** [3] - 113:12, 124:7, 182:5
**apart** [3] - 89:10, 89:18, 98:13
**apartment** [37] - 29:15, 30:3, 30:6, 30:18, 32:4, 33:1, 37:12, 39:2, 39:3, 39:8, 41:9, 42:1, 42:9, 42:22, 43:13, 43:14, 43:18, 43:25, 49:15, 50:15, 59:10, 62:15, 65:17, 71:9, 71:13, 71:16, 71:25, 72:2, 93:11, 93:13, 93:14, 163:4, 163:4, 163:13, 165:25, 166:14, 168:23
**Apartment** [10] - 28:21, 30:10, 30:17, 31:25, 39:4, 43:1, 43:19, 43:22, 48:10, 71:21
**apartments** [5] - 31:6, 31:9, 38:23, 41:16, 44:5
**Apartments** [2] - 27:23, 38:17
**apologize** [7] - 60:22, 98:21, 103:20, 117:17, 126:20, 134:24, 193:25
**Appeal** [1] - 68:2
**appear** [6] - 80:24, 102:9, 102:10, 119:9, 149:7, 149:10
**appeared** [2] - 35:19, 36:10, 109:11
**apple** [1] - 55:8
**applies** [1] - 143:2
**appreciate** [1] - 67:5
**approach** [5] - 38:1, 55:25, 61:4, 63:18, 88:15
**approaching** [1] - 31:25
**appropriate** [5] - 8:16, 10:9, 23:3, 64:5, 192:23
**approximate** [1] - 62:24
**April** [4] - 24:12, 24:19, 111:10, 111:11
**area** [11] - 25:25, 31:1, 48:22, 48:23, 49:3, 49:12, 58:1, 115:16, 115:17, 140:13

**areas** [6] - 3:16, 46:4, 59:25, 70:8, 137:25, 151:16
**argument** [2] - 117:5, 198:4
**arrangement** [1] - 40:22
**arrangement-type** [1] - 40:22
**arrangements** [1] - 140:9
**arrest** [20] - 104:18, 139:1, 139:13, 139:15, 139:22, 139:24, 140:2, 140:3, 140:5, 140:16, 140:17, 140:18, 141:23, 142:2, 145:11, 145:13, 146:22, 147:3, 147:25, 148:5
**arrested** [5] - 35:2, 108:18, 139:11, 169:1, 189:15
**arrived** [1] - 113:25
**arrows** [2] - 77:4, 77:6
**aside** [1] - 43:8
**aspect** [1] - 9:4
**assigned** [4] - 27:11, 27:17, 138:21, 138:25
**assignment** [6] - 27:16, 29:1, 37:24, 47:3, 47:11, 138:24
**assignments** [1] - 27:10
**assist** [4] - 17:10, 140:25, 147:25, 170:13
**assistance** [1] - 35:9
**assistant** [1] - 27:4
**assisting** [1] - 32:5
**assortment** [1] - 51:12
**assume** [3] - 145:22, 146:15, 146:18
**assuming** [1] - 42:7
**at..** [1] - 2:23
**ATF** [9] - 1:16, 126:25, 138:21, 138:25, 141:23, 147:4, 147:8, 147:11, 147:13
**attack** [2] - 5:1, 8:18
**attacking** [2] - 7:2, 182:21
**attempt** [1] - 146:25
**attempting** [1] - 82:24
**attention** [2] - 155:3, 171:4
**attitude** [1] - 98:22

**attorney** [2] - 24:1, 80:22
**audio** [6] - 73:2, 73:7, 73:8, 73:18, 73:19, 74:10
**aunt's** [1] - 136:12
**aunts** [1] - 131:3
**AUSA** [2] - 1:11, 1:12
**authoring** [1] - 41:23
**authorized** [1] - 180:14
**autopsy** [2] - 115:3, 115:14
**available** [2] - 126:10, 126:12
**avatar** [1] - 189:8
**Avenue** [11] - 27:22, 28:20, 29:22, 47:14, 48:10, 71:11, 71:14, 72:7, 77:18, 129:8, 136:12
**avoid** [1] - 143:23
**await** [1] - 198:9
**aware** [11] - 22:21, 27:21, 31:20, 68:12, 94:24, 122:3, 134:8, 157:17, 160:11, 179:6, 179:9
**AZUR** [3] - 1:6, 137:15, 200:10
**Azur** [11] - 126:11, 126:25, 137:9, 137:21, 137:23, 138:14, 143:23, 144:6, 144:13, 145:2, 150:17

## B

**baby** [10] - 22:16, 95:25, 130:3, 130:4, 130:5, 172:13, 191:13, 191:15, 191:16, 192:13
**baby's** [1] - 174:2
**backed** [1] - 30:18
**bad** [3] - 123:18, 156:3, 175:15
**bag** [14] - 51:22, 53:6, 53:14, 53:17, 53:20, 55:11, 55:18, 55:20, 56:8, 56:9, 56:18, 57:3, 57:6, 57:17
**baggie** [4] - 51:3, 53:6, 55:4, 56:16
**baggies** [11] - 51:22, 51:23, 55:8, 55:9, 55:10, 55:11, 55:21, 56:10, 56:11, 56:24, 57:25

**bags** [6] - 55:10, 55:11, 55:12, 55:15, 55:17, 56:10
**ball** [1] - 57:18
**Baltimore** [36] - 1:25, 28:11, 32:7, 32:12, 37:5, 70:3, 77:18, 79:18, 83:21, 85:2, 85:11, 85:15, 88:4, 90:5, 90:22, 93:17, 97:15, 97:17, 101:2, 110:11, 113:4, 113:5, 117:24, 124:25, 129:8, 133:23, 138:19, 145:16, 145:17, 145:18, 150:9, 153:16, 154:4, 155:13, 199:11, 199:13
**BALTIMORE** [1] - 1:9
**banged** [1] - 43:22
**banging** [9] - 98:8, 116:9, 116:11, 117:4, 118:5
**barely** [1] - 173:13
**based** [19] - 25:16, 101:4, 102:14, 110:6, 110:13, 110:23, 111:4, 111:13, 111:19, 112:21, 113:12, 113:16, 115:2, 117:14, 128:22, 129:9, 131:9, 134:16, 186:16
**basic** [5] - 8:25, 75:19, 101:25, 103:21, 107:15
**basis** [4] - 111:16, 111:18, 120:2, 181:10
**bathroom** [6] - 48:24, 49:14, 49:21, 49:24, 50:10, 81:14
**became** [2] - 154:24, 175:3
**become** [4] - 27:21, 154:21, 155:6, 160:11
**becomes** [1] - 10:24
**bed** [5] - 51:15, 53:10, 60:18, 60:23, 163:15
**bedroom** [29] - 16:18, 16:19, 33:8, 33:9, 34:12, 49:24, 50:1, 50:4, 50:6, 50:22, 50:23, 50:24, 53:22, 54:17, 57:9, 57:10, 61:9, 114:16,

114:20, 116:5, 163:14, 163:25, 164:2, 164:5, 164:8, 164:9, 166:20
**Bedroom** [19] - 49:25, 50:2, 50:5, 50:9, 50:11, 50:17, 51:1, 51:6, 51:19, 53:10, 53:15, 53:22, 54:13, 54:24, 55:24, 56:14, 56:18, 57:11, 60:21
**bedrooms** [4] - 33:7, 48:24, 50:3, 163:22
**BEFORE** [1] - 1:8
**beg** [1] - 66:20
**began** [3] - 30:19, 70:24, 100:10
**begin** [1] - 102:2
**beginning** [4] - 48:25, 86:4, 108:6, 110:1, 185:25
**behavior** [1] - 174:25
**behind** [4] - 51:14, 53:10, 60:18, 60:23
**belabor** [1] - 182:8
**belief** [3] - 179:20, 179:21, 179:25
**beliefs** [5] - 176:16, 176:18, 179:15, 181:19, 181:24
**believes** [2] - 17:9, 143:5
**below** [3] - 55:4, 80:10, 141:15
**bench** [2] - 12:15, 188:11
**benefit** [2] - 143:4, 151:25
**BENNETT** [1] - 1:8
**Bennett** [6] - 2:4, 64:16, 126:4, 137:24, 144:21, 151:14
**Benton** [12] - 11:3, 11:12, 45:10, 45:12, 45:24, 46:1, 46:21, 58:6, 59:2, 59:9, 63:3, 63:8
**BENTON** [3] - 1:6, 45:18, 200:6
**best** [5] - 8:13, 74:19, 112:10, 112:13, 188:8
**better** [2] - 37:14, 125:11
**between** [21] - 2:10, 4:17, 17:25, 24:18, 29:20, 71:24, 72:11, 78:25, 86:2, 95:18, 98:9, 101:6, 109:14,

111:2, 111:7, 111:14, 113:19, 117:24, 121:14, 128:25, 149:16
**beyond** [4] - 5:15, 197:5, 197:9, 198:12
**BGF** [3] - 178:24, 180:12, 180:14
**bifurcated** [1] - 66:17
**big** [2] - 16:15, 131:9
**Bill** [1] - 120:23
**binders** [1] - 169:7
**birthday** [1] - 192:15
**bit** [8] - 9:5, 60:5, 86:20, 93:1, 93:13, 125:9, 193:22, 196:7
**Bivens** [1] - 163:19
**black** [10] - 19:18, 52:17, 52:23, 52:25, 53:17, 53:20, 56:16, 56:18, 57:3, 60:17
**block** [3] - 29:5, 93:19, 168:25
**blocks** [1] - 91:2
**blood** [1] - 20:12
**blow** [1] - 130:14
**blow-up** [1] - 130:14
**blue** [1] - 153:20
**bluntly** [1] - 126:15
**board** [4] - 130:11, 130:18, 135:7, 188:15
**bodies** [2] - 19:8, 19:9, 168:10
**books** [1] - 169:16
**boot** [3] - 52:5, 57:24, 58:13
**boots** [4] - 51:21, 52:8, 52:10, 57:20
**bottle** [11] - 51:11, 53:20, 56:13, 56:17, 56:22, 61:15, 61:20, 61:22, 171:23, 173:10
**bottom** [11] - 2:25, 14:8, 29:15, 31:18, 31:21, 77:7, 80:6, 80:16, 81:1, 118:16
**box** [5] - 2:21, 51:2, 52:11, 55:16, 56:9
**boy** [2] - 45:25, 191:18
**boyfriend** [2] - 163:17, 163:19
**BPD** [1] - 194:17
**break** [9] - 64:5, 81:23, 81:24, 87:11, 125:11, 144:10, 144:11, 144:14, 193:18
**breaks** [1] - 81:11

BRIAN [3] - 1:6, 69:22,
200:8
Brian [10] - 11:8,
11:15, 11:21, 63:23,
63:25, 69:2, 69:10,
69:13, 69:15, 70:2
Brianna [3] - 116:25,
117:1
briefing [2] - 28:4,
28:5
briefly [5] - 3:22, 27:9,
44:13, 106:9, 145:10
briefs [1] - 28:25
bring [14] - 5:23,
10:13, 10:18, 64:19,
69:1, 106:10, 127:9,
140:10, 144:22,
146:7, 174:12,
182:25, 187:3, 188:3
Briscoe [90] - 14:21,
15:16, 22:4, 28:19,
30:14, 30:16, 31:21,
33:19, 33:24, 34:1,
39:8, 39:19, 66:19,
66:22, 72:24, 73:17,
74:7, 74:12, 75:10,
75:12, 75:14, 79:17,
79:22, 80:11, 80:19,
81:3, 82:1, 82:9,
82:14, 82:24, 86:1,
93:22, 98:17,
101:22, 102:5,
102:23, 103:5,
103:25, 104:5,
104:19, 105:5,
106:1, 107:16,
107:17, 112:4,
113:3, 113:20,
114:10, 115:19,
116:4, 116:7, 117:9,
117:20, 118:2,
119:23, 120:1,
121:6, 121:7,
122:19, 125:2,
135:3, 135:9,
135:12, 135:15,
136:1, 139:2, 139:4,
139:8, 145:12,
145:13, 145:19,
146:2, 146:9,
146:15, 146:23,
146:25, 147:3,
148:5, 148:9,
148:24, 149:7,
149:20, 153:19,
153:22, 158:8,
183:10, 187:16,
188:20, 189:1,
196:16
BRISCOE [1] - 1:5

Briscoe's [6] - 43:1,
81:15, 83:14,
100:12, 101:15,
136:12
Brittany [2] - 116:22,
116:24
Broadway [1] - 93:19
brother [5] - 153:13,
153:14, 159:3,
160:21, 165:24
brothers [4] - 153:25,
154:20, 161:25,
162:4
brought [5] - 24:23,
25:1, 81:15, 82:1,
84:13
brown [1] - 57:6
Brown [3] - 102:23,
200:16, 200:17
brunt [1] - 54:3
BRUSCA [78] - 10:14,
11:7, 11:14, 11:18,
11:20, 11:23, 63:23,
64:3, 64:6, 64:23,
65:12, 65:15, 65:19,
65:24, 66:1, 66:6,
66:9, 66:13, 69:4,
69:14, 70:18, 70:20,
77:3, 77:6, 77:10,
77:11, 88:15, 88:19,
88:21, 100:2,
107:11, 111:16,
115:4, 115:7, 115:9,
120:2, 123:23,
125:9, 125:15,
125:18, 126:8,
126:20, 127:6,
127:10, 127:13,
128:1, 128:3,
128:14, 128:20,
128:21, 130:11,
130:15, 130:17,
131:8, 132:4,
132:12, 134:14,
134:15, 134:20,
137:8, 138:13,
139:9, 139:10,
139:19, 139:21,
142:25, 143:7,
143:12, 143:17,
143:21, 143:22,
144:5, 194:12,
194:15, 195:7,
197:22, 198:2,
198:21
Brusca [17] - 1:11,
63:22, 70:17, 88:18,
100:3, 121:4, 125:8,
127:25, 135:2,
135:7, 136:1, 137:6,

139:18, 194:11,
197:20, 200:9,
200:11
brushed [4] - 174:4,
174:17, 174:18,
174:19
budlow [1] - 192:19
BUDLOW [91] - 2:15,
2:19, 2:21, 2:24, 3:6,
3:9, 3:13, 3:20, 4:19,
8:5, 8:19, 9:3, 11:19,
21:10, 21:12, 25:7,
26:7, 26:21, 34:2,
38:1, 38:3, 38:10,
40:23, 44:13, 44:15,
44:22, 45:9, 45:12,
46:18, 46:20, 47:8,
55:25, 56:2, 56:4,
56:6, 58:5, 59:2,
63:7, 63:18, 106:11,
106:14, 114:5,
150:24, 152:3,
152:5, 152:22,
162:5, 166:8, 166:9,
169:5, 169:12,
169:21, 170:9,
170:15, 172:22,
176:21, 176:24,
177:2, 177:6, 177:8,
177:12, 177:14,
177:17, 177:24,
178:13, 178:18,
179:3, 179:11,
179:14, 180:10,
181:15, 181:22,
182:3, 182:13,
182:24, 183:14,
183:16, 184:1,
184:9, 184:21,
184:23, 184:25,
185:3, 185:16,
185:20, 186:15,
186:22, 188:13,
188:14, 192:17,
195:25
Budlow [28] - 1:12,
2:18, 21:9, 25:9,
26:6, 38:12, 44:12,
44:23, 46:17, 59:4,
63:6, 150:23, 152:2,
169:15, 169:19,
177:1, 177:16,
178:9, 181:5, 185:4,
185:14, 187:13,
188:12, 196:2,
200:3, 200:5, 200:7,
200:13
building [9] - 29:14,
29:17, 29:23, 31:6,
32:4, 47:22, 71:11,

93:11, 93:14
buildings [2] - 29:9,
29:18
bunch [1] - 164:18
burden [4] - 197:4,
197:6, 197:7, 197:8
burn [1] - 5:13
business [1] - 31:13
business-like [1] -
31:13
but.. [1] - 172:5
buy [1] - 157:13
BY [59] - 13:10, 13:18,
18:13, 21:12, 25:12,
26:21, 34:2, 38:3,
38:16, 40:16, 40:25,
44:15, 46:20, 47:8,
56:6, 58:5, 59:8,
60:14, 61:6, 70:20,
77:11, 88:21, 100:7,
106:24, 107:14,
112:2, 114:6,
115:12, 119:3,
120:3, 120:8, 124:2,
128:3, 128:21,
130:17, 131:8,
132:4, 132:12,
134:15, 135:1,
138:13, 139:10,
139:21, 143:22,
145:7, 149:4, 152:5,
152:22, 162:5,
166:9, 169:21,
170:15, 172:22,
176:21, 177:2,
177:8, 177:17,
188:14, 190:5

## C

cable [1] - 121:23
Cadle [4] - 1:19, 8:14,
10:2, 18:6
calendar [2] - 113:8,
126:19
calm [5] - 34:7, 39:6,
39:13, 41:1, 43:7
Cambridge [55] - 11:3,
26:19, 27:3, 27:6,
28:6, 31:2, 45:10,
46:24, 46:25, 47:14,
65:17, 66:25, 71:9,
71:24, 72:3, 72:4,
72:21, 73:6, 75:7,
77:24, 79:18, 82:21,
84:13, 84:14, 85:1,
85:12, 85:20, 90:5,
94:16, 94:17, 95:8,
95:11, 95:13, 95:17,
95:24, 96:8, 97:17,

97:18, 99:18,
100:15, 103:18,
110:22, 119:2,
123:15, 125:2,
125:3, 129:13,
129:17, 129:24,
152:9, 153:16,
155:15, 160:25,
168:22, 189:18
cannot [6] - 67:8,
70:12, 179:24,
181:5, 196:23
car [4] - 4:8, 72:4,
167:23, 174:2
card [2] - 141:2, 141:6
care [1] - 21:2
career [1] - 44:18
CASE [1] - 1:3
case [29] - 2:12, 3:17,
6:21, 10:24, 41:13,
57:3, 62:14, 67:22,
75:25, 76:21,
112:11, 135:24,
137:1, 137:2,
139:25, 140:1,
148:12, 148:22,
176:16, 180:13,
186:7, 195:3,
196:10, 196:12,
197:13, 198:9,
198:17
cases [2] - 106:6,
122:12
catching [2] - 19:8,
19:9
categories [1] -
103:22
caught [1] - 93:5
causing [1] - 175:24
CDS [1] - 57:17
cell [21] - 36:20, 38:8,
53:15, 77:20, 78:13,
81:15, 82:12, 82:14,
101:5, 101:6, 113:9,
114:4, 114:9,
117:14, 117:19,
121:4, 121:5, 121:6,
121:7, 121:14
center [2] - 51:20,
169:3
central [1] - 140:10
certain [4] - 73:18,
81:16, 81:17, 103:22
certainly [14] - 7:2,
7:3, 8:18, 38:2, 56:1,
61:5, 63:2, 65:9,
128:18, 181:4,
183:4, 183:11,
184:13
certify [1] - 200:21

**cetera** [3] - 4:5, 4:12, 5:18
**chair** [4] - 51:14, 114:16, 116:3, 142:16
**chairs** [3] - 72:23, 75:8, 142:16
**challenge** [1] - 184:5
**change** [4] - 22:14, 34:5, 85:25, 174:24
**changed** [2] - 22:12, 43:1
**charge** [1] - 125:3
**chart** [1] - 189:3
**check** [4] - 36:14, 57:10, 57:22, 103:22
**checked** [1] - 31:20
**chemical** [1] - 58:8
**chest** [1] - 24:10
**child** [18] - 4:10, 18:23, 19:4, 19:15, 19:16, 35:7, 35:9, 35:11, 154:22, 175:22, 179:7, 179:10, 180:22, 183:11, 185:8, 185:10, 187:16
**children** [11] - 3:25, 4:23, 9:8, 153:3, 154:13, 154:16, 155:22, 164:1, 164:3, 190:16, 191:20
**children's** [2] - 171:13
**choice** [1] - 156:19
**cigarette** [3] - 51:2, 55:3, 55:16
**Circuit** [4] - 68:2, 68:3, 198:14, 198:15
**circumstances** [1] - 112:14
**City** [6] - 32:7, 70:3, 145:17, 150:9, 199:11, 199:13
**civil** [1] - 35:8
**CJ** [3] - 89:5, 89:9, 89:10
**CJ's** [1] - 89:8
**clarification** [1] - 91:4
**clarify** [4] - 62:16, 99:3, 198:25, 199:4
**clarity** [1] - 200:19
**Clark** [4] - 1:23, 151:25, 200:21, 200:24
**clean** [1] - 105:1
**clear** [23] - 3:25, 6:18, 6:19, 9:17, 16:25, 42:1, 51:2, 51:21, 55:4, 55:8, 57:25,

61:16, 67:14, 77:3, 77:5, 82:20, 179:17, 183:14, 184:4, 188:3, 196:17, 197:17, 199:18
**clearly** [16] - 26:15, 45:22, 67:22, 68:3, 73:16, 102:10, 102:18, 137:18, 151:9, 151:24, 162:1, 174:6, 179:20, 180:17, 196:10, 198:6
**CLERK** [28] - 2:2, 7:16, 12:1, 12:8, 12:22, 13:2, 26:10, 26:15, 45:16, 45:21, 64:12, 64:15, 69:6, 69:20, 69:25, 77:5, 126:1, 126:3, 127:19, 137:14, 137:18, 144:17, 144:20, 144:24, 151:3, 188:4, 193:20, 199:23
**clerk** [1] - 2:11
**clip** [5] - 18:4, 18:6, 18:9, 18:11, 100:18
**clips** [1] - 82:16
**clock** [1] - 16:15
**close** [6] - 20:15, 93:13, 154:16, 154:18, 155:6, 175:18
**closer** [4] - 154:19, 154:21, 154:24, 158:10
**closest** [1] - 50:1
**closet** [2] - 60:19, 60:21
**Cobb** [2] - 14:24, 15:22
**cocaine** [3] - 58:16, 58:17, 156:20
**coherent** [4] - 76:1, 76:7, 102:6, 102:10
**collect** [6] - 45:4, 47:17, 59:16, 62:17, 89:5, 105:11
**Collective** [1] - 2:6
**collective** [2] - 12:11, 42:9
**collectively** [1] - 39:1
**colloquy** [1] - 113:19
**color** [2] - 52:17, 61:15
**coming** [12] - 4:9, 10:22, 15:16, 43:23, 64:1, 65:13, 65:15, 71:25, 92:10, 116:7,

127:4, 146:9
**commands** [1] - 34:10
**comments** [5] - 67:15, 181:6, 181:7, 185:10, 186:6
**commit** [1] - 101:19
**commitment** [1] - 196:7
**communicate** [2] - 3:18, 23:25
**communicated** [1] - 24:3
**compare** [1] - 98:19
**compiled** [1] - 140:1
**complain** [1] - 4:7
**complete** [3] - 23:12, 23:13, 124:24
**completed** [2] - 79:5, 143:20
**completely** [4] - 32:19, 68:12, 101:20, 122:5
**completeness** [1] - 68:8
**complex** [8] - 29:5, 43:13, 43:18, 47:19, 71:9, 71:25, 72:2, 168:23
**Complex** [1] - 28:21
**compliance** [1] - 65:7
**compliant** [2] - 43:10, 105:6
**complied** [1] - 68:10
**comply** [1] - 34:16
**computer** [1] - 1:21
**computer-aided** [1] - 1:21
**concerned** [2] - 68:9, 84:20, 134:22
**concluded** [2] - 113:13, 199:20
**concludes** [4] - 26:3, 45:1, 137:2, 150:19
**concluding** [1] - 193:16
**conclusion** [1] - 198:9
**conduct** [5] - 31:13, 34:5, 62:12, 140:2, 147:24
**conducted** [3] - 148:14, 148:19, 182:6
**conducting** [1] - 199:15
**confer** [6] - 38:9, 45:7, 58:4, 65:25, 107:13, 118:24
**conferences** [2] - 12:15, 188:11
**confessions** [1] -

178:22
**confident** [1] - 107:24
**configuration** [1] - 40:22
**confine** [1] - 68:17
**confining** [1] - 68:15
**confirm** [2] - 116:18, 181:18
**confirmed** [2] - 117:4, 117:20
**confuse** [2] - 6:22, 6:24
**confused** [2] - 6:8, 23:15
**confusing** [5] - 4:16, 4:19, 6:6, 6:7, 122:14
**congratulations** [1] - 26:25
**connect** [1] - 123:10
**connection** [3] - 66:25, 123:12, 129:17
**consent** [1] - 37:2
**consider** [2] - 59:19, 197:2
**consideration** [1] - 197:15
**consisted** [1] - 72:22
**consistent** [4] - 114:11, 115:19, 117:8, 150:11
**construction** [6] - 140:6, 140:7, 145:16, 145:20, 146:1
**CONT** [2] - 1:5, 200:2
**cont** [1] - 13:9
**contact** [6] - 41:7, 78:1, 78:7, 78:12, 130:22, 136:18
**contained** [3] - 51:22, 52:17, 56:16
**container** [5] - 52:16, 52:23, 60:17, 60:19, 105:1
**containing** [1] - 56:8
**contains** [2] - 55:9, 57:3
**contend** [1] - 7:6
**content** [1] - 99:9
**contentions** [1] - 185:7
**contents** [1] - 56:22
**context** [8] - 4:10, 4:16, 5:5, 9:6, 9:10, 9:11, 65:4, 178:15
**continue** [6] - 4:6, 13:6, 127:22, 145:2, 181:16, 188:12

**continued** [3] - 46:5, 93:24, 173:3
**continues** [2] - 4:7, 9:4
**continuous** [1] - 29:17
**converged** [1] - 140:17
**conversation** [14] - 4:17, 5:20, 8:22, 9:7, 9:25, 32:13, 39:17, 94:21, 108:3, 124:9, 147:11, 161:20, 162:21, 174:12
**conversations** [1] - 140:8
**cool** [3] - 86:8, 86:9, 111:14
**cooled** [2] - 86:2, 111:9
**cooperation** [1] - 22:18
**cooperative** [2] - 37:10, 124:20
**copper** [2] - 57:6, 57:7
**copy** [1] - 141:4
**cordial** [6] - 31:14, 31:16, 32:9, 32:13, 39:5, 39:12
**Corporal** [4] - 11:2, 26:8, 36:3, 165:21
**corporal** [1] - 26:23
**correct** [198] - 5:7, 5:24, 5:25, 6:3, 10:1, 10:4, 10:5, 11:23, 13:12, 13:13, 16:6, 16:11, 17:5, 17:20, 21:20, 24:7, 29:18, 29:19, 31:23, 33:11, 38:19, 38:20, 38:23, 39:13, 39:22, 41:1, 41:6, 41:11, 41:19, 42:3, 42:14, 42:23, 42:24, 43:3, 43:5, 43:24, 44:1, 44:3, 44:4, 48:6, 48:16, 50:7, 50:18, 52:12, 54:11, 55:7, 57:15, 59:10, 59:11, 59:16, 59:17, 59:23, 60:2, 61:21, 61:23, 61:24, 62:7, 62:19, 62:20, 64:2, 65:24, 66:9, 66:13, 66:24, 70:25, 87:19, 88:18, 88:19, 97:7, 97:9, 97:12, 99:7, 100:12, 100:18, 100:22, 101:11, 101:23, 102:3, 102:7, 102:15, 103:1,

103:5, 103:9,
103:13, 103:23,
104:1, 104:3, 104:6,
104:10, 104:12,
104:16, 104:22,
105:19, 106:3,
106:6, 107:18,
107:22, 107:25,
108:18, 108:22,
109:1, 109:5,
109:24, 110:4,
110:7, 110:14,
110:17, 110:20,
110:24, 111:2,
111:5, 111:9,
111:13, 111:15,
112:4, 112:6, 112:8,
112:11, 112:15,
112:17, 112:19,
112:25, 113:6,
113:9, 113:14,
113:17, 114:1,
114:17, 114:25,
115:21, 116:5,
116:9, 116:12,
116:15, 116:19,
117:6, 117:9,
117:12, 118:3,
118:12, 118:18,
118:21, 119:13,
119:16, 119:19,
119:23, 120:1,
120:10, 121:3,
121:8, 121:12,
121:20, 122:11,
122:24, 123:7,
123:10, 123:19,
124:6, 124:22,
124:25, 126:7,
128:8, 128:11,
131:18, 135:4,
136:10, 136:11,
136:19, 145:20,
145:24, 145:25,
146:4, 146:7,
146:13, 146:17,
146:23, 146:24,
147:6, 147:10,
147:20, 147:21,
148:5, 148:9,
148:10, 148:19,
148:20, 148:22,
148:23, 149:22,
149:23, 150:3,
163:23, 180:9,
182:12, 199:7,
199:8, 199:16,
200:22
**corrected** [1] - 10:2
**correcting** [1] - 16:9
**correction** [1] - 23:7

**cotton** [3] - 53:7,
57:18
**couch** [20] - 32:20,
33:5, 33:13, 33:16,
35:23, 36:5, 36:14,
36:16, 36:19, 37:7,
37:8, 38:8, 39:21,
39:25, 40:21, 43:5,
48:18, 48:20, 49:8
**couches** [1] - 48:14
**Counsel** [10] - 11:1,
24:16, 45:7, 69:5,
77:5, 123:25, 180:5,
183:1, 186:4, 199:14
**counsel** [12] - 24:4,
38:9, 58:4, 65:25,
107:13, 108:13,
117:9, 118:24,
169:6, 177:14,
193:11, 194:2
**counsel's** [1] - 183:3
**Counselor** [1] - 100:9
**counted** [3] - 20:1,
20:6, 20:7
**County** [2] - 145:17,
145:18
**couple** [6] - 2:24,
103:18, 107:7,
113:12, 157:9, 171:8
**course** [4] - 39:2,
61:8, 158:20, 182:13
**court** [2] - 67:23,
151:25
**Court** [30] - 1:24, 2:2,
6:7, 46:3, 54:7, 64:7,
64:11, 64:15, 64:21,
66:16, 67:20, 68:1,
70:7, 126:1, 126:3,
126:18, 137:25,
141:4, 144:9,
144:17, 144:20,
151:15, 185:2,
185:23, 185:25,
186:5, 188:10,
199:23, 199:24,
200:25
**COURT** [255] - 1:1,
2:5, 2:7, 2:16, 2:20,
2:22, 3:3, 3:7, 3:12,
3:19, 4:15, 4:25,
5:16, 5:24, 6:2, 6:6,
6:15, 6:18, 6:24,
7:12, 7:17, 7:24, 8:6,
8:10, 8:25, 9:6, 9:15,
10:4, 10:7, 10:15,
10:18, 11:11, 11:17,
11:21, 11:24, 12:2,
12:7, 12:10, 12:12,
12:23, 13:5, 13:15,
16:24, 17:2, 17:7,

17:17, 17:19, 17:21,
21:7, 25:9, 25:23,
26:6, 26:9, 33:25,
38:2, 38:12, 40:12,
40:15, 44:11, 44:23,
45:6, 45:8, 45:10,
45:13, 46:1, 46:11,
46:15, 47:5, 56:1,
56:3, 56:5, 59:4,
60:7, 60:10, 60:12,
61:5, 63:2, 63:5,
63:8, 63:13, 63:20,
63:25, 64:4, 64:8,
64:17, 64:24, 65:13,
65:18, 65:22, 66:3,
66:7, 66:10, 66:14,
66:20, 66:23, 66:25,
67:3, 67:6, 67:10,
67:14, 68:16, 68:19,
68:21, 69:5, 69:8,
69:16, 69:19, 70:4,
70:14, 77:2, 77:7,
88:16, 100:3,
106:15, 106:18,
106:20, 106:23,
107:12, 111:17,
111:21, 115:6,
115:8, 115:11,
120:6, 123:24,
125:7, 125:11,
125:17, 125:20,
126:5, 126:13,
126:24, 127:4,
127:8, 127:11,
127:14, 127:17,
127:21, 128:15,
128:18, 130:13,
130:16, 131:7,
132:3, 132:9,
132:11, 134:11,
134:19, 134:21,
136:22, 137:4,
137:6, 137:10,
137:23, 138:7,
138:11, 139:7,
139:17, 139:20,
143:2, 143:10,
143:13, 143:16,
143:18, 144:1,
144:6, 144:10,
144:16, 144:22,
145:1, 149:1,
150:16, 150:22,
151:1, 151:9,
151:13, 151:23,
152:16, 152:19,
152:21, 162:1,
169:9, 169:14,
170:11, 172:17,
176:20, 176:25,
177:4, 177:11,

177:13, 177:16,
177:25, 178:2,
178:9, 178:17,
179:2, 179:8,
179:13, 179:17,
180:7, 180:16,
181:3, 181:20,
181:23, 182:10,
182:21, 182:25,
183:15, 183:20,
183:23, 184:2,
184:13, 184:17,
184:22, 184:24,
185:2, 185:4,
185:19, 185:22,
186:2, 186:8,
186:14, 186:16,
186:21, 187:2,
187:8, 187:12,
187:19, 187:23,
188:2, 188:6,
192:19, 192:23,
193:8, 193:10,
193:15, 193:21,
194:5, 194:10,
194:13, 194:20,
195:8, 195:12,
195:16, 195:18,
196:5, 196:15,
197:25, 198:3,
198:22, 198:25,
199:4, 199:9,
199:13, 199:17
**Court's** [8] - 8:22,
16:22, 17:14, 17:15,
64:12, 68:12,
178:13, 186:23
**court's** [2] - 18:8, 63:1
**courthouse** [5] - 46:5,
70:8, 70:9, 138:1,
151:16
**courtroom** [20] - 2:8,
12:9, 14:2, 33:20,
46:7, 64:13, 68:22,
69:7, 126:2, 127:20,
138:1, 139:4,
144:18, 144:25,
151:18, 178:8,
181:9, 188:5,
193:12, 194:4
**cousin** [32] - 83:16,
84:8, 85:5, 90:22,
91:14, 92:14, 94:6,
94:18, 94:21, 96:1,
97:14, 97:20,
110:16, 111:2,
111:8, 120:10,
120:15, 123:9,
130:1, 130:4, 130:5,
131:22, 131:24,

135:3, 135:15,
158:8, 159:23,
159:24, 159:25,
164:13, 188:22,
190:11
**cousin's** [3] - 93:24,
95:18, 121:1
**cousins** [11] - 84:14,
84:20, 92:17, 97:19,
131:5, 135:19,
153:23, 153:24,
160:9, 160:12
**cousins'** [1] - 95:2
**cover** [1] - 107:1
**covered** [2] - 83:13,
98:13
**COVID** [1] - 68:22
**COVID-19** [1] - 46:5
**crack** [2] - 156:20,
161:15
**created** [1] - 106:8
**credibility** [9] - 5:1,
7:3, 183:1, 183:3,
184:2, 184:3, 184:5,
186:24
**cried** [1] - 173:6
**crime** [3] - 62:1,
98:20, 101:19
**crimes** [3] - 134:4,
134:6, 134:12
**criminal** [4] - 27:17,
62:11, 197:6, 197:7
**CRIMINAL** [1] - 1:3
**Cross** [2] - 59:5, 68:17
**cross** [16] - 13:7,
22:17, 38:13, 67:3,
67:8, 67:11, 100:4,
132:18, 145:3,
182:16, 192:20,
194:8, 194:22,
194:23, 195:14,
195:17
**Cross-Examination**
[1] - 59:5
**cross-examination**
[12] - 13:7, 22:17,
38:13, 67:8, 100:4,
132:18, 145:3,
182:16, 194:8,
194:22, 194:23,
195:14
**cross-examine** [1] -
192:20
**crosses** [1] - 20:15
**crossing** [2] - 9:18,
32:25
**cry** [2] - 173:3, 175:6
**crying** [4] - 93:1,
173:1, 174:9, 175:9
**cuffed** [1] - 43:4

**cuffs** [4] - 35:25, 36:5, 36:12, 36:13
**current** [1] - 47:3
**cursing** [1] - 4:23
**cursor** [3] - 48:22, 49:23, 50:16
**cursory** [2] - 36:14, 36:17
**custody** [3] - 25:25, 79:11, 139:23
**cut** [2] - 9:5, 29:19
**cut-out** [1] - 29:19

## D

**dad** [2] - 165:16, 165:17
**damaged** [1] - 37:2
**Damonte** [3] - 163:18, 164:10, 164:22
**Dana** [1] - 1:11
**danger** [1] - 41:10
**Daniel** [1] - 36:3
**data** [5] - 71:4, 101:11, 117:15, 122:2
**date** [13] - 16:25, 23:20, 25:14, 66:18, 71:2, 80:12, 90:3, 113:11, 139:17, 159:12, 168:11, 171:11, 199:19
**dated** [1] - 107:22
**dates** [3] - 14:18, 23:15, 168:9
**daughter** [1] - 155:4
**daughter's** [1] - 158:12
**Dave** [1] - 137:8
**David** [3] - 126:11, 126:24, 137:21
**DAVID** [4] - 1:6, 137:15, 137:22, 200:10
**DAY** [1] - 1:4
**daylight** [2] - 119:10, 132:22
**days** [4] - 19:18, 23:19, 113:12, 171:8
**dead** [1] - 21:24
**deal** [9] - 178:11, 187:5, 187:6, 187:8, 188:8, 188:9, 194:25, 195:9, 198:5
**dealing** [8] - 7:5, 7:15, 8:6, 88:11, 89:11, 89:15, 89:19, 123:7
**dealt** [3] - 68:7, 101:17, 106:5
**death** [1] - 87:21
**debris** [1] - 51:23

**Defendant** [186] - 1:6, 1:13, 22:4, 22:8, 34:1, 34:4, 35:24, 37:9, 37:15, 37:18, 66:12, 67:6, 67:15, 67:20, 71:6, 71:13, 71:20, 72:1, 72:6, 72:10, 72:13, 72:19, 73:9, 75:17, 76:5, 76:21, 77:16, 78:4, 78:7, 78:20, 79:21, 80:14, 80:24, 81:2, 81:20, 83:4, 83:13, 83:22, 84:1, 84:6, 84:11, 84:15, 84:22, 84:23, 85:3, 85:8, 85:14, 85:19, 85:24, 86:6, 86:13, 86:16, 86:22, 87:3, 87:12, 87:24, 88:5, 88:9, 88:24, 89:7, 89:10, 89:15, 89:18, 90:2, 90:4, 90:14, 90:16, 90:20, 91:6, 91:13, 91:18, 92:1, 92:5, 92:13, 92:18, 93:3, 93:23, 94:1, 94:3, 94:7, 94:10, 94:13, 94:17, 94:20, 95:7, 95:12, 95:16, 95:23, 96:3, 96:6, 96:11, 96:13, 96:16, 96:19, 96:24, 97:2, 97:14, 97:18, 97:22, 98:3, 98:16, 99:4, 99:6, 99:10, 99:16, 99:19, 99:22, 128:4, 129:1, 129:4, 129:10, 129:16, 129:23, 130:18, 131:16, 132:13, 132:16, 132:18, 132:22, 133:5, 133:6, 133:14, 134:17, 139:2, 139:8, 139:11, 139:23, 140:4, 140:10, 140:14, 140:17, 140:18, 141:7, 141:11, 141:19, 142:5, 142:9, 142:20, 153:19, 154:1, 154:7, 154:18, 154:25, 155:6, 155:9, 156:21, 157:2, 157:17, 158:1, 158:18, 159:18, 159:24, 160:8, 161:17, 162:6, 163:6, 168:20,
169:1, 170:5, 170:21, 171:5, 171:15, 174:10, 175:11, 175:14, 175:18, 177:21, 178:23, 179:5, 179:6, 179:9, 180:1, 180:5, 180:18, 181:25, 185:9, 187:16, 189:2, 189:14, 189:23, 197:1, 197:3, 198:8, 198:12
**defendant** [3] - 197:6, 197:7, 197:16
**Defendant's** [23] - 8:7, 17:2, 17:4, 17:19, 17:24, 40:11, 60:7, 65:16, 67:23, 70:25, 81:21, 81:25, 97:3, 97:8, 97:13, 97:15, 98:22, 131:10, 132:14, 140:8, 141:10, 144:4, 174:25
**Defender's** [1] - 199:10
**Defense** [36] - 3:4, 3:17, 4:25, 6:20, 6:22, 8:24, 10:15, 17:9, 24:16, 106:10, 119:25, 176:8, 177:4, 179:19, 180:5, 180:13, 182:14, 182:16, 182:19, 182:22, 182:25, 183:1, 183:18, 183:23, 184:14, 185:12, 187:20, 195:3, 195:19, 196:12, 196:15, 197:25, 198:23, 199:6, 199:14
**defined** [1] - 68:10
**definitely** [3] - 36:9, 181:17, 188:8
**deleted** [2] - 9:16, 10:23
**deliberations** [1] - 17:12
**demeanor** [4] - 34:7, 35:16, 43:1, 76:5
**Demetriou** [1] - 2:11
**department** [3] - 77:14, 101:2, 138:20
**Department** [21] - 11:3, 26:19, 27:4, 27:7, 28:6, 28:11, 32:7, 45:11, 46:24,

47:1, 70:3, 71:24, 72:3, 72:5, 72:21, 73:6, 79:19, 82:21, 101:2, 138:19, 189:18
**depict** [5] - 50:8, 52:7, 54:6, 54:23, 61:20
**depicted** [7] - 49:16, 50:25, 51:9, 51:17, 52:5, 53:5, 53:25
**depiction** [1] - 49:11
**describe** [17] - 32:8, 35:16, 37:10, 48:8, 50:24, 52:22, 55:1, 57:2, 72:19, 73:15, 74:4, 81:23, 83:12, 92:24, 95:7, 142:13, 166:19
**described** [5] - 52:4, 70:23, 73:17, 75:7, 177:6
**describing** [1] - 86:21
**despite** [1] - 4:8
**detailed** [1] - 65:10
**details** [1] - 28:3
**detained** [3] - 34:19, 34:21, 169:2
**detected** [1] - 58:18
**detective** [9] - 11:21, 32:12, 47:12, 76:16, 117:18, 135:14, 135:18, 138:19, 150:17
**Detective** [56] - 11:7, 11:8, 11:15, 63:23, 63:25, 64:18, 64:19, 65:13, 65:15, 69:2, 69:10, 69:13, 69:16, 70:2, 70:4, 70:21, 72:15, 73:16, 74:7, 74:12, 75:11, 75:12, 75:13, 75:18, 76:16, 77:8, 77:12, 79:17, 82:9, 82:11, 83:6, 88:12, 88:22, 98:21, 100:8, 100:10, 112:13, 122:17, 122:18, 125:23, 127:6, 127:9, 127:12, 127:14, 127:22, 127:24, 128:4, 128:22, 134:4, 136:23, 138:14, 145:2, 145:8, 145:10, 165:21
**DETECTIVE** [1] - 69:22
**detectives** [5] - 28:11, 30:18, 37:4, 150:9,

150:12
**detention** [1] - 169:3
**determination** [2] - 6:21, 9:12
**determine** [3] - 6:3, 143:4, 184:6
**Dev** [4] - 97:21, 97:23, 98:1, 98:2
**development** [1] - 29:4
**device** [3] - 51:25, 52:3, 58:12
**Dickerson** [1] - 189:19
**died** [2] - 168:5, 168:19
**difference** [4] - 3:9, 121:14, 121:15, 154:10
**different** [7] - 2:13, 25:19, 43:14, 51:12, 61:22, 87:11, 89:13
**difficult** [5] - 52:15, 73:20, 122:12, 135:14, 135:18
**difficulties** [1] - 68:22
**digital** [2] - 55:5, 56:9
**dining** [2] - 49:3, 49:11
**dinner** [1] - 31:15
**direct** [5] - 40:17, 135:23, 149:21, 177:22, 200:20
**Direct** [1] - 100:10
**directed** [4] - 4:18, 5:20, 7:7, 7:25, 9:1, 9:9, 9:17, 29:15
**directing** [1] - 5:5
**direction** [2] - 9:19, 50:13
**directly** [2] - 49:21, 75:12
**discretion** [4] - 46:6, 70:9, 138:2, 151:17
**discuss** [13] - 26:1, 44:25, 63:9, 63:13, 65:1, 65:10, 86:6, 125:22, 136:24, 137:1, 150:17, 192:25, 193:3
**discussed** [3] - 65:20, 66:4, 66:8
**discussing** [2] - 81:16, 151:14
**discussion** [1] - 65:8
**discussions** [1] - 68:25
**displaying** [1] - 54:7
**dispute** [3] - 2:18, 3:16, 5:14
**disregard** [1] - 186:6

**distance** [1] - 117:24
**distant** [2] - 159:25, 160:1
**District** [3] - 2:2, 2:3, 54:7
**DISTRICT** [3] - 1:1, 1:1, 1:8
**division** [1] - 27:17
**DIVISION** [1] - 1:2
**DM** [1] - 104:24
**DNA** [7] - 98:18, 98:19, 98:20, 99:2, 104:22, 105:5, 105:6
**document** [11] - 40:8, 40:18, 47:17, 47:24, 48:2, 54:9, 54:12, 54:15, 79:15, 88:16, 88:17
**documenting** [1] - 81:2
**dog** [1] - 126:15
**done** [2] - 7:17, 197:23
**door** [36] - 30:25, 32:6, 32:9, 32:10, 32:13, 32:14, 32:19, 32:20, 33:5, 33:8, 33:9, 33:12, 34:4, 34:8, 39:17, 40:3, 48:9, 48:13, 48:15, 48:17, 48:18, 49:8, 72:25, 98:4, 98:8, 116:9, 117:5, 118:5, 142:17, 164:16, 166:13, 167:17, 172:1
**doorknob** [1] - 48:15
**doors** [1] - 49:22
**doorway** [1] - 49:24
**dot** [1] - 67:4
**double** [1] - 57:10
**double-check** [1] - 57:10
**doubt** [6] - 4:3, 136:25, 143:23, 197:5, 197:9, 198:13
**down** [45] - 5:13, 25:24, 36:19, 40:17, 43:4, 44:24, 46:8, 46:12, 50:11, 67:16, 70:11, 70:15, 74:16, 75:2, 75:17, 75:19, 84:13, 85:1, 85:20, 87:8, 88:2, 95:10, 103:16, 123:15, 129:17, 135:11, 136:23, 138:8, 150:17, 151:19, 164:17, 165:1, 165:3, 165:4,

167:15, 168:22, 168:25, 171:16, 171:25, 172:15, 172:19, 173:15, 174:2
**downstairs** [2] - 193:19, 193:22
**draft** [1] - 17:23
**draw** [2] - 155:3, 171:4
**drawer** [2] - 51:6, 55:24
**drawers** [1] - 42:17
**drawn** [2] - 32:25, 196:24
**dream** [2] - 172:21, 172:24
**dreams** [6] - 172:16, 172:20, 175:11, 175:15, 190:6
**dressed** [1] - 19:17
**dresser** [5] - 51:6, 51:14, 51:15, 54:3, 55:24
**drew** [1] - 34:10
**drinking** [8] - 15:2, 76:7, 76:12, 102:13, 171:16, 171:18, 171:22, 173:23
**driving** [1] - 25:13
**dropped** [1] - 133:18
**drove** [2] - 94:19, 97:19
**drug** [6] - 38:22, 44:16, 50:19, 123:7, 156:17, 180:20
**drugs** [27] - 15:4, 15:6, 16:14, 41:18, 41:22, 42:12, 44:20, 50:19, 62:3, 86:22, 86:24, 87:4, 87:8, 87:10, 87:12, 87:18, 88:7, 125:3, 156:19, 157:13, 157:15, 157:24, 161:11, 161:18, 162:7, 162:9, 163:1
**due** [2] - 6:22, 126:13
**duly** [6] - 12:24, 26:12, 45:18, 69:22, 137:15, 151:6
**dumpsters** [1] - 29:19
**during** [32] - 3:23, 4:1, 17:11, 24:18, 50:4, 50:19, 75:8, 78:24, 79:2, 79:8, 81:11, 81:19, 81:24, 83:17, 85:4, 86:7, 88:8, 89:7, 91:6, 92:13, 94:21, 97:4, 117:18, 129:4, 142:18,

144:14, 149:20, 170:4, 177:20, 182:16, 189:21, 190:10

---

# E

**e-n-t-o-n** [1] - 45:25
**early** [13] - 10:3, 12:13, 89:2, 114:1, 114:19, 116:8, 117:5, 118:11, 156:21, 157:2, 159:20, 197:14
**east** [2] - 93:17, 93:25
**Eastern** [4] - 87:8, 90:22, 110:10, 110:19
**edification** [1] - 143:4
**EDWARD** [3] - 1:5, 26:12, 200:4
**Edward** [2] - 26:8, 26:18
**effect** [3] - 65:5, 97:1, 102:14
**effort** [1] - 193:2
**eight** [7] - 62:25, 140:2, 145:12, 146:21, 156:14, 164:19, 165:4
**either** [9] - 94:22, 106:1, 116:14, 140:7, 147:12, 168:9, 172:4, 172:9, 180:17
**elementary** [1] - 35:11
**elicit** [1] - 181:18
**emotion** [1] - 6:14
**emotional** [10] - 5:2, 6:14, 7:2, 7:22, 8:1, 8:18, 10:10, 173:21, 175:4, 175:7
**employed** [7] - 27:2, 27:3, 46:23, 138:16, 138:18, 145:20, 156:6
**employee** [1] - 199:9
**encountered** [1] - 168:18
**end** [12] - 8:7, 10:5, 48:14, 50:16, 79:24, 93:1, 98:14, 105:4, 143:16, 164:8, 184:7, 187:6
**ended** [1] - 172:10
**ends** [3] - 2:25, 4:1, 143:17
**enforcement** [8] - 19:14, 19:17, 20:11, 20:14, 21:1, 24:19,

25:19, 34:5
**enforcement's** [1] - 30:22
**engage** [1] - 36:11
**engaged** [1] - 184:6
**engaging** [1] - 30:19
**entered** [3] - 33:6, 34:3, 37:6
**enters** [6] - 12:9, 69:7, 127:20, 142:17, 144:25, 188:5
**entertainment** [1] - 51:20
**entire** [6] - 37:15, 42:25, 112:23, 124:22, 148:19, 184:10
**entirety** [1] - 143:19
**entitled** [1] - 200:22
**entrance** [2] - 49:12, 49:15
**entry** [15] - 27:5, 27:14, 27:18, 30:20, 30:22, 30:23, 32:5, 33:10, 42:4, 48:5, 48:15, 48:17, 49:7, 59:12, 59:14
**entryway** [1] - 34:8
**envelope** [1] - 54:2
**equipment** [4] - 73:2, 101:4, 101:7, 147:17
**equipped** [1] - 73:2, 147:16, 147:17
**escaping** [1] - 83:19
**especially** [2] - 117:24, 122:13
**Esq** [2] - 1:14, 1:15
**essentially** [4] - 2:9, 9:2, 13:19, 67:15
**established** [2] - 85:6, 120:13
**et** [3] - 4:5, 4:12, 5:18
**evening** [9] - 16:14, 90:7, 95:9, 118:13, 118:14, 118:21, 163:9, 192:9, 193:25
**event** [11] - 20:2, 26:2, 44:25, 63:10, 63:14, 65:2, 136:24, 150:18, 196:22, 197:1, 199:18
**events** [1] - 40:4
**eventually** [6] - 32:24, 103:16, 109:18, 122:22, 123:7, 163:22
**evidence** [30] - 8:10, 8:11, 10:22, 17:10, 17:11, 17:24, 47:18, 48:5, 50:3, 52:20,

54:23, 55:22, 58:6, 59:16, 62:1, 62:11, 62:17, 63:19, 67:24, 88:17, 106:23, 143:3, 143:20, 169:11, 170:12, 186:15, 186:18, 197:3, 198:11
**evidentiary** [6] - 2:9, 7:15, 12:16, 68:25, 188:8, 199:5
**ex** [1] - 199:11
**ex-Baltimore** [1] - 199:11
**exact** [4] - 14:18, 53:10, 78:14, 168:11
**exactly** [7] - 28:3, 64:3, 93:13, 107:24, 117:8, 172:5, 172:10
**examination** [14] - 13:7, 22:17, 38:13, 67:8, 100:4, 127:22, 132:18, 145:3, 177:23, 182:16, 194:8, 194:22, 194:23, 195:14
**Examination** [2] - 59:5, 100:11
**examine** [1] - 192:20
**examined** [7] - 12:24, 26:13, 45:19, 58:6, 69:23, 137:15, 151:6
**exception** [2] - 68:4, 70:9, 138:1
**exchange** [1] - 163:1
**excitement** [1] - 126:5
**exculpatory** [1] - 68:5
**excuse** [6] - 25:13, 51:1, 90:19, 105:17, 115:5, 139:14
**excused** [3] - 63:9, 193:11, 194:2
**execute** [2] - 29:2, 98:15, 139:24
**executed** [5] - 27:22, 30:10, 31:17, 47:20, 47:22
**executing** [3] - 29:13, 38:25, 44:18
**execution** [4] - 43:21, 47:13, 149:25, 150:1
**exhibit** [17] - 8:3, 8:7, 30:5, 45:4, 54:20, 54:21, 56:3, 56:19, 68:14, 82:7, 106:8, 106:15, 107:4, 130:13, 130:14, 149:1, 169:6
**Exhibit** [33] - 8:8, 17:3, 17:4, 17:19,

17:24, 29:3, 29:6, 38:4, 40:11, 48:7, 52:19, 53:3, 54:19, 58:21, 60:7, 60:10, 68:14, 77:12, 105:18, 106:10, 114:3, 114:7, 115:24, 119:25, 136:19, 141:4, 142:24, 143:8, 143:19, 169:9, 170:10, 188:16, 189:7
**exists** [2] - 142:17, 193:14
**exit** [1] - 193:12
**exits** [6] - 64:13, 126:2, 144:18, 178:7, 178:8, 194:4
**expect** [1] - 68:10
**expecting** [1] - 126:9
**experience** [5] - 34:25, 35:2, 42:12, 76:18, 102:15
**expert** [1] - 101:12
**explain** [5] - 79:15, 80:16, 80:19, 85:3, 97:18
**explained** [5] - 77:13, 80:19, 97:19, 98:17, 197:4
**explore** [1] - 10:10
**expressing** [1] - 18:17
**expression** [1] - 179:19
**extent** [3] - 65:5, 66:18, 185:13
**extra** [1] - 8:20
**eyesight** [1] - 146:3

**F**

**F.2nd** [1] - 198:15
**F.3rd** [2] - 68:3, 198:17
**face** [3] - 22:21, 83:3, 173:14
**Facebook** [1] - 168:8
**facing** [3] - 48:18, 48:20, 49:8
**fact** [14] - 24:23, 98:24, 102:5, 102:9, 103:5, 116:17, 116:18, 117:20, 123:9, 129:13, 149:5, 182:6, 186:11, 197:2
**facts** [2] - 4:22, 198:12
**fair** [8] - 20:21, 112:18, 114:22,

118:1, 122:15, 122:16, 183:11, 185:10
**fairly** [3] - 39:6, 39:13, 102:7
**fairness** [2] - 7:13, 67:6
**false** [1] - 120:22
**familiar** [6] - 28:20, 38:18, 54:20, 109:8, 109:9, 177:9
**family** [12] - 84:19, 95:14, 131:10, 131:12, 135:8, 135:21, 157:1, 158:18, 175:21, 190:11, 190:12
**far** [8] - 50:1, 68:9, 76:3, 82:2, 83:20, 84:19, 91:1, 108:14
**father** [12] - 155:22, 157:20, 157:22, 158:21, 161:15, 162:23, 163:17, 164:6, 166:21, 166:22, 171:13, 174:2
**father's** [1] - 188:25
**fathers** [1] - 153:25
**Fatman** [2] - 159:5, 165:24
**fats** [1] - 159:4
**Fats** [1] - 159:5
**favorable** [1] - 198:11
**FBI** [3] - 1:17, 194:16, 194:17
**fear** [2] - 190:15, 190:17
**February** [5] - 84:10, 85:8, 110:2, 110:3, 155:9
**federal** [1] - 138:22
**Federal** [4] - 1:24, 67:24, 139:11, 139:13
**felt** [3] - 18:17, 24:9, 68:18
**female** [6] - 41:8, 83:15, 95:6, 120:12, 120:18, 135:6
**Fentanyl** [1] - 58:17
**few** [6] - 3:16, 77:14, 91:2, 91:14, 131:12, 193:10
**field** [3] - 101:12, 147:8, 147:11
**Fifth** [1] - 196:21
**Fifty** [1] - 106:17
**Fifty-four** [1] - 106:17
**figure** [2] - 109:10,

135:18
**Filbert** [1] - 194:17
**filling** [2] - 75:20, 75:21
**filtrate** [1] - 181:9
**final** [1] - 18:11
**finally** [1] - 104:14
**fine** [21] - 6:5, 6:10, 6:23, 7:12, 11:17, 16:24, 41:21, 64:8, 68:16, 68:19, 68:20, 93:8, 98:23, 127:9, 143:13, 173:23, 178:17, 185:19, 198:5
**Fine** [1] - 182:10
**finish** [7] - 11:2, 17:15, 74:23, 125:14, 195:23, 196:4, 196:9
**finished** [4] - 176:25, 178:6, 187:3, 195:9
**finishes** [1] - 194:21
**finishing** [1] - 196:2
**fire** [7] - 3:1, 3:3, 4:1, 4:2, 5:17, 9:22, 10:5
**firearm** [1] - 138:22
**first** [57] - 6:16, 10:19, 24:17, 27:11, 29:20, 30:7, 30:20, 32:17, 35:15, 36:24, 39:2, 39:5, 39:12, 39:24, 40:20, 49:4, 49:24, 71:20, 72:13, 72:15, 73:20, 74:4, 75:18, 81:20, 82:7, 83:7, 83:22, 84:12, 84:23, 95:2, 97:6, 108:17, 108:25, 109:7, 110:4, 110:16, 110:19, 116:25, 129:17, 131:5, 131:22, 131:24, 149:13, 153:23, 153:24, 159:24, 160:24, 164:14, 168:17, 177:4, 179:4, 179:17, 179:22, 181:5, 183:17
**five** [13] - 19:9, 19:10, 62:25, 74:25, 114:12, 123:3, 125:13, 125:16, 125:19, 153:10, 155:19, 176:11, 178:19
**flights** [1] - 174:1
**flip** [1] - 78:2
**floor** [4] - 29:15, 30:7,

31:25
**Floor** [1] - 1:24
**fluid** [1] - 115:16
**focus** [2] - 39:4, 39:10
**folks** [1] - 131:13
**folks'** [1] - 65:20
**follow** [1] - 199:18
**followed** [2] - 112:17, 112:23
**following** [5] - 28:23, 32:21, 65:17, 70:24, 160:24
**follows** [6] - 12:25, 26:13, 45:19, 69:23, 137:16, 151:7
**FOR** [1] - 1:1
**force** [6] - 31:8, 138:22, 138:25, 145:12, 146:22, 147:4
**forced** [1] - 197:15
**forceful** [1] - 30:24
**forcefully** [1] - 33:9
**foregoing** [1] - 200:22
**forgot** [1] - 46:3
**forgotten** [1] - 70:5
**form** [8] - 75:20, 75:22, 79:19, 79:20, 80:4, 81:6, 103:12, 182:1
**former** [1] - 199:13
**forth** [1] - 101:5
**forward** [6] - 26:9, 45:14, 127:3, 127:15, 137:10, 151:1
**foundation** [3] - 111:22, 111:24, 111:25
**four** [10] - 72:23, 72:25, 75:8, 102:17, 106:17, 140:14, 146:11, 153:6, 153:10, 159:15
**four-wheeler** [1] - 140:14
**Fourteen** [2] - 147:14, 147:16
**fourth** [2] - 64:1, 64:20
**Fourth** [3] - 68:3, 198:14, 198:15
**free** [8] - 4:25, 7:3, 8:18, 46:16, 65:9, 65:10, 107:8, 163:1
**freezers** [1] - 42:15
**frequency** [1] - 86:4
**frequently** [4] - 84:22, 85:25, 86:17, 162:4
**fresh** [1] - 57:7
**friend** [1] - 31:15

**friends** [1] - 86:11
**front** [16] - 14:3, 19:4, 30:5, 48:17, 49:7, 49:21, 50:14, 52:8, 52:11, 53:9, 93:14, 106:25, 130:12, 173:10, 188:15, 197:23
**full** [9] - 23:20, 26:16, 45:23, 75:5, 121:1, 136:9, 137:19, 151:10, 158:22
**full-time** [1] - 158:22
**fully** [6] - 46:7, 70:10, 70:12, 80:9, 80:21, 138:2, 138:5, 151:18, 151:21
**furniture** [1] - 42:19
**fussing** [3] - 92:8, 92:19, 92:25

**G**

**gain** [1] - 75:19
**gains** [1] - 111:22
**gang** [6] - 180:2, 180:8, 180:11, 180:20, 181:13, 182:12
**Gardner** [16] - 2:11, 4:3, 4:17, 4:18, 5:6, 5:11, 5:20, 7:8, 9:2, 9:19, 9:25, 16:2, 18:1, 18:14, 18:24, 20:24
**Gator** [8] - 140:14, 140:17, 146:7, 146:10, 146:15, 146:16, 147:1
**general** [2] - 75:24, 75:25
**generally** [12] - 27:9, 28:24, 29:23, 32:3, 35:5, 54:6, 55:1, 83:12, 89:15, 95:17, 103:25, 187:14
**generation** [1] - 154:14
**generic** [1] - 89:24
**gentleman** [1] - 148:18
**gentlemen** [4] - 17:7, 69:8, 178:4, 193:15
**girl** [5] - 86:9, 95:18, 130:3, 130:14, 130:5
**girl's** [2] - 90:6, 95:25
**girlfriend** [4] - 78:11, 83:18, 85:18, 131:1
**given** [5] - 97:3, 97:16, 102:21, 117:24,

128:18
**glad** [2] - 180:4, 180:24
**glass** [2] - 51:24, 52:2
**glove** [2] - 52:16, 53:1
**gloves** [1] - 52:13
**godfather** [3] - 158:13, 158:14, 158:16
**Government** [38] - 4:16, 5:6, 5:19, 6:19, 8:17, 10:8, 10:13, 17:8, 23:14, 52:19, 60:9, 60:10, 63:21, 66:17, 67:9, 67:21, 68:13, 69:14, 107:4, 135:11, 136:9, 136:18, 137:7, 137:8, 138:8, 143:5, 182:7, 186:17, 194:11, 194:24, 195:6, 195:22, 196:23, 197:8, 197:20, 198:3, 198:11, 198:20
**government's** [2] - 77:2, 170:11
**Government's** [31] - 3:7, 3:22, 4:12, 22:24, 29:3, 29:6, 38:4, 48:7, 53:3, 54:19, 56:19, 58:21, 69:13, 77:1, 77:12, 79:14, 80:17, 82:6, 82:16, 105:18, 114:3, 114:7, 141:3, 142:23, 143:7, 143:19, 150:25, 186:4, 188:16, 189:7, 198:9
**GPS** [1] - 101:11
**grab** [1] - 130:11
**grabbing** [1] - 172:21
**Grand** [4] - 13:20, 13:23, 14:1, 192:11
**grandmother** [5] - 78:6, 130:20, 130:21, 136:17, 153:18
**grandmother's** [8] - 95:25, 103:7, 136:14, 136:15, 161:3, 168:15, 168:18, 191:24
**grandmothers** [1] - 160:2
**granted** [1] - 67:21
**green** [2] - 57:25, 146:11
**greenlit** [3] - 178:25,

179:1, 179:4
**Greenwood** [12] - 27:22, 28:20, 29:5, 29:7, 29:22, 38:17, 47:14, 48:10, 71:11, 71:14, 72:7, 155:16
**greetings** [2] - 2:6, 12:11
**group** [5] - 14:1, 14:2, 42:9, 154:16, 161:21
**grow** [2] - 153:15, 154:1
**guess** [13] - 5:2, 7:8, 8:13, 86:1, 86:3, 100:24, 101:4, 121:17, 125:11, 126:15, 135:23, 146:10, 147:13
**guilt** [4] - 179:25, 180:18, 197:5, 197:9
**guilty** [1] - 198:12
**gun** [8] - 16:6, 16:11, 22:7, 123:22, 124:3, 124:9, 124:10, 124:16
**guns** [2] - 32:25, 164:19
**Gurevich** [7] - 7:14, 11:24, 13:5, 77:3, 127:17, 137:12, 145:1
**guy** [1] - 188:17
**guys** [4] - 28:9, 42:2, 59:22, 106:12

# H

**H-a-r-r-i-s** [1] - 151:12
**hack** [10] - 90:23, 90:25, 93:6, 93:9, 93:10, 93:15, 93:16, 93:18, 93:24, 132:14
**half** [6] - 27:12, 27:13, 97:6, 138:21, 164:20, 165:4
**halfway** [1] - 82:4
**hallway** [10] - 48:25, 49:16, 49:18, 49:19, 50:11, 50:16, 163:22, 164:4, 164:8, 178:3
**hand** [10] - 12:22, 26:11, 29:16, 45:17, 68:1, 69:21, 121:6, 137:14, 151:5, 171:19
**handcuffed** [2] - 78:22, 147:6
**handcuffs** [4] - 34:22, 37:22, 78:23, 79:7

**hands** [4] - 34:11, 173:9, 173:11, 173:12
**hang** [2] - 14:22, 158:18
**happy** [4] - 2:15, 126:21, 183:16, 196:1
**hard** [5] - 4:20, 58:22, 74:4, 74:11, 197:12
**Harris** [42] - 11:4, 11:12, 11:19, 34:25, 35:13, 41:5, 54:8, 54:10, 54:16, 57:13, 78:6, 78:8, 85:5, 85:6, 111:8, 130:20, 131:14, 136:19, 150:25, 151:1, 151:12, 151:13, 153:18, 157:14, 158:8, 158:24, 164:21, 164:22, 165:24, 168:4, 169:22, 170:19, 177:9, 179:8, 187:9, 187:12, 188:16, 192:17, 192:25, 194:8, 194:21, 194:22
**harris** [1] - 152:6
**HARRIS** [3] - 1:6, 151:6, 200:12
**Harris's** [3] - 123:10, 123:12, 131:1
**harsh** [1] - 4:11
**Haynes** [33] - 2:8, 2:10, 3:23, 4:17, 5:1, 9:1, 10:11, 10:18, 11:2, 11:12, 12:2, 12:20, 12:21, 13:4, 13:11, 13:19, 16:5, 17:25, 20:18, 21:1, 21:14, 25:16, 25:24, 26:2, 104:3, 104:6, 110:17, 159:9, 159:11, 159:22, 160:8, 160:16, 182:17
**HAYNES** [3] - 1:5, 12:24, 200:2
**head** [2] - 136:18, 173:15
**heading** [3] - 96:8, 99:18
**headset** [1] - 68:23
**health** [1] - 7:1
**hear** [23] - 8:24, 9:5, 73:20, 74:4, 74:6, 74:9, 115:6, 115:8, 125:17, 143:5,

143:23, 158:6, 165:19, 166:7, 169:24, 170:20, 178:11, 180:4, 180:24, 185:22, 190:3
**heard** [17] - 20:18, 20:22, 21:13, 107:16, 135:5, 147:11, 148:4, 148:15, 158:6, 162:14, 164:14, 164:15, 164:16, 164:17, 182:15, 183:13, 185:9
**hearing** [3] - 40:5, 68:13, 187:15
**hearsay** [3] - 67:25, 177:23, 180:17
**heart** [1] - 53:16
**heavy** [1] - 68:25
**heel** [1] - 58:1
**held** [1] - 52:16
**hello** [1] - 70:21
**help** [5] - 40:7, 40:20, 88:23, 118:16, 177:14
**helpful** [2] - 88:12, 95:20
**hereby** [1] - 200:21
**heroin** [6] - 58:17, 87:25, 156:20, 161:13, 161:15, 162:24
**herself** [5] - 5:10, 90:11, 91:21, 133:18
**hi** [1] - 138:14
**hidden** [2] - 41:19, 60:1
**hide** [1] - 42:12
**high** [3] - 157:22, 157:23, 157:24
**highlighted** [1] - 67:12
**highly** [1] - 179:22
**himself** [1] - 91:23
**hit** [1] - 128:10
**Hold** [1] - 64:18
**hold** [2] - 2:22, 67:17
**holding** [3] - 100:21, 121:6, 167:10
**home** [14] - 15:16, 22:15, 25:13, 90:9, 90:10, 90:24, 90:25, 91:20, 117:25, 133:18, 158:2, 160:19, 163:21
**homeboys** [3] - 94:5, 94:8, 133:7
**homicide** [9] - 70:3, 76:16, 101:17,

101:18, 112:6, 117:18, 135:14, 135:18, 150:9
**Honor** [94] - 2:15, 3:22, 6:10, 6:23, 7:10, 7:20, 8:9, 8:19, 11:23, 12:1, 13:8, 16:22, 17:1, 17:6, 17:20, 18:2, 25:8, 26:7, 38:1, 38:14, 40:14, 45:3, 45:4, 45:9, 45:14, 46:10, 46:18, 55:25, 59:3, 59:6, 60:9, 61:4, 63:7, 63:17, 63:18, 63:24, 64:3, 64:23, 65:12, 66:6, 66:15, 69:4, 69:14, 69:18, 70:13, 70:18, 88:15, 88:19, 100:2, 100:5, 107:11, 115:7, 115:9, 125:10, 125:19, 126:8, 127:10, 128:1, 128:12, 128:14, 128:20, 130:11, 134:20, 137:3, 138:6, 138:10, 139:19, 142:25, 143:12, 143:17, 144:3, 144:5, 144:8, 145:5, 149:2, 150:21, 150:24, 169:5, 169:12, 170:9, 178:13, 181:15, 183:14, 185:16, 188:13, 192:18, 193:20, 194:12, 194:15, 195:7, 197:22, 197:23, 198:21, 198:24
**HONORABLE** [1] - 1:8
**Honorable** [4] - 2:3, 64:16, 126:4, 144:21
**hope** [1] - 22:18
**hopefully** [2] - 181:17, 195:8
**hoping** [1] - 126:9
**horrendous** [1] - 101:19
**hour** [7] - 37:14, 37:17, 37:18, 82:5, 108:2, 142:4, 193:18
**hours** [18] - 16:14, 73:24, 73:25, 74:1, 74:21, 74:24, 75:1, 75:4, 81:9, 81:19, 92:11, 102:17, 105:14, 117:22,

123:3, 124:22, 133:20, 133:23
**house** [71] - 3:1, 3:3, 4:1, 4:2, 5:13, 5:17, 9:22, 10:5, 14:21, 19:18, 22:8, 34:25, 42:5, 43:14, 85:17, 90:6, 91:9, 91:19, 92:3, 92:6, 92:11, 92:18, 93:3, 93:5, 93:6, 93:24, 94:2, 94:3, 98:11, 99:4, 99:5, 99:18, 114:11, 114:15, 115:25, 116:8, 117:12, 117:21, 118:3, 118:18, 118:21, 125:3, 131:17, 132:14, 132:20, 133:14, 136:13, 136:14, 154:14, 157:15, 157:20, 157:23, 158:19, 158:24, 159:7, 159:16, 161:3, 163:7, 163:16, 168:15, 168:18, 171:5, 171:15, 172:12, 173:25, 176:6, 176:10, 178:19, 191:24
**houses** [4] - 41:16
**Howard** [11] - 11:2, 11:12, 26:8, 26:18, 26:22, 38:17, 44:8, 44:24, 46:2, 165:21
**HOWARD** [4] - 1:5, 26:12, 26:19, 200:4
**Hughlett** [1] - 161:4
**hundred** [1] - 157:9
**hundreds** [1] - 76:17
**hung** [1] - 90:8

## I

**ID** [5] - 106:11, 106:12, 106:14, 106:19, 106:20
**idea** [1] - 25:2
**ideas** [1] - 182:19
**identification** [10] - 8:12, 10:21, 40:12, 88:20, 106:20, 169:7, 169:11, 170:10, 170:13
**identified** [6] - 3:16, 33:23, 34:1, 35:24, 37:1, 139:8
**identify** [3] - 78:5, 109:1, 170:16

**identity** [1] - 33:15
**III** [5] - 83:25, 84:3, 86:19, 200:17
**image** [3] - 49:6, 51:2, 53:18
**immediately** [4] - 32:6, 48:17, 49:23, 51:7
**impeach** [1] - 182:23
**important** [1] - 42:21
**improper** [1] - 134:13
**impugn** [1] - 186:24
**IN** [1] - 1:1
**inaccurately** [1] - 23:23
**incarcerated** [1] - 190:22
**incident** [3] - 98:3, 116:11, 116:19
**include** [4] - 8:21, 48:4, 74:11, 88:3
**included** [1] - 5:9
**including** [5] - 31:24, 129:9, 183:1, 184:25, 198:17
**inconsistent** [1] - 150:11
**increases** [1] - 73:21
**incrimination** [1] - 196:21
**indeed** [1] - 9:19
**indicate** [8] - 84:1, 84:15, 89:15, 89:19, 96:16, 97:14, 141:19, 181:10
**indicated** [18] - 43:14, 64:25, 67:12, 70:6, 100:11, 100:20, 101:25, 102:9, 103:21, 105:6, 105:13, 105:16, 105:24, 107:20, 110:9, 116:14, 135:3, 145:12
**indicating)** [2] - 173:11, 173:14
**indicative** [2] - 101:14, 114:9
**individual** [4] - 34:11, 39:15, 55:9, 56:23
**individual's** [1] - 34:6
**individuals** [5] - 33:10, 34:3, 34:18, 35:24, 89:11
**indulgence** [2] - 18:8, 63:1
**inference** [1] - 196:24
**inform** [1] - 31:3
**information** [32] - 23:25, 24:4, 28:8,

75:20, 75:21, 76:3, 76:6, 77:13, 78:7, 78:12, 78:25, 79:5, 95:12, 97:22, 98:2, 101:5, 101:25, 102:1, 102:22, 103:6, 117:19, 121:18, 122:23, 130:22, 130:25, 136:8, 150:6, 182:11, 182:15, 190:9
**informed** [1] - 127:2
**initial** [9] - 29:12, 30:22, 33:10, 39:3, 39:17, 40:2, 42:4, 43:21, 59:9
**initials** [2] - 80:1, 107:20
**innocence** [3] - 180:1, 180:18, 197:8
**innocent** [1] - 178:23
**inquire** [6] - 65:7, 66:10, 179:24, 185:5, 185:6, 187:14
**inquired** [3] - 36:22, 36:24, 111:23
**inquiring** [3] - 138:3, 180:2, 180:3
**inquiry** [9] - 8:16, 10:9, 180:22, 183:12, 184:7, 185:7, 185:11, 185:15, 187:15
**inside** [14] - 30:25, 32:15, 39:5, 52:4, 53:17, 54:13, 54:17, 55:11, 55:12, 57:22, 57:24, 71:13, 73:1, 167:25
**instance** [1] - 62:3
**instruct** [2] - 183:17, 186:5
**instruction** [2] - 185:5, 196:25
**intending** [1] - 5:13
**interact** [1] - 72:6
**interacted** [1] - 37:9
**interacting** [2] - 31:6, 32:18
**interaction** [1] - 35:5
**intersection** [1] - 132:13
**interview** [52] - 24:19, 66:2, 66:19, 66:21, 72:22, 73:8, 73:18, 73:21, 73:22, 74:10, 74:22, 74:25, 75:9, 76:10, 81:8, 81:20, 82:3, 82:10, 82:18,

83:8, 89:7, 90:3, 91:6, 92:13, 97:4, 97:6, 98:14, 102:2, 103:22, 105:4, 105:13, 112:3, 112:4, 124:24, 129:4, 139:2, 141:22, 142:3, 142:7, 142:13, 142:15, 142:21, 148:2, 148:8, 148:15, 148:19, 149:20, 178:20, 189:21, 189:25, 190:2, 190:10
**interviewed** [15] - 76:15, 78:20, 112:19, 112:23, 114:12, 115:20, 116:21, 116:22, 116:24, 142:5, 178:24, 180:14, 189:17, 192:7
**interviews** [4] - 24:11, 177:18, 182:6, 182:7
**intimacy** [1] - 86:12
**intimate** [1] - 86:14
**intoxicated** [1] - 76:24
**intoxication** [1] - 76:19
**introduced** [2] - 17:24, 106:23
**investigate** [1] - 138:22
**investigated** [4] - 112:4, 134:4, 134:5, 134:12
**investigating** [1] - 28:14
**investigation** [30] - 70:24, 110:6, 110:13, 110:24, 111:4, 111:13, 111:19, 112:6, 112:14, 112:21, 112:24, 113:16, 114:19, 115:2, 115:13, 115:24, 117:18, 128:22, 129:9, 131:9, 131:11, 134:16, 147:23, 147:24, 148:8, 148:13, 149:21, 150:2, 180:20, 199:15
**investigations** [3] - 27:14, 27:17, 111:22
**investigative** [1] - 25:2
**investigator** [23] -

116:17, 176:8, 177:4, 179:8, 179:19, 180:12, 180:13, 181:6, 181:13, 182:14, 182:16, 182:18, 182:19, 183:18, 183:24, 184:11, 184:14, 184:20, 185:7, 185:14, 186:6, 187:20, 199:6
**investigator's** [1] - 181:8
**involved** [4] - 36:2, 47:13, 145:13, 148:4
**involvement** [1] - 182:12
**issue** [11] - 2:9, 3:21, 3:23, 8:11, 10:25, 108:13, 126:17, 175:15, 183:3, 188:8, 199:5
**issues** [3] - 3:20, 5:2, 106:7
**it's..** [1] - 157:1
**Item** [1] - 80:3
**item** [3] - 38:5, 51:5, 57:25
**items** [6] - 17:9, 52:17, 55:3, 56:8, 58:9, 58:17
**itself** [4] - 8:4, 147:19, 147:24, 149:20

## J

**Jackson** [7] - 78:11, 78:12, 103:15, 104:14, 104:16, 131:2, 131:14
**Jackson's** [8] - 103:8, 103:11, 118:18, 118:20, 131:17, 132:15, 132:19, 133:6
**jail** [3] - 24:18, 24:23, 25:3
**jamb** [1] - 32:20
**James** [1] - 54:16
**Javon** [1] - 1:16
**jealous** [1] - 21:20
**Jeffery** [1] - 18:18
**Jeffrey** [26] - 1:17, 14:20, 19:15, 21:3, 23:12, 83:15, 83:25, 84:12, 85:25, 86:7, 86:13, 109:7, 109:19, 110:4, 111:2, 111:8, 113:6, 113:21, 115:14,

116:14, 128:6,
128:25, 134:17,
160:17, 160:21,
168:5
**Jeffrey's** [10] - 19:11,
78:2, 113:22,
114:10, 114:15,
115:25, 116:4,
116:8, 117:21,
117:25
**Jen** [10] - 14:22, 22:1,
92:12, 123:9,
123:12, 129:16,
160:6, 160:25,
162:18, 175:12
**Jen's** [6] - 22:8, 86:17,
90:25, 91:23, 92:9,
168:12
**JENNIFER** [3] - 1:6,
45:18, 200:6
**Jennifer** [64] - 19:15,
21:3, 21:24, 23:12,
45:12, 45:24, 78:2,
83:15, 83:25, 84:7,
84:11, 84:13, 84:21,
84:23, 84:25, 85:6,
85:9, 85:16, 85:19,
85:25, 86:2, 86:22,
87:7, 87:20, 88:6,
89:1, 89:11, 89:15,
89:19, 91:1, 96:4,
96:7, 96:13, 96:16,
99:6, 99:19, 99:22,
103:23, 104:1,
109:6, 109:18,
110:4, 111:2, 111:8,
111:14, 113:5,
113:21, 113:22,
114:10, 114:15,
114:24, 115:14,
115:24, 116:4,
116:8, 117:20,
123:12, 128:6,
128:25, 134:17,
159:15, 162:13,
168:5, 172:21
**Jennifer's** [13] - 84:3,
84:4, 87:25, 88:9,
90:15, 90:16, 90:20,
92:11, 98:4, 99:5,
117:11, 122:14,
123:1
**Jeremy** [1] - 194:17
**job** [6] - 2:12, 7:18,
59:15, 59:20, 155:10
**Jones** [1] - 120:22
**Jr** [1] - 165:24
**judge** [3] - 23:2,
41:25, 184:10
**JUDGE** [1] - 1:8

**Judge** [15] - 9:8, 46:6,
70:10, 77:10,
125:13, 134:23,
137:23, 137:24,
138:2, 151:13,
151:14, 151:17,
186:20, 192:21,
195:11
**judgment** [1] - 198:8
**July** [4] - 13:20, 27:8,
191:1, 191:9
**JUNE** [1] - 1:9
**June** [38] - 27:16,
27:19, 27:25, 28:6,
47:11, 47:14, 54:24,
66:23, 71:3, 72:1,
72:17, 73:9, 73:22,
77:17, 79:5, 79:21,
80:13, 83:13, 90:3,
94:22, 95:4, 95:5,
100:21, 100:24,
101:15, 108:12,
111:9, 114:19,
115:20, 117:9,
117:16, 120:12,
135:6, 156:21,
163:3, 170:2, 175:6
**Junior** [26] - 94:22,
95:3, 95:4, 119:16,
119:18, 119:21,
119:23, 120:9,
120:13, 120:16,
120:25, 121:2,
131:17, 131:22,
131:24, 132:1,
132:5, 135:2, 135:4,
135:13, 135:16,
135:19, 136:9,
159:1, 167:20,
188:17
**Junior's** [8] - 94:24,
120:18, 120:24,
131:20, 132:7,
135:23, 136:2, 136:5
**jurors** [2] - 17:22,
144:11
**jury** [38] - 6:8, 6:25,
7:13, 7:14, 9:23,
10:13, 12:3, 12:7,
12:8, 12:9, 64:19,
68:24, 69:1, 69:6,
127:18, 127:19,
127:20, 144:23,
144:24, 153:1,
162:2, 169:6,
170:13, 171:14,
172:14, 174:14,
178:4, 183:6, 186:5,
187:13, 187:24,
188:3, 188:4, 191:9,

196:25, 197:4,
198:10
**Jury** [12] - 13:20,
13:24, 14:1, 64:13,
69:7, 126:2, 144:18,
144:25, 178:8,
188:5, 192:11, 194:4
**JURY** [1] - 1:4

# K

**K.B** [8] - 83:25, 84:3,
86:19, 108:25,
109:1, 200:16,
200:17
**K.B.'s** [1] - 109:24
**keep** [10] - 47:5, 74:8,
144:1, 151:23,
151:24, 152:16,
172:6, 172:16,
172:17, 194:13
**Keisha** [1] - 153:12
**Kelly** [5] - 1:17, 11:5,
11:13, 11:14, 194:16
**kept** [2] - 172:20,
191:14
**Kester** [3] - 200:15,
200:16, 200:17
**Ki** [3] - 90:7, 91:16,
91:17
**ki** [1] - 91:17
**KIARA** [3] - 1:5, 12:24,
200:2
**Kiara** [41] - 2:10, 5:1,
11:2, 13:4, 83:16,
84:8, 84:13, 84:21,
90:7, 90:9, 90:11,
90:23, 90:24, 91:19,
92:5, 92:14, 92:19,
93:5, 93:8, 93:15,
93:23, 97:14, 98:3,
98:7, 104:3, 104:6,
110:17, 116:7,
117:5, 129:16,
129:19, 133:14,
133:17, 133:18,
159:9, 160:24,
170:7, 170:23,
182:16
**Kiara's** [24] - 85:17,
90:13, 90:15, 91:1,
91:19, 92:3, 92:6,
92:18, 93:3, 93:5,
93:10, 96:7, 96:9,
98:11, 99:4, 99:18,
117:12, 117:21,
117:25, 118:3,
122:14, 122:24,
123:3, 133:21
**kicking** [1] - 30:25

**kids** [4] - 9:9, 154:13,
163:17, 172:13
**kill** [5] - 19:15, 19:16,
20:15, 23:12, 173:17
**killed** [5] - 14:21,
18:21, 21:4, 172:25,
173:20
**killing** [3] - 19:3,
19:19, 180:12
**Killing** [1] - 20:11
**kin** [6] - 76:4, 78:4,
78:5, 130:10,
130:19, 131:13
**kind** [5] - 73:19, 73:20,
110:4, 122:18
**kinds** [1] - 42:13
**kissing** [1] - 92:17
**kitchen** [4] - 49:3,
49:6, 49:11, 189:24
**Kizzy** [2] - 168:21,
168:22
**knock** [7] - 30:19,
30:24, 31:14, 32:6,
32:9, 164:16
**knocked** [1] - 43:25
**knocking** [2] - 98:4,
117:4
**knowledge** [23] - 25:1,
103:12, 108:12,
108:20, 111:18,
111:21, 120:22,
121:21, 125:4,
147:12, 148:21,
149:21, 150:1,
150:4, 160:8,
161:10, 162:23,
163:16, 176:1,
180:3, 180:9,
180:23, 183:10
**known** [1] - 103:17
**knows** [4] - 111:20,
157:18, 189:2,
190:21

# L

**lab** [1] - 105:2
**label** [2] - 56:14, 61:16
**labeled** [2] - 49:25,
51:11
**lack** [4] - 5:2, 6:14,
67:19, 180:4
**ladies** [4] - 17:7, 69:8,
178:4, 193:15
**laid** [1] - 29:23
**land** [1] - 122:5
**landing** [1] - 44:4
**language** [2] - 6:15,
10:23
**large** [1] - 56:22

**larger** [2] - 2:25,
109:19
**last** [29] - 2:21, 2:24,
3:14, 3:15, 25:14,
40:17, 50:6, 64:2,
64:24, 64:25, 69:12,
70:5, 70:7, 70:23,
73:23, 83:19, 95:2,
96:3, 113:6, 116:23,
128:25, 131:2,
138:21, 174:15,
175:6, 177:11,
189:19, 195:14,
197:16
**lasted** [2] - 81:8,
116:11
**lasts** [1] - 105:13
**late** [7] - 3:15, 64:8,
90:10, 92:11, 98:7,
118:21, 159:13
**Latex** [1] - 52:13
**latitude** [1] - 128:19
**laugh** [3] - 191:13,
191:15, 191:16
**laughing** [1] - 9:10
**law** [11] - 2:11, 19:14,
19:17, 20:11, 20:14,
21:1, 24:19, 25:19,
30:22, 34:5, 67:22
**lawyer** [7] - 9:7, 108:4,
108:7, 108:10,
108:22, 149:14,
149:16
**lawyers** [1] - 197:12
**lay** [3] - 111:22,
111:24, 111:25
**laying** [3] - 40:1,
40:20, 82:11
**layout** [1] - 163:21
**lead** [2] - 48:23,
112:10
**leader** [2] - 178:24,
180:14
**leads** [2] - 112:17,
112:23
**learn** [9] - 33:15,
131:12, 160:14,
162:6, 162:8,
162:18, 162:20,
165:13, 189:14
**learned** [6] - 27:25,
30:16, 168:4,
168:19, 182:7,
182:11
**least** [4] - 29:12,
30:20, 59:19, 150:8
**leave** [5] - 11:7, 11:10,
68:24, 119:1, 188:9
**leaving** [6] - 96:9,
99:17, 172:4, 172:9,

191:7, 191:10
**ledge** [1] - 5:11
**left** [37] - 11:14, 14:21,
22:8, 23:9, 30:6,
30:7, 31:18, 31:21,
49:22, 49:24, 50:1,
50:6, 50:12, 51:13,
51:15, 51:23, 52:4,
54:9, 55:5, 55:16,
55:18, 58:12, 90:11,
90:13, 98:20, 114:1,
117:11, 148:18,
164:4, 164:7, 166:2,
166:15, 166:17,
167:7, 168:2, 173:25
**legal** [1] - 108:13
**less** [3] - 73:25, 81:9,
143:9
**level** [2] - 30:3, 31:8
**levels** [1] - 30:1
**Lewis** [40] - 11:8,
11:15, 11:21, 63:23,
63:25, 64:18, 64:19,
65:13, 65:15, 69:2,
69:10, 69:13, 69:15,
69:16, 70:2, 70:4,
70:21, 76:16, 77:8,
77:12, 88:12, 88:22,
98:21, 100:8,
100:10, 122:17,
125:23, 127:6,
127:9, 127:12,
127:14, 127:23,
127:24, 128:4,
128:22, 134:4,
136:23, 150:9
**LEWIS** [3] - 1:6, 69:22,
200:8
**lie** [1] - 19:22
**lied** [5] - 13:23, 20:1,
20:7, 24:6, 192:6
**life** [2] - 22:22, 158:12
**light** [2] - 4:21, 198:11
**likely** [2] - 158:5,
158:7
**Lillian** [6] - 78:6,
130:20, 131:1,
131:13, 136:19,
153:18
**limitations** [1] - 67:7
**limited** [1] - 67:11
**line** [21] - 2:17, 2:24,
4:11, 8:16, 8:21,
10:9, 79:24, 80:10,
81:4, 118:17, 119:6,
124:10, 134:13,
141:13, 178:10,
183:11, 184:10,
185:11, 185:15,
196:4

**lines** [1] - 181:16
**list** [1] - 130:18
**listed** [1] - 78:1
**listen** [9] - 4:6, 6:2,
6:8, 6:20, 7:8, 8:15,
9:11, 12:17, 17:11
**listening** [1] - 149:19
**literally** [1] - 103:17
**live** [5] - 93:11, 152:8,
168:22, 168:23,
168:24
**lived** [7] - 78:14,
93:14, 132:1, 132:5,
154:14, 155:25,
157:20
**lives** [1] - 83:21
**living** [11] - 24:8,
48:13, 50:14,
155:12, 155:14,
155:21, 164:18,
164:22, 168:20,
172:4, 172:9
**locate** [1] - 71:4
**located** [4] - 51:5,
53:15, 56:14, 163:12
**location** [9] - 29:2,
42:21, 53:10, 83:20,
101:10, 140:11,
140:15, 141:21
**locations** [2] - 31:22,
44:3
**locked** [3] - 89:6,
170:1, 190:20
**locks** [1] - 52:24
**Lombard** [1] - 1:24
**look** [15] - 41:18, 57:2,
59:22, 59:25, 61:7,
61:19, 61:25, 73:1,
102:18, 106:25,
107:2, 107:9, 119:4,
153:1, 169:7
**looked** [7] - 57:12,
88:22, 106:9, 109:7,
166:12, 174:17,
174:19
**looking** [20] - 28:15,
28:17, 28:18, 30:5,
30:13, 40:8, 42:2,
42:5, 42:23, 48:13,
49:18, 50:11, 51:20,
52:22, 62:4, 62:6,
83:3, 89:1, 118:22,
135:24
**looks** [1] - 195:16
**lose** [1] - 105:17
**lost** [2] - 84:5, 109:11
**loud** [5] - 30:21,
30:24, 31:14, 80:2,
164:16
**louder** [2] - 74:17,

190:1
**loudly** [2] - 43:22,
98:8
**love** [1] - 158:8
**low** [5] - 73:18, 73:19,
74:3, 74:10
**lunch** [4] - 125:11,
125:23, 193:18,
193:23
**lying** [3] - 36:7, 39:24,
40:8

# M

**ma'am** [37] - 35:12,
38:19, 38:21, 38:24,
39:3, 39:7, 39:11,
39:14, 39:18, 39:20,
40:9, 40:19, 41:2,
41:4, 41:17, 41:20,
42:6, 42:11, 42:16,
42:18, 42:20, 43:3,
43:6, 43:9, 44:10,
72:8, 74:2, 74:15,
74:20, 75:6, 76:14,
77:23, 77:25, 78:3,
83:11, 131:4, 138:15
**mad** [1] - 18:14
**MaGee** [12] - 176:15,
177:9, 177:12,
178:19, 179:18,
179:25, 183:24,
184:4, 184:15,
187:5, 199:6
**MAGEE** [1] - 199:7
**maGee** [1] - 187:20
**mail** [7] - 53:23, 53:25,
54:3, 54:7, 54:17,
57:12, 57:14
**main** [4] - 48:9, 49:12,
49:14
**male** [11] - 28:18,
32:12, 33:4, 33:5,
33:6, 41:7, 95:6,
120:12, 120:18,
120:19, 135:6
**man** [2] - 108:21,
176:6
**manager** [3] - 156:11,
156:13, 156:15
**manner** [2] - 31:13,
61:11
**March** [3] - 23:21,
24:12, 24:24
**marijuana** [2] - 15:7,
15:9
**mark** [1] - 110:3
**marked** [3] - 40:10,
61:2, 88:20
**marks** [1] - 200:19

**marshal** [2] - 12:5,
25:25
**MARYLAND** [2] - 1:1,
1:9
**Maryland** [7] - 1:25,
2:3, 58:11, 71:9,
77:18, 152:8, 153:16
**mask** [6] - 46:8, 46:12,
46:15, 70:14, 138:8,
151:24
**masks** [7] - 46:4, 70:7,
70:11, 137:25,
151:16, 151:19,
151:20
**match** [1] - 34:7
**matter** [23] - 5:3, 7:1,
7:15, 8:2, 12:16,
35:8, 67:15, 98:24,
179:18, 180:2,
180:3, 180:8,
180:22, 180:23,
183:24, 184:3,
185:7, 197:20,
199:1, 199:20,
200:22
**matters** [1] - 194:1
**maximum** [1] - 22:21
**McDonald's** [2] -
156:9, 156:12
**mean** [19] - 4:20, 6:4,
9:6, 34:21, 39:1,
62:24, 66:1, 73:19,
89:21, 98:25, 122:4,
126:20, 157:1,
157:12, 161:21,
165:8, 166:16,
190:18, 195:2
**meaning** [7] - 42:9,
46:7, 62:10, 84:19,
87:8, 90:7, 129:2
**means** [2] - 134:8,
195:19
**meant** [3] - 17:10,
20:23, 126:21
**meet** [4] - 14:13,
84:14, 84:20, 168:12
**meeting** [8] - 28:5,
28:23, 28:25, 84:16,
84:23, 85:8, 145:23,
177:20
**meetings** [1] - 85:11
**Melissa** [2] - 200:21,
200:24
**melissa** [1] - 1:23
**member** [2] - 27:18,
46:25
**members** [9] - 32:5,
37:19, 131:12,
158:18, 169:6,
171:14, 172:14,

174:14, 191:8
**members'** [1] - 29:1
**membership** [6] -
180:3, 180:8,
180:11, 180:21,
181:14, 182:12
**memoranda** [1] -
198:4
**memory** [4] - 73:24,
79:1, 112:22, 160:4
**mental** [2] - 7:1, 7:22
**mentioned** [5] - 7:21,
23:5, 94:4, 145:23,
164:10
**mercy** [1] - 126:19
**merely** [1] - 181:8
**mesh** [2] - 57:6, 57:7
**message** [6] - 20:17,
28:2, 170:4, 170:7,
170:20, 170:25
**messages** [9] - 81:17,
96:19, 96:22, 96:23,
97:3, 97:10, 99:10,
99:20, 122:10
**met** [17] - 14:24, 84:7,
84:8, 84:11, 110:2,
110:4, 110:16,
110:19, 159:11,
159:12, 160:4,
160:6, 160:16,
160:17, 160:22,
160:24, 191:23
**MFer** [2] - 3:5, 5:4
**Michael** [2] - 184:15,
199:6
**microphone** [13] -
26:16, 45:22, 47:5,
137:19, 144:2,
151:10, 151:25,
152:17, 153:1,
162:2, 172:8,
172:17, 191:8
**middle** [2] - 31:21,
163:25
**midnight** [2] - 90:19,
114:1
**might** [6] - 59:25,
64:4, 66:16, 102:13,
106:2, 171:8
**Mike** [5] - 176:6,
176:10, 177:6,
177:9, 177:18
**mind** [2] - 22:12,
22:14
**minds** [2] - 122:19,
182:20
**mine** [2] - 141:16,
190:16
**minimize** [1] - 148:3
**minuet** [1] - 197:16

**minus** [1] - 55:21
**minute** [3] - 127:5, 144:12, 169:17
**minutes** [18] - 43:20, 64:10, 77:14, 82:18, 82:19, 83:10, 98:9, 116:12, 125:13, 125:16, 125:19, 143:8, 143:12, 143:13, 144:12, 188:7, 192:21, 194:9
**Miranda** [4] - 79:10, 80:4, 107:17, 140:21
**misconduct** [2] - 184:3, 184:6
**misidentified** [1] - 56:21
**missed** [1] - 44:20
**missing** [1] - 9:20
**misstates** [1] - 123:23
**mistake** [2] - 25:14, 147:15
**mistaken** [1] - 168:21
**Molly** [2] - 15:7, 15:9
**mom** [1] - 161:13
**moment** [4] - 4:2, 18:8, 63:1, 79:4
**momentarily** [1] - 169:12
**Monday** [6] - 126:10, 195:4, 195:10, 196:3, 196:12, 196:13
**money** [8] - 87:20, 88:5, 88:6, 88:7, 89:1, 89:5, 156:22, 157:2
**Monkers** [1] - 194:17
**monster** [3] - 173:2, 173:5, 175:3
**months** [3] - 26:24, 164:20, 165:4
**morning** [43] - 2:5, 10:3, 12:10, 12:12, 15:15, 15:24, 16:2, 16:8, 22:9, 23:5, 26:22, 28:6, 46:1, 46:21, 46:22, 57:22, 64:9, 69:16, 69:18, 70:22, 72:12, 90:19, 92:1, 92:6, 92:18, 98:10, 99:4, 99:5, 114:1, 116:8, 116:9, 117:6, 117:21, 128:5, 132:15, 139:15, 139:22, 140:4, 164:15, 193:1, 195:10, 195:23, 196:12
**most** [2] - 190:15,

198:11
**mother** [1] - 155:23
**motion** [5] - 32:21, 67:21, 68:13, 197:25, 198:7
**motioned** [1] - 32:19
**motions** [6] - 194:25, 195:1, 195:9, 195:18, 196:10, 196:11
**mouth** [2] - 98:19, 105:1
**move** [8] - 31:5, 36:23, 37:2, 83:8, 129:18, 154:8, 188:15, 198:8
**moved** [2] - 129:13, 154:7
**moving** [4] - 51:16, 163:3, 184:23, 184:24
**MR** [169] - 2:15, 2:19, 2:21, 2:24, 3:6, 3:9, 3:13, 3:20, 4:19, 8:5, 8:19, 9:3, 11:19, 21:10, 21:12, 25:7, 26:7, 26:21, 33:23, 34:2, 38:1, 38:3, 38:10, 40:23, 44:13, 44:15, 44:22, 45:9, 45:12, 46:18, 46:20, 47:8, 55:25, 56:2, 56:4, 56:6, 58:5, 59:2, 63:7, 63:18, 66:15, 66:21, 66:24, 67:2, 67:5, 67:7, 67:11, 68:12, 68:17, 68:20, 100:5, 100:7, 106:11, 106:12, 106:14, 106:17, 106:19, 106:22, 106:24, 107:14, 111:19, 112:2, 114:5, 114:6, 115:5, 115:12, 119:3, 120:3, 120:7, 120:8, 124:2, 125:6, 125:13, 127:1, 128:12, 128:17, 131:6, 132:2, 132:8, 132:10, 134:10, 134:18, 134:23, 135:1, 136:21, 139:6, 144:8, 145:5, 145:7, 149:2, 149:4, 150:14, 150:24, 152:3, 152:5, 152:22, 162:5, 166:7, 166:8, 166:9, 169:5, 169:12, 169:21, 170:9,

170:15, 172:22, 176:19, 176:21, 176:23, 176:24, 177:2, 177:6, 177:8, 177:12, 177:14, 177:17, 177:22, 177:24, 178:1, 178:13, 178:18, 179:3, 179:11, 179:14, 180:6, 180:10, 181:1, 181:15, 181:22, 182:3, 182:13, 182:24, 183:14, 183:16, 183:22, 184:1, 184:9, 184:10, 184:16, 184:18, 184:21, 184:23, 184:25, 185:3, 185:16, 185:20, 185:24, 186:4, 186:13, 186:15, 186:20, 186:22, 187:7, 188:13, 188:14, 190:3, 190:5, 192:17, 192:21, 194:9, 195:11, 195:13, 195:17, 195:21, 195:25, 196:1, 199:3, 199:8, 199:11
**MS** [131] - 5:9, 5:22, 5:25, 6:5, 6:10, 6:17, 6:23, 7:10, 7:20, 8:9, 10:2, 10:6, 10:14, 10:17, 11:7, 11:14, 11:18, 11:20, 11:23, 13:8, 13:10, 13:18, 16:22, 17:1, 17:6, 17:14, 17:18, 17:20, 18:2, 18:4, 18:6, 18:8, 18:11, 18:13, 21:6, 25:12, 25:22, 38:14, 38:16, 40:14, 40:16, 40:24, 40:25, 44:8, 45:4, 59:6, 59:8, 60:9, 60:11, 60:13, 60:14, 61:4, 61:6, 63:1, 63:3, 63:23, 64:3, 64:6, 64:23, 65:12, 65:15, 65:19, 65:24, 66:1, 66:6, 66:9, 66:13, 69:4, 69:14, 70:18, 70:20, 77:3, 77:6, 77:10, 77:11, 88:15, 88:19, 88:21, 100:2, 107:11, 111:16, 114:3, 115:4, 115:7, 115:9, 120:2,

123:23, 125:9, 125:15, 125:18, 126:8, 126:20, 127:6, 127:10, 127:13, 128:1, 128:3, 128:14, 128:20, 128:21, 130:11, 130:15, 130:17, 131:8, 132:4, 132:12, 134:14, 134:15, 134:20, 137:8, 138:13, 139:9, 139:10, 139:19, 139:21, 142:25, 143:7, 143:12, 143:17, 143:21, 143:22, 144:5, 194:12, 194:15, 195:7, 196:14, 197:22, 198:2, 198:21, 198:24, 199:16
**Muck** [6] - 51:21, 52:5, 52:8, 52:10, 57:20, 58:13
**multiple** [1] - 122:18
**murdering** [1] - 6:13
**murders** [2] - 70:24, 178:25
**Murray** [1] - 1:18

## N

**name** [44] - 13:3, 26:17, 28:19, 41:7, 45:23, 54:7, 54:10, 57:13, 69:25, 83:19, 89:8, 89:12, 94:24, 95:3, 97:20, 102:22, 103:6, 116:23, 116:25, 120:14, 120:21, 120:22, 120:24, 121:1, 130:1, 131:1, 131:2, 131:20, 133:6, 135:23, 136:6, 136:7, 136:9, 137:19, 137:21, 151:10, 153:12, 153:14, 177:5, 177:11, 188:19, 188:25, 189:2, 189:19
**named** [8] - 34:25, 90:1, 153:13, 159:9, 176:6, 188:17, 199:6
**names** [12] - 54:15, 89:10, 89:18, 89:25, 94:7, 94:11, 95:2, 122:12, 130:6,

153:11, 189:5
**Narcan** [4] - 52:17, 52:24, 57:4, 60:17
**narcotic** [1] - 138:23
**narcotics** [1] - 27:13
**nature** [6] - 31:4, 34:7, 35:5, 36:15, 86:6, 92:14
**near** [1] - 105:4
**necessarily** [4] - 42:5, 154:13, 179:16, 200:20
**need** [8] - 12:21, 126:17, 146:6, 162:1, 193:10, 195:19, 198:1, 198:4
**needed** [1] - 124:12
**negative** [6] - 4:21, 58:25, 59:1, 180:9, 181:11, 183:12
**neighborhood** [1] - 91:11
**never** [27] - 19:14, 19:16, 19:17, 20:11, 20:14, 43:1, 43:12, 99:25, 100:1, 108:7, 108:10, 109:3, 124:15, 128:5, 128:10, 133:24, 134:1, 136:6, 167:12, 175:7, 175:23, 175:25, 183:13, 185:9, 186:25, 197:6, 197:7
**new** [1] - 141:5
**Newport** [4] - 51:2, 55:3, 55:16, 56:9
**next** [45] - 15:24, 16:2, 16:5, 18:6, 18:9, 19:1, 20:14, 26:6, 26:7, 28:4, 30:17, 32:8, 45:2, 45:8, 63:21, 64:17, 69:9, 69:13, 76:3, 78:4, 78:5, 79:25, 82:11, 90:19, 92:1, 98:10, 102:21, 104:3, 104:8, 114:1, 126:24, 127:4, 130:10, 130:19, 131:13, 133:25, 137:7, 150:22, 150:25, 167:14, 168:25, 172:14, 174:10, 194:11
**Nice** [1] - 12:12
**nice** [2] - 12:13, 69:17
**nickname** [4] - 135:8, 135:11, 159:3, 189:12

**nicknames** [2] - 135:8, 189:5
**niece** [2] - 116:15, 116:22
**night** [23] - 3:14, 3:15, 14:20, 15:2, 15:4, 15:24, 25:14, 27:25, 76:8, 76:13, 90:18, 91:24, 102:13, 119:2, 158:4, 158:7, 159:12, 160:16, 160:22, 160:24, 163:15, 174:16
**nightmares** [4] - 175:12, 175:16, 175:24, 179:11
**nighttime** [1] - 95:9
**NO** [1] - 1:3
**noise** [3] - 12:18, 30:22, 68:23
**noon** [1] - 133:3
**NORTHERN** [1] - 1:2
**NOTE** [1] - 200:19
**note** [1] - 11:1
**noted** [1] - 136:17
**notes** [2] - 1:21, 66:4
**Nothing** [1] - 174:3
**nothing** [12] - 5:19, 7:25, 9:18, 9:24, 41:23, 86:10, 100:2, 173:6, 174:4, 184:20, 186:17, 187:23
**notice** [1] - 174:24
**noticed** [1] - 36:19
**notified** [1] - 37:5
**number** [28] - 40:23, 56:3, 57:10, 60:4, 64:20, 71:4, 71:6, 71:8, 74:14, 77:19, 77:20, 77:22, 78:13, 103:7, 103:8, 103:11, 104:15, 106:15, 107:8, 132:7, 136:2, 136:5, 146:21, 149:1, 152:12, 189:8, 189:10, 192:3
**numbers** [2] - 76:3, 133:9
**numerous** [1] - 198:16
**nuts** [1] - 172:21

## O

**o'clock** [8] - 16:7, 72:11, 72:16, 72:17, 76:11, 80:13, 116:9, 125:24
**oath** [4] - 13:11,

13:19, 13:20, 127:24
**object** [2] - 3:10, 185:25
**Objection** [1] - 134:10
**objection** [23] - 8:17, 10:7, 111:16, 111:24, 115:4, 115:10, 120:2, 123:23, 127:1, 128:12, 131:6, 132:2, 132:8, 134:12, 134:18, 176:19, 176:23, 177:22, 180:25, 181:2, 186:9, 186:19
**objections** [1] - 178:12
**obscured** [2] - 52:25, 56:14
**observations** [1] - 171:21
**observe** [2] - 32:14, 53:23
**observed** [1] - 33:4
**obtained** [1] - 41:12
**obtaining** [2] - 71:4, 105:5
**obviously** [6] - 65:4, 101:17, 127:24, 148:14, 194:23, 198:6
**occasion** [4] - 84:16, 84:18, 86:18, 86:20
**occasions** [2] - 38:20, 178:19
**occur** [1] - 85:11
**occurred** [2] - 163:13, 177:24
**occurring** [1] - 191:14
**OF** [2] - 1:1, 1:3
**offer** [1] - 135:23
**offered** [1] - 98:23
**Office** [1] - 199:10
**office** [4] - 140:11, 141:24, 147:9, 147:11
**officer** [9] - 21:2, 40:3, 50:12, 138:22, 138:25, 147:13, 189:18, 199:12, 199:14
**Officer** [1] - 144:6
**officers** [18] - 30:19, 31:5, 31:20, 31:24, 32:18, 32:21, 34:9, 34:10, 39:1, 42:10, 62:14, 62:18, 62:19, 79:10, 145:13, 146:22, 147:4, 165:6
**Official** [2] - 1:24,

200:25
**old** [1] - 152:10
**older** [4] - 153:12, 153:13, 154:11, 159:3
**once** [16] - 35:24, 70:5, 80:18, 84:25, 85:2, 85:9, 86:4, 86:5, 90:13, 95:11, 95:12, 117:11, 143:2, 168:16, 168:17
**one** [68] - 3:21, 3:25, 9:8, 9:9, 15:10, 15:12, 17:23, 18:8, 29:9, 29:17, 30:6, 30:7, 31:12, 33:7, 33:12, 34:3, 41:10, 43:15, 44:5, 49:10, 50:3, 51:13, 53:3, 53:9, 57:10, 63:1, 64:6, 64:18, 67:17, 75:23, 75:24, 78:1, 79:24, 81:14, 84:19, 86:18, 86:19, 87:15, 95:4, 97:19, 99:3, 110:9, 115:7, 115:9, 124:12, 126:19, 133:25, 134:23, 135:22, 137:11, 137:12, 141:5, 142:16, 142:17, 144:11, 152:11, 153:6, 154:14, 159:12, 163:25, 178:22, 180:6, 182:1, 196:22, 199:1
**op** [1] - 28:9
**open** [5] - 48:17, 146:12, 166:13, 171:24, 193:19
**opened** [2] - 32:10, 32:19
**operation** [3] - 27:21, 28:2, 28:9
**opine** [2] - 111:25, 180:18
**opined** [1] - 179:25
**opinion** [1] - 198:15
**opioid** [1] - 58:18
**opponent** [1] - 67:25
**opposed** [1] - 121:17
**opposing** [1] - 183:3
**opposite** [1] - 75:10
**oral** [2] - 115:17, 197:25
**orally** [1] - 197:24
**orange** [1] - 61:15
**order** [8] - 31:3, 46:3, 65:5, 65:8, 126:6,

126:16, 173:1, 194:18
**orders** [3] - 70:7, 137:24, 151:15
**oriented** [1] - 60:6
**ourselves** [1] - 31:13
**out-of-court** [1] - 67:23
**outside** [6] - 32:3, 32:4, 81:22, 166:3, 166:4, 166:12
**overall** [1] - 48:4
**overhead** [1] - 141:3
**overlooked** [1] - 46:2
**overnight** [1] - 71:8
**Overruled** [1] - 132:9
**overruled** [5] - 8:17, 123:24, 132:3, 132:11
**overview** [1] - 28:13
**owe** [2] - 87:22, 87:23
**owed** [1] - 87:20
**own** [6] - 124:10, 179:19, 179:25, 181:24, 184:2, 184:3

## P

**p.m** [13] - 79:6, 81:7, 82:17, 126:2, 127:20, 133:3, 144:18, 144:25, 178:8, 188:5, 194:4, 199:24
**packaged** [2] - 61:11, 61:14
**packaging** [1] - 55:17
**PAGE** [1] - 200:2
**Page** [1] - 50:8
**page** [40] - 2:19, 40:23, 48:8, 48:11, 49:4, 49:5, 49:10, 49:13, 49:17, 50:8, 50:22, 50:24, 51:4, 51:16, 52:1, 52:5, 52:7, 52:19, 53:3, 53:5, 53:11, 53:19, 53:25, 54:4, 54:12, 58:20, 82:7, 82:13, 82:23, 105:18, 106:25, 107:1, 107:8, 118:22, 118:25, 119:4, 124:5, 124:7
**paint** [2] - 4:20, 4:21
**pair** [1] - 51:20
**pandemic** [1] - 46:6
**paper** [3] - 51:24, 52:2, 192:4
**paperwork** [3] - 42:6,

42:7, 42:8
**paragraph** [1] - 2:25
**Paralegal** [2] - 1:18, 1:19
**parameters** [1] - 68:10
**paraphernalia** [1] - 50:19
**pardon** [2] - 39:10, 66:20
**parenting** [2] - 4:22, 7:4
**parents** [3] - 156:17, 158:20, 161:11
**Parker** [15] - 72:15, 73:17, 74:7, 74:12, 75:11, 75:13, 75:18, 79:17, 82:9, 82:11, 83:6, 112:13, 122:18, 150:9
**Parker's** [1] - 75:13
**parking** [3] - 8:23, 72:2, 140:12
**part** [17] - 8:23, 9:4, 29:20, 37:14, 70:23, 83:7, 115:13, 115:23, 147:22, 147:24, 147:25, 148:7, 148:13, 152:8, 161:20, 183:17
**participate** [2] - 139:1, 142:20
**participated** [2] - 149:24, 149:25
**particular** [13] - 4:21, 28:25, 51:13, 59:20, 60:19, 62:14, 75:25, 80:23, 112:11, 115:24, 135:24, 148:22, 186:7
**particularly** [1] - 4:11
**partner** [5] - 72:15, 82:9, 106:2, 112:8, 114:20
**parts** [1] - 87:11
**party** [8] - 14:25, 32:12, 33:4, 33:5, 33:6, 67:25, 68:5, 68:6
**partying** [2] - 15:21, 15:24
**pass** [3] - 16:23, 17:16, 143:1
**past** [7] - 24:6, 40:4, 106:5, 106:7, 166:20, 167:7, 167:15
**path** [1] - 67:16
**patrol** [1] - 72:4
**Paul** [1] - 1:12

paused [1] - 109:10
people [22] - 6:13, 14:1, 14:2, 34:14, 42:12, 76:15, 81:17, 84:2, 85:4, 88:10, 89:16, 89:20, 91:15, 101:19, 112:19, 112:22, 116:22, 130:24, 154:15, 165:9, 182:18, 190:21
people's [1] - 182:20
perceived [1] - 34:6
Percocet [2] - 15:7, 15:9
perfectly [4] - 9:17, 10:9, 70:15, 184:4
perhaps [3] - 106:1, 140:3, 142:4
period [3] - 83:17, 88:8, 114:8
Perkins [10] - 78:14, 78:19, 91:12, 93:17, 93:20, 103:16, 118:12, 122:23, 123:5, 150:5
permission [4] - 16:22, 17:14, 17:16, 178:14
permit [1] - 183:4
person [28] - 3:24, 4:6, 4:8, 4:9, 5:5, 20:14, 30:13, 32:14, 33:16, 34:24, 35:23, 41:3, 41:5, 70:10, 75:23, 76:1, 79:12, 87:15, 119:15, 126:19, 136:17, 136:18, 138:2, 148:14, 159:5, 159:9, 177:5
person's [1] - 126:16
personal [10] - 77:13, 78:25, 176:16, 176:18, 179:15, 179:20, 179:21, 179:25, 181:19, 181:24
personally [2] - 178:24, 180:13
persons [7] - 30:25, 32:6, 34:7, 35:19, 46:7, 79:10, 151:18
phone [69] - 15:18, 20:17, 36:20, 36:21, 36:22, 37:1, 37:3, 37:5, 38:8, 43:7, 53:15, 70:25, 71:4, 71:8, 76:3, 77:19, 77:20, 78:2, 78:13, 81:15, 81:21, 81:22,

81:25, 82:12, 82:14, 82:25, 83:2, 83:5, 83:8, 96:22, 96:25, 97:4, 97:8, 97:11, 100:12, 100:14, 100:17, 101:9, 101:10, 101:15, 101:22, 103:7, 103:8, 103:11, 104:15, 113:9, 114:9, 117:14, 117:19, 121:4, 121:5, 121:6, 121:7, 121:9, 121:10, 121:14, 121:17, 121:18, 121:19, 128:25, 132:7, 133:9, 152:12, 170:23, 189:8, 189:10, 191:2
phones [3] - 101:6, 101:20, 122:4
photo [1] - 50:13
Photograph [2] - 55:1, 60:13
photograph [15] - 47:17, 47:25, 48:8, 48:12, 49:2, 52:20, 54:1, 55:22, 59:15, 61:19, 62:17, 109:1, 109:14, 109:21, 109:24
photographs [11] - 47:24, 48:2, 48:5, 51:10, 51:18, 54:20, 57:13, 58:7, 83:23, 83:24, 115:23
photos [3] - 48:4, 51:8, 84:2
phrase [3] - 7:24, 9:15, 177:1
physical [3] - 86:12, 86:14, 114:23
physically [2] - 3:24, 163:12
pick [1] - 140:10
picked [12] - 51:24, 93:9, 117:23, 119:12, 119:15, 120:10, 120:16, 120:23, 131:17, 132:14, 135:3
picture [9] - 49:14, 50:1, 82:7, 84:4, 105:16, 109:6, 109:19, 119:25, 120:1
pictures [1] - 121:5
piece [4] - 52:20, 57:12, 57:14, 192:4

pill [7] - 51:11, 53:20, 56:13, 56:17, 56:22, 56:23, 61:15
pills [5] - 51:12, 61:1, 61:2, 61:8, 61:22
ping [1] - 101:10
pipe [1] - 58:15
place [11] - 16:17, 41:18, 90:12, 90:15, 90:16, 92:9, 93:20, 133:25, 142:3, 142:14
placed [10] - 29:20, 34:21, 35:25, 36:4, 36:12, 36:13, 43:4, 81:6, 140:17, 169:10
places [3] - 42:13, 88:3, 154:5
placing [1] - 183:2
plain [2] - 42:4, 62:10
Plaintiff [2] - 1:3, 1:10
plan [6] - 23:12, 38:25, 39:1, 146:5, 178:15, 183:18
planes [1] - 122:4
planting [1] - 182:19
plastic [12] - 51:21, 51:22, 53:6, 53:17, 53:20, 55:8, 55:10, 55:15, 56:10, 56:16, 56:23, 57:25
play [4] - 68:9, 68:15, 142:23, 169:13
played [13] - 9:14, 17:13, 18:3, 18:5, 18:7, 18:10, 18:12, 19:7, 24:20, 143:15, 143:19, 169:20, 170:14
playing [2] - 75:4, 143:7
plenty [4] - 196:17, 197:10, 197:13, 197:17
Plexiglas [1] - 188:11
plug [4] - 121:24, 162:14, 162:15, 162:18
plural [1] - 87:15
pocket [1] - 167:12
point [48] - 3:16, 5:7, 5:17, 8:15, 8:25, 9:13, 10:12, 15:15, 21:2, 33:22, 37:19, 43:15, 64:5, 82:24, 83:2, 85:6, 85:24, 87:3, 87:9, 89:7, 90:9, 91:4, 94:24, 95:5, 99:3, 100:24, 101:1, 101:11,

108:15, 108:16, 114:21, 117:15, 119:18, 145:19, 146:3, 146:16, 146:21, 146:25, 147:3, 149:14, 166:14, 182:4, 184:19, 186:13, 192:24, 197:19, 198:19, 198:22
pointed [2] - 49:6, 164:19
pointing [1] - 9:4
points [3] - 25:10, 73:18, 134:22
police [16] - 31:2, 31:3, 43:23, 44:2, 77:14, 79:11, 79:12, 101:2, 138:20, 163:4, 164:18, 165:19, 166:2, 166:16, 199:12, 199:13
Police [23] - 11:3, 26:19, 27:3, 27:6, 28:6, 28:11, 31:2, 32:7, 45:11, 46:24, 46:25, 58:11, 70:3, 71:24, 72:3, 72:5, 72:21, 73:6, 79:18, 82:21, 101:2, 138:19, 189:18
polite [2] - 31:16, 124:20
Poo [4] - 78:1, 159:15, 159:17, 190:18
Poo's [2] - 169:25, 176:9
poorly [1] - 126:21
pop [1] - 158:3
popping [1] - 121:24
portion [3] - 80:16, 88:13, 95:20
position [4] - 3:23, 5:7, 40:1, 40:3
possible [1] - 98:20
possibly [2] - 88:10, 194:16
Post [1] - 192:4
post [1] - 168:8
Post-It [1] - 192:4
power [2] - 82:25, 121:20
powered [1] - 83:2
powering [1] - 121:17
precaution [1] - 46:5
precautions [2] - 12:15, 68:21
pregnant [3] - 155:4, 164:20, 165:5

prejudicial [1] - 179:22
preparation [2] - 14:9, 74:13
prepared [1] - 65:21
presence [2] - 66:12, 187:12
present [10] - 28:11, 30:14, 42:25, 59:9, 80:22, 140:23, 142:18, 148:24, 149:3, 165:24
Present [1] - 1:16
presented [1] - 2:12
preserve [1] - 10:24
preserved [1] - 10:23
Presiding [6] - 46:6, 70:10, 137:24, 138:2, 151:14, 151:17
presiding [5] - 2:4, 64:16, 126:4, 144:21, 196:8
pretty [5] - 3:25, 16:7, 43:10, 124:19, 186:25
previous [1] - 76:13
previously [9] - 35:3, 35:6, 36:4, 46:2, 66:4, 67:20, 70:6, 160:4, 175:12
primarily [1] - 143:24
prison [3] - 22:22, 23:24, 25:13
privilege [2] - 196:18, 196:21
problem [4] - 19:3, 35:10, 105:24, 120:7
problems [2] - 35:7, 106:5
procedures [1] - 30:21
proceed [7] - 29:1, 46:17, 70:17, 128:15, 169:19, 195:3, 196:11
proceeded [1] - 75:19
proceedings [1] - 200:22
process [2] - 31:16, 108:20
product [2] - 123:18
professional [1] - 3:18
proffer [6] - 65:11, 178:10, 178:14, 180:7, 185:23, 186:17
proffered [2] - 5:19, 185:11
progressed [1] - 131:11

project [1] - 194:5
Projects [7] - 78:15, 78:19, 91:12, 93:17, 93:20, 103:16, 118:12
projects [1] - 150:5
promise [1] - 22:24
promotion [1] - 26:24
promptly [2] - 193:3, 193:17
proper [3] - 42:6, 42:7, 42:8
prosecution [1] - 197:5
prosecutor [1] - 21:2
prosecutors [1] - 14:13
protect [1] - 190:16
prove [3] - 197:5, 197:7, 197:9
provide [12] - 68:4, 70:7, 77:16, 78:7, 78:12, 94:11, 95:12, 98:2, 129:7, 133:6, 141:4, 151:16
provided [5] - 22:6, 72:21, 79:19, 129:8, 130:25
provides [1] - 46:3
providing [1] - 182:14
Public [1] - 199:10
public [4] - 46:4, 70:8, 137:25, 151:16
pull [8] - 46:8, 46:11, 70:11, 70:14, 77:1, 138:8, 151:19, 169:6
pulled [3] - 51:3, 113:8, 167:23
purpose [4] - 6:7, 6:24, 12:17, 75:21
purposes [4] - 11:1, 11:15, 88:20, 169:7
Purpura [24] - 1:15, 7:21, 66:14, 100:4, 106:16, 120:23, 125:7, 128:18, 134:21, 136:22, 144:7, 145:4, 150:16, 180:24, 185:23, 187:8, 192:20, 194:7, 195:1, 195:12, 195:20, 199:1, 200:9, 200:11
pURPURA [1] - 184:16
PURPURA [78] - 33:23, 66:15, 66:21, 66:24, 67:2, 67:5, 67:7, 67:11, 68:12, 68:17, 68:20, 100:5,

100:7, 106:12, 106:17, 106:19, 106:22, 106:24, 107:14, 111:19, 112:2, 114:3, 114:6, 115:5, 115:12, 119:3, 120:3, 120:7, 120:8, 124:2, 125:6, 125:13, 127:1, 128:12, 128:17, 131:6, 132:2, 132:8, 132:10, 134:10, 134:18, 134:23, 135:1, 136:21, 139:6, 144:8, 145:5, 145:7, 149:2, 149:4, 150:14, 166:7, 176:19, 176:23, 177:22, 178:1, 180:6, 181:1, 183:22, 184:10, 184:18, 185:24, 186:4, 186:13, 186:20, 187:7, 190:3, 190:5, 192:21, 194:9, 195:11, 195:13, 195:17, 195:21, 196:1, 199:3, 199:8, 199:11
purse [3] - 53:14, 53:17, 56:18
pursuant [2] - 139:11, 198:7
put [19] - 10:22, 63:10, 79:24, 80:1, 105:1, 115:25, 126:15, 126:21, 135:11, 141:3, 146:6, 156:1, 156:2, 167:12, 173:9, 173:12, 173:15, 194:22, 197:3
putting [2] - 114:3, 182:17

**Q**

quality [1] - 73:15
questioning [4] - 134:13, 178:10, 184:11, 186:25
questions [31] - 13:16, 24:11, 44:12, 63:4, 76:22, 102:2, 102:7, 102:11, 103:20, 104:12, 104:15, 107:7, 107:15, 125:6, 134:20, 136:21, 138:9, 144:5, 144:6, 144:9,

148:16, 150:15, 152:25, 179:6, 181:11, 182:17, 183:9, 184:19, 184:25, 185:24, 186:15
quick [2] - 8:1, 36:11
quick-tempered [1] - 8:1
quicker [1] - 193:22
quickly [3] - 29:25, 33:6, 52:10
quite [5] - 15:13, 67:22, 86:20, 131:12, 193:18
quotation [1] - 200:19
quote [1] - 200:20

**R**

raise [5] - 12:22, 26:10, 45:16, 69:20, 151:4
Raise [1] - 137:14
raised [1] - 153:17
ran [5] - 4:9, 34:4, 41:3, 41:5, 44:6
rather [1] - 75:4
rational [1] - 198:12
Ravenwood [3] - 77:18, 129:8, 136:12
RDB-20-139 [1] - 1:3
re [4] - 11:24, 12:3, 12:20, 12:21
re-swear [3] - 11:24, 12:3, 12:20
re-sworn [1] - 12:21
reach [1] - 37:4
read [13] - 2:16, 2:17, 58:22, 79:23, 79:25, 80:2, 80:6, 80:8, 141:2, 141:8
reading [1] - 61:18
ready [15] - 12:19, 64:17, 69:1, 69:9, 72:4, 72:10, 127:3, 127:22, 169:18, 171:11, 195:19, 195:22, 196:10, 196:13, 198:5
real [4] - 74:24, 94:24, 188:19, 189:5
realize [1] - 23:22
realized [2] - 15:16, 25:14
really [20] - 4:18, 7:6, 7:22, 15:21, 25:16, 43:1, 61:25, 86:9, 86:10, 102:14, 108:21, 109:3,

149:20, 158:21, 168:17, 173:6, 175:7, 175:10, 186:1, 188:11
realm [1] - 128:15
reason [4] - 87:17, 182:7, 190:14, 195:22
reasonable [3] - 197:5, 197:9, 198:13
reasonably [1] - 5:7
reboot [4] - 96:25, 121:20, 121:24, 122:8
rebooted [2] - 97:11, 121:7
rebooting [4] - 121:13, 121:14, 121:19, 121:21
recalled [1] - 11:15
receive [1] - 22:25
received [2] - 28:2, 28:8
recently [1] - 113:5
recess [9] - 64:9, 64:11, 64:12, 64:14, 125:21, 126:1, 144:12, 144:17, 144:19
recognize [6] - 29:3, 38:4, 84:4, 116:1, 169:22, 189:7
recognized [2] - 84:1, 84:3
recognizing [1] - 76:19
recollection [7] - 14:18, 40:7, 74:19, 88:18, 88:23, 106:9, 119:8
reconciled [1] - 92:22
reconvene [1] - 64:9
record [19] - 10:7, 10:20, 10:22, 10:24, 13:3, 26:17, 33:25, 45:23, 58:21, 70:1, 73:3, 137:20, 139:7, 143:18, 151:11, 196:17, 197:17, 199:18, 200:22
recorded [4] - 73:7, 74:1, 142:7, 147:12
recording [26] - 8:3, 8:10, 8:11, 9:14, 9:23, 17:11, 17:13, 18:3, 18:5, 18:7, 18:10, 18:12, 73:8, 73:13, 74:3, 74:14, 105:25, 106:3, 143:3, 143:15,

147:19, 169:10, 169:20, 170:12, 170:14
recordings [1] - 107:5
recovered [1] - 38:8
recross [4] - 25:10, 128:16, 128:19, 134:21
recurring [1] - 175:15
red [5] - 53:6, 57:17, 58:21, 60:4, 61:18
redirect [7] - 21:9, 63:6, 125:8, 125:9, 127:11, 127:22, 128:13
refer [1] - 94:20
reference [3] - 51:5, 53:9, 186:23
references [1] - 89:24
referencing [2] - 51:14, 92:10
referred [3] - 89:9, 120:11, 135:19
referring [4] - 23:16, 95:5, 135:15, 159:17
reflect [5] - 33:25, 107:5, 139:7, 143:18, 200:20
refresh [5] - 40:7, 88:18, 88:23, 106:9, 119:8
refuse [1] - 78:16
regard [1] - 197:18
regarding [1] - 89:1
regardless [2] - 4:13, 101:14
regular [2] - 155:10, 186:25
regularly [1] - 158:2
rehearsal [3] - 193:24, 196:8
reiterated [1] - 198:16
relate [1] - 170:7
related [5] - 153:22, 159:22, 179:12, 183:17, 184:25
relating [1] - 17:23
relation [1] - 168:9
relationship [18] - 83:14, 83:16, 83:20, 85:7, 86:2, 86:6, 86:15, 86:21, 92:14, 97:13, 103:23, 104:1, 104:5, 111:1, 111:7, 111:14, 114:23, 160:11
relative [1] - 78:10
relay [1] - 170:4
relayed [1] - 170:25
relevance [4] - 5:14,

7:22, 9:22, 179:21
**relevant** [8] - 3:14,
4:13, 4:24, 7:2, 7:23,
181:25, 184:12,
184:13
**relieve** [1] - 81:14
**relieved** [1] - 37:23
**remain** [4] - 26:10,
45:16, 69:20, 151:4
**remained** [3] - 37:12,
37:20, 125:2
**remaining** [1] - 58:17
**remains** [1] - 3:21
**remember** [34] -
20:16, 20:20, 20:21,
22:19, 24:14, 24:21,
36:7, 40:1, 40:20,
74:7, 78:17, 78:18,
82:2, 84:17, 98:1,
113:23, 118:21,
123:15, 123:22,
136:2, 155:2, 163:3,
168:4, 168:11,
169:1, 171:7,
171:10, 172:5,
172:6, 172:10,
174:15, 191:11,
191:23
**remembered** [1] -
23:11
**removed** [2] - 78:23,
79:8
**repeat** [1] - 166:8
**repeated** [1] - 187:24
**rephrase** [1] - 128:14
**replacement** [2] -
161:25, 162:3
**replied** [2] - 180:8,
181:11
**report** [2] - 115:3,
115:14
**reported** [10] - 9:14,
17:13, 18:3, 18:5,
18:7, 18:10, 18:12,
143:15, 169:20,
170:14
**Reported** [1] - 1:22
**reporter** [1] - 152:1
**REPORTER** [1] -
200:19
**Reporter** [2] - 1:24,
200:25
**representations** [2] -
181:7, 183:8
**representatives** [1] -
32:7
**represented** [1] -
179:18
**representing** [2] -
182:10, 183:2

**request** [1] - 64:6
**requested** [1] - 108:10
**required** [1] - 198:8
**resetting** [2] - 121:14,
121:17
**residence** [4] - 31:1,
31:4, 35:20, 37:6
**residents** [2] - 31:6,
31:12
**resist** [1] - 147:3
**resistance** [1] - 98:24
**resolve** [1] - 3:20
**resolved** [1] - 126:6
**respect** [17] - 2:9,
6:22, 17:3, 65:16,
67:21, 76:5, 78:4,
79:21, 84:22, 86:12,
98:15, 126:14,
130:10, 180:22,
185:11, 187:15,
196:15
**respectfully** [3] -
148:11, 184:10,
185:16
**respond** [8] - 13:15,
36:24, 47:17,
102:19, 183:12,
185:12, 196:18,
198:4
**responding** [1] -
138:8
**responds** [1] - 198:3
**response** [3] - 32:10,
120:16, 186:24
**responsibility** [1] -
37:16
**responsible** [1] -
180:12
**rest** [5] - 4:13, 90:18,
126:9, 126:22,
194:24
**restate** [1] - 13:3,
69:25
**restaurant** [1] - 193:19
**restrained** [1] - 78:21
**restraints** [1] - 34:21
**result** [1] - 22:18
**results** [1] - 58:15
**resumes** [6] - 12:6,
64:15, 126:3,
127:16, 144:20,
187:11
**retained** [1] - 199:14
**retrofitting** [3] - 12:14,
68:22, 188:10
**return** [4] - 16:6,
16:10, 50:14, 193:1
**returned** [5] - 95:13,
99:4, 132:19, 140:15
**returning** [1] - 69:12

**reup** [3] - 157:5,
157:6, 157:12
**reversed** [1] - 194:18
**review** [2] - 74:25,
150:8
**reviewed** [9] - 66:2,
73:11, 73:13, 74:14,
88:13, 105:21,
115:3, 115:13,
115:23
**reviewing** [1] - 3:15
**rewinding** [1] - 75:1
**RICARDO** [1] - 1:5
**Richard** [4] - 2:3,
64:16, 126:4, 144:21
**RICHARD** [1] - 1:8
**rid** [1] - 101:20
**ride** [2] - 23:24, 90:21
**right-hand** [1] - 29:16
**Rights** [14] - 78:24,
79:1, 79:2, 79:3,
79:8, 79:9, 79:16,
79:18, 79:19, 79:20,
80:4, 80:18, 107:17,
140:21
**rights** [15] - 79:13,
79:23, 80:8, 80:9,
80:21, 80:24, 81:2,
108:21, 140:19,
141:7, 141:19,
142:10, 148:25,
149:8, 149:11
**Ripka** [1] - 54:16
**rise** [8] - 12:8, 64:12,
69:6, 127:19,
144:17, 144:24,
188:4, 199:23
**road** [5] - 27:4, 27:12,
47:4, 47:9, 47:10
**Robert** [1] - 1:19
**rodeo** [1] - 108:17
**role** [4] - 47:16, 87:25,
97:14, 158:11
**romantic** [2] - 85:7,
86:2
**Ronnell** [1] - 163:19
**room** [35] - 16:17,
19:2, 19:5, 35:25,
48:13, 50:14, 72:20,
72:22, 72:25, 73:2,
73:4, 73:7, 73:17,
74:9, 75:7, 75:8,
75:15, 81:21, 81:22,
82:1, 82:10, 82:20,
83:9, 142:13,
142:15, 164:1,
164:3, 164:6,
164:18, 164:22,
166:22, 172:5,
172:9, 178:5

**roommate** [1] - 116:15
**roughly** [3] - 15:15,
43:20, 114:8
**routine** [1] - 36:11
**RPR** [2] - 1:23, 200:21
**Rule** [12] - 67:24, 68:9,
179:23, 194:25,
195:1, 195:9,
195:18, 196:10,
196:11, 197:24,
198:7
**rule** [2] - 68:8, 143:2
**ruled** [2] - 67:21, 68:3
**rules** [5] - 67:24, 68:3,
157:15, 157:17,
157:19
**ruling** [1] - 181:17
**Run** [1] - 9:24
**run** [21] - 3:2, 3:4, 3:5,
4:4, 4:5, 4:12, 5:3,
5:4, 5:18, 7:6, 7:7,
7:24, 8:21, 8:23,
9:20, 9:24, 39:15,
147:1
**ruse** [1] - 146:6
**Ryan** [1] - 155:4
**Ryan's** [1] - 158:13,
158:14, 158:16

## S

**safe** [2] - 42:2, 42:3
**safety** [1] - 146:19
**sandwich** [1] - 55:12
**sandwiches** [1] -
193:21
**sat** [12] - 36:19, 37:4,
43:7, 75:8, 75:17,
148:8, 171:16,
171:17, 171:25,
172:15, 172:19,
178:20
**satisfied** [1] - 9:15
**save** [2] - 7:15, 105:2
**saves** [1] - 7:20
**saw** [22] - 16:14,
29:10, 33:10, 35:16,
37:6, 39:15, 42:8,
48:13, 72:9, 84:22,
85:25, 86:17, 86:18,
86:19, 86:20,
100:17, 105:16,
109:3, 110:2, 110:9,
113:5, 166:19
**scale** [4] - 16:15, 55:5,
55:16, 56:9
**scene** [6] - 37:14,
47:24, 48:2, 62:23,
98:20, 141:23
**scenes** [1] - 51:10

**scent** [2] - 191:13,
191:15
**Schedule** [1] - 58:16
**schedule** [2] - 195:4,
198:18
**scheduling** [1] - 194:1
**scheme** [1] - 126:23
**school** [2] - 35:7,
35:11
**school-age** [1] - 35:11
**screen** [5] - 56:9,
77:7, 77:8, 79:14,
173:13
**scroll** [1] - 51:8
**search** [34] - 27:21,
29:2, 29:13, 30:10,
31:2, 31:17, 36:12,
36:17, 38:25, 41:10,
41:12, 41:13, 42:21,
44:18, 47:13, 47:19,
47:25, 50:4, 50:20,
59:22, 61:25, 62:16,
62:19, 65:17, 67:1,
98:17, 99:1, 139:12,
149:24, 149:25,
163:7, 163:13,
164:15, 165:25
**searched** [1] - 62:15
**searches** [1] - 59:23
**searching** [2] - 41:15,
163:4
**seat** [3] - 13:2, 26:15,
45:21
**seated** [6] - 14:2,
36:16, 40:3, 72:24,
116:4, 153:19
**sec** [1] - 49:10
**second** [23] - 2:21,
2:22, 17:23, 18:4,
30:7, 31:25, 53:4,
53:18, 64:18, 67:17,
78:10, 83:8, 89:12,
131:5, 134:23,
137:11, 137:12,
142:9, 148:7,
169:15, 178:3,
180:6, 182:4
**secondarily** [1] -
179:22
**seconds** [6] - 39:15,
39:18, 81:4, 82:17,
129:3, 186:22
**secret** [1] - 188:23
**section** [1] - 141:9
**secure** [2] - 39:2,
41:10
**See** [2] - 167:6, 167:8
**see** [58] - 2:13, 3:3,
9:13, 12:12, 12:13,
32:15, 32:17, 33:20,

34:24, 42:22, 49:18, 49:25, 51:19, 52:15, 55:2, 55:7, 55:15, 62:10, 69:17, 72:1, 73:16, 82:15, 84:25, 85:9, 92:12, 96:23, 102:5, 113:21, 114:4, 123:17, 125:23, 129:21, 129:22, 135:8, 139:4, 140:25, 146:9, 158:24, 160:25, 161:2, 161:6, 164:21, 166:2, 167:10, 167:20, 167:22, 173:13, 174:6, 174:10, 175:9, 178:5, 188:17, 195:2, 195:5, 195:10, 199:21

**seeing** [2] - 40:1, 58:1
**seem** [4] - 4:23, 68:24, 76:24, 105:16
**seized** [8] - 50:3, 50:19, 53:8, 54:23, 55:23, 58:7, 61:8, 100:14
**seizure** [3] - 48:5, 98:18, 99:1
**self** [4] - 67:19, 68:4, 175:5, 196:21
**self-incrimination** [1] - 196:21
**self-serving** [2] - 67:19, 68:4
**sell** [4] - 87:8, 87:25, 88:2, 123:15
**selling** [4] - 87:7, 88:3, 88:7, 123:14
**semen** [2] - 105:9, 134:8
**seminal** [1] - 115:16
**senior** [1] - 47:9
**sense** [1] - 30:20
**sentence** [4] - 22:21, 22:25, 23:2, 80:7
**separate** [4] - 5:3, 29:18, 40:5, 140:12
**separated** [1] - 56:23
**September** [1] - 23:14
**sequestration** [2] - 65:5, 65:7
**SERGEANT** [4] - 1:5, 26:12, 45:18, 200:4
**sergeant** [11] - 26:18, 26:23, 38:17, 44:24, 45:24, 47:4, 47:9, 47:10, 58:6, 59:9, 61:7

**Sergeant** [12] - 11:3, 26:22, 38:10, 42:8, 44:8, 45:10, 46:1, 46:2, 46:21, 59:2, 63:3, 63:8
**serves** [3] - 6:22, 73:24, 79:1
**service** [1] - 101:18
**serving** [2] - 67:19, 68:4
**session** [4] - 2:3, 64:15, 126:3, 144:20
**Set** [5] - 3:1, 4:1, 4:2, 9:22, 10:5
**set** [4] - 3:3, 5:16, 40:21, 198:13
**setting** [1] - 8:20
**seven** [7] - 24:9, 27:13, 74:25, 82:7, 155:19, 155:20, 156:16
**seven-page** [1] - 82:7
**several** [4] - 51:22, 62:22, 62:24, 84:20
**sex** [7] - 93:2, 118:8, 134:4, 134:6, 134:9, 134:12, 134:17
**sexual** [9] - 111:1, 111:7, 175:24, 176:2, 179:7, 179:9, 180:4, 185:1, 185:8
**sexually** [1] - 175:22
**shape** [3] - 29:9, 29:17, 182:1
**shaped** [1] - 29:4
**Shawn** [2] - 2:11, 16:2
**sheet** [9] - 36:9, 76:6, 77:13, 79:1, 79:2, 79:5, 79:18, 102:1, 130:25
**shift** [1] - 27:4
**shifts** [1] - 197:6
**shirt** [1] - 153:20
**shoe** [2] - 51:21, 51:23
**shoebox** [1] - 52:12
**shoot** [1] - 22:1
**Shore** [3] - 90:22, 110:10, 110:20
**Shore/Cambridge** [1] - 87:9
**Short** [2] - 64:14, 144:19
**short** [2] - 113:13, 195:15
**shorten** [1] - 107:3
**shorter** [1] - 193:17
**show** [13] - 2:17, 34:11, 40:10, 51:16, 53:11, 54:4, 54:5, 60:3, 61:2, 61:17,

82:6, 83:23, 88:12
**showed** [9] - 14:5, 58:7, 83:24, 95:20, 108:25, 109:6, 121:5, 135:7, 167:12
**showing** [12] - 29:3, 29:6, 38:4, 47:19, 48:7, 58:20, 88:17, 105:18, 114:7, 167:10, 174:7, 189:7
**shown** [3] - 79:14, 82:7, 82:20
**shows** [1] - 52:10
**shut** [1] - 33:9
**siblings** [1] - 153:7
**side** [10] - 29:16, 29:21, 29:22, 32:1, 50:13, 65:10, 75:10, 75:13, 142:16, 142:17
**sign** [1] - 149:11
**signals** [1] - 101:4
**signature** [4] - 80:10, 81:1, 141:9, 141:13
**signatures** [1] - 81:6
**signed** [5] - 80:12, 99:1, 100:21, 107:22, 141:18
**signs** [1] - 76:19
**simple** [2] - 102:7, 126:17
**sister** [2] - 153:12
**sisters** [1] - 160:2
**sit** [2] - 108:7, 148:1
**site** [6] - 101:5, 117:19, 140:6, 140:7, 145:16, 146:1
**siting** [1] - 36:9
**sitting** [12] - 32:20, 36:7, 36:20, 37:6, 39:21, 40:8, 43:4, 75:19, 82:10, 114:16, 114:22, 146:10
**six** [1] - 27:13
**size** [1] - 135:21
**slammed** [2] - 33:9, 34:4
**sleep** [2] - 102:17, 163:9
**sleeping** [2] - 36:10, 40:21
**sleepy** [2] - 16:3, 102:18
**slept** [3] - 15:21, 166:21, 166:22
**slow** [2] - 74:16, 75:2
**small** [3] - 44:4, 55:5, 142:15
**smaller** [2] - 55:9,

56:23
**smell** [2] - 171:23, 192:13
**smiling** [1] - 196:9
**smoking** [3] - 51:25, 52:2, 52:12
**so..** [1] - 183:19
**softly** [2] - 106:1, 106:2
**solely** [1] - 65:16
**someone** [12] - 5:6, 5:21, 7:25, 9:1, 9:17, 36:10, 65:6, 116:18, 120:21, 122:13, 146:1, 176:1
**sometime** [9] - 110:2, 113:25, 114:1, 117:21, 118:11, 159:7, 170:2, 193:18
**sometimes** [19] - 42:15, 42:17, 42:19, 74:5, 74:6, 85:5, 85:16, 85:17, 85:21, 85:22, 85:23, 110:10, 121:23, 122:4, 122:12, 130:2, 158:3
**somewhat** [3] - 53:25, 111:9, 118:5
**somewhere** [2] - 72:11, 93:19
**son** [11] - 6:13, 14:20, 23:13, 83:25, 84:3, 86:17, 94:5, 94:12, 168:12, 191:19, 191:21
**Sorry** [1] - 166:8
**sorry** [52] - 11:11, 15:8, 17:15, 32:4, 40:24, 47:6, 47:7, 56:3, 56:13, 60:8, 71:19, 73:12, 77:4, 77:5, 86:23, 89:17, 90:24, 91:17, 93:7, 99:13, 99:15, 103:20, 107:10, 115:8, 115:25, 123:11, 124:1, 124:6, 125:17, 127:8, 131:23, 134:5, 135:17, 138:17, 139:18, 143:10, 144:3, 147:15, 149:2, 152:18, 153:10, 162:9, 166:7, 172:7, 176:3, 177:11, 189:11, 190:1, 190:3, 194:14, 199:3
**sort** [9] - 15:10, 16:14,

29:4, 36:11, 76:4, 84:15, 91:4, 92:21, 172:8
**sought** [1] - 68:6
**sound** [2] - 177:9, 195:6
**source** [1] - 161:18
**spaces** [1] - 14:8
**speaking** [17] - 4:3, 4:5, 4:11, 4:14, 26:15, 45:22, 46:8, 61:20, 70:11, 75:23, 83:22, 135:22, 137:18, 151:9, 151:19, 151:20, 191:8
**speaks** [1] - 146:2
**special** [2] - 84:18, 145:14, 145:15
**Special** [10] - 1:16, 1:17, 148:18, 148:21, 189:18, 191:1, 191:9, 191:17, 192:5, 192:14
**specific** [5] - 59:15, 87:25, 117:23, 133:24, 134:1
**specifically** [14] - 52:19, 58:20, 89:25, 101:7, 104:8, 114:14, 120:9, 123:13, 123:16, 132:25, 147:22, 158:19, 180:2, 196:25
**specify** [2] - 95:15, 95:19
**speed** [1] - 74:16
**spell** [4] - 26:16, 45:23, 137:19, 151:10
**spelling** [2] - 177:12, 177:15
**spend** [4] - 3:10, 158:2, 158:4, 158:7
**spent** [5] - 27:12, 91:24, 92:3, 118:20, 123:3
**spring** [4] - 158:1, 158:19, 159:7, 161:10
**Sr** [1] - 189:1
**staged** [2] - 140:4, 140:12
**staircase** [1] - 30:6
**stairs** [2] - 167:15, 174:2
**stalking** [1] - 6:13
**stamp** [1] - 82:15

**stand** [35] - 11:22, 12:3, 12:6, 12:22, 12:23, 23:5, 26:2, 45:1, 63:15, 63:19, 64:1, 65:2, 65:3, 65:6, 65:14, 69:3, 69:11, 69:12, 125:24, 127:7, 127:16, 136:25, 150:19, 151:3, 178:7, 183:6, 183:21, 184:4, 187:9, 187:11, 193:2, 193:5, 193:14, 196:16, 199:21
**standard** [2] - 198:10, 198:13
**standing** [9] - 26:10, 45:16, 46:3, 50:10, 69:20, 70:7, 137:24, 151:4, 151:15
**stands** [4] - 64:11, 126:1, 144:17, 199:23
**start** [8] - 12:14, 74:23, 76:10, 144:12, 192:22, 193:3, 197:14, 199:22
**started** [8] - 81:20, 83:22, 91:9, 108:6, 110:2, 122:23, 172:25, 193:16
**starting** [4] - 48:7, 139:16, 139:23, 195:4
**starts** [1] - 3:1
**State** [1] - 58:11
**state** [13] - 7:2, 7:22, 8:1, 8:18, 10:10, 26:16, 45:23, 111:18, 137:19, 151:10, 173:21, 175:4, 179:24
**statement** [7] - 11:16, 17:15, 65:16, 73:3, 79:12, 150:8, 150:10
**statements** [7] - 66:11, 66:18, 67:20, 67:23, 67:25, 68:5, 179:15
**STATES** [3] - 1:1, 1:3, 1:8
**States** [4] - 2:2, 68:1, 68:2, 198:14
**stating** [1] - 182:18
**status** [1] - 138:3
**stay** [9] - 85:14, 85:16, 85:17, 85:19, 95:16,

95:25, 113:21, 129:10
**stayed** [8] - 15:13, 94:13, 95:14, 95:23, 118:20, 129:23, 130:2, 164:6
**steals** [2] - 156:3, 156:4
**stenographic** [1] - 200:22
**stenotype** [1] - 1:21
**step** [4] - 25:24, 44:24, 136:23, 150:17
**stepped** [2] - 32:22, 83:9
**steps** [3] - 44:2, 98:15, 174:1
**stick** [1] - 190:12
**still** [14] - 2:7, 12:13, 22:21, 27:18, 37:22, 58:2, 67:17, 80:21, 96:22, 105:19, 119:10, 127:24, 146:15, 190:20
**stipulate** [2] - 33:23, 139:6
**stood** [1] - 36:13
**stop** [7] - 93:18, 108:3, 159:2, 171:18, 192:24, 193:24, 196:6
**stopped** [1] - 134:2
**story** [1] - 113:13
**straight** [7] - 122:19, 122:22, 135:20, 163:22, 163:25, 164:7, 166:20
**strange** [1] - 191:13
**strategy** [1] - 182:22
**Street** [4] - 1:24, 93:19, 116:24, 117:1
**street** [8] - 4:9, 5:12, 9:16, 9:18, 9:20, 9:24, 168:22, 168:25
**stretch** [1] - 155:19
**strictly** [1] - 46:13
**strike** [12] - 6:4, 14:12, 19:25, 117:17, 123:21, 124:6, 186:5, 186:8, 186:10, 186:14, 186:16, 186:18
**striking** [2] - 186:11
**stuff** [1] - 162:22
**stupid** [3] - 3:5, 5:4, 92:10
**subject** [3] - 28:18, 36:15, 41:8
**submit** [1] - 198:4
**submitted** [1] - 58:8

**subpoena** [1] - 126:18
**subscribed** [1] - 71:6
**substance** [5] - 51:3, 55:4, 56:10, 58:23, 181:18
**success** [1] - 148:5
**suddenly** [1] - 9:7
**suggested** [1] - 196:3
**summarize** [3] - 180:19, 181:13, 183:7
**summary** [1] - 75:4
**summer** [2] - 174:24, 175:9
**sun** [1] - 95:10
**supervisor** [9] - 27:4, 27:5, 140:9, 140:13, 140:16, 146:2, 146:5, 146:14
**supervisor's** [1] - 146:19
**supplier** [1] - 88:9
**supposed** [2] - 176:2, 190:12
**surrounding** [2] - 31:1, 164:19
**suspect** [1] - 125:20
**suspected** [4] - 50:19, 52:13, 57:17, 58:12
**sustained** [15] - 10:8, 111:17, 111:24, 120:6, 131:7, 134:11, 134:12, 134:19, 176:20, 178:15, 186:2, 186:9, 186:18
**swab** [5] - 53:7, 57:18, 98:19, 104:25
**swabs** [1] - 98:19
**Swear** [1] - 137:12
**swear** [3] - 11:24, 12:3, 12:20
**sworn** [11] - 12:21, 12:24, 26:9, 26:12, 45:15, 45:18, 69:19, 69:22, 137:11, 137:15, 151:6
**syringe** [1] - 52:18
**syringes** [3] - 52:18, 52:23, 57:4

## T

**table** [14] - 37:4, 48:14, 63:10, 72:22, 72:24, 75:11, 82:11, 142:15, 142:16, 171:17, 172:11, 172:19, 173:25, 189:24

**tablets** [3] - 51:12, 53:21, 56:17
**tactical** [1] - 59:10
**tail** [1] - 126:14
**takedown** [1] - 145:11
**talks** [2] - 30:19, 32:6
**tape** [7] - 6:16, 17:9, 143:6, 143:16, 143:17, 143:20, 169:10
**target** [1] - 108:16
**Tariek** [1] - 24:18
**Tarrell** [1] - 89:12
**task** [6] - 138:22, 138:25, 145:12, 146:22, 147:4, 147:13
**tasked** [1] - 37:24
**tax** [1] - 157:9
**team** [20] - 25:2, 27:5, 27:14, 27:18, 28:23, 28:25, 30:18, 32:5, 101:3, 139:25, 140:1, 140:3, 140:16, 147:25, 148:5, 176:9, 179:19, 182:22, 182:25
**technical** [1] - 101:3
**technically** [1] - 100:25
**Tee's** [1] - 193:19
**telephone** [7] - 2:10, 17:25, 136:2, 136:5, 169:2, 176:12, 192:8
**tempered** [1] - 8:1
**ten** [9] - 27:15, 64:9, 140:2, 144:12, 145:12, 146:21, 154:11, 188:7
**ten-minute** [1] - 144:12
**Teresa** [1] - 1:14
**term** [2] - 162:14, 179:1
**terms** [31] - 5:1, 5:3, 7:2, 7:4, 8:13, 9:18, 9:20, 10:10, 11:11, 23:9, 30:22, 65:8, 66:11, 67:14, 68:7, 111:21, 163:21, 175:4, 178:10, 180:9, 180:17, 180:18, 180:20, 181:11, 183:8, 183:17, 183:25, 198:6, 199:4, 199:15
**Terrell** [1] - 193:8
**terrible** [1] - 155:2
**terrified** [1] - 164:20

**Terrill** [5] - 54:8, 54:10, 57:13, 165:24, 167:23
**tested** [1] - 58:23
**tester** [1] - 162:23
**testified** [19] - 12:25, 22:9, 23:22, 25:20, 26:13, 40:4, 45:19, 60:15, 64:20, 69:12, 69:23, 70:23, 75:3, 81:8, 98:10, 131:16, 133:17, 137:16, 151:7
**testifies** [1] - 183:24
**testify** [10] - 11:5, 14:14, 65:16, 65:21, 178:18, 183:9, 192:11, 197:1, 197:3, 197:11
**testifying** [6] - 14:3, 46:12, 70:11, 70:15, 127:2, 178:1
**testimony** [25] - 5:23, 23:6, 23:10, 24:7, 26:1, 44:25, 63:9, 63:13, 64:22, 65:1, 65:10, 65:20, 66:5, 66:11, 66:17, 74:13, 125:22, 136:24, 137:1, 144:14, 150:18, 184:12, 193:1, 193:4, 195:8
**testing** [1] - 58:10
**text** [6] - 81:17, 96:19, 97:3, 97:10, 99:10, 99:20
**texting** [5] - 96:7, 96:13, 99:6, 99:16, 128:8
**TFO** [1] - 143:23
**THE** [330] - 1:1, 1:1, 1:8, 2:2, 2:5, 2:7, 2:16, 2:20, 2:22, 3:3, 3:7, 3:12, 3:19, 4:15, 4:25, 5:16, 5:24, 6:2, 6:6, 6:15, 6:18, 6:24, 7:12, 7:16, 7:17, 7:24, 8:6, 8:10, 8:25, 9:6, 9:15, 10:4, 10:7, 10:15, 10:18, 11:11, 11:17, 11:21, 11:24, 12:1, 12:2, 12:7, 12:8, 12:10, 12:12, 12:22, 12:23, 13:1, 13:2, 13:4, 13:5, 13:15, 13:17, 16:24, 17:2, 17:7, 17:17, 17:19, 17:21, 21:7, 25:9, 25:23, 26:5, 26:6, 26:9, 26:10,

26:14, 26:15, 26:18,
33:25, 38:2, 38:12,
40:12, 40:15, 44:10,
44:11, 44:23, 45:3,
45:6, 45:8, 45:10,
45:13, 45:16, 45:20,
45:21, 45:24, 46:1,
46:10, 46:11, 46:14,
46:15, 47:5, 47:7,
56:1, 56:3, 56:5,
59:4, 60:7, 60:10,
60:12, 61:5, 63:2,
63:5, 63:8, 63:12,
63:13, 63:17, 63:20,
63:25, 64:4, 64:8,
64:12, 64:15, 64:17,
64:24, 65:13, 65:18,
65:22, 66:3, 66:7,
66:10, 66:14, 66:20,
66:23, 66:25, 67:3,
67:6, 67:10, 67:14,
68:16, 68:19, 68:21,
69:5, 69:6, 69:8,
69:16, 69:18, 69:19,
69:20, 69:24, 69:25,
70:2, 70:4, 70:13,
70:14, 77:2, 77:5,
77:7, 88:16, 100:3,
106:15, 106:18,
106:20, 106:23,
107:12, 111:17,
111:21, 115:6,
115:8, 115:11,
118:25, 120:6,
123:24, 123:25,
125:7, 125:11,
125:17, 125:20,
125:25, 126:1,
126:3, 126:5,
126:13, 126:24,
127:4, 127:8,
127:11, 127:14,
127:17, 127:19,
127:21, 128:15,
128:18, 130:13,
130:16, 131:7,
132:3, 132:9,
132:11, 134:11,
134:19, 134:21,
136:22, 137:3,
137:4, 137:5, 137:6,
137:10, 137:14,
137:17, 137:18,
137:21, 137:23,
138:6, 138:7,
138:10, 138:11,
139:7, 139:17,
139:20, 143:2,
143:10, 143:13,
143:16, 143:18,
144:1, 144:3, 144:6,

144:10, 144:15,
144:16, 144:17,
144:20, 144:22,
144:24, 145:1,
149:1, 149:3,
150:16, 150:21,
150:22, 151:1,
151:3, 151:8, 151:9,
151:12, 151:13,
151:22, 151:23,
152:16, 152:18,
152:19, 152:20,
152:21, 162:1,
162:3, 169:9,
169:14, 170:11,
172:17, 172:19,
176:20, 176:25,
177:4, 177:11,
177:13, 177:16,
177:25, 178:2,
178:9, 178:17,
179:2, 179:8,
179:13, 179:17,
180:7, 180:16,
181:3, 181:20,
181:23, 182:10,
182:21, 182:25,
183:15, 183:20,
183:23, 184:2,
184:13, 184:17,
184:22, 184:24,
185:2, 185:4,
185:19, 185:22,
186:2, 186:8,
186:14, 186:16,
186:21, 187:2,
187:8, 187:12,
187:18, 187:19,
187:22, 187:23,
188:1, 188:2, 188:4,
188:6, 190:4,
192:19, 192:23,
193:7, 193:8, 193:9,
193:10, 193:15,
193:20, 193:21,
194:5, 194:10,
194:13, 194:20,
195:8, 195:12,
195:16, 195:18,
196:5, 196:15,
197:25, 198:3,
198:22, 198:25,
199:4, 199:9,
199:13, 199:17,
199:23
**themselves** [1] - 101:6
**theory** [2] - 6:11
**thereof** [3] - 5:2,
67:19, 180:4
**Theresa** [2] - 14:24,
15:22

**they've** [4] - 67:12,
186:25, 196:3
**thinking** [2] - 114:21,
191:18
**thinks** [1] - 23:2
**third** [3] - 30:8, 33:6,
136:25
**Thirty** [1] - 152:11
**Thirty-one** [1] - 152:11
**thorough** [1] - 59:19
**thoughts** [1] - 19:19
**threat** [1] - 34:6
**threatened** [3] - 19:14,
19:16, 21:3
**three** [14] - 30:1,
33:10, 48:23, 51:8,
54:5, 72:23, 75:8,
103:21, 147:13,
163:22, 173:9,
194:20, 194:23,
195:14
**threshold** [2] - 33:1,
48:12
**throughout** [2] - 3:17,
42:25
**throw** [1] - 170:23
**Tiera** [2] - 16:5, 16:10
**Tiffany** [22] - 78:11,
83:19, 85:18, 90:23,
91:11, 91:14, 94:4,
94:12, 103:8,
103:11, 103:15,
104:14, 104:16,
118:17, 118:20,
131:1, 131:14,
131:17, 132:15,
132:19, 133:5
**Tiffany's** [21] - 16:13,
16:17, 90:6, 90:7,
90:8, 90:13, 90:23,
91:9, 91:13, 91:18,
91:19, 93:6, 93:20,
94:2, 94:3, 94:14,
95:8, 119:2, 122:13,
133:14, 133:21
**timeframe** [1] - 158:11
**timeline** [2] - 14:5,
14:8
**timestamped** [1] -
82:17
**tiny** [1] - 55:11
**title** [1] - 156:10
**today** [15] - 11:1,
11:12, 24:7, 65:21,
74:13, 75:3, 75:5,
119:21, 126:11,
176:1, 195:2,
195:24, 196:1, 196:2
**today's** [1] - 66:18
**toes** [1] - 52:9

**together** [5] - 89:5,
145:23, 167:23,
168:2, 190:12
**Tommy** [1] - 120:22
**tomorrow** [13] - 126:9,
126:22, 193:1,
193:3, 193:17,
193:23, 194:6,
195:2, 195:20,
195:22, 196:7,
198:18, 199:22
**Tone** [6] - 161:21,
168:12, 191:21,
192:15
**Tone's** [1] - 192:15
**Tony** [31] - 41:5,
54:16, 85:5, 85:6,
86:2, 111:2, 111:8,
111:14, 123:9,
123:12, 153:14,
158:20, 159:15,
160:21, 161:7,
161:9, 161:22,
162:18, 162:21,
163:6, 164:21,
165:12, 165:19,
170:1, 170:4,
170:19, 189:11
**Tony's** [2] - 86:9,
123:9
**TONYA** [4] - 1:6,
151:6, 151:12,
200:12
**Tonya** [6] - 11:4, 11:9,
34:25, 150:25,
151:12, 194:7
**took** [13] - 13:11,
13:19, 13:20, 23:5,
90:11, 90:23, 90:24,
93:15, 98:15,
133:20, 133:23,
142:3, 142:13
**tools** [1] - 74:16
**top** [5] - 51:6, 54:2,
55:24, 78:19, 82:15
**topic** [4] - 65:22, 66:7,
69:11, 89:13
**topics** [1] - 83:12
**toss** [1] - 42:5
**total** [1] - 156:13
**touch** [4] - 77:7, 96:4,
185:18, 185:20
**tough** [1] - 19:12
**toward** [1] - 93:16
**towards** [8] - 16:14,
32:19, 49:6, 50:14,
93:17, 98:14, 153:1,
172:8
**towel** [2] - 51:24, 52:2
**tower** [1] - 114:4

**towers** [1] - 101:6
**Towson** [1] - 89:6
**track** [4] - 71:8,
100:25, 101:4,
101:23
**tracked** [1] - 77:22
**tracking** [2] - 70:25,
100:12
**trailer** [1] - 140:11
**trained** [6] - 41:15,
59:22, 59:25, 61:25,
62:19, 76:18
**transcript** [17] - 2:9,
3:15, 6:16, 8:2, 9:21,
17:16, 17:23, 88:13,
88:22, 95:21, 107:3,
107:4, 118:22,
118:25, 143:3,
169:11, 200:22
**transcription** [1] -
1:21
**transcripts** [6] - 4:7,
10:21, 16:23, 17:3,
17:8, 170:12
**transit** [1] - 71:24
**transmitted** [1] - 101:5
**transported** [8] -
37:19, 37:22, 37:23,
72:4, 72:10, 141:21,
141:23, 141:25
**traveling** [1] - 122:13
**Tresvant** [1] - 198:14
**TRESVANT** [1] -
198:15
**trial** [4] - 14:9, 26:3,
45:1, 150:19
**TRIAL** [1] - 1:4
**trier** [1] - 198:12
**trip** [1] - 97:15
**trips** [1] - 85:4
**trouble** [6] - 43:12,
61:18, 103:7,
105:25, 106:3,
109:11
**Troy** [1] - 191:19
**true** [3] - 21:18, 24:23,
128:23
**truth** [10] - 13:11,
19:24, 20:5, 23:12,
23:14, 24:8, 25:16,
25:18, 25:19
**truthful** [7] - 150:4,
189:21, 190:6,
190:10, 190:14,
192:6, 192:7
**try** [8] - 2:17, 12:18,
61:17, 74:7, 74:19,
89:5, 121:24, 197:16
**trying** [18] - 5:12,
15:18, 35:8, 35:9,

67:3, 75:1, 75:5, 87:8, 87:24, 88:2, 107:2, 109:10, 123:14, 185:22, 186:23, 196:19, 197:11, 199:4
**Tuesday** [1] - 133:13
**turn** [14] - 49:4, 49:19, 50:9, 53:19, 60:5, 82:25, 121:10, 122:4, 122:5, 124:5, 124:6, 164:4, 164:7, 170:9
**turned** [2] - 101:15, 101:22
**turning** [12] - 50:8, 50:22, 50:24, 52:7, 52:10, 52:14, 53:25, 89:13, 90:2, 94:1, 97:13, 133:13
**TV** [2] - 51:20, 121:23
**twice** [2] - 14:15, 70:5
**twin** [8] - 153:13, 158:20, 160:21, 161:7, 164:21, 189:11, 189:12
**two** [41] - 2:12, 18:20, 19:18, 26:24, 34:7, 34:15, 46:7, 48:13, 49:22, 51:17, 55:15, 73:24, 73:25, 74:1, 74:24, 75:4, 81:9, 81:14, 81:19, 87:11, 88:10, 89:14, 89:16, 89:18, 89:20, 89:25, 93:19, 105:14, 108:2, 124:22, 131:13, 133:20, 133:23, 142:16, 155:22, 161:25, 163:17, 174:1, 178:24, 181:22, 186:2
**two-hour** [1] - 108:2
**type** [5] - 40:22, 61:22, 79:11, 98:24, 140:14
**typed** [1] - 41:24
**Tyrell** [1] - 89:12

## U

**U-shape** [2] - 29:9, 29:17
**U-shaped** [1] - 29:4
**ultimately** [6] - 37:3, 83:4, 92:21, 93:1, 98:19, 192:11
**uncle** [1] - 164:21
**uncles** [1] - 131:3
**under** [16] - 42:19,

67:24, 68:8, 105:14, 112:14, 127:24, 137:23, 137:24, 140:17, 141:9, 141:13, 146:6, 179:22, 179:23, 196:21, 198:7
**understood** [12] - 76:8, 80:1, 80:21, 102:6, 107:24, 141:19, 149:7, 181:15, 182:3, 182:24, 184:9, 198:6
**unit** [3] - 59:10, 70:3, 101:3
**UNITED** [3] - 1:1, 1:3, 1:8
**United** [4] - 2:2, 68:1, 68:2, 198:14
**unknown** [1] - 53:21
**unlabeled** [1] - 56:17
**Unless** [1] - 106:12
**unlike** [1] - 41:3
**unlikely** [2] - 63:10, 63:14
**untruthful** [1] - 150:5
**unused** [2] - 52:13, 52:17
**unusual** [1] - 59:25
**up** [79] - 5:17, 8:20, 12:16, 14:24, 15:24, 19:17, 24:18, 24:23, 25:2, 26:24, 36:13, 40:21, 45:5, 46:13, 47:5, 51:24, 55:7, 56:8, 70:15, 74:8, 74:16, 77:1, 82:14, 82:25, 83:2, 85:1, 86:19, 89:6, 90:5, 90:21, 93:1, 93:9, 97:17, 97:19, 106:10, 107:3, 112:3, 113:3, 113:8, 113:11, 113:13, 114:3, 115:25, 117:23, 118:8, 119:13, 119:15, 120:10, 120:16, 120:23, 124:9, 127:4, 130:14, 131:17, 132:14, 135:3, 140:10, 141:3, 144:1, 146:25, 151:24, 152:16, 153:15, 154:1, 158:3, 164:16, 167:23, 170:2, 172:10, 172:17, 173:25, 174:12, 187:9,

188:11, 190:20, 194:13, 195:23, 199:18
**upcoming** [1] - 175:7
**upset** [8] - 20:17, 35:17, 35:18, 92:9, 118:5, 174:1, 174:6, 174:7
**uses** [1] - 77:15

## V

**vaccinated** [8] - 46:7, 46:9, 70:10, 70:12, 138:3, 138:5, 151:18, 151:21
**vaccination** [1] - 138:3
**vaccinations** [1] - 46:8
**vaginal** [1] - 115:17
**Valentine's** [4] - 84:9, 110:3, 171:4, 171:7
**Valentines** [1] - 189:24
**variations** [3] - 2:13, 2:14
**various** [1] - 181:10
**varying** [1] - 44:2
**vehicle** [3] - 140:14, 140:16, 147:8
**vehicles** [1] - 140:12
**venting** [3] - 20:16, 20:17, 20:25
**verbatim** [1] - 41:24
**verdict** [1] - 198:10
**version** [1] - 3:4
**versus** [2] - 68:2, 198:14
**vest** [1] - 50:12
**vicinity** [1] - 114:10
**victim** [2] - 83:15
**victims** [1] - 180:12
**Victoria** [1] - 153:13
**video** [11] - 73:2, 73:7, 73:8, 73:16, 100:17, 105:19, 105:21, 147:16, 147:17
**video-equipped** [2] - 147:16, 147:17
**videotape** [2] - 19:7, 66:2
**view** [17] - 4:12, 4:15, 5:8, 8:22, 9:3, 10:12, 32:20, 33:6, 40:2, 42:4, 49:19, 62:10, 181:13, 197:19, 198:10, 198:19, 198:22
**viewpoint** [1] - 181:8

**violations** [1] - 138:23
**visible** [1] - 49:8
**voice** [12] - 20:22, 21:13, 47:5, 74:8, 144:1, 144:4, 151:24, 152:16, 172:6, 172:17, 194:13
**voices** [4] - 143:23, 169:22, 169:24, 170:16
**volume** [3] - 31:8, 73:19, 74:3
**voluntarily** [1] - 149:10
**vs** [1] - 1:4

## W

**wag** [1] - 126:14
**wait** [5] - 137:12, 169:15, 193:12, 195:2, 195:10
**waited** [1] - 32:9
**waiting** [1] - 82:25
**waive** [1] - 149:11
**waiver** [2] - 81:2, 141:9
**waking** [1] - 166:10
**walk** [4] - 139:15, 139:22, 163:21, 174:1
**walked** [9] - 33:3, 33:4, 93:12, 164:18, 166:20, 167:15, 171:25, 174:1
**walking** [3] - 5:10, 166:5, 166:11
**walkway** [1] - 29:21
**walls** [1] - 72:25
**Wane** [10] - 119:23, 120:1, 135:8, 135:12, 167:20, 167:22, 167:24, 167:25, 188:20, 189:1
**wants** [2] - 144:9, 185:23
**warning** [1] - 79:10
**warrant** [34] - 27:21, 29:2, 29:13, 30:10, 31:2, 31:12, 31:17, 38:25, 41:12, 41:13, 41:20, 41:21, 41:23, 43:21, 44:16, 47:13, 47:20, 47:25, 98:18, 99:2, 100:11, 100:12, 100:20, 104:18, 104:21, 104:24, 139:12,

139:13, 139:24, 149:24, 150:1, 163:7
**warrants** [2] - 44:18, 98:15
**watch** [2] - 74:22, 167:18
**wavelength** [1] - 67:18
**weapon** [2] - 42:8, 42:10
**weapons** [8] - 34:10, 36:15, 36:17, 41:22, 42:2, 42:5, 42:12, 62:6
**Weaver** [18] - 1:16, 139:25, 140:8, 140:22, 140:25, 142:1, 142:19, 143:25, 148:1, 148:18, 148:21, 189:18, 191:1, 191:9, 191:17, 192:1, 192:5, 192:14
**Weaver's** [2] - 141:14, 144:4
**wedding** [4] - 193:24, 196:8, 196:9
**Wednesday** [5] - 64:25, 92:7, 99:5, 128:5
**week** [14] - 45:2, 64:2, 69:12, 70:5, 70:7, 70:23, 84:25, 85:2, 85:9, 86:4, 86:5, 90:3, 97:15, 110:10
**weeks** [2] - 18:20, 103:18
**weight** [2] - 84:5, 109:12
**welcome** [1] - 193:9
**WHALEN** [52] - 5:9, 5:22, 5:25, 6:5, 6:10, 6:17, 6:23, 7:10, 7:20, 8:9, 10:2, 10:6, 10:17, 13:8, 13:10, 13:18, 16:22, 17:1, 17:6, 17:14, 17:18, 17:20, 18:2, 18:4, 18:6, 18:8, 18:11, 18:13, 21:6, 25:12, 25:22, 38:14, 38:16, 40:14, 40:16, 40:24, 40:25, 44:8, 45:4, 59:6, 59:8, 60:9, 60:11, 60:13, 60:14, 61:4, 61:6, 63:1, 63:3, 196:14, 198:24, 199:16
**Whalen** [20] - 1:14, 10:9, 10:15, 13:6,

16:25, 17:5, 21:7,
23:17, 25:10, 25:23,
38:13, 40:13, 44:11,
59:5, 176:12, 183:2,
186:23, 200:3,
200:5, 200:7
**Whalen's** [2] - 13:16,
186:24
**whatnot** [1] - 31:15
**whatsoever** [1] -
102:14
**wheeler** [1] - 140:14
**wheels** [1] - 146:11
**whereabouts** [2] -
83:17, 104:9
**white** [11] - 12:17,
51:3, 53:21, 55:4,
56:9, 56:10, 56:17,
58:23, 68:23,
114:16, 116:3
**whole** [6] - 37:18,
61:22, 74:1, 107:2,
120:24, 193:18
**wide** [1] - 166:13
**Wilkerson** [1] - 68:2
**William** [1] - 1:15
**willing** [1] - 6:20
**willingly** [1] - 178:20
**window** [3] - 73:1,
166:12, 193:22
**withdraw** [1] - 115:10
**withdrawn** [2] - 115:7,
115:9
**withheld** [1] - 190:9
**witness** [75] - 4:21,
11:22, 12:3, 26:2,
26:6, 26:8, 33:25,
45:1, 45:8, 63:15,
63:18, 63:21, 64:1,
64:18, 64:20, 65:2,
65:3, 65:6, 65:8,
65:9, 65:14, 69:3,
69:10, 69:11, 69:12,
69:13, 76:6, 79:5,
125:24, 126:17,
126:18, 126:23,
126:24, 127:4,
127:16, 136:25,
137:7, 137:13,
139:7, 141:13,
150:19, 150:22,
150:25, 151:3,
177:6, 178:2,
178:11, 178:18,
179:3, 179:24,
182:15, 182:23,
183:6, 183:21,
184:4, 184:8,
184:14, 184:15,
185:6, 185:8,

185:12, 185:17,
187:1, 187:3, 187:4,
187:9, 193:2, 193:4,
193:14, 195:8,
196:22, 196:23,
196:24
**Witness** [3] - 12:6,
178:7, 187:11
**WITNESS** [46] - 13:1,
13:4, 13:17, 26:5,
26:14, 26:18, 44:10,
45:3, 45:20, 45:24,
46:10, 46:14, 47:7,
63:12, 63:17, 69:18,
69:24, 70:2, 70:13,
118:25, 123:25,
125:25, 137:3,
137:5, 137:17,
137:21, 138:6,
138:10, 144:3,
144:15, 149:3,
150:21, 151:8,
151:12, 151:22,
152:18, 152:20,
162:3, 172:19,
187:18, 187:22,
188:1, 190:4, 193:7,
193:9, 200:2
**witness's** [1] - 111:18
**witnessed** [1] - 81:4
**witnesses** [14] -
11:12, 65:11, 70:6,
126:6, 151:15,
179:16, 186:25,
194:11, 194:21,
194:23, 195:14,
195:20, 196:4,
196:13
**Wolfson** [1] - 198:17
**woman** [1] - 103:15
**wonderful** [1] - 2:12
**wooden** [1] - 142:16
**word** [2] - 108:17,
173:17
**words** [8] - 2:24, 4:18,
8:13, 9:19, 74:5,
74:6, 87:15, 171:20
**worker** [1] - 140:6
**worn** [4] - 46:4, 70:8,
137:25, 151:17
**worry** [1] - 174:4
**wrapped** [2] - 51:25,
52:3

# Y

**year** [3] - 27:12,
103:17, 175:8
**years** [17] - 24:9,
25:19, 27:8, 27:13,

27:15, 47:2, 101:18,
102:15, 114:12,
138:20, 138:21,
147:13, 147:16,
154:11, 155:19,
156:14, 175:14
**yelled** [1] - 9:7
**yelling** [5] - 35:17,
35:18, 35:19, 165:8,
165:11
**yellow** [1] - 68:14
**yesterday** [13] - 8:7,
11:5, 13:14, 13:23,
14:5, 17:25, 23:6,
23:9, 23:17, 23:23,
24:14, 25:20, 195:25
**you-all** [1] - 146:7
**younger** [1] - 154:18
**yourself** [4] - 31:24,
59:19, 112:13,
135:14

# Z

**Ziploc** [1] - 55:11
**zoomed** [1] - 55:6