```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
2                      NORTHERN DIVISION

3    UNITED STATES OF AMERICA,)  CRIMINAL CASE NO.
          Plaintiff,          )  RDB-20-139
4                             )
          vs.                 )
5                             )  JURY TRIAL DAY 11
     ANDRE RICARDO BRISCOE,    )  CLOSING ARGUMENTS
6         Defendant.          )  JURY INSTRUCTIONS
     ─────────────────────────)
7

8             BEFORE THE HONORABLE RICHARD D. BENNETT
                  UNITED STATES DISTRICT JUDGE
9                  TUESDAY, JUNE 7, 2022
                    BALTIMORE, MARYLAND
10
     For the Plaintiff:
11     Dana Brusca, AUSA

12     Paul Budlow, AUSA

13
     For the Defendant:
14     Teresa Whalen, Esq.

15     William Purpura, Esq.

16
     Also Present:  Javon Weaver, Special Agent ATF
17
       Jeffrey Kelly, Special Agent, FBI
18
       Andrew Murray, Paralegal
19
       Robert Cadle, Paralegal
20

21       (Computer-aided transcription of stenotype notes.)

22   ──────────────────────────────────────────────────────

                          Reported by:
23
                     Melissa L. Clark, RPR
24             Federal Official Court Reporter
               101 W. Lombard Street, 4th Floor
25                Baltimore, Maryland  21201
```

```
 1              P R O C E E D I N G S
 2         (9:41 a.m.)
 3              THE COURT:  We are ready, I believe, to proceed with
 4    closing arguments in the case.
 5         The Government ready?
 6              MS. BRUSCA:  Yes, Your Honor.
 7              THE COURT:  The Defense ready?
 8              MS. WHALEN:  Yes, Your Honor.
 9              THE COURT:  All right.  With that, good morning,
10    Mr. Briscoe.  Good morning to everyone.  You all may be
11    seated.
12         Obviously, masks will remain worn by everyone in the
13    gallery there, unless you have a speaking role of some sort,
14    if you'll keep masks on consistent with the standing orders of
15    this Court.
16         And with that, we'll bring in the jury, Mr. Gurevich.
17    They did get their menus for lunch; correct?
18              THE CLERK:  Yes, Your Honor.
19         All rise for the jury.
20         (Jury enters courtroom 9:45 a.m.)
21              THE COURT:  Good morning, everyone.  I trust you all
22    got your lunch menus.  Get some of your tax dollars back this
23    morning.
24         The process will be, we're going to have closing argument
25    by the Government, then we'll have closing argument by the
```

 1  Defense, and then because the Government bears the burden of

 2  proof at all time, we then will have rebuttal argument by the

 3  Government, and then I will charge you and give you

 4  instructions, and we will have breaks throughout the day on

 5  that.  I think we'll probably wind up having to do some of it

 6  after lunch as well, we'll just see.  So we're not in any rush

 7  here.  So with that, we are ready to proceed, and first we'll

 8  hear from the Government in its closing argument.

 9       Ms. Brusca, good morning.

10            **MS. BRUSCA:**  Good morning.  Thank you, Your Honor.

11       Ladies and gentlemen, the facts of this case are tragic.

12  For just 80 grams of dope, the Defendant, Andre Briscoe, he

13  walked on the beautiful day of May 27, 2015, he walked

14  .3 miles from Kiara Haynes' apartment to 103 Upmanor Road, the

15  home of Jennifer Jeffrey and her son, Tone.  He entered the

16  house.  He walked into the kitchen where Jennifer is at the

17  table, and he shot her three times, in the back of the wrist,

18  shoulder, the chest, and then finally to make sure she was

19  dead, in the back of her head.

20       He made the cowardly walk upstairs where Jennifer's son

21  was sitting in his mother's bed, home sick from school, eating

22  breakfast and watching cartoons.  He shot that little boy

23  through the neck, in the mouth, and then to make sure he was

24  dead, he took this gun and he put it and he pressed it into

25  that little boy's head, and he took his life.

 1          He thought he left no witnesses.  He was wrong.  In the

 2     Defendant's interactions in the days before, of, and after the

 3     murder with family, friends, even strangers like Martin

 4     DaShields, he left a trail of evidence, a trail of witnesses

 5     that led to only one inevitable conclusion; he did it.  He did

 6     do it.  And no matter how quickly he tried to flee from

 7     Baltimore to Cambridge the night of the murders, and no matter

 8     how hard he tried to hide his guilt from the police and from

 9     himself, it bubbled up again and again and again, and it

10     pointed to him and only him.

11          Now, ladies and gentlemen, you have heard a lot of

12     evidence in this case:  Witness testimony, phone records,

13     physical evidence, social media records, jail calls, recorded

14     statements.  There was a lot.  We have tried our best to

15     present it to you in order.  We haven't always been

16     successful.

17          So what I'm going to do today, over the next hour or so

18     is to take you back to the beginning and to put that evidence

19     in order.  We are going to start back in February of 2015 when

20     the Defendant met Kiara Haynes.  We're going to move forward

21     to the drug dealing among Tony, the Defendant, Jennifer, CJ,

22     and others, and then move almost hour by hour through the days

23     before and of the murders.

24          Once we've reviewed that evidence, ladies and gentlemen,

25     you will be sure beyond any doubt that the Defendant is guilty

1    of the crimes charged, and I want to take a moment and go

2    through those crimes.

3         The Defendant is charged with six separate offenses,

4    each called a count or a charge.  The first count, conspiracy

5    to distribute heroin, covers the sad, but all too familiar

6    reason for the crime, drugs.  It covers the agreement between

7    Defendant and others to deal heroin.  The rest of the counts

8    really deal with the day of the murder.  They break each

9    portion of the crime the Defendant committed when he entered

10   Jeffrey's home, stole her heroin so he could sell it and

11   killed her and Tone.

12        There will be many instructions given to you by Judge

13   Bennett, and you should follow those instructions when you go

14   back and deliberate.  But as tragic as the details of these

15   crimes are, they're also simple.  It's drug dealing, robbery,

16   and murder.

17        Now, a crime is basically made up of elements, a bad

18   action and a particular state of mind.  And if you find that

19   the Defendant committed that act, that he did so

20   intentionally, without mistake, then you should find he's

21   guilty of those crimes.

22        Count 1 has three elements, conspiracy to distribute

23   heroin.  The act in the case of conspiracy is an agreement.

24   That's all he had to do to commit that crime, agree knowingly

25   and voluntarily to join that conspiracy and to distribute 100

1  grams or more of heroin.

2      Counts 4 and 5 are the murder counts.  They're not

3  called murder because we're lawyers, so why use one word when

4  you can use 15, but what it says is, the Defendant used a gun

5  to kill someone.  In this case, two people, Jennifer and Tone,

6  and he did so in the course of committing another crime,

7  robbery or drug trafficking.

8      Drug trafficking in this case can be either the

9  conspiracy or possession of heroin on the day of the murders.

10  Robbery is just what it sounds like, the taking of property

11  from someone by force, against the victims' will.  That the

12  Defendant did so knowingly and that he used, possessed, and

13  carried a firearm, which resulted in the victims' death.

14      Count 3 is just a small part of the murder crime.  It

15  charges the Defendant with possessing a gun and ammunition

16  knowingly, unlawfully.  There are four elements, but three and

17  four, that the gun moved in interstate commerce, and that the

18  Defendant was previously convicted of a felony, a crime

19  punishable by more than 12 months before May 27, 2015, are not

20  in dispute.  The Defendant has agreed to those.

21      So all you have to decide is whether on or about May 27,

22  2015, the Defendant possessed the gun and ammunition that

23  killed Jennifer and Tone and whether he did so knowingly.

24      Likewise, Count 2, possession with the intent to

25  distribute heroin.  The elements are that the Defendant

1    possessed heroin, or tried to knowingly, on May 27, 2015, the

2    day of the robbery and murders.

3        And finally, Count 6 charges the Defendant killed a

4    witness, that he did so intentionally to prevent that witness

5    here, Tone, from talking to Federal agents.

6        As I said at the outset, ladies and gentlemen, these

7    crimes are not complicated.  And if you find that the

8    Defendant agreed to sell heroin with Jennifer his cousins, and

9    others, if you find that he shot Jennifer, in order to take

10   and sell the drugs she was holding and that he shot Tone in

11   order to prevent him from identifying his mother's killer,

12   then you should find he is guilty on all counts.  So with

13   that, let's turn to the evidence.

14       The Defendant met Kiara Haynes in February of 2015 at a

15   Valentine's Day party.  We know it because she said so.  We

16   know it because the Defendant said so, and we know it because

17   it's on their Facebook records.  Kiara Haynes posted on

18   February 15, 2015, "Having a fun night with family and

19   meeting, quote, a new cousin last night, Andre," the

20   Defendant.

21       Not long thereafter, the Defendant moved to Cambridge,

22   and Jennifer was about to get married.  So Kiara Haynes, who

23   wanted to see her cousin who had moved, took Jennifer down to

24   Cambridge to meet her family, and for something of a

25   bachelorette.  Pretty soon, there was a foursome, Jennifer and

1    Tony Harris, Kiara and the Defendant, and they hung out

2    together.  They hung out in Cambridge.  They hung out in

3    Baltimore.  They hung out at Jen's house.

4        You heard the testimony of CJ Williams, Jennifer's

5    roommate.  He said he would walk in and see the four of them,

6    and he thought it was, like, a double dating kind of thing,

7    that's what it was, and then something happened.  Tony was

8    having problems getting heroin.  He and Andre and their

9    cousins Wane Briscoe, Jr., Terrill Harris, Jr., also known as

10   Fatman, and George Briscoe were, at the time, in Cambridge all

11   dealing heroin, all out of their grandmother's house at 706

12   Hughlett Street.

13       You heard from Wane Briscoe.  He told you that customers

14   would drive up to the house.  They'd drive up.  They'd walk

15   up.  They'd be on their bicycles.  One of the cousins who

16   tipped them off would sell heroin to them.

17       Wane said when she ran out of drugs, they would re-up,

18   often they'd bring new drugs back to 706 Hughlett where they

19   broke them down, bagged them up.  And what did he do when he

20   was there doing that with all of his cousins, he talked to

21   them, to the family, they talked about everything, including

22   drugs.

23       At some point, Tony had trouble getting drugs, something

24   wasn't right.  CJ Williams told you that Jennifer asked him

25   for a favor.  Can you help me out?  Can you connect Tony with

1    somebody?

2        CJ Williams testified he didn't want to do it at first,

3    but Jen pestered him for a week.  Finally he relented.  All

4    right, he testified.  Let's cook up that liquid Percocet you

5    got, we'll fool those guys down in Cambridge.  Meanwhile,

6    Kevin Wilder testified that the Defendant told him, Tony got a

7    dope shop down in Cambridge.  I'm going to connect Tony and

8    CJ.  She was excited.  She was putting to the two people in

9    her life.

10        In April of 2015, Wane Briscoe testified that he saw a

11   stocky guy in a Muslim cap talking to the Defendant in

12   Cambridge.  The Defendant told Wane, this guy can get heroin.

13   Why don't you guys join up with us, let CJ be your supplier.

14   And Tonya Harris told you Jennifer was the Defendant's

15   supplier.

16        You heard the testimony, and the cell site confirms it.

17   Jennifer was traveling to Cambridge every few days.  The

18   Defendant was traveling to Baltimore every few days.  The

19   Defendant told Baltimore police, when Jennifer came up here,

20   she stayed with me sometimes.  And when I went there, I stayed

21   with her sometimes.  I also stayed at Kiara or my girl's

22   house.  Once a week he said he saw her.

23        He later told Special Agent Javon Weaver in 2020 that he

24   and Tony, we were getting work, heroin, from Jennifer.  The

25   Defendant said he got about ten grams a week, that Tony

1     handled the money.

2          Tony handled the drugs and he would break off a piece for

3     the Defendant or sell him some outright.  The Defendant had no

4     problem talking about a relative who he had committed a crime

5     with.

6          Then things changed.  May 12th, 2015, CJ Williams is

7     arrested, and who is left holding the bag?  Literally, it's

8     Jennifer.  She's the only one running around trying to get

9     bail money for CJ, trying to get his car title, trying to make

10    sure he's going to get out of jail.  And CJ says to her, on a

11    jail call that's recorded that I'm going to play for you in a

12    minute, on May 23rd, four days before the murders, go to the

13    studio and get the 80, leave the 10.

14         CJ told you what that meant.  It was the 90 grams of

15    liquid Percocet that he had cooked up.  He told Jen to get the

16    80 and he told her who they were for.  Tell Fatboy and them.

17    He told you, Fatboy was Tony Harris.  Tell Fatboy and them the

18    tickets, the price has gone up, from $85 a gram to 90.

19    Jennifer asked, how can you do that?  You can't just raise the

20    price.  He says, it's some different stuff, but he told you on

21    the stand that was a lie.  He needed money for bail.  The

22    price went up.

23         (Recording played but not reported.)

24         **MS. BRUSCA:**  You will have this exhibit back in the

25    deliberation room.  You can keep listening if you want.  That

1    phone call is clear.  CJ told you about it and it's coded, but

2    you know what it means.  Get the 80, get it to Fatboy and

3    them, the price is 90.  That's what it is.

4         Two days later, the Defendant comes to Baltimore.  It's

5    Monday, Memorial Day, May 26, two days before the murders.  He

6    comes and he stays with Kiara.  How do you know?  Well, she

7    put it on Facebook.  The Defendant messaged her, call my phone

8    ASAP or call my grandma's phone.  He messages her again, call

9    back.  Kiara says, "I called both phones.  You call me."

10   Finally at 12:35 p.m. Eastern Standard Time, the Defendant

11   says, "I'm on my way."  And the cell phone, the cell site

12   confirms he did get to Baltimore that day, at 6:45 p.m. on the

13   bottom left there, May 25, 2015, at 6:45 on Monday, May 25th,

14   the Defendant is in Baltimore with his phone.

15        Now, it's May 26th.  I can see from a cell site he stays

16   overnight from 6:43 on the 25th until 10:39 the next morning,

17   Tuesday, May 26th.  He spends the day in Baltimore with Kiara

18   at Tiffany Jackson's house in the Perkins Projects, and he

19   talked to Jennifer, he talked to CJ, and he talked to Wane.

20        Once again, how do we know?  We know first because the

21   cell site puts him there.  You can see he travels from West

22   Baltimore to East Baltimore at about noon.  He does something

23   downtown around 2:30, and then for the rest of the day, from

24   3:39 until 9:37, the Defendant is in the area of Tiffany

25   Jackson's.  And look who he's talking to.  The blue is his

1    cousin, Wane Briscoe, and the red and brown is Jennifer.

2        We also know because Jennifer told CJ, again, on a

3    recorded jail call.  CJ called Jennifer's flip phone, that

4    (410) 908-8308 number.  Jennifer tells CJ, "Poo's in Perkins

5    Projects."  CJ is confused, "Why is he down there?  Who is he

6    visiting?"  He tells her to call his brother, and the three of

7    them, CJ, CJ's brother, and Jennifer discuss all of the

8    details that confirm for you that the Defendant is at Tiffany

9    Jackson's house.  She's in that house in court, Herring Court,

10   that's her address, by the dumpster, with the poles and the

11   handicap ramp -- the handicap ramp.

12       Tiffany Jackson told you her house, kind of, looked like

13   it was on the end.  It was right near the dumpsters and had a

14   handicap ramp.

15        About a half hour later, CJ calls Jen again, and this

16   time they call the Defendant.  They want to know why he's down

17   there.  It's recorded.  First CJ calls Jennifer.  That top

18   record is the call log on 5/26 at 6:41 p.m. from CJ in jail to

19   Jennifer's flip phone (401) 908-8303.  That's Exhibit 233.

20       Then Jennifer calls the Defendant.  These are his phone

21   records at the bottom.  They show that at 6:41:52 seconds, the

22   Defendant had an incoming call from that same flip phone

23   (410) 908-8303.  We know where the Defendant was at the time

24   of this call; ladies and gentlemen, his cell site shows it.

25   We know it because he says it on the phone.  I'm going to play

1       a portion of that call for you now.

2               (Recording played but not reported.)

3               **MS. BRUSCA:**  Ladies and gentlemen, a lot is

4       happening on this call, right?  CJ says, "I need guys to do

5       what they do because I'm trying to get up out of here."  He's

6       trying to raise money for bail.  "I need guys to do what they

7       do."  That's not hard to understand.  He wants the Defendant

8       to sell drugs and do what you do, get some money.  Not just

9       any drugs, the 80 grams, the 80 grams he told Jennifer to get

10      for Tony and the Defendant.

11          What does the Defendant say back?  He says, "We're going

12      to take care of it.  We got leverage down there."  You've

13      heard from all kinds of witnesses, Wane, Terrill Harris, the

14      cost of heroin in Cambridge is twice what it is in Baltimore.

15      "We got leverage down there," that price increase, 85 to 90,

16      it ain't too much.  We'll take care of it.

17          Now, as soon as he hangs up the phone -- as soon as he

18      hangs up the phone that call with CJ and Jennifer at 6:41 is

19      about four minutes long.  At 6:46, the Defendant calls his

20      cousin, Wane Briscoe.  Why?  He's already told you, the

21      Defendant needed a ride.  He was going to take care of it.  He

22      was going to take care of it by taking the drugs, and he

23      wanted to be sure he had a ride back to Cambridge afterwards.

24      He hangs up with Jennifer and he calls Wane.

25          Later that night Kiara called her nephews, Tariek and

 1      Tarrell Powell.  This is the night before the murders.  Kiara

 2      called her nephews and she asked to run a gun, a bitch for her

 3      fam, her blood.  She told you who that was.  She said it was

 4      the Defendant.  She explained the business.  She said a

 5      female, Jennifer's people, got locked up, that's CJ, and she's

 6      sitting on 100 of them, and she wants people to move it.

 7           Ladies and gentlemen, that is exactly what the Defendant

 8      told Special Agent Weaver in 2020.  Jennifer wanted us to move

 9      some drugs.  This is the night before the murder.  The

10      Defendant knows this, Kiara knows it, and they're getting a

11      gun so that they can just take it.

12           And at the end Kiara says, we need the gun right now,

13      tonight, and she explained she's about to get in the car.

14           (Recording played but not recorded.)

15           **MS. BRUSCA:**  Ladies and gentlemen, Kiara joined the

16      call with Tariek and Tarrell Powell at 9:31.  About four

17      minutes later, the call ends, and about three minutes after

18      that, the Defendant's cell site starts moving.  Why?  Because

19      he's about to get in that movement, in that car with Martin

20      DaShields and with Kiara.

21           The Defendant's last call in the area of Tiffany

22      Jackson's is at 9:37, Tuesday, May 26, 2015, the night before

23      the murders.  And by 9:44, it's moved west, all the way over

24      to the area of Edmonson and Warwick where both Martin

25      DaShields and Kiara Haynes told you they stopped to get a gun,

1   to meet Tarrell Powell and to get a gun.  And that tower, the
2   1011 and 1012 tower, and the 1043 tower, in all of May, the
3   Defendant's phone never hits off of those towers.  He had no
4   reason to be in that area, except to get a gun.
5       So his cell site moved.  How else do we know?  The
6   Defendant told you, this is exactly what he did on the night
7   of May 26, 2015 he told the Baltimore Police Department, "I
8   was with Ki, Kiara at Tiffany's house in Perkins until late at
9   night.  Kiara didn't want to go home alone, so I dropped her
10  off at her house."  How do you drop someone off?  Ladies and
11  gentlemen, you go in a car together.  And then the Defendant
12  said, he went to Jennifer's around midnight and spent the
13  night.
14      We also know because of who's using the phone.  Look at
15  who is using the phone between 8:41 and 9:38 p.m.  It's the
16  Defendant texting Jennifer Jeffrey, that call, we just said,
17  that very last call, 9:37 in the area of Tiffany Jackson's
18  that the Defendant made.  At 9:38, the next minute, he sends
19  Jennifer a text.  We don't have to guess what it says, we
20  know.  We know, because at 9:45 Jennifer is on the phone once
21  again with CJ.  She says, "No.  Why do you want to stop past
22  and holler at me?  What for?  I don't feel like this shit, yo.
23  CJ asks her, "Who are you talking to?  She says, "Yo, Poo.  He
24  wants to come up here, and I'm like, I'm sick."  He said,
25  "Okay.  I'm still going to stop past and check on you."

1    And the Defendant did stop past.  He said it.  We know

2    it.  It's not disputed.  He went to Jennifer's house that

3    night.  He told you, Kiara told you.  Her niece, Brianna

4    Street saw him there, told you.  His cell site puts him there,

5    he went.

6        Now, what happened when the Defendant was at Jennifer

7    Jeffrey's house.  Well, Brianna Street told you that before he

8    came over, Jennifer told Brianna to put this up.  Jennifer

9    tossed her a bag.  It was black, a plastic corner store bag.

10   Brianna didn't open it.  She knew what was in it.  She said,

11   "I know it wasn't no good," and she puts the bag in the top

12   drawer of her pink dresser.

13       Later, Brianna heard the Defendant downstairs.  Jennifer

14   came up and asked for the bag.  She took it downstairs.  She

15   came back a few minutes later and threw it back at Brianna who

16   let it drop to the floor.  Brianna said the next morning when

17   she got up, she picked up the bag, put it back in the drawer

18   and shut it.

19        Now, why is that relevant?  Ladies and gentlemen, the

20   Defendant saw the drugs.  He could hear Jennifer and Brianna

21   talking when she went to get the drugs and when she went to

22   give them back, he knew where they were.  You saw the photos

23   from 103 Upmanor Road.  It wasn't ransacked.  It didn't have

24   to be.  The Defendant knew what room the drugs were in, in

25   that room, Brianna's room, it was disturbed.  She said, I made

1    my bed.  I didn't leave that bowl there.  I closed my drawers.

2    There was no bag, no drugs that next day.

3        So after this exchange, Kiara comes banging on the door.

4    It's 5:00 a.m.  Jennifer sends Brianna downstairs.  You deal

5    with it.  I don't want her to see me.  Brianna yells through

6    the door.  She's saying, "I have to work tomorrow.  Come on,

7    Kiara, go home.  This is crazy.  There are kids in the house."

8    Jennifer pulled out her little gun and she said if Kiara came

9    back, she would shoot her.

10       Later that morning, the Defendant walked back to Kiara's.

11   His first phone call was longer than 30 seconds, to Kiara at

12   was 7:23.  It lasts about six or seven minutes.  And Kiara

13   told you he made the call while he was walking back to the

14   apartment.

15       Now it's the morning of the murders.  The Defendant is

16   back at Kiara's house.  We know because we saw the cell site,

17   he's there.  His phone stays in that area from 7:23 a.m. until

18   1:06 p.m.  We also know that the Defendant left Kiara's house,

19   we heard it.  We heard it when Kiara was on jail calls and she

20   said, "Poo, get me some cigarettes."  He left the house to get

21   some cigarettes.  We also know the Defendant left the house

22   because Kiara tried to call him three times, 10:28, 10:29,

23   10:30.  The Defendant's phone is on.  There is cell sites.

24   They're in rapid succession.  They short.  They don't look

25   like they're even answered.  She wouldn't call the Defendant

1    if she was with him.

2         So now we get to 11:41 a.m.  The Defendant's phone is

3    still in the area of Kiara's apartment.  He leaves a second

4    time.  He goes back to Jennifer's house, and he kills her and

5    Tone.  That 11:41 a.m. call was the last call that Jennifer

6    ever made.  The Defendant's phone had no activity from 11:43

7    a.m. to 12:58 p.m.  The Defendant turned his phone off or it

8    wasn't connected to the network.  We know because Kiara tried

9    to call him at 11:57 a.m.  There is no cell site for the call,

10   it didn't connect.

11        Now, the Defendant argued in their opening, the

12   Government assumes that a phone call at 11:41 from Jennifer

13   Jeffrey's phone to Mr. Briscoe, they assume it's the last

14   call, and they assume that that was Mr. Briscoe and Ms.

15   Jeffrey's phone, but there is no proof of that.

16        Ladies and gentlemen, that's plain wrong.  We showed you

17   Jennifer Jeffrey's cell phone records.  Not a single one of

18   the calls after 11:41 a.m. had cell site.  Not a single one

19   connects to the network.  We showed you the records for her

20   flip phone.  The last outgoing call was 11:40 a.m., a minute

21   before this one.  Who is it to?  Tony Harris.  We checked the

22   phone, every other call was a missed call.  11:41 a.m. was the

23   last call.

24        Now, we also know that it was the Defendant and Jennifer

25   who talked.  It's frankly ridiculous to think it was anybody

 1    else.  The very first person who the Defendant calls on his

 2    phone at 12:58 p.m. is Wane Briscoe, his cousin.

 3         Now, you have Wane Briscoe's phone records.  It's

 4    Exhibit 10.3.  There are zero calls between Kiara Haynes and

 5    Wane Briscoe before June 2015 before the time of the murders.

 6    It's the Defendant who is calling Wane Briscoe.  It's the

 7    Defendant with his phone, just like it has been every other

 8    time in the past 36 hours when you've seen his phone.  You've

 9    seen his cell site, and you've heard and seen the evidence

10    that he was with his phone.

11         We also know that this is the time when Jennifer and Tone

12    were killed.  You heard the testimony of Dr. Dean.  She said

13    that the victims were killed between 12 and 36 hours before

14    their bodies were examined at 1:00 p.m. on May 28th, 2015 --

15    that's the pink area, from 1:00 a.m. on May 27th, 2015, to

16    1:00 a.m., on May 28, 2015, but we know Jennifer's last

17    Facebook activity ever was at 11:38 a.m. that morning.  Her

18    last phone call for both of her phones is 11:41 a.m.

19         At 1:29 CJ Williams called Jennifer.  He's been on the

20    phone with her nonstop for weeks, she doesn't answer.  At

21    2 o'clock p.m., Linda Pittman knocks on the door just to see

22    if her neighbors are okay, nobody answers.

23         Now, you heard defense counsel, he can bang much louder

24    than I can, but they didn't hear this (makes sound), ladies

25    and gentlemen, six shots from a .45 are going to make the

1    sound they make, no matter when they're fired.

2        You've heard the evidence from Detective Lewis.  There

3    was not a single call to 911 anytime on May 27th, 2015, in the

4    area of 103 Upmanor Road.  It means absolutely nothing that

5    nobody called 911, because nobody ever did.  Look at the

6    evidence that we've showed you.  This is the evidence that

7    shows you when she died.

8        After 1:06 p.m., the Defendant goes to Tiffany's house,

9    he goes with Kiara, he goes with his phone and calls Wane, his

10   cousin, incessantly.  Now, what happens when he gets to

11   Tiffany Jackson's house, she told you the Defendant busted the

12   door open.  It was so loud it startled her.  He was hot.  He

13   was sweaty.  He had a hole in his knee.  He was pacing back

14   and forth between her bedroom and the bathroom.  He was

15   mumbling, talking on the phone.  He changed his clothes and he

16   put them in a bag, and that day, out of nowhere, the Defendant

17   told Tiffany Jackson, "That's it.  I'm not coming back."

18       The Defendant also refused to answer Tiffany's questions,

19   she asked the Defendant what was wrong.  He said, "It's none

20   of your fucking business.  Everything ain't for you to know,"

21   and she didn't know as he told her over and over and over

22   again.

23       Ladies and gentlemen, this is important.  Make no

24   mistake, the Defendant was telling Tiffany Jackson what to

25   say.  You say you don't know anything, and she might not

1    know -- she might not have known the details of what happened,

2    but she did know.  If law enforcement, if Baltimore Police had

3    known that within hours of the murders the Defendant ran to

4    Tiffany Jackson's house sweaty, mumbling, changing his

5    clothes, that would be bad for him, and so he checks in on

6    her.  Even when she changes her phone number, he sends

7    somebody to her house.  "Hey, just checking in.  How's the

8    family.  Any police officers around these days?  You don't

9    know anything."

10        Now, what happens after Tiffany's house, the Defendant's

11   relatives come to get him finally.  After 52 attempted calls

12   between Wane and the Defendant, he comes to pick him up.  He

13   comes with his Uncle Rel, Terrill Harris, Sr., and his aunt

14   Louise Martin, Boug.

15        Terrill Harris, Sr., and Wane Briscoe told you, the

16   Defendant had dope.  He gave some to Terrill Harris, Uncle

17   Rel, and Boug to try.  The Defendant told Terrill, "When we

18   get back to Cambridge, we're going to make some money.  And

19   when the Defendant got back to Cambridge, he did make some

20   money.  Terrill told you he was over at Hughlett Street,

21   grandma's house, selling dime bags for $20 for two times with

22   leverage.

23        Now, let's pause for a minute, ladies and gentlemen.

24   That was the evidence in Baltimore.  We're going to move now

25   to the people who lived in Cambridge and the events that

1    happened there.

2        The people in Cambridge are mostly the Defendant's

3    family.  These people are mostly familiar to you now.  You've

4    heard from no fewer than five of the Defendant's family

5    members; his uncle, Alfred Harris, III, Uncle BooBoo, his

6    uncle Terrill Harris, Sr., his cousin Tonya Harris, his cousin

7    Wane Briscoe, Jr., and his cousin, Kiara Haynes.

8        Each of these witnesses told you that the Defendant

9    admitted out of his own mouth to them that he killed the

10   victims from this case.  And Kiara and Wane told you the ways

11   in which they had helped him.  This evidence is terrible for

12   the Defendant, five family members said he did it.  And so the

13   Defense tells you and asks you, just throw it away, don't

14   believe it.  Well, what are the reasons that the Defense has

15   offered to not believe these witnesses.

16       Well, first, they use drugs.  Their own witness said it.

17   Methadone doesn't make you a liar.  Heroin is not an

18   anti-truth serum.  It's an addiction.  It's an illness.  It

19   doesn't make you lie.  Well, what's another reason?  These

20   witnesses have their freedom, they got out so they didn't have

21   to go to jail.  They made it up so they could get away with

22   it.

23       Ladies and gentlemen, Kiara is in jail.  She has pled

24   guilty.  She's not free.  And there is not a single shred of

25   evidence that Tonya Harris, Terrill Harris, Al Harris knew a

1   single thing about these murders before they were committed or

2   that they helped in any way.  They didn't commit a crime.

3   They didn't have to trade for their freedom because they

4   didn't do anything wrong.

5       Now, what about Wane, he did pick the Defendant up

6   knowing the crime had been committed, and he told you so.  But

7   we also know that Wane wasn't in Baltimore the day of the

8   murders, he was somewhere else.  He did not do these murders.

9   He's not lying to protect the Defendant or himself.  He's

10  telling the truth.

11      What about Al?  Well, he got money, says the Defense.  He

12  got money to testify.  He got money to put the Defendant in

13  jail.  That's just simply not true.  Al Harris came forward,

14  he told Baltimore Police what he knew.  Yes, he asked for help

15  with a probation violation for a restitution, failure to pay

16  back a victim, and he didn't get any help.  He went to jail.

17  The next time somebody approached him, in 2017, it was Special

18  Agent Weaver.  He approached him in jail.  Al Harris told you

19  Special Agent Weaver didn't promise him anything.  He didn't

20  give him anything.  He didn't offer him anything.  He just

21  said, "Can you help me?"  And Al Harris said yes, and he told

22  him the exact same things that he had told Detective Lewis in

23  2016.

24      Now, at the end of that conversation, after Al Harris had

25  provided information, Special Agent Weaver asked him, "Will

1    you help more?  Will you wear a wire and record your own

2    nephew talking about two heinous murders?"  And he agreed.

3    And he did it.  And yes, he got paid.  And he got paid to

4    collect evidence that is crucial to this case.  He recorded

5    Wane Briscoe telling you all of the things that Wane Briscoe

6    told you in court before he knew anything about this

7    investigation; that he picked up the Defendant after the

8    Defendant told him that he was going to rob Jennifer; that he

9    killed Jennifer; that he killed the little boy because he

10   could identify him.

11       He recorded conversations with the Defendant, and in

12   those conversations, the Defendant admitted lots of things.

13   He admitted he was having nightmares:  Nightmares that Al

14   Harris told you about, nightmares that Wane Briscoe told you

15   about, nightmares that Tonya Harris told you about.

16       He admitted that he knew the little boy, and that when he

17   would come over, the little boy would play upstairs.  He

18   admitted that when he got out of jail after the search at

19   Tonya's house, Fatman gave him money.  This is exactly what

20   all of the other witnesses said.  Al Harris got that evidence.

21   It was also because of those meetings that the Defendant sent

22   that letter to Wane Briscoe, a letter in which he says, "Be

23   careful.  Uncle BooBoo is asking those questions about the

24   past.  Don't feed into it."  We got that letter.  We got

25   Wane's testimony.  That's from Al.  He got money for that.

1          These are not reasons for the Defendant's family members

2     to lie.  The Defendant's family members love him, and he loves

3     them.  Terrill Harris told you how when he was sick so he

4     wouldn't get sick, the Defendant just gave him heroin.

5          Al Harris testified he loved his nephew.  Wane Briscoe

6     grew up with the Defendant.  He knew his birthday.  Tonya

7     Harris said, "I love him like a brother.  He's my child's

8     godfather."  These people are not lying.  They're telling the

9     truth, and the reason why is simple.  They're doing it for

10    this little boy.  Because even in a dog-eat-dog world, there

11    is a code.  You don't kill an innocent child.  Not for

12    90 grams of heroin.  Not for the sins of the mother.  You

13    don't do it.  And these witnesses told you that's why they

14    came forward.

15         You heard from Wane Briscoe.  He's on a recorded

16    interview at Dorchester County Hospital, so stressed from

17    coming forward in this case, he checked himself in.  He tells

18    the officer, "It crushed me when I found out what happened to

19    that little boy."  The officer tries to interrupt him, and he

20    says, "No.  I told the Defendant, I told him.  You can't kill

21    no kid for some financial gain.  That's wrong."  Wane Briscoe,

22    he was consistent.

23         He was also consistently inconsistent.  He told you in

24    court and in Grand Jury, he couldn't remember the exact times

25    of the call.  What he remembered was a pattern of calls, the

1   Defendant calling him and calling him and calling him, and

2   what he remembered was that at the beginning of those calls,

3   the Defendant told him, "I'm going to rob Jennifer of

4   250 grams."  Wane said, "How are you going to do that?  She

5   knows you."  The Defendant said, "Shut up.  Don't worry about

6   it.  I got this."  Wane Briscoe also remembered that the

7   Defendant later called him and said, "It's done.  Come get

8   me," that Wane initially said no and then agreed in exchange

9   for some heroin.

10          The third thing that Wane Briscoe remembered was that the

11  Defendant told him how he killed Jennifer and how he killed

12  Tone.  The Defendant said he shot them in the head.  He said

13  he shot the little boy because he could identify him and he

14  could say the Defendant was the last one there.  On these

15  things, Wane Briscoe never wavered.  We're going to play a

16  portion of those now.

17          (Recording played but not reported.)

18          **MS. BRUSCA:**  Ladies and gentlemen, just for a moment

19  let's focus on what Wane said.  He said that the Defendant

20  told him that Jennifer's plug was going to hit him off.  He

21  says, "Just do that.  Just move the 80 grams like she asked

22  you."  He says, "No, I'm going to take it."

23          (Recording played but not reported.)

24          **MS. BRUSCA:**  Now, what about Alfred Harris, Uncle

25  BooBoo?  Same thing.  Very consistent.  He said he stopped by

1    to see the Defendant every day.  The Defendant, his nephew,

2    his family, every day on the way home from work.  And he

3    testified that he saw the Defendant on Monday, June 1st, the

4    Monday after the murders at Kizzy's house, and he had a bag

5    full of dope.

6        And he said he saw the Defendant Friday, June 5th, at

7    Tonya's house, 502 Greenwood Avenue, the morning of the

8    search, again, with a bag full of dope, this time bagged up.

9    And he told you that after he spoke to police on June 5th,

10   2015, he went back to Tonya's house to get his car, and he saw

11   Fatman holding the same bag of drugs outside of Tonya's

12   apartment.  That's what Alfred Harris told you.

13       What about Terrill Harris, Sr., he testified that the

14   Defendant probably went to Kizzy's after coming back from

15   Baltimore on May 28th, 2015.  He testified that in the days

16   after the murders, every time he saw the Defendant, the

17   Defendant had 3- to $400 worth of dope.  He also told you that

18   on the morning of that search where Al Harris was with the

19   Defendant that morning, he hid the Defendant's drugs under the

20   dresser, and then he told Fatman about them.

21       What about Tonya?  She said Fatman came over after the

22   search, went into her dad's room, Terrill Harris, Sr.'s room,

23   came out and said, "See, they didn't get it."  Now, she didn't

24   see the drugs, she knew what they meant.

25       And what about the Defendant himself?  He told Al during

1    a recorded conversation when he got out of jail he was asked,

2    "Did they pay you back?"  He says "Who?  Fatman?"  Al says,

3    "Yeah."  The Defendant says, "They didn't give me all of it,

4    you feel what I'm saying.  They gave me -- when I came home,

5    they bought me a phone, some clothes and they gave me a

6    couple -- they gave me, like, $200 and then they just kept

7    on -- they kept on spoon feeding me, you know what I'm saying?

8    So I'm like, look, man, just give me $700, and we're gonna,

9    we're gonna, like every couple of days."  I was like, "Yo,

10   what's up man?  I need some money, da, da, da.  It was like,

11   look, man, just give me $700, and I mean, I'm going to go

12   ahead and make that work from there, and I did."  Four

13   witnesses, including the Defendant, say that this happened.

14       What else did Uncle Harris say -- Uncle Al Harris say?

15   He said, without almost any inconsistency, that the Defendant

16   killed Jennifer because she had heroin.  That he killed Tone

17   because the boy could ID him, and that the Defendant got the

18   gun from a guy Kiara knew.  He said, "He told me he killed

19   them."  He said, "I was siting there because I came home from

20   work a day early, and I was sitting in the kitchen at Kizzy's

21   house," and he said, "I killed the bitch."

22       (Recording played but not reported.)

23           MS. BRUSCA:  I'm going to skip those for time sake,

24   but you have them if you need them in the back.

25       Now, let's think about this for a second.  Alfred Harris

1    testified that the Defendant told him he got the gun from a

2    guy Kiara knew, that the Defendant said, "She's not as

3    innocent as you think."  Al Harris also testified he had met

4    Kiara Haynes maybe twice.  He could identify one of her

5    pictures, but not the other.  How is Al Harris going to make

6    up that the Defendant got a gun from Kiara Haynes, a woman

7    he's met twice, he's not.  He heard it from the Defendant.

8    And it's true, that is what happened, we know because -- you

9    know because there's a call with Tariek and Terrell Powell the

10   night before the murders when Kiara says, "I need the bitch.

11   I need it for my fam.  It's blood."

12       Let's talk for a second about Kiara Haynes.  You don't

13   have to rely on anything Kiara Haynes said to convict this

14   Defendant of all of his crimes, but you should consider her

15   testimony, and here's why.  Kiara Haynes lied, yes, she did.

16   Yes, she did.  And then she came in and she told the truth.

17   She told the Government about that call.  It's her recorded

18   getting a gun to commit robbery.  That's not coded.  That call

19   is clear as day.  And we had to find that call.  She didn't

20   have the recording.  She just told us about it.  And so what

21   did Special Agent Weaver do, he looked and he listened, and he

22   listened and he looked, and he found the call.  And when you

23   listen to it, it said exactly what Kiara Haynes had told us.

24       She also told about Martin DaShields, a stranger to the

25   Defendant, who, just like Kiara, corroborated that on May

1   26th, 2015, he took Kiara and a male to go get a gun at the

2   intersection of Edmondson and Warwick.  It wasn't just any

3   guy, it was the Defendant.  His cell site said so.  He said so

4   when he told Detective Brian Lewis that he was going to drop

5   Kiara off after leaving Tiffany Jackson's house, and Al said

6   it.  Al didn't know about this call.

7        The Defendant's confessions also corroborate Kiara.  He's

8   the one telling people he killed the little boy because the

9   little boy could identify him.

10       Let's talk for a minute about what the Defendant did, how

11  you know he's guilty.  On May 27, 2015, the day of the

12  murders, his phone goes dead from 11:43 a.m. to 12:58 p.m.,

13  exactly when Jennifer and Tone are killed.  He has no Facebook

14  activity at all for 33 hours from May 26th to May 27th.  He's

15  incessantly calling Wane, why?  For a ride to leave Baltimore.

16  He busts into Tiffany's house, sweating, panicking, angry.  He

17  changes clothes and puts them in a bag.  He won't talk to her.

18       After he leaves Cambridge, he told Kiara, "Come down

19  here.  He told her on a jail call, get rid of her phone ASAP.

20  He told Detective Brian Lewis that he had been texting with

21  Jennifer on the morning of May 27th, but he rebooted his

22  phone.  He didn't have any messages to give.  He didn't call

23  police, and he didn't reach out to Jen's family.

24       And during those meetings with Baltimore Police, and

25  later with Special Agent Javon Weaver, the Defendant lies, and

1    we're not talking close calls, we're taking lies, because he

2    never spoke to Jennifer after leaving her house on the morning

3    of May 27th, 2015.  We know it's a lie.  She called him at

4    11:41 a.m., and they spoke for two minutes.

5        He tells Detective Lewis, "I arrived at Tiffany's house

6    on May 21st before noon."  Again, simply not true.  He was in

7    the area of Kiara Haynes' house until at least 1:06 p.m.  He

8    also told Detective Lewis that he and Tony had stopped getting

9    drugs from Jen and CJ well before the murders, but you heard

10   the call, ladies and gentlemen.  You heard two calls.  One

11   where CJ tells Jennifer, "Get the 80, give it to Fatboy and

12   them, Tony and them."  And one later, the night before the

13   murder when the Defendant is on the call with CJ and Jennifer,

14   says, "We'll take care of it, we got leverage, it ain't too

15   much."

16       The Defendant also told ATF in 2020, "I didn't spend the

17   night at Jennifer's."  Now, the Defense wants you to believe,

18   oh, it's five years.  It's his memory.  It's not his memory,

19   ladies and gentlemen.  Watch the statement.  He said, "When I

20   left Jen, it was still nighttime."

21       A little bit later in the interview, Special Agent Weaver

22   says, "So you spent the night at Kiara's?"  He said, "No, no.

23   I told you.  I didn't spend the night there.  "Why is he

24   lying?  He's distancing himself from CJ, and he's distancing

25   himself from Jen.  He denied even knowing Jen's supplier.

 1              And then on top of it all, he downplayed Kiara's anger

 2      that night.  She walked over at 5:00 a.m. in the morning and

 3      she's banging on the door.  Defense tells you -- played you

 4      countless calls to show you how angry Kiara was.  What does

 5      the Defendant say when he's asked about the fight.  He says,

 6      "Oh, to say they was beefing.  No, I ain't going to say it's

 7      beefing.  Yeah, I mean with respect to Kiara, she fussed, we

 8      fucked, and it was over with, you know."

 9              "What about Kiara being mad at Jen?"  "Oh, I ain't going

10      to say she was mad at Jen?  She just thought I was on some.

11      I'm like, No, you know how women are on their insecurities.

12      That's all it was."

13              Why is he protecting Kiara?  Because he and she committed

14      this crime together.  She is a risk for him.  If she talks,

15      she will talk about him, just as she did.

16              The Defendant also hid information from police.  He

17      denied knowing Junior's real name.  Ladies and gentlemen, this

18      is his cousin.  This is a letter that the Defendant sent to

19      Junior, and guess what, he knows his name.

20              He denied knowing Tiffany's address.  It's on his phone

21      bill for his new phone that he got five days earlier, but he

22      didn't know it then.  He didn't identify the homeboys who were

23      with him at Tiffany's house.  He says, "Just check with

24      Tiffany and her family."  Why?  She don't know nothing.  And

25      he didn't provide an address in Cambridge.  He said he never

1    stayed at my cousin's unnamed.  I never -- I stayed with my

2    baby girl, unnamed.  I stayed with my grandma.

3         During that interview in 2015, the Defendant offered only

4    one name the police didn't already know, Tarrell.  Kevin

5    Wilder, CJ Williams both told you Jennifer didn't know a

6    Tarrell.  There is only one Tarrell in this case, Tarrell

7    Powell, the one who gave the Defendant and Kiara Haynes, the

8    gun.

9         Now, the Defendant's guilt follows him for years.  After

10   Al Harris comes to see him in jail on the second visit, it

11   didn't take more than two visits.  The Defendant sends a

12   letter to his cousin Wane Briscoe.  He says, now about Uncle

13   BooBoo -- this is August 5th, 2019 -- Cuz, he keep asking

14   crazy questions about the past dealing with that girl, because

15   if he call you or he come through to holler at you and get to

16   asking questions about that situation, don't feed into his

17   questions.  Tell him to talk about something else.  He came to

18   see me twice, and both times he brought that situation up.

19   I'm putting you on point so you can limit your conversations

20   with Unc and the past.

21        There is no reason to limit the conversation unless there

22   is something to limit, ladies and gentlemen, and there was.

23   Wane Briscoe told you it was this situation where the

24   Defendant killed Jennifer and her son.

25        And, finally, there is the search for that letter at Wane

 1    Briscoe's house.  The search happens January 3rd, 2020.  The

 2    Defendant finds out the same day in a call from his grandma.

 3    Don't talk to anyone.  They don't want to talk on the phone,

 4    says grandma.  And he gets out of jail on January 29th, 2020,

 5    and he opens a Facebook account, and the very first thing the

 6    Defendant does is start to look for Kiara Haynes.  He searches

 7    for her every which way, sends her a friend request.  She

 8    doesn't accept it or his messages.

 9        He messages Chipo Blackwell, "Brother that girl Kiara

10    Haynes is my cousin, she missing.  Her Facebook is

11    deactivated.  You are the only friend on Facebook.  If you

12    have any information on her or can reach her, tell her I'm

13    home.  She know me as Poo and my real name.  If you can help,

14    please help, please."  A couple days later, he posts a photo

15    of Kiara Haynes with a message, "Kiara Haynes, my cousin."

16        And then there is the guilt that eats the Defendant up

17    when he was drinking, crying, and sleeping, he's having

18    nightmares.

19        Terrill Harris, Sr. told you he was on the balcony with

20    the Defendant -- I skipped ahead.  First Tonya Harris, she

21    said we were sitting down at the table, and he was basically

22    telling me, he was telling me how crazy Jonice was.  And he

23    was like, "This bitch be eating my nuts," and then he was

24    like, "I keep waking up in sweats, and I had a dream.  In the

25    dream, I woke up because Jen was clutching my nuts."  And I

1   was like, "Why are you dreaming about Jen?"  I was like,

2   "What?  You killed her or something?"  And then he was like,

3   "Yeah."  And I was like, "No, you didn't.  You got to be --

4   you would have to be a fucking monster to do that."  And he

5   was like, "I did it."  And I was like, "Cuz, you would have to

6   be a monster to do that."

7          The Defendant's Uncle Terrill Harris, same thing.  Not a

8   dream this time.  He wasn't feeling too good about himself,

9   the Defendant.  He was talking to me and he was like about to

10  cry.  He said, "I done F'd up, you know.  I did something and

11  I'm going to have to pay for this one."  He said, "God, you

12  know, he's going to make me pay for this one."  He definitely

13  has to pay for it.

14         Ladies and gentlemen, there is only one person in this

15  case who had the motive, the means, the opportunity, and the

16  guilt for committing the murders of Jennifer Jeffrey and her

17  son.

18         We know it from his statements.  We know it from jail

19  calls.  We know it because the gun was used to kill Jen and

20  Tone and to shoot Tone in the face.  He had the last call to

21  the victim.  His cell towers keep him in the area, and they

22  have them fleeing to Tiffany's where he comes busting in

23  sweaty and stressed.

24         In the days after the murders, he stole the victim's

25  drugs.  He never called the victim again.  He lied to police

 1   and he confessed four times.  He said he could kill the boy

 2   because the boy could ID him, and those nightmares haunted him

 3   for years.

 4        Ladies and gentlemen, it's time for the nightmares to

 5   end.  It is time to put Jennifer Jeffrey and her son to rest.

 6   The Defendant thought he left no witnesses, but you have borne

 7   witness to the evidence in this trial.  You have borne witness

 8   to the testimony of the 25 witnesses that have been called,

 9   and the hundreds of exhibits.

10        And that's why we ask you at the end of today to go back

11   to the jury room and to return the only verdict that's

12   consistent with the law, the evidence, and your common sense,

13   and that's a verdict of guilty on all counts.

14        **THE COURT:**  Thank you, Ms. Brusca.

15        We'll take a very brief ten-minute recess.  We'll let

16   Mr. Purpura have time to organize his materials.

17        This court stands in recess for ten minutes.

18        **THE CLERK:**  All rise.  This court stands in recess.

19        (Jury excused 10:57 a.m.)

20        (Short recess taken.)

21        **THE CLERK:**  This court resumes its session.  The

22   Honorable Richard D. Bennett, presiding.

23        **THE COURT:**  You all may be seated and we'll be ready

24   to bring the jury in a second.

25        Before we bring the jury in, ladies and gentlemen, I just

 1    want to emphasize to those members of the public in the

 2    gallery, it's an open proceeding, everyone is welcome, but I

 3    think as Mr. Gurevich has indicated, all cell phones should be

 4    turned off so the Security personnel should not have to

 5    monitor that.  You all should have your cell phones turned

 6    off.

 7        And if there is a child in the courtroom, please position

 8    yourself close enough to the end of the aisles that if you

 9    have to quickly take the child out, just go out the door.  You

10    can come back in again.  I don't want to limit anyone, but

11    it's difficult if you're over here on this side of the

12    courtroom trying to get all the way out if the child happens

13    to be making any noise.

14        So with that, Mr. Gurevich, if you'll retrieve the jury,

15    please.

16        Mr. Purpura, are you ready?

17            **MR. PURPURA:**  I am, Your Honor.

18            **THE COURT:**  All right.

19            **THE CLERK:**  All rise for the jury.

20        (Jury enters courtroom 11:17 a.m.)

21            **THE COURT:**  All right.  With that, thank you all

22    very much.  Everyone may be seated.

23        And with that, we'll now hear the closing argument for

24    the Defense, Mr. Purpura.

25            **MR. PURPURA:**  Judge Bennett, thank you very much.

 1          Don't we all wish that life in this case could be just as

 2     tidy as a well-prepared PowerPoint.  Life's not like that and

 3     either is this case.

 4          Next to -- possibly equal with military service, the next

 5     important service we have is what you all are doing as jurors.

 6     The military protects our freedom, and you all as jurors here

 7     protect our liberty, our democracy.

 8          Ms. Whalen and I thank you all, jurors and alternates,

 9     for your service, and this service has not and will not still

10     be an easy one.

11          As a father, as a grandfather, the death of Jennifer

12     Jeffrey and, in particular her innocent seven-year-old child,

13     K.B. is heartbreaking.  I still have the image of Detective

14     Lewis on the witness stand, and I think Mr. Budlow was

15     distracted and Detective Lewis was holding up pajama bottoms

16     of the child.  It was for seconds but it truly, truly was

17     heartbreaking.

18          To accuse anyone, anyone of this absolutely horrific,

19     horrific crime and ask a jury to convict, the Government, the

20     prosecution must, you have to, must have the evidence to prove

21     beyond a reasonable doubt.  Respectfully, I hope you will

22     agree with me, and I'm going to talk another 30 or 40 minutes.

23     In this case, no matter how hard they try, no matter how hard

24     they tried to package their evidence in a PowerPoint, in

25     close, or in rebuttal, they are woefully short in a case of

1    this magnitude and this nature.

2         At best, the evidence you heard, all of the evidence that

3    you heard is circumstantial and clearly not sufficient or

4    trustworthy.  Every civilian witness who testified, probably

5    with three exceptions, Mr. DaShields, he was the

6    Uber/hack-driver.

7         CJ Curtis, CJ Curtis Williams, he's the drug trafficker

8    the one that watched the Drunk, Inc., on TV, and I'll agree

9    with the Government, Tiffany Jackson.  They seemed to be the

10   most candid and the most reliable.  All of the other

11   witnesses, Al Harris, Terrill Harris, Tonya Harris, Wane

12   Briscoe, Kiara Haynes, every single one of them admitted they

13   lied multiple times.

14        Initially, every single one of them, every one, gave a

15   different story of events.  In every single one of their

16   cases, any alleged statements made by Andre Briscoe was just

17   made to them.  There was no one else present who could

18   corroborate what was said, or if it was said.  Every single

19   one of them has an extreme close connection to each other by

20   way of family and by way of specific drug trafficking within

21   that family.

22        There are only two choices that you have in this case,

23   guilty, not guilty.  Has the Government -- to say it a

24   different way, has the Government proven their case beyond a

25   reasonable doubt that it's guilty, or have they not proven

```
1    their case that it's not guilty.
2         Andre Briscoe is not guilty.  I know you all listened and
3    you did attentively to the evidence and you took notes.  Quite
4    frankly, probably in my 40-plus years, almost as long as Judge
5    Bennett has been on the bench, I never saw a jury take more
6    concentration and better notes than you all.  And you all came
7    here every day, punctually, and it's probably us that slowed
8    you all down.
9         What I should do at this time, after saying that, I just
10   don't have the nerve or fortitude to do it, is just to sit
11   down and let you all get back there as quick as you can and
12   make the right decision.  But what I'm going to do is I'm
13   going to talk to you a little bit longer.  And what I'm going
14   to say is just -- just my recollection of the testimony, my
15   recollection of the events.  What's important is your
16   recollection of the testimony, your opinion of the demeanor of
17   the witnesses when they testified as to their credibility or
18   not credibility, which you rely upon them in an important
19   manner in your life.
20        The indictment basically can be broken down two ways, six
21   counts.  The easiest way to look at it is drug conspiracy and
22   murder, because that's what it's all about.
23        The Government's first, I believe, civilian witness was
24   Al Harris.  And what Al Harris said from the witness stand --
25   and you remember in the Government's exhibit, he had the same
```

1    shirt on that he actually testified to.  I remember that

2    because the shirt had a gray pattern -- although some of us

3    deny that, it had the gray pattern, and I asked him to stand

4    up and -- because he said that the heroin that he saw in the

5    bag that Poo brought back was gray.  And I really questioned

6    him on that, and y'all thought, well, why is he questioning

7    him on that, that's a silly thing, but it was gray, and that's

8    what he said.

9         What we know is that the drugs that CJ Williams were

10   making or was making was a mixture of Percocet and food

11   coloring.  He actually said it was garbage, it was bad, and it

12   was beige, and that's why we have the gray and beige, because

13   the -- because the Government's entire theory of the case is

14   that the drugs, which came from Baltimore back to Cambridge,

15   were the drugs taken from Jennifer Jeffrey.  And clearly

16   they're not.  Their own witness said it was gray, not what CJ

17   was making.

18        Terrill Harris, the one thing we know about Terrill

19   Harris is that he's been a heroin addict and coke addict for

20   30-something years, and what he knows is his drugs, just

21   that's what he does, he knows what it is.  And he was brought

22   to Baltimore to Perkins Projects for a specific reason, and he

23   was going to test those drugs, and he did test those drugs.

24   And what he said at the conclusion of the tests, and what he

25   said from that witness stand to you all, the drugs are good.

1          Grand Jury testimony, witness stand testimony, the drugs

2     are good.  And we know that the drugs at Jennifer Jeffrey's

3     house were garbage.

4          Post-arrest statement, Andre Briscoe.  When the work got

5     bad, when the work got bad, we didn't want the work.  It

6     wasn't no good.  The dope wasn't no good.  We didn't want it.

7     I was up there to grab something else, some other dope, not

8     from her.  Now, he might have wanted that dope as well, but

9     the dope that he really wanted was the dope that he told

10    special agent that he was in Perkins Projects trying to get

11    and got.  The good dope.  The gray dope.  The dope that Al

12    Harris saw.  The dope that Terrill Harris, Sr. tested.

13         Not only did he say the same thing in 2020 when he spoke

14    to Detective Lewis back in 2015 on June 5th, he said the same

15    exact thing, the dope CJ had was junk, garbage.  So that alone

16    should give you pause, just that slide and nothing else.  The

17    Government's theory is that that man kills a woman and a child

18    for garbage that that man knows he will hardly be able to sell

19    anywhere, or does his statement make more sense, that he was

20    there to get something from someone else, and it's verified by

21    the witness, the Government witnesses.

22         The only person -- the only person that places Andre

23    Briscoe back at Jennifer Jeffrey's home sometime in the late

24    morning or early afternoon of May 26, 2015, is Kiara Haynes.

25    Even the cell tower information does not corroborate this,

1    just the opposite as Special Agent Wilde testified to, and

2    you're going to have that exhibit, I don't have the exhibit

3    number, but it's a pack.  It looks like this.  You've seen

4    them.  It's about this thick.  You can go through all of the

5    photos, and you're going to see everyone, how they were

6    traveling, not only Andre, but Wane.  The one thing you won't

7    see who was traveling, unfortunately, is Kiara Haynes, because

8    by then those records are no longer in existence.  But

9    clearly, you can see where the phone of Andre Briscoe was in

10   the evening between around 12 midnight, you see the times

11   right up there, and about 5 o'clock in the morning right at

12   Jennifer Jeffrey's house.

13        The phone moves and at 11:41 -- 11:41 would be the cell

14   tower furthest away, and it's right there at the bottom.

15   11:41, it's the last call that the Government keeps on talking

16   about.  And let's think about that call for a second and use

17   our common sense.

18        If it was an outgoing call, an outgoing call from Andre

19   Briscoe to Jennifer Jeffrey, that would make sense in the

20   Government's theory, because Andre Briscoe at that point would

21   be trying to find out, is she home?  Is she home with her

22   child?  What's going on up there if I'm going to go back up

23   there and steal or rob the drug, but it's just the opposite.

24   It's an outgoing call from Jennifer Jeffrey to Andre Briscoe,

25   and then there is no more communication with Andre Briscoe and

1    Jennifer Jeffrey.

2        Now, let's infer what that call's all about, all right,

3    from the evidence.  She's calling him.  He tells her, "I've

4    got a ride.  Junior is going to pick me up.  I don't need a

5    ride back, going down to Perkins, talk to you later."  That's

6    it.  No need to call her back, she knows where he's going,

7    what's going on, and the cell towers then do put him down

8    towards Perkins right around 1:58.

9        Look at the cell records, you're going to have those,

10   and you're going to see that in the month before, there are

11   not a lot of calls between Jennifer Jeffrey and Andre Briscoe.

12   What makes sense is this communication was the last

13   communication because Andre said, "Heading to Perkins, talk to

14   you some other time."

15       Common sense one more time, just an aside.  Andre's in

16   the house.  We know that from the phone records from 12

17   midnight until 5 o'clock in the morning.  We know that Kiara

18   comes sometime around 4 o'clock and is banging on the door.

19   We'll talk about that in a few minutes.  What goes on?  We

20   know that Brianna Street testified after Kiara left and

21   stopped banging on the door after they called 911, every one

22   went back to sleep.

23       At that point, the Government's theory is Andre Briscoe

24   knows where the drugs are, right there in the bedroom.  Knows

25   where the gun is, because Kiara took it out.  And instead of

1    just walking from the one bedroom where he's sitting in that
2    white chair, going in the dresser, pulling the drugs out,
3    putting them in his pocket if he wanted, the garbage that it
4    was, and leaving.  Instead, he makes this big plan to come
5    back the next day when she's wide awake and bring a gun and
6    put a bullet in her and a bullet in K.  Common sense, it just
7    doesn't make sense.  And you heard drug dealers talk on the
8    witness stand, and you heard them say, because I asked them.
9    "What happens when someone steals your stash?  Can you call
10   the police?  Well, you know, you can't call the police.  I
11   could take matters into my own hands, do something."
12       Where is CJ at this time, he's in jail, so if Andre
13   Briscoe wanted those drugs, walk, walk, walk, take, pocket,
14   down the stairs out the door.
15       Ms. Pittman, same scenario, common sense, right there.
16   The one thing -- she was a sweetheart.  She had the cane, she
17   came in here, 67 years old.  Husband, unfortunately, has
18   passed away.  Lived right next to her.  Loved the child.  She
19   waits -- she has TVs all over the house, which is somewhat
20   unusual, maybe not always, and she says the TVs are on, the
21   one especially in the bedroom on all the time.  So make no
22   mistake about that.  And there's other TVs around, but she's
23   still -- regardless of the TVs, she can hear in the morning,
24   because she can hear it, K. running down the steps.  And that
25   morning of the 27th, she didn't hear it, and that concerned

1     her.

2          K. at that point probably, who knows, but at that point

3     he was in bed.  He wasn't going to school that morning, that's

4     for sure.  We know he came outside a little later with his

5     pajama bottoms on.  So he wasn't running down the stairs.  She

6     didn't hear that.  But equally so, that very next-door

7     neighbor, and the Government, you'll have the picture of the

8     house -- the Government didn't use that during their close,

9     the house, they share a common wall.  And one thing she didn't

10    hear, and I probably can bang louder, but six, .45-caliber

11    gunshots, she didn't hear that.

12          Now, here is a woman, a next-door neighbor who is so

13    concerned about K., if she would have heard something like

14    that until she left, you know darn well she would be banging

15    on that door next door, "What's going on here," or she will be

16    calling 911.  She wouldn't just close her ears and close her

17    eyes, that's not her.  She left at 2 o'clock in the afternoon.

18          At 1:58 in the afternoon, 1:58 his cell phone is bouncing

19    off the Perkins projects cell tower, and he's told the agents

20    and homicide where he was, and it's been corroborated.

21    Tiffany Jackson's house, 2 o'clock, common sense.

22          Just briefly, I'm going to talk about the Baltimore City

23    homicide investigation.  And I mean this absolutely sincerely,

24    Detective Lewis, you will never, ever find a better human

25    being than Detective Lewis.  This city is lucky to have had

1    him and still have him, and the same with his partner,

2    Detective Parker.  He told you -- and you all can use, again,

3    your own experiences as if you're here in 2015.  He told you

4    what it was like working homicide in the city in 2015.  He was

5    a primary and a secondary on multiple, multiple cases.

6         The riots lasted over four weeks.  He was unable to

7    investigate homicide scenes without uniformed police officers

8    accompanying him, because of the riots and fear for his

9    safety, and the safety of those he worked with.  And he told

10   you candidly, candidly that he has PTSD as a result of this.

11        During this time, as we've heard, the Kiara Haynes phone

12   records were never requested, and that's despite the

13   investigators knew of what she did that night when there was a

14   911 call, just like hours, hours before the murder, banging on

15   the door ten minutes, yelling, screaming, God knows what she

16   was saying.  You heard her on tape.  But despite that, those

17   records were never obtained, in 2000- -- Special Agent Weaver

18   2019, they're no longer available.

19        CJ Curtis was interviewed May 29th by homicide while he's

20   at Towson Detention Center.  He begged.  He begged the

21   detectives, "Get the video.  Get the video.  This will show

22   you who did it.  Get the video.  It's in the kitchen," he

23   said, "The video you looked at?"  And we went through -- I

24   think Mr. Budlow put the crime scene technician on the witness

25   stand.  We must have looked at 60 photographs, 60, and the

1    first -- as you may recall, the first series of photographs

2    everything is pristine, so nothing has been touched at that

3    point.  Sixty, whatever amount of photographs, not one single

4    photograph, not one, showed the camera or where it was placed.

5        Brianna Street testified that the bill wasn't paid and

6    there was no service.  Government submitted a Comcast bill,

7    Government Exhibit 1.27, you're going to have it.  Look at it.

8    This billing dated April 14th, 2015, it shows a reactivation

9    fee for home security March 19th.  We never know.  We never

10   heard from Comcast if this was reactivated or not.  We don't

11   know if anything is captured or not, maybe not on that, but

12   perhaps in the cloud.  We just don't know, and it was never,

13   ever investigated.  You'll have the exhibit, but it's clearly

14   not enough.

15       Bottom line -- bottom line about the investigation is

16   even after canvassing the area, talking to various witnesses,

17   interviewing Andre Briscoe on video seated down in Dorchester,

18   Cambridge, in the police department for two hours with two

19   homicide detectives conducting a homicide investigation, Andre

20   Briscoe wasn't charged.  The case wasn't presented to a Grand

21   Jury.  No action.

22       November 9th, 2016, Al Harris needs help.  It may just be

23   a failure to pay restitution, but this judge -- I think his

24   name was Judge Jews, J-e-w-s, doesn't mess.  He's afraid he's

25   going to go back to jail.  He remembers homicide.  Takes that

1  card, makes a few calls.  They said Baltimore City homicide,

2  you know, they said it a couple times.  He says first

3  November 9th, 2016, "Remember what I told you, right, about my

4  revocation hearing?"  He says that a couple times to him.  Did

5  they help him?  No.  He even asked for money for bus fare.

6  They even stiffed him on the bus fare.  He didn't get help

7  until the following year and that's when he got help from the

8  Feds.  He got signed up, again, he's in jail.  He got out

9  early on parole before his maximum parole.

10  And he received -- and you have as an exhibit -- $6,900

11  of taxpayer money for his cooperation, and you can see the

12  dates when he got the bigger checks.  Recorded meeting, MCTC

13  $200.  Recorded meeting, MCTC $200.  Recorded meeting, MCTC

14  $200.  Recorded meeting, MCTC another $200.  And the big

15  check, May 27, 2020, when he was arrested five days earlier

16  $700, and you're going to have that as an exhibit.

17  When Al Harris -- I mean, you know, you don't want to

18  make light of a tragic life, but he's been -- as the

19  Government's brought out, he's been a long-time thief.  He's

20  familiar with the criminal justice system.  He's been in and

21  out.  He's lied most of his life.  He's been a drug addict,

22  drug salesperson.  He's used various names, which he admitted

23  to.  He used multiple Social Security numbers, which he

24  admitted to.  He has multiple dates of birth, which he

25  admitted to when law enforcement stops him.  He lied to you

1    when he told you about the fight that Anthony and Andre had.

2    You heard Anthony from the witness stand.  Did he ever say to

3    Andre, "You don't get credit for killing little kids?  He

4    said, "Absolutely not."

5         Let me add Anthony to the witnesses that you can believe.

6    And you can just tell from his demeanor, and based on the

7    cross-examination by Mr. Budlow, that he was telling you the

8    truth when he spoke.  That didn't happen.

9         He lied to you when the police knocked on that apartment

10   door (makes sound) June 5, 2015, and he says at the point

11   Andre gets up and he runs back to the bedroom, back bedroom,

12   and runs back out again and is standing on the couch when the

13   police come in.  Lied to you twice there.  He lied -- or maybe

14   not.

15        First thing he tells the police, June 15, 2015, "I ain't

16   know nothing until you just told me, man."  He goes on to say,

17   "If you remember, I'm run my own investigation," and he wanted

18   a homicide's card.  "I'm going to run my own investigation."

19   And what does he do?  He does in a sense.  He hears things,

20   clearly, clearly when Baltimore City homicide crosses that Bay

21   Bridge and comes to Cambridge and takes someone down, you

22   think something's bigger than selling drugs.

23        They know about Jennifer Jeffrey.  They know about her

24   child.  Talk is going all around that very small community,

25   talk, and that's just what it is.  And he wanted to use that

1    talk to his benefit.  He tried it with Baltimore City

2    homicide, it didn't work.  He did hook a fish when it came to

3    ATF, though.

4         So what do we have?  I mean, we can't put him on a lie

5    detector.  There is no button that we can press when he's on

6    the witness stand, and it's going to light up and say truth,

7    lie, truth, lie.  It would be great, doesn't happen.  So all

8    we get are people like me, who have limited skills in anything

9    else, and they become lawyers, and we ask them questions.  And

10   the questions -- the only thing we can do as the truth finder

11   is to see does the truth change, because we know the truth

12   never changes.  It's simple.

13        If you say something once, you can repeat it again and

14   again and again, especially something as big as this, because

15   the truth never changes.  October 26, 2017.  He's talking to

16   Special Agent Weaver.  Heard about it prior to raid.  Andre

17   drunk, crying outside.  That's when he's saying, I heard the

18   first time he's drunk.  He's crying.  He's outside.  He

19   actually goes on to say that his girlfriend is nearby, near

20   the car.

21        In the same statement -- in the same statement to Special

22   Agent Weaver he says, "Could have been my niece's house,

23   Tonya, bunch of people there."  Who are those bunch of people?

24   And now it's Tonya's house, crying outside and now it's

25   Tonya's house.

1           And finally as the Government put up on their PowerPoint,

2     the last time in front of the United States Grand Jury,

3     sitting at a kitchen table at Kizzy's house, not Tonya's,

4     Kizzy's house, Andrea Molock's house, he said for the first

5     time, "I killed the bitch."  And yeah, I was -- yeah, he was

6     sober.  Yeah, he was sober.

7           So just look at those three things:  Drunk, outside,

8     crying.  Next time same statement, "Could have been my niece's

9     house, Tonya, bunch of people there."  Third statement, stone

10    sober, Kizzy's house, table.

11          I don't believe the Government went into much detail

12    about his four visits to MCTC, which he got paid a total of

13    $800 for.  So he's going to MCTC, he's all miked up like me

14    here, but it's being recorded, and Andre puts him on his

15    visitor's list.  Remember that letter, "Love you.  Put me on

16    your list."

17          So he puts him on the list, which you have to do, and he

18    comes and visits him.  And he's talking about -- keeps on

19    trying to -- he does pump him about dreams.  And in the very

20    second visit when he starts talking to Andre about dreams,

21    Andre tells him for probably the first time, you know, "Yeah,

22    my dreams -- I'm getting over the dreams right now.  I'm not

23    taking medication, a lot of people here are taking medication,

24    I'm not.  I'm doing a lot better with the dreams."  And then

25    he pushes him more, and as the conversation goes on, he tells

 1    him, "Well, the reason I'm having these dreams is because when

 2    I was young, in Georgia, living in this house, I was molested.

 3    And Daddy" -- he said "Daddy, had to come down and take me

 4    home."

 5         And you heard his brother, Anthony, he testified from

 6    this witness stand, and we didn't ask him this question,

 7    Government counsel asked him this question, Mr. Budlow.  Mr.

 8    Budlow asked him, "Well, how did you know about these" -- "How

 9    do you know about these dreams?"  And Anthony said, "I was

10    there."

11         "Well, then who did it?"  Thinking maybe he trapped him.

12    "My cousin."

13         "Do you know his name?  I don't remember his name, but I

14    do remember he just came home from the military."

15         "Did you call the police?  Nine-year-old, ten-year-old,

16    he said, "No, I told my Daddy."

17         "What did your Dad do?  He came and got us both."

18    Nightmares, maybe even sexual in nature.

19         Wane Briscoe -- I'm moving to try to be quick.  I told

20    His Honor 57 minutes will be my longest close, and I'm going

21    to beat that and get it lower, so I want to try to push on.

22         Wane Briscoe, what's his big fact?  His big fact is what

23    he told you, ladies and gentlemen of the jury.  His big fact

24    is that Andre -- remember he's sitting here -- Andre confessed

25    to me sitting at a table in Perkins Projects, first time.

1    Very descriptive, very detailed.  You're going to get --

2    you're going to have, receive.  I don't think "get" is the

3    right word.  You're going to receive, as an exhibit 19.1, and

4    rarely, if ever, does a jury get a Grand Jury transcript, but

5    both counsel agreed, and you're going to get it.

6        The Grand Jury proceeding, as you heard, is so much

7    different than the proceeding we have here.  The Grand Jury

8    proceeding is just the prosecutor, as you heard, the witness,

9    and the grand jurors.  No Defense attorney, and no Defendant.

10   Think of an old time New York prosecutor joke that he could

11   indict a ham sandwich for murder in front of the right Grand

12   Jury, and you probably can.  It's just a very one-sided

13   proceeding.  That's why normally Defense says, no, man, you

14   can't have this.  You have it.  And you look at it.  And you

15   look to see in the entire Grand Jury transcript if he at one

16   time says to that Grand Jury under oath, The first time I

17   heard about it, very descriptively, is Perkins Projects,

18   sitting at the table, and the answer is no.

19       What he tells the United States Grand Jury is that he

20   remembers the first time was when -- after he picked up Andre

21   and he's in the car with his aunt and uncle, Terrill, Sr. and

22   Boug, and that's when he said, "I killed her."  He killed her,

23   and the son.

24       He repeats that, he says it on page 21.  "Do you remember

25   if Poo said anything during the drive?  I think he said he

1    killed her.  And did he tell you at that point if he had

2    killed her son?  Yes.

3        Ms. Brusca asked again on page 28, because there's

4    actually witnesses to that conversation and she knows, because

5    she's had these witnesses before the Grand Jury.  That would

6    be Ms. Martin, Terrill, Sr.  They just don't corroborate that.

7        So she asks him again.  "And do you remember if when Poo

8    was telling you that he -- that was while you were in the car

9    or in the conversations the days after or before you even went

10   to get him?"  Sorry, should have moved to Wane Briscoe, I

11   apologize.  And his response again was, I think in the car.

12   And this is even though -- question, "Even though your aunt

13   and uncle were there, you think it was in the car?  Yes."

14       And just to segue just for a second, because I missed it.

15   The one thing that Wane Briscoe says to Special Agent Weaver,

16   I think which is restated many times with all of the

17   witnesses, everybody was just saying, yo, meaning Andre, must

18   have did something crazy.  I mean, he must have did something,

19   but I never knew nothing about that.  People were talking, and

20   there was a lot of talk.

21       Then in the same Grand Jury proceeding, which you're

22   going to have, I don't think you could probably read that or

23   not, but sorry it's not darker.  But what happens in a Grand

24   Jury, unlike a jury here, now you all can't just raise your

25   hand and ask a question, but in the Grand Jury proceeding, the

1    prosecutor says, does the Grand Jury have any questions?  And
2    one Grand Juror was kind of thinking, well, he made that
3    statement in the car with two people present, let me ask about
4    that, and she did.  She said, "I just want to get back to the
5    aunt and uncle."  This is the Grand Jury.
6         What was the reaction when Poo said he killed Jennifer?
7    I mean, is that normal conversation amongst four people in a
8    car, "I killed Jennifer."
9         What was their reaction to that statement?  But what was
10   their reaction?  And then Wane says, "Well, Boug," meaning his
11   aunt, was -- "she just didn't like it one bit," indicating
12   that Boug heard it and was annoyed by it.  She was just mind
13   boggled.
14        Now, Mike Hamlin, another Assistant U.S. attorney sitting
15   there asked, "How about your uncle or the uncle?"  Wane,
16   "Well, at that time, I don't know.  Like, I don't know if he
17   said anything, or he just, like, shook his head.  Shook his
18   head like."
19        So three times under oath in the car two people are
20   witnesses, under oath to you all, Perkins sitting at a table.
21   The last couple points of Wane Briscoe, what he did say and,
22   again, you're going to have the transcript and I'm asking you
23   to please look at page 17 and 18 of the transcript when you
24   get it.  It's really -- it's a gold mind you normally don't
25   get it.

1     He's asked specifically by Ms. Brusca -- he's asked

2     specifically by Ms. Brusca as to, "Well, when he calls you,

3     the first time that's to pick him up, pick him up," because we

4     know there is a lot of phone calls going back and forth, and

5     I'll show you where the exhibit is that has all of those

6     records.

7         The first time he calls, "The first time he calls to pick

8     me up, when is that?  It's right after he told me what

9     happened.  So what time is that?"  He goes, "I don't know the

10    exact time, but it's nighttime.  Are you sure it's nighttime?

11    Yes, it's dark outside.  It's nighttime."

12        Why is that important?  Hold on one second.  Page 18

13    repeats it again.  Nighttime and then he says he doesn't come

14    and pick him up, not right away.  It takes a day to a half day

15    before he comes and picks him up.  So he gets the call at

16    nighttime, and it's a day almost delay until he picks him up.

17        Now, with that, you're going to have Government's

18    Exhibit 11.2.  And I apologize for not having this on a

19    PowerPoint, but I'm just not particularly skilled with

20    PowerPoints.  I'm better with easels.

21        Look at page 2, because the only nighttime call -- when

22    Andre is calling Wane, the only nighttime calls are at -- that

23    connect are at 10:00 in the evening.  So it's dark outside at

24    10:00 in the evening.  There is more attempts at 12:45, but

25    that's going to voicemail.  We heard that, those messages.

1    And the next call is not until 8:17 in the morning, 8:17 in

2    the morning.  8:17 in the morning, Wane agreed with me, it's

3    light outside.

4        You look at the next day and you go right on through, and

5    you're going to see the only nighttime calls, which is

6    consistent with the day picking me up or a half day picking me

7    up is the call that night at around 10:12 on the 26th, and

8    this exhibit you will have, and please, please look at it.

9    Again, it's Government's Exhibit 11.2.

10       We know that at that point if he's right, between the

11   difference of day and night, light out or dark, that's not a

12   difficult one to be accurate about.  Sometimes the truth

13   doesn't change.  Nighttime, daytime.  We know at that time

14   Jennifer Jeffrey is obviously well alive.  It's all before

15   Kiara bangs on the door and even before Andre actually arrives

16   at the house.

17       And then if you need to question anything else about

18   Wane, for the very first time, for the very first time when he

19   testifies before you, he indicates that "Fatman said that Poo

20   is going to come for us.  We're going to have to kill him if

21   we don't sell the drugs."

22       Even Ms. Brusca -- and I'll quote to her credit, she said

23   it right away, "Mr. Briscoe, have you ever told the Government

24   that before?  All those interviews, so what's important with

25   that?  No, the very first time.  Because he's a gentleman, and

```
1    I asked him that question, that has difficulty telling truth
2    versus fantasy.  You heard he said he has PTSD, worried about
3    Huntington's disease.  He lost his wallet coming through the
4    metal detective.  Now, he didn't remember that.  We had to
5    call Special Agent Weaver.  He lost his wallet coming through
6    the metal detector right here the same way you all come
7    through, and he was paranoid that he was under investigation
8    because of that.
9         Prior psychiatric issues.  Spends two weeks, two weeks in
10   the psych ward in Dorchester County, two weeks.  That's where
11   he made that statement that was played.  Did the Government
12   ever ask for consent to get those psychiatric records to see
13   what the admission was all about or what's going on in this
14   poor young man's head?  Did you all get them in the exhibits?
15   No.  Two weeks.
16        The Government played -- or may play in rebuttal, a
17   conversation when Al was wired up, and he's talking to Wane,
18   and Wane doesn't know Al's wired up.  This is July 18th, 2018.
19   I don't have the -- oh, it's Government Exhibit -- put this
20   down, 18.3T of the transcript.  You're just going to get the
21   recordings.  If you want to hear the recording, you have to
22   ask to hear the recording.  I asked him about this and he said
23   sometimes talk is just talk.  And that's when Unc, Al is
24   trying to get information out of him.  Again, get information
25   out of him.  I think it was at that time when he mentions the
```

1   pillow and the child's head.  We know.  We know that there is

2   no pillow.  We know that from the forensics.  We know that

3   from the scene.  Wrong.  Lie.  Exaggerating.  Fantasy.  He

4   said, "The bitch had a whole brick in there, an MF-ing whole

5   brick, a whole bird.  Another exaggeration.  CJ said it's

6   about 80 grams, maybe 20 more after that.

7        He said he spent two hours in that place searching and

8   searching and searching.  Another lie, another fantasy.  No

9   one after 6:45 with two dead bodies spends two hours searching

10  and searching and searching.  "I mean, the boy got a half a

11  brick."  Another lie.  Exaggerating, fantasy.

12       And the last whopper when Alfred says, "What about the

13  gun?  What about the gun?"  And he said, "Man, that mother

14  fucking gun is long gone, man.  That shit is fuckin' somewhere

15  in the" -- and I'm swearing, I'm sorry -- the mother f-ing

16  water or damn near where in the mountains.  He got rid of that

17  bitch, scorched that bitch with something.  I know he said he

18  took that MFer apart."

19       Now, unless I was seeing things, Ms. Brusca showed you

20  that gun, which wasn't scorched, wasn't in the water, wasn't

21  torched, and wasn't taken apart.

22       All right.  I asked Wane Briscoe -- simple question.  I

23  asked Wane Briscoe, and this says a lot about all of the

24  Government's witnesses, a simple question.  "Were you in the

25  Glen Burnie area, Anne Arundel County for four hours before

1    you came to pick up Poo?"  And he said -- looked at me.  I

2    mean, he normally took a long time to answer questions.  When

3    I said, you know, there's a difference between fantasy and

4    reality, he took about ten seconds before he finally said yes.

5         So I asked him about the four hours.  Now why?  I'm not a

6    savant.  I don't -- I can't see things, but I can every once

7    in a while stumble upon a record in the Government's exhibit

8    which they didn't mention whatsoever, and you're going to have

9    that -- you're going to get the whole pack of cell phone

10   records back there, and it clearly shows, clearly shows his

11   phone, Wane Briscoe's phone, going from Cambridge across the

12   Bay Bridge, and you see where the phone stopped where number

13   seven is and the time period there.  When you take a look at

14   that exhibits it's four hours.  It's Exhibit 11 point

15   something.  I can't -- it's page 28.

16        Take a look at that exhibit, four hours.  Government

17   didn't bring it out.  We asked them, and he lied.  He lied to

18   you, and then the crazy stuff is, you see the way the numbers

19   go back.  He comes back again, so then he's coming right back.

20   And it gets even crazier, because I asked him, "How did you

21   come to Baltimore?  Did you go across the bridge or did you go

22   up" -- I was really specific, because I, kind of, know the

23   area.

24        "Did you go up through Elkton to 40 and then down 95?"

25   He says, "Yeah, that's the way I came.  You didn't go across

1   the bridge?  No, I went the northern route."  Yeah, northern

2   route.  Well, look.  Look what it shows.  Look which way he

3   came, across the bridge, the same way he came earlier that

4   day, the same way he came when he spent four hours in freaking

5   Glen Burnie.  They vouched for his credibility.

6       Terrill Harris, Sr., he does admit, obviously, it's

7   truthful he goes with Junior.  He's a Junior, that's the name

8   they use for him, Junior, to pick up Andre at Perkins.  What

9   he tells you all and what he told Special Agent Weaver as well

10  on 5/20, no talk about anyone being killed at Perkins or the

11  car ride back.

12      He even tells you all that he's in the backseat with

13  Andre on the car ride back, and there's no talk.  Again,

14  contrary to what Wane said three times in his Grand Jury.

15  He describes the demeanor of Andre Briscoe.  He was leaning

16  back.  He was playing, you know.  He was in a party mood.  Not

17  like what the Government would describe, not like a man who is

18  anxious, in a rush to get out of town.  They stay there, they

19  drink, they party, they test the drugs.

20      If you just killed somebody in Baltimore, you think you

21  would want to get as far away as possible as fast as possible,

22  but that's not what happened.  He tells you that Andre is a

23  Bible quoting man.  He added some language to the effect that

24  Andre, while quoting the Bible, said, "I done fucked up.  "God

25  is going to make me pay for this one."

1          And, again, the first time he ever mentions that, and

2     this time period's important, May 27th through August 20th.

3     At that point, there is a fairly intensive -- as you can see

4     all of the dates on this investigation by ATF with all sorts

5     of people, this whole crew, is getting subpoenaed to come to

6     the Grand Jury, and the agents are going to investigate.

7          So at that point everyone is thinking, uh-oh, what's

8     going on.  And Terrill Harris, again, for the first time says

9     what I just went through.  And, again, no one else is present.

10          Tonya Harris, quite frankly, and honestly sometimes the

11     Defense, sort of, can be honest, that Tonya Harris, she

12     appeared to be the best Government witness of all of the

13     family members when she took the witness stands.  I just want

14     to say she's a good witness.  But I want you just -- and,

15     again, we don't have that lie detector here.  I want you just

16     to look at what she said, the difference, the difference.  And

17     you're not going to have my slides back there with you, it's

18     just going to be your memory and your notes.

19          The difference of what she says from May 26, 2020, to

20     July 21st, 2020, to the same man, Agent Weaver.  Never heard

21     who could have done this.  "Honest, if I knew for a fact that

22     Tone or Yo did it, I would tell you straight up."  She said he

23     always got crazy nightmares and that -- that is the truth.  We

24     heard from Anthony, and now we know why.

25          She told you, never had nightmares before, and this is

1    the key, just take a look at this.  He had a nightmare about

2    Jonice, not Jonice, biting his dick off.  And that's what she

3    said, very specific, very graphic.  And then he went on to

4    say, and she said, Agent Weaver, quoting Andre, "I keep having

5    dreams about Shorty.  She bit my dick off.  And then Agent

6    Weaver says, "Who is Shorty?"  And then Tonya Harris says,

7    "Jonice.  Jonice."  And then what did you do?  She said, "I

8    just burst out laughing and went to bed."

9         What happens in between those two dates?  She knows her

10   family members are being subpoenaed to the United States Grand

11   Jury.  She knows that Special Agent Weaver started the

12   interview with her.  I'm not here to charge you right now.

13   She knows that Wane, at least she appears -- that Wane

14   Briscoe, she told you that cut his hair, that he was growing

15   since he was nine to ten years old, because he thought he was

16   going to jail and didn't want to be anyone's bitch.

17        She knows there was talk in the community like we heard

18   from so many other witnesses, from her father, Terrill Harris,

19   Sr., from George, from Tony, and most importantly, what she

20   heard, and what she told you all on cross-examination is that

21   she heard that Kizzy, Andrea Molock was talking to the Feds,

22   and that her name, her name, Tonya Harris, was being thrown

23   in.

24        She gets on that train right away.  She caught that

25   Government train.  She's interviewed July 21, 2020.  Just

1    look.  Look.  Look.  Look how it changes.  Starts again in the

2    dream talking about, again, Jonice, and then supposedly Andre

3    said, "Man, I woke up this morning in a real big sweat.  I had

4    a dream that Jen just reached up and grabbed my nuts."  Look

5    at the difference between the two.  And then out of the blue

6    Tonya says, "What did you kill her?  And out of the blue he

7    supposedly says, I did it.  I did it.  I did it."  And then

8    she says she was upset, she remembers that.  She's crying, and

9    she left with her boyfriend.  Before, she's laughing and goes

10   upstairs to bed.  And now she's crying three months later and

11   leaves with her boyfriend.  The Government says, don't worry.

12        But what we do know?  What we do know, that there's a

13   family connection with those witnesses.  Terrill is the dad.

14   Tonya, daughter, Terrill Harris, Sr., Fatman, Jr., Wane, good

15   connection to Louise Martin Boug, has coffee with Terrill, Sr.

16   every Sunday.  And I didn't mention how he uses -- how Wane

17   uses Boug.  I mean, that's just disgusting.

18        Again, we're talking about Wane.  We could go on forever

19   with Wane.  You could only beat him so bad.  He's using this

20   woman to carry his drugs in her private parts, so he doesn't

21   get caught.  Well, he's using these statements to help himself

22   out so he doesn't get indicted, because who on that charge is

23   going to be an indictment that you have before you?  Just one

24   person, Andre Briscoe, none of these people.

25        Lastly on Tonya, she tells you all, "No Mr. Purpura, I

1    told them before that.  I told them way before that about the

2    dreams.  I told Dickerson, Detective Dickerson."

3         Well, we know that Detective Dickerson was working this

4    case right along with Special Agent Weaver.  We know that if

5    Detective Dickerson heard this, he would have told Special

6    Agent Weaver, and Special Agent Weaver testified, no one told

7    me that, because if someone told Agent Weaver that, he would

8    have investigated it, so that's another lie.  Once again, the

9    truth never changes, but it does change with her.

10        The gun, Tariek, Tarrell, they are cousins of Kiara, not

11   of Andre, that's the connection.  Government played the call,

12   maybe not the whole clip of the call.  You'll have the clips

13   back there.  You remember the call, but in that call, in that

14   call, Tariek tells Tarrell not once, but twice, "Go with her.

15   Go with her."

16        The description, you have Mr. DaShields who we all

17   believe and couldn't be a better witness.  You have          Mr.

18   DaShields, he testifies that what he remembers is a wide nose,

19   that's pretty dramatic, a wide nose.  That's the person who

20   got the gun.  If you look at Andre, he has his mask on, but

21   you can see the picture there, he has the opposite of a wide

22   nose.  He has a thin nose.  He also said that the complexion,

23   his complexion was a little darker than mine.  Again, you look

24   at Andre, doesn't fit the bill.

25        Out of the 30-plus pictures he looked at, he said -- even

 1   the Government asked him a couple of times, yeah.  This person

 2   here, Jaron Laws, looks most like the person.  He had the

 3   photograph of Andre Briscoe.  We know that from Special Agent

 4   Weaver.  He looked at that photograph, didn't blink an eye,

 5   right past him.  You know why, because Andre wasn't there.  He

 6   sat right here on the witness stand in broad daylight, Andre

 7   Briscoe five feet away, walks right in and you're looking

 8   right at him.  He's not going to confuse Andre Briscoe with me

 9   or Ms. Whalen, so he's looking at him, no recognition, no

10   identification because it's not the guy.

11        The Government makes an issue about where Andre's phone

12   is in the area.  Well, we had the agent, Agent Wilder, and he

13   said, Route 40 cuts right through there.  That's the way you

14   go from Perkins to the house.  So if you go back and forth

15   from Jen's to Kiara's or Perkins there, that's the route you

16   take.

17        We also know it's a high drug area, so we don't really

18   know what else the phone was doing in that area, except he's

19   got a right to be there in that area, because that's the exact

20   way he would go to both Kiara's and Jen's from Perkins

21   Projects.

22        Last but not least, Kiara.  I'm going to get to Kiara in

23   a second.  But what Kiara says about the gun itself is that "I

24   brought the gun -- that I went down to Perkins.  I went down

25   to Ms. Jackson's apartment, Andre handed me the gun back,

1    wrapped in a shirt."  That's what she tells you all.

2         You had Tiffany Jackson testify.  The Government wants

3    you to believe Tiffany Jackson.  Tiffany Jackson told you all,

4    under oath, she saw this woman Kiara, once before.  This was

5    the day she saw her, when Andre was there.  She's never there.

6    She had the gun.  She kept the gun.  She gave the gun back to

7    the owner.

8         Moving as fast as I can.  I'm sorry, I'm taking way too

9    much time.

10        Ms. Whalen, how much time have I taken?

11             **MS. WHALEN:**  You're good.

12             **MR. PURPURA:**  Still good, okay.

13        If y'all need to stand up -- look, I couldn't sit there

14   for an hour.  I'll tell you what, normally when my priest is

15   talking, I went and head to the back door most of the time,

16   but I apologize.  We just have to tell you what we think, and

17   so feel free -- I mean, if you want to stand, just stand for a

18   second.

19             **THE COURT:**  No, I don't want them standing.  They

20   either stay seated or they stand.

21             **MR. PURPURA:**  All right.  I'm sorry, Judge.

22             **THE COURT:**  Mr. Purpura, no disrespect, but I'll

23   tell the jury what to do.

24             **MR. PURPURA:**  All right, Judge.  No disrespect.

25   Sorry.

1            THE COURT:  That's all right.  No problem.

2            MR. PURPURA:  Anyway, sorry if I'm --

3            THE COURT:  That's all right.  Take your time.  No

4     rush.  Take your time.

5            MR. PURPURA:  You know, with Kiara, it's just a

6     beautiful example Ms. Whalen brought out, again, on

7     cross-examination how a lie grows if you just look at this

8     slide we have up on there.

9        So what happens on May 29th, 2015, there's a statement to

10    Baltimore Police.  And the first thing that Kiara says is,

11    "I'm home."  I have sex with Andre.  I go to Tiera's, he goes

12    to Perkins."

13        On February 24th, '20, the statement now increases when

14    Weaver goes to interview her, Special Agent Weaver goes to

15    interview her in Pennsylvania.  Left for one hour, meaning

16    Andre, got a bottle in his back pocket when he came back, and

17    that's probably very consistent with Andre leaving the house

18    at that point when we have that phone at that time.

19        Now, July 15th, 2020, there's an interview, first time

20    with an attorney.  Now she adds, Andre wants drugs from Jen.

21    Now, she's interviewed on July 22nd, 2020, in what's called

22    the pre-Grand Jury interview, before, and then there's a break

23    because things aren't going that well, and then she realizes

24    they have more information, and her story grows at that time

25    that Andre came back now with two bags, and one had the

1   imprint of a gun.  And she admits that she lied about

2   15 minutes earlier when she talked to him, no mention of

3   seeing the gun or getting the gun at Tiffany's, just that the

4   bag had an imprint.

5       The investigator, she says nothing.  Interview now with

6   the second attorney present, Ruter, first time stated that she

7   actually got the gun and that's because she heard the phone

8   conversation played by the Government of Tariek Powell and

9   herself.  So she had to admit it and she admitted it at that

10  time.  First time it comes out March 8th, 2021.  The story

11  grows as we go along, and it grows as the noose is getting

12  tighter around her neck at that time.

13      And finally, we know that she goes on June 18th, 2021 --

14  she's born and raised in Baltimore, she told you that.  She's

15  arrested in Texas.

16      The interview with her attorney, Mr. Proctor, for the

17  first time she says that Andre says, I'm going to rob and kill

18  both, "and then she responds immediately, "Should I get a

19  gun?"  And that's the sequence of how her story grows, and at

20  that point when she says that, at that point she gets her

21  deal.  And her deal is, she's facing life without the

22  possibility of parole.  Life without the possibility of

23  parole.

24      And in addition, there's two mandatory minimum counts of

25  ten years each, which means a mandatory minimum of 20 years

1    regardless.  She's not facing life without the possibility of

2    parole.  She's not facing a mandatory minimum of 20 years.

3    She's hoping to get out before her children grow much older.

4    And I repeat, as I've repeated with every single witness, no

5    one else was present when these statements were made, all five

6    of the Government's witnesses.

7         About ten minutes left.

8         Ladies and gentlemen, this was not an act of robbery.

9    This was an act of rage.  CJ Williams said that she lived

10   right there in Jennifer's house, so she knows the reaction of

11   Jennifer.  He described it as a toxic relationship.  Probably

12   the most poignant and poetic words by any witness in this

13   particular case because it clearly was a toxic relationship.

14   She admitted that she was jealous of Jen's popularity with her

15   Cambridge family.  She was jealous of Jen's looks, of her

16   popularity.  She admitted multiple prior confrontations.  She

17   was sickened and mad and angry that Jen made fun of her for

18   having no money, and that she made fun of her not paying her

19   20 bucks back for the Percocet pill.

20        She's in her house at 12 midnight, 26th going into the

21   27th, and she's waiting for Andre to come back.  The clock

22   keeps on ticking.  It's 1 o'clock, 2 o'clock, 3 o'clock,

23   4 o'clock.  Imagine the thoughts going through her head at

24   that point.  She knows Andre's at Jen's house, this woman she

25   despises with the toxic relationship.  She marches the

1   one-third of a mile to Jen's house, banging on the door so

2   loud, so loud that 911 has to be called for.  Ten minutes,

3   yelling and screaming.  It's so loud that Jen gets out a gun

4   and states, "If she comes in here, I'll shoot her."  That's a

5   toxic relationship.

6       In your life, have you ever heard language like this?  "I

7   deleted the Jen off my Facebook page.  I'm not talking to that

8   bitch no more.  I said I deleted that bitch off my Facebook

9   page.  I'm not talking to that bitch no more.  We got into an

10  argument.  She told me she was going to get her connect, the

11  boy CJ, said they were going to come up here, they were going

12  to kill me and clean my body up, that CJ and her connect were

13  going to kill her."

14      I said, "Okay, pull this car over right now, let's get

15  out this and roll, let's fight."  She said, "No, I'm too

16  cute."  I said, "Nah, bitch you ain't never been in a fight.

17  You think I don't" -- "you ain't never been in a fight.  You

18  always used to get your ass beat just going to school.  You

19  ain't about this fucking life, bitch.  Shit, I've been

20  catching bodies since I'm five years old."  I said, "Bitch,

21  you ain't ever been in a fight."  I said, "Stop living other

22  people's lives.  You know what I'm saying, you over here

23  living somebody else's life."  Again, she's talking about

24  Cambridge, living my life.  Coming to my home.  Coming to my

25  family.  "You a phony ass bitch, stop living other people's

1  life, you know what I'm saying, like pull this fucking car

2  over."  That was May 1st.  May 1st, 26 days before the murder.

3       May 9th, two weeks before the murder.  "All my life my

4  mother said she treated me so bad, and I let this bitch come

5  in and she basically sabotaged my shit.  I'm hurting.  I'm

6  hurting to a point it just hurt.  Want something all your life

7  and you finally get it, and some motherfuckin' slut ass bitch

8  come in and sabotage it."

9       She goes on, "But yo, I put on all black last night,

10  suited up, knobbed up.  I went to that bitch's house.  Feel

11  me.  I was in the backyard and front yard.  I sat out there

12  and tried it, how I could kill her, real talk, without getting

13  caught.  I'm not scared to hurt nobody.  Killing is in my

14  blood.

15       She goes on, "When this shit happened to me and I remove

16  myself from the situation, I'm not scared, yo.  Bitch had a

17  gun on me, pull a gun on me," meaning Jennifer.  "I've had

18  guns pointed at my head for bullshit.  I'm not saying I'm hard

19  or nothing like that, but I'm crazy.  I'm crazy, yo.  I'm a

20  crazy motherfucker."

21       She ends by saying, "Last night I put on all black and

22  went to the motherfucking house and sat there.  Shit.  I tried

23  to throw motherfucking toilet paper with gasoline, set the

24  house on fire.  It's two weeks before."  The person that said,

25  "I'm catching bodies since I was five years old" according to

1    Kiara is Jen.  So they were both dangerous, and we know that

2    Kiara had one, if not two guns -- or Jen had one, if not two

3    guns.  "I'm crazy.  I'm crazy.  You know I'm crazy,

4    motherfucker."  That's Kiara.  "I'm not scared to hurt nobody,

5    killing is in my blood."  That's Kiara.

6         On the day of or day before or the day of, Bri -- it was

7    the day of, May 27th, Brianna Street testified right here

8    before you, ladies and gentlemen of the jury, that Jen told

9    her that Kiara threatened to kill her, meaning Jen and her

10   child, Tone Tone.

11        Toxic relationship is an understatement, but it's not

12   for the Defense to prove anything.  Andre Briscoe literally

13   testified twice through the statements.  June 5th, 2015, it's

14   a statement that Detective Lewis took the witness stand on,

15   but it wasn't played.  The video and audio were not played.

16   There was a transcript, but you all never received that

17   transcript, Government's choice.

18        May 22nd, 2020, I think Detective Azur just sat on the

19   witness stand while the statement was being played, he sat

20   there.  He had nothing to do, because obviously Special Agent

21   Weaver took the statement, but Azur just sat there as they

22   played the statement.  Again, Government's choice.  Sideshow

23   Bob, I meant to mention it before, obviously, that's what CJ

24   referred to Andre as, I mean, as a flunky.

25        When you heard that first statement, you got to agree

1    with me, you all sitting there June 5th, 2015, hi, hi, we're

2    going to hear it now.  We got two homicide detectives.  We're

3    going to hear them say something, at least something really

4    big, like I did it.  Like, an inconsistency that I was in --

5    never went to Baltimore in my life or haven't been to

6    Baltimore in a year.  I didn't hear it.

7        What you heard, no matter how the Government wants to

8    pick and pick and pick and pick at these statements, and

9    you're going to have the 2020 transcripts, so -- not

10   transcript, again, the tape.  So listen to it again, and you

11   can see how absolutely it is consistent.

12       Now, Andre Briscoe is there without an attorney.  Never

13   talked to an attorney.  Didn't expect the police to be rushing

14   into the house on June 5th, 2015.  Didn't expect the police

15   and to be taken down to Cambridge, but there he was being

16   recorded.  He waived his rights, didn't have to.  He's

17   experienced.  We know that he's got prior convictions.  He's

18   been through the rodeo before, as they said.  Didn't care,

19   wanted to talk.  Gave his grandmother's name, didn't remember

20   the address, said Tiffany Jackson, Perkins, didn't remember

21   the address, gave the correct phone number.

22       Come on.  He's not happy, but he gave up.  Got the phone

23   number, Tiffany Jackson.  Tiffany Jackson?  Whoa, wait?  Why

24   would you give Tiffany Jackson's number up?

25       That's where you were when you had the drugs."  He didn't

```
1    care because that's all it was was drugs.  These are homicide

2    cops.  He had nothing to do with any homicide.  So he gives up

3    Tiffany Jackson, where he was, literally, a couple days ago.

4        ID'd the photo of K and Jen, said he met Jen around

5    Valentine's Day.  Based on the investigation, that's accurate.

6    See her in Baltimore, Cambridge, one time a week, that's

7    accurate based on the investigation.  Messing with my cousin,

8    Tony.  That's accurate, based on the investigation.  Things

9    cooled off, that's between Tony and her.  That's accurate

10   based on the investigation.  Admits coming to Baltimore on

11   May 26th.  We actually used the calendar, right there,

12   May 26th, the very day.  I mean, if you're going to give a

13   phony statement or an alibi you're going to say, I wasn't in

14   Baltimore.  He admits it there.  Right there, I'm there.

15       Admits that Kiara paid $50 -- go back to why Kiara was so

16   mad, she took $50 of her hard-earned money, the girl didn't

17   have a lot of money, paying for him to be there, and he's with

18   some other woman.

19       Went to Jen's around midnight.  Well, you have all of the

20   phone records, that's absolutely accurate.  Sat in the white

21   chair.  You got the pictures, that's absolutely accurate.

22   Denied having sex.  We got the autopsy report, you have -- the

23   sheets have been examined, and then he wants to give up his

24   DNA and his semen freely, all accurate.

25       He then discloses he says, "Kissing cousins, Kiara is
```

1    jealous."  And then he said, "Don't let that get out that

2    we're kissing cousins."  That's what he's worried about.  "She

3    paid for me to get up there.  I spend the night at Jen's," all

4    accurate.  Banging on the door, 911, derringer, all accurate.

5    Left, went to Kiara's, accurate.  Eventually back to Perkins

6    at Tiffany Jackson's house.  That's what he said.  Accurate.

7    Junior, Junior, Junior, where are you, Junior, my cousin.

8    Government asked about Junior.  We know who Junior is, "My

9    cousin, picked me up, took me back to Cambridge."

10        Gave the detective the phone, he said he just rebooted

11   the phone, meaning he just repowered on and off, that's all.

12   You saw him turn it back on.  Did you see the video on that?

13   No, we didn't -- yeah, didn't see the video anyway.

14        Then here is the big one, what was Jen doing when you

15   left.  She was sleeping.  Again, if you're going to steal the

16   drugs, she's sleeping, just steal the drugs for God's sakes.

17        Then he goes on to say Tony's connect was Jen.

18   Important, 2015, but the product was garbage.  Garbage.  You

19   ain't killing her and a child for garbage.  Stop dealing

20   heroin.  It's bad.  All accurate based on the investigation.

21   May 22nd, 2020, now when you're hearing that and you got the

22   detective on the witness stand, and you've had -- we heard it.

23   There is no video.

24        Now, you're really waiting for it.  You're waiting for

25   the punchline, you're waiting for, this is it, this is the big

1  moment.  We're going to hear it now.  We're going to hear

2  them.

3       No flight.  Arrested.  No flight.  Still no attorney.

4  Five years later where was he?  Was he in Texas?  Was he in

5  Alabama?  Was he in California?  Baltimore, working

6  construction.  Consents to the interview.  Sure, he's

7  aggravated and upset and mad.  He's been through this multiple

8  times.  He keeps on saying, "I said this, I told you all.  You

9  all know this stuff already.  Why are you repeating it?"  Sure

10  he's mad, because he's basically being accused of murder,

11  again.

12       You read that.  You look at that.  You'll see.  Does his

13  story change?  Not dramatically.  Very little after five

14  years.  Why?  Because the basic truth doesn't change.

15       When Andre Briscoe was arraigned, he said he was not

16  guilty.  He maintains that through June 5th, 2015, May 22nd,

17  and today's date.  He says he's not guilty because he's not

18  guilty.  He says he's not guilty because the Government hasn't

19  proven its case beyond a reasonable doubt.

20       Thank you for your time.

21       **THE COURT:**  Thank you, Mr. Purpura.  Ladies and

22  gentlemen, we've been going for over three hours except for

23  one break.  Your lunch has arrived, so we're going to take a

24  recess.  I think that we should just take about a 40-minute

25  recess.  Lunch is going to be in there.  We'll take a recess

1    until 1:30, and we will start again.

2         I think -- quite frankly, counsel, I think we can

3    probably just take a half an hour for you all to eat lunch.  I

4    think that should work.  We're going to start at 20 minutes

5    after 1:00.  We're going to take a half an hour break for

6    lunch, give staff a break.  But then we're going to have

7    rebuttal argument by the Government, and then I'll instruct

8    the -- give you your instructions.

9         So this Court -- again, you should not discuss this case

10   in any way.  You shouldn't discuss what's been said by Ms.

11   Brusca or by Mr. Purpura.  Now you have to wait for the

12   rebuttal argument by Mr. Budlow, and then you have to wait for

13   my instructions, so you should not -- absolutely should not

14   discuss this matter.  Just have lunch and I'll see you all in

15   a half an hour.  We'll take a half an hour break.

16              THE CLERK:  All rise.  Court stands in recess.

17        (Jury exits courtroom 12:46 p.m.)

18        (Short recess taken.)

19              **THE CLERK:**  Court resumes its session.  The

20   Honorable Richard D. Bennett is presiding.

21              **THE COURT:**  All right.  Thank you all very much.

22   And with that, I see you had a nice leisurely lunch,

23   Mr. Budlow, and we can proceed with that.

24              **MR. BUDLOW:**  Exactly.

25              **THE COURT:**  Ready to proceed.  And we'll bring the

1     jury in.

2          Anything else before the jury comes back in?  All right.

3     All right.  Here we go.

4          (Jury enters courtroom 1:35 p.m.)

5          **THE COURT:**  Thank you, ladies and gentlemen.  And I

6     hope you enjoyed your lunch.  And with that, we are ready to

7     continue now with rebuttal by the Government.

8          Mr. Budlow?

9          **MR. BUDLOW:**  Thank you, Your Honor.

10         Good afternoon.  Ladies and gentlemen, it never fails,

11    when all of the evidence, like it does in this instance,

12    points indisputably, and without any doubt at one person, and

13    that's the Defendant.  The Defendant comes into court and

14    points the finger at everyone else, and that's exactly what

15    you heard for the last hour and 14 minutes.

16         Al Harris, Wane Briscoe, Terrill Harris, Tonya Harris,

17    not CJ Williams, Baltimore Police Department, the ATF, the

18    FBI, the Government.  Nobody escapes the empty finger pointing

19    of a cornered Defendant.

20         Now, the overview of the evidence, which you heard

21    before, is exactly what I'm talking about, which shows you

22    that all of it points indisputably and beyond all doubt at the

23    Defendant.  He had the motive, he wanted the drugs, he knew

24    Jen was vulnerable.  We proved that to you, his words proved

25    that to you.  He's the last person to speak to the Defendant.

1    I believe they seemed to be conceding that finally.  It was a

2    ten-minute walk away.  He had the opportunity.  He turned his

3    phone off.  He called for his ride.  He fled to Cambridge with

4    Jen's drugs.  Make no mistake about it.  And then he lied to

5    the police over and over again, and he lied, as we'll discuss

6    in a minute, about Jen.  Not about other things.  He lied

7    about Jen.  He confessed four times, and there were no

8    eyewitnesses to this crime.

9        Well, there was one eyewitness to this crime, but he made

10   sure there were no surviving eyewitnesses.  And then he never

11   picked up the phone, sent a text message, called Jennifer

12   Jeffrey again.  You'll see the pattern.  They were in regular

13   communication.  He called her from his phone on her regular

14   smartphone.  He texted her on her regular smartphone.  He

15   called her and texted her from his phone to her flip phone,

16   but after 11:41 a.m. on May 27th, 2015, when nobody else in

17   the world knew that Jennifer Jeffrey was dead, he never called

18   her again.

19       And despite all of that evidence, the Defense does what

20   they do, and that is to attack the Government witnesses, and

21   attack the investigators.  But before we talk about some of

22   the Defense theories, I would like to just maybe clarify a

23   couple of the facts raised by Mr. Purpura.

24       Mr. Purpura says that the entire Government theory is

25   that these are the same drugs, and that might be the grossest

1    overstatement we've heard the entire day.  Those are the same

2    drugs, but the theory is the Defendant killed Jennifer Jeffrey

3    and K.B. to rob her, and to make sure there were no witnesses,

4    that's the theory.

5         But we see why, because their Defense is that gray equals

6    beige equals not guilty.  I saw it.  I watched it on the

7    screen, they're two colors, I agree.  I don't follow it.  It's

8    been years.  I don't know if we care it's been five minutes,

9    gray versus beige does not equal not guilty.

10        The Defense wants you to believe that Terrill Harris

11   testified in this witness -- at that witness stand right now,

12   in trial, and he said that dope was good.  That's what the

13   Defense said to you.  Here is the official transcript of

14   Terrill Harris, Sr.'s testimony.  "And did you try it?  Yes, I

15   did.  And how was it?  It was okay."  Not what Mr. Purpura

16   said.  His entire Defense is based upon it being the great

17   heroin that clearly Jen wasn't selling.  No, he wants you to

18   think that Terrill Harris said it was good because that's

19   their entire theory of the case.

20        Even the Defendant said in his interview years later he

21   said, yeah, I could sell it.  So this isn't a question of

22   whether or not those drugs got people high, because you heard

23   from multiple people that they tried the drugs, and it got

24   them high.  You heard from Terrill Harris, it was okay.  That

25   is consistent with everything that we -- you know, keep in

1     mind Terrill Harris testified that these drugs that were okay

2     were at Tiffany Jackson's house where the Defendant had run to

3     on the afternoon of May 27th.

4          The Defense also says to you, well, we know somehow

5     magically what was the content of that last call.  Mr. Purpura

6     said, and he does say, maybe the Defendant told her he was

7     going to Perkins, maybe.  That is rank speculation and you

8     will hear an instruction from Judge Bennett that tells you,

9     that's exactly what you don't do in this context, you do not

10    speculate.  Because actually what you have is evidence about

11    what they would have been talking about that day, because you

12    see in the phone records they're texting back and forth.  And

13    then there is that call.

14         What's the testimony about what they were planning to do

15    that day?  Kevin Wilder testified that he was told by Jennifer

16    that she was giving him a ride to Cambridge that next day, the

17    day that she was killed, May 27th, 2015.  And then you heard a

18    jail call where Jen told CJ the exact same things the night

19    before.  She said she's giving Poo a ride for $50 to Cambridge

20    the next day.  That's what they were discussing.  Not what

21    they say maybe, and they speculate.  They were discussing that

22    ride, but we now know, you now know Jen never gave the

23    Defendant that ride.  He had other plans.

24         Mr. Purpura talked to you about dreams and there's been

25    some discussion in this case about dreams, nightmares, and

```
 1      it's all based on that recording, right, there's other
 2      testimony about the Defendant has nightmares of Jen grabbing
 3      his privates, and this is where he then goes into a
 4      confession.  And the Defense would have you believe that those
 5      nightmares aren't about Jen, so all of those witnesses are
 6      lying, this is not Jen, but they're about something else, some
 7      incident of sexual molestation when he was a child, which if
 8      it's true, it's awful, and he says it on the call.
 9           Now, remember what does Al Harris say to him on the call,
10      "I didn't know that," but it's on a call.  But what I want to
11      point out to you is that unlike what Mr. Purpura says, which
12      is that there is evidence that the dreams are related to this
13      prior incident, is not in evidence.  The Defendant doesn't
14      even connect it in his own words.  He separately talks about
15      the dreams.  Later, in the same recording, he mentions that he
16      had been abused as a child.  He does not say, "And those are
17      the nightmares that you and I were taking about five minutes
18      ago."
19           So there is no evidence drawing that connection, that's
20      the Defendant's speculation.  The evidence is that he had
21      dreams and nightmares or that he was haunted by what he did,
22      as he should have been.
23           Now, you have heard, I will call it criticism of the
24      Government's case, that the Government didn't play all of the
25      recordings.  They didn't play the whole -- for example, the
```

1   whole recording from June the 5th in Cambridge, but you heard

2   the uncontradicted testimony of Detective Brian Lewis, and he

3   told you that recording was very hard to hear.  Each word and

4   each sentence, he had to go back and forth, and back and

5   forth, and it took him hours just to come up with a portion of

6   the transcript.

7        So Mr. Purpura is right.  We could have, while Detective

8   Lewis sat on the witness stand, played that multiple times

9   over and over again so that you could hear every word, but

10  instead he summarized it for you, and he was, just like every

11  other witness in this case, subject to cross-examination.  So

12  you were able to determine the truth of what Detective Lewis

13  said the Defendant said.  And I suggest to you that that

14  testimony from Detective Lewis about the Defendant's conduct

15  and where he went, which we'll talk about later, his dealing

16  in drugs with Jen and CJ, is uncontradicted.  Uncontradicted

17  by Detective Lewis's testimony, uncontradicted in this entire

18  case, but we could have spent another week in trial, true.

19       Ladies and gentlemen, the evidence is, and the way it

20  comes out is that the investigators in this case, they do

21  their job and they follow the evidence.  There is nothing

22  convenient.  There's nothing -- oh, I did want to point out,

23  the Defense talks about exhibits that the Government didn't

24  highlight for you.  They're Government Exhibits, so I don't

25  know what he means by highlight, we put them into evidence,

1    they are Government's Exhibit.  So you can't argue that the

2    Government is hiding the evidence that they put into the

3    trial.

4         But what did the investigators do in this case, they

5    followed the evidence, there's nothing sinister, it's

6    old-fashioned hard work, and the evidence over and over again,

7    pointed to the Defendant.  That's not convenient, that's just

8    the truth, that's just following the evidence.  You heard

9    about interviews, the obtaining of phone records, physical

10   evidence, and you saw where the Defendant was on what days.

11   You saw his cell phone activity.  You saw the glocks.  You

12   heard from witnesses.  You heard from his family.  All of that

13   pointed to the Defendant.

14        You even heard that the detectives followed up on all of

15   the ridiculous tips that we heard about in opening statements

16   and through the testimony and cross-examination of Detective

17   Lewis, people with firsthand knowledge.  They followed up on

18   everything, they looked for corroboration and they continued

19   to follow the evidence, and the evidence continued to point to

20   Andre Briscoe.

21        Now, the Defense says, well, there is nobody who puts

22   Andre Briscoe in the house at the time of the murder, there is

23   no witness.  So what they're saying is there is no eyewitness

24   to the crime, and they're right.  The Defense says there's no

25   eyewitnesses, and they say you should have more.

1          Ladies and gentlemen, common sense would tell you that

2     one -- when one is going to do the dastardly deed that the

3     Defendant did in this case, they're not going to do it outside

4     in broad daylight in front of witnesses.  They're going to do

5     it inside, and like the Defendant did, sadly to eliminate, and

6     kill the witnesses.

7          The Defense certainly could not be suggesting that if the

8     Defendant committed this crime, and there were no witnesses,

9     because he arranged for it to be that way, that he walks off

10    scot-free.  It's not that easy.  And, of course, you know

11    there were eyewitnesses to the crime, you know, exactly what

12    you will hear, just like you heard with the confession,

13    they're not credible, they're not consistent, and we'll talk

14    about that in a moment.

15         The Defense says -- well, first of all, the Defense has

16    no obligation to have a theory, to put on a Defense, to

17    question witnesses, they have no burden whatsoever.  But it's

18    fair to say, what is the Defense?  Is it that Kiara Haynes did

19    it, or is it that Kiara Haynes and Tarrell Powell did it, or

20    is it that Kiara Haynes and Jaron Laws did it?  It's a little

21    unclear based on what we've heard here today and throughout

22    this trial.

23         But are they really arguing that Tarrell Powell could

24    have been the fam or the blood that Kiara Haynes was talking

25    about on the phone?  I mean, they completely ignore that part

1    of the call.  Tariek says, "Tarrell you should rock with her,"

2    or "roll with her."  And what does Tarrell say, "No way."

3    Like, it's not even close.  They don't discuss it again.

4    Tarrell says, "I'm not doing" -- "I'm not part of that.  I am

5    not going," and you have the call, you listen to it, he's not

6    going.

7         They also ignore the testimony of Martin DaShields, and

8    they ignore the testimony that puts the Defendant in Martin

9    DaShields's car.  Martin DaShields testified, and this is just

10   with respect to Tarrell Powell.  Picks him up in Perkins

11   Projects, with Kiara Haynes, there's another person.  We know

12   there's cell towers, which the Defendant knows through calling

13   patterns, and those are the Defendant's own words.

14        And they drive to the intersection to get a gun, and the

15   two of them get out, get the gun, and the two of them came

16   back.  They got the gun from Tarrell Powell, that's not even

17   being contested.  So there cannot be any legitimate suggestion

18   that Tarrell Powell is in any way involved in this crime

19   outside of his role of supplying the gun.

20        Ladies and gentlemen, those are facts that are just

21   simply not in evidence, this is pure speculation.

22        Defense says, well, Kiara Haynes is not a credible

23   witness.  Kiara Haynes lied and her story evolved, and she has

24   a history of lying under oath.  And she has jail calls where

25   she expresses disdain, to say the least, for the victim in

```
1    this case.  It's true.  All of it's true.  But the first thing
2    I want to tell you is you do not need the testimony of Kiara
3    Haynes at all in this case.  You can ignore her testimony.
4        I don't think I mentioned it in opening, you have more
5    than enough evidence beyond any doubt, based on all of the
6    other evidence in this case.  Statements to others.
7    Statements to the police.  His acting with a guilty conscious
8    afterwards, cell tower data, all of that which I'll go
9    through.
10       You can completely disregard the testimony of Kiara
11   Haynes.  But I suggest to you, you make that decision.  Don't
12   let the defense make that decision for you.  Don't let me make
13   that decision for you.  You evaluate her testimony, and, of
14   course, given her history, carefully.  Any fact of her
15   testimony, make sure it's corroborated.  Make sure it makes
16   sense.  I think if you do that, you'll come to your own
17   opinion.
18       Now, Kiara Haynes, as I said in opening, was jealous.
19   She was angry.  It was about men.  It was about drugs.  All
20   true.  But even the Defense didn't argue to you directly that
21   she pulled the trigger.  Yes, there is a jail call where she
22   says, "killing is in my blood."  And look, she's guilty, she
23   pled guilty.  She had motive, and she acted on it.  But they
24   leave out the part of the call where she says, "I'm just
25   ranting.  I just want you to say I'm right."  Listen to the
```

1    call.  I'm not making those words up.  That is a disturbing

2    rant, no doubt about it, and we should not judge people based

3    on how we speak, right?  By any standards, it's a pretty

4    disturbing rant.  But then she says, "I'm just ranting."  And

5    he says, "What do you want from me?"  She says, "I just want

6    you to agree with me."  She's expressing herself in ways

7    different than most of us, but she does say that in any event.

8         Ladies and gentlemen, Kiara Haynes did not put that gun

9    to the temple or the cheek of her godson Tone Tone, and pull

10   the trigger.  She's guilty and she will face a sentence before

11   Judge Bennett, but there is no credible evidence that she did

12   that.

13        She didn't have the motive to do it.  The Defendant, who

14   needed no witnesses who can be identified, who was about to

15   get what he thought would be the biggest drug score of his

16   life, because he didn't want to work for those drugs, he

17   wanted to steal them.  The drugs that even he said they sold,

18   they weren't great for being stolen, he wanted it free, but

19   Jen knew him, and Tone Tone knew him, and there couldn't be

20   any witnesses, and Kiara, well, just the truth.

21        Now, the other thing is the witnesses in this case are

22   his close family, the family that love him, that grew up with

23   him.  They were raised with him and they dealt drugs with him.

24   And all of those witnesses on that chart that are right there,

25   they're all lying, according to the Defendant, to put him in

1   jail to protect their distant cousin that they just met.  Why?

2   Is there a shred of evidence in this case of why they would

3   lie to put the person who is uncontradicted, they love, they

4   have a close relationship with?  There's no evidence before

5   you.  It doesn't make any sense.  They would not protect

6   Kiara.

7       So the Defense says, it's not a lie.  What happened to

8   the entire opening statement that you would have all of this

9   evidence that basically everybody in Baltimore City had a

10  motive to kill Jen Jeffrey.  BGF, Bloods, CJ Williams with the

11  shootout, and that was a lovely witness.  Of course he's

12  involved.  How do you know he's involved?  The drawer was

13  open, the room was disturbed.

14      According to a jail call, there were 80 grams of heroin

15  at her house.  CJ Williams told her, 80, 90 grams, go get it,

16  take it back to your house, you know they were there.

17      Brianna Street testified Jennifer threw her a bag of

18  drugs.  I know Brianna didn't say it was drugs.  We all know.

19  Black bag, heavy in weight to her, she didn't want to look in,

20  she said, put it up, bag of drugs.  Even the Defendant said,

21  he was aware, in his ATF interview, he was aware that Jen had

22  stuff to move.  And he turned up with gray or beige or brown

23  drugs that night.  And you know what, there is no evidence in

24  this case, except his own self-serving statement that he has

25  any source of heroin in Baltimore, except his plug.  And we

know who his plug is, Jennifer Jeffrey.

And the last reason why you know it was a robbery, because there were no drugs in the house.  Police didn't find them.  Brianna Street told you they weren't there.

Now, the fact that there was no ransacking throughout the house doesn't mean that there wasn't a robbery.  There was ransacking.  Brianna Street told you that's not how her room looked, but it was precise ransacking, because the Defendant went there that night to butter up Jen, and to get information.  And you know that happened for a variety of reasons, because Brianna Street testified that after she learned that Poo was coming over, Jen came up and said, give me those drugs back.  Again, she didn't say "drugs," give me that back.  She gave her the bag.

She went downstairs while the Defendant, by his own admission, was in the house.  Now, what reason is that?  Remember, she's his plug.  He knows she's moving weight for CJ to get CJ out of jail, and they wanted him to do it.  She showed him the drugs.  This is it.  This is the 250 grams that he's been telling people about.  He sees the drugs, he knows she goes upstairs with the drugs.  He hears her talk to Brianna.  He might have been on the couch and heard it.  He might have been at the bottom of the step, because common sense would tell you, Brianna is in her bed.  She's dealing with Jen, she cannot see past Jen down to the bottom of the

1    stairs, so he's fully aware of that.  So yes, it was a

2    robbery.

3        The Defendant was in the car with Martin DaShields.  His

4    own statements made that conclusive.  You heard argument today

5    that it might have been someone else.  Yes, Martin DaShields

6    looked at a picture of somebody in that book named Jaron Laws,

7    and you know why he was there, because he was involved in the

8    early interviews by Detective Lewis.  And he said, that guy

9    looks, kinds of, familiar or words to that effect.  He did not

10   say, "That's the guy," right?  He didn't.  And the Defense in

11   opening, he did not identify him in the courtroom.

12       Can you imagine if I would have asked that question while

13   the Defendant is sitting there as the only person in the

14   courtroom?  Does that sound fair?  Do you think that would

15   have gone over?

16       Kiara Haynes testified that was the Defendant in the car,

17   and you have corroboration of that.  You have conclusive

18   evidence that that was him, because in his statement to

19   Detective Lewis on June 5th, and his memory was great.  2015,

20   what did he say?  "Well, I was at Kiara's," cell towers put

21   him at Kiara's.  Kiara and he went to Tiffany Jackson's, cell

22   towers put him at Tiffany Jackson's.  Then, of course, you

23   know there's a phone call to one of the Powells.

24       At that almost precise moment, the car -- or I'm sorry,

25   the Defendant's phone moves back west.  The Defendant says,

1    "Ki didn't want to go home alone, so I took her home."  He's a

2    nice guy.  He's got a lot of chivalry, he wanted to make sure

3    she wasn't alone, those are his words, and he dropped her off

4    and his cell phone records show East Baltimore Edmondson and

5    Warwick, Kiara Haynes.  And then he said, "I dropped her off,

6    I went to Jennifer's."  His phone records show him at

7    Jennifer's all night.

8        So there is no legitimate dispute that he's the person in

9    the car.  And, of course, that's why the Defense tries to

10   argue that Jaron Laws rather than the Defendant in the car.

11   What do we know?  Kiara and the Defendant, according to Martin

12   DaShields talked about a drug score, and they're going to get

13   a gun.

14       Now, I may have heard the defense argue that Tiffany

15   Jackson was both one of the most credible witnesses here, and

16   that it could have been a totally different day that she was

17   referring to when she testified that the Defendant came over

18   sweating, out of breath, holes in his clothes, changed his

19   clothes, angry, pacing, muttering, and he wouldn't answer

20   questions.

21       But she also said it was the last time he was at her

22   house before noon, right?  She also said he was there from

23   early afternoon until sometime close to midnight.  And that

24   she said he said to her he was moving without telling her

25   prior to that he was about to move.  She knew he was generally

1    going to move.  Then he said he's moving to Cambridge.

2         What did the cell tower record show?  He's shows up at

3    her house 1:30, he's there all day, around 11:30, he's calling

4    Wane back and forth all day.  He goes to Cambridge, and guess

5    what, he never went back before he was arrested.

6         So there's no doubt about it, Tiffany Jackson told you

7    about the day Jennifer Jeffrey and Tone Tone were killed.

8    They're found on the 28th.  They're killed on the 27th, and he

9    shows up on the evening of the 27th, that's what his cell

10   phone records show, there's no doubts about it.

11        According to the defense, both in opening and throughout

12   the trial and again today, instead of giving all of these

13   statements to the police, and he's being forthcoming.  He's

14   not running.  He's cooperative.  He gives voluntary DNA.  He

15   provided his phone voluntarily.  He's just not worried about

16   the murders, that's what the defense would have you believe.

17   But let's take a little bit of a closer look at that, because

18   Al Harris testified that he saw the police before the entry,

19   and he gave the guys inside time to get ready.  And they went

20   into the back, and he gave the drugs, and then the Defendant

21   was out.  So sure, he knew they were coming and he knew his

22   drugs weren't there.

23        In his statement to law enforcement -- this is one of

24   those where I'm not even sure if we were in the same courtroom

25   for the past two weeks when I heard Mr. Purpura telling you

1    about how honest the Defendant was.

2         The Defendant did nothing but lie about his interactions

3    with Jennifer Jeffrey when he spoke to BPD and when he spoke

4    to the ATF.  He said he never talked to Jennifer after leaving

5    her house.  This is on June 5th.  He just talked to her, it

6    had been less than a week or about a week, and he said, no, we

7    didn't talk.  He said, "I'm at Tiffany's before noon."  He's

8    just being helpful, just happens to mention that he's at her

9    house before the time he knows she was killed.  And he says,

10   "I stopped getting drugs from Jen and CJ well before the

11   murders."

12        Now, you know that's demonstrably false, because he's on

13   a jail call with CJ where he's saying, I'm still hoping to

14   mess with you.  I'm still hoping to sell drugs with you.  It's

15   clear as day.  Those are all lies that he made to BPD.

16        To ATF he said, why didn't I just spend the night at

17   Jen's.  Time has moved on, his memory is not as good, so he

18   doesn't remember what he told to Baltimore City Police

19   Department.  He says -- he's positive -- remember in opening

20   the defense said, well, it's been a while, maybe he didn't

21   remember whether or not he spent the night, but you recall,

22   you heard this interview.  When he was first asked, did you

23   spend the night he said, no, I didn't spend the night.  I

24   spent the night at Kiara's.

25        Later on in the interview, Special Agent Weaver

1   mentioned, again, that the Defendant spent the night, and he

2   jumped in definitively, no, no, no, I was home.  I was back at

3   Kiara's, I did not spend the night.  Again, he's distancing

4   himself from the victims.  And, of course, just like with BPD

5   he said, well, I wasn't dealing anymore, the drugs weren't any

6   good, we were done.  We even heard in opening that he admits

7   that he was willing and trying to get with CJ and continue to

8   sell them.

9        And really, the most telling of all of his statements,

10  and then I'm sure you noticed it when listening to that

11  recording late last week, is the story that he told about

12  Kiara, that her and Jen were like still good friends.  They

13  had some moments, that's how women are, that's how he

14  described it.  Like, they're fine.

15       The Defense has spent the whole trial explaining to you

16  that Kiara Haynes was out of control, that she was angry.  She

17  was homicidal.  She was losing it outside of her house the

18  night before.  They called the police, she was screaming.

19  Most of that is true, so if that's true, and if the Defendant

20  knows it, right, and he's being asked about those days and

21  those very important hours, and he's being asked about the

22  relationship between a woman that he knows is dead, and his

23  second cousin, why doesn't he say, "Yes, it was bad.  She was

24  out of control.  She was homicidal."  Because if he says that,

25  what are they going to do, they're going to talk to Kiara, and

1     that's the last thing that Andre Briscoe wants to have.  He

2     does not want the police anywhere near Kiara Haynes, so he

3     protects her.

4          Mr. Purpura says that the Defendant's testimony was that

5     he rebooted his phone.  It's true, he used the word

6     "rebooted."  I don't know if he's an IT specialist.  I don't

7     know if he knows the difference between reboot and reset, but

8     what I do know is that Detective Lewis testified, the context

9     of that comment was, can we see the text messages?  And the

10    Defendant said, I just rebooted my phone.  He's telling

11    Detective Lewis there are no text messages.  So I understand

12    what Mr. Purpura is saying.  When I reboot my phone, it does

13    not delete text messages.  That's not what Andre Briscoe was

14    saying, Andre Briscoe was saying, there aren't any text

15    messages.  So I don't know if he rebooted, deleted or reset,

16    but his message to Detective Lewis was clear.

17         So it's not just that he lied, look at his conduct.  No

18    phone activity.  No Facebook activity showing up at Tiffany

19    Jackson's house.  This is not evidence consistent with

20    innocence.  He says to Kiara, through somebody else, get rid

21    of your phone.  Why is she's getting rid of his phone -- her

22    phone if they haven't done anything wrong?

23         He tells relatives, I don't want to talk about it.  He

24    sends a letter saying, the situation, we shouldn't talk about

25    the situation in the past.  Look, the Defendant thinks he's

1    smarter than the police, right?  He turned off his phone for

2    over an hour right before talking to Jen.  He stopped using

3    Facebook.  He didn't realize that to you, turning off your

4    phone right before a murder, that is evidence.  That doesn't

5    hide evidence, that's evidence.  He didn't realize that cell

6    phone companies keep cell tower locations.  He didn't realize

7    that his location right before, and right after the murders in

8    walking distance to the victim's house, even if his phone

9    wasn't used between is evidence.

10          He thought his family would never, ever testify against

11   him.  He thinks he's smarter than everyone.  He also didn't

12   realize that just coming in here and saying Kiara Haynes was

13   mad at Jen wasn't going to be enough to get him an acquittal.

14          Mr. Purpura argues to you that the Defendant, if he was

15   really going to kill Jen and steal these drugs, or just steal

16   the drugs, he just would have taken them that night because he

17   was there the evening of the 26th.  He knew where the drugs

18   are, true and true, he could have just taken the drugs.

19          So he couldn't have just taken the drugs, because

20   although CJ Williams was in jail, CJ Williams wasn't in jail

21   forever.  And the Defendant wasn't willing to face CJ Williams

22   when he got out of jail, and the Defendant was told -- when

23   Jen told CJ Williams, oh, remember those 80 grams or those

24   90 grams, well, guess what?  The Defendant took them from you.

25   So that's a fiction.  That's not happening.

1          Second, could have just killed them that night, right?

2     Wrong, because what do you know, Brianna Street and her

3     one-year-old daughter were in the house.  So unless the

4     Defendant was going to kill four people, two women and two

5     children he knew very well, because he heard Brianna yell to

6     Kiara, "I got to work tomorrow."  And they're there, so he

7     knew, I'll come back tomorrow.  But it makes no sense that he

8     could have committed this robbery or the murder that he had to

9     wait for the next day.  And that's why he was mad at Kiara.

10         He was mad at Kiara.  He's telling her to go apologize,

11    because she's messing things up and she's drawing attention.

12    And you can see it did have that exact effect.  That call at

13    5:00 a.m. left a record, and that record lead to the

14    Defendant.  It didn't get to him all that fast, but it got to

15    him eventually.

16         The Defense says, well, you know, Wane's lying because he

17    didn't -- there's no evidence of a cleanup.  There's no

18    evidence of a pillow, but Wanes not lying, the Defendant may

19    have lied to Wane, because remember what's Wane's testimony,

20    "The Defendant called me, needed a ride, and I said no."

21         So sure, the Defendant in another call maybe says, well,

22    I cleaned up.  It's all good.  He's got to convince Wane it's

23    worth his time for the five grams of heroin to come get him,

24    so it's not Wane that's lying, it's the Defendant that's lying

25    to Wane.  And that's assuming there was no cleanup.  Remember,

1    the drawer is partially closed.  Maybe the Defendant tried to

2    close the drawer, but didn't close it all the way in a rush.

3    There's no prints on any of the drawers.  Whoever killed

4    Jennifer, and we know that the Defendant had to use a door to

5    get in and out, but there's no prints there, so it's very

6    possible that he did clean up.

7         Mr. Purpura, the Defense says, well, the crime might be

8    on video, isn't that camera on?  If only the Government wasn't

9    so bad at their job, if only BPD would have gotten the video,

10   if only ATF would have called Comcast.  Ladies and gentlemen,

11   this is Government's 1.25.  This is the Comcast bill that was

12   found at the Defendant's [sic] house.  In addition, Mr.

13   Purpura clearly read it, because he read some of it to you.

14   But he left out the part where it says under Xfinity Home,

15   package includes 24/7 central station security monitoring

16   services, basic video monitoring, paren, live video only.

17        You're going to have this.  You're going to have a

18   picture of it.  We could have called Comcast.  We could have

19   called every relative on that chart.  We could have played

20   every recording, every jail call.  We could have been here for

21   three more weeks.  The document says, live video only.  There

22   is no server with video on it.  There's no service that ever

23   recorded anything that was in their house.  You had testimony

24   from two witnesses that the videocamera didn't work anyway.

25        So yeah, I guess we could have brought in somebody from

1    Comcast to say, the non-functioning videocamera didn't retain

2    video.

3        All right.  My last topic, is the credibility of

4    witnesses.  The Defendant has argued to you, I would suggest,

5    these are bad people, and you shouldn't believe in them

6    because they're bad people.  They do drugs, they sell drugs,

7    they lie about doing drugs, lie about selling drugs.

8        Ladies and gentlemen common sense tells you, when you

9    have a drug-related murder in Cambridge or Baltimore City,

10   these are the witnesses that you would expect.  Witnesses to

11   crimes are real people, they're going to be people the

12   Defendant knows, the Defendant hangs out with, the Defendant

13   does business with.  Your common sense tells you that these

14   witnesses are exactly who you would expect them to be.

15       The Government did not pick these witnesses, the

16   Defendant picked the witnesses.  He decided who to hang out

17   with.  He decided who to love.  He decided who to sell drugs

18   with, and he decided who to confess to.

19       When you're reviewing their testimony, judge their

20   credibility based on what you saw.  Your observations of them

21   on the witness stand, not what the Defense tells you.

22   Consider their prior statements under oath, their recordings,

23   their testimony, all of this, but you saw in person, and you

24   listened to their testimony.  You are the judges of their

25   credibility.

1           Now, I see a lot of you taking a lot of notes.  I hope
2      your handwriting is better than mine, because I've tried to
3      read what the witnesses said.  But I think that you will see
4      that as jurors, your job is very much like witnesses are, and
5      this is what I would suggest to you.  It's more in theory than
6      reality, but you can do it.
7           When you go back into that jury room to deliberate, place
8      one of the jurors at the table and have the other jurors say,
9      tell me what you saw for the last two weeks, and then go to
10     another juror, and then do it to another juror.  And what
11     you're going to see is that they're all going to have slightly
12     different versions of what's going on in this courtroom, in
13     that witness stand, the lawyers and judge, the gallery.  But
14     what you're also going to see is that each of those jurors is
15     going to tell you what they remember that was important to
16     them.  And that's what being a witness is just like that, the
17     witnesses are going to remember what's important to them.
18          There's never been a criminal trial where every witness
19     got on the witness stand, and didn't say anything inconsistent
20     with something they said previously, something another witness
21     said, because they're human beings.  If we called in witnesses
22     like that, the Defense would say, oh, they're coaching their
23     witnesses, they're like robots.  We don't call robots, we call
24     human beings, and human beings remember what's important to
25     them.

1          The Defense is, well, these confessions, there was nobody

2     else around, they were always alone.  Well, again, use your

3     common sense.  The Defendant has committed, and is struggling

4     with the most dastardly deed of killing an innocent child.

5     He's not going to stand out in the street where he's selling

6     drugs with all of his cousins and tell everybody at the same

7     time, he's going to tell them in a moment of weakness at the

8     kitchen table, along a drive in somebody's house when he's

9     drunk, when he's high, when he's just woken up from a

10    nightmare.  That's what your common sense tells you.  He's not

11    going to tell a group.

12         I want to make a distinction between Kiara Haynes and

13    every other witness in this case.  Kiara Haynes is a

14    cooperator.  She pled guilty.  She's going to ask for leniency

15    based on her testimony, put her over here.  That doesn't apply

16    to any of these other witnesses.  They're witnesses.  They're

17    not getting a break.  They're not charged with anything.

18    They're witnesses.

19         Mr. Harris, after providing honest information without

20    any promise of any benefit -- in fact, he tried to get a

21    benefit and BPD said, no.  They didn't give it to him.  He

22    came forward again with the same information.  And then after

23    he gave all of that information, Special Agent Weaver said --

24    what I think that you all in hindsight will realize was a

25    brilliant decision -- "Will you work undercover?  Will you try

1  to get recordings of your cousin saying some of the things to

2  you that you told us he said already?  Like the dreams and

3  like the drug dealing?"  And he did just that, and he got paid

4  for it.  But you know what?  That's proactive undercover work,

5  and it's dangerous.  And law enforcement doesn't ask people to

6  do that every day.  It's an obligation to testify truthfully.

7  But if you're going to ask a witness to do something

8  dangerous, especially a witness like Al Harris, you have to

9  give them a benefit.  But don't throw a connection between

10  that benefit, and those undercover recordings, which are

11  corroborated by the Defendant's words, and the information

12  that Al Harris had already provided twice, and has since

13  testified to consistently.

14      I'm going to go through witnesses, but the overarching

15  theme for all four of these witnesses, Wane Harris, Al Harris,

16  Terrill Harris, Tonya Harris, Wane Briscoe.  There's too many

17  Harrises.  None of them have a motive to lie.  The Defense has

18  pointed to nothing credible in this record that would provide

19  a motive for any of them to lie against their cousin, Andre

20  Briscoe.

21      Again, you saw them testify.  Wane Briscoe's Grand Jury

22  exhibit, as I was referencing earlier, his Government's

23  exhibit.  Wane Briscoe does not have the Huntington's disease

24  that Mr. Purpura asked him about.  He testified that he

25  doesn't have the symptoms.  He testified that he got tested,

1   and it was negative.  So what does that have to do with this

2   case?  Nothing.

3       I'm speaking "him."  So Wane Briscoe was in Glen Burnie

4   for four hours, and either doesn't know what he was doing, or

5   doesn't remember what he was doing, and what does that have to

6   do with this case, because what we know is Wane Briscoe was in

7   Glen Burnie or Cambridge at the time the Defendant killed

8   Jennifer Jeffrey.  He's not part of the murder.  What was he

9   doing?  He was probably buying drugs.  Wane Briscoe told you,

10  he couldn't have been more forthcoming, that's what I did in

11  2015.  I was buying drugs.  I was selling drugs.  I was

12  packaging drugs.  There is nothing memorable about buying

13  drugs in 2015 when you do it every day.  There is something

14  memorable about your first cousin telling you that you

15  committed an execution murder of a seven-year-old to keep him

16  from testifying, that is memorable.  And that's what you would

17  expect him to remember.  He was always unsure of times.  The

18  phone records are how you figure out times.  Just like how we

19  know Tiffany Jackson's story when it occurred was on the night

20  of the murder, Wane Briscoe was unclear of a lot of time.  He

21  actually said, daytime or nighttime occasionally, but if you

22  look at the phone records and you look at his testimony,

23  you'll see how it tells the story the exact same way.  And

24  what was he clear about.  He knew the order of the calls and

25  he knew the substance of the calls.

 1          Look at Government's Exhibit 11.2 that Mr. Purpura and

 2   Ms. Brusca referenced.  There's 52 calls between them in less

 3   than two days.  The nighttime versus daytime come get me call.

 4   It establishes the exact pattern.  There was missed calls.

 5   There's a connection around 1:00 in the afternoon.  There's

 6   frantic calls by the Defendant to Wane Briscoe unanswered all

 7   day.  There's connected calls in the evening and then Wane

 8   Briscoe comes up to Baltimore, that's the exact pattern that

 9   he discussed, the timing is different.  And remember that Wane

10   Briscoe testified that the day before when the Defendant

11   called him and said, I want to help you commit a robbery, the

12   Defendant also said in that call, "come get me," the same

13   words were used, "come get me."

14          So when you look at that Grand Jury transcript, that I

15   suggest that you look at, and listen to his testimony in

16   addition to the recordings, there's some confusion sometimes

17   as to which of those two days is being discussed, and I will

18   concede that Wane Briscoe was inconsistent at times relating

19   to the timing, but you'll see there were two very similar

20   calls.  One was the day before, and one was the day after of

21   the murder.

22          But Wane Briscoe has simply no motive to lie.  He owns

23   his drug dealing.  He even told you that he considered and

24   briefly agreed to commit the robbery, but you know what, the

25   Government didn't know about that, the ATF didn't know about

1    that, they only learned about that because he told them.   And

2    remember, if the Defendant is guilty as an accomplice, as the

3    Defense says, he's only guilty if the Defendant -- I'm sorry,

4    if Wane Briscoe was guilty, he's only guilty if the Defendant

5    is guilty.   And look at Wane's testimony, cell tower records

6    corroborated, Terrill Harris corroborates, Terrill Harris

7    saying, the Defendant said to him, God was going to punish me

8    corroborates it.   The calls from the Defendant corroborate it.

9    Tiffany Jackson saying the Defendant showed up that same night

10   acting guilty corroborates it, and Kiara Haynes corroborates

11   it.

12        So he's corroborated by other evidence in the case, but

13   he's also corroborated by all of his prior statements.   It's

14   on tape.   It's in the Grand Jury.   It's in the hospital.   You

15   saw some of time, watch that video.   Watch what he says and

16   watch his demeanor.   Did he pause when answering some of the

17   Defense questions, yes, in front of you, under oath years

18   later, watch that interview of him in the hospital, or

19   remember your viewing, remember his demeanor, watch his

20   reaction when the detective asked him questions, and he goes

21   what about it?   And Wane is just dumbfounded he goes, the

22   murders, that's what he's talking about, the murders.   But the

23   ultimate corroboration of Wane Briscoe was in that interview

24   on the fourth clip that you saw.

25        Photo is Government's Exhibit 2.8, page 6, and the audio

1    recording is 18.12, what does he say?  What does he say the

2    Defendant tells him?  "She was at the table.  He shot her in

3    the head.  She never saw it coming."  There's no evidence in

4    this case that anybody knew that outside of law enforcement.

5         Look at page 6, and you will see next to Jennifer's body

6    is the chair and the trash can.  And now, after listening to

7    what the Defendant told Wane Briscoe, you have the full story,

8    because he surprised her.  She was sitting at the table, she

9    didn't see it coming, and when he shot her, she fell, knocking

10   over the chair and the wastebasket.  He could not have known

11   that, he was in Delaware or Cambridge as they have told you.

12        Al Harris did not get help from the feds.  The Defense

13   has argued that they did, there is no evidence of that.  What

14   he says is not evidence.  The testimony was clear, the

15   Government did not help Al Harris in any of his cases.

16        The Defense argues that Al Harris's statements are

17   inconsistent on where he was exactly when he first heard this

18   confession.  And this is a perfect example of what I was

19   mentioning earlier, witnesses remember the important, not what

20   day of the week it was or what time of day it was, or whose

21   house they were at.  His nephew told him he shot the bitch,

22   and he did it, and he shot Tone, that's what he remembers.  He

23   said, the Defendant told him he shot the child because he

24   could identify him, that's what's important.  That's what he

25   remembers.  He has no motive to lie.  But like Wane, Al

1    provides information that is indisputable corroboration,

2    because when he comes forward in 2016, that's 2016, he says

3    the Defendant told him Kiara is not so innocent.  She got the

4    gun.  2016 remember, law enforcement does not even know about

5    that call with Tarrell Powell until Kiara Haynes comes in and

6    tells them, and they go back and find that call from way back

7    in May 26th, 2015.

8         Just like Al Harris said, Kiara and her fam needed a gun

9    to rob these people of the drugs that she was sitting on.

10   Nobody knew about that call.  Special Agent Weaver didn't know

11   about that call when he first talked to Al Harris.  You all

12   heard Al Harris's numerous prior inconsistent statements, I

13   suggest that you listen to those as well, all saying the same

14   thing over and over again.

15        His ATF interview of October 26, 2017, his Grand Jury

16   testimony on February 19th, 2020.  His interview with BPD on

17   November 9th, 2016.  "The kid could recognize him because he

18   seen me there."  He said he did it because the boy had seen

19   him.  And time, Mr. Purpura says, well we don't know what

20   happened in between her first statement and her second

21   statement.  All right.  And she came in and she told you she

22   lied the first time, she didn't provide all of the

23   information.  Critically, she didn't provide a confession, but

24   we do know that, because she told you that, and it's really

25   uncontradicted.  It's simple.  It's a little strange, she

1    smelled a baby, and it made her think about her own kids, and

2    it made her think about Tone, that's her testimony.  When she

3    called Special Agent Weaver, she told him, right, and then he

4    called her again and they had another longer call that he

5    recorded, that you heard parts of.  And then she testified in

6    Grand Jury all of the same.

7         So yes, she did lie, initially, and she sat there, and

8    she looked at you, and she looked at the Defendant.  She told

9    you, I lied previously, I have no reason to lie now.  I was

10   afraid, he did -- he told me he did it.  He told me, I did it,

11   I didn't do it.

12        You are the judges of credibility.  Remember Tonya

13   Harris, she sat across the table from him as he cried.  Not

14   only that, Tonya Harris told you that the next day she asked

15   him about it again, and he denied it.  Who does that?  If

16   she's making up a story, who builds in a subsequent denial,

17   does that make any sense or does that ring true because it is

18   true?

19     Tonya Harris is not just a good witness, she's a truthful

20   witness.  She had no motive to lie and she came in here and

21   she told you everything.

22        Now, Ms. Whalen said in opening statement that it's human

23   nature to point the finger at people even though they didn't

24   do it.  I disagree.  I disagree.  I think it's human nature to

25   give people the benefit of the doubt, and that's what Tonya

 1    Harris did.  Because sure she was hearing rumors but she

 2    didn't have any evidence, but when the Defendant said to her,

 3    "I was dreaming about Jen, and she's grabbing my nuts in my

 4    nightmare," that's when Tonya said, you sound like you killed

 5    her.  And the Defendant said, "I did it.  I did do it."  But

 6    she lied to protect him, and she eventually came forward and

 7    she told you, she looked right at him.  She loved him and she

 8    still loves him.

 9         So I disagree with Ms. Whalen that's it's human nature to

10    want to implicate people for crimes that they didn't do.  It's

11    human nature to give the people the benefit of the doubt, but

12    the Defendant did this crime, even as terrible as it is, and

13    he told Tonya Harris.  She told you.  Remember, you judge

14    credibility.

15         Ladies and gentlemen, the government is not asking you to

16    like any of these witnesses.  Some have committed crimes.

17    Some have agreed to commit violent crimes.  Some likeable,

18    some are not.  Even some of the ones that committed crimes

19    might be likeable, but we're not asking you to like them.

20    Just follow the evidence, and the evidence tells you that

21    those witnesses are telling the truth, and you don't need to

22    rely on any single one of those witnesses, because you have

23    all of the evidence of the Defendant's location, his phone

24    calls, his conduct covering things up, his turning off his

25    phone, any one of those witness, Tonya Harris, plus all of

 1    that evidence is not a convicted offense.

 2         Wane Briscoe and all of that evidence is not, but you

 3    don't have to look at them in isolation.  You're not being

 4    asked to find beyond a reasonable doubt if Tonya Harris is

 5    telling the truth.  Your simple question, each of those

 6    elements on the verdict sheet is when you view all of the

 7    evidence in totality, is the Defendant guilty, did he kill Jen

 8    and Tone Tone?

 9         This case is not whether you believe Kiara Haynes, you

10    can believe Kiara Haynes, and there's a lot of reasons to do

11    so, but the evidence in the case is overwhelming without her

12    testimony, and it's overwhelming without any individual

13    witness's testimony.  You have motive.  He was the last person

14    to speak to Jen.  He had the opportunity.  He was there.  He

15    turned off his phone, there is no explanation for that.  He

16    stopped using Facebook.  He called for his ride.  He fled to

17    Cambridge with Jen's drugs.  He lied to the police multiple

18    times, and those lies all referenced Jen, distance from the

19    victim.  He confessed four times.  There is no witnesses

20    because he killed Tone Tone.  He never called Jen again and he

21    protected Kiara Haynes.

22         Ladies and gentlemen, the Defendant has certainly had

23    his day in court.  Give him what he's earned.  Give him a

24    verdict of guilty.  You're 12 or soon to be 12 reasonable men

25    and women.  The Government's case has literally overflowed

1   with evidence of this Defendant's guilt.  So I -- we turn you

2   over to your good common sense in evaluating the evidence of

3   viewing the testimony.

4       Federal investigators did their jobs gathering the

5   evidence.  The Government has done its job presenting it to

6   you.  Now, it's your turn.  I ask you to do your job, consider

7   the evidence fairly, come back in this courtroom and say we

8   find the Defendant guilty of whatever you want to call, but

9   the murders of Jennifer Jeffrey and K.B., III, Tone Tone, and

10  all six counts charged.

11      Thank you.

12          **THE COURT:**  Thank you very much, Mr. Budlow.

13      Ladies and gentlemen, I'm now going to read the

14  instructions to you.  This is a very important process here.

15  I will tell you that you don't see this on television ever,

16  because if you did, the ratings would go right through the

17  floor, okay.  That's a very simple matter, and this is done in

18  every case, and I think only two of you have had prior jury

19  service, so you wouldn't understand this, but this is very

20  important here in terms of my instructing you on the law.

21  These will be tape recorded, but you won't have a copy of the

22  tape itself.

23      What I'm going to read, you're going to get copies.

24  Every one of you, all 12 of you will have instructions every

25  one of you, all 12 of you will have instructions handed you to

1    when you start your deliberations, as well as the verdict

2    form, and the alternates just stand by, because you stay here

3    and you're very much a part of the process.  And they are

4    indexed with descriptions, and with an index and the page

5    numbers on them.

6         You have now heard all of the evidence and the arguments

7    counsel, and are about to enter your final duty which is to

8    decide the fact issues in the case.  Before you to do that, I

9    will instruct you on the law.  You must pay close attention to

10   me now, I will go as slowly as I can, and be as clear as

11   possible.

12        I told you at the very start of the trial your principal

13   function during the taking of testimony would be to listen

14   carefully and observe each witness who testified.  It has been

15   obvious to me and to counsel that you have faithfully

16   discharged this duty.  Your interest never flagged and it is

17   evident that you followed the testimony with close attention.

18        I will ask that you give that same careful attention as I

19   I instruct you on the law.  You have now heard all of the

20   evidence in the case, as well as the final arguments of the

21   lawyers for the parties.  My duty at this point is to instruct

22   you as to the law.  It is your duty to accept these

23   instructions of the law and apply them to the facts as you

24   determine them, just as it has been my duty to preside over

25   the trial and decide what testimony and evidence is relevant

1           under the law for your consideration.

2               On these legal matters, you must take the law, as I give

3           it to you.  If any attorney has stated a legal principle

4           different from any that I state to you in my instructions here

5           this afternoon, it is my instructions that you must follow.

6           Your role is to pass upon and decide the factual issues that

7           are in the case.  You the members of the jury are the sole and

8           exclusive judges of the facts.  You pass upon the weight of

9           the evidence.  You determine the credibility of the witnesses.

10          You resolve such conflicts as there may be in the testimony,

11          and you draw whatever reasonable inferences you decide to draw

12          from the facts as you have determined them.

13              In determining the facts, you must rely upon your own

14          recollection of the evidence.  The evidence in this case

15          consists of the sworn testimony of the witnesses and the

16          exhibits received into evidence.  What the lawyers have said

17          in their opening statements at the beginning of this trial,

18          and what they've said in their closing arguments today, in

19          their objections, and in their questions to the witnesses, is

20          not evidence.  What I say here right now is not evidence.

21              Since you are the sole and exclusive judges of the facts,

22          I do not need to indicate any opinion as to the facts or what

23          your verdict should be.  You are to perform the duty of

24          finding the facts without bias or prejudice as to any party.

25          You are to perform your final duty in an attitude of complete

1   fairness and impartiality.  The case is important to the

2   Government, for the enforcement of criminal laws is a matter

3   of prime concern to the community.

4        Equally, it is important to the Defendant who is charged

5   with serious crimes.  The fact that the prosecution is brought

6   in the name of the United States of America entitles the

7   Government to no greater consideration than that afforded to

8   any other party to a litigation.

9        By the same token, it is entitled to no less

10  consideration.  All parties, whether Government or individuals

11  will stand as equals at the bar of justice.

12       Defense counsel have an ethical duty to investigate and

13  secure relevant information that may assist in the defense of

14  the case.  This duty may include engaging an investigator to

15  conduct interviews of potential witnesses.  Your verdict must

16  be based upon -- must be solely based upon the evidence

17  developed at trial or the lack of evidence.  It would be

18  improper for you to consider in reaching your decision, as to

19  whether the Government sustained its burden of proof, any

20  personal feeling you may have about the Defendant's race,

21  religion, national origin, sex, or age.

22       All persons are entitled to the presumption of innocence

23  and the Government has the burden of proof as I will discuss

24  in a moment.

25       It would be equally improper for you to allow any

1    feelings you might have about the nature of the crimes charged

2    to interfere with your decision making process.  Under your

3    oath as jurors, you are not to be swayed by sympathy.  You are

4    to be guided solely by the evidence in this case, and the

5    crucial hardcore question that you must ask yourself as you

6    sift through the evidence is, has the Government proven the

7    guilt of the Defendant beyond a reasonable doubt.

8         It must be clear to you, once you let fear or prejudice

9    or bias or sympathy interfere with your thinking, there is a

10    risk that you will not arrive at a true and just verdict.  If

11    you have a reasonable doubt as to a Defendant's guilt, you

12    should not hesitate for any reason to find a verdict of

13    acquittal.  But on the other hand, if you should find that the

14    Government has met its burden of proving Defendant's guilt

15    beyond a reasonable doubt, you should not hesitate because of

16    sympathy or any other reason to render a verdict of guilty.

17         I remind you that an indictment itself is not evidence.

18    It merely describes the charges made against the Defendant.

19    It is an accusation.  It may not be considered by you as any

20    evidence of the guilt of the Defendant.  In reaching your

21    determination of whether the Government has proved the

22    Defendant guilty beyond a reasonable doubt, you may consider

23    only the evidence introduced or lack of evidence.  The

24    indictment contains a total of six counts, you must consider

25    each count separately and return a separate verdict of guilty

 1      or not guilty for each count, and you will have a verdict

 2      sheet there you can all look at, and your foreperson will be

 3      checking off those answers.

 4           Whether you find the Defendant guilty or not guilty as to

 5      one offense, should not affect your verdict as to any other

 6      offense charged.  The burden is on the prosecution, that is

 7      the Government, to prove the Defendant's guilt beyond a

 8      reasonable doubt.  As a result, the Defendant begins the trial

 9      here with a clean slate.  This presumption of innocence alone

10      is sufficient to acquit the Defendant, unless you, after a

11      careful and impartial consideration of the all of the

12      evidence, are unanimously convinced, beyond a reasonable doubt

13      of the Defendant's guilt.

14           If the Government fails to sustain its burden of proving

15      the Defendant guilty beyond a reasonable doubt, you must find

16      the Defendant not guilty.  This burden never shifts to the

17      Defendant for the simple reason that the law never imposes

18      upon a Defendant in a criminal case the burden of calling any

19      witness or producing any evidence.

20           The fact that one party called more witnesses and

21      introduced more evidence than the other, does not mean that

22      you should necessarily find the facts in favor of the side

23      offering the most witnesses.

24           You also have to decide which witnesses to believe and

25      which facts are true.  To do this, you must look at all of the

 1     evidence, drawing upon your own common sense and personal

 2     experience.

 3         After examining all of the evidence, you may decide that

 4     the party calling the most witnesses has not persuaded you,

 5     because you do not believe its witnesses, or because you do

 6     believe the fewer witnesses called by the other side.  In a

 7     moment, I will discuss the criteria for evaluating

 8     credibility.

 9         For the moment, however, you should keep in mind that the

10     burden of proof is always on the Government and the Defendant

11     is not required to call any witnesses or offer any evidence

12     since he is presumed to be innocent.

13         During the trial, you've heard the testimony of

14     witnesses, and arguments by counsel that the Government did

15     not utilize specific investigative techniques.  You may

16     consider these facts in deciding whether the Government has

17     met its burden of proof, because, as I told you, you should

18     look to all of the evidence, or lack of evidence in deciding

19     whether Defendant is guilty.

20         However, you're also instructed that there is no legal

21     requirement that the Government use any of these specific

22     investigative techniques to prove its case.  Your concern, as

23     I have said, is to determine whether or not on the evidence or

24     lack of evidence the Defendant's guilt has been proved beyond

25     a reasonable doubt.

1          There are two types of evidence that are generally

2     presented during a trial.  I think I've mentioned this to you

3     when you started two weeks ago, direct and circumstantial

4     evidence.

5          Direct evidence is the testimony of a person who asserts

6     actual knowledge of a fact, such as an eyewitness.

7     Circumstantial evidence is proof of a chain of facts and

8     circumstances indicating the existence of a fact.  The law

9     makes no distinction between the weight or value to be given

10    to either direct evidence or circumstantial evidence, nor is a

11    greater degree of certainly required of circumstantial

12    evidence than of direct evidence.

13         You should weigh all of the evidence in the case, after

14    weighing all of the evidence, if you are not convinced of the

15    guilt of a Defendant beyond a reasonable doubt, you must find

16    him not guilty.

17         I remind you that a lawyer's question to a witness is not

18    evidence.  At times a lawyer on cross-examination may have

19    incorporated into a question a statement that assumes certain

20    facts to be true, and ask the witness if the statement was

21    true.  If the witness denies the truth of the statement, and

22    if there is no evidence in the record proving the assumed fact

23    is true, then you may not consider the fact to be true simply

24    because it was contained in the lawyer's question.  In short,

25    questions are not evidence, answers are.

The evidence in this case consists of the sworn testimony of the witnesses, the exhibits received in evidence and certain stipulations.

As I've mentioned earlier during the trial, a stipulation, essentially, is an agreement among the parties that a certain fact is true.  You should regard such agreed facts as true.  Exhibits which have been marked for identification, but not received may be considered by you as evidence -- may not be considered by you as evidence.

Some items of evidence are marked just for identification only, they will not be going back in the jury room with you. Only those exhibits received may be considered as evidence. Anything that you may have seen or heard about this case outside of the courtroom is not evidence, and must be entirely disregarded.

As I indicated before, only the witnesses' answers are evidence, and you are not to consider a question as evidence. Similarly, statements by counsel are not evidence.  You should consider the evidence in light of your own common sense and experience.  And you may draw reasonable inferences from the evidence.

The government has offered evidence in the form of taped recordings of conversations with the Defendant.  These recordings were made without the knowledge of the Defendant, but with the consent and agreement of one of the other parties

1   to the conversations.  The use of this procedure to gather

2   evidence is perfectly lawful.

3      The parties have presented exhibits in the form of

4   charts and summaries.  I decided to admit these charts and

5   summaries in place of the underlying documents that they

6   represent in order to save time and avoid unnecessary

7   inconvenience.  You consider -- you should consider these

8   charts and summaries as you would any other evidence.  There

9   has been evidence that the Defendant allegedly made certain

10  statements in which the Government claims he admitted certain

11  facts charged in the indictment.

12     You should first examine with great care whether each

13  statement was made, and if so, whether, in fact, it was

14  voluntarily and understandably made.  I instruct you that you

15  are to give the statement such weight as you feel they deserve

16  in light of all of the evidence.

17     The Defendant did not testify in this case.  Under our

18  constitution, he has no obligation to testify, or to present

19  any other evidence because it is the prosecution's burden to

20  prove the Defendant guilty beyond a reasonable doubt.  That

21  burden remains with the prosecution throughout the entire

22  trial, and never shifts to the Defendant.  The Defendant is

23  never required to prove that he is innocent.  You may not

24  attach any significance to the fact that the Defendant did not

25  testify, no adverse inference against him may be drawn by you

```
 1    because he did not take the witness stand.

 2         You may not consider this against the Defendant in any

 3    way in your deliberations in the jury room.  There has been

 4    testimony that the Defendant was silent when statements were

 5    made in his presence accusing him of committing the acts

 6    charged in the indictment.  If you find that the Defendant was

 7    actually present and heard the statements and understood them,

 8    then you may consider the Defendant's silence as an admission

 9    of their truth, if you find, in accordance with your common

10    sense and experience, that the Defendant would have denied the

11    statements had they been untrue.  However, you should bear in

12    mind that some people will remain silent, even if they are

13    innocent.

14         During the trial, you've heard the lawyers -- attorneys

15    use the term "inference," and in their arguments they've asked

16    you to infer on the basis of your reason, experience, and

17    common sense from one or more established facts the existence

18    of some other fact.

19         An inference is not a suspicion or a guess.  It is a

20    reasoned logical decision to conclude that a disputed fact

21    exists on the basis of another fact, which you know exists.

22    There are several persons whose names you have heard during

23    the course of the trial, but who did not appear here to

24    testify.  And one or more of the attorneys has referred to

25    their absence from the trial.
```

```
 1              I instruct you that each party had an equal opportunity
 2       or lack of opportunity to call any of these witnesses,
 3       therefore, you should not draw any inferences or reach any
 4       conclusions as to what they would have testified, had they
 5       been called.  Their absence should not affect your judgment in
 6       any way.
 7              You should, however, remember my instruction that the law
 8       does not impose on a Defendant in a criminal case the burden
 9       or duty of calling any witnesses or producing any evidence.
10       It must be clear to you by now that the Government and the
11       Defendant are asking you to draw very different conclusions
12       about various factual issues in the case.  Deciding these
13       issues will involve making judgments about the testimony of
14       the witnesses you've listen to, and observed.
15              In making these judgments you should carefully scrutinize
16       all of the testimony of each witness, the circumstances under
17       which each witness testified, and any other matter and
18       evidence that may help you to decide the truth, and the
19       importance of each witness's testimony.
20              Your decision whether or not to believe a witness may
21       depend on how that witness impressed you.  How did the witness
22       appear?  Was the witness candid, frank and forthright or did
23       the witness seem to be evasive or suspect in some way.
24              How did the way the witness testified on direct
25       examination compare with how the witness testified on
```

     1    cross-examination.  Was the witness consistent or

     2    contradictory?  Did the witness appear to know what he or she

     3    was talking about?  Did the witness strike you as someone who

     4    was trying to report his or her knowledge accurately?  These

     5    are examples of the kinds of common sense questions you should

     6    ask yourselves in deciding whether a witness is or is not

     7    truthful.

     8         How much you choose to believe a witness may be

     9    influenced by the witness's bias.  Does the witness have a

    10    relationship with the Government or the Defendant that may

    11    affect how he or she testified?

    12         Does the witness have some incentive, loyalty, or motive

    13    that might cause him or her to shade the truth?  Does the

    14    witness have some bias, prejudice, or hostility that may cause

    15    the witness to give you something other than a completely

    16    accurate account of the facts he or she testified to?

    17         You should also consider whether a witness has an

    18    opportunity to observe the facts he or she testified about.

    19    Also, you should consider whether the witness's recollection

    20    of the facts stands up in light of the other evidence in the

    21    case.  In other words, you must try to do -- what you must try

    22    to do in deciding credibility is to size up a person just as

    23    you would in any important matter when you're trying to decide

    24    if a person is truthful, straightforward and accurate in his

    25    or her recollection.

1        In connection with your evaluation of the credibility of

2   the witnesses, you should specifically consider evidence of

3   resentment or anger that some Government witnesses may have

4   towards the Defendant.  Evidence that a witness is biased,

5   prejudiced, or hostile toward the Defendant requires you to

6   view that witnesses testimony with caution, to weigh it with

7   care, and subject it to close and searching scrutiny.

8        In evaluating credibility of the witnesses you should

9   take into account any evidence that the witness who testified

10  may benefit in some way from the outcome of this case.  Such

11  an interest in the outcome creates a motive to testify falsely

12  and may sway the witness to testify in a way that advances his

13  own interests.

14       Therefore, if you find that any witness whose testimony

15  you're considering may have an interest in the outcome of this

16  trial, then you should bear that factor in mind when

17  evaluating the credibility of his or her testimony, and accept

18  it with great care.

19       This is not to suggest that every witness who has an

20  interest in the outcome of the case will testify falsely.  It

21  is for you to decide to what extent, if at all, the witness's

22  interest has affected or colored his or her testimony.

23       You have heard witnesses who testified that they were

24  actually involved in planning and carrying out crimes charged

25  in the indictment.  There has been a great deal said about

 1    these accomplice witnesses and the summations of counsel and

 2    whether or not you should believe them.  The Government

 3    argues, as it is permitted to do, that it makes -- it must

 4    take the witnesses as it finds them.  It argues that only

 5    people who themselves take part in criminal activity have the

 6    knowledge acquired to show criminal behavior by others.  For

 7    those very reasons, the law allows the use of accomplice

 8    testimony, indeed, it is the law in Federal courts that the

 9    testimony of accomplices may be enough, in and of itself, for

10    convictions, even if the jury finds that testimony establishes

11    guilt beyond a reasonable doubt.

12        However, it is also the case that accomplice testimony is

13    of such nature that it must be scrutinized with great care and

14    viewed with particular caution when you decide how much of

15    that testimony to believe.

16        I have given you some general considerations on

17    credibility, and I will not repeat them all here, nor will I

18    repeat all of the arguments made on both sides.  However, let

19    me say a few things that you may want to consider during your

20    deliberations on the subject of accomplices.

21        You should ask yourself whether these so-called

22    accomplices would benefit more by lying or by telling the

23    truth.  Was their testimony made up in any way because they

24    believed or hoped that they would somehow receive favorable

25    treatment by testifying falsely, or did they believe that

1    their interest was best served by testifying truthfully?

2         If you believe that a witness was motivated by hopes of

3    personal gain, was the motivation one that would cause her to

4    lie, or was it one that would cause her to tell the truth?

5    Did that motivation color her testimony?

6         In summary, you should look at all of the evidence in

7    deciding what credence and what weight, if any, you will want

8    to give to the accomplice witnesses.  You have heard testimony

9    from a Government witness who plead guilty to charges out of

10   the same facts in this case.

11        You are instructed you are to draw no conclusions or

12   inferences of any kind about the guilt of the Defendant on

13   trial, and the fact that a prosecution witness plead guilty to

14   similar charges.  That witness's decision to plead guilty was

15   a personal decision about her own guilt.  It may not be used

16   by you in any way as evidence against or unfavorable to the

17   Defendant on trial here.

18        In this case, there has been testimony from that

19   Government witness, a specific government witness, Kiara

20   Haynes, who pled guilty after entering into an agreement with

21   the Government to testify.

22        The Government has promised to bring the witness's

23   cooperation to the attention of the sentencing court.  The

24   Government is permitted to enter into this kind of plea

25   agreement.  You, in turn, may accept the testimony of such a

1    witness and convict the Defendant on the basis of that

2    testimony alone if it convinces you of the Defendant's guilt

3    beyond a reasonable doubt.

4         However, you should bear in mind that a witness who has

5    entered into such an agreement has an interest in that case

6    different than any ordinary witness.  A witness who realizes

7    that she may be able to obtain her own freedom, or receive a

8    lighter sentence by giving testimony favorable to prosecution,

9    has a motive to testify falsely.  Therefore, you must examine

10   her testimony with caution and weigh it with great care.  If

11   after scrutinizing his testimony, you decide to accept it, you

12   may give it whatever weight, if any, you find it deserves.

13   There has been evidence introduced at trial that the

14   Government used an informer in this case.  I instruct you that

15   there is nothing improper in the Government's use of

16   informers.  You, therefore, should not concern yourself with

17   how you personally feel about the use of informers, because

18   that is really besides the point.

19        To put it another way, your concern is to decide whether

20   the Government has proved the guilt of the Defendant beyond a

21   reasonable doubt, regardless of whether evidence was obtained

22   by the use of an informer.

23        On the other hand, when an informer testifies, as he did

24   here, his testimony must be examined with greater scrutiny

25   than the testimony of an ordinary witness.  You should

1    consider whether he received any benefits or promises from the

2    Government that would motivate him to testify falsely against

3    the Defendant.

4        For example, he may believe he will only continue to

5    receive those benefits if he produces evidence of criminal

6    conduct.  If you decide to accept his testimony after

7    considering it in the light of all of the evidence in this

8    case, then you may give it whatever weight, if any, you find

9    it deserves.

10       You have heard the testimony of law enforcement

11   officials.  The fact that a witness may be employed by a law

12   enforcement official, as a law enforcement official, does not

13   mean that his or her testimony is necessarily deserving of

14   more or less consideration, or greater or lesser weight than

15   that of an ordinary witness.  At the same time, it is quite

16   legitimate for defense counsel to try to attack the

17   credibility of a law enforcement witness on the grounds that

18   his testimony may be colored by a personal or professional

19   interest in the outcome of the case.

20       It is your decision, after reviewing all of the evidence,

21   whether to accept the testimony of a law enforcement witness,

22   and to give that testimony, whatever weight, if any, you find

23   it deserves.  There's been evidence that a witness who

24   testified at that trial, lied under oath at another

25   proceeding.  I must warn you that the testimony of this

1   witness should be viewed cautiously, and weighed with great

2   care.  It is, however, for you to decide how much of his or

3   her testimony, if any, you wish to believe.

4        You have heard evidence that a witness made a statement

5   on an earlier occasion that counsel argues is inconsistent

6   with the witness's trial testimony.  Evidence of a prior

7   inconsistent statement is not to be considered by you as an

8   affirmative evidence bearing on the Defendant's guilt.

9   Evidence of the prior inconsistent statement was placed before

10  you for the more limited purpose of helping you to decide

11  whether to believe the trial testimony of the witness who

12  contradicted himself.

13       If you find that the witness made an earlier statement

14  that conflicts with his trial testimony, you may consider that

15  fact in deciding how much of his trial testimony, if any, to

16  believe.  In making this determination, you may consider

17  whether the witness purposely made a false statement or

18  whether it was an innocent mistake, whether the inconsistency

19  concerns an important fact, or whether it had to do with a

20  small detail.  Whether the witness had an explanation for the

21  inconsistency, and whether that explanation appealed to your

22  common sense.

23       It is exclusively your duty, based upon all of the

24  evidence in your own good judgement, to determine whether the

25  prior statement was inconsistent, and if so, how much if any

1    weight to be given to the inconsistent statement in

2    determining whether to believe all or part of the witness's

3    testimony.

4         In this case, I have permitted certain witnesses to

5    express their opinions about matters that are at issue.  A

6    witness may be permitted to testify to an opinion on those

7    matters about which he or she has special knowledge, skill,

8    experience, and training.

9         In weighing this expert opinion testimony, you may

10   consider the witness's qualifications, his or her opinions,

11   the reasons for testifying, as well as all of the other

12   considerations that ordinarily apply when you are deciding

13   whether or not to believe a witness's testimony.

14        You should not, however, accept opinion testimony merely

15   because I allow the witness to testify concerning his or her

16   opinion.

17        The question of possible punishment of the Defendant is

18   of no concern to the jury, and should not, in any sense, enter

19   into or influence your deliberations.  The duty of imposing

20   sentence rests exclusively upon me, the Court.  You have been

21   instructed that in order to sustain this burdens of proof, the

22   Government must prove that the Defendant acted knowingly,

23   willfully, and intentionally.  A person acts knowingly if he

24   acts intentionally and voluntarily, and not because of

25   ignorance, mistake, accidents or carelessness.  Whether the

1       Defendant acted knowingly may be proven by the Defendant's

2       conduct, and by all the facts and circumstances surrounding

3       the case.

4            A person acts willfully, which means to act with

5       knowledge that one's conduct isn't unlawful and with the

6       intent to do something the law forbids, that is to say with

7       the bad purpose to disobey or disregard the law.

8            The Defendant's conduct was not willful if it was due to

9       negligence or inadvertence or a mistake.  A person acts

10      intentionally if he acted deliberately and purposefully.  That

11      is the Defendant's acts must have been the product of the

12      Defendant's conscious objectives, rather than the product of a

13      mistake or accident.

14           Knowledge, willfulness, and intent involve the state of a

15      person's mind.  It has often been said to juries, the state of

16      one's mind is a fact as much as the state of his digestion.

17      Accordingly, this is a fact that you were called upon to

18      decide.  Medical science has not yet devised an instrument

19      which can record what was in one's mind in the distant past.

20           Rarely is direct proof available to establish the state

21      of one's mind.  This may be inferred from what he says or

22      does, his words, his actions, and his conduct as of the time

23      of the occurrence of certain events.

24           The intent with which an act is done, is often more

25      deadly, clearly rather -- is often more clearly and

conclusively shown by the act itself, or by a series of acts
than by words or explanations of the act that are long after
its occurrence.

Accordingly, intent, willfulness, knowledge, or it's
usually established by surrounding facts and circumstances as
of the time the acts in question occurred or the events took
place, and the reasonable inferences to be drawn from them.
Proof of motive is not a necessary element of the crime with
which the Defendant is charged.

Proof of motive does not establish guilt, nor does a lack
of proof of motive establish a Defendant is not guilty, if the
guilt of a Defendant is shown beyond a reasonable doubt, it is
immaterial what the motive for the crime may be, or whether
any motive may be shown.  But the presence or absence of a
motive is a circumstance that you may consider as bearing on
the intent of a Defendant.

The indictment contains six counts.

Count 1 charges the Defendant with conspiracy to
distribute and possess with intent to distribute controlled
substance.

Count 2 charges the Defendant with possession with intent
to distribute controlled substance.

Counts 3 charges the Defendant with possession of a
firearm and ammunition by a prohibited person.

Counts 4 and 5 charge the Defendant with use and carry of

1    a firearm during and in relation to a drug trafficking crime,

2    and also a crime of violence, causing the death of another.

3        Count 6 charges the Defendant with killing a witness to

4    prevent communication to law enforcement.  The Defendant has

5    denied that he is guilty of these charges.

6        Count 1, the narcotics conspiracy, the Defendant is

7    essentially charged in Count 1 of the indictment with

8    conspiracy to distribute and possess with intent to distribute

9    controlled substances.  And I'm now going to summarize and

10   read some of these counts.  You're not going to get a copy of

11   the indictment, because I'm going to read from the indictment

12   here, and it will be included in the instructions that all of

13   you will have before you when you deliberate.

14       As to Count 1, the indictment reads, beginning no later

15   than March 2015 and continuing until in or about October 2015,

16   in the District of Maryland and elsewhere, the Defendant,

17   Andre Ricardo Briscoe, did knowingly combine, conspire,

18   confederate and agree with others known and unknown to the

19   Grand Jury, to distribute and possess with the intent to

20   distribute 100 grams or more of a mixture or substance

21   containing a detectable amount of heroin, a Schedule 1

22   controlled substance.

23       The relevant statute on this subject is 21 United States

24   Code §846, which prohibits anyone from conspiring to

25   distribute and possess with intent to distribute controlled

1    dangerous substances.

2         In order to satisfy its burden of proof on Count 1, the

3    Government must establish both of the following elements

4    beyond a reasonable doubt.

5         First, that two or more persons entered into an unlawful

6    agreement to distribute and possess with intent to distribute

7    heroin, a controlled dangerous substance as charged in the

8    indictment.  And two, that the Defendant knowingly and

9    willfully became a member of the conspiracy.

10        The first element the Government has proved beyond a

11   reasonable doubt to establish the offense of conspiracy is

12   that two or more persons entered the unlawful agreement charge

13   in the indictment, that is an agreement to distribute and

14   possess with intent to distribute controlled dangerous

15   substances.  The controlled dangerous substance alleged in

16   this count is heroin.

17        In order for the Government to satisfy this element, you

18   need not find that the alleged members of the conspiracy met

19   together and entered into any express or formal agreement.

20   Similarly, you need not find that the alleged conspirator

21   stated in words or writing what the scheme was.  It's object

22   or purpose or every precise detail of the scheme, or the means

23   by which it's object or purpose was to be accomplished.

24        What the Government must prove is that there was a mutual

25   understanding, either spoken or unspoken between two or more

1    people to cooperate with each other to accomplish an unlawful

2    act.

3         You may, of course, find that the existence of an

4    agreement to disobey or disregard the law has been established

5    by direct proof.  However, since conspiracy is by its very

6    nature characterized by secrecy, you may also infer its

7    existence from the circumstances of this case, and the conduct

8    of the parties involved.

9         In a very real sense then, in the context of conspiracy

10   cases, actions often speak louder than words.  In this regard,

11   you may in determining whether an agreement existed here,

12   consider the actions and statements of all of those you find

13   to be participant as proof that a common design existed on the

14   part of the person charged, and its co-conspirators to act

15   together for the accomplishment of an unlawful purpose.

16        The second element that the Government must prove beyond

17   a reasonable doubt to establish the offense of conspiracy is

18   that the Defendant knowingly, willfully, and voluntarily

19   became a member of the conspiracy.  If you are satisfied that

20   the conspiracy charged in the indictment existed, you must

21   next ask yourselves who the members of the conspiracy were in

22   deciding whether the Defendant was -- in deciding whether the

23   Defendant was, in fact, a member of the conspiracy you should

24   consider whether he knowingly and willfully joined the

25   conspiracy.

1    Did he participate in it with knowledge of its unlawful

2    purpose, and with the specific intention to further his

3    business or objective as an associate or worker?  The

4    Defendant's participation in the conspiracy must be

5    established by his own acts or statements, or the acts or

6    statements of his alleged co-conspirators, and the reasonable

7    inferences that may be drawn from them.

8    A Defendant's knowledge is a matter of inference from the

9    facts proved.  In that connection, I instruct you that to

10   become a member of the conspiracy, a Defendant need not have

11   known the identifies of each and every member, nor need he

12   have been apprised of all of their activities.  Moreover, a

13   Defendant need not have been fully informed as to all of the

14   details, or the scope of the conspiracy in order to justify an

15   inference of knowledge on his part.

16   Furthermore, a Defendant need not have joined in all of

17   the conspiracy's unlawful objectives.  Once a conspiracy is

18   established, even a slight connection between a Defendant and

19   the conspiracy is sufficient to include him in the plan.  And

20   one who joins an ongoing conspiracy is deemed to have adopted

21   the prior acts and declarations of the conspirators made after

22   the formation and in furtherance of the conspiracy.

23   A conspiracy continues so long as acts in furtherance of

24   this purpose are done.  For example, distribution of the

25   proceeds of the conspiracy is an act occurring during the

1    pendency of a conspiracy.  Further, action is taken to protect

2    the proceeds of a robbery represent an act in furtherance of

3    the conspiracy.  The extent of a Defendant's participation has

4    no bearing on the issue of his guilt.

5         A conspirator's liability is not measured by the extent

6    or duration of his participation.  Indeed, each member may

7    perform separate and distinct acts and may perform them at

8    different times.  Some conspirators play major roles, while

9    others play minor roles in the scheme.

10        An equal role is not what the law requires.  In fact,

11   even a single act may be sufficient to draw a Defendant within

12   the ambit of the conspiracy.

13        I want to caution you, however, that a Defendant's mere

14   presence at the scene of the alleged crime, does not, by

15   itself, make him a member of the conspiracy.  Similarly, mere

16   association with one or more members of the conspiracy, does

17   not automatically make a Defendant a member.

18        A person may knowingly or be friendly or may know or be

19   friendly with a criminal without being a criminal himself.

20   Mere similarity of conduct, or the fact that they may have

21   assembled together and discussed common aims and interest,

22   does not necessarily establish proof of the existence of a

23   conspiracy.

24        If, on the other hand, you find beyond a reasonable doubt

25   that the Defendant knew about the plan to commit a robbery,

1    and agreed to participation, you should find the Defendant

2    guilty.  I also want to caution you that mere knowledge or

3    acquiesce without participation in the unlawful plan is not

4    sufficient.

5         Moreover, the fact that the acts of the Defendant without

6    knowledge merely happened to further the purposes or

7    objectives of the conspiracy, does not make him a member.

8    More is required under the law.  What is necessary is that the

9    Defendant must have participated with knowledge of at least

10   some of the purposes or objectives of the conspiracy and with

11   the intention of aiding in the accomplishment of the unlawful

12   ends.

13        In some, the Defendant with an understanding of the

14   unlawful character of the conspiracy must have intentionally

15   engaged, advised, or assisted in it for the purpose of

16   furthering the illegal undertaking.  He thereby becomes a

17   knowing and willing participant in the unlawful agreement.

18   That is to say a conspirator.

19        You will recall that I have admitted into evidence

20   against the Defendant acts of others, because of these acts

21   were committed by persons who the Government charges were also

22   confederates or co-conspirators of the Defendant on trial.

23   The reason for allowing this evidence to be received against

24   the Defendant has to do with the nature of the crime of

25   conspiracy.

1        A conspiracy is often referred to as a partnership in

2   crime.   Thus, as in other types of partnerships when people

3   enter into a conspiracy to accomplish an unlawful end, each

4   and every member becomes an agent for the other conspirators

5   in carrying out the conspiracy.

6        Accordingly, the reasonably foreseeable acts of any

7   members of the conspiracy, and in furtherance of the common

8   purpose of the conspiracy, are deemed under law to be the acts

9   of all of the members.   And all of the members are responsible

10  for such acts.   If you find beyond a reasonable doubt that the

11  Defendant was a member of the conspiracy charged in the

12  indictment, then any acts done in furtherance of the

13  conspiracy by persons also found by you to have been members

14  of that conspiracy may be considered against the Defendant.

15       This is so even if such acts were done in the Defendant's

16  absence, and without his knowledge.   However, before you may

17  consider the acts of a co-conspirator in deciding the issue of

18  the Defendant's guilt, you must first determine that the acts

19  were made during the existence, and in furtherance of the

20  unlawful scheme.

21       If the acts were done by someone whom you do not find to

22  have been a member of the conspiracy, or if they were not done

23  in furtherance of the conspiracy, they may not be considered

24  by you as evidence, only against the member who did them.

25       Just bear with me, I know this is time consuming, but I

1    have to keep reading through this with you, and we do our very

2    best to narrow it, I can assure you.  So why don't you all

3    take a stand -- now, you will stand for a minute as I've told

4    you, not Mr. Purpura's call, but your call, just stand and

5    stretch for a minute.  And I can assure you that this is very

6    important, and I know it's tedious.  One juror one time said

7    to me, this is mind numbing, and that's part of the reason why

8    we hand out copies of this to every juror, because of her

9    suggestion.  So everyone would be able to look at it when you

10   start to discuss the matter, and you can read through it next.

11   So just take a deep breath for a second.

12       (Brief pause.)

13       Okay.  With that, you may be seated again.

14       Now, as to Count 1, on the amounts of the controlled

15   substance.  If you find that the Government has proven the

16   Defendant guilty of the conspiracy charged in Count 1, then

17   there is one more issue that you must decide.  I provided you

18   with a special verdict form, and you'll see to it that if you

19   determine that the Defendant is guilty on Count 1, then there

20   is a question about what the drug quantity is, and you'll see

21   this -- and your foreperson will fill out, we'll go over that

22   in a minute, your foreperson will fill out the verdict form,

23   and I'm giving a copy to everyone to also have the verdict

24   form so you can see how we go through this.

25       I've provided you with a special verdict form asking you

1    to fill in the amount of the heroin that the Defendant

2    conspired to distribute.  The burden is on the Government to

3    establish the amount of heroin beyond a reasonable doubt.

4    Remember, you should address the issue and complete the form

5    only if you find the Defendant guilty of the conspiracy

6    charged in Count 1.

7        In determining the quantity of heroin attributable to the

8    Defendant, you should consider the following factors.  First,

9    the Defendant is accountable for any quantity of heroin which

10   he personally distributed or possessed with intent to

11   distribute.

12       Second, the Defendant is also accountable for any

13   quantity of heroin which he attempted to or planned to

14   distribute or possessed with intent to distribute,

15   specifically, he is accountable for that quantity of heroin,

16   even if it was never actually distributed, so long as an

17   objective of the conspiracy was for the Defendant to

18   distribute or possess with intent to distribute that quantity

19   of drugs.

20       Third, the Defendant is also accountable for any quantity

21   of heroin which another member of the conspiracy distributed

22   or possessed with intent to distribute as part of the

23   conspiracy.  So long as it was reasonably foreseeable to the

24   Defendant that such a quantity of heroin would be involved in

25   the conspiracy which he joined.

1          Fourth, he is also accountable for any quantity of

2     heroin, which another member of the conspiracy attempted to,

3     or planned to distribute, or possessed with intent to

4     distribute, so long as it was reasonably foreseeable to the

5     Defendant that such a quantity of heroin would be involved in

6     the conspiracy which he joined.

7          A Defendant is accountable for those drugs, even if

8     those drugs were never actually obtained or distributed by

9     other members of the conspiracy, so long as an objective of

10    the conspiracy was for the others members of the conspiracy to

11    distribute or possess with intent to distribute such a type

12    and quantity of drugs.

13         These last two rules apply even if the Defendant did not

14    personally participate in the acts or plans of his

15    co-conspirators, or even if the Defendant did not have actual

16    knowledge of those acts or plans, so long as those acts or

17    plans were reasonably foreseeable to the Defendant, and were

18    committed by his co-conspirators in furtherance of the

19    conspiracy.

20         The reason for this is simply that a co-conspirator is

21    deemed to be an agent of all other members of the conspiracy.

22    Therefore all of the co-conspirators bear criminal

23    responsibility for acts or plans that are undertaken to

24    further the goals of the conspiracy.

25         Your findings about the quantity of heroin attributable

1        to the Defendant will be noted on the verdict form, which I

2        will discuss, hopefully, in a few minutes.

3            All right.  That's it as to Count 1.  There are no more

4        instructions as to Count 1.  And there must be seven of them

5        that all lined up now.  Just look at them as you wish, but

6        that's the end as to Count 1.

7            Now, Count 2, possession with the intent to distribute

8        narcotics.  Count 2 of the indictment charges the Defendant

9        with the possession of a controlled substance with the intent

10       to distribute it.  The indictment reads as follows:  On or

11       about May 27, 2015, in the District of Maryland, the

12       Defendant, Andre Ricardo Briscoe, knowingly and intentionally

13       possessed with intent to distribute, a mixture or substance

14       containing a detectable amount of heroin, a Schedule I

15       controlled substance.

16           The Defendant is charged with violating the Drug Abuse

17       Prevention and Control Act.  That law makes it a crime for any

18       person knowingly or intentionally to manufacture, distribute,

19       or dispense or possess with intent to manufacture, distribute,

20       or dispense a controlled substance.

21           In order to prove this charge against the Defendant, the

22       Government must establish beyond a reasonable doubt each of

23       the following three elements.  Three elements of this offense.

24       First, that the Defendant possessed narcotic drugs.  Second

25       that the Defendant knew that he possessed narcotic drugs.  And

1      third, that the Defendant possessed the narcotic drugs with

2      the intent to distribute them.

3          The first element the Government must prove beyond a

4      reasonable doubt is to establish guilt on Count 2, is that the

5      Defendant possessed narcotic drugs.  To establish this

6      element, the Government must prove that the material that the

7      Defendant is charged with possessing is, in fact, narcotics.

8      The Government may prove this through either direct evidence

9      or through circumstantial evidence.  An example of direct

10     evidence is the testimony of a chemist who has done a chemical

11     analysis of the material.

12         Circumstantial evidence, would be evidence in which you

13     can infer that the material was heroin, such as testimony

14     concerning the names used by the Defendant to refer to the

15     material or testimony about the material's appearance.

16     Whether the Government relies on direct or circumstantial

17     evidence to prove that the material at issue was narcotics, it

18     must prove so by a reasonable doubt.

19         As I've instructed you, the Government must prove beyond

20     a reasonable doubt that the Defendant possessed the drugs.

21     The legal concept of possession may differ from the everyday

22     use of the term, so I will explain it in some detail.

23         Actual possession is what most of us think of as

24     possession, that is physical custody or control of an object.

25     For example, if you find that the Defendant had the drugs on

1    his person, you may find that he had possession of the drugs.

2    However, a person need not have actual physical custody of an

3    object in order to be in legal possession of it.

4         If an individual has the ability and intent to exercise

5    substantial control over an object that he does not have in

6    his physical custody, then he is in possession of that item.

7    An example of this from everyday experience would be a

8    person's possession of items he keeps in the safe deposit box

9    of his bank.

10        Although the person does not have physical custody of

11   those items, he exercises substantial control over them, and

12   still has legal possession of them.

13        The law also recognizes that possession may be sole or

14   joint.  If one person alone possesses something that is sole

15   position.  However, it is possible that more than one person

16   may have the power and intention to exercise control over the

17   drugs.  This is called joint possession.  If you find that the

18   Defendant had such power and intention that he possessed the

19   drugs under this element, even if he possessed the drugs

20   jointly with another.  Possession of drugs cannot be found

21   solely on the ground that the Defendant was near or close to

22   the drugs.  Nor can it be found simply because the Defendant

23   was present at a scene where drugs were involved, or solely

24   because the Defendant is associated with a person who did

25   control the drugs or the property when they were found.

1         However, these factors may be considered by you in

2    connection with all other evidence in making your decision

3    whether the Defendant possessed the drugs.

4         The second element the Government must prove beyond a

5    reasonable doubt is that the Defendant knew that he possessed

6    narcotics.  To establish this element, the Government must

7    prove that the Defendant knew or that he possessed narcotics,

8    and that his possession was not due to carelessness,

9    negligence or mistake.

10        If you find that the Defendant did not know that he had

11   narcotics in his possession, or that he didn't know that what

12   he possessed was, in fact, narcotics, then you must find the

13   Defendant not guilty.

14        Although the Government must prove that the Defendant

15   knew that he possessed narcotics, the Government does not have

16   to prove that the Defendant knew the exact nature of the drugs

17   in his possession.  It is enough that the Government proves

18   that the Defendant knew that he possessed some kind of

19   narcotic.

20        The third element the Government must prove beyond a

21   reasonable doubt, and we're still on Count 2, is that the

22   Defendant possessed narcotics with the intent to distribute.

23   To prove the third element this way, the Government must

24   prove, beyond a reasonable doubt that the Defendant had

25   control over the drugs, with the state of mind or purpose to

1    transfer them to another person.  The same considerations that

2    apply to your determination, whether the Defendant knew he

3    possessed narcotics apply to your decision concerning the

4    Defendant's intention to distribute them.

5        Since you cannot read the Defendant's mind, you must make

6    inferences from his behavior.  However, you may not convict

7    the Defendant unless these inferences convince you beyond a

8    reasonable doubt that the Defendant intended to distribute the

9    narcotics.

10       When I say that you must find that the Defendant intended

11   to distribute the narcotics, this does not mean that you must

12   find that the Defendant intended personally to distribute or

13   deliver the drugs.  It is sufficient if you find that the

14   Defendant intended to cause or assist the distribution of the

15   narcotics.  Basically, what you're determining is whether the

16   drugs in the Defendant's possession were for his personal use,

17   or for the personal use -- or for the purpose of distribution.

18   Often, it is possible to make this determination from the

19   quantity of drugs found in the Defendant's possession.

20       For example, it would be highly unlikely that a person

21   with 50,000 doses of amphetamine possessed them all for

22   personal consumption.  The possession of a large quantity of

23   narcotics does not necessarily mean that the Defendant

24   intended to distribute them.  On the other hand, a Defendant

25   may have intended to distribute narcotics, even if he did not

1    possess a large amount of them.

2         Other physical evidence such as paraphernalia from the

3    packaging or processing of drugs can show such an intent.

4    There might also be evidence of a plan to distribute.  You

5    should make your decision whether the Defendant intended to

6    distribute the narcotics in his possession from all of the

7    other evidence presented.

8         If you do not find the Defendant guilty of the

9    substantive crime charged in Count 2 as to the possession with

10   intent to distribute, you will be asked to determine whether

11   the Government has proven beyond a reasonable doubt, that the

12   Defendant committed the offense of attempted possession with

13   intent to distribute heroin.

14        In order to prove the charge of attempting to commit the

15   crime of possession with intent to distribute heroin, the

16   Government must prove the following two elements beyond a

17   reasonable doubt.

18        First, that the Defendant intended to commit the crime of

19   possession with intent to distribute heroin.  And second, that

20   the Defendant did some act that was a substantial step in an

21   effort to bring about or accomplish the crime.  Mere intention

22   to commit a specific crime does not amount to an attempt.  In

23   order to convict the Defendant of an attempt, you must find,

24   beyond a reasonable doubt, that the Defendant intended to

25   commit the crime charged, and that he took some action, which

1    would was a substantial step toward the Commission of that

2    crime.  In determining whether the Defendant's actions

3    amounted to a substantial step towards the commission of the

4    crime, it is necessary to distinguish between mere preparation

5    on the one hand, and the actual doing of the criminal deed on

6    the other.  Mere preparation, which may consist of planning

7    the offense, or of devising, obtaining a range and a means for

8    his commission is not an attempt, although some preparations

9    may amount to an attempt, the act of a person who intends to

10   commit a crime will constitute an attempt when the acts

11   themselves clearly indicate an attempt and intent to commit

12   the crime, and the acts are a substantial step in a course of

13   conduct planned to culminate in the commission of a crime.

14        And I would note that you don't even get to this issue if

15   you answer guilty on Count 2, then you disregard Part B and

16   move to Count 3.  But if you answer not guilty as to Count 2,

17   then you must address the issue of attempt, as I've explained

18   to you just now.

19        As to Count 3, a felon in possession.  The indictment

20   charges the Defendant with being a felon, being a person

21   convicted of a crime punishable by more than one year in

22   prison who possessed a weapon shipped in interstate commerce,

23   the indictment specifically reads as follows:

24        On or about May 27, 2015, in the District of Maryland,

25   the Defendant Andre Ricardo Briscoe knowing he had previously

1    been convicted of a crime, punishable by imprisonment for a

2    term exceeding one year, knowingly possessed a firearm and

3    ammunition to with one para ordinance .45 caliber pistol,

4    bearing serial number RK8433, and approximately five rounds of

5    .45 caliber Winchester brand ammunition, and the firearm and

6    ammunition were in and affecting commerce.

7        The relevant statute on the subject is Section 922(g) of

8    Title 18 of the United States Code, which provides it should

9    be unlawful for any person who has been convicted in any court

10   of a crime punishable by imprisonment for a term exceeding one

11   year, to possess in or affecting interstate commerce --

12   possess in or affecting commerce, any firearm or ammunition or

13   to receive any firearm or ammunition which has been shipped or

14   transported in interstate or foreign commerce.

15       The Government must prove each of the following elements

16   beyond a reasonable doubt in order to sustain its burden of

17   providing the Defendant guilty on Count 3.  First, that the

18   Defendant was convicted, and knew that even so convicted in

19   any court of a crime punishable by imprisonment for a term

20   exceeding one year, and that his civil rights had not been

21   restored.

22       And second, that the Defendant possessed the firearm as

23   charged.  And third, the possession charge was in or affecting

24   interstate or foreign commerce.  The first element the

25   Government must prove beyond a reasonable doubt, is that prior

 1     to the date charged in the -- prior to the date the

 2     Defendant's charged with possessing the firearm, the Defendant

 3     had a been convict of a crime punishable by imprisonment for a

 4     term exceeding one year, and that the state has not restored

 5     the Defendant's civil rights following that conviction.

 6          The parties here have stipulated that prior to May 27,

 7     2015, the Defendant Andre Ricardo Briscoe, Jr., had been

 8     convicted of a crime punishable by imprisonment for a term

 9     exceeding one year as defined in 18 United States Code §921.

10     Furthermore, prior to May 27th, 2015, the Defendant knew of

11     his prior conviction of a crime punishable by imprisonment for

12     a term exceeding one year, and further knew that his civil

13     rights felony conviction included his right to possess a

14     firearm, had not been restored.

15          I instruct you that the prior conviction that is an

16     element of this charge here, is only to be considered by you

17     for the fact that it exists, and for nothing else.  You are

18     not to consider it for any other purpose.  You may not

19     consider the prior conviction in deciding whether or not -- or

20     whether it is more likely than not that the Defendant was in

21     knowing possession of the firearms that are charged, which is

22     a disputed element of the offense.

23          The second element the Government must prove beyond a

24     reasonable doubt with respect to Count 3, is that on or about

25     the date set forth in the indictment, the Defendant knowingly

1    possessed a firearm.  A firearm is any weapon that will or is
2    designed to or may readily -- or may be readily converted to
3    expel a projectile by the action of an explosive.  To possess
4    means to have something within a person's control.  This does
5    not necessarily mean that the Defendant must hold it
6    physically, that is have actual possession of it, as long as
7    the firearm is within the Defendant's control, and he
8    possesses it.  If you find that the Defendant either had
9    actual possession of the firearm, or that he had the power and
10   intention to exercise control over it, even though it was not
11   in his physical possession, you may find that the Government
12   has proven possession.

13        The law also recognizes that possession may be sole or
14   joint.  If one person alone possesses it, that is sole
15   possession.  However, it is possible that more than one person
16   may have the power and intention to exercise control over the
17   firearm.  This is called joint possession.  If you find that
18   the Defendant had such power and intention, that he possessed
19   the firearm under this element, even if he possessed it
20   jointly with another.

21        Proof of ownership of the firearm is not required.  To
22   satisfy this element, you must also find that the Defendant
23   knowingly possessed the firearm.  This means that he possessed
24   the firearm purposely and voluntarily, and not by accident or
25   mistake.  It also means that he knew the weapon was a firearm

1    as we commonly use the word.  However, the Government is not

2    required to prove that the Defendant knew that he was breaking

3    the law.

4         The third element the Government must prove beyond a

5    reasonable doubt is that the firearm the Defendant is charged

6    with possessing was in or affecting interstate commerce.  The

7    parties have entered into a stipulation that there was, in

8    fact, an effect on interstate commerce.  Okay.  Getting there,

9    I promise.  Another 20 minutes, perhaps.

10        Counts 4 and 5, use of a firearm during and in relation

11   to a predicate crime resulting in death.  Both the indictment

12   and the statute.  It's entitled here, and it's on page 74.

13   The Defendant is charged with using a firearm to commit or

14   carrying a firearm during the commission of or possession of a

15   firearm in furtherance of a crime of violence, or a drug

16   trafficking crime.

17        Count 4 reads as follows, on or about May 27, 2015, in

18   the District of Maryland, the Defendant, Andre Ricardo Briscoe

19   unlawfully and knowingly used, carried and discharged the

20   firearm during and in relation to one, the drug trafficking

21   crime charged in Count 1 for which a Defendant may be

22   prosecuted in a court of the United States.

23        Two, the drug trafficking crime alleged in Count 2 for

24   which a Defendant may be prosecuted in a court of the United

25   States.  And three, a crime of violence for which a Defendant

1    may be prosecuted in a court of the United States,

2    specifically affecting commerce by robbery in violation of 18

3    United States Code §1951(a), and possessed a firearm in

4    furtherance of said crimes in violation of 18 United States

5    Code §924(c).  And in the course of that violation, caused the

6    death of Jennifer Jeffrey, through the use of a firearm in

7    which the killing was a murder, as defined in count -- at 18

8    U. S. C §1111.

9         Count 5 contains identical language as that contained in

10   Count 4, but for the name of the victim.  And specifically, in

11   lieu of quote, caused the death of Jennifer Jeffrey, Count 5

12   reads, caused the death of K.B., the initials K.B., Jennifer

13   Jeffrey's seven-year-old son.  The relevant statute on this

14   subject is Title 18 United States Code §924(c), which provides

15   a person who during and in relation to any crime of violence

16   or drug trafficking crime for which the person may be

17   prosecuted in a court of the United States, uses or carries a

18   firearm, or who in furtherance of such crime possesses a

19   firearm shall be guilty of a crime.

20        Counts 4 and 5 in terms of the elements.  The Government

21   must prove each of the following elements beyond a reasonable

22   doubt to sustain this burden of proving the Defendant guilty

23   on Counts 4 or 5.

24        First, that the Defendant committed a predicate crime,

25   that is either a crime of violence, or a drug trafficking

1   crime for which he might be prosecuted in a Court of the

2   United States.

3       Second, that the Defendant knowingly used or carried or

4   discharged a firearm during and in relation to the commission

5   of a predicate crime, or knowingly possessed a firearm in

6   furtherance of the predicate crime.  Here the predicate crime

7   charged were one, the drug trafficking crime alleged in Count

8   1 of the indictment.

9       Two, the drug trafficking crime alleged in Count 2 of the

10  indictment.  And 3, a crime of violence specifically affecting

11  commerce by robbery about which I'll explain to you in a

12  moment.

13      Third, that the Defendant discharged the firearm.  The

14  first element the Government must prove beyond a reasonable

15  doubt is that the Defendant committed what is known as a

16  predicate crime, either a drug trafficking crime or a crime of

17  violence for which he might be prosecuted in a court of the

18  United States.  There are three predicated crimes that can

19  satisfy this element of counts 4 and 5.

20      The Government need not prove all three predicate crimes

21  so as long as you find unanimously beyond a reasonable doubt

22  that the Defendant committed one of these predicate crimes.

23  The first predicate crime that the Defendant is charged with

24  committing is the drug trafficking crime charged in Count 1 of

25  the indictment.  That is conspiracy to distribute and possess

1   with intent to distribute narcotics as previously explained to

2   you.  The second predicate crime is the drug trafficking crime

3   charged in Count 2 of the indictment.  Possession with the

4   intent to distribute narcotics which I've also previously

5   explained.

6        The third predicate crime is that the Defendant committed

7   a crime of violence, specifically interference to commerce by

8   robbery, commonly referred to as Hobbs Act Robbery.  I

9   instruct you that Hobbs Act Robbery is a crime of violence.

10  However, it is for you to determine that the Government has

11  proven beyond a reasonable doubt that the Defendant committed

12  a Hobbs Act Robbery to satisfy this element of Counts 4 and 5.

13  I will instruct you on the elements of Hobbs Act Robbery in a

14  moment.

15       The second element the Government must prove beyond a

16  reasonable doubt is that the Defendant knowingly used or

17  carried a firearm during and in relation to the commission of

18  one of the predicate crimes that I just described, or

19  knowingly possessed a firearm in furtherance of the predicate

20  crime.

21       You must next determine whether the use, carry, or

22  possession, as defined below also involved discharging the

23  firearm.  A firearm is any weapon which will or is designed to

24  or may be readily converted to expel a projectile by the

25  action of an explosive.  Knowing means that the firearm was

1  carried purposely and voluntarily and not by accident or

2  mistake.  It also means that he knew the weapon was a firearm

3  as we commonly use the word.

4      To prove use of the firearm, the Government must prove an

5  active employment of the firearm by the Defendant.  This does

6  not mean that the Defendant must actually fire or attempt to

7  fire the weapon, although those actions would, of course,

8  constitute use of the weapon.  In brandishing, displaying, or

9  even referring to the weapon, so that others present knew that

10  the Defendant had the firearm available if needed, all

11  constitute use of the firearm.

12      However, the mere possession of a firearm at or near the

13  site of the crime without active employment as I just

14  described is not sufficient to constitute use of the firearm.

15       To prove carrying of the firearm, the Government must

16  prove beyond a reasonable doubt that the Defendant had the

17  weapon within his control, in such a way that it furthered the

18  commission of the crime of violence, or was an integral part

19  of the commission of the crime.

20      It is not necessary to hold the firearm physically, that

21  is have actual possession of it on one's person.  If you find

22  that the Defendant had dominion and control over the place

23  where the firearm is located, and had the power and intention

24  to exercise control over the firearm in such a way that it

25  furthered the commission of the crime of violence, you may

 1    find that the Government has proven that the weapon was

 2    carried.   To prove possession of a firearm, the Government

 3    must prove that the Defendant had possession of the firearm,

 4    and that such possession was in furtherance of the predicate

 5    crime.

 6         Possession means either physical possession of the

 7    firearm on one's person, or that the person had dominion and

 8    control over the place where the firearm was located, and had

 9    the power and intention to exercise control over the firearm.

10         To possess a firearm in furtherance of a crime means that

11    the firearm helped forward, advance, or promote the commission

12    of the crime.   The mere possession of the crime or the scene

13    of the crime is not sufficient under this definition.   The

14    firearm must have been displayed at some part in furthering

15    the crime in order for this element to be satisfied.   To prove

16    discharging the third element, the Government must prove that

17    the Defendant fired the gun.

18         The predicate crime of violence referenced in Counts 4

19    and 5 of the indictment is interference with commerce through

20    robbery in violation of Section 1951 of Title 18 of the United

21    States Code, commonly referred to as Hobbs Act Robbery.

22         That statute in pertinent part provides whoever in any

23    way or degree obstructs the ways or effects commerce or the

24    movement of an article of commodity in commerce by robbery or

25    attempts or conspires so to do, or commits or threatens

 1    physical violence to any person or property in furtherance of
 2    a plan or purpose to do anything in violation of this section
 3    commits a crime.
 4         Robbery is the unlawful taking or obtaining of personal
 5    property of another against his or her will by threatening or
 6    actually using force, violence, or fear of injury immediately
 7    or in the future to personal property.
 8         The first element the Government's proved beyond a
 9    reasonable doubt, we're still on Counts 4 and 5 for a Hobbs
10    Act Robbery in violation of 18 United States Code Section
11    1951, is that the Defendant knowingly obtained or took the
12    personal property of another, or from the presence of another.
13         The term property includes money and other tangible
14    intangible things of value that are capable of being
15    transferred from one person to another.
16         The second element the Government must prove beyond a
17    reasonable doubt for a Hobbs Act Robbery, is that the
18    Defendant took this property against the victim's will by
19    actual or threatened force, violence, or fear of injury,
20    whether immediately or in the future.  In considering whether
21    force, violence, or fear was planned to be or actually used or
22    threatened during the robbery, you should give those words
23    their common and ordinary meaning, and understand them as you
24    normally would.  The violence does not have to be directed at
25    the person whose property was taken, the use or threat of

1    force or violence might be aimed at a third person, or at

2    causing economic, rather than physical injury.

3        A threat may also be made verbally or by a physical

4    gesture.  Whether a statement or physical gesture by the

5    Defendant actually was a threat depends upon the surrounding

6    facts.  As I've just instructed you, you must determine

7    whether the Defendant knowingly and willfully threatened to

8    use force, violence, fear to unlawfully obtain property.

9        The third element you must then decide is whether the

10   actions of the Defendant, or his accomplices or

11   co-conspirators affected interstate commerce in any way or

12   degree.  If you decide that the Defendant obtained another's

13   property against his or her will by the use of threat or

14   force, violence or fear of injury, you must then decide

15   whether this action would affect interstate commerce in any

16   way or degree.  You must determine whether there's an actual

17   or potential effect on commerce between two or more states or

18   on commerce within one state that goes through any place

19   outside that state.

20       The Government's claim here is that narcotics were taken

21   from the victim, and that those narcotics were assets of a

22   narcotics business and not purely personal assets.  An affect

23   or attempt to affect even the interstate sale -- even the

24   intrastate sale, within state sale of narcotics is a

25   sufficient effect on interstate commerce.

1       Thus it is enough that the Defendant knowingly stole or

2  attempted to steal drugs or drug proceeds from a drug dealer

3  to satisfy this amount.  Thus it is enough that Defendant

4  knowingly stole or attempted to steal drugs or drug proceeds

5  from a drug dealer to satisfy this amount.

6       You do not have to find that interstate commerce was

7  actually affected.  You do not have to decide whether the

8  affect with interstate commerce was harmful or beneficial to a

9  particular business or to commerce in general.

10       The Government satisfies its burden of proving an effect

11  with interstate commerce if it proves, beyond a reasonable

12  doubt, any effect whether is it is harmful or not.  The

13  Defendant need not have intended or anticipated an effect on

14  interstate commerce.  You may find that the affect is a

15  natural consequence of his actions.

16       If you find that the Defendant intended to take certain

17  actions, that is that he did the acts charged in the

18  indictment in order to obtain property, and you find those

19  actions have either caused or would have probably caused an

20  effect on interstate commerce, then you may find the

21  requirements of this element have been satisfied.

22       All right.  We're now on the last count.  By the way,

23  I'll be talking to the lawyers in a moment, but don't think

24  we're going to keep you here tonight trying to deliberate,

25  you're going to want to come back tomorrow morning to

1    deliberate.  So we're not going to keep you late here tonight.

2         Count 6, killing a witness to prevent communication to

3    law enforcement, the indictments and the statute.  The

4    Defendant has been charged in the indictment with killing

5    K.B., Jennifer Jeffrey's seven-year-old child in order to

6    prevent K.B. from providing information to Federal law

7    enforcement officers.

8         The indictment reads as follows:  And this is as to

9    Count 6, the last count.  "On or about May 27th, 2015, in the

10   District of Maryland, the Defendant Andre Ricardo Briscoe

11   unlawfully, knowingly and intentionally killed a person with

12   the intent to prevent the communication by any person to a law

13   enforcement officer information related to the commission and

14   commission of a Federal offense.  Namely, the Defendant killed

15   Jennifer Jeffrey's seven-year-old child, K.B., by shooting

16   K.B. multiple times, including in the head and mouth, which

17   killing was first degree murder as defined in 18 United States

18   Section Code §1111."

19        The relevant statutes on this subject are 18 United

20   States Code §1512, Subpart (a)(1)(C) and 1111(a) that I just

21   mentioned.  Section 1512 (a)(1)(C) provides whoever kills or

22   attempts to kill another person with intent to prevent the

23   communication by any persons to a law enforcement officer or

24   judge of the United States of information relating to the

25   commission of a possible commission of a Federal offense or a

1    violation of conditions of probation, supervised release,

2    parole or release pending judicial proceedings shall be guilty

3    of that crime.

4        Section 1111(a) provides murder is the unlawful killing

5    of a human being with malice aforethought.  Every murder

6    perpetrated by poison, lying in wait, or any other kind of

7    willful, deliberate, malicious and premeditated killing are

8    committed in the perpetration of or attempt to perpetrate, any

9    arson, escape, murder, kidnapping, treason, espionage,

10   sabotage, aggravated sexual abuse, or sexual abuse, child

11   abuse, burglary or robbery, or perpetrated as part of a

12   pattern or practice of assault or torture against a child or

13   children, or perpetrated from a premeditated design unlawfully

14   or maliciously to affect the death of any human being other

15   than him who is killed, is murdered in the first degree.

16       This statute is designed to protect persons who are

17   victims of Federal crimes.  Persons who may be called to

18   testify or give evidence in a Federal proceeding of either

19   civil or criminal, and persons who have information about

20   federal crimes.

21       In order to prove the Defendant guilty of the crime

22   charged in Count 6 of the indictment, the Government must

23   prove each of the following elements beyond a reasonable

24   doubt.  First, that the Defendant killed K.B., and second that

25   the Defendant killed K.B. with the intent to prevent the

1    communication by any person to a Federal law enforcement

2    officer relating to the commission or possible commission of a

3    Federal crime.

4        The first element the Government must prove beyond a

5    reasonable doubt is that the Defendant killed K.B., and that

6    the Defendant did so in violation of 18 United States Code

7    §1111(a) first degree murder.  I will instruct you on the

8    elements of first degree murder in a moment.

9        The second element the Government must prove beyond a

10   reasonable doubt is that the Defendant killed K.B. with the

11   intent to permit -- to prevent the communication by any person

12   to a Federal law enforcement officer or judge relating to the

13   commission or possible commission of a federal crime.  If you

14   find that the Defendant acted with the intent to prevent

15   communication by K.B. to a specific law enforcement officer or

16   group of officers, this element is satisfied, if that officer

17   or one of the group of officers was a Federal law enforcement

18   officer.

19       A Federal law enforcement officer is an officer or

20   employee of the Federal government who is authored to act on

21   behalf of the Federal government in the prevention, detection,

22   investigation or prosecution of Federal crimes.  The

23   Government is not required to prove that the Defendant knew

24   that the officer was a Federal law enforcement officer.

25       On the other hand, if you find that the Defendant was not

1    acting with the intent to prevent communication to a

2    particular officer or group of officers, then this element is

3    satisfied only if the Government proved beyond a reasonable

4    doubt that there was a reasonable likelihood that had K.B.

5    been able to communicate with law enforcement officers, at

6    least one relevant communication would have been made to a

7    Federal law enforcement officer.

8         To prove the Defendant guilty of Count 6, killing the

9    witness to prevent communication to law enforcement, the

10   Government need not prove that a Federal investigation was in

11   progress at the time the Defendant committed the murder.  Nor

12   must the Government show that such a communication, had it

13   occurred, would have been Federal beyond a reasonable doubt.

14        Rather, the Government need only show that the likelihood

15   of communication to a Federal officer was more than remote,

16   outlandish, or simply hypothetical.

17        As charged in Count 6 of the indictment, the killing of

18   K.B. must also be in violation of 18 United States Code

19   Section 1111, the murder statute.  I already read Count 6 to

20   you, the relevant statute on this subject is Section 1111 of

21   title 18th United States code, which provides murder is the

22   unlawful killing of a human being with malice aforethought.

23   Every murder perpetrated by premeditated killing is murder in

24   the first degree.

25        To prove murder in the first degree in violation of 18

1    United States Code Section 1111, the Government must establish

2    each of the following elements beyond a reasonable doubt.

3    First, that the Defendant unlawfully killed K.B. as charged in

4    the indictment.

5         Second, that the Defendant acted with malice

6    aforethought.

7         And third, the Defendant acted with premeditation.

8         The first element the Government's proving beyond a

9    reasonable doubt is that the Defendant unlawfully killed K.B.

10   as charged in the indictment.  In this regard, it is the

11   Government's burden to prove that the Defendant's conduct was

12   the direct cause of K.B.'s death.  This means simply that the

13   Government must prove that the Defendant inflicted an injury

14   or injuries upon the deceased from which the deceased died.

15   An act is done unlawfully that was done without justification

16   or excuse, while the taking of a human life is the most

17   serious matter, not all killing, even when intentional is

18   unlawful.

19        The second element the Government must prove beyond a

20   reasonable doubt is that the Defendant acted with malice

21   aforethought.  Malice is a state of mind and can cause a

22   person to act without regard to the life of another.  To

23   satisfy this element, the Government [sic] must have acted

24   consciously with the intent to kill another person.

25        The third element the Government must prove beyond a

1    reasonable doubt is that the Defendant acted with

2    premeditation, an act is done with premeditation if it is done

3    upon planning or deliberation.

4         In order to satisfy this element, the Government must

5    prove that the Defendant killed K.B. only after thinking the

6    matter over, deliberating whether to act before committing the

7    crime.  There is no requirement that the Government prove that

8    the Defendant deliberated for any particular period of time in

9    order to show premeditation.

10        The amount of time needed for premeditation of a killing

11   depends upon the person and the circumstances.  It is

12   sufficient to satisfy this element if you find that before he

13   acted, the Defendant had a period of time to become fully

14   aware of what he intended to do, and to think it over before

15   he acted.

16        Counts 2 through 4.  I have to go back on one matter,

17   this has to do with aiding and abetting as to Counts 2, 3 and

18   4.  The Defendant is also charged in Counts 2 through 4.  This

19   doesn't apply to Counts 5 and 6 with the aiding and abetting

20   statute.  Aiding and abetting is a separate law which allows

21   you to find the Defendant guilty of Counts 2 through 4, even

22   if you do not believe that the Government has shown that the

23   Defendant himself physically committed the crime with which he

24   is charged.

25        Under the aiding and abetting statute, it is not

 1    necessary for the Government to show that the Defendant act --
 2    Defendant himself physically committed the crime with which he
 3    is charged in order for the Government to sustain its burden
 4    of proof.
 5        A person who aids or abets another to commit an offense
 6    is just as guilty of that offense as if he committed it
 7    himself.  Accordingly, you may find the Defendant guilty of
 8    the offense charged, if you find beyond a reasonable doubt
 9    that the Government has proven that another person actually
10    committed the offense with which the Defendant is charged, and
11    that the Defendant aided or abetted that person in the
12    commission of the offense.
13        As you can see, the first requirement is that you find
14    that another person has committed the crime charged.
15    Obviously, no one can be convicted of aiding or abetting the
16    criminal acts of another if no crime was committed by the
17    other person in the first place, but if you did find that a
18    crime was committed, then you must consider whether the
19    Defendant aided or abetted the commission of that crime.
20        In order to aid or abet another to commit a crime, it is
21    necessary that the Defendant knowingly associate himself in
22    some way with the crime, and that he participate in the crime
23    by doing some act to help make the crime succeed.
24        To establish that the Defendant knowingly associated
25    himself with the crime for Count 4, the Government must prove

1    that the Defendant had advanced knowledge that someone would

2    be using or carrying a firearm during the commission of the

3    drug trafficking crime, or crime of violence, that is the

4    Hobbs Act Robbery.

5        To establish that the Defendant participated in the

6    commission of the crime, the Government must prove he engaged

7    in some affirmative conduct or overt act for the specific

8    purpose of bringing about the crime.  The mere presence of the

9    Defendant where a crime is being committed, even coupled with

10   the knowledge by the Defendant that a crime is being committed

11   or merely associating with others who were committing the

12   crime is not sufficient to establish aiding or abetting.

13       One who has knowledge that a crime is being committed or

14   is about to be committed but inadvertently does something that

15   aids in the commission of that crime is not an aider or

16   abetter, an aider or abetter must show that the crime is being

17   committed, and act in a way that intends to bring about the

18   success of the criminal venture.

19       To determine whether this Defendant aided or abetted the

20   commission of a crime with which he's charged, ask yourself

21   these questions.  Did he participate in the crime charged as

22   something he wished to bring about?  Did he knowingly

23   associate himself with the criminal venture?  Did he seek by

24   his actions to make the criminal venture succeed?  If he did,

25   then the Defendant is an aider and abetter and therefore

1    guilty of the offense.  If on the other hand you answered any

2    of these questions as no, then the Defendant is not an aider

3    and abetter, and you must find him not guilty.

4        Members of the jury, if you unanimously find the

5    Defendant guilty of Count 5 or Count 6 of the indictment, this

6    is the very end now in terms of findings.  This is if you find

7    the Defendant unanimously -- you find him -- unanimously find

8    him guilty of Count 5 or Count 6 of the indictment, you must

9    also consider and find unanimously whether the Government has

10   proven beyond a reasonable doubt the following four facts.

11   And this will be in the verdict sheet, you'll see it, it's

12   here, whether the -- with respect to the victim K.B., whether

13   the victim K.B. was younger than 14 years old at the time of

14   the Defendant's commission of the crime.  Whether K.B. died as

15   a result of the offense.  Whether the Defendant Andre Ricardo

16   Briscoe in the course of committing the offense, intentionally

17   killed victim K.B., intentionally inflicted on K.B. serious

18   bodily injury resulting in his death.  Intentionally

19   participated in an act contemplating that the life of a person

20   will be taken and intending that lethal force will be used in

21   connection with a person other than one of the participants in

22   the offense, and victim K.B. died as a result.

23       D, intentionally and specifically engaged in an act of

24   violence, knowing that the act created a grave risk of death

25   to a person, other than one of the participants in the

1    offense, such that participation in the act constituted a

2    reckless disregard for human life, and the victim K.B. died as

3    a direct result of the act, and whether Andre Ricardo Briscoe

4    was 18 years or older at the time of the offense.

5        Your findings as to whether the Government has proved the

6    existence beyond a reasonable doubt of each of these

7    particular factors must be separate and unanimous as to each

8    count.  You have to consider Count 5 and Count 6 separately.

9    With respect to the factors relating to the Defendant's

10   intent, your finding must be based on the Defendant's personal

11   actions and intent.

12       Intent or knowledge may be proved like anything else, you

13   might -- may consider any statements made or acts done by the

14   Defendant, and all of the facts and circumstances and

15   evidence, which may aide in the determination -- in a

16   determination of the Defendant's knowledge or intent.  You

17   may, but are not required to infer that a person intends the

18   natural and probable consequences or acts knowingly done or

19   knowingly omitted.

20       During your deliberations you should indicate whether you

21   have unanimously found beyond a reasonable doubt each of the

22   special findings as to each of Count 5 and 6 on the

23   appropriate line on the verdict form.

24       All right.  As to that, I've got a few more instructions

25   to give you, but the verdict form is very clear in terms of

1    what I've just laid out.  You determine -- you'll see checks

2    as to guilt or not guilty -- guilty or not guilty as to Counts

3    1 and 2.  You will see the possession, Count 3.  Count 4

4    coming through, same thing.  I already mentioned the matter of

5    the attempt matter as to one count.

6        When you get to Count 5, you will see that if you find

7    that Defendant discharged resulted in the death of K.B.,

8    guilty or not guilty, and if you found he discharged in

9    relation to a robbery affected commerce, guilty or not guilty.

10   If you find him guilty of Count 5, then, then you go through

11   parts C through H, and all of those I just listed.

12       If you were to find him not guilty of Count 5, then you

13   disregard C through H, and it's pretty well -- it's pretty

14   clear here, and the lawyers have worked on this by agreement

15   in terms of the verdict sheet.

16       Count 6, killing a witness to prevent communication to

17   law enforcement.  Again, if you determine guilty or not

18   guilty, and then if you find the Defendant guilty on Count 6,

19   then you also deal with those other parts just as well, and

20   then your foreperson will be signing the verdict sheet, and

21   I'll get into that in a moment as well.

22       Okay.  Then finally in conclusion, believe it or not, I

23   think we're just about there, and you understand why you don't

24   see this on television, but this is very important.  It's very

25   important.

1       You're about to go into the jury room and begin your

2   deliberations.  If during those deliberations you want to see

3   any of the exhibits, they will be sent to you in the jury room

4   upon request.  If you want any of the testimony read -- if you

5   want to have testimony read back that can also be done, but

6   please remember that is always not easy to locate exactly what

7   you might want.  And you might have to be a specific as you

8   possibly can in requesting exhibits or portions of testimony.

9   Your request for exhibits are testimony.  In fact, any

10  communication with the court should be made to me in writing.

11  You sign a note, your foreperson will sign the note and then

12  give it to one of the marshals, and then I will respond to any

13  questions or requests you have as promptly as I can by having

14  you return to the courtroom, and I will answer and I'll have

15  -- the lawyers will be here, and the Defendant will be here,

16  and I will answer your question.

17      In any event, you do not tell me or anyone else how the

18  jury stands on any of the counts as you go through these

19  counts until after a unanimous verdict has been reached on all

20  counts.

21      The Government to prevail must prove the essential

22  elements by the required degree of proof as I've summarized in

23  great detail as I've already explained in these instructions.

24  If it succeeds, your verdict should be guilty, if it fails, it

25  should be not guilty.  To report a verdict, it must be

1    unanimous.  That is, you must deliberate about each question

2    on the verdict form that you've answered and render a

3    unanimous decision.  Your function is to weigh the evidence in

4    the case and determine whether or not the Defendant is guilty,

5    solely upon the basis of such evidence.

6         Each juror is entitled to his or her opinion.  Each

7    should, however, exchange views with his or her fellow jurors.

8    That is a very purpose of jury deliberation, to discuss and

9    consider the evidence, to listen to the arguments of fellow

10   jurors.  To present your individual views, to consult with one

11   another or to reach an agreement based solely and wholly on

12   the evidence.

13        If you can do so without violence to your own individual

14   judgment.  Each of you must decide the case for yourself after

15   consideration with your fellow jurors of the evidence in the

16   case, but you should not hesitate to change an opinion which

17   after discussion with your fellow jurors, appears erroneous.

18        However, after carefully considering all of the evidence

19   and the arguments of your fellow jurors, you entertain a

20   conscientious view that differs from the others, you should --

21   you're not to yield your convictions simply because you're

22   outnumbered.

23        Your final verdict must reflect your conscientious

24   convictions as to how the issue should be decided.  Your

25   verdict, whether guilty or not guilty, must be unanimous.

1    Now, when you retire, the lawyers have agreed in terms of my

2    designation of a foreperson here, two of you have had prior

3    jury service.  Juror No. 5 has had prior jury service here in

4    this Court in Federal Court, and I believe Juror No. 12, and

5    that was five years ago, I believe, according to the Voir Dire

6    question, Juror No. 12 had prior jury service about ten years

7    ago in state court.

8         So we've agreed that Juror No. 5 shall be the foreperson

9    here.  And I thank everyone for their attention, we've

10   definitely noted your attention as well.

11        When you retire, Juror No. 5 shall be your foreperson,

12   that is the person who will preside over the deliberation, and

13   who will be your spokesperson here in court.  The foreperson

14   runs the meeting, controls deliberations and communicates with

15   the Court.  If you need to communicate with me, it should be

16   by written note signed by the foreperson.

17        A verdict form has been prepared for your convenience,

18   and you will take this form to the jury room, and each of you,

19   along with a copy of these instructions will have your own

20   verdict form, only one form is filled out, but you can have it

21   to go along with as you go a through the analysis.

22        You will take this jury -- this form to the jury room,

23   and when you have reached unanimous agreement as to your

24   verdict, you will have your foreperson to fill it in, and then

25   date it and sign it.  And after you have done so, please

1    advise the Court by sending a note through the court security

2    officer, there will be a bailiff outside the door there that

3    you have reached a verdict.  When I receive that note, I shall

4    have you return with your verdict to the courtroom, then that

5    note will be given to the clerk of the court, I will look at

6    it, I will hand it back to Mr. Gurevich, who will then hand it

7    to the foreperson, and then the foreperson will respond to his

8    questions in terms of the verdict for each one of these

9    counts.

10         With that ladies and gentlemen, do not discuss this in

11   any way yet, I just want you to go into the jury room for a

12   moment.  I just need to go over some preliminary matters.

13   We're not going to keep you here late tonight at all, I'm just

14   going to go over some scheduling matters, and a few things.

15         Everyone step into the jury room, including the

16   alternates, everyone stays together, and I'll have you come

17   back out in a second.

18         (Jury exits courtroom 3:54 p.m.)

19             **THE COURT:**  Counsel, ordinarily if we weren't taking

20   the precautions here for COVID, I would have you all come to

21   the bench, I would just have you verify that there were no

22   mistakes read, or any additional objections.  You preserved

23   any objections you had during the charge conference.

24         From the point of view of the Government, were there any

25   mistakes or additional objections the Government has?

1          **MS. BRUSCA:**  No, Your Honor.

2          **THE COURT:**  From the Defense?

3          **MS. WHALEN:**  No, Your Honor.

4          **THE COURT:**  So with that, I would ordinarily dismiss

5     the alternate jurors, and then we would swear the bailiff and

6     proceed.  I am inclined, in the abundance of caution with

7     respect to the situation with COVID and people not feeling

8     well and precautions, I think the safest procedure here would

9     be to tell them that I want all of them to come back,

10    including the alternate jurors.  And then at that point in

11    time, I will dismiss the alternate jurors and Mr. Gurevich

12    will then swear the bailiff, and then they'll be sent in to

13    deliberate.

14         I think this precaution should be taken just in light of

15    the number of people in the court system that lately have been

16    testing positive where people aren't feeling well and test

17    themselves, and suddenly it causes too much chaos.

18         Does the Government have any objection to that?

19         **MS. BRUSCA:**  No, Your Honor.

20         **THE COURT:**  Any objection from the Defense?

21         **MS. WHALEN:**  No, Your Honor.

22         **THE COURT:**  All right.  And I think perhaps -- I

23    think it might be advisable that I just indicate the reasoning

24    for that in terms of precautions we're all taking as to the

25    COVID and we'll have everyone come back, including the

1    alternates, and we'll tell them we want to have them all back

2    in the jury room so I can bring them into the courtroom at

3    9:30 promptly, and then they'll start with deliberations.

4         Unless there is anything further, Mr. Gurevich if you'll

5    have the jury come back in.

6         I think over the next hour, I'll give everyone time to

7    get the exhibits together, double check things and go from

8    there.

9         **THE CLERK:**  All rise for the jury.

10   (Jury enters courtroom 4:00 p.m.)

11        **THE COURT:**  Thank you all very much.  Ladies and

12   gentlemen, what we're going to do now is you will -- everyone

13   may be seated, you all are going to be excused for the day,

14   and you all are going to come back, including the three

15   alternates.  Very likely the three alternates are going to be

16   dismissed in the morning, but I think in the abundance of

17   caution, because of precautions we take here with the COVID-19

18   pandemic, I think it's a wisest thing after a two and a half

19   week trial to make sure everyone gets back here in case

20   someone is not feeling well, and just whatever we move along

21   here, and then the alternate jurors will be dismissed, and

22   then you'll be sworn and you can begin your deliberations.

23        So that's what we're going to do, everyone has to come

24   back, all 12 jurors, all three alternates, we'll have lunch

25   menus, Mr. Gurevich with respect to the 12 jurors, and

1    assuming everyone is back and alternates will get certificates

2    of appreciation that I have to sign, and I hate to

3    inconvenience everyone, but it's just -- it's the safest thing

4    to do here in terms of this case, obviously, the great

5    importance of this case and the precautions we're taking here

6    in light of the COVID-19 pandemic.

7         So with that, I've got to stay on the bench for just a

8    few more minutes with everyone.  With that, you're excused.

9    Please get here promptly between 9:00 and 9:30.  We're going

10   to try to get started right out of the gate at 9:30 and have

11   all of the Exhibits ready for you, and all 12 jurors will have

12   a copy of all of the instructions that I just read to you, as

13   well as a copy of the verdict sheet.  And ma'am foreperson,

14   you will have -- you will then begin to conduct the meeting.

15        So with that, thank you all very much, and you all are

16   excused.

17        (Jury exits courtroom 4:02 p.m.)

18        **THE COURT:**  Okay.  From that point of view, let me

19   just say competent counsel and how hard you all have worked,

20   it's been a very hard two and a half weeks.  So I'm going to

21   compliment all of the lawyers in this case, you've all worked

22   very hard from both the Defense side and the Government side,

23   and you deserve a lot of credit.  There's been a lot of hours

24   and I thank the agents on this case for their hard work,

25   there's been a lot of time spent on this over the last two and

1    a half, three, four weeks even getting ready.  So I compliment

2    all of you for your professionalism and your hard work.

3          Is there anything further from the ponit of view of the

4    Government before we adjourn for the evening, Ms. Brusca?

5                **MS. BRUSCA:**  No, Your Honor.  Thank you.

6                **THE COURT:**  Then I'll see everyone tomorrow back

7    here.  And from the point of view from the Defense, anything

8    further from the point of view of the Defense?

9                **MS. WHALEN:**  I just have a question.  Does Your

10   Honor wish for the attorneys to be in the courtroom when the

11   jury goes out?

12               **THE COURT:**  Yes, I want everybody to be back here.

13   I want all of the attorneys back here.  I want -- it should be

14   very clear, all of the attorneys are back, Defendant's back,

15   we're just right where we are right now, we're back here and

16   we'll start at 9:30.

17         Yes, Mr. Purpura.

18               **MR. PURPURA:**  Your Honor, it was our intent at this

19   point, it's really not necessarily for two counsel, but I

20   could be available by phone only.

21               **THE COURT:**  I think -- I think in light of the

22   crossing T's and dotting I's on this, I prefer you to be here,

23   Mr. Purpura, I really would.  I'd like you to be here at 9:30

24   tomorrow morning.  So everyone is back here at 9:30.

25         Okay.  With that, this Court stands at adjourned for the

1    day.  Thank you all very much.

2            **THE CLERK:**  All rise.  Court stands adjourned.

3        (Court adjourned at 4:03 p.m.)

```
 1                        I N D E X   P A G E

 2        WITNESS:                                    PAGE

 3        CLOSING ARGUMENTS

 4          By Ms. Brusca                              3

 5          By Mr. Purpura                            37

 6          By Mr. Budlow                             80

 7

 8
                                    K E Y
 9
          K.         = Kester
10
          K.B.       = Kester Brown
11
          K.B., III = Kester Brown, III
12

13

      REPORTER NOTE:  Quotation marks are used for clarity and do
14                    not necessarily reflect a direct quote.

15

16             I, Melissa L. Clark, RPR, do hereby certify that the

17      foregoing is a correct transcript from the stenographic record

18      of proceedings in the above-entitled matter.

19

20

21             _____/S/_____
                        Melissa L. Clark
22                   Official Court Reporter

23

24

25
```

**$**

**$20** [1] - 21:21
**$200** [5] - 28:6, 49:13, 49:14
**$400** [1] - 27:17
**$50** [3] - 76:15, 76:16, 83:19
**$6,900** [1] - 49:10
**$700** [3] - 28:8, 28:11, 49:16
**$800** [1] - 52:13
**$85** [1] - 10:18

**'**

**'20** [1] - 69:13

**/**

**/S** [1] - 185:21

**1**

**1** [19] - 5:22, 71:22, 135:18, 136:6, 136:7, 136:14, 136:21, 137:2, 143:14, 143:16, 143:19, 144:6, 146:3, 146:4, 146:6, 156:21, 158:8, 158:24, 175:3
**1.25** [1] - 101:11
**1.27** [1] - 48:7
**10** [1] - 10:13
**10.3** [1] - 19:4
**100** [3] - 5:25, 14:6, 136:20
**101** [1] - 1:24
**1011** [1] - 15:2
**1012** [1] - 15:2
**103** [3] - 3:14, 16:23, 20:4
**1043** [1] - 15:2
**10:00** [2] - 57:23, 57:24
**10:12** [1] - 58:7
**10:28** [1] - 17:22
**10:29** [1] - 17:22
**10:30** [1] - 17:23
**10:39** [1] - 11:16
**10:57** [1] - 36:19
**11** [2] - 1:5, 61:14
**11.2** [3] - 57:18, 58:9, 107:1
**1111** [3] - 168:19, 168:20, 169:1
**1111(a** [2] - 165:20, 166:4

**2**

**2** [22] - 6:24, 19:21, 46:17, 46:21, 57:21, 71:22, 135:21,

**11:17** [1] - 37:20
**11:30** [1] - 95:3
**11:38** [1] - 19:17
**11:40** [1] - 18:20
**11:41** [11] - 18:2, 18:5, 18:12, 18:18, 18:22, 19:18, 31:4, 43:13, 43:15, 81:16
**11:43** [2] - 18:6, 30:12
**11:57** [1] - 18:9
**12** [14] - 6:19, 19:13, 43:10, 44:16, 71:20, 113:24, 114:24, 114:25, 178:4, 178:6, 181:24, 181:25, 182:11
**12:35** [1] - 11:10
**12:45** [1] - 57:24
**12:46** [1] - 79:17
**12:58** [3] - 18:7, 19:2, 30:12
**12th** [1] - 10:6
**14** [2] - 80:15, 173:13
**14th** [1] - 48:8
**15** [4] - 6:4, 7:18, 50:15, 70:2
**1512** [1] - 165:21
**15th** [1] - 69:19
**17** [1] - 56:23
**18** [16] - 56:23, 57:12, 153:8, 154:9, 157:2, 157:4, 157:7, 157:14, 161:20, 162:10, 165:17, 165:19, 167:6, 168:18, 168:25, 174:4
**18.12** [1] - 109:1
**18.3T** [1] - 59:20
**18th** [3] - 59:18, 70:13, 168:21
**19.1** [1] - 54:3
**1951** [2] - 161:20, 162:11
**19th** [2] - 48:9, 110:16
**1:00** [5] - 19:14, 19:15, 19:16, 79:5, 107:5
**1:06** [3] - 17:18, 20:8, 31:7
**1:29** [1] - 19:19
**1:30** [2] - 79:1, 95:3
**1:35** [1] - 80:4
**1:58** [3] - 44:8, 46:18
**1st** [3] - 27:3, 73:2

146:7, 146:8, 147:4, 149:21, 151:9, 152:15, 152:16, 156:23, 158:9, 159:3, 170:16, 170:17, 170:18, 170:21, 175:3
**2.8** [1] - 108:25
**20** [6] - 60:6, 70:25, 71:2, 71:19, 79:4, 156:9
**2000** [1] - 47:17
**2015** [50] - 3:13, 4:19, 6:19, 6:22, 7:1, 7:14, 7:18, 9:10, 10:6, 11:13, 14:22, 15:7, 19:5, 19:14, 19:15, 19:16, 20:3, 27:10, 27:15, 30:1, 30:11, 31:3, 33:3, 42:14, 42:24, 47:3, 47:4, 48:8, 50:10, 50:15, 69:9, 74:13, 75:1, 75:14, 77:18, 78:16, 81:16, 83:17, 93:19, 106:11, 106:13, 110:7, 136:15, 146:11, 152:24, 154:7, 154:10, 156:17, 165:9
**2016** [7] - 23:23, 48:22, 49:3, 110:2, 110:4, 110:17
**2017** [3] - 23:17, 51:15, 110:15
**2018** [1] - 59:18
**2019** [2] - 33:13, 47:18
**2020** [16] - 9:2, 9:21, 31:16, 34:1, 34:4, 42:13, 49:15, 63:19, 63:20, 64:25, 69:19, 69:21, 74:18, 75:9, 77:21, 110:16
**2021** [2] - 70:10, 70:13
**2022** [1] - 1:9
**20th** [1] - 63:2
**21** [3] - 54:24, 64:25, 136:23
**21201** [1] - 1:25
**21st** [2] - 31:6, 63:20
**22nd** [4] - 69:21, 74:18, 77:21, 78:16
**233** [1] - 12:19
**23rd** [1] - 10:12
**24/7** [1] - 101:15
**24th** [1] - 69:13
**25** [2] - 11:13, 36:8
**250** [2] - 26:4, 92:19
**25th** [2] - 11:13, 11:16
**26** [8] - 11:5, 14:22,

15:7, 42:24, 51:15, 63:19, 73:2, 110:15
**26th** [10] - 11:15, 11:17, 30:1, 30:14, 58:7, 71:20, 76:11, 76:12, 99:17, 110:7
**27** [10] - 3:13, 6:19, 6:21, 7:1, 30:11, 49:15, 146:11, 152:24, 154:6, 156:17
**27th** [16] - 19:15, 20:3, 30:14, 30:21, 31:3, 45:25, 63:2, 71:21, 74:7, 81:16, 83:3, 83:17, 95:8, 95:9, 154:10, 165:9
**28** [3] - 19:16, 55:3, 61:15
**28th** [3] - 19:14, 27:15, 95:8
**29th** [3] - 34:4, 47:19, 69:9
**2:30** [1] - 11:23

**3**

**3** [13] - 3:14, 6:14, 27:17, 71:22, 135:23, 152:16, 152:19, 153:17, 154:24, 158:10, 170:17, 175:3, 185:4
**30** [2] - 17:11, 38:22
**30-plus** [1] - 66:25
**30-something** [1] - 41:20
**33** [1] - 30:14
**36** [2] - 19:8, 19:13
**37** [1] - 185:5
**3:39** [1] - 11:24
**3:54** [1] - 179:18
**3rd** [1] - 34:1

**4**

**4** [19] - 6:2, 44:18, 71:23, 135:25, 156:10, 156:17, 157:10, 157:20, 157:23, 158:19, 159:12, 161:18, 162:9, 170:16, 170:18, 170:21, 171:25, 175:3
**40** [3] - 38:22, 61:24, 67:13
**40-minute** [1] - 78:24
**40-plus** [1] - 40:4
**401** [1] - 12:19

**410** [2] - 12:4, 12:23
**45** [3] - 19:25, 153:3, 153:5
**45-caliber** [1] - 46:10
**4:00** [1] - 181:10
**4:02** [1] - 182:17
**4:03** [1] - 184:3
**4th** [1] - 1:24

**5**

**5** [25] - 6:2, 43:11, 44:17, 50:10, 135:25, 156:10, 157:9, 157:11, 157:20, 157:23, 158:19, 159:12, 161:19, 162:9, 170:19, 173:5, 173:8, 174:8, 174:22, 175:6, 175:10, 175:12, 178:3, 178:8, 178:11
**5/20** [1] - 62:10
**5/26** [1] - 12:18
**50,000** [1] - 150:21
**502** [1] - 27:7
**52** [2] - 21:11, 107:2
**57** [1] - 53:20
**5:00** [3] - 17:4, 32:2, 100:13
**5th** [11] - 27:6, 27:9, 33:13, 42:14, 74:13, 75:1, 75:14, 78:16, 85:1, 93:19, 96:5

**6**

**6** [17] - 7:3, 108:25, 109:5, 136:3, 165:2, 165:9, 166:22, 168:8, 168:17, 168:19, 170:19, 173:5, 173:8, 174:8, 174:22, 175:16, 175:18
**60** [2] - 47:25
**67** [1] - 45:17
**6:41** [2] - 12:18, 13:18
**6:41:52** [1] - 12:21
**6:43** [1] - 11:16
**6:45** [3] - 11:12, 11:13, 60:9
**6:46** [1] - 13:19

**7**

**7** [1] - 1:9
**706** [2] - 8:11, 8:18
**74** [1] - 156:12

**7:23** [2] - 17:12, 17:17

**8**

**80** [13] - 3:12, 10:13, 10:16, 11:2, 13:9, 26:21, 31:11, 60:6, 91:14, 91:15, 99:23, 185:6
**85** [1] - 13:15
**8:17** [3] - 58:1, 58:2
**8:41** [1] - 15:15
**8th** [1] - 70:10

**9**

**90** [7] - 10:14, 10:18, 11:3, 13:15, 25:12, 91:15, 99:24
**908-8303** [2] - 12:19, 12:23
**908-8308** [1] - 12:4
**911** [7] - 20:3, 20:5, 44:21, 46:16, 47:14, 72:2, 77:4
**922(g** [1] - 153:7
**95** [1] - 61:24
**9:00** [1] - 182:9
**9:30** [6] - 181:3, 182:9, 182:10, 183:16, 183:23, 183:24
**9:31** [1] - 14:16
**9:37** [3] - 11:24, 14:22, 15:17
**9:38** [2] - 15:15, 15:18
**9:41** [1] - 2:2
**9:44** [1] - 14:23
**9:45** [2] - 2:20, 15:20
**9th** [4] - 48:22, 49:3, 73:3, 110:17

**A**

**a)(1)(C** [2] - 165:20, 165:21
**a.m** [22] - 2:2, 2:20, 17:4, 17:17, 18:2, 18:5, 18:7, 18:9, 18:18, 18:20, 18:22, 19:15, 19:16, 19:17, 19:18, 30:12, 31:4, 32:2, 36:19, 37:20, 81:16, 100:13
**abet** [1] - 171:20
**abets** [1] - 171:5
**abetted** [3] - 171:11, 171:19, 172:19
**abetter** [4] - 172:16, 172:25, 173:3
**abetting** [6] - 170:17,

170:19, 170:20, 170:25, 171:15, 172:12
**ability** [1] - 148:4
**able** [5] - 42:18, 85:12, 130:7, 143:9, 168:5
**above-entitled** [1] - 185:18
**absence** [4] - 124:25, 125:5, 135:14, 142:16
**Absolutely** [1] - 50:4
**absolutely** [7] - 20:4, 38:18, 46:23, 75:11, 76:20, 76:21, 79:13
**abundance** [2] - 180:6, 181:16
**abuse** [3] - 166:10, 166:11
**Abuse** [1] - 146:16
**abused** [1] - 84:16
**accept** [8] - 34:8, 115:22, 127:17, 129:25, 130:11, 131:6, 131:21, 133:14
**accident** [3] - 134:13, 155:24, 160:1
**accidents** [1] - 133:25
**accompanying** [1] - 47:8
**accomplice** [5] - 108:2, 128:1, 128:7, 128:12, 129:8
**accomplices** [4] - 128:9, 128:20, 128:22, 163:10
**accomplish** [3] - 138:1, 142:3, 151:21
**accomplished** [1] - 137:23
**accomplishment** [2] - 138:15, 141:11
**accordance** [1] - 124:9
**according** [6] - 73:25, 90:25, 91:14, 94:11, 95:11, 178:5
**accordingly** [4] - 134:17, 135:4, 142:6, 171:7
**account** [3] - 34:5, 126:16, 127:9
**accountable** [6] - 144:9, 144:12, 144:15, 144:20, 145:1, 145:7
**accurate** [15] - 58:12, 76:5, 76:7, 76:8, 76:9, 76:20, 76:21,

76:24, 77:4, 77:5, 77:6, 77:20, 126:16, 126:24
**accurately** [1] - 126:4
**accusation** [1] - 118:19
**accuse** [1] - 38:18
**accused** [1] - 78:10
**accusing** [1] - 124:5
**acquiesce** [1] - 141:3
**acquired** [1] - 128:6
**acquit** [1] - 119:10
**acquittal** [2] - 99:13, 118:13
**act** [29] - 5:19, 5:23, 71:8, 71:9, 134:4, 134:24, 135:1, 135:2, 138:2, 138:14, 139:25, 140:2, 140:11, 151:20, 152:9, 167:20, 169:15, 169:22, 170:2, 170:6, 171:1, 171:23, 172:7, 172:17, 173:19, 173:23, 173:24, 174:1, 174:3
**Act** [4] - 146:17, 159:8, 159:9, 159:12, 159:13, 161:21, 162:10, 162:17, 172:4
**acted** [12] - 89:23, 133:22, 134:1, 134:10, 167:14, 169:5, 169:7, 169:20, 169:23, 170:1, 170:13, 170:15
**acting** [3] - 89:7, 108:10, 168:1
**action** [7] - 5:18, 48:21, 140:1, 151:25, 155:3, 159:25, 163:15
**actions** [11] - 134:22, 138:10, 138:12, 152:2, 160:7, 163:10, 164:15, 164:17, 164:19, 172:24, 174:11
**active** [2] - 160:5, 160:13
**activities** [1] - 139:12
**activity** [7] - 18:6, 19:17, 30:14, 86:11, 98:18, 128:5
**acts** [34] - 124:5, 133:23, 133:24,

134:4, 134:9, 134:11, 135:1, 135:6, 135:9, 139:21, 139:23, 140:7, 141:5, 141:20, 142:6, 142:8, 142:10, 142:12, 142:15, 142:17, 142:18, 142:21, 145:14, 145:16, 145:23, 152:10, 152:12, 164:17, 171:16, 174:13, 174:18
**actual** [10] - 121:6, 145:15, 147:23, 148:2, 152:5, 155:6, 155:9, 160:21, 162:19, 163:16
**add** [1] - 50:5
**added** [1] - 62:23
**addict** [3] - 41:19, 49:21
**addiction** [1] - 22:18
**addition** [3] - 70:24, 101:12, 107:16
**additional** [2] - 179:22, 179:25
**address** [7] - 12:10, 32:20, 32:25, 75:20, 75:21, 144:4, 152:17
**adds** [1] - 69:20
**adjourn** [1] - 183:4
**adjourned** [3] - 183:25, 184:2, 184:3
**admission** [3] - 59:13, 92:16, 124:8
**admit** [3] - 62:6, 70:9, 123:4
**admits** [5] - 70:1, 76:10, 76:14, 76:15, 97:6
**admitted** [14] - 22:9, 24:12, 24:13, 24:16, 24:18, 39:12, 49:22, 49:24, 49:25, 70:9, 71:14, 71:16, 123:10, 141:19
**adopted** [1] - 139:20
**advance** [1] - 161:11
**advanced** [1] - 172:1
**advances** [1] - 127:12
**adverse** [1] - 123:25
**advisable** [1] - 180:23
**advise** [1] - 179:1
**advised** [1] - 141:15
**affect** [9] - 119:5, 125:5, 126:11, 163:15, 163:22, 163:23, 164:8,

164:14, 166:14
**affected** [4] - 127:22, 163:11, 164:7, 175:9
**affecting** [7] - 153:6, 153:11, 153:12, 153:23, 156:6, 157:2, 158:10
**afforded** [1] - 117:7
**aforethought** [4] - 166:5, 168:22, 169:6, 169:21
**afraid** [2] - 48:24, 111:10
**afternoon** [8] - 42:24, 46:17, 46:18, 80:10, 83:3, 94:23, 107:5, 116:5
**afterwards** [2] - 13:23, 89:8
**age** [1] - 117:21
**agent** [4] - 42:10, 67:12, 142:4, 145:21
**Agent** [33] - 1:16, 1:17, 9:23, 14:8, 23:18, 23:19, 23:25, 29:21, 30:25, 31:21, 43:1, 47:17, 51:16, 51:22, 55:15, 59:5, 62:9, 63:20, 64:4, 64:5, 64:11, 66:4, 66:6, 66:7, 67:3, 67:12, 69:14, 74:20, 96:25, 104:23, 110:10, 111:3
**agents** [4] - 7:5, 46:19, 63:6, 182:24
**aggravated** [2] - 78:7, 160:10
**ago** [5] - 76:3, 84:18, 121:3, 178:5, 178:7
**agree** [7] - 5:24, 38:22, 39:8, 74:25, 82:7, 90:6, 136:18
**agreed** [6] - 6:20, 7:8, 24:2, 26:8, 54:5, 58:2, 107:24, 112:17, 122:6, 141:1, 178:1, 178:8
**agreement** [17] - 5:6, 5:23, 122:5, 122:25, 129:20, 129:25, 130:5, 137:6, 137:12, 137:13, 137:19, 138:4, 138:11, 141:17, 175:14, 177:11, 178:23
**ahead** [2] - 28:12, 34:20
**aid** [1] - 171:20

**aide** [1] - 174:15
**aided** [4] - 1:21,
171:11, 171:19,
172:19
**aider** [4] - 172:15,
172:16, 172:25,
173:2
**aiding** [7] - 141:11,
170:17, 170:19,
170:20, 170:25,
171:15, 172:12
**aids** [2] - 171:5,
172:15
**aimed** [1] - 163:1
**aims** [1] - 140:21
**ain't** [11] - 13:16,
20:20, 31:14, 32:6,
32:9, 50:15, 72:16,
72:17, 72:19, 72:21,
77:19
**aisles** [1] - 37:8
**Al** [40] - 22:25, 23:11,
23:13, 23:18, 23:21,
23:24, 24:13, 24:20,
24:25, 25:5, 27:18,
27:25, 28:2, 28:14,
29:3, 29:5, 30:5,
30:6, 33:10, 39:11,
40:24, 42:11, 48:22,
49:17, 59:17, 59:23,
80:16, 84:9, 95:18,
105:8, 105:12,
105:15, 109:12,
109:15, 109:16,
109:25, 110:8,
110:11, 110:12
**Al's** [1] - 59:18
**Alabama** [1] - 78:5
**Alfred** [5] - 22:5,
26:24, 27:12, 28:25,
60:12
**alibi** [1] - 76:13
**alive** [1] - 58:14
**alleged** [9] - 39:16,
137:15, 137:18,
137:20, 139:6,
140:14, 156:23,
158:7, 158:9
**allegedly** [1] - 123:9
**allow** [2] - 117:25,
133:15
**allowing** [1] - 141:23
**allows** [2] - 128:7,
170:20
**almost** [5] - 4:22,
28:15, 40:4, 57:16,
93:24
**alone** [9] - 15:9, 42:15,
94:1, 94:3, 104:2,
119:9, 130:2,

148:14, 155:14
**alternate** [4] - 180:5,
180:10, 180:11,
181:21
**alternates** [8] - 38:8,
115:2, 179:16,
181:1, 181:15,
181:24, 182:1
**ambit** [1] - 140:12
**America** [1] - 117:6
**AMERICA** [1] - 1:3
**ammunition** [8] - 6:15,
6:22, 135:24, 153:3,
153:5, 153:6,
153:12, 153:13
**amount** [11] - 48:3,
136:21, 144:1,
144:3, 146:14,
151:1, 151:22,
152:9, 164:3, 164:5,
167:10
**amounted** [1] - 152:3
**amounts** [1] - 143:14
**amphetamine** [1] -
150:21
**analysis** [2] - 147:11,
178:21
**ANDRE** [1] - 1:5
**Andre** [74] - 3:12,
7:19, 8:8, 39:16,
40:2, 42:4, 42:22,
43:6, 43:9, 43:18,
43:20, 43:24, 43:25,
44:11, 44:13, 44:23,
45:12, 48:17, 48:19,
50:1, 50:3, 50:11,
51:16, 52:14, 52:20,
52:21, 53:24, 54:20,
55:17, 57:22, 58:15,
62:8, 62:13, 62:15,
62:22, 62:24, 64:4,
65:2, 65:24, 66:11,
66:20, 66:24, 67:3,
67:5, 67:6, 67:8,
67:25, 68:5, 69:11,
69:16, 69:17, 69:20,
69:25, 70:17, 71:21,
74:12, 74:24, 75:12,
78:15, 86:20, 86:22,
98:1, 98:13, 98:14,
105:19, 136:17,
146:12, 152:25,
154:7, 156:18,
165:10, 173:15,
174:3
**Andre's** [3] - 44:15,
67:11, 71:24
**Andrea** [2] - 52:4,
64:21
**Andrew** [1] - 1:18

**anger** [2] - 32:1, 127:3
**angry** [6] - 30:16,
32:4, 71:17, 89:19,
94:19, 97:16
**Anne** [1] - 60:25
**annoyed** [1] - 56:12
**another's** [1] - 163:12
**answer** [9] - 19:20,
20:18, 54:18, 61:2,
94:19, 152:15,
152:16, 176:14,
176:16
**answered** [3] - 17:25,
173:1, 177:2
**answering** [1] -
108:16
**answers** [4] - 19:22,
119:3, 121:25,
122:16
**Anthony** [6] - 50:1,
50:2, 50:5, 53:5,
53:9, 63:24
**anti** [1] - 22:18
**anti-truth** [1] - 22:18
**anticipated** [1] -
164:13
**anxious** [1] - 62:18
**anytime** [1] - 20:3
**anyway** [3] - 69:2,
77:13, 101:24
**apart** [2] - 60:18,
60:21
**apartment** [6] - 3:14,
17:14, 18:3, 27:12,
50:9, 67:25
**apologize** [4] - 55:11,
57:18, 68:16, 100:10
**appealed** [1] - 132:21
**appear** [3] - 124:23,
125:22, 126:2
**appearance** [1] -
147:15
**appeared** [1] - 63:12
**apply** [7] - 104:15,
115:23, 133:12,
145:13, 150:2,
150:3, 170:19
**appreciation** [1] -
182:2
**apprised** [1] - 139:12
**approached** [2] -
23:17, 23:18
**appropriate** [1] -
174:23
**April** [2] - 9:10, 48:8
**area** [18] - 11:24,
14:21, 14:24, 15:4,
15:17, 17:17, 18:3,
19:15, 20:4, 31:7,
35:21, 48:16, 60:25,

61:23, 67:12, 67:17,
67:18, 67:19
**argue** [4] - 86:1,
89:20, 94:10, 94:14
**argued** [3] - 18:11,
102:4, 109:13
**argues** [5] - 99:14,
109:16, 128:3,
128:4, 132:5
**arguing** [1] - 87:23
**argument** [9] - 2:24,
2:25, 3:2, 3:8, 37:23,
72:10, 79:7, 79:12,
93:4
**arguments** [9] - 2:4,
115:6, 115:20,
116:18, 120:14,
124:15, 128:18,
177:9, 177:19
**ARGUMENTS** [2] -
1:5, 185:3
**arraigned** [1] - 78:15
**arranged** [1] - 87:9
**arrest** [1] - 42:4
**arrested** [5] - 10:7,
49:15, 70:15, 78:3,
95:5
**arrive** [1] - 118:10
**arrived** [2] - 31:5,
78:23
**arrives** [1] - 58:15
**arson** [1] - 166:9
**article** [1] - 161:24
**Arundel** [1] - 60:25
**ASAP** [2] - 11:8, 30:19
**aside** [1] - 44:15
**ass** [3] - 72:18, 72:25,
73:7
**assault** [1] - 166:12
**assembled** [1] -
140:21
**asserts** [1] - 121:5
**assets** [2] - 163:21,
163:22
**assist** [2] - 117:13,
150:14
**Assistant** [1] - 56:14
**assisted** [1] - 141:15
**associate** [3] - 139:3,
171:21, 172:23
**associated** [2] -
148:24, 171:24
**associating** [1] -
172:11
**association** [1] -
140:16
**assume** [2] - 18:13,
18:14
**assumed** [1] - 121:22
**assumes** [1] - 18:12,

121:19
**assuming** [2] -
100:25, 182:1
**assure** [2] - 143:2,
143:5
**ATF** [11] - 1:16, 31:16,
51:3, 63:4, 80:17,
91:21, 96:4, 96:16,
101:10, 107:25,
110:15
**attach** [1] - 123:24
**attack** [3] - 81:20,
81:21, 131:16
**attempt** [11] - 151:22,
151:23, 152:8,
152:9, 152:10,
152:11, 152:17,
160:6, 163:23,
166:8, 175:5
**attempted** [6] - 21:11,
144:13, 145:2,
151:12, 164:2, 164:4
**attempting** [1] -
151:14
**attempts** [3] - 57:24,
161:25, 165:22
**attention** [7] - 100:11,
115:9, 115:17,
115:18, 129:23,
178:9, 178:10
**attentively** [1] - 40:3
**attitude** [1] - 116:25
**attorney** [9] - 54:9,
56:14, 69:20, 70:6,
70:16, 75:12, 75:13,
78:3, 116:3
**attorneys** [5] - 124:14,
124:24, 183:10,
183:13, 183:14
**attributable** [1] -
144:7, 145:25
**audio** [2] - 74:15,
108:25
**August** [2] - 33:13,
63:2
**aunt** [5] - 21:13,
54:21, 55:12, 56:5,
56:11
**AUSA** [2] - 1:11, 1:12
**authored** [1] - 167:20
**automatically** [1] -
140:17
**autopsy** [1] - 76:22
**available** [4] - 47:18,
134:20, 160:10,
183:20
**Avenue** [1] - 27:7
**avoid** [1] - 123:6
**awake** [1] - 45:5
**aware** [4] - 91:21,

93:1, 170:14
**awful** [1] - 84:8
**Azur** [2] - 74:18, 74:21

## B

**baby** [2] - 33:2, 111:1
**bachelorette** [1] - 7:25
**backseat** [1] - 62:12
**backyard** [1] - 73:11
**bad** [13] - 5:17, 21:5, 41:11, 42:5, 65:19, 73:4, 77:20, 97:23, 101:9, 102:5, 102:6, 134:7
**bag** [18] - 10:7, 16:9, 16:11, 16:14, 16:17, 17:2, 20:16, 27:4, 27:8, 27:11, 30:17, 41:5, 70:4, 91:17, 91:19, 91:20, 92:14
**bagged** [2] - 8:19, 27:8
**bags** [2] - 21:21, 69:25
**bail** [3] - 10:9, 10:21, 13:6
**bailiff** [3] - 179:2, 180:5, 180:12
**balcony** [1] - 34:19
**BALTIMORE** [1] - 1:9
**Baltimore** [43] - 1:25, 4:7, 8:3, 9:18, 9:19, 11:4, 11:12, 11:14, 11:17, 11:22, 13:14, 15:7, 21:2, 21:24, 23:7, 23:14, 27:15, 30:15, 30:24, 41:14, 41:22, 46:22, 49:1, 50:20, 51:1, 61:21, 62:20, 69:10, 70:14, 75:5, 75:6, 76:6, 76:10, 76:14, 78:5, 80:17, 91:9, 91:25, 94:4, 96:18, 102:9, 107:8
**bang** [2] - 19:23, 46:10
**banging** [8] - 17:3, 32:3, 44:18, 44:21, 46:14, 47:14, 72:1, 77:4
**bangs** [1] - 58:15
**bank** [1] - 148:9
**bar** [1] - 117:11
**based** [18] - 50:6, 76:5, 76:7, 76:8, 76:10, 77:20, 82:16, 84:1, 87:21, 89:5, 90:2, 102:20, 104:15, 117:16,

132:23, 174:10, 177:11
**basic** [2] - 78:14, 101:16
**basis** [4] - 124:16, 124:21, 130:1, 177:5
**bathroom** [1] - 20:14
**Bay** [2] - 50:20, 61:12
**bear** [5] - 124:11, 127:16, 130:4, 142:25, 145:22
**bearing** [4] - 132:8, 135:15, 140:4, 153:4
**bears** [1] - 3:1
**beat** [3] - 53:21, 65:19, 72:18
**beautiful** [2] - 3:13, 69:6
**became** [2] - 137:9, 138:19
**become** [3] - 51:9, 139:10, 170:13
**becomes** [2] - 141:16, 142:4
**bed** [6] - 3:21, 17:1, 46:3, 64:8, 65:10, 92:24
**bedroom** [6] - 20:14, 44:24, 45:1, 45:21, 50:11
**beefing** [2] - 32:6, 32:7
**BEFORE** [1] - 1:8
**begged** [2] - 47:20
**begin** [3] - 176:1, 181:22, 182:14
**beginning** [4] - 4:18, 26:2, 116:17, 136:14
**begins** [1] - 119:8
**behalf** [1] - 167:21
**behavior** [2] - 128:6, 150:6
**beige** [5] - 41:12, 82:6, 82:9, 91:22
**beings** [3] - 103:21, 103:24
**below** [1] - 159:22
**bench** [3] - 40:5, 179:21, 182:7
**beneficial** [1] - 164:8
**benefit** [9] - 51:1, 104:20, 104:21, 105:9, 105:10, 111:25, 112:11, 127:10, 128:22
**benefits** [2] - 131:1, 131:5
**BENNETT** [1] - 1:8
**Bennett** [7] - 5:13, 36:22, 37:25, 40:5,

79:20, 83:8, 90:11
**best** [5] - 4:14, 39:2, 63:12, 129:1, 143:2
**better** [6] - 40:6, 46:24, 52:24, 57:20, 66:17, 103:2
**between** [26] - 5:6, 15:15, 19:4, 19:13, 20:14, 21:12, 43:10, 44:11, 58:10, 61:3, 64:9, 65:5, 76:9, 97:22, 98:7, 99:9, 104:12, 105:9, 107:2, 110:20, 121:9, 137:25, 139:18, 152:4, 163:17, 182:9
**beyond** [62] - 4:25, 38:21, 39:24, 78:19, 80:22, 89:5, 113:4, 118:7, 118:15, 118:22, 119:7, 119:12, 119:15, 120:24, 121:15, 123:20, 128:11, 130:3, 130:20, 135:12, 137:4, 137:10, 138:16, 140:24, 142:10, 144:3, 146:22, 147:3, 147:19, 149:4, 149:20, 149:24, 150:7, 151:11, 151:16, 151:24, 153:16, 153:25, 154:23, 156:4, 157:21, 158:14, 158:21, 159:11, 159:15, 160:16, 162:8, 162:16, 164:11, 166:23, 167:4, 167:9, 168:3, 168:13, 169:2, 169:8, 169:19, 169:25, 171:8, 173:10, 174:6, 174:21
**BGF** [1] - 91:10
**bias** [4] - 116:24, 118:9, 126:9, 126:14
**biased** [1] - 127:4
**Bible** [2] - 62:23, 62:24
**bicycles** [1] - 8:15
**big** [10] - 45:4, 49:14, 51:14, 53:22, 53:23, 65:3, 75:4, 77:14, 77:25
**bigger** [2] - 49:12,

50:22
**biggest** [1] - 90:15
**bill** [5] - 32:21, 48:5, 48:6, 66:24, 101:11
**billing** [1] - 48:8
**bird** [1] - 60:5
**birth** [1] - 49:24
**birthday** [1] - 25:6
**bit** [5] - 31:21, 40:13, 56:11, 64:5, 95:17
**bitch** [19] - 14:2, 28:21, 29:10, 34:23, 52:5, 60:4, 60:17, 64:16, 72:8, 72:9, 72:16, 72:19, 72:25, 73:4, 73:7, 73:16, 109:21
**Bitch** [1] - 72:20
**bitch's** [1] - 73:10
**biting** [1] - 64:2
**black** [4] - 16:9, 73:9, 73:21, 91:19
**Blackwell** [1] - 34:9
**blink** [1] - 67:4
**blood** [6] - 14:3, 29:11, 73:14, 74:5, 87:24, 89:22
**Bloods** [1] - 91:10
**blue** [3] - 11:25, 65:5, 65:6
**Bob** [1] - 74:23
**bodies** [4] - 19:14, 60:9, 72:20, 73:25
**bodily** [1] - 173:18
**body** [2] - 72:12, 109:5
**boggled** [1] - 56:13
**BooBoo** [4] - 22:5, 24:23, 26:25, 33:13
**book** [1] - 93:6
**born** [1] - 70:14
**borne** [2] - 36:6, 36:7
**bottle** [1] - 69:16
**bottom** [7] - 11:13, 12:21, 43:14, 48:15, 92:23, 92:25
**bottoms** [2] - 38:15, 46:5
**Boug** [7] - 21:14, 21:17, 54:22, 56:10, 56:12, 65:15, 65:17
**bought** [1] - 28:5
**bouncing** [1] - 46:18
**bowl** [1] - 17:1
**box** [1] - 148:8
**boy** [15] - 3:22, 24:9, 24:16, 24:17, 25:10, 25:19, 26:13, 28:17, 30:8, 30:9, 36:1, 36:2, 60:10, 72:11, 110:18

**boy's** [1] - 3:25
**boyfriend** [2] - 65:9, 65:11
**BPD** [6] - 96:3, 96:15, 97:4, 101:9, 104:21, 110:16
**brand** [1] - 153:5
**brandishing** [1] - 160:8
**break** [8] - 5:8, 10:2, 69:22, 78:23, 79:5, 79:6, 79:15, 104:17
**breakfast** [1] - 3:22
**breaking** [1] - 156:2
**breaks** [1] - 3:4
**breath** [2] - 94:18, 143:11
**Bri** [1] - 74:6
**Brian** [3] - 30:4, 30:20, 85:2
**Brianna** [22] - 16:3, 16:7, 16:8, 16:10, 16:13, 16:15, 16:16, 16:20, 17:4, 17:5, 44:20, 48:5, 74:7, 91:17, 91:18, 92:4, 92:7, 92:11, 92:22, 92:24, 100:2, 100:5
**Brianna's** [1] - 16:25
**brick** [3] - 60:4, 60:5, 60:11
**Bridge** [2] - 50:21, 61:12
**bridge** [3] - 61:21, 62:1, 62:3
**brief** [2] - 36:15, 143:12
**briefly** [2] - 46:22, 107:24
**brilliant** [1] - 104:25
**bring** [12] - 2:16, 8:18, 36:24, 36:25, 45:5, 61:17, 79:25, 129:22, 151:21, 172:17, 172:22, 181:2
**bringing** [1] - 172:8
**Briscoe** [89] - 2:10, 3:12, 8:9, 8:10, 8:13, 9:10, 12:1, 13:20, 18:13, 18:14, 19:2, 19:5, 19:6, 21:15, 22:7, 24:5, 24:14, 24:22, 25:5, 25:15, 25:21, 26:6, 26:10, 26:15, 33:12, 33:23, 39:12, 39:16, 40:2, 42:4, 42:23, 43:9, 43:19, 43:20, 43:24, 43:25, 44:11, 44:23,

45:13, 48:17, 48:20, 53:19, 53:22, 55:10, 55:15, 56:21, 58:23, 60:22, 60:23, 62:15, 64:14, 65:24, 67:3, 67:7, 67:8, 74:12, 75:12, 78:15, 80:16, 86:20, 86:22, 98:1, 98:13, 98:14, 105:16, 105:20, 105:23, 106:3, 106:6, 106:9, 106:20, 107:6, 107:8, 107:10, 107:18, 107:22, 108:4, 108:23, 109:7, 113:2, 136:17, 146:12, 152:25, 154:7, 156:18, 165:10, 173:16, 174:3
**BRISCOE** [1] - 1:5
**Briscoe's** [4] - 19:3, 34:1, 61:11, 105:21
**broad** [2] - 67:6, 87:4
**broke** [1] - 8:19
**broken** [1] - 40:20
**Brother** [1] - 34:9
**brother** [4] - 12:6, 12:7, 25:7, 53:5
**brought** [8] - 33:18, 41:5, 41:21, 49:19, 67:24, 69:6, 101:25, 117:5
**brown** [2] - 12:1, 91:22
**Brown** [2] - 185:10, 185:11
**Brusca** [12] - 1:11, 3:9, 36:14, 55:3, 57:1, 57:2, 58:22, 60:19, 79:11, 107:2, 183:4, 185:4
**BRUSCA** [11] - 2:6, 3:10, 10:24, 13:3, 14:15, 26:18, 26:24, 28:23, 180:1, 180:19, 183:5
**bubbled** [1] - 4:9
**bucks** [1] - 71:19
**BUDLOW** [1] - 79:24, 80:9
**budlow** [2] - 53:7, 79:23
**Budlow** [9] - 1:12, 38:14, 47:24, 50:7, 53:8, 79:12, 80:8, 114:12, 185:6
**builds** [1] - 111:16
**bullet** [2] - 45:6

**bullshit** [1] - 73:18
**bunch** [3] - 51:23, 52:9
**burden** [21] - 3:1, 87:17, 117:19, 117:23, 118:14, 119:6, 119:14, 119:16, 119:18, 120:10, 120:17, 123:19, 123:21, 125:8, 137:2, 144:2, 153:16, 157:22, 164:10, 169:11, 171:3
**burdens** [1] - 133:21
**burglary** [1] - 166:11
**Burnie** [4] - 60:25, 62:5, 106:3, 106:7
**burst** [1] - 64:8
**bus** [2] - 49:5, 49:6
**business** [6] - 14:4, 20:20, 102:13, 139:3, 163:22, 164:9
**busted** [1] - 20:11
**busting** [1] - 35:22
**busts** [1] - 30:16
**butter** [1] - 92:9
**button** [1] - 51:5
**buying** [3] - 106:9, 106:11, 106:12

---

# C

**Cadle** [1] - 1:19
**calendar** [1] - 76:11
**caliber** [2] - 153:3, 153:5
**California** [1] - 78:5
**call's** [1] - 44:2
**Cambridge** [36] - 4:7, 7:21, 7:24, 8:2, 8:10, 9:5, 9:7, 9:12, 9:17, 13:14, 13:23, 21:18, 21:19, 21:25, 22:2, 30:18, 32:25, 41:14, 48:18, 50:21, 61:11, 71:15, 72:24, 75:15, 76:6, 77:9, 81:3, 83:16, 83:19, 85:1, 95:1, 95:4, 102:9, 106:7, 109:11, 113:17
**camera** [2] - 48:4, 101:8
**candid** [2] - 39:10, 125:22
**candidly** [2] - 47:10
**cane** [1] - 45:16
**cannot** [4] - 88:17, 92:25, 148:20, 150:5

**canvassing** [1] - 48:16
**cap** [1] - 9:11
**capable** [1] - 162:14
**captured** [1] - 48:11
**car** [23] - 10:9, 14:13, 14:19, 15:11, 27:10, 51:20, 54:21, 55:8, 55:11, 55:13, 56:3, 56:8, 56:19, 62:11, 62:13, 72:14, 73:1, 88:9, 93:3, 93:16, 93:24, 94:9, 94:10
**card** [2] - 49:1, 50:18
**care** [14] - 13:12, 13:16, 13:21, 13:22, 31:14, 75:18, 76:1, 82:8, 123:12, 127:7, 127:18, 128:13, 130:10, 132:2
**careful** [3] - 24:23, 115:18, 119:11
**carefully** [4] - 89:14, 115:14, 125:15, 177:18
**carelessness** [2] - 133:25, 149:8
**carried** [6] - 6:13, 156:19, 158:3, 159:17, 160:1, 161:2
**carries** [1] - 157:17
**carry** [3] - 65:20, 135:25, 159:21
**carrying** [5] - 127:24, 142:5, 156:14, 160:15, 172:2
**cartoons** [1] - 3:22
**case** [83] - 2:4, 3:11, 4:12, 5:23, 6:5, 6:8, 22:10, 24:4, 25:17, 33:6, 35:15, 38:1, 38:3, 38:23, 38:25, 39:22, 39:24, 40:1, 41:13, 48:20, 66:4, 71:13, 78:19, 79:9, 82:19, 83:25, 84:24, 85:11, 85:18, 85:20, 86:4, 87:3, 89:1, 89:3, 89:6, 90:21, 91:2, 91:24, 104:13, 106:2, 106:6, 108:12, 109:4, 113:9, 113:11, 113:25, 114:18, 115:8, 115:20, 116:7, 116:14, 117:1, 117:14, 118:4, 119:18, 120:22, 121:13, 122:1, 122:13, 123:17, 125:8,

125:12, 126:21, 127:10, 127:20, 128:12, 129:10, 129:18, 130:5, 130:14, 131:8, 131:19, 133:4, 134:3, 138:7, 177:4, 177:14, 177:16, 181:19, 182:4, 182:5, 182:21, 182:24
**CASE** [1] - 1:3
**cases** [4] - 39:16, 47:5, 109:15, 138:10
**catching** [2] - 72:20, 73:25
**caught** [3] - 64:24, 65:21, 73:13
**caused** [5] - 157:5, 157:11, 157:12, 164:19
**causes** [1] - 180:17
**causing** [2] - 136:2, 163:2
**caution** [7] - 127:6, 128:14, 130:10, 140:13, 141:2, 180:6, 181:17
**cautiously** [1] - 132:1
**cell** [37] - 9:16, 11:11, 11:15, 11:21, 12:24, 14:18, 15:5, 16:4, 17:16, 17:23, 18:9, 18:17, 18:18, 19:9, 30:3, 35:21, 37:3, 37:5, 42:25, 43:13, 44:7, 44:9, 46:18, 46:19, 61:9, 86:11, 88:12, 89:8, 93:20, 93:21, 94:4, 95:2, 95:9, 99:5, 99:6, 108:5
**Center** [1] - 47:20
**central** [1] - 101:15
**certain** [8] - 121:19, 122:3, 122:6, 123:9, 123:10, 133:4, 134:23, 164:16
**certainly** [3] - 87:7, 113:22, 121:11
**certificates** [1] - 182:1
**certify** [1] - 185:16
**chain** [1] - 121:7
**chair** [4] - 45:2, 76:21, 109:6, 109:10
**change** [6] - 51:11, 58:13, 66:9, 78:13, 78:14, 177:16
**changed** [3] - 10:6, 20:15, 94:18

**changes** [6] - 21:6, 30:17, 51:12, 51:15, 65:1, 66:9
**changing** [1] - 21:4
**chaos** [1] - 180:17
**character** [1] - 141:14
**characterized** [1] - 138:6
**charge** [11] - 3:3, 5:4, 64:12, 65:22, 135:25, 137:12, 146:21, 151:14, 153:23, 154:16, 179:23
**charged** [48] - 5:1, 5:3, 48:20, 104:17, 114:10, 117:4, 118:1, 119:6, 123:11, 124:6, 127:24, 135:9, 136:7, 137:7, 138:14, 138:20, 142:11, 143:16, 144:6, 146:16, 147:7, 151:9, 151:25, 153:23, 154:1, 154:2, 154:21, 156:5, 156:13, 156:21, 158:7, 158:23, 158:24, 159:3, 164:17, 165:4, 166:22, 168:17, 169:3, 169:10, 170:18, 170:24, 171:3, 171:8, 171:10, 171:14, 172:20, 172:21
**charges** [13] - 6:15, 7:3, 118:18, 129:9, 129:14, 135:18, 135:21, 135:23, 136:3, 136:5, 141:21, 146:8, 152:20
**chart** [2] - 90:24, 101:19
**charts** [3] - 123:4, 123:8
**check** [4] - 15:25, 32:23, 49:15, 181:7
**checked** [2] - 18:21, 25:17
**checking** [2] - 21:7, 119:3
**checks** [3] - 21:5, 49:12, 175:1
**cheek** [1] - 90:9
**chemical** [1] - 147:10
**chemist** [1] - 147:10

**chest** [1] - 3:18
**child** [20] - 25:11, 37:7, 37:9, 37:12, 38:12, 38:16, 42:17, 43:22, 45:18, 50:24, 74:10, 77:19, 84:7, 84:16, 104:4, 109:23, 165:5, 165:15, 166:10, 166:12
**child's** [2] - 25:7, 60:1
**children** [3] - 71:3, 100:5, 166:13
**Chipo** [1] - 34:9
**chivalry** [1] - 94:2
**choice** [2] - 74:17, 74:22
**choices** [1] - 39:22
**choose** [1] - 126:8
**cigarettes** [2] - 17:20, 17:21
**circumstance** [1] - 135:15
**circumstances** [7] - 121:8, 125:16, 134:2, 135:5, 138:7, 170:11, 174:14
**circumstantial** [7] - 39:3, 121:3, 121:10, 121:11, 147:9, 147:12, 147:16
**Circumstantial** [1] - 121:7
**City** [7] - 46:22, 49:1, 50:20, 51:1, 91:9, 96:18, 102:9
**city** [2] - 46:25, 47:4
**civil** [4] - 153:20, 154:5, 154:12, 166:19
**civilian** [2] - 39:4, 40:23
**CJ** [57] - 4:21, 8:4, 8:24, 9:2, 9:8, 9:13, 10:6, 10:9, 10:10, 10:14, 11:1, 11:19, 12:2, 12:3, 12:4, 12:5, 12:7, 12:15, 12:17, 12:18, 13:4, 13:18, 14:5, 15:21, 15:23, 19:19, 31:9, 31:11, 31:13, 31:24, 33:5, 39:7, 41:9, 41:16, 42:15, 45:12, 47:19, 60:5, 71:9, 72:11, 72:12, 74:23, 80:17, 83:18, 85:16, 91:10, 91:15, 92:17, 92:18, 96:10, 96:13, 97:7, 99:20, 99:21,

99:23
**CJ's** [1] - 12:7
**claim** [1] - 163:20
**claims** [1] - 123:10
**clarify** [1] - 81:22
**clarity** [1] - 185:13
**Clark** [3] - 1:23, 185:16, 185:21
**clean** [3] - 72:12, 101:6, 119:9
**cleaned** [1] - 100:22
**cleanup** [2] - 100:17, 100:25
**clear** [12] - 11:1, 29:19, 96:15, 98:16, 106:24, 109:14, 115:10, 118:8, 125:10, 174:25, 175:14, 183:14
**clearly** [14] - 39:3, 41:15, 43:9, 48:13, 50:20, 61:10, 71:13, 82:17, 101:13, 134:25, 152:11
**CLERK** [8] - 2:18, 36:18, 36:21, 37:19, 79:16, 79:19, 181:9, 184:2
**clerk** [1] - 179:5
**clip** [2] - 66:12, 108:24
**clips** [1] - 66:12
**clock** [1] - 71:21
**close** [18] - 31:1, 37:8, 38:25, 39:19, 46:8, 46:16, 53:20, 88:3, 90:22, 91:4, 94:23, 101:2, 115:9, 115:17, 127:7, 148:21
**closed** [2] - 17:1, 101:1
**closer** [1] - 95:17
**closing** [6] - 2:4, 2:24, 2:25, 3:8, 37:23, 116:18
**CLOSING** [2] - 1:5, 185:3
**clothes** [6] - 20:15, 21:5, 28:5, 30:17, 94:18, 94:19
**cloud** [1] - 48:12
**clutching** [1] - 34:25
**co** [9] - 138:14, 139:6, 141:22, 142:17, 145:15, 145:18, 145:20, 145:22, 163:11
**co-conspirator** [2] - 142:17, 145:20
**co-conspirators** [7] -

138:14, 139:6, 141:22, 145:15, 145:18, 145:22, 163:11
**coaching** [1] - 103:22
**code** [2] - 25:11, 168:21
**Code** [13] - 136:24, 153:8, 154:9, 157:3, 157:5, 157:14, 161:21, 162:10, 165:18, 165:20, 167:6, 168:18, 169:1
**coded** [2] - 11:1, 29:18
**coffee** [1] - 65:15
**coke** [1] - 41:19
**collect** [1] - 24:4
**color** [1] - 129:5
**colored** [2] - 127:22, 131:18
**coloring** [1] - 41:11
**colors** [1] - 82:7
**combine** [1] - 136:17
**Comcast** [6] - 48:6, 48:10, 101:10, 101:11, 101:18, 102:1
**coming** [15] - 20:17, 25:17, 27:14, 59:3, 59:5, 61:19, 72:24, 76:10, 92:12, 95:21, 99:12, 109:3, 109:9, 175:4
**comment** [1] - 98:9
**commerce** [27] - 6:17, 152:22, 153:6, 153:11, 153:12, 153:14, 153:24, 156:6, 156:8, 157:2, 158:11, 159:7, 161:19, 161:23, 161:24, 163:11, 163:15, 163:17, 163:18, 163:25, 164:6, 164:8, 164:9, 164:11, 164:14, 164:20, 175:9
**Commission** [1] - 152:1
**commission** [25] - 152:3, 152:8, 152:13, 156:14, 158:4, 159:17, 160:18, 160:19, 160:25, 161:11, 165:13, 165:14, 165:25, 167:2, 167:13, 171:12, 171:19, 172:2,

172:6, 172:15, 172:20, 173:14
**commit** [16] - 5:24, 23:2, 29:18, 107:11, 107:24, 112:17, 140:25, 151:14, 151:18, 151:22, 151:25, 152:10, 152:11, 156:13, 171:5, 171:20
**commits** [2] - 161:25, 162:3
**committed** [34] - 5:9, 5:19, 10:4, 23:1, 23:6, 32:13, 87:8, 100:8, 104:3, 106:15, 112:16, 112:18, 141:21, 145:18, 151:12, 157:24, 158:15, 158:22, 159:6, 159:11, 166:8, 168:11, 170:23, 171:2, 171:6, 171:10, 171:14, 171:16, 171:18, 172:9, 172:10, 172:13, 172:14, 172:17
**committing** [7] - 6:6, 35:16, 124:5, 158:24, 170:6, 172:11, 173:16
**commodity** [1] - 161:24
**common** [24] - 36:12, 43:17, 44:15, 45:6, 45:15, 46:9, 46:21, 87:1, 92:23, 102:8, 102:13, 104:3, 104:10, 114:2, 120:1, 122:19, 124:9, 124:17, 126:5, 132:22, 138:13, 140:21, 142:7, 162:23
**commonly** [4] - 156:1, 159:8, 160:3, 161:21
**communicate** [2] - 168:5, 178:15
**communicates** [1] - 178:14
**communication** [18] - 43:25, 44:12, 44:13, 81:13, 136:4, 165:2, 165:12, 165:23, 167:1, 167:11, 167:15, 168:1, 168:6, 168:9, 168:12, 168:15,

175:16, 176:10
**community** [3] - 50:24, 64:17, 117:3
**companies** [1] - 99:6
**compare** [1] - 125:25
**competent** [1] - 182:19
**complete** [2] - 116:25, 144:4
**completely** [3] - 87:25, 89:10, 126:15
**complexion** [2] - 66:22, 66:23
**complicated** [1] - 7:7
**compliment** [2] - 182:21, 183:1
**computer** [1] - 1:21
**computer-aided** [1] - 1:21
**concede** [1] - 107:18
**conceding** [1] - 81:1
**concentration** [1] - 40:6
**concept** [1] - 147:21
**concern** [5] - 117:3, 120:22, 130:16, 130:19, 133:18
**concerned** [2] - 45:25, 46:13
**concerning** [3] - 133:15, 147:14, 150:3
**concerns** [1] - 132:19
**conclude** [1] - 124:20
**conclusion** [3] - 4:5, 41:24, 175:22
**conclusions** [3] - 125:4, 125:11, 129:11
**conclusive** [2] - 93:4, 93:17
**conclusively** [1] - 135:1
**conditions** [1] - 166:1
**conduct** [15] - 85:14, 98:17, 112:24, 117:15, 131:6, 134:2, 134:5, 134:8, 134:22, 138:7, 140:20, 152:13, 169:11, 172:7, 182:14
**conducting** [1] - 48:19
**confederate** [1] - 136:18
**confederates** [1] - 141:22
**conference** [1] - 179:23
**confess** [1] - 102:18

confessed [4] - 36:1, 53:24, 81:7, 113:19
confession [4] - 84:4, 87:12, 109:18, 110:23
confessions [2] - 30:7, 104:1
confirm [1] - 12:8
confirms [2] - 9:16, 11:12
conflicts [2] - 116:10, 132:14
confrontations [1] - 71:16
confuse [1] - 67:8
confused [1] - 12:5
confusion [1] - 107:16
connect [8] - 8:25, 9:7, 18:10, 57:23, 72:10, 72:12, 77:17, 84:14
connected [2] - 18:8, 107:7
connection [12] - 39:19, 65:13, 65:15, 66:11, 84:19, 105:9, 107:5, 127:1, 139:9, 139:18, 149:2, 173:21
connects [1] - 18:19
conscientious [2] - 177:20, 177:23
conscious [2] - 89:7, 134:12
consciously [1] - 169:24
consent [2] - 59:12, 122:25
consents [1] - 78:6
consequence [1] - 164:15
consequences [1] - 174:18
consider [34] - 29:14, 102:22, 114:6, 117:18, 118:22, 118:24, 120:16, 121:23, 122:17, 122:19, 123:7, 124:2, 124:8, 126:17, 126:19, 127:2, 128:19, 131:1, 132:14, 132:16, 133:10, 135:15, 138:12, 138:24, 142:17, 144:8, 154:18, 154:19, 171:18, 173:9, 174:8, 174:13, 177:9

consideration [6] - 116:1, 117:7, 117:10, 119:11, 131:14, 177:15
considerations [3] - 128:16, 133:12, 150:1
considered [10] - 107:23, 118:19, 122:8, 122:9, 122:12, 132:7, 142:14, 142:23, 149:1, 154:16
considering [4] - 127:15, 131:7, 162:20, 177:18
consist [1] - 152:6
consistent [11] - 2:14, 25:22, 26:25, 36:12, 58:6, 69:17, 75:11, 82:25, 87:13, 98:19, 126:1
consistently [2] - 25:23, 105:13
consists [2] - 116:15, 122:1
conspiracy [64] - 5:4, 5:22, 5:23, 5:25, 6:9, 40:21, 135:18, 136:6, 136:8, 137:9, 137:11, 137:18, 138:5, 138:9, 138:17, 138:19, 138:20, 138:21, 138:23, 138:25, 139:4, 139:10, 139:14, 139:17, 139:19, 139:20, 139:22, 139:23, 139:25, 140:1, 140:3, 140:12, 140:15, 140:16, 140:23, 141:7, 141:10, 141:14, 141:25, 142:1, 142:3, 142:5, 142:7, 142:8, 142:11, 142:13, 142:14, 142:22, 142:23, 143:16, 144:5, 144:17, 144:21, 144:23, 144:25, 145:2, 145:6, 145:9, 145:10, 145:19, 145:21, 145:24, 158:25
conspiracy's [1] - 139:17
conspirator [4] - 137:20, 141:18,

142:17, 145:20
conspirator's [1] - 140:5
conspirators [10] - 138:14, 139:6, 139:21, 140:8, 141:22, 142:4, 145:15, 145:18, 145:22, 163:11
conspire [1] - 136:17
conspired [1] - 144:2
conspires [1] - 161:25
conspiring [1] - 136:24
constitute [4] - 152:10, 160:8, 160:11, 160:14
constituted [1] - 174:1
constitution [1] - 123:18
construction [1] - 78:6
consult [1] - 177:10
consuming [1] - 142:25
consumption [1] - 150:22
contained [2] - 121:24, 157:9
containing [2] - 136:21, 146:14
contains [3] - 118:24, 135:17, 157:9
contemplating [1] - 173:19
content [1] - 83:5
contested [1] - 88:17
context [3] - 83:9, 98:8, 138:9
continue [3] - 80:7, 97:7, 131:4
continued [2] - 86:18, 86:19
continues [1] - 139:23
continuing [1] - 136:15
contradicted [1] - 132:12
contradictory [1] - 126:2
contrary [1] - 62:14
control [17] - 97:16, 97:24, 147:24, 148:5, 148:11, 148:16, 148:25, 149:25, 155:4, 155:7, 155:10, 155:16, 160:17, 160:22, 160:24, 161:8, 161:9

Control [1] - 146:17
controlled [12] - 135:19, 135:22, 136:9, 136:22, 136:25, 137:7, 137:14, 137:15, 143:14, 146:9, 146:15, 146:20
controls [1] - 178:14
convenience [1] - 178:17
convenient [2] - 85:22, 86:7
conversation [8] - 23:24, 28:1, 33:21, 52:25, 55:4, 56:7, 59:17, 70:8
conversations [6] - 24:11, 24:12, 33:19, 55:9, 122:23, 123:1
converted [2] - 155:2, 159:24
convict [6] - 29:13, 38:19, 130:1, 150:6, 151:23, 154:3
convicted [9] - 6:18, 113:1, 152:21, 153:1, 153:9, 153:18, 154:8, 171:15
conviction [5] - 154:5, 154:11, 154:13, 154:15, 154:19
convictions [4] - 75:17, 128:10, 177:21, 177:24
convince [2] - 100:22, 150:7
convinced [2] - 119:12, 121:14
convinces [1] - 130:2
cook [1] - 9:4
cooked [1] - 10:15
cooled [1] - 76:9
cooperate [1] - 138:1
cooperation [2] - 49:11, 129:23
cooperative [1] - 95:14
cooperator [1] - 104:14
copies [2] - 114:23, 143:8
cops [1] - 76:2
copy [6] - 114:21, 136:10, 143:23, 178:19, 182:12, 182:13
corner [1] - 16:9
cornered [1] - 80:19

correct [3] - 2:17, 75:21, 185:17
corroborate [5] - 30:7, 39:18, 42:25, 55:6, 108:8
corroborated [7] - 29:25, 46:20, 89:15, 105:11, 108:6, 108:12, 108:13
corroborates [4] - 108:6, 108:8, 108:10
corroboration [4] - 86:18, 93:17, 108:23, 110:1
cost [1] - 13:14
couch [2] - 50:12, 92:22
counsel [15] - 19:23, 53:7, 54:5, 79:2, 115:7, 115:15, 117:12, 120:14, 122:18, 128:1, 131:16, 132:5, 179:19, 182:19, 183:19
count [12] - 5:4, 118:25, 119:1, 136:3, 137:16, 157:7, 157:9, 164:22, 165:9, 174:8, 175:5
Count [58] - 5:22, 6:14, 6:24, 7:3, 135:18, 135:21, 136:6, 136:7, 136:14, 137:2, 143:14, 143:16, 143:19, 144:6, 146:3, 146:4, 146:6, 146:7, 146:8, 147:4, 149:21, 151:9, 152:15, 152:16, 152:19, 153:17, 154:24, 156:17, 156:21, 156:23, 157:10, 157:11, 158:7, 158:9, 158:24, 159:3, 165:2, 165:9, 166:22, 168:8, 168:17, 168:19, 171:25, 173:5, 173:8, 174:8, 174:22, 175:3, 175:6, 175:10, 175:12, 175:16, 175:18
countless [1] - 32:4
Counts [15] - 6:2, 135:23, 135:25,

156:10, 157:20,
157:23, 159:12,
161:18, 162:9,
170:16, 170:17,
170:18, 170:19,
170:21, 175:2
**counts** [15] - 5:7, 6:2,
7:12, 36:13, 40:21,
70:24, 114:10,
118:24, 135:17,
136:10, 158:19,
176:18, 176:19,
176:20, 179:9
**County** [3] - 25:16,
59:10, 60:25
**couple** [9] - 28:6,
28:9, 34:14, 49:2,
49:4, 56:21, 67:1,
76:3, 81:23
**coupled** [1] - 172:9
**course** [13] - 6:6,
87:10, 89:14, 91:11,
93:22, 94:9, 97:4,
124:23, 138:3,
152:12, 157:5,
160:7, 173:16
**court** [22] - 12:9, 24:6,
25:24, 36:17, 36:18,
36:21, 80:13,
113:23, 129:23,
153:9, 153:19,
156:22, 156:24,
157:1, 157:17,
158:17, 176:10,
178:7, 178:13,
179:1, 179:5, 180:15
**Court** [16] - 1:24, 2:15,
12:9, 79:9, 79:16,
79:19, 133:20,
158:1, 178:4,
178:15, 179:1,
183:25, 184:2,
184:3, 185:22
**COURT** [28] - 1:1, 2:3,
2:7, 2:9, 2:21, 36:14,
36:23, 37:18, 37:21,
68:19, 68:22, 69:1,
69:3, 78:21, 79:21,
79:25, 80:5, 114:12,
179:19, 180:2,
180:4, 180:20,
180:22, 181:11,
182:18, 183:6,
183:12, 183:21
**courtroom** [19] - 2:10,
37:7, 37:12, 37:20,
79:17, 80:4, 93:11,
93:14, 95:24,
103:12, 114:7,
122:14, 176:14,

179:4, 179:18,
181:2, 181:10,
182:17, 183:10
**courts** [1] - 128:8
**cousin** [22] - 7:19,
7:23, 12:1, 13:20,
19:2, 20:10, 22:6,
22:7, 32:18, 33:12,
34:10, 34:15, 53:12,
76:7, 77:7, 77:9,
91:1, 97:23, 105:1,
105:19, 106:14
**cousin's** [1] - 33:1
**cousins** [8] - 7:8, 8:9,
8:15, 8:20, 66:10,
76:25, 77:2, 104:6
**covering** [1] - 112:24
**covers** [2] - 5:5, 5:6
**COVID** [3] - 179:20,
180:7, 180:25
**COVID-19** [2] -
181:17, 182:6
**cowardly** [1] - 3:20
**crazier** [1] - 61:20
**crazy** [12] - 17:7,
33:14, 34:22, 55:18,
61:18, 63:23, 73:19,
73:20, 74:3
**created** [1] - 173:24
**creates** [1] - 127:11
**credence** [1] - 129:7
**credibility** [16] - 40:17,
40:18, 62:5, 102:3,
102:20, 102:25,
111:12, 112:14,
116:9, 120:8,
126:22, 127:1,
127:8, 127:17,
128:17, 131:17
**credible** [5] - 87:13,
88:22, 90:11, 94:15,
105:18
**credit** [3] - 50:3,
58:22, 182:23
**crew** [1] - 63:5
**cried** [1] - 111:13
**crime** [118] - 5:6, 5:9,
5:17, 5:24, 6:6, 6:14,
6:18, 10:4, 23:2,
23:6, 32:14, 38:19,
47:24, 81:8, 81:9,
86:24, 87:8, 87:11,
88:18, 101:7,
112:12, 135:8,
135:13, 136:1,
136:2, 140:14,
141:24, 142:2,
146:17, 151:9,
151:15, 151:18,
151:21, 151:22,

151:25, 152:2,
152:4, 152:10,
152:12, 152:13,
152:21, 153:1,
153:10, 153:19,
154:3, 154:8,
154:11, 156:11,
156:15, 156:16,
156:21, 156:23,
156:25, 157:15,
157:16, 157:18,
157:19, 157:24,
157:25, 158:1,
158:5, 158:6, 158:7,
158:9, 158:10,
158:16, 158:23,
158:24, 159:2,
159:6, 159:7, 159:9,
159:20, 160:13,
160:18, 160:19,
160:25, 161:5,
161:10, 161:12,
161:13, 161:15,
161:18, 162:3,
166:3, 166:21,
167:3, 167:13,
170:7, 170:23,
171:2, 171:14,
171:16, 171:18,
171:19, 171:20,
171:22, 171:23,
171:25, 172:3,
172:6, 172:8, 172:9,
172:10, 172:12,
172:13, 172:15,
172:16, 172:20,
172:21, 173:14
**crimes** [22] - 5:1, 5:2,
5:15, 5:21, 7:7,
29:14, 102:11,
112:10, 112:16,
112:17, 112:18,
117:5, 118:1,
127:24, 157:4,
158:18, 158:20,
158:22, 159:18,
166:17, 166:20,
167:22
**CRIMINAL** [1] - 1:3
**criminal** [17] - 49:20,
103:18, 117:2,
119:18, 125:8,
128:5, 128:6, 131:5,
140:19, 145:22,
152:5, 166:19,
171:16, 172:18,
172:23, 172:24
**criteria** [1] - 120:7
**critically** [1] - 110:23
**criticism** [1] - 84:23

**cross** [7] - 50:7,
64:20, 69:7, 85:11,
86:16, 121:18, 126:1
**cross-examination** [7]
- 50:7, 64:20, 69:7,
85:11, 86:16,
121:18, 126:1
**crosses** [1] - 50:20
**crossing** [1] - 183:22
**crucial** [2] - 24:4,
118:5
**crushed** [1] - 25:18
**cry** [1] - 35:10
**crying** [7] - 34:17,
51:17, 51:18, 51:24,
52:8, 65:8, 65:10
**culminate** [1] - 152:13
**Curtis** [3] - 39:7, 47:19
**custody** [4] - 147:24,
148:2, 148:6, 148:10
**customers** [1] - 8:13
**cut** [1] - 64:14
**cute** [1] - 72:16
**cuts** [1] - 67:13
**Cuz** [2] - 33:13, 35:5

## D

**dad** [1] - 65:13
**Dad** [1] - 53:17
**dad's** [1] - 27:22
**Daddy** [3] - 53:3,
53:16
**damn** [1] - 60:16
**Dana** [1] - 1:11
**dangerous** [7] - 74:1,
105:5, 105:8, 137:1,
137:7, 137:14,
137:15
**dark** [3] - 57:11,
57:23, 58:11
**darker** [2] - 55:23,
66:23
**darn** [1] - 46:14
**DaShields** [12] - 4:4,
14:20, 14:25, 29:24,
39:5, 66:16, 66:18,
88:7, 88:9, 93:3,
93:5, 94:12
**DaShields's** [1] - 88:9
**dastardly** [2] - 87:2,
104:4
**data** [1] - 89:8
**date** [5] - 78:17, 154:1,
154:25, 178:25
**dated** [1] - 48:8
**dates** [4] - 49:12,
49:24, 63:4, 64:9
**dating** [1] - 8:6
**daughter** [2] - 65:14,

100:3
**DAY** [1] - 1:5
**daylight** [2] - 67:6,
87:4
**days** [21] - 4:2, 4:22,
9:17, 9:18, 10:12,
11:4, 11:5, 21:8,
27:15, 28:9, 32:21,
34:14, 35:24, 49:15,
55:9, 73:2, 76:3,
86:10, 97:20, 107:3,
107:17
**daytime** [3] - 58:13,
106:21, 107:3
**deactivated** [1] -
34:11
**dead** [6] - 3:19, 3:24,
30:12, 60:9, 81:17,
97:22
**deadly** [1] - 134:25
**deal** [7] - 5:7, 5:8,
17:4, 70:21, 127:25,
175:19
**dealer** [2] - 164:2,
164:5
**dealers** [1] - 45:7
**dealing** [10] - 4:21,
5:15, 8:11, 33:14,
77:19, 85:15, 92:24,
97:5, 105:3, 107:23
**dealt** [1] - 90:23
**dean** [1] - 19:12
**death** [12] - 6:13,
38:11, 136:2,
156:11, 157:6,
157:11, 157:12,
166:14, 169:12,
173:18, 173:24,
175:7
**deceased** [1] - 169:14
**decide** [23] - 6:21,
115:8, 115:25,
116:6, 116:11,
119:24, 120:3,
125:18, 126:23,
127:21, 128:14,
130:11, 130:19,
131:6, 132:2,
132:10, 134:18,
143:17, 163:9,
163:12, 163:14,
164:7, 177:14
**decided** [6] - 102:16,
102:17, 102:18,
123:4, 177:24
**deciding** [12] - 120:16,
120:18, 125:12,
126:6, 126:22,
129:7, 132:15,
133:12, 138:22,

142:17, 154:19
**decision** [16] - 40:12,
89:11, 89:12, 89:13,
104:25, 117:18,
118:2, 124:20,
125:20, 129:14,
129:15, 131:20,
149:2, 150:3, 151:5,
177:3
**declarations** [1] -
139:21
**deed** [3] - 87:2, 104:4,
152:5
**deemed** [3] - 139:20,
142:8, 145:21
**deep** [1] - 143:11
**Defendant** [446] - 1:6,
1:13, 3:12, 4:20,
4:21, 4:25, 5:3, 5:7,
5:9, 5:19, 6:4, 6:12,
6:15, 6:18, 6:20,
6:22, 6:25, 7:3, 7:8,
7:14, 7:16, 7:20,
7:21, 8:1, 9:6, 9:11,
9:12, 9:18, 9:19,
9:25, 10:3, 11:4,
11:7, 11:10, 11:14,
11:24, 12:8, 12:16,
12:20, 12:22, 12:23,
13:7, 13:10, 13:11,
13:19, 13:21, 14:4,
14:7, 14:10, 15:6,
15:11, 15:16, 15:18,
16:1, 16:6, 16:13,
16:20, 16:24, 17:10,
17:15, 17:18, 17:21,
17:25, 18:7, 18:11,
18:24, 19:1, 19:6,
19:7, 20:8, 20:11,
20:16, 20:18, 20:19,
20:24, 21:3, 21:12,
21:16, 21:17, 21:19,
22:8, 22:12, 23:5,
23:9, 23:12, 24:7,
24:8, 24:11, 24:12,
24:21, 25:4, 25:6,
25:20, 26:1, 26:3,
26:5, 26:7, 26:11,
26:12, 26:14, 26:19,
27:1, 27:3, 27:6,
27:14, 27:16, 27:17,
27:19, 27:25, 28:3,
28:13, 28:15, 28:17,
29:1, 29:2, 29:6,
29:7, 29:14, 29:25,
30:3, 30:10, 30:25,
31:13, 31:16, 32:5,
32:16, 32:18, 33:3,
33:7, 33:11, 33:24,
34:2, 34:6, 34:16,

34:20, 35:9, 36:6,
54:9, 80:13, 80:19,
80:23, 80:25, 82:2,
82:20, 83:2, 83:6,
83:23, 84:2, 84:13,
85:13, 86:7, 86:10,
86:13, 87:3, 87:5,
87:8, 88:8, 88:12,
90:13, 90:25, 91:20,
92:8, 92:15, 93:3,
93:13, 93:16, 93:25,
94:10, 94:11, 94:17,
95:20, 96:1, 96:2,
97:1, 97:19, 98:10,
98:25, 99:14, 99:21,
99:22, 99:24, 100:4,
100:14, 100:18,
100:20, 100:21,
100:24, 101:1,
101:4, 102:4,
102:12, 102:16,
104:3, 106:7, 107:6,
107:10, 107:12,
108:2, 108:3, 108:4,
108:7, 108:8, 108:9,
109:2, 109:7,
109:23, 110:3,
111:8, 112:2, 112:5,
112:12, 113:7,
113:22, 114:8,
117:4, 118:7,
118:18, 118:20,
118:22, 119:4,
119:8, 119:10,
119:15, 119:16,
119:17, 119:18,
120:10, 120:19,
121:15, 122:23,
122:24, 123:9,
123:17, 123:20,
123:22, 123:24,
124:2, 124:4, 124:6,
124:10, 125:8,
125:11, 126:10,
127:4, 127:5,
129:12, 129:17,
130:1, 130:20,
131:3, 133:17,
133:22, 134:1,
135:9, 135:11,
135:12, 135:16,
135:18, 135:21,
135:23, 135:25,
136:3, 136:4, 136:6,
136:16, 137:8,
138:18, 138:22,
138:23, 139:10,
139:13, 139:16,
139:18, 140:11,
140:17, 140:25,
141:1, 141:5, 141:9,

141:13, 141:20,
141:22, 141:24,
142:11, 142:14,
143:16, 143:19,
144:1, 144:5, 144:8,
144:9, 144:12,
144:17, 144:20,
144:24, 145:5,
145:7, 145:13,
145:15, 145:17,
146:1, 146:8,
146:12, 146:16,
146:21, 146:24,
146:25, 147:1,
147:5, 147:7,
147:14, 147:20,
147:25, 148:18,
148:21, 148:22,
148:24, 149:3,
149:5, 149:7,
149:10, 149:13,
149:14, 149:16,
149:18, 149:22,
149:24, 150:2,
150:7, 150:8,
150:10, 150:12,
150:14, 150:23,
150:24, 151:5,
151:8, 151:12,
151:18, 151:20,
151:23, 151:24,
152:20, 152:25,
153:17, 153:18,
153:22, 154:2,
154:7, 154:10,
154:20, 154:25,
155:5, 155:8,
155:18, 155:22,
156:2, 156:5,
156:13, 156:18,
156:21, 156:24,
156:25, 157:22,
157:24, 158:3,
158:13, 158:15,
158:22, 158:23,
159:6, 159:11,
159:16, 160:5,
160:6, 160:10,
160:16, 160:22,
161:3, 161:17,
162:11, 162:18,
163:5, 163:7,
163:10, 163:12,
164:1, 164:3,
164:13, 164:16,
165:4, 165:10,
165:14, 166:21,
166:24, 166:25,
167:5, 167:6,
167:10, 167:14,
167:23, 167:25,

168:8, 168:11,
169:3, 169:5, 169:7,
169:9, 169:13,
169:20, 170:1,
170:5, 170:8,
170:13, 170:18,
170:21, 170:23,
171:1, 171:2, 171:7,
171:10, 171:11,
171:19, 171:21,
171:24, 172:1,
172:5, 172:9,
172:10, 172:19,
172:25, 173:2,
173:5, 173:7,
173:15, 174:14,
175:7, 175:18,
176:15, 177:4
**Defendant's** [59] - 4:2,
9:14, 14:18, 14:21,
15:3, 17:23, 18:2,
18:6, 21:10, 22:2,
22:4, 25:1, 25:2,
27:19, 30:7, 33:9,
35:7, 84:20, 85:14,
88:13, 93:25, 98:4,
101:12, 105:11,
112:23, 114:1,
117:20, 118:11,
118:14, 119:7,
119:13, 120:24,
124:8, 130:2, 132:8,
134:1, 134:8,
134:11, 134:12,
139:4, 139:8, 140:3,
140:13, 142:15,
142:18, 150:4,
150:5, 150:16,
150:19, 152:2,
154:2, 154:5, 155:7,
169:11, 173:14,
174:9, 174:10,
174:16, 183:14
**Defense** [49] - 2:7, 3:1,
22:13, 22:14, 23:11,
31:17, 32:3, 37:24,
54:9, 54:13, 63:11,
74:12, 81:19, 81:22,
82:5, 82:10, 82:13,
82:16, 83:4, 84:4,
85:23, 86:21, 86:24,
87:7, 87:15, 87:16,
87:18, 88:22, 89:20,
91:7, 93:10, 94:9,
97:15, 100:16,
101:7, 102:21,
103:22, 104:1,
105:17, 108:3,
108:17, 109:12,
109:16, 180:2,
180:20, 182:22,

183:7, 183:8
**defense** [9] - 19:23,
89:12, 94:14, 95:11,
95:16, 96:20,
117:12, 117:13,
131:16
**defined** [4] - 154:9,
157:7, 159:22,
165:17
**definitely** [2] - 35:12,
178:10
**definition** [1] - 161:13
**definitively** [1] - 97:2
**degree** [11] - 121:11,
161:23, 163:12,
163:16, 165:17,
166:15, 167:7,
167:8, 168:24,
168:25, 176:22
**Delaware** [1] - 109:11
**delay** [1] - 57:16
**delete** [1] - 98:13
**deleted** [3] - 72:7,
72:8, 98:15
**deliberate** [8] - 5:14,
103:7, 136:13,
164:24, 165:1,
166:7, 177:1, 180:13
**deliberated** [1] - 170:8
**deliberately** [1] -
134:10
**deliberating** [1] -
170:6
**deliberation** [4] -
10:25, 170:3, 177:8,
178:12
**deliberations** [10] -
115:1, 124:3,
128:20, 133:19,
174:20, 176:2,
178:14, 181:3,
181:22
**deliver** [1] - 150:13
**demeanor** [5] - 40:16,
50:6, 62:15, 108:16,
108:19
**democracy** [1] - 38:7
**demonstrably** [1] -
96:12
**denial** [1] - 111:16
**denied** [7] - 31:25,
32:17, 32:20, 76:22,
111:15, 124:10,
136:5
**denies** [1] - 121:21
**deny** [1] - 41:3
**department** [1] - 48:18
**Department** [3] - 15:7,
80:17, 96:19
**deposit** [1] - 148:8

**derringer** [1] - 77:4
**describe** [1] - 62:17
**described** [4] - 71:11,
97:14, 159:18,
160:14
**describes** [2] - 62:15,
118:18
**description** [1] - 66:16
**descriptions** [1] -
115:4
**descriptive** [1] - 54:1
**descriptively** [1] -
54:17
**deserve** [2] - 123:15,
182:23
**deserves** [3] - 130:12,
131:9, 131:23
**deserving** [1] - 131:13
**design** [2] - 138:13,
166:13
**designation** [1] -
178:2
**designed** [3] - 155:2,
159:23, 166:16
**despises** [1] - 71:25
**despite** [3] - 47:12,
47:16, 81:19
**detail** [5] - 52:11,
132:20, 137:22,
147:22, 176:23
**detailed** [1] - 54:1
**details** [4] - 5:14, 12:8,
21:1, 139:14
**detectable** [2] -
136:21, 146:14
**detection** [1] - 167:21
**detective** [4] - 59:4,
77:10, 77:22, 108:20
**Detective** [28] - 20:2,
23:22, 30:4, 30:20,
31:5, 31:8, 38:13,
38:15, 42:14, 46:24,
46:25, 47:2, 66:2,
66:3, 66:5, 74:14,
74:18, 85:2, 85:7,
85:12, 85:14, 85:17,
86:16, 93:8, 93:19,
98:8, 98:11, 98:16
**detectives** [4] - 47:21,
48:19, 75:2, 86:14
**detector** [3] - 51:5,
59:6, 63:15
**Detention** [1] - 47:20
**determination** [6] -
118:21, 132:16,
150:2, 150:18,
174:15, 174:16
**determine** [16] -
85:12, 115:24,
116:9, 120:23,

132:24, 142:18,
143:19, 151:10,
159:10, 159:21,
163:6, 163:16,
172:19, 175:1,
175:17, 177:4
**determined** [1] -
116:12
**determining** [6] -
116:13, 133:2,
138:11, 144:7,
150:15, 152:2
**developed** [1] -
117:17
**devised** [1] - 134:18
**devising** [1] - 152:7
**dick** [2] - 64:2, 64:5
**Dickerson** [4] - 66:2,
66:3, 66:5
**died** [5] - 20:7, 169:14,
173:14, 173:22,
174:2
**differ** [1] - 147:21
**difference** [7] - 58:11,
61:3, 63:16, 63:19,
65:5, 98:7
**different** [12] - 10:20,
39:15, 39:24, 54:7,
90:7, 94:16, 103:12,
107:9, 116:4,
125:11, 130:6, 140:8
**differs** [1] - 177:20
**difficult** [2] - 37:11,
58:12
**difficulty** [1] - 59:1
**digestion** [1] - 134:16
**dime** [1] - 21:21
**Dire** [1] - 178:5
**direct** [13] - 121:3,
121:5, 121:10,
121:12, 125:24,
134:20, 138:5,
147:8, 147:9,
147:16, 169:12,
174:3, 185:14
**directed** [1] - 162:24
**directly** [1] - 89:20
**disagree** [3] - 111:24,
112:9
**discharged** [6] -
115:16, 156:19,
158:4, 158:13,
175:7, 175:8
**discharging** [2] -
159:22, 161:16
**discloses** [1] - 76:25
**discuss** [12] - 12:7,
79:9, 79:10, 79:14,
81:5, 88:3, 117:23,
120:7, 143:10,

146:2, 177:8, 179:10
**discussed** [3] - 107:9,
107:17, 140:21
**discussing** [2] -
83:20, 83:21
**discussion** [2] -
83:25, 177:17
**disdain** [1] - 88:25
**disease** [2] - 59:3,
105:23
**disgusting** [1] - 65:17
**dismiss** [2] - 180:4,
180:11
**dismissed** [2] -
181:16, 181:21
**disobey** [2] - 134:7,
138:4
**dispense** [2] - 146:19,
146:20
**displayed** [1] - 161:14
**displaying** [1] - 160:8
**dispute** [2] - 6:20,
94:8
**disputed** [3] - 16:2,
124:20, 154:22
**disregard** [6] - 89:10,
134:7, 138:4,
152:15, 174:2,
175:13
**disregarded** [1] -
122:15
**disrespect** [2] - 68:22,
68:24
**distance** [2] - 99:8,
113:18
**distancing** [3] - 31:24,
97:3
**distant** [2] - 91:1,
134:19
**distinct** [1] - 140:7
**distinction** [2] -
104:12, 121:9
**distinguish** [1] - 152:4
**distracted** [1] - 38:15
**distribute** [50] - 5:5,
5:22, 5:25, 6:25,
135:19, 135:22,
136:8, 136:19,
136:20, 136:25,
137:6, 137:13,
137:14, 144:2,
144:11, 144:14,
144:18, 144:22,
145:3, 145:4,
145:11, 146:7,
146:10, 146:13,
146:18, 146:19,
147:2, 149:22,
150:4, 150:8,
150:11, 150:12,

150:24, 150:25,
151:4, 151:6,
151:10, 151:13,
151:15, 151:19,
158:25, 159:1, 159:4
**distributed** [4] -
144:10, 144:16,
144:21, 145:8
**distribution** [2] -
139:24, 150:14,
150:17
**DISTRICT** [3] - 1:1,
1:1, 1:8
**District** [5] - 136:16,
146:11, 152:24,
156:18, 165:10
**disturbed** [2] - 16:25,
91:13
**disturbing** [2] - 90:1,
90:4
**DIVISION** [1] - 1:2
**DNA** [2] - 76:24, 95:14
**document** [1] - 101:21
**documents** [1] - 123:5
**dog** [2] - 25:10
**dog-eat-dog** [1] -
25:10
**dollars** [1] - 2:22
**dominion** [2] - 160:22,
161:7
**done** [23] - 26:7,
35:10, 62:24, 63:21,
97:6, 98:22, 114:5,
114:17, 134:24,
139:24, 142:12,
142:15, 142:21,
142:22, 147:10,
169:15, 170:2,
174:13, 174:18,
176:5, 178:25
**door** [21] - 17:3, 17:6,
19:21, 20:12, 32:3,
37:9, 44:18, 44:21,
45:14, 46:6, 46:12,
46:15, 47:15, 50:10,
58:15, 68:15, 72:1,
77:4, 101:4, 179:2
**dope** [7] - 3:12, 9:7,
21:16, 27:5, 27:8,
27:17, 42:6, 42:7,
42:8, 42:9, 42:11,
42:12, 42:15, 82:12
**Dorchester** [3] -
25:16, 48:17, 59:10
**doses** [1] - 150:21
**dotting** [1] - 183:22
**double** [2] - 8:6, 181:7
**doubt** [69] - 4:25,
38:21, 39:25, 78:19,
80:12, 80:22, 89:5,

90:2, 95:6, 111:25,
112:11, 113:4,
118:7, 118:11,
118:15, 118:22,
119:8, 119:12,
119:15, 120:25,
121:15, 123:20,
128:11, 130:3,
130:21, 135:12,
137:4, 137:11,
138:17, 140:24,
142:10, 144:3,
146:22, 147:4,
147:18, 147:20,
149:5, 149:21,
149:24, 150:8,
151:11, 151:17,
151:24, 153:16,
153:25, 154:24,
156:5, 157:22,
158:15, 158:21,
159:11, 159:16,
160:16, 162:9,
162:17, 164:12,
166:24, 167:5,
167:10, 168:4,
168:13, 169:2,
169:9, 169:20,
170:1, 171:8,
173:10, 174:6,
174:21
**doubts** [1] - 95:10
**down** [27] - 7:23, 8:19,
9:5, 9:7, 12:5, 12:16,
13:12, 13:15, 30:18,
34:21, 40:8, 40:11,
40:20, 44:5, 44:7,
45:14, 45:24, 46:5,
48:17, 50:21, 53:3,
59:20, 61:24, 67:24,
75:15, 92:25
**downplayed** [1] - 32:1
**downstairs** [4] -
16:13, 16:14, 17:4,
92:15
**downtown** [1] - 11:23
**Dr** [1] - 19:12
**dramatic** [1] - 66:19
**dramatically** [1] -
78:13
**draw** [7] - 116:11,
122:20, 125:3,
125:11, 129:11,
140:11
**drawer** [5] - 16:12,
16:17, 91:12, 101:1,
101:2
**drawers** [2] - 17:1,
101:3
**drawing** [3] - 84:19,

100:11, 120:1
**drawn** [3] - 123:25,
135:7, 139:7
**dream** [5] - 34:24,
34:25, 35:8, 65:2,
65:4
**dreaming** [2] - 35:1,
112:3
**dreams** [15] - 52:19,
52:20, 52:22, 52:24,
53:1, 53:9, 64:5,
66:2, 83:24, 83:25,
84:12, 84:15, 84:21,
105:2
**dresser** [3] - 16:12,
27:20, 45:2
**drink** [1] - 62:19
**drinking** [1] - 34:17
**drive** [5] - 8:14, 54:25,
88:14, 104:8
**driver** [1] - 39:6
**drop** [3] - 15:10,
16:16, 30:4
**dropped** [3] - 15:9,
94:3, 94:5
**drug** [34] - 4:21, 5:15,
6:7, 6:8, 39:7, 39:20,
40:21, 43:23, 45:7,
49:21, 49:22, 67:17,
90:15, 94:12, 102:9,
105:3, 107:23,
136:1, 143:20,
156:15, 156:20,
156:23, 157:16,
157:25, 158:7,
158:9, 158:16,
158:24, 159:2,
164:2, 164:4, 164:5,
172:3
**Drug** [1] - 146:16
**drug-related** [1] -
102:9
**drugs** [114] - 5:6, 7:10,
8:17, 8:18, 8:22,
8:23, 10:2, 13:8,
13:9, 13:22, 14:9,
16:20, 16:21, 16:24,
17:2, 22:16, 27:11,
27:19, 27:24, 31:9,
35:25, 41:9, 41:14,
41:15, 41:20, 41:23,
41:25, 42:1, 42:2,
44:24, 45:2, 45:13,
50:22, 58:21, 62:19,
65:20, 69:20, 75:25,
76:1, 77:16, 80:23,
81:4, 81:25, 82:2,
82:22, 82:23, 83:1,
85:16, 89:19, 90:16,
90:17, 90:23, 91:18,

91:20, 91:23, 92:3,
92:13, 92:19, 92:20,
92:21, 95:20, 95:22,
96:10, 96:14, 97:5,
99:15, 99:16, 99:17,
99:18, 99:19, 102:6,
102:7, 102:17,
104:6, 106:9,
106:11, 106:12,
106:13, 110:9,
113:17, 144:19,
145:7, 145:8,
145:12, 146:24,
146:25, 147:1,
147:5, 147:20,
147:25, 148:1,
148:17, 148:19,
148:20, 148:22,
148:23, 148:25,
149:3, 149:16,
149:25, 150:13,
150:16, 150:19,
151:3, 164:2, 164:4
**drunk** [4] - 51:17,
51:18, 52:7, 104:9
**Drunk** [1] - 39:8
**due** [2] - 134:8, 149:8
**dumbfounded** [1] -
108:21
**dumpster** [1] - 12:10
**dumpsters** [1] - 12:13
**duration** [1] - 140:6
**during** [27] - 27:25,
30:24, 33:3, 46:8,
47:11, 54:25,
115:13, 120:13,
121:2, 122:4,
124:14, 124:22,
128:19, 136:1,
139:25, 142:19,
156:10, 156:14,
156:20, 157:15,
158:4, 159:17,
162:22, 172:2,
174:20, 176:2,
179:23
**duty** [12] - 115:7,
115:16, 115:21,
115:22, 115:24,
116:23, 116:25,
117:12, 117:14,
125:9, 132:23,
133:19

## E

**early** [5] - 28:20,
42:24, 49:9, 93:8,
94:23
**earned** [2] - 76:16,

113:23
**ears** [1] - 46:16
**easels** [1] - 57:20
**easiest** [1] - 40:21
**East** [2] - 11:22, 94:4
**Eastern** [1] - 11:10
**easy** [3] - 38:10,
87:10, 176:6
**eat** [2] - 25:10, 79:3
**eating** [2] - 3:21,
34:23
**eats** [1] - 34:16
**economic** [1] - 163:2
**Edmondson** [3] -
14:24, 30:2, 94:4
**effect** [10] - 62:23,
93:9, 100:12, 156:8,
163:17, 163:25,
164:10, 164:12,
164:13, 164:20
**effects** [1] - 161:23
**effort** [1] - 151:21
**either** [13] - 6:8, 38:3,
68:20, 106:4,
121:10, 137:25,
147:8, 155:8,
157:25, 158:16,
161:6, 164:19,
166:18
**element** [38] - 135:8,
137:10, 137:17,
138:16, 147:3,
147:6, 148:19,
149:4, 149:6,
149:20, 149:23,
153:24, 154:16,
154:22, 154:23,
155:19, 155:22,
156:4, 158:14,
158:19, 159:12,
159:15, 161:15,
161:16, 162:8,
162:16, 163:9,
164:21, 167:4,
167:9, 167:16,
168:2, 169:8,
169:19, 169:23,
169:25, 170:4,
170:12
**elements** [17] - 5:17,
5:22, 6:16, 6:25,
113:6, 137:3,
146:23, 151:16,
153:15, 157:20,
157:21, 159:13,
166:23, 167:8,
169:2, 176:22
**eliminate** [1] - 87:5
**Elkton** [1] - 61:24
**elsewhere** [1] - 136:16

**emphasize** [1] - 37:1
**employed** [1] - 131:11
**employee** [1] - 167:20
**employment** [2] -
160:5, 160:13
**empty** [1] - 80:18
**end** [9] - 12:13, 14:12,
23:24, 36:5, 36:10,
37:8, 142:3, 146:6,
173:6
**ends** [3] - 14:17,
73:21, 141:12
**enforcement** [27] -
21:2, 49:25, 95:23,
105:5, 109:4, 110:4,
117:2, 131:10,
131:12, 131:17,
131:21, 136:4,
165:3, 165:7,
165:13, 165:23,
167:1, 167:12,
167:15, 167:17,
167:19, 167:24,
168:5, 168:7, 168:9,
175:17
**engaged** [3] - 141:15,
172:6, 173:23
**engaging** [1] - 117:14
**enjoyed** [1] - 80:6
**enter** [4] - 115:7,
129:24, 133:18,
142:3
**entered** [7] - 3:15, 5:9,
130:5, 137:5,
137:12, 137:19,
156:7
**entering** [1] - 129:20
**enters** [4] - 2:20,
37:20, 80:4, 181:10
**entertain** [1] - 177:19
**entire** [9] - 41:13,
54:15, 81:24, 82:1,
82:16, 82:19, 85:17,
91:8, 123:21
**entirely** [1] - 122:14
**entitled** [5] - 117:9,
117:22, 156:12,
177:6, 185:18
**entitles** [1] - 117:6
**entry** [1] - 95:18
**equal** [4] - 38:4, 82:9,
125:1, 140:10
**equally** [4] - 46:6,
117:4, 117:25
**equals** [3] - 82:5, 82:6,
117:11
**erroneous** [1] - 177:17
**escape** [1] - 166:9
**escapes** [1] - 80:18
**especially** [3] - 45:21,

51:14, 105:8
**espionage** [1] - 166:9
**Esq** [2] - 1:14, 1:15
**essential** [1] - 176:21
**essentially** [2] - 122:5,
136:7
**establish** [16] -
134:20, 135:10,
135:11, 137:3,
137:11, 138:17,
140:22, 144:3,
146:22, 147:4,
147:5, 149:6, 169:1,
171:24, 172:5,
172:12
**established** [5] -
124:17, 135:5,
138:4, 139:5, 139:18
**establishes** [1] -
107:4, 128:10
**ethical** [1] - 117:12
**evaluate** [1] - 89:13
**evaluating** [4] - 114:2,
120:7, 127:8, 127:17
**evaluation** [1] - 127:1
**evasive** [1] - 125:23
**evening** [7] - 43:10,
57:23, 57:24, 95:9,
99:17, 107:7, 183:4
**event** [2] - 90:7,
176:17
**events** [5] - 21:25,
39:15, 40:15,
134:23, 135:6
**eventually** [3] - 77:5,
100:15, 112:6
**everyday** [2] - 147:21,
148:7
**evidence** [171] - 4:4,
4:12, 4:13, 4:18,
4:24, 7:13, 19:9,
20:2, 20:6, 21:24,
22:11, 22:25, 24:4,
24:20, 36:7, 36:12,
38:20, 38:24, 39:2,
40:3, 44:3, 80:11,
80:20, 81:19, 83:10,
84:12, 84:13, 84:19,
84:20, 85:19, 85:21,
85:25, 86:2, 86:5,
86:6, 86:8, 86:10,
86:19, 88:21, 89:5,
89:6, 90:11, 91:2,
91:4, 91:9, 91:23,
93:18, 98:19, 99:4,
99:5, 99:9, 100:17,
100:18, 108:12,
109:3, 109:13,
109:14, 112:2,
112:20, 112:23,

113:1, 113:2, 113:7, 113:11, 114:1, 114:2, 114:5, 114:7, 115:6, 115:20, 115:25, 116:9, 116:14, 116:16, 116:20, 117:16, 117:17, 118:4, 118:6, 118:17, 118:20, 118:23, 119:12, 119:19, 119:21, 120:1, 120:3, 120:11, 120:18, 120:23, 120:24, 121:1, 121:4, 121:5, 121:7, 121:10, 121:12, 121:13, 121:14, 121:18, 121:22, 121:25, 122:1, 122:2, 122:9, 122:10, 122:12, 122:14, 122:17, 122:18, 122:19, 122:21, 122:22, 123:2, 123:8, 123:9, 123:16, 123:19, 125:9, 125:18, 126:20, 127:2, 127:4, 127:9, 129:6, 129:16, 130:13, 130:21, 131:5, 131:7, 131:20, 131:23, 132:4, 132:6, 132:8, 132:9, 132:24, 141:19, 141:23, 142:24, 147:8, 147:9, 147:10, 147:12, 147:17, 149:2, 151:2, 151:4, 151:7, 166:18, 174:15, 177:3, 177:5, 177:9, 177:12, 177:15, 177:18
**evident** [1] - 115:17
**evolved** [1] - 88:23
**exact** [11] - 23:22, 25:24, 42:15, 57:10, 67:19, 83:18, 100:12, 106:23, 107:4, 107:8, 149:16
**exactly** [13] - 14:7, 15:6, 24:19, 29:23, 30:13, 79:24, 80:14, 80:21, 83:9, 87:11, 102:14, 109:17, 176:6
**exaggerating** [2] - 60:3, 60:11

**exaggeration** [1] - 60:5
**examination** [8] - 50:7, 64:20, 69:7, 85:11, 86:16, 121:18, 125:25, 126:1
**examine** [2] - 123:12, 130:9
**examined** [3] - 19:14, 76:23, 130:24
**examining** [1] - 120:3
**example** [9] - 69:6, 84:25, 109:18, 131:4, 139:24, 147:9, 147:25, 148:7, 150:20
**examples** [1] - 126:5
**exceeding** [6] - 153:2, 153:10, 153:20, 154:4, 154:9, 154:12
**except** [5] - 15:4, 67:18, 78:22, 91:24, 91:25
**exceptions** [1] - 39:5
**exchange** [3] - 17:3, 26:8, 177:7
**excited** [1] - 9:8
**exclusive** [2] - 116:8, 116:21
**exclusively** [2] - 132:23, 133:20
**excuse** [1] - 169:16
**excused** [4] - 36:19, 181:13, 182:8, 182:16
**execution** [1] - 106:15
**exercise** [6] - 148:4, 148:16, 155:10, 155:16, 160:24, 161:9
**exercises** [1] - 148:11
**exhibit** [14] - 10:24, 40:25, 43:2, 48:13, 49:10, 49:16, 54:3, 57:5, 58:8, 61:7, 61:16, 105:22, 105:23
**Exhibit** [10] - 12:19, 19:4, 48:7, 57:18, 58:9, 59:19, 61:14, 86:1, 107:1, 108:25
**Exhibits** [2] - 85:24, 182:11
**exhibits** [13] - 36:9, 59:14, 61:14, 85:23, 116:16, 122:2, 122:7, 122:12, 123:3, 176:3, 176:8, 176:9, 181:7

**existed** [3] - 138:11, 138:13, 138:20
**existence** [8] - 43:8, 121:8, 124:17, 138:3, 138:7, 140:22, 142:19, 174:6
**exists** [3] - 124:21, 154:17
**exits** [2] - 79:17, 179:18, 182:17
**expect** [5] - 75:13, 75:14, 102:10, 102:14, 106:17
**expel** [2] - 155:3, 159:24
**experience** [6] - 120:2, 122:20, 124:10, 124:16, 133:8, 148:7
**experienced** [1] - 75:17
**experiences** [1] - 47:3
**expert** [1] - 133:9
**explain** [2] - 147:22, 158:11
**explained** [6] - 14:4, 14:13, 152:17, 159:1, 159:5, 176:23
**explaining** [1] - 97:15
**explanation** [3] - 113:15, 132:20, 132:21
**explanations** [1] - 135:2
**explosive** [2] - 155:3, 159:25
**express** [2] - 133:5, 137:19
**expresses** [1] - 88:25
**expressing** [1] - 90:6
**extent** [3] - 127:21, 140:3, 140:5
**extreme** [1] - 39:19
**eye** [1] - 67:4
**eyes** [1] - 46:17
**eyewitness** [3] - 81:9, 86:23, 121:6
**eyewitnesses** [4] - 81:8, 81:10, 86:25, 87:11

# F

**F'd** [1] - 35:10
**f-ing** [1] - 60:15
**face** [3] - 35:20, 90:10, 99:21
**Facebook** [12] - 7:17, 11:7, 19:17, 30:13,

34:5, 34:10, 34:11, 72:7, 72:8, 98:18, 99:3, 113:16
**facing** [1] - 70:21, 71:1, 71:2
**fact** [35] - 53:22, 53:23, 63:21, 89:14, 92:5, 104:20, 115:8, 117:5, 119:20, 121:6, 121:8, 121:22, 121:23, 122:6, 123:13, 123:24, 124:18, 124:20, 124:21, 129:13, 131:11, 132:15, 132:19, 134:16, 134:17, 138:23, 140:10, 140:20, 141:5, 147:7, 149:12, 154:17, 156:8, 176:9
**factor** [1] - 127:16
**factors** [4] - 144:8, 149:1, 174:7, 174:9
**facts** [28] - 3:11, 81:23, 88:20, 115:23, 116:8, 116:12, 116:13, 116:21, 116:22, 116:24, 119:22, 119:25, 120:16, 121:7, 121:20, 122:7, 123:11, 124:17, 126:16, 126:18, 126:20, 129:10, 134:2, 135:5, 139:9, 163:6, 173:10, 174:14
**factual** [2] - 116:6, 125:12
**fails** [3] - 80:10, 119:14, 176:24
**failure** [2] - 23:15, 48:23
**fair** [2] - 87:18, 93:14
**fairly** [2] - 63:3, 114:7
**fairness** [1] - 117:1
**faithfully** [1] - 115:15
**false** [2] - 96:12, 132:17
**falsely** [5] - 127:11, 127:20, 128:25, 130:9, 131:2
**fam** [4] - 14:3, 29:11, 87:24, 110:8
**familiar** [4] - 5:5, 22:3, 49:20, 93:9
**family** [24] - 4:3, 7:18, 7:24, 8:21, 21:8, 22:3, 22:4, 22:12,

25:1, 25:2, 27:2, 30:23, 32:24, 39:20, 39:21, 63:13, 64:10, 65:13, 71:15, 72:25, 86:12, 90:22, 99:10
**fantasy** [5] - 59:2, 60:3, 60:8, 60:11, 61:3
**far** [1] - 62:21
**fare** [2] - 49:5, 49:6
**fashioned** [1] - 86:6
**fast** [3] - 62:21, 68:8, 100:14
**Fatboy** [5] - 10:16, 10:17, 11:2, 31:11
**father** [2] - 38:11, 64:18
**Fatman** [8] - 8:10, 24:19, 27:11, 27:20, 27:21, 28:2, 58:19, 65:14
**favor** [2] - 8:25, 119:22
**favorable** [2] - 128:24, 130:8
**FBI** [2] - 1:17, 80:18
**fear** [7] - 47:8, 118:8, 162:6, 162:19, 162:21, 163:8, 163:14
**February** [5] - 4:19, 7:14, 7:18, 69:13, 110:16
**Federal** [23] - 1:24, 7:5, 114:4, 128:8, 165:6, 165:14, 165:25, 166:17, 166:18, 167:1, 167:3, 167:12, 167:17, 167:19, 167:20, 167:21, 167:22, 167:24, 168:7, 168:10, 168:13, 168:15, 178:4
**federal** [2] - 166:20, 167:13
**feds** [1] - 109:12
**Feds** [2] - 49:8, 64:21
**fee** [1] - 48:9
**feed** [2] - 24:24, 33:16
**feeding** [1] - 28:7
**feelings** [1] - 118:1
**feet** [1] - 67:7
**fell** [1] - 109:9
**fellow** [5] - 177:7, 177:9, 177:15, 177:17, 177:19
**felon** [2] - 152:19, 152:20

**felony** [2] - 6:18, 154:13
**female** [1] - 14:5
**few** [10] - 9:17, 9:18, 16:15, 44:19, 49:1, 128:19, 146:2, 174:24, 179:14, 182:8
**fewer** [2] - 22:4, 120:6
**fiction** [1] - 99:25
**fight** [6] - 32:5, 50:1, 72:15, 72:16, 72:17, 72:21
**figure** [1] - 106:18
**fill** [4] - 143:21, 143:22, 144:1, 178:24
**filled** [1] - 178:20
**final** [4] - 115:7, 115:20, 116:25, 177:23
**finally** [12] - 3:18, 7:3, 9:3, 11:10, 21:11, 33:25, 52:1, 61:4, 70:13, 73:7, 81:1, 175:22
**financial** [1] - 25:21
**finder** [1] - 51:10
**findings** [4] - 145:25, 173:6, 174:5, 174:22
**fine** [1] - 97:14
**finger** [3] - 80:14, 80:18, 111:23
**fire** [3] - 73:24, 160:6, 160:7
**firearm** [58] - 6:13, 135:24, 136:1, 153:2, 153:5, 153:12, 153:13, 153:22, 154:2, 154:14, 155:1, 155:7, 155:9, 155:17, 155:19, 155:21, 155:23, 155:24, 155:25, 156:5, 156:10, 156:13, 156:14, 156:15, 156:20, 157:3, 157:6, 157:18, 157:19, 158:4, 158:5, 158:13, 159:17, 159:19, 159:23, 159:25, 160:2, 160:4, 160:5, 160:10, 160:11, 160:12, 160:14, 160:15, 160:20, 160:23, 160:24, 161:2, 161:3, 161:7,

161:8, 161:9, 161:10, 161:11, 161:14, 172:2
**firearms** [1] - 154:21
**fired** [2] - 20:1, 161:17
**first** [69] - 3:7, 5:4, 9:2, 11:20, 12:17, 17:11, 19:1, 22:16, 34:5, 34:20, 40:23, 48:1, 49:2, 50:15, 51:18, 52:4, 52:21, 53:25, 54:16, 54:20, 57:3, 57:7, 58:18, 58:25, 63:1, 63:8, 69:10, 69:19, 70:6, 70:10, 70:17, 74:25, 87:15, 89:1, 96:22, 106:14, 109:17, 110:11, 110:20, 110:22, 123:12, 137:5, 137:10, 142:18, 144:8, 146:24, 147:3, 151:18, 153:17, 153:24, 157:24, 158:14, 158:23, 162:8, 165:17, 166:15, 166:24, 167:4, 167:7, 167:8, 168:24, 168:25, 169:3, 169:8, 171:13, 171:17
**firsthand** [1] - 86:17
**fish** [1] - 51:2
**fit** [1] - 66:24
**five** [16] - 22:4, 22:12, 31:18, 32:21, 49:15, 67:7, 71:5, 72:20, 73:25, 78:4, 78:13, 82:8, 84:17, 100:23, 153:4, 178:5
**flagged** [1] - 115:16
**fled** [2] - 81:3, 113:16
**flee** [1] - 4:6
**fleeing** [1] - 35:22
**flight** [2] - 78:3
**flip** [5] - 12:3, 12:19, 12:22, 18:20, 81:15
**floor** [2] - 16:16, 114:17
**Floor** [1] - 1:24
**flunky** [1] - 74:24
**focus** [1] - 26:19
**follow** [6] - 5:13, 82:7, 85:21, 86:19, 112:20, 116:5
**followed** [4] - 86:5, 86:14, 86:17, 115:17
**following** [12] - 49:7, 86:8, 137:3, 144:8,

146:23, 151:16, 153:15, 154:5, 157:21, 166:23, 169:2, 173:10
**follows** [5] - 33:9, 146:10, 152:23, 156:17, 165:8
**food** [1] - 41:10
**fool** [1] - 9:5
**FOR** [1] - 1:1
**forbids** [1] - 134:6
**force** [8] - 6:11, 162:6, 162:19, 162:21, 163:1, 163:8, 163:14, 173:20
**foregoing** [1] - 185:17
**foreign** [2] - 153:14, 153:24
**forensics** [1] - 60:2
**foreperson** [14] - 119:2, 143:21, 143:22, 175:20, 176:11, 178:2, 178:8, 178:11, 178:13, 178:16, 178:24, 179:7, 182:13
**foreseeable** [4] - 142:6, 144:23, 145:4, 145:17
**forever** [2] - 65:18, 99:21
**form** [17] - 115:2, 122:22, 123:3, 143:18, 143:22, 143:24, 143:25, 144:4, 146:1, 174:23, 174:25, 177:2, 178:17, 178:18, 178:20, 178:22
**formal** [1] - 137:19
**formation** [1] - 139:22
**forth** [8] - 20:14, 57:4, 67:14, 83:12, 85:4, 85:5, 95:4, 154:25
**forthcoming** [2] - 95:13, 106:10
**forthright** [1] - 125:22
**fortitude** [1] - 40:10
**forward** [8] - 4:20, 23:13, 25:14, 25:17, 104:22, 110:2, 112:6, 161:11
**four** [23] - 6:16, 6:17, 8:5, 10:12, 13:19, 14:16, 28:12, 36:1, 47:6, 52:12, 56:7, 60:25, 61:5, 61:14, 61:16, 62:4, 81:7,

100:4, 105:15, 106:4, 113:19, 173:10, 183:1
**foursome** [1] - 7:25
**fourth** [2] - 108:24, 145:1
**frank** [1] - 125:22
**frankly** [4] - 18:25, 40:4, 63:10, 79:2
**frantic** [1] - 107:6
**freaking** [1] - 62:4
**free** [4] - 22:24, 68:17, 87:10, 90:18
**freedom** [4] - 22:20, 23:3, 38:6, 130:7
**freely** [1] - 76:24
**Friday** [1] - 27:6
**friend** [2] - 34:7, 34:11
**friendly** [2] - 140:18, 140:19
**friends** [2] - 4:3, 97:12
**front** [5] - 52:2, 54:11, 73:11, 87:4, 108:17
**fucked** [2] - 32:8, 62:24
**fuckin'** [1] - 60:14
**fucking** [5] - 20:20, 35:4, 60:14, 72:19, 73:1
**full** [3] - 27:5, 27:8, 109:7
**fully** [3] - 93:1, 139:13, 170:13
**fun** [2] - 7:18, 71:17, 71:18
**function** [2] - 115:13, 177:3
**functioning** [1] - 102:1
**furtherance** [16] - 139:22, 139:23, 140:2, 142:7, 142:12, 142:19, 142:23, 145:18, 156:15, 157:4, 157:18, 158:6, 159:19, 161:4, 161:10, 162:1
**furthered** [2] - 160:17, 160:25
**furthering** [2] - 141:16, 161:14
**furthermore** [2] - 139:16, 154:10
**furthest** [1] - 43:14
**fussed** [1] - 32:7
**future** [2] - 162:7, 162:20

### G

**gain** [2] - 25:21, 129:3
**gallery** [3] - 2:13, 37:2, 103:13
**garbage** [8] - 41:11, 42:3, 42:15, 42:18, 45:3, 77:18, 77:19
**gasoline** [1] - 73:23
**gate** [1] - 182:10
**gather** [1] - 123:1
**gathering** [1] - 114:4
**general** [2] - 128:16, 164:9
**generally** [2] - 94:25, 121:1
**gentleman** [1] - 58:25
**gentlemen** [40] - 3:11, 4:11, 4:24, 7:6, 12:24, 13:3, 14:7, 14:15, 15:11, 16:19, 18:16, 19:25, 20:23, 21:23, 22:23, 26:18, 31:10, 31:19, 32:17, 33:22, 35:14, 36:4, 36:25, 53:23, 71:8, 74:8, 78:22, 80:5, 80:10, 85:19, 87:1, 88:20, 90:8, 101:10, 102:8, 112:15, 113:22, 114:13, 179:10, 181:12
**George** [2] - 8:10, 64:19
**Georgia** [1] - 53:2
**gesture** [2] - 163:4
**girl** [4] - 33:2, 33:14, 34:9, 76:16
**girl's** [1] - 9:21
**girlfriend** [1] - 51:19
**given** [6] - 5:12, 89:14, 121:9, 128:16, 133:1, 179:5
**Glen** [4] - 60:25, 62:5, 106:3, 106:7
**glocks** [1] - 86:11
**goals** [1] - 145:24
**God** [4] - 35:11, 47:15, 62:24, 108:7
**God's** [1] - 77:16
**godfather** [1] - 25:8
**godson** [1] - 90:9
**gold** [1] - 56:24
**gonna** [2] - 28:8, 28:9
**Government** [149] - 2:5, 2:25, 3:1, 3:3, 3:8, 18:12, 29:17, 38:19, 39:9, 39:23, 39:24, 42:21, 43:15, 46:7, 46:8, 48:6,

48:7, 52:1, 52:11,
53:7, 58:23, 59:11,
59:16, 59:19, 61:16,
62:17, 63:12, 64:25,
65:11, 66:11, 67:1,
67:11, 68:2, 70:8,
75:7, 77:8, 78:18,
79:7, 80:7, 80:18,
81:20, 81:24, 84:24,
85:23, 85:24, 86:2,
101:8, 102:15,
107:25, 109:15,
114:5, 117:2, 117:7,
117:10, 117:19,
117:23, 118:6,
118:14, 118:21,
119:7, 119:14,
120:10, 120:14,
120:16, 120:21,
123:10, 125:10,
126:10, 127:3,
128:2, 129:9,
129:19, 129:21,
129:22, 129:24,
130:14, 130:20,
131:2, 133:22,
137:3, 137:10,
137:17, 137:24,
138:16, 141:21,
143:15, 144:2,
146:22, 147:3,
147:6, 147:8,
147:16, 147:19,
149:4, 149:6,
149:14, 149:15,
149:17, 149:20,
149:23, 151:11,
151:16, 153:15,
153:25, 154:23,
155:11, 156:1,
156:4, 157:20,
158:14, 158:20,
159:10, 159:15,
160:4, 160:15,
161:1, 161:2,
161:16, 162:16,
164:10, 166:22,
167:4, 167:9,
167:23, 168:3,
168:10, 168:12,
168:14, 169:1,
169:13, 169:19,
169:23, 169:25,
170:4, 170:7,
170:22, 171:1,
171:3, 171:9,
171:25, 172:6,
173:9, 174:5,
176:21, 179:24,
179:25, 180:18,
182:22, 183:4

**government** [5] -
112:15, 122:22,
129:19, 167:20,
167:21
**Government's** [26] -
40:23, 40:25, 41:13,
42:17, 43:20, 44:23,
49:19, 57:17, 58:9,
60:24, 61:7, 71:6,
74:17, 74:22, 84:24,
86:1, 101:11,
105:22, 107:1,
108:25, 113:25,
130:15, 162:8,
163:20, 169:8,
169:11
**grab** [1] - 42:7
**grabbed** [1] - 65:4
**grabbing** [2] - 84:2,
112:3
**gram** [1] - 10:18
**grams** [17] - 3:12, 6:1,
9:25, 10:14, 13:9,
25:12, 26:4, 26:21,
60:6, 91:14, 91:15,
92:19, 99:23, 99:24,
100:23, 136:20
**Grand** [28] - 25:24,
42:1, 48:20, 52:2,
54:4, 54:6, 54:7,
54:11, 54:15, 54:16,
54:19, 55:5, 55:21,
55:23, 55:25, 56:1,
56:2, 56:5, 62:14,
63:6, 64:10, 69:22,
105:21, 107:14,
108:14, 110:15,
111:6, 136:19
**grand** [1] - 54:9
**grandfather** [1] -
38:11
**grandma** [3] - 33:2,
34:2, 34:4
**grandma's** [2] - 11:8,
21:21
**grandmother's** [2] -
8:11, 75:19
**graphic** [1] - 64:3
**grave** [1] - 173:24
**gray** [10] - 41:2, 41:3,
41:5, 41:7, 41:12,
41:16, 42:11, 82:5,
82:9, 91:22
**great** [12] - 51:7,
82:16, 90:18, 93:19,
123:12, 127:18,
127:25, 128:13,
130:10, 132:1,
176:23, 182:4
**greater** [4] - 117:7,

121:11, 130:24,
131:14
**Greenwood** [1] - 27:7
**grew** [2] - 25:6, 90:22
**grossest** [1] - 81:25
**ground** [1] - 148:21
**grounds** [1] - 131:17
**group** [4] - 104:11,
167:16, 167:17,
168:2
**grow** [1] - 71:3
**growing** [1] - 64:14
**grows** [5] - 69:7,
69:24, 70:11, 70:19
**guess** [6] - 15:19,
32:19, 95:4, 99:24,
101:25, 124:19
**guided** [1] - 118:4
**guilt** [25] - 4:8, 33:9,
34:16, 35:16, 114:1,
118:7, 118:11,
118:14, 118:20,
119:7, 119:13,
120:24, 121:15,
128:11, 129:12,
129:15, 130:2,
130:20, 132:8,
135:10, 135:12,
140:4, 142:18,
147:4, 175:2
**guilty** [86] - 4:25, 5:21,
7:12, 22:24, 30:11,
36:13, 39:23, 39:25,
40:1, 40:2, 78:16,
78:17, 78:18, 82:6,
82:9, 89:7, 89:22,
89:23, 90:10,
104:14, 108:2,
108:3, 108:4, 108:5,
108:10, 113:7,
113:24, 114:8,
118:16, 118:22,
118:25, 119:1,
119:4, 119:15,
119:16, 120:19,
121:16, 123:20,
129:9, 129:13,
129:14, 129:20,
135:11, 136:5,
141:2, 143:16,
143:19, 144:5,
149:13, 151:8,
152:15, 152:16,
153:17, 157:19,
157:22, 166:2,
166:21, 168:8,
170:21, 171:6,
171:7, 173:1, 173:3,
173:5, 173:8, 175:2,
175:8, 175:9,

175:10, 175:12,
175:17, 175:18,
176:24, 176:25,
177:4, 177:25
**gun** [50] - 3:24, 6:4,
6:15, 6:17, 6:22,
14:2, 14:11, 14:12,
14:25, 15:1, 15:4,
17:8, 28:18, 29:1,
29:6, 29:18, 30:1,
33:8, 35:19, 44:25,
45:5, 60:13, 60:14,
60:20, 66:10, 66:20,
67:23, 67:24, 67:25,
68:6, 70:1, 70:3,
70:7, 70:19, 72:3,
73:17, 88:14, 88:15,
88:16, 88:19, 90:8,
94:13, 110:4, 110:8,
161:17
**guns** [3] - 73:18, 74:2,
74:3
**gunshots** [1] - 46:11
**gurevich** [1] - 181:25
**Gurevich** [6] - 2:16,
37:3, 37:14, 179:6,
180:11, 181:4
**guy** [9] - 9:11, 9:12,
28:18, 29:2, 30:3,
67:10, 93:8, 93:10,
94:2
**guys** [5] - 9:5, 9:13,
13:4, 13:6, 95:19

# H

**hair** [1] - 64:14
**half** [11] - 12:15,
57:14, 58:6, 60:10,
79:3, 79:5, 79:15,
181:18, 182:20,
183:1
**ham** [1] - 54:11
**Hamlin** [1] - 56:14
**hand** [11] - 55:25,
118:13, 130:23,
140:24, 143:8,
150:24, 152:5,
167:25, 173:1, 179:6
**handed** [2] - 67:25,
114:25
**handicap** [3] - 12:11,
12:14
**handled** [2] - 10:1,
10:2
**hands** [1] - 45:11
**handwriting** [1] -
103:2
**hang** [1] - 102:16
**hangs** [4] - 13:17,

13:18, 13:24, 102:12
**happy** [1] - 75:22
**hard** [13] - 4:8, 13:7,
38:23, 73:18, 76:16,
85:3, 86:6, 182:19,
182:20, 182:22,
182:24, 183:2
**hard-earned** [1] -
76:16
**hardcore** [1] - 118:5
**hardly** [1] - 42:18
**harmful** [2] - 164:8,
164:12
**Harris** [88] - 8:1, 8:9,
9:14, 10:17, 13:13,
18:21, 21:13, 21:15,
21:16, 22:5, 22:6,
22:25, 23:13, 23:18,
23:21, 23:24, 24:14,
24:15, 24:20, 25:3,
25:5, 25:7, 26:24,
27:12, 27:13, 27:18,
27:22, 28:14, 28:25,
29:3, 29:5, 33:10,
34:19, 34:20, 35:7,
39:11, 40:24, 41:18,
41:19, 42:12, 48:22,
49:17, 62:6, 63:8,
63:10, 63:11, 64:6,
64:18, 64:22, 65:14,
80:16, 82:10, 82:14,
82:18, 82:24, 83:1,
84:9, 95:18, 104:19,
105:8, 105:12,
105:15, 105:16,
108:6, 109:12,
109:15, 110:8,
110:11, 111:13,
111:14, 111:19,
112:1, 112:13,
112:25, 113:4
**Harris's** [2] - 109:16,
110:12
**Harrises** [1] - 105:17
**hate** [1] - 182:2
**haunted** [2] - 36:2,
84:21
**Haynes** [46] - 4:20,
7:14, 7:17, 7:22,
14:25, 19:4, 22:7,
29:4, 29:6, 29:12,
29:13, 29:15, 29:23,
33:7, 34:6, 34:10,
34:15, 39:12, 42:24,
43:7, 47:11, 87:18,
87:19, 87:20, 87:24,
88:11, 88:22, 88:23,
89:3, 89:11, 89:18,
90:8, 93:16, 94:5,
97:16, 98:2, 99:12,

104:12, 104:13,
108:10, 110:5,
113:9, 113:10,
113:21, 129:20
**Haynes'** [2] - 3:14,
31:7
**head** [12] - 3:19, 3:25,
26:12, 56:17, 56:18,
59:14, 60:1, 68:15,
71:23, 73:18, 109:3,
165:16
**Heading** [1] - 44:13
**hear** [21] - 3:8, 16:20,
19:24, 37:23, 45:23,
45:24, 45:25, 46:6,
46:10, 46:11, 59:21,
59:22, 75:2, 75:3,
75:6, 78:1, 83:8,
85:3, 85:9, 87:12
**heard** [82] - 4:11, 8:4,
8:13, 9:16, 13:13,
16:13, 17:19, 19:9,
19:12, 19:23, 20:2,
22:4, 25:15, 29:7,
31:9, 31:10, 39:2,
39:3, 45:7, 45:8,
46:13, 47:11, 47:16,
48:10, 50:2, 51:16,
51:17, 53:5, 54:6,
54:8, 54:17, 56:12,
57:25, 59:2, 63:20,
63:24, 64:17, 64:20,
64:21, 66:5, 70:7,
72:6, 74:25, 75:7,
77:22, 80:15, 80:20,
82:1, 82:22, 82:24,
83:17, 84:23, 85:1,
86:8, 86:12, 86:14,
86:15, 87:12, 87:21,
92:22, 93:4, 94:14,
95:25, 96:22, 97:6,
100:5, 109:17,
110:12, 111:5,
115:6, 115:19,
120:13, 122:13,
124:7, 124:14,
124:22, 127:23,
129:8, 131:10, 132:4
**hearing** [3] - 49:4,
77:21, 112:1
**hears** [2] - 50:19,
92:21
**heartbreaking** [2] -
38:13, 38:17
**heavy** [1] - 91:19
**heinous** [1] - 24:2
**help** [17] - 8:25, 23:14,
23:16, 23:21, 24:1,
34:13, 34:14, 48:22,
49:5, 49:6, 49:7,

65:21, 107:11,
109:12, 109:15,
125:18, 171:23
**helped** [3] - 22:11,
23:2, 161:11
**helpful** [1] - 96:8
**helping** [1] - 132:10
**hereby** [1] - 185:16
**heroin** [46] - 5:5, 5:7,
5:10, 5:23, 6:1, 6:9,
6:25, 7:1, 7:8, 8:8,
8:11, 8:16, 9:12,
9:24, 13:14, 22:17,
25:4, 25:12, 26:9,
28:16, 41:4, 41:19,
77:20, 82:17, 91:14,
91:25, 100:23,
136:21, 137:7,
137:16, 144:1,
144:3, 144:7, 144:9,
144:13, 144:15,
144:21, 144:24,
145:2, 145:5,
145:25, 146:14,
147:13, 151:13,
151:15, 151:19
**Herring** [1] - 12:9
**herself** [2] - 70:9, 90:6
**hesitate** [3] - 118:12,
118:15, 177:16
**hi** [2] - 75:1
**hid** [2] - 27:19, 32:16
**hide** [2] - 4:8, 99:5
**hiding** [1] - 86:2
**high** [4] - 67:17,
82:22, 82:24, 104:9
**highlight** [2] - 85:24,
85:25
**highly** [1] - 150:20
**himself** [17] - 4:9,
23:9, 25:17, 27:25,
31:24, 31:25, 35:8,
65:21, 97:4, 132:12,
140:19, 170:23,
171:2, 171:7,
171:21, 171:25,
172:23
**hindsight** [1] - 104:24
**history** [2] - 88:24,
89:14
**hit** [1] - 26:20
**hits** [1] - 15:3
**Hobbs** [8] - 159:8,
159:9, 159:12,
159:13, 161:21,
162:9, 162:17, 172:4
**hold** [3] - 57:12,
155:5, 160:20
**holding** [4] - 7:10,
10:7, 27:11, 38:15

**hole** [1] - 20:13
**holes** [1] - 94:18
**holler** [2] - 15:22,
33:15
**home** [20] - 3:15, 3:21,
5:10, 15:9, 17:7,
27:2, 28:4, 28:19,
34:13, 42:23, 43:21,
48:9, 53:4, 53:14,
69:11, 72:24, 94:1,
97:2
**Home** [1] - 101:14
**homeboys** [1] - 32:22
**homicidal** [2] - 97:17,
97:24
**homicide** [14] - 46:20,
46:23, 47:4, 47:7,
47:19, 48:19, 48:25,
49:1, 50:20, 51:2,
75:2, 76:1, 76:2
**homicide's** [1] - 50:18
**honest** [4] - 63:11,
63:21, 96:1, 104:19
**honestly** [1] - 63:10
**Honor** [14] - 2:6, 2:8,
2:18, 3:10, 37:17,
53:20, 80:9, 180:1,
180:3, 180:19,
180:21, 183:5,
183:10, 183:18
**HONORABLE** [1] - 1:8
**Honorable** [2] - 36:22,
79:20
**hook** [1] - 51:2
**hope** [3] - 38:21, 80:6,
103:1
**hoped** [1] - 128:24
**hopefully** [1] - 146:2
**hopes** [1] - 129:2
**hoping** [3] - 71:3,
96:13, 96:14
**horrific** [2] - 38:18,
38:19
**Hospital** [1] - 25:16
**hospital** [2] - 108:14,
108:18
**hostile** [1] - 127:5
**hostility** [1] - 126:14
**hot** [1] - 20:12
**hour** [13] - 4:17, 4:22,
12:15, 68:14, 69:15,
79:3, 79:5, 79:15,
80:15, 99:2, 181:6
**hours** [19] - 19:8,
19:13, 21:3, 30:14,
47:14, 48:18, 60:7,
60:9, 60:25, 61:5,
61:14, 61:16, 62:4,
78:22, 85:5, 97:21,
106:4, 182:23

**house** [84] - 3:16, 8:3,
8:11, 8:14, 9:22,
11:18, 12:9, 12:12,
15:8, 15:10, 16:2,
16:7, 17:7, 17:16,
17:18, 17:20, 17:21,
18:4, 20:8, 20:11,
21:4, 21:7, 21:10,
21:21, 24:19, 27:4,
27:7, 27:10, 28:21,
30:5, 30:16, 31:2,
31:5, 31:7, 32:23,
34:1, 42:3, 43:12,
44:16, 45:19, 46:8,
46:9, 46:21, 51:22,
51:24, 51:25, 52:3,
52:4, 52:9, 52:10,
53:2, 58:16, 67:14,
69:17, 71:10, 71:20,
71:24, 72:1, 73:10,
73:22, 73:24, 75:14,
77:6, 83:2, 86:22,
91:15, 91:16, 92:3,
92:6, 92:16, 94:22,
95:3, 96:5, 96:9,
97:17, 98:19, 99:8,
100:3, 101:12,
101:23, 104:8,
109:21
**Hughlett** [3] - 8:12,
8:18, 21:20
**human** [13] - 46:24,
103:21, 103:24,
111:22, 111:24,
112:9, 112:11,
166:5, 166:14,
168:22, 169:16,
174:2
**hundreds** [1] - 36:9
**hung** [4] - 8:1, 8:2, 8:3
**Huntington's** [2] -
59:3, 105:23
**hurt** [3] - 73:6, 73:13,
74:4
**hurting** [2] - 73:5, 73:6
**husband** [1] - 45:17
**hypothetical** [1] -
168:16

# I

**I's** [1] - 183:22
**ID** [2] - 28:17, 36:2
**ID'd** [1] - 76:4
**identical** [1] - 157:9
**identification** [3] -
67:10, 122:8, 122:10
**identified** [1] - 90:14
**identifies** [1] - 139:11
**identify** [7] - 24:10,

26:13, 29:4, 30:9,
32:22, 93:11, 109:24
**identifying** [1] - 7:11
**ignorance** [1] - 133:25
**ignore** [4] - 87:25,
88:7, 88:8, 89:3
**III** [4] - 22:5, 114:9,
185:11
**illegal** [1] - 141:16
**illness** [1] - 22:18
**image** [1] - 38:13
**imagine** [2] - 71:23,
93:12
**immaterial** [1] -
135:13
**immediately** [3] -
70:18, 162:6, 162:20
**impartial** [1] - 119:11
**impartiality** [1] - 117:1
**implicate** [1] - 112:10
**importance** [2] -
125:19, 182:5
**important** [23] - 20:23,
38:5, 40:15, 40:18,
57:12, 58:24, 63:2,
77:18, 97:21,
103:15, 103:17,
103:24, 109:19,
109:24, 114:14,
114:20, 117:1,
117:4, 126:23,
132:19, 143:6,
175:24, 175:25
**importantly** [1] - 64:19
**impose** [1] - 125:8
**imposes** [1] - 119:17
**imposing** [1] - 133:19
**impressed** [1] -
125:21
**imprint** [2] - 70:1, 70:4
**imprisonment** [6] -
153:1, 153:10,
153:19, 154:3,
154:8, 154:11
**improper** [3] - 117:18,
117:25, 130:15
**IN** [1] - 1:1
**inadvertence** [1] -
134:9
**inadvertently** [1] -
172:14
**Inc** [1] - 39:8
**incentive** [1] - 126:12
**incessantly** [2] -
20:10, 30:15
**incident** [2] - 84:7,
84:13
**inclined** [1] - 180:6
**include** [2] - 117:14,
139:19

included [2] - 136:12, 154:13
includes [2] - 101:15, 162:13
including [7] - 8:21, 28:13, 165:16, 179:15, 180:10, 180:25, 181:14
incoming [1] - 12:22
inconsistency [4] - 28:15, 75:4, 132:18, 132:21
inconsistent [10] - 25:23, 103:19, 107:18, 109:17, 110:12, 132:5, 132:7, 132:9, 132:25, 133:1
inconvenience [2] - 123:7, 182:3
incorporated [1] - 121:19
increase [1] - 13:15
increases [1] - 69:13
indeed [2] - 128:8, 140:6
index [1] - 115:4
indexed [1] - 115:4
indicate [4] - 116:22, 152:11, 174:20, 180:23
indicated [2] - 37:3, 122:16
indicates [1] - 58:19
indicating [2] - 56:11, 121:8
indict [1] - 54:11
indicted [1] - 65:22
indictment [36] - 40:20, 65:23, 118:17, 118:24, 123:11, 124:6, 127:25, 135:17, 136:7, 136:11, 136:14, 137:8, 137:13, 138:20, 142:12, 146:8, 146:10, 152:19, 152:23, 154:25, 156:11, 158:8, 158:10, 158:25, 159:3, 161:19, 164:18, 165:4, 165:8, 166:22, 168:17, 169:4, 169:10, 173:5, 173:8
indictments [1] - 165:3
indisputable [1] - 110:1

indisputably [2] - 80:12, 80:22
individual [4] - 113:12, 148:4, 177:10, 177:13
individuals [1] - 117:10
inevitable [1] - 4:5
infer [5] - 44:2, 124:16, 138:6, 147:13, 174:17
inference [5] - 123:25, 124:15, 124:19, 139:8, 139:15
inferences [8] - 116:11, 122:20, 125:3, 129:12, 135:7, 139:7, 150:6, 150:7
inferred [1] - 134:21
inflicted [2] - 169:13, 173:17
influence [1] - 133:19
influenced [1] - 126:9
information [19] - 23:25, 32:16, 34:12, 42:25, 59:24, 69:24, 92:10, 104:19, 104:22, 104:23, 105:11, 110:1, 110:23, 117:13, 165:6, 165:13, 165:24, 166:19
informed [1] - 139:13
informer [3] - 130:14, 130:22, 130:23
informers [2] - 130:16, 130:17
ing [2] - 60:4, 60:15
initials [1] - 157:12
injuries [1] - 169:14
injury [6] - 162:6, 162:19, 163:2, 163:14, 169:13, 173:18
innocence [3] - 98:20, 117:22, 119:9
innocent [9] - 25:11, 29:3, 38:12, 104:4, 110:3, 120:12, 123:23, 124:13, 132:18
insecurities [1] - 32:11
inside [1] - 87:5, 95:19
instance [1] - 80:11
instead [4] - 44:25, 45:4, 85:10, 95:12
instruct [12] - 79:7, 115:9, 115:19,

115:21, 123:14, 125:1, 130:14, 139:9, 154:15, 159:9, 159:13, 167:7
instructed [5] - 120:20, 121:11, 133:21, 147:19, 163:6
instructing [1] - 114:20
instruction [2] - 83:8, 125:7
instructions [17] - 3:4, 5:12, 5:13, 79:8, 79:13, 114:14, 114:24, 114:25, 115:23, 116:4, 116:5, 136:12, 146:4, 174:24, 176:23, 178:19, 182:12
INSTRUCTIONS [1] - 1:6
instrument [1] - 134:18
intangible [1] - 162:14
integral [1] - 160:18
intended [12] - 150:8, 150:10, 150:12, 150:14, 150:24, 150:25, 151:5, 151:18, 151:24, 164:13, 164:16, 170:14
intending [1] - 173:20
intends [3] - 152:9, 172:17, 174:17
intensive [1] - 63:3
intent [46] - 6:24, 134:6, 134:14, 134:24, 135:4, 135:16, 135:19, 135:21, 136:8, 136:19, 136:25, 137:6, 137:14, 144:10, 144:14, 144:18, 144:22, 145:3, 145:11, 146:7, 146:9, 146:13, 146:19, 147:2, 148:4, 149:22, 151:3, 151:10, 151:13, 151:15, 151:19, 152:11, 159:1, 159:4, 165:12, 165:22, 166:25, 167:11, 167:14, 168:1, 169:24, 174:10, 174:11,

174:12, 174:16, 183:18
intention [11] - 139:2, 141:11, 148:16, 148:18, 150:4, 151:21, 155:10, 155:16, 155:18, 160:23, 161:9
intentional [1] - 169:17
intentionally [13] - 5:20, 7:4, 133:23, 133:24, 134:10, 141:14, 146:12, 146:18, 165:11, 173:16, 173:17, 173:18, 173:23
interactions [2] - 4:2, 96:2
interest [9] - 115:16, 127:11, 127:15, 127:20, 127:22, 129:1, 130:5, 131:19, 140:21
interests [1] - 127:13
interfere [2] - 118:2, 118:9
interference [2] - 159:7, 161:19
interrupt [1] - 25:19
intersection [2] - 30:2, 88:14
interstate [16] - 6:17, 152:22, 153:11, 153:14, 153:24, 156:6, 156:8, 163:11, 163:15, 163:23, 163:25, 164:6, 164:8, 164:11, 164:14, 164:20
interview [19] - 25:16, 31:21, 33:3, 64:12, 69:14, 69:15, 69:19, 69:22, 70:5, 70:16, 78:6, 82:20, 91:21, 96:22, 96:25, 108:18, 108:23, 110:15, 110:16
interviewed [3] - 47:19, 64:25, 69:21
interviewing [1] - 48:17
interviews [4] - 58:24, 86:9, 93:8, 117:15
intrastate [1] - 163:24
introduced [3] - 118:23, 119:21, 130:13
investigate [3] - 47:7,

63:6, 117:12
investigated [2] - 48:13, 66:8
investigation [15] - 24:7, 46:23, 48:15, 48:19, 50:17, 50:18, 59:7, 63:4, 76:5, 76:7, 76:8, 76:10, 77:20, 167:22, 168:10
investigative [2] - 120:15, 120:22
investigator [2] - 70:5, 117:14
investigators [5] - 47:13, 81:21, 85:20, 86:4, 114:4
involve [2] - 125:13, 134:14
involved [10] - 88:18, 91:12, 93:7, 127:24, 138:8, 144:24, 145:5, 148:23, 159:22
isolation [1] - 113:3
issue [10] - 67:11, 133:5, 140:4, 142:17, 143:17, 144:4, 147:17, 152:14, 152:17, 177:24
issues [5] - 59:9, 115:8, 116:6, 125:12, 125:13
IT [1] - 98:6
item [1] - 148:6
items [3] - 122:10, 148:8, 148:11
itself [6] - 67:23, 114:22, 118:17, 128:9, 135:1, 140:15

**J**

Jackson [14] - 12:12, 20:17, 20:24, 39:9, 68:2, 68:3, 75:20, 75:23, 76:3, 94:15, 95:6, 108:9
Jackson's [17] - 11:18, 11:25, 12:9, 14:22, 15:17, 20:11, 21:4, 30:5, 46:21, 67:25, 75:24, 77:6, 83:2, 93:21, 93:22, 98:19, 106:19
jail [32] - 4:13, 10:10, 10:11, 12:13, 12:18, 17:19, 22:21, 22:23, 23:13, 23:16, 23:18,

24:18, 28:1, 30:19,
33:10, 34:4, 35:18,
45:12, 48:25, 49:8,
64:16, 83:18, 88:24,
89:21, 91:1, 91:14,
92:18, 96:13, 99:20,
99:22, 101:20
**January** [2] - 34:1,
34:4
**Jaron** [4] - 67:2,
87:20, 93:6, 94:10
**Javon** [3] - 1:16, 9:23,
30:25
**jealous** [4] - 71:14,
71:15, 77:1, 89:18
**Jeffrey** [24] - 1:17,
3:15, 15:16, 35:16,
36:5, 38:12, 41:15,
43:19, 43:24, 44:1,
44:11, 50:23, 58:14,
81:12, 81:17, 82:2,
91:10, 92:1, 95:7,
96:3, 106:8, 114:9,
157:6, 157:11
**Jeffrey's** [11] - 5:10,
16:7, 18:13, 18:15,
18:17, 42:2, 42:23,
43:12, 157:13,
165:5, 165:15
**Jen** [52] - 9:3, 10:15,
12:15, 31:9, 31:20,
31:25, 32:9, 32:10,
34:25, 35:1, 35:19,
65:4, 69:20, 71:17,
72:3, 72:7, 74:1,
74:2, 74:8, 74:9,
76:4, 77:14, 77:17,
80:24, 81:6, 81:7,
82:17, 83:18, 83:22,
84:2, 84:5, 84:6,
85:16, 90:19, 91:10,
91:21, 92:9, 92:12,
92:25, 96:10, 97:12,
99:2, 99:13, 99:15,
99:23, 112:3, 113:7,
113:14, 113:18,
113:20
**Jen's** [14] - 8:3, 30:23,
31:25, 67:15, 67:20,
71:14, 71:15, 71:24,
72:1, 76:19, 77:3,
81:4, 96:17, 113:17
**Jennifer** [90] - 3:15,
3:16, 4:21, 6:5, 6:23,
7:8, 7:9, 7:22, 7:23,
7:25, 8:24, 9:14,
9:17, 9:19, 9:24,
10:8, 10:19, 11:19,
12:1, 12:2, 12:4,
12:7, 12:17, 12:20,

13:9, 13:18, 13:24,
14:8, 15:16, 15:19,
15:20, 16:6, 16:8,
16:13, 16:20, 17:4,
17:8, 18:5, 18:12,
18:17, 18:24, 19:11,
19:19, 24:8, 24:9,
26:3, 26:11, 28:16,
30:13, 30:21, 31:2,
31:11, 31:13, 33:5,
33:25, 35:16, 36:5,
38:11, 41:15, 42:2,
42:23, 43:12, 43:19,
43:24, 44:1, 44:11,
50:23, 56:6, 56:8,
58:14, 71:11, 73:17,
81:11, 81:17, 82:2,
83:15, 91:17, 92:1,
95:7, 96:3, 96:4,
101:4, 106:8, 114:9,
157:6, 157:11,
157:12, 165:5,
165:15
**Jennifer's** [15] - 3:20,
8:4, 12:3, 12:19,
14:5, 15:12, 16:2,
18:4, 19:16, 26:20,
31:17, 71:10, 94:6,
94:7, 109:5
**Jews** [1] - 48:24
**JEWS** [1] - 48:24
**job** [5] - 85:21, 101:9,
103:4, 114:5, 114:6
**jobs** [1] - 114:4
**join** [2] - 5:25, 9:13
**joined** [5] - 14:15,
138:24, 139:16,
144:25, 145:6
**joins** [1] - 139:20
**joint** [4] - 148:14,
148:17, 155:14,
155:17
**jointly** [2] - 148:20,
155:20
**joke** [1] - 54:10
**Jonice** [6] - 34:22,
64:2, 64:7, 65:2
**Jr** [5] - 8:9, 22:7,
65:14, 154:7
**judge** [7] - 48:23,
90:2, 102:19,
103:13, 112:13,
165:24, 167:12
**JUDGE** [1] - 1:8
**Judge** [8] - 5:12,
37:25, 40:4, 48:24,
68:21, 68:24, 83:8,
90:11
**judgement** [1] -
132:24

**judges** [4] - 102:24,
111:12, 116:8,
116:21
**judgment** [2] - 125:5,
177:14
**judgments** [2] -
125:13, 125:15
**judicial** [1] - 166:2
**July** [5] - 59:18, 63:20,
64:25, 69:19, 69:21
**jumped** [1] - 97:2
**June** [15] - 19:5, 27:3,
27:6, 27:9, 42:14,
50:10, 50:15, 70:13,
74:13, 75:1, 75:14,
78:16, 85:1, 93:19,
96:5
**JUNE** [1] - 1:9
**Junior** [11] - 32:19,
44:4, 62:7, 62:8,
77:7, 77:8
**Junior's** [1] - 32:17
**junk** [1] - 42:15
**juries** [1] - 134:15
**Juror** [6] - 56:2, 178:3,
178:4, 178:6, 178:8,
178:11
**juror** [5] - 103:10,
143:6, 143:8, 177:6
**jurors** [21] - 38:5,
38:6, 38:8, 54:9,
103:4, 103:8,
103:14, 118:3,
177:7, 177:10,
177:15, 177:17,
177:19, 180:5,
180:10, 180:11,
181:21, 181:24,
181:25, 182:11
**Jury** [29] - 25:24,
36:19, 37:20, 42:1,
48:21, 52:2, 54:4,
54:6, 54:7, 54:12,
54:15, 54:16, 54:19,
55:5, 55:21, 55:24,
55:25, 56:1, 56:5,
62:14, 63:6, 64:11,
69:22, 105:21,
107:14, 108:14,
110:15, 111:6,
136:19
**jury** [46] - 2:16, 2:19,
2:20, 36:11, 36:24,
36:25, 37:14, 37:19,
38:19, 40:5, 53:23,
54:4, 55:24, 68:23,
74:8, 79:17, 80:1,
80:2, 80:4, 103:7,
114:18, 116:7,
122:11, 124:3,

128:10, 133:18,
173:4, 176:1, 176:3,
176:18, 177:8,
178:3, 178:6,
178:18, 178:22,
179:11, 179:15,
179:18, 181:2,
181:5, 181:9,
181:10, 182:17,
183:11
**JURY** [2] - 1:5, 1:6
**justice** [2] - 49:20,
117:11
**justification** [1] -
169:15
**justify** [1] - 139:14

## K

**K.B** [29] - 38:13, 82:3,
114:9, 157:12,
165:5, 165:6,
165:15, 165:16,
166:24, 166:25,
167:5, 167:10,
167:15, 168:4,
168:18, 169:3,
169:9, 170:5,
173:12, 173:13,
173:14, 173:17,
173:22, 174:2,
175:7, 185:10,
185:11
**K.B.'s** [1] - 169:12
**keep** [14] - 2:14,
10:25, 33:13, 34:24,
35:21, 64:4, 82:25,
99:6, 106:15, 120:9,
143:1, 164:24,
165:1, 179:13
**keeps** [5] - 43:15,
52:18, 71:22, 78:8,
148:8
**Kelly** [1] - 1:17
**kept** [3] - 28:6, 28:7,
68:6
**Kester** [3] - 185:9,
185:10, 185:11
**Kevin** [3] - 9:6, 33:4,
83:15
**key** [1] - 64:1
**Ki** [2] - 15:8, 94:1
**Kiara** [116] - 3:14,
4:20, 7:14, 7:17,
7:22, 8:1, 9:21, 11:6,
11:9, 11:17, 13:25,
14:1, 14:10, 14:12,
14:15, 14:20, 14:25,
15:8, 15:9, 16:3,
17:3, 17:7, 17:8,

17:11, 17:12, 17:19,
17:22, 18:8, 19:4,
20:9, 22:7, 22:10,
22:23, 28:18, 29:2,
29:4, 29:6, 29:10,
29:12, 29:13, 29:15,
29:23, 29:25, 30:1,
30:5, 30:7, 30:18,
31:7, 32:4, 32:7,
32:9, 32:13, 33:7,
34:6, 34:9, 34:15,
39:12, 42:24, 43:7,
44:17, 44:20, 44:25,
47:11, 58:15, 66:10,
67:22, 67:23, 68:4,
69:5, 69:10, 74:1,
74:2, 74:4, 74:5,
74:9, 76:15, 76:25,
87:18, 87:19, 87:20,
87:24, 88:11, 88:22,
88:23, 89:2, 89:10,
89:18, 90:8, 90:20,
91:6, 93:16, 93:21,
94:5, 94:11, 97:12,
97:16, 97:25, 98:2,
98:20, 99:12, 100:6,
100:9, 100:10,
104:12, 104:13,
108:10, 110:3,
110:5, 110:8, 113:9,
113:10, 113:21,
129:19
**Kiara's** [13] - 17:10,
17:16, 17:18, 18:3,
31:22, 32:1, 67:15,
67:20, 77:5, 93:20,
93:21, 96:24, 97:3
**kid** [2] - 25:21, 110:17
**kidnapping** [1] - 166:9
**kids** [4] - 17:7, 50:3,
111:1
**kill** [19] - 6:5, 25:11,
25:20, 35:19, 36:1,
58:20, 65:6, 70:17,
72:12, 72:13, 73:12,
74:9, 87:6, 91:10,
99:15, 100:4, 113:7,
165:22, 169:24
**killed** [48] - 5:11, 6:23,
7:3, 19:12, 19:13,
22:9, 24:9, 26:11,
28:16, 28:18, 28:21,
30:8, 30:13, 33:24,
35:2, 52:5, 54:22,
55:1, 55:2, 56:6,
56:8, 62:10, 62:20,
82:2, 83:17, 95:7,
95:8, 96:9, 100:1,
101:3, 106:7, 112:4,
113:20, 165:11,

165:14, 166:15, 166:24, 166:25, 167:5, 167:10, 169:3, 169:9, 170:5, 173:17
**killer** [1] - 7:11
**killing** [20] - 50:3, 73:13, 74:5, 77:19, 89:22, 104:4, 136:3, 157:7, 165:2, 165:4, 165:17, 166:4, 166:7, 168:8, 168:17, 168:22, 168:23, 169:17, 170:10, 175:16
**kills** [3] - 18:4, 42:17, 165:21
**kind** [8] - 8:6, 12:12, 56:2, 61:22, 129:12, 129:24, 149:18, 166:6
**kinds** [3] - 13:13, 93:9, 126:5
**Kissing** [1] - 76:25
**kissing** [1] - 77:2
**kitchen** [5] - 3:16, 28:20, 47:22, 52:3, 104:8
**Kizzy** [1] - 64:21
**Kizzy's** [6] - 27:4, 27:14, 28:20, 52:3, 52:4, 52:10
**knee** [1] - 20:13
**knobbed** [1] - 73:10
**knocked** [1] - 50:9
**knocking** [1] - 109:9
**knocks** [1] - 19:21
**knowing** [9] - 23:6, 31:25, 32:17, 32:20, 141:17, 152:25, 154:21, 159:25, 173:24
**knowingly** [33] - 5:24, 6:12, 6:16, 6:23, 7:1, 133:22, 133:23, 134:1, 136:17, 137:8, 138:18, 138:24, 140:18, 146:12, 146:18, 153:2, 154:25, 155:23, 156:19, 158:3, 158:5, 159:16, 159:19, 162:11, 163:7, 164:1, 164:4, 165:11, 171:21, 171:24, 172:22, 174:18, 174:19
**knowledge** [22] - 86:17, 121:6,

122:24, 126:4, 128:6, 133:7, 134:5, 134:14, 135:4, 139:1, 139:8, 139:15, 141:2, 141:6, 141:9, 142:16, 145:16, 172:1, 172:10, 172:13, 174:12, 174:16
**known** [7] - 8:9, 21:1, 21:3, 109:10, 136:18, 139:11, 158:15
**knows** [27] - 14:10, 26:5, 32:19, 41:20, 41:21, 42:18, 44:6, 44:24, 46:2, 47:15, 55:4, 64:9, 64:11, 64:13, 64:17, 71:10, 71:24, 88:12, 92:17, 92:20, 96:9, 97:20, 97:22, 98:7, 102:12

---

## L

**lack** [6] - 117:17, 118:23, 120:18, 120:24, 125:2, 135:10
**ladies** [40] - 3:11, 4:11, 4:24, 7:6, 12:24, 13:3, 14:7, 14:15, 15:10, 16:19, 18:16, 19:24, 20:23, 21:23, 22:23, 26:18, 31:10, 31:19, 32:17, 33:22, 35:14, 36:4, 36:25, 53:23, 71:8, 74:8, 78:21, 80:5, 80:10, 85:19, 87:1, 88:20, 90:8, 101:10, 102:8, 112:15, 113:22, 114:13, 179:10, 181:11
**laid** [1] - 175:1
**language** [3] - 62:23, 72:6, 157:9
**large** [2] - 150:22, 151:1
**last** [32] - 7:19, 14:21, 15:17, 18:5, 18:13, 18:20, 18:23, 19:16, 19:18, 26:14, 35:20, 43:15, 44:12, 52:2, 56:21, 60:12, 67:22, 73:9, 80:15, 80:25, 83:5, 92:2, 94:21, 97:11, 98:1, 102:3, 103:9, 113:13, 145:13, 164:22,

165:9, 182:25
**Last** [1] - 73:21
**lasted** [1] - 47:6
**lastly** [1] - 65:25
**lasts** [1] - 17:12
**late** [5] - 15:8, 42:23, 97:11, 165:1, 179:13
**lately** [1] - 180:15
**laughing** [2] - 64:8, 65:9
**law** [50] - 21:2, 36:12, 49:25, 95:23, 105:5, 109:4, 110:4, 114:20, 115:9, 115:19, 115:22, 115:23, 116:1, 116:2, 119:17, 121:8, 125:7, 128:7, 128:8, 131:10, 131:11, 131:12, 131:17, 131:21, 134:6, 134:7, 136:4, 138:4, 140:10, 141:8, 142:8, 146:17, 148:13, 155:13, 156:3, 165:3, 165:6, 165:12, 165:23, 167:1, 167:12, 167:15, 167:17, 167:19, 167:24, 168:5, 168:7, 168:9, 170:20, 175:17
**lawful** [1] - 123:2
**Laws** [4] - 67:2, 87:20, 93:6, 94:10
**laws** [1] - 117:2
**lawyer** [1] - 121:18
**lawyer's** [2] - 121:17, 121:24
**lawyers** [11] - 6:3, 51:9, 103:13, 115:21, 116:16, 124:14, 164:23, 175:14, 176:15, 178:1, 182:21
**lead** [1] - 100:13
**leaning** [1] - 62:15
**learned** [2] - 92:12, 108:1
**least** [7] - 31:7, 64:13, 67:22, 75:3, 88:25, 141:9, 168:6
**leave** [4] - 10:13, 17:1, 30:15, 89:24
**leaves** [3] - 18:3, 30:18, 65:11
**leaving** [5] - 30:5, 31:2, 45:4, 69:17, 96:4

**led** [1] - 4:5
**left** [19] - 4:1, 4:4, 10:7, 11:13, 17:18, 17:20, 17:21, 31:20, 36:6, 44:20, 46:14, 46:17, 65:9, 69:15, 71:7, 77:5, 77:15, 100:13, 101:14
**legal** [6] - 116:2, 116:3, 120:20, 147:21, 148:3, 148:12
**legitimate** [3] - 88:17, 94:8, 131:16
**leisurely** [1] - 79:22
**leniency** [1] - 104:14
**less** [4] - 96:6, 107:2, 117:9, 131:14
**lesser** [1] - 131:14
**lethal** [1] - 173:20
**letter** [8] - 24:22, 24:24, 32:18, 33:12, 33:25, 52:15, 98:24
**leverage** [4] - 13:12, 13:15, 21:22, 31:14
**Lewis** [22] - 20:2, 23:22, 30:4, 30:20, 31:5, 31:8, 38:14, 38:15, 42:14, 46:24, 46:25, 74:14, 85:2, 85:8, 85:12, 85:14, 86:17, 93:8, 93:19, 98:8, 98:11, 98:16
**Lewis's** [1] - 85:17
**liability** [1] - 140:5
**liar** [1] - 22:17
**liberty** [1] - 38:7
**lie** [26] - 10:21, 22:19, 25:2, 31:3, 51:4, 51:7, 60:3, 60:8, 60:11, 63:15, 66:8, 69:7, 91:3, 91:7, 96:2, 102:7, 105:17, 105:19, 107:22, 109:25, 111:7, 111:9, 111:20, 129:4
**lied** [22] - 29:15, 35:25, 39:13, 49:21, 49:25, 50:9, 50:13, 61:17, 70:1, 81:4, 81:5, 81:6, 88:23, 98:17, 100:19, 110:22, 111:9, 112:6, 113:17, 131:24
**lies** [4] - 30:25, 31:1, 96:15, 113:18
**lieu** [1] - 157:11
**life** [22] - 3:25, 9:9, 38:1, 40:19, 49:18,

49:21, 70:21, 70:22, 71:1, 72:6, 72:19, 72:23, 72:24, 73:1, 73:3, 73:6, 75:5, 90:16, 169:16, 169:22, 173:19, 174:2
**life's** [1] - 38:2
**light** [11] - 49:18, 51:6, 58:3, 58:11, 122:19, 123:16, 126:20, 131:7, 180:14, 182:6, 183:21
**lighter** [1] - 130:8
**likeable** [2] - 112:17, 112:19
**likelihood** [2] - 168:4, 168:14
**likely** [2] - 154:20, 181:15
**likewise** [1] - 6:24
**limit** [4] - 33:19, 33:21, 33:22, 37:10
**limited** [2] - 51:8, 132:10
**Linda** [1] - 19:21
**line** [3] - 48:15, 174:23
**lined** [1] - 146:5
**liquid** [2] - 9:4, 10:15
**list** [3] - 52:15, 52:16, 52:17
**listed** [1] - 175:11
**listen** [9] - 29:23, 75:10, 88:5, 89:25, 107:15, 110:13, 115:13, 125:14, 177:9
**listened** [4] - 29:21, 29:22, 40:2, 102:24
**listening** [3] - 10:25, 97:10, 109:6
**literally** [4] - 10:7, 74:12, 76:3, 113:25
**litigation** [1] - 117:8
**live** [2] - 101:16, 101:21
**lived** [3] - 21:25, 45:18, 71:9
**lives** [1] - 72:22
**living** [5] - 53:2, 72:21, 72:23, 72:24, 72:25
**locate** [1] - 176:6
**located** [2] - 160:23, 161:8
**location** [2] - 99:7, 112:23
**locations** [1] - 99:6
**locked** [1] - 14:5
**log** [1] - 12:18
**logical** [1] - 124:20

**Lombard** [1] - 1:24
**long-time** [1] - 49:19
**longest** [1] - 53:20
**look** [54] - 11:25, 15:14, 17:24, 20:5, 28:8, 28:11, 34:6, 40:21, 44:9, 48:7, 52:7, 54:14, 54:15, 56:23, 57:21, 58:4, 58:8, 61:13, 61:16, 62:2, 63:16, 64:1, 65:1, 65:4, 66:20, 66:23, 68:13, 69:7, 78:12, 89:22, 91:19, 95:17, 98:17, 98:25, 106:22, 107:1, 107:14, 107:15, 108:5, 109:5, 113:3, 119:2, 119:25, 120:18, 129:6, 143:9, 146:5, 179:5
**looked** [14] - 12:12, 29:21, 29:22, 47:23, 47:25, 61:1, 66:25, 67:4, 86:18, 92:8, 93:6, 111:8, 112:7
**looking** [2] - 67:7, 67:9
**looks** [4] - 43:3, 67:2, 71:15, 93:9
**losing** [1] - 97:17
**lost** [2] - 59:3, 59:5
**loud** [4] - 20:12, 72:2, 72:3
**louder** [3] - 19:23, 46:10, 138:10
**Louise** [2] - 21:14, 65:15
**love** [5] - 25:2, 25:7, 90:22, 91:3, 102:17
**Love** [1] - 52:15
**loved** [3] - 25:5, 45:18, 112:7
**lovely** [1] - 91:11
**loves** [2] - 25:2, 112:8
**lower** [1] - 53:21
**loyalty** [1] - 126:12
**lucky** [1] - 46:25
**lunch** [11] - 2:17, 2:22, 3:6, 78:23, 78:25, 79:3, 79:6, 79:14, 79:22, 80:6, 181:24
**lying** [12] - 23:9, 25:8, 31:24, 84:6, 88:24, 90:25, 100:16, 100:18, 100:24, 128:22, 166:6

# M

**ma'am** [1] - 182:13
**mad** [9] - 32:9, 32:10, 71:17, 76:16, 78:7, 78:10, 99:13, 100:9, 100:10
**magically** [1] - 83:5
**magnitude** [1] - 39:1
**maintains** [1] - 78:16
**major** [1] - 140:8
**male** [1] - 30:1
**malice** [4] - 166:5, 168:22, 169:5, 169:20
**Malice** [1] - 169:21
**malicious** [1] - 166:7
**maliciously** [1] - 166:14
**man** [11] - 28:8, 28:10, 28:11, 42:17, 42:18, 50:16, 54:13, 60:14, 62:17, 62:23, 63:20
**Man** [2] - 60:13, 65:3
**man's** [1] - 59:14
**mandatory** [2] - 70:24, 70:25, 71:2
**manner** [1] - 40:19
**manufacture** [2] - 146:18, 146:19
**March** [3] - 48:9, 70:10, 136:15
**marches** [1] - 71:25
**marked** [2] - 122:7, 122:10
**marks** [1] - 185:13
**married** [1] - 7:22
**marshals** [1] - 176:12
**Martin** [13] - 4:3, 14:19, 14:24, 21:14, 29:24, 55:6, 65:15, 88:7, 88:8, 88:9, 93:3, 93:5, 94:11
**Maryland** [6] - 1:25, 136:16, 146:11, 152:24, 156:18, 165:10
**MARYLAND** [2] - 1:1, 1:9
**mask** [1] - 66:20
**masks** [2] - 2:12, 2:14
**material** [5] - 147:6, 147:11, 147:13, 147:15, 147:17
**material's** [1] - 147:15
**materials** [1] - 36:16
**matter** [19] - 4:6, 4:7, 20:1, 38:23, 75:7, 79:14, 114:17, 117:2, 125:17,

126:23, 139:8, 143:10, 169:17, 170:6, 170:16, 175:4, 175:5, 185:18
**matters** [6] - 45:11, 116:2, 133:5, 133:7, 179:12, 179:14
**maximum** [1] - 49:9
**MCTC** [6] - 49:12, 49:13, 49:14, 52:12, 52:13
**mean** [21] - 28:11, 32:7, 46:23, 49:17, 51:4, 55:18, 56:7, 60:10, 61:2, 65:17, 68:17, 74:24, 76:12, 87:25, 92:6, 119:21, 131:13, 150:11, 150:23, 155:5, 160:6
**meaning** [7] - 55:17, 56:10, 69:15, 73:17, 74:9, 77:11, 162:23
**means** [16] - 11:2, 20:4, 35:15, 70:25, 85:25, 134:4, 137:22, 152:7, 155:4, 155:23, 155:25, 159:25, 160:2, 161:6, 161:10, 169:12
**meant** [3] - 10:14, 27:24, 74:23
**meanwhile** [1] - 9:5
**measured** [1] - 140:5
**media** [1] - 4:13
**medical** [1] - 134:18
**medication** [2] - 52:23
**meet** [2] - 7:24, 15:1
**meeting** [7] - 7:19, 49:12, 49:13, 49:14, 178:14, 182:14
**meetings** [2] - 24:21, 30:24
**Melissa** [2] - 185:16, 185:21
**melissa** [1] - 1:23
**member** [15] - 137:9, 138:19, 138:23, 139:10, 139:11, 140:6, 140:15, 140:17, 141:7, 142:4, 142:11, 142:22, 142:24, 144:21, 145:2
**members** [19] - 22:5, 22:12, 25:1, 25:2, 37:1, 63:13, 64:10, 116:7, 137:18, 138:21, 140:16, 142:7, 142:9,

142:13, 145:9, 145:10, 145:21, 173:4
**memorable** [3] - 106:12, 106:14, 106:16
**Memorial** [1] - 11:5
**memory** [5] - 31:18, 63:18, 93:19, 96:17
**men** [2] - 89:19, 113:24
**mention** [5] - 61:8, 65:16, 70:2, 74:23, 96:8
**mentioned** [6] - 89:4, 97:1, 121:2, 122:4, 165:21, 175:4
**mentioning** [1] - 109:19
**mentions** [3] - 59:25, 63:1, 84:15
**menus** [3] - 2:17, 2:22, 181:25
**mere** [1] - 140:13, 140:15, 140:20, 141:2, 151:21, 152:4, 152:6, 160:12, 161:12, 172:8
**merely** [4] - 118:18, 133:14, 141:6, 172:11
**mess** [2] - 48:24, 96:14
**message** [3] - 34:15, 81:11, 98:16
**messaged** [1] - 11:7
**messages** [9] - 11:8, 30:22, 34:8, 34:9, 57:25, 98:9, 98:11, 98:13, 98:15
**messing** [2] - 76:7, 100:11
**met** [9] - 4:20, 7:14, 29:3, 29:7, 76:4, 91:1, 118:14, 120:17, 137:18
**metal** [2] - 59:4, 59:6
**methadone** [1] - 22:17
**MF** [1] - 60:4
**MF-ing** [1] - 60:4
**MFer** [1] - 60:18
**midnight** [6] - 15:12, 43:10, 44:17, 71:20, 76:19, 94:23
**might** [19] - 20:25, 21:1, 42:8, 81:25, 92:22, 92:23, 93:5, 101:7, 112:19, 118:1, 126:13,

151:4, 158:1, 158:17, 163:1, 174:13, 176:7, 180:23
**Mike** [1] - 56:14
**miked** [1] - 52:13
**mile** [1] - 72:1
**miles** [1] - 3:14
**military** [3] - 38:4, 38:6, 53:14
**mind** [16] - 5:18, 56:12, 56:24, 83:1, 120:9, 124:12, 127:16, 130:4, 134:15, 134:16, 134:19, 134:21, 143:7, 149:25, 150:5, 169:21
**mine** [2] - 66:23, 103:2
**minimum** [3] - 70:24, 70:25, 71:2
**minor** [1] - 140:9
**minute** [11] - 10:12, 15:18, 18:20, 21:23, 30:10, 36:15, 81:2, 81:6, 143:3, 143:5, 143:22
**minutes** [21] - 13:19, 14:17, 16:15, 17:12, 31:4, 36:17, 38:22, 44:19, 47:15, 53:20, 70:2, 71:7, 72:2, 79:4, 80:15, 82:8, 84:17, 146:2, 156:9, 182:8
**missed** [3] - 18:22, 55:14, 107:4
**missing** [1] - 34:10
**mistake** [11] - 5:20, 20:24, 45:22, 81:4, 132:18, 133:25, 134:9, 134:13, 149:9, 155:25, 160:2
**mistakes** [2] - 179:22, 179:25
**mixture** [3] - 41:10, 136:20, 146:13
**molestation** [1] - 84:7
**molested** [1] - 53:2
**Molock** [1] - 64:21
**Molock's** [1] - 52:4
**moment** [15] - 5:1, 26:18, 78:1, 87:14, 93:24, 104:7, 117:24, 120:7, 120:9, 158:12, 159:14, 164:23, 167:8, 175:21, 179:12
**moments** [1] - 97:13

**Monday** [4] - 11:5, 11:13, 27:3, 27:4
**money** [19] - 10:1, 10:9, 10:21, 13:6, 13:8, 21:18, 21:20, 23:11, 23:12, 24:19, 24:25, 28:10, 49:5, 49:11, 71:18, 76:16, 76:17, 162:13
**monitor** [1] - 37:5
**monitoring** [2] - 101:15, 101:16
**monster** [2] - 35:4, 35:6
**month** [1] - 44:10
**months** [2] - 6:19, 65:10
**mood** [1] - 62:16
**moreover** [2] - 139:12, 141:5
**morning** [30] - 2:9, 2:10, 2:21, 2:23, 3:9, 3:10, 11:16, 16:16, 17:10, 17:15, 19:17, 27:7, 27:18, 27:19, 30:21, 31:2, 32:2, 42:24, 43:11, 44:17, 45:23, 45:25, 46:3, 58:1, 58:2, 65:3, 164:25, 181:16, 183:24
**most** [16] - 39:10, 49:21, 64:19, 67:2, 68:15, 71:12, 90:7, 94:15, 97:9, 97:19, 104:4, 119:23, 120:4, 147:23, 169:16
**mostly** [2] - 22:2, 22:3
**mother** [4] - 25:12, 60:13, 60:15, 73:4
**mother's** [2] - 3:21, 7:11
**motherfucker** [2] - 73:20, 74:4
**motherfuckin'** [1] - 73:7
**motherfucking** [2] - 73:22, 73:23
**motivate** [1] - 131:2
**motivated** [1] - 129:2
**motivation** [2] - 129:3, 129:5
**motive** [20] - 35:15, 80:23, 89:23, 90:13, 91:10, 105:17, 105:19, 107:22, 109:25, 111:20, 113:13, 126:12, 127:11, 130:9,

135:8, 135:10, 135:11, 135:13, 135:14, 135:15
**mountains** [1] - 60:16
**mouth** [3] - 3:23, 22:9, 165:16
**move** [11] - 4:20, 4:22, 14:6, 14:8, 21:24, 26:21, 91:22, 94:25, 95:1, 152:16, 181:20
**moved** [7] - 6:17, 7:21, 7:23, 14:23, 15:5, 55:10, 96:17
**movement** [4] - 14:19, 161:24
**moves** [2] - 43:13, 93:25
**moving** [6] - 14:18, 53:19, 68:8, 92:17, 94:24, 95:1
**MR** [10] - 37:17, 37:25, 68:12, 68:21, 68:24, 69:2, 69:5, 79:24, 80:9, 183:18
**MS** [16] - 2:6, 2:8, 3:10, 10:24, 13:3, 14:15, 26:18, 26:24, 28:23, 68:11, 180:1, 180:3, 180:19, 180:21, 183:5, 183:9
**multiple** [11] - 39:13, 47:5, 49:23, 49:24, 71:16, 78:7, 82:23, 85:8, 113:17, 165:16
**mumbling** [2] - 20:15, 21:4
**murder** [35] - 4:3, 5:8, 5:16, 6:2, 6:3, 6:14, 14:9, 31:13, 40:22, 47:14, 54:11, 73:2, 73:3, 78:10, 86:22, 99:4, 100:8, 102:9, 106:8, 106:15, 106:20, 107:21, 157:7, 165:17, 166:4, 166:5, 166:9, 167:7, 167:8, 168:11, 168:19, 168:21, 168:23, 168:25
**murdered** [1] - 166:15
**murders** [28] - 4:7, 4:23, 6:9, 7:2, 10:12, 11:5, 14:1, 14:23, 17:25, 19:5, 21:3, 23:1, 23:8, 24:2, 27:4, 27:16, 29:10, 30:12, 31:9, 35:16, 35:24, 95:16, 96:11, 99:7, 108:22, 114:9

**Murray** [1] - 1:18
**Muslim** [1] - 9:11
**must** [101] - 38:20, 47:25, 55:17, 55:18, 115:9, 116:2, 116:5, 116:13, 117:15, 117:16, 118:5, 118:8, 118:24, 119:15, 119:25, 121:15, 122:14, 125:10, 126:21, 128:3, 128:13, 130:9, 130:24, 131:25, 133:22, 134:11, 137:3, 137:24, 138:16, 138:20, 139:4, 141:9, 141:14, 142:18, 143:17, 146:4, 146:22, 147:3, 147:6, 147:18, 147:19, 149:4, 149:6, 149:12, 149:14, 149:20, 149:23, 150:5, 150:10, 150:11, 151:16, 151:23, 152:17, 153:15, 153:25, 154:23, 155:5, 155:22, 156:4, 157:21, 158:14, 159:15, 159:21, 160:4, 160:6, 160:15, 161:3, 161:14, 161:16, 162:16, 163:6, 163:9, 163:14, 163:16, 166:22, 167:4, 167:9, 168:12, 168:18, 169:1, 169:13, 169:19, 169:23, 169:25, 170:4, 171:18, 171:25, 172:6, 172:16, 173:3, 173:8, 174:7, 174:10, 176:21, 176:25, 177:1, 177:14, 177:23, 177:25
**muttering** [1] - 94:19
**mutual** [1] - 137:24

# N

**Nah** [1] - 72:16
**name** [13] - 32:17, 32:19, 33:4, 34:13, 48:24, 53:13, 62:7, 64:22, 75:19, 117:6,

157:10
**named** [1] - 93:6
**namely** [1] - 165:14
**names** [3] - 49:22, 124:22, 147:14
**narcotic** [5] - 146:24, 146:25, 147:1, 147:5, 149:19
**narcotics** [23] - 136:6, 146:8, 147:7, 147:17, 149:6, 149:7, 149:11, 149:12, 149:15, 149:22, 150:3, 150:9, 150:11, 150:15, 150:23, 150:25, 151:6, 159:1, 159:4, 163:20, 163:21, 163:22, 163:24
**narrow** [1] - 143:2
**national** [1] - 117:21
**natural** [2] - 164:15, 174:18
**nature** [11] - 39:1, 53:18, 111:23, 111:24, 112:9, 112:11, 118:1, 128:13, 138:6, 141:24, 149:16
**near** [6] - 12:13, 51:19, 60:16, 98:2, 148:21, 160:12
**nearby** [1] - 51:19
**necessarily** [7] - 119:22, 131:13, 140:22, 150:23, 155:5, 183:19, 185:14
**necessary** [6] - 135:8, 141:8, 152:4, 160:20, 171:1, 171:21
**neck** [2] - 3:23, 70:12
**need** [27] - 13:4, 13:6, 14:12, 28:10, 28:24, 29:10, 29:11, 44:4, 44:6, 58:17, 68:13, 89:2, 112:21, 116:22, 137:18, 137:20, 139:10, 139:11, 139:13, 139:16, 148:2, 158:20, 164:13, 168:10, 168:14, 178:15, 179:12
**needed** [7] - 10:21, 13:21, 90:14, 100:20, 110:8, 160:10, 170:10

**needs** [1] - 48:22
**negative** [1] - 106:1
**negligence** [2] - 134:9, 149:9
**neighbor** [2] - 46:7, 46:12
**neighbors** [1] - 19:22
**nephew** [4] - 24:2, 25:5, 27:1, 109:21
**nephews** [2] - 13:25, 14:2
**nerve** [1] - 40:10
**network** [2] - 18:8, 18:19
**never** [42] - 15:3, 26:15, 31:2, 32:25, 33:1, 35:25, 40:5, 46:24, 47:12, 47:17, 48:9, 48:12, 51:12, 51:15, 55:19, 63:20, 63:25, 66:9, 68:5, 72:16, 72:17, 74:16, 75:5, 75:12, 80:10, 81:10, 81:17, 83:22, 95:5, 96:4, 99:10, 103:18, 109:3, 113:20, 115:16, 119:16, 119:17, 123:22, 123:23, 144:16, 145:8
**new** [3] - 7:19, 8:18, 32:21
**New** [1] - 54:10
**next** [25] - 4:17, 11:16, 15:18, 16:16, 17:2, 23:17, 38:4, 45:5, 45:18, 46:6, 46:12, 46:15, 52:8, 58:1, 58:4, 83:16, 83:20, 100:9, 109:5, 111:14, 138:21, 143:10, 159:21, 181:6
**next-door** [2] - 46:6, 46:12
**nice** [2] - 79:22, 94:2
**niece** [1] - 16:3
**niece's** [2] - 51:22, 52:8
**night** [39] - 4:7, 7:18, 7:19, 13:25, 14:1, 14:9, 14:22, 15:6, 15:9, 15:13, 16:3, 29:10, 31:12, 31:17, 31:22, 31:23, 32:2, 47:13, 58:7, 58:11, 73:9, 73:21, 77:3, 83:18, 91:23, 92:9, 94:7, 96:16, 96:21, 96:23, 96:24, 97:1,

97:3, 97:18, 99:16, 100:1, 106:19, 108:9
**nightmare** [3] - 64:1, 104:10, 112:4
**nightmares** [15] - 24:13, 24:14, 24:15, 34:18, 36:2, 36:4, 53:18, 63:23, 63:25, 83:25, 84:2, 84:5, 84:17, 84:21
**nighttime** [12] - 31:20, 57:10, 57:11, 57:13, 57:16, 57:21, 57:22, 58:5, 58:13, 106:21, 107:3
**nine** [2] - 53:15, 64:15
**nine-year-old** [1] - 53:15
**NO** [1] - 1:3
**nobody** [10] - 19:22, 20:5, 73:13, 74:4, 80:18, 81:16, 86:21, 104:1, 110:10
**noise** [1] - 37:13
**non** [1] - 102:1
**non-functioning** [1] - 102:1
**none** [3] - 20:19, 65:24, 105:17
**nonstop** [1] - 19:20
**noon** [4] - 11:22, 31:6, 94:22, 96:7
**noose** [1] - 70:11
**normal** [1] - 56:7
**normally** [5] - 54:13, 56:24, 61:2, 68:14, 162:24
**northern** [2] - 62:1
**NORTHERN** [1] - 1:2
**nose** [4] - 66:18, 66:19, 66:22
**note** [7] - 152:14, 176:11, 178:16, 179:1, 179:3, 179:5
**NOTE** [1] - 185:13
**noted** [2] - 146:1, 178:10
**notes** [5] - 1:21, 40:3, 40:6, 63:18, 103:1
**nothing** [19] - 20:4, 32:24, 42:16, 48:2, 50:16, 55:19, 70:5, 73:19, 74:20, 76:2, 85:21, 85:22, 86:5, 96:2, 105:18, 106:2, 106:12, 130:15, 154:17
**noticed** [1] - 97:10
**November** [3] - 48:22, 49:3, 110:17

**nowhere** [1] - 20:16
**number** [9] - 12:4, 21:6, 43:3, 61:12, 75:21, 75:23, 75:24, 153:4, 180:15
**numbers** [3] - 49:23, 61:18, 115:5
**numbing** [1] - 143:7
**numerous** [1] - 110:12
**nuts** [4] - 34:23, 34:25, 65:4, 112:3

## O

**o'clock** [10] - 19:21, 43:11, 44:17, 44:18, 46:17, 46:21, 71:22, 71:23
**oath** [9] - 54:16, 56:19, 56:20, 68:4, 88:24, 102:22, 108:17, 118:3, 131:24
**object** [5] - 137:21, 137:23, 147:24, 148:3, 148:5
**objection** [2] - 180:18, 180:20
**objections** [4] - 116:19, 179:22, 179:23, 179:25
**objective** [3] - 139:3, 144:17, 145:9
**objectives** [4] - 134:12, 139:17, 141:7, 141:10
**obligation** [3] - 87:16, 105:6, 123:18
**observations** [1] - 102:20
**observe** [2] - 115:14, 126:18
**observed** [1] - 125:14
**obstructs** [1] - 161:23
**obtain** [3] - 130:7, 163:8, 164:18
**obtained** [5] - 47:17, 130:21, 145:8, 162:11, 163:12
**obtaining** [3] - 86:9, 152:7, 162:4
**obvious** [1] - 115:15
**obviously** [7] - 2:12, 58:14, 62:6, 74:20, 74:23, 171:15, 182:4
**occasion** [1] - 132:5
**occasionally** [1] - 106:21
**occurred** [3] - 106:19, 135:6, 168:13

**occurrence** [2] - 134:23, 135:3
**occurring** [1] - 139:25
**October** [2] - 110:15, 136:15
**october** [1] - 51:15
**OF** [2] - 1:1, 1:3
**offense** [22] - 113:1, 119:5, 119:6, 137:11, 138:17, 146:23, 151:12, 152:7, 154:22, 165:14, 165:25, 171:5, 171:6, 171:8, 171:10, 171:12, 173:1, 173:15, 173:16, 173:22, 174:1, 174:4
**offenses** [1] - 5:3
**offer** [2] - 23:20, 120:11
**offered** [3] - 22:15, 33:3, 122:22
**offering** [1] - 119:23
**officer** [17] - 25:18, 25:19, 165:13, 165:23, 167:2, 167:12, 167:15, 167:16, 167:18, 167:19, 167:24, 168:2, 168:7, 168:15, 179:2
**officers** [7] - 21:8, 47:7, 165:7, 167:16, 167:17, 168:2, 168:5
**Official** [2] - 1:24, 185:22
**official** [3] - 82:13, 131:12
**officials** [1] - 131:11
**often** [8] - 8:18, 134:15, 134:24, 134:25, 138:10, 142:1, 150:18
**old** [15] - 38:12, 45:17, 53:15, 54:10, 64:15, 72:20, 73:25, 86:6, 100:3, 106:15, 157:13, 165:5, 165:15, 173:13
**old-fashioned** [1] - 86:6
**older** [2] - 71:3, 174:4
**omitted** [1] - 174:19
**once** [11] - 4:24, 9:22, 11:20, 15:20, 51:13, 61:6, 66:8, 66:14, 68:4, 118:8, 139:17
**one** [115] - 4:5, 6:3, 8:15, 10:8, 18:17,

18:18, 18:21, 26:14, 29:4, 30:8, 31:10, 31:12, 33:4, 33:6, 33:7, 35:11, 35:12, 35:14, 38:10, 39:8, 39:12, 39:14, 39:15, 39:17, 39:19, 41:18, 43:6, 44:15, 44:21, 45:1, 45:16, 45:21, 46:9, 48:3, 48:4, 54:12, 54:15, 55:15, 56:2, 56:11, 57:12, 58:12, 60:9, 62:25, 63:9, 65:23, 66:6, 69:15, 69:25, 71:5, 72:1, 74:2, 76:6, 77:14, 78:23, 80:12, 81:9, 87:2, 93:23, 94:15, 95:23, 100:3, 103:8, 107:20, 112:22, 112:25, 114:24, 114:25, 119:5, 119:20, 122:25, 124:17, 124:24, 129:3, 129:4, 139:20, 140:16, 143:6, 143:17, 148:14, 148:15, 152:5, 152:21, 153:2, 153:3, 153:10, 153:20, 154:4, 154:9, 154:12, 155:14, 155:15, 156:20, 158:7, 158:22, 159:18, 162:15, 163:18, 167:17, 168:6, 170:16, 171:15, 172:13, 173:21, 173:25, 175:5, 176:12, 177:10, 178:20, 179:8
**one's** [6] - 134:5, 134:16, 134:19, 134:21, 160:21, 161:7
**one-sided** [1] - 54:12
**one-third** [1] - 72:1
**one-year-old** [1] - 100:3
**ones** [1] - 112:18
**ongoing** [1] - 139:20
**open** [4] - 16:10, 20:12, 37:2, 91:13
**opening** [11] - 18:11, 86:15, 89:4, 89:18, 91:8, 93:11, 95:11, 96:19, 97:6, 111:22, 116:17

**opens** [1] - 34:5
**opinion** [9] - 40:16, 89:17, 116:22, 133:6, 133:9, 133:14, 133:16, 177:6, 177:16
**opinions** [2] - 133:5, 133:10
**opportunity** [6] - 35:15, 81:2, 113:14, 125:1, 125:2, 126:18
**opposite** [3] - 43:1, 43:23, 66:21
**order** [23] - 4:15, 4:19, 7:9, 7:11, 106:24, 123:6, 133:21, 137:2, 137:17, 139:14, 146:21, 148:3, 151:14, 151:23, 153:16, 161:15, 164:18, 165:5, 166:21, 170:4, 170:9, 171:3, 171:20
**orders** [1] - 2:14
**ordinance** [1] - 153:3
**ordinarily** [3] - 133:12, 179:19, 180:4
**ordinary** [4] - 130:6, 130:25, 131:15, 162:23
**organize** [1] - 36:16
**origin** [1] - 117:21
**outcome** [5] - 127:10, 127:11, 127:15, 127:20, 131:19
**outgoing** [4] - 18:20, 43:18, 43:24
**outlandish** [1] - 168:16
**outnumbered** [1] - 177:22
**outright** [1] - 10:3
**outset** [1] - 7:6
**outside** [16] - 27:11, 46:4, 51:17, 51:18, 51:24, 52:7, 57:11, 57:23, 58:3, 87:3, 88:19, 97:17, 109:4, 122:14, 163:19, 179:2
**overarching** [1] - 105:14
**overflowed** [1] - 113:25
**overnight** [1] - 11:16
**overstatement** [1] - 82:1
**overt** [1] - 172:7
**overview** [1] - 80:20

**overwhelming** [2] - 113:11, 113:12
**own** [25] - 22:9, 22:16, 24:1, 41:16, 45:11, 47:3, 50:17, 50:18, 84:14, 88:13, 89:16, 91:24, 92:15, 93:4, 111:1, 116:13, 120:1, 122:19, 127:13, 129:15, 130:7, 132:24, 139:5, 177:13, 178:19
**owner** [1] - 68:7
**ownership** [1] - 155:21
**owns** [1] - 107:22

## P

**p.m** [18] - 11:10, 11:12, 12:18, 15:15, 17:18, 18:7, 19:2, 19:14, 19:21, 20:8, 30:12, 31:7, 79:17, 80:4, 179:18, 181:10, 182:17, 184:3
**pacing** [2] - 20:13, 94:19
**pack** [2] - 43:3, 61:9
**package** [2] - 38:24, 101:15
**packaging** [2] - 106:12, 151:3
**page** [12] - 54:24, 55:3, 56:23, 57:12, 57:21, 61:15, 72:7, 72:9, 108:25, 109:5, 115:4, 156:12
**PAGE** [1] - 185:2
**paid** [7] - 24:3, 48:5, 52:12, 76:15, 77:3, 105:3
**pajama** [2] - 38:15, 46:5
**pandemic** [2] - 181:18, 182:6
**panicking** [1] - 30:16
**paper** [1] - 73:23
**para** [1] - 153:3
**Paralegal** [2] - 1:18, 1:19
**paranoid** [1] - 59:7
**paraphernalia** [1] - 151:2
**paren** [1] - 101:16
**Parker** [1] - 47:2
**parole** [6] - 49:9, 70:22, 70:23, 71:2,

166:2
**Part** [1] - 152:15
**part** [17] - 6:14, 87:25, 88:4, 89:24, 101:14, 106:8, 115:3, 128:5, 133:2, 138:14, 139:15, 143:7, 144:22, 160:18, 161:14, 161:22, 166:11
**partially** [1] - 101:1
**participant** [2] - 138:13, 141:17
**participants** [2] - 173:21, 173:25
**participate** [4] - 139:1, 145:14, 171:22, 172:21
**participated** [3] - 141:9, 172:5, 173:19
**participation** [6] - 139:4, 140:3, 140:6, 141:1, 141:3, 174:1
**particular** [8] - 5:18, 38:12, 71:13, 128:14, 164:9, 168:2, 170:8, 174:7
**particularly** [1] - 57:19
**parties** [8] - 115:21, 117:10, 122:5, 122:25, 123:3, 138:8, 154:6, 156:7
**partner** [1] - 47:1
**partnership** [1] - 142:1
**partnerships** [1] - 142:2
**parts** [4] - 65:20, 111:5, 175:11, 175:19
**party** [8] - 7:15, 62:16, 62:19, 116:24, 117:8, 119:20, 120:4, 125:1
**pass** [2] - 116:6, 116:8
**passed** [1] - 45:18
**past** [12] - 15:21, 15:25, 16:1, 19:8, 24:24, 33:14, 33:20, 67:5, 92:25, 95:25, 98:25, 134:19
**pattern** [7] - 25:25, 41:2, 41:3, 81:12, 107:4, 107:8, 166:12
**patterns** [1] - 88:13
**Paul** [1] - 1:12
**pause** [4] - 21:23, 42:16, 108:16, 143:12
**pay** [8] - 23:15, 28:2,

35:11, 35:12, 35:13, 48:23, 62:25, 115:9
**paying** [2] - 71:18, 76:17
**pendency** [1] - 140:1
**pending** [1] - 166:2
**Pennsylvania** [1] - 69:15
**people** [43] - 6:5, 9:8, 14:5, 14:6, 21:25, 22:2, 22:3, 25:8, 30:8, 51:8, 51:23, 52:9, 52:23, 55:19, 56:3, 56:7, 56:19, 63:5, 65:24, 82:22, 82:23, 86:17, 90:2, 92:20, 100:4, 102:5, 102:6, 102:11, 105:5, 110:9, 111:23, 111:25, 112:10, 112:11, 124:12, 128:5, 138:1, 142:2, 180:7, 180:15, 180:16
**people's** [2] - 72:22, 72:25
**Percocet** [4] - 9:4, 10:15, 41:10, 71:19
**perfect** [1] - 109:18
**perfectly** [1] - 123:2
**perform** [4] - 116:23, 116:25, 140:7
**perhaps** [3] - 48:12, 156:9, 180:22
**period** [3] - 61:13, 170:8, 170:13
**period's** [1] - 63:2
**Perkins** [23] - 11:18, 12:4, 15:8, 41:22, 42:10, 44:5, 44:8, 44:13, 46:19, 53:25, 54:17, 56:20, 62:8, 62:10, 67:14, 67:15, 67:20, 67:24, 69:12, 75:20, 77:5, 83:7, 88:10
**permit** [1] - 167:11
**permitted** [4] - 128:3, 129:24, 133:4, 133:6
**perpetrate** [1] - 166:8
**perpetrated** [4] - 166:6, 166:11, 166:13, 168:23
**perpetration** [1] - 166:8
**person** [67] - 19:1, 35:14, 42:22, 65:24, 66:19, 67:1, 67:2, 73:24, 80:12, 80:25, 88:11, 91:3, 93:13,

94:8, 102:23, 113:13, 121:5, 126:22, 126:24, 133:23, 134:4, 134:9, 135:24, 138:14, 140:18, 146:18, 148:1, 148:2, 148:10, 148:14, 148:15, 148:24, 150:1, 150:20, 152:9, 152:20, 153:9, 155:14, 155:15, 157:15, 157:16, 160:21, 161:7, 162:1, 162:15, 162:25, 163:1, 165:11, 165:12, 165:22, 167:1, 167:11, 169:22, 169:24, 170:11, 171:5, 171:9, 171:11, 171:14, 171:17, 173:19, 173:21, 173:25, 174:17, 178:12
**person's** [3] - 134:15, 148:8, 155:4
**personal** [13] - 117:20, 120:1, 129:3, 129:15, 131:18, 150:16, 150:17, 150:22, 162:4, 162:7, 162:12, 163:22, 174:10
**personally** [4] - 130:17, 144:10, 145:14, 150:12
**personnel** [1] - 37:4
**persons** [10] - 117:22, 124:22, 137:5, 137:12, 141:21, 142:13, 165:23, 166:16, 166:17, 166:19
**persuaded** [1] - 120:4
**pertinent** [1] - 161:22
**pestered** [1] - 9:3
**phone** [97] - 4:12, 11:1, 11:7, 11:8, 11:11, 11:14, 12:3, 12:19, 12:20, 12:22, 12:25, 13:17, 13:18, 15:3, 15:14, 15:15, 15:20, 17:11, 17:17, 17:23, 18:2, 18:6, 18:7, 18:12, 18:13, 18:15, 18:17, 18:20, 18:22, 19:2, 19:3, 19:7, 19:8, 19:10,

19:18, 19:20, 20:9, 20:15, 21:6, 28:5, 30:12, 30:19, 30:22, 32:20, 32:21, 34:3, 43:9, 43:13, 44:16, 46:18, 47:11, 57:4, 61:9, 61:11, 61:12, 67:11, 67:18, 69:18, 70:7, 75:21, 75:22, 76:20, 77:10, 77:11, 81:3, 81:11, 81:13, 81:15, 83:12, 86:9, 86:11, 87:25, 93:23, 93:25, 94:4, 94:6, 95:10, 95:15, 98:5, 98:10, 98:12, 98:18, 98:21, 98:22, 99:1, 99:4, 99:6, 99:8, 106:18, 106:22, 112:23, 112:25, 113:15, 183:20
**phones** [4] - 11:9, 19:18, 37:3, 37:5
**phony** [2] - 72:25, 76:13
**photo** [3] - 34:14, 76:4, 108:25
**photograph** [3] - 48:4, 67:3, 67:4
**photographs** [3] - 47:25, 48:1, 48:3
**photos** [2] - 16:22, 43:5
**physical** [13] - 4:13, 86:9, 147:24, 148:2, 148:6, 148:10, 151:2, 155:11, 161:6, 162:1, 163:2, 163:3, 163:4
**physically** [4] - 155:6, 160:20, 170:23, 171:2
**pick** [14] - 21:12, 23:5, 44:4, 57:3, 57:7, 57:14, 61:1, 62:8, 75:8, 102:15
**picked** [6] - 16:17, 24:7, 54:20, 77:9, 81:11, 102:16
**picking** [2] - 58:6
**picks** [3] - 57:15, 57:16, 88:10
**picture** [4] - 46:7, 66:21, 93:6, 101:18
**pictures** [3] - 29:5, 66:25, 76:21
**piece** [1] - 10:2
**pill** [1] - 71:19
**pillow** [3] - 60:1, 60:2, 100:18

**pink** [2] - 16:12, 19:15
**pistol** [1] - 153:3
**Pittman** [2] - 19:21, 45:15
**place** [8] - 60:7, 103:7, 123:5, 135:7, 160:22, 161:8, 163:18, 171:17
**placed** [2] - 48:4, 132:9
**places** [1] - 42:22
**plain** [1] - 18:16
**Plaintiff** [2] - 1:3, 1:10
**plan** [6] - 45:4, 139:19, 140:25, 141:3, 151:4, 162:2
**planned** [4] - 144:13, 145:3, 152:13, 162:21
**planning** [4] - 83:14, 127:24, 152:6, 170:3
**plans** [5] - 83:23, 145:14, 145:16, 145:17, 145:23
**plastic** [1] - 16:9
**play** [9] - 10:11, 12:25, 24:17, 26:15, 59:16, 84:24, 84:25, 140:8, 140:9
**played** [17] - 10:23, 13:2, 14:14, 26:17, 26:23, 28:22, 32:3, 59:11, 59:16, 66:11, 70:8, 74:15, 74:19, 74:22, 85:8, 101:19
**playing** [1] - 62:16
**plea** [1] - 129:24
**plead** [3] - 129:9, 129:13, 129:14
**pled** [4] - 22:23, 89:23, 104:14, 129:20
**plug** [4] - 26:20, 91:25, 92:1, 92:17
**plus** [1] - 112:25
**pocket** [3] - 45:3, 45:13, 69:16
**poetic** [1] - 71:12
**poignant** [1] - 71:12
**point** [30] - 8:23, 33:19, 43:20, 44:23, 46:2, 48:3, 50:10, 55:1, 58:10, 61:14, 63:3, 63:7, 69:18, 70:20, 71:24, 73:6, 84:11, 85:22, 86:19, 111:23, 115:21, 130:18, 179:24, 180:10, 182:18, 183:7, 183:8, 183:19
**pointed** [5] - 4:10,

**pink** [continued]
73:18, 86:7, 86:13, 105:18
**pointing** [1] - 80:18
**points** [4] - 56:21, 80:12, 80:14, 80:22
**poison** [1] - 166:6
**poles** [1] - 12:10
**police** [27] - 4:8, 9:19, 21:8, 27:9, 30:23, 32:16, 33:4, 35:25, 45:10, 47:7, 48:18, 50:9, 50:13, 50:15, 53:15, 75:13, 75:14, 81:5, 89:7, 92:3, 95:13, 95:18, 97:18, 98:2, 99:1, 113:17
**Police** [7] - 15:7, 21:2, 23:14, 30:24, 69:10, 80:17, 96:18
**ponit** [1] - 183:3
**Poo** [11] - 15:23, 17:20, 34:13, 41:5, 54:25, 55:7, 56:6, 58:19, 61:1, 83:19, 92:12
**Poo's** [1] - 12:4
**poor** [1] - 59:14
**popularity** [2] - 71:14, 71:16
**portion** [4] - 5:9, 13:1, 26:16, 85:5
**portions** [1] - 176:8
**position** [2] - 37:7, 148:15
**positive** [2] - 96:19, 180:16
**possess** [16] - 135:19, 136:8, 136:19, 136:25, 137:6, 137:14, 144:18, 145:11, 146:19, 151:1, 153:11, 153:12, 154:13, 155:3, 158:25, 161:10
**possessed** [35] - 6:12, 6:22, 7:1, 144:10, 144:14, 144:22, 145:3, 146:13, 146:24, 146:25, 147:1, 147:5, 147:20, 148:18, 148:19, 149:3, 149:5, 149:7, 149:12, 149:15, 149:18, 149:22, 150:3, 150:21, 152:22, 153:2, 153:22, 155:1, 155:18, 155:19,

**possessed** [continued]
155:23, 157:3, 158:5, 159:19
**possesses** [4] - 148:14, 155:8, 155:14, 157:18
**possessing** [4] - 6:15, 147:7, 154:2, 156:6
**possession** [50] - 6:9, 6:24, 135:21, 135:23, 146:7, 146:9, 147:21, 147:23, 147:24, 148:1, 148:3, 148:6, 148:8, 148:12, 148:13, 148:17, 148:20, 149:8, 149:11, 149:17, 150:16, 150:19, 150:22, 151:6, 151:9, 151:12, 151:15, 151:19, 152:19, 153:23, 154:21, 155:6, 155:9, 155:11, 155:12, 155:13, 155:15, 155:17, 156:14, 159:3, 159:22, 160:12, 160:21, 161:2, 161:3, 161:4, 161:6, 161:12, 175:3
**possibility** [3] - 70:22, 71:1
**possible** [11] - 62:21, 101:6, 115:11, 133:17, 148:15, 150:18, 155:15, 165:25, 167:2, 167:13
**possibly** [2] - 38:4, 176:8
**Post** [1] - 42:4
**Post-arrest** [1] - 42:4
**posted** [1] - 7:17
**posts** [1] - 34:14
**potential** [2] - 117:15, 163:17
**Powell** [12] - 14:1, 14:16, 15:1, 29:9, 33:7, 70:8, 87:19, 87:23, 88:10, 88:16, 88:18, 110:5
**Powells** [1] - 93:23
**power** [7] - 148:16, 148:18, 155:9, 155:16, 155:18, 160:23, 161:9
**PowerPoint** [4] - 38:2, 38:24, 52:1, 57:19
**PowerPoints** [1] -

**PowerPoints** [continued]
57:20
**practice** [1] - 166:12
**pre** [1] - 69:22
**pre-Grand** [1] - 69:22
**precaution** [1] - 180:14
**precautions** [5] - 179:20, 180:8, 180:24, 181:17, 182:5
**precise** [3] - 92:8, 93:24, 137:22
**predicate** [5] - 156:11, 157:24, 158:5, 158:6, 158:16, 158:20, 158:22, 158:23, 159:2, 159:6, 159:18, 159:19, 161:4, 161:18
**predicated** [1] - 158:18
**prefer** [1] - 183:22
**prejudice** [3] - 116:24, 118:8, 126:14
**prejudiced** [1] - 127:5
**preliminary** [1] - 179:12
**premeditated** [3] - 166:7, 166:13, 168:23
**premeditation** [5] - 169:7, 170:2, 170:9, 170:10
**preparation** [2] - 152:4, 152:6
**preparations** [1] - 152:8
**prepared** [2] - 38:2, 178:17
**presence** [5] - 124:5, 135:14, 140:14, 162:12, 172:8
**Present** [1] - 1:16
**present** [11] - 4:15, 39:17, 56:3, 63:9, 70:6, 71:5, 123:18, 124:7, 148:23, 160:9, 177:10
**presented** [4] - 48:20, 121:2, 123:3, 151:7
**presenting** [1] - 114:5
**preserved** [1] - 179:22
**preside** [2] - 115:24, 178:12
**presiding** [2] - 36:22, 79:20
**press** [1] - 51:5
**pressed** [1] - 3:24
**presumed** [1] - 120:12

**presumption** [2] - 117:22, 119:9
**pretty** [5] - 7:25, 66:19, 90:3, 175:13
**prevail** [1] - 176:21
**prevent** [13] - 7:4, 7:11, 136:4, 165:2, 165:6, 165:12, 165:22, 166:25, 167:11, 167:14, 168:1, 168:9, 175:16
**prevention** [1] - 167:21
**Prevention** [1] - 146:17
**previously** [6] - 6:18, 103:20, 111:9, 152:25, 159:1, 159:4
**price** [5] - 10:18, 10:20, 10:22, 11:3, 13:15
**priest** [1] - 68:14
**primary** [1] - 47:5
**prime** [1] - 117:3
**principal** [1] - 115:12
**principle** [1] - 116:3
**prints** [2] - 101:3, 101:5
**prison** [1] - 152:22
**pristine** [1] - 48:2
**private** [1] - 65:20
**privates** [1] - 84:3
**proactive** [1] - 105:4
**probable** [1] - 174:18
**probation** [2] - 23:15, 166:1
**problem** [2] - 10:4, 69:1
**problems** [1] - 8:8
**procedure** [2] - 123:1, 180:8
**proceed** [5] - 2:3, 3:7, 79:23, 79:25, 180:6
**proceeding** [9] - 37:2, 54:6, 54:7, 54:8, 54:13, 55:21, 55:25, 131:25, 166:18
**proceedings** [2] - 166:2, 185:18
**proceeds** [4] - 139:25, 140:2, 164:2, 164:4
**process** [4] - 2:24, 114:14, 115:3, 118:2
**processing** [1] - 151:3
**Proctor** [1] - 70:16
**produces** [1] - 131:5
**producing** [2] - 119:19, 125:9
**product** [3] - 77:18, 134:11, 134:12

**professional** [1] - 131:18
**professionalism** [1] - 183:2
**progress** [1] - 168:11
**prohibited** [1] - 135:24
**prohibits** [1] - 136:24
**projectile** [2] - 155:3, 159:24
**Projects** [8] - 11:18, 12:5, 41:22, 42:10, 53:25, 54:17, 67:21, 88:11
**projects** [1] - 46:19
**promise** [3] - 23:19, 104:20, 156:9
**promised** [1] - 129:22
**promises** [1] - 131:1
**promote** [1] - 161:11
**promptly** [3] - 176:13, 181:3, 182:9
**proof** [19] - 3:2, 18:15, 117:19, 117:23, 120:10, 120:17, 121:7, 133:21, 134:20, 135:8, 135:10, 135:11, 137:2, 138:5, 138:13, 140:22, 155:21, 171:4, 176:22
**property** [12] - 6:10, 148:25, 162:1, 162:5, 162:7, 162:12, 162:13, 162:18, 162:25, 163:8, 163:13, 164:18
**prosecuted** [6] - 156:22, 156:24, 157:1, 157:17, 158:1, 158:17
**prosecution** [7] - 38:20, 117:5, 119:6, 123:21, 129:13, 130:8, 167:22
**prosecution's** [1] - 123:19
**prosecutor** [3] - 54:8, 54:10, 56:1
**protect** [7] - 23:9, 38:7, 91:1, 91:5, 112:6, 140:1, 166:16
**protected** [1] - 113:21
**protecting** [1] - 32:13
**protects** [2] - 38:6, 98:3
**prove** [60] - 38:20, 74:12, 119:7,

120:22, 123:20, 123:23, 133:22, 137:24, 138:16, 146:21, 147:3, 147:6, 147:8, 147:17, 147:18, 147:19, 149:4, 149:7, 149:14, 149:16, 149:20, 149:23, 149:24, 151:14, 151:16, 153:15, 153:25, 154:23, 156:2, 156:4, 157:21, 158:14, 158:20, 159:15, 160:4, 160:15, 160:16, 161:2, 161:3, 161:15, 161:16, 162:16, 166:21, 166:23, 167:4, 167:9, 167:23, 168:8, 168:10, 168:25, 169:11, 169:13, 169:19, 169:25, 170:5, 170:7, 171:25, 172:6, 176:21
**proved** [11] - 80:24, 118:21, 120:24, 130:20, 137:10, 139:9, 162:8, 168:3, 174:5, 174:12
**proven** [12] - 39:24, 39:25, 78:19, 118:6, 134:1, 143:15, 151:11, 155:12, 159:11, 161:1, 171:9, 173:10
**proves** [2] - 149:17, 164:11
**provide** [4] - 32:25, 105:18, 110:22, 110:23
**provided** [5] - 23:25, 95:15, 105:12, 143:17, 143:25
**provides** [7] - 110:1, 153:8, 157:14, 161:22, 165:21, 166:4, 168:21
**providing** [3] - 104:19, 153:17, 165:6
**proving** [6] - 118:14, 119:14, 121:22, 157:22, 164:10, 169:8
**psych** [1] - 59:10
**psychiatric** [2] - 59:9, 59:12

**PTSD** [2] - 47:10, 59:2
**public** [1] - 37:1
**pull** [4] - 72:14, 73:1, 73:17, 90:9
**pulled** [2] - 17:8, 89:21
**pulling** [1] - 45:2
**pump** [1] - 52:19
**punchline** [1] - 77:25
**punctually** [1] - 40:7
**punish** [1] - 108:7
**punishable** [8] - 6:19, 152:21, 153:1, 153:10, 153:19, 154:3, 154:8, 154:11
**punishment** [1] - 133:17
**pure** [1] - 88:21
**purely** [1] - 163:22
**purpose** [15] - 132:10, 134:7, 137:22, 137:23, 138:15, 139:2, 139:24, 141:15, 142:8, 149:25, 150:17, 154:18, 162:2, 172:8, 177:8
**purposefully** [1] - 134:10
**purposely** [3] - 132:17, 155:24, 160:1
**purposes** [2] - 141:6, 141:10
**Purpura** [26] - 1:15, 37:16, 37:24, 65:25, 68:22, 78:21, 79:11, 81:23, 81:24, 82:15, 83:5, 83:24, 84:11, 85:7, 95:25, 98:4, 98:12, 99:14, 101:7, 101:13, 105:24, 107:1, 110:19, 183:17, 183:23, 185:5
**purpura** [1] - 36:16
**PURPURA** [8] - 37:17, 37:25, 68:12, 68:21, 68:24, 69:2, 69:5, 183:18
**Purpura's** [1] - 143:4
**push** [1] - 53:21
**pushes** [1] - 52:25
**put** [28] - 3:24, 4:18, 11:7, 16:8, 16:17, 20:16, 23:12, 36:5, 44:7, 45:6, 47:24, 51:4, 52:1, 52:15, 59:19, 73:9, 73:21, 85:25, 86:2, 87:16,

90:8, 90:25, 91:3, 91:20, 93:20, 93:22, 104:15, 130:19
**puts** [8] - 11:21, 16:4, 16:11, 30:17, 52:14, 52:17, 86:21, 88:8
**putting** [3] - 9:8, 33:19, 45:3

**Q**

**qualifications** [1] - 133:10
**quantity** [14] - 143:20, 144:7, 144:9, 144:13, 144:15, 144:18, 144:20, 144:24, 145:1, 145:5, 145:12, 145:25, 150:19, 150:22
**questioned** [1] - 41:5
**questioning** [1] - 41:5
**questions** [19] - 20:18, 24:23, 33:14, 33:16, 33:17, 51:9, 51:10, 56:1, 61:2, 94:20, 108:17, 108:20, 116:19, 121:25, 126:5, 172:21, 173:2, 176:13, 179:8
**quick** [2] - 40:11, 53:19
**quickly** [2] - 4:6, 37:9
**quite** [4] - 40:3, 63:10, 79:2, 131:15
**quotation** [1] - 185:13
**quote** [4] - 7:19, 58:22, 157:11, 185:14
**quoting** [3] - 62:23, 62:24, 64:4

**R**

**race** [1] - 117:20
**rage** [1] - 71:9
**raid** [1] - 51:16
**raise** [3] - 10:19, 13:6, 55:24
**raised** [3] - 70:14, 81:23, 90:23
**ramp** [2] - 12:11, 12:14
**ran** [2] - 8:17, 21:3
**range** [1] - 152:7
**rank** [1] - 83:7
**ransacked** [1] - 16:23
**ransacking** [3] - 92:5, 92:7, 92:8

**rant** [2] - 90:2, 90:4
**ranting** [2] - 89:25, 90:4
**rapid** [1] - 17:24
**rarely** [2] - 54:4, 134:20
**rather** [5] - 94:10, 134:12, 134:25, 163:2, 168:14
**ratings** [1] - 114:16
**RDB-20-139** [1] - 1:3
**re** [1] - 8:17
**re-up** [1] - 8:17
**reach** [4] - 30:23, 34:12, 125:3, 177:11
**reached** [4] - 65:4, 176:19, 178:23, 179:3
**reaching** [2] - 117:18, 118:20
**reaction** [5] - 56:6, 56:9, 56:10, 71:10, 108:20
**reactivated** [1] - 48:10
**reactivation** [1] - 48:8
**read** [16] - 55:22, 78:12, 101:13, 103:3, 114:13, 114:23, 136:10, 136:11, 143:10, 150:5, 168:19, 176:4, 176:5, 179:22, 182:12
**readily** [3] - 155:2, 159:24
**reading** [1] - 143:1
**reads** [6] - 136:14, 146:10, 152:23, 156:17, 157:12, 165:8
**ready** [11] - 2:3, 2:5, 2:7, 3:7, 36:23, 37:16, 79:25, 80:6, 95:19, 182:11, 183:1
**real** [6] - 32:17, 34:13, 65:3, 73:12, 102:11, 138:9
**reality** [2] - 61:4, 103:6
**realize** [5] - 99:3, 99:5, 99:6, 99:12, 104:24
**realizes** [2] - 69:23, 130:6
**really** [15] - 5:8, 41:5, 42:9, 56:24, 61:22, 67:17, 75:3, 77:24, 87:23, 97:9, 99:15, 110:24, 130:18, 183:19, 183:23
**reason** [17] - 5:6, 15:4, 22:19, 25:9, 33:21,

41:22, 53:1, 92:2, 92:16, 111:9, 118:12, 118:16, 119:17, 124:16, 141:23, 143:7, 145:20
**reasonable** [67] - 38:21, 39:25, 78:19, 113:4, 113:24, 116:11, 118:7, 118:11, 118:15, 118:22, 119:8, 119:12, 119:15, 120:25, 121:15, 122:20, 123:20, 128:11, 130:3, 130:21, 135:7, 135:12, 137:4, 137:11, 138:17, 139:6, 140:24, 142:10, 144:3, 146:22, 147:4, 147:18, 147:20, 149:5, 149:21, 149:24, 150:8, 151:11, 151:17, 151:24, 153:16, 153:25, 154:24, 156:5, 157:21, 158:14, 158:21, 159:11, 159:16, 160:16, 162:9, 162:17, 164:11, 166:23, 167:5, 167:10, 168:3, 168:4, 168:13, 169:2, 169:9, 169:20, 170:1, 171:8, 173:10, 174:6, 174:21
**reasonably** [4] - 142:6, 144:23, 145:4, 145:17
**reasoned** [1] - 124:20
**reasoning** [1] - 180:23
**reasons** [6] - 22:14, 25:1, 92:11, 113:10, 128:7, 133:11
**reboot** [2] - 98:7, 98:12
**rebooted** [6] - 30:21, 77:10, 98:5, 98:6, 98:10, 98:15
**rebuttal** [6] - 3:2, 38:25, 59:16, 79:7, 79:12, 80:7
**receive** [7] - 54:2, 54:3, 128:24, 130:7, 131:5, 153:13, 179:3
**received** [8] - 49:10,

74:16, 116:16, 122:2, 122:8, 122:12, 131:1, 141:23
**recess** [9] - 36:15, 36:17, 36:18, 36:20, 78:24, 78:25, 79:16, 79:18
**reckless** [1] - 174:2
**recognition** [1] - 67:9
**recognize** [1] - 110:17
**recognizes** [2] - 148:13, 155:13
**recollection** [6] - 40:14, 40:15, 40:16, 116:14, 126:19, 126:25
**record** [10] - 12:18, 24:1, 61:7, 95:2, 100:13, 105:18, 121:22, 134:19, 185:17
**recorded** [19] - 4:13, 10:11, 12:3, 12:17, 14:14, 24:4, 24:11, 25:15, 28:1, 29:17, 49:12, 49:13, 49:14, 52:14, 75:16, 101:23, 111:5, 114:21
**recording** [16] - 10:23, 13:2, 14:14, 26:17, 26:23, 28:22, 29:20, 59:21, 59:22, 84:1, 84:15, 85:1, 85:3, 97:11, 101:20, 109:1
**recordings** [8] - 59:21, 84:25, 102:22, 105:1, 105:10, 107:16, 122:23, 122:24
**records** [24] - 4:12, 4:13, 7:17, 12:21, 18:17, 18:19, 19:3, 43:8, 44:9, 44:16, 47:12, 47:17, 57:6, 59:12, 61:10, 76:20, 83:12, 86:9, 94:4, 94:6, 95:10, 106:18, 106:22, 108:5
**red** [1] - 12:1
**refer** [1] - 147:14
**referenced** [3] - 107:2, 113:18, 161:18
**referencing** [1] - 105:22
**referred** [5] - 74:24, 124:24, 142:1, 159:8, 161:21
**referring** [2] - 94:17,

160:9
**reflect** [2] - 177:23, 185:14
**refused** [1] - 20:18
**regard** [4] - 122:6, 138:10, 169:10, 169:22
**regardless** [3] - 45:23, 71:1, 130:21
**regular** [3] - 81:12, 81:13, 81:14
**Rel** [2] - 21:13, 21:17
**related** [3] - 84:12, 102:9, 165:13
**relating** [5] - 107:18, 165:24, 167:2, 167:12, 174:9
**relation** [7] - 136:1, 156:10, 156:20, 157:15, 158:4, 159:17, 175:9
**relationship** [8] - 71:11, 71:13, 71:25, 72:5, 74:11, 91:4, 97:22, 126:10
**relative** [2] - 10:4, 101:19
**relatives** [2] - 21:11, 98:23
**release** [2] - 166:1, 166:2
**relented** [1] - 9:3
**relevant** [9] - 16:19, 115:25, 117:13, 136:23, 153:7, 157:13, 165:19, 168:6, 168:20
**reliable** [1] - 39:10
**relies** [1] - 147:16
**religion** [1] - 117:21
**rely** [4] - 29:13, 40:18, 112:22, 116:13
**remain** [2] - 2:12, 124:12
**remains** [1] - 123:21
**Remember** [1] - 49:3
**remember** [38] - 25:24, 40:25, 41:1, 50:17, 52:15, 53:13, 53:14, 53:24, 54:24, 55:7, 59:4, 66:13, 75:19, 75:20, 84:9, 92:17, 96:18, 96:19, 96:21, 99:23, 100:19, 100:25, 103:15, 103:17, 103:24, 106:5, 106:17, 107:9, 108:2, 108:19, 109:19, 110:4,

111:12, 112:13, 125:7, 144:4, 176:6
**remembered** [4] - 25:25, 26:2, 26:6, 26:10
**remembers** [6] - 48:25, 54:20, 65:8, 66:18, 109:22, 109:25
**remind** [2] - 118:17, 121:17
**remote** [1] - 168:15
**remove** [1] - 73:15
**render** [2] - 118:16, 177:2
**repeat** [4] - 51:13, 71:4, 128:17, 128:18
**repeated** [1] - 71:4
**repeating** [1] - 78:9
**repeats** [2] - 54:24, 57:13
**report** [3] - 76:22, 126:4, 176:25
**Reported** [1] - 1:22
**reported** [5] - 10:23, 13:2, 26:17, 26:23, 28:22
**REPORTER** [1] - 185:13
**Reporter** [2] - 1:24, 185:22
**repowered** [1] - 77:11
**represent** [2] - 123:6, 140:2
**request** [3] - 34:7, 176:4, 176:9
**requested** [1] - 47:12
**requesting** [1] - 176:8
**requests** [1] - 176:13
**required** [9] - 120:11, 121:11, 123:23, 141:8, 155:21, 156:2, 167:23, 174:17, 176:22
**requirement** [3] - 120:21, 170:7, 171:13
**requirements** [1] - 164:21
**requires** [2] - 127:5, 140:10
**resentment** [1] - 127:3
**reset** [2] - 98:7, 98:15
**resolve** [1] - 116:10
**respect** [7] - 32:7, 88:10, 154:24, 173:12, 174:9, 180:7, 181:25
**respectfully** [1] - 38:21

**respond** [2] - 176:12, 179:7
**responds** [1] - 70:18
**response** [1] - 55:11
**responsibility** [1] - 145:23
**responsible** [1] - 142:9
**rest** [3] - 5:7, 11:23, 36:5
**restated** [1] - 55:16
**restitution** [2] - 23:15, 48:23
**restored** [3] - 153:21, 154:4, 154:14
**rests** [1] - 133:20
**result** [5] - 47:10, 119:8, 173:15, 173:22, 174:3
**resulted** [2] - 6:13, 175:7
**resulting** [2] - 156:11, 173:18
**resumes** [2] - 36:21, 79:19
**retain** [1] - 102:1
**retire** [2] - 178:1, 178:11
**retrieve** [1] - 37:14
**return** [4] - 36:11, 118:25, 176:14, 179:4
**reviewed** [1] - 4:24
**reviewing** [2] - 102:19, 131:20
**revocation** [1] - 49:4
**RICARDO** [1] - 1:5
**Ricardo** [8] - 136:17, 146:12, 152:25, 154:7, 156:18, 165:10, 173:15, 174:3
**Richard** [2] - 36:22, 79:20
**RICHARD** [1] - 1:8
**rid** [4] - 30:19, 60:16, 98:20, 98:21
**ride** [14] - 13:21, 13:23, 30:15, 44:4, 44:5, 62:11, 62:13, 81:3, 83:16, 83:19, 83:22, 83:23, 100:20, 113:16
**ridiculous** [2] - 18:25, 86:15
**rights** [4] - 75:16, 153:20, 154:5, 154:13
**ring** [1] - 111:17
**riots** [2] - 47:6, 47:8

**rise** [6] - 2:19, 36:18, 37:19, 79:16, 181:9, 184:2
**risk** [3] - 32:14, 118:10, 173:24
**RK8433** [1] - 153:4
**Road** [3] - 3:14, 16:23, 20:4
**rob** [6] - 24:8, 26:3, 43:23, 70:17, 82:3, 110:9
**robbery** [23] - 5:15, 6:7, 6:10, 7:2, 29:18, 71:8, 92:2, 92:6, 93:2, 100:8, 107:11, 107:24, 140:2, 140:25, 157:2, 158:11, 159:8, 161:20, 161:24, 162:4, 162:22, 166:11, 175:9
**Robbery** [8] - 159:8, 159:9, 159:12, 159:13, 161:21, 162:10, 162:17, 172:4
**Robert** [1] - 1:19
**robots** [2] - 103:23
**rock** [1] - 88:1
**rodeo** [1] - 75:18
**role** [4] - 2:13, 88:19, 116:6, 140:10
**roles** [2] - 140:8, 140:9
**roll** [2] - 72:15, 88:2
**room** [19] - 10:25, 16:24, 16:25, 27:22, 36:11, 91:13, 92:7, 103:7, 122:11, 124:3, 176:1, 176:3, 178:18, 178:22, 179:11, 179:15, 181:2
**roommate** [1] - 8:5
**rounds** [1] - 153:4
**route** [3] - 62:1, 62:2, 67:15
**Route** [1] - 67:13
**RPR** [2] - 1:23, 185:16
**rules** [1] - 145:13
**rumors** [1] - 112:1
**run** [4] - 14:2, 50:17, 50:18, 83:2
**running** [4] - 10:8, 45:24, 46:5, 95:14
**runs** [3] - 50:11, 50:12, 178:14
**rush** [4] - 3:6, 62:18, 69:4, 101:2
**rushing** [1] - 75:13

**Ruter** [1] - 70:6

**S**

**sabotage** [2] - 73:8, 166:10
**sabotaged** [1] - 73:5
**sad** [1] - 5:5
**sadly** [1] - 87:5
**safe** [1] - 148:8
**safest** [2] - 180:8, 182:3
**safety** [2] - 47:9
**sake** [1] - 28:23
**sakes** [1] - 77:16
**sale** [3] - 163:23, 163:24
**salesperson** [1] - 49:22
**sandwich** [1] - 54:11
**sat** [10] - 67:6, 73:11, 73:22, 74:18, 74:19, 74:21, 76:20, 85:8, 111:7, 111:13
**satisfied** [5] - 138:19, 161:15, 164:21, 167:16, 168:3
**satisfies** [1] - 164:10
**satisfy** [10] - 137:2, 137:17, 155:22, 158:19, 159:12, 164:3, 164:5, 169:23, 170:4, 170:12
**savant** [1] - 61:6
**save** [1] - 123:6
**saw** [28] - 9:10, 9:22, 16:4, 16:20, 16:22, 17:16, 27:3, 27:6, 27:10, 27:16, 40:5, 41:4, 42:12, 68:4, 68:5, 77:12, 82:6, 86:10, 86:11, 95:18, 102:20, 102:23, 103:9, 105:21, 108:15, 108:24, 109:3
**scared** [3] - 73:13, 73:16, 74:4
**scenario** [1] - 45:15
**scene** [5] - 47:24, 60:3, 140:14, 148:23, 161:12
**scenes** [1] - 47:7
**Schedule** [2] - 136:21, 146:14
**scheduling** [1] - 179:14
**scheme** [4] - 137:21, 137:22, 140:9,

142:20
**school** [3] - 3:21, 46:3, 72:18
**science** [1] - 134:18
**scope** [1] - 139:14
**scorched** [2] - 60:17, 60:20
**score** [2] - 90:15, 94:12
**scot** [1] - 87:10
**scot-free** [1] - 87:10
**screaming** [3] - 47:15, 72:3, 97:18
**screen** [1] - 82:7
**scrutinize** [1] - 125:15
**scrutinized** [1] - 128:13
**scrutinizing** [1] - 130:11
**scrutiny** [2] - 127:7, 130:24
**search** [6] - 24:18, 27:8, 27:18, 27:22, 33:25, 34:1
**searches** [1] - 34:6
**searching** [7] - 60:7, 60:8, 60:9, 60:10, 127:7
**seated** [7] - 2:11, 36:23, 37:22, 48:17, 68:20, 143:13, 181:13
**second** [32] - 18:3, 28:25, 29:12, 33:10, 36:24, 43:16, 52:20, 55:14, 57:12, 67:23, 68:18, 70:6, 97:23, 100:1, 110:20, 138:16, 143:11, 144:12, 146:24, 149:4, 151:19, 153:22, 154:23, 158:3, 159:2, 159:15, 162:16, 166:24, 167:9, 169:5, 169:19, 179:17
**secondary** [1] - 47:5
**seconds** [4] - 12:21, 17:11, 38:16, 61:4
**secrecy** [1] - 138:6
**Section** [9] - 153:7, 161:20, 162:10, 165:18, 165:21, 166:4, 168:19, 168:20, 169:1
**section** [1] - 162:2
**secure** [1] - 117:13
**security** [3] - 48:9, 101:15, 179:1

**Security** [2] - 37:4, 49:23
**see** [59] - 3:6, 7:23, 8:5, 11:15, 11:21, 17:5, 19:21, 27:1, 27:24, 33:10, 33:18, 43:5, 43:7, 43:9, 43:10, 44:10, 49:11, 51:11, 54:15, 58:5, 59:12, 61:6, 61:12, 61:18, 63:3, 66:21, 75:11, 76:6, 77:12, 77:13, 78:12, 79:14, 79:22, 81:12, 82:5, 83:12, 92:25, 98:9, 100:12, 103:1, 103:3, 103:11, 103:14, 106:23, 107:19, 109:5, 109:9, 114:15, 143:18, 143:20, 143:24, 171:13, 173:11, 175:1, 175:3, 175:6, 175:24, 176:2, 183:6
**See** [1] - 27:23
**seeing** [2] - 60:19, 70:3
**seek** [1] - 172:23
**seem** [1] - 125:23
**sees** [1] - 92:20
**segue** [1] - 55:14
**self** [1] - 91:24
**self-serving** [1] - 91:24
**sell** [13] - 5:10, 7:8, 7:10, 8:16, 10:3, 13:8, 42:18, 58:21, 82:21, 96:14, 97:8, 102:6, 102:17
**selling** [6] - 21:21, 50:22, 82:17, 102:7, 104:5, 106:11
**semen** [1] - 76:24
**sending** [1] - 179:1
**sends** [6] - 15:18, 17:4, 21:6, 33:11, 34:7, 98:24
**sense** [30] - 36:12, 42:19, 43:17, 43:19, 44:12, 44:15, 45:6, 45:7, 45:15, 46:21, 50:19, 87:1, 89:16, 91:5, 92:24, 100:7, 102:8, 102:13, 104:3, 104:10, 111:17, 114:2, 120:1, 122:19, 124:10, 124:17, 126:5, 132:22,

133:18, 138:9
**sent** [5] - 24:21, 32:18, 81:11, 176:3, 180:12
**sentence** [4] - 85:4, 90:10, 130:8, 133:20
**sentencing** [1] - 129:23
**separate** [5] - 5:3, 118:25, 140:7, 170:20, 174:7
**separately** [3] - 84:14, 118:25, 174:8
**sequence** [1] - 70:19
**serial** [1] - 153:4
**series** [2] - 48:1, 135:1
**serious** [3] - 117:5, 169:17, 173:17
**serum** [1] - 22:18
**served** [1] - 129:1
**server** [1] - 101:22
**service** [10] - 38:4, 38:5, 38:9, 48:6, 101:22, 114:19, 178:3, 178:6
**services** [1] - 101:16
**serving** [1] - 91:24
**session** [2] - 36:21, 79:19
**set** [2] - 73:23, 154:25
**seven** [8] - 17:12, 38:12, 61:13, 106:15, 146:4, 157:13, 165:5, 165:15
**seven-year-old** [5] - 38:12, 106:15, 157:13, 165:5, 165:15
**several** [1] - 124:22
**sex** [3] - 69:11, 76:22, 117:21
**sexual** [4] - 53:18, 84:7, 166:10
**shade** [1] - 126:13
**shall** [5] - 157:19, 166:2, 178:8, 178:11, 179:3
**share** [1] - 46:9
**sheet** [6] - 113:6, 119:2, 173:11, 175:15, 175:20, 182:13
**sheets** [1] - 76:23
**shifts** [2] - 119:16, 123:22
**shipped** [2] - 152:22, 153:13
**shirt** [3] - 41:1, 41:2, 68:1
**shit** [6] - 15:22, 60:14,

72:19, 73:5, 73:15, 73:22
**shook** [2] - 56:17
**shoot** [3] - 17:9, 35:20, 72:4
**shooting** [1] - 165:15
**shootout** [1] - 91:11
**shop** [1] - 9:7
**Short** [2] - 36:20, 79:18
**short** [3] - 17:24, 38:25, 121:24
**Shorty** [2] - 64:5, 64:6
**shot** [11] - 3:17, 3:22, 7:9, 7:10, 26:12, 26:13, 109:2, 109:9, 109:21, 109:22, 109:23
**shots** [1] - 19:25
**shoulder** [1] - 3:18
**show** [15] - 12:21, 32:4, 47:21, 57:5, 94:4, 94:6, 95:2, 95:10, 128:6, 151:3, 168:12, 168:14, 170:9, 171:1, 172:16
**showed** [7] - 18:16, 18:19, 20:6, 48:4, 60:19, 92:19, 108:9
**showing** [1] - 98:18
**shown** [4] - 135:1, 135:12, 135:14, 170:22
**shows** [9] - 12:24, 20:7, 48:8, 61:10, 62:2, 80:21, 95:2, 95:9
**shred** [2] - 22:24, 91:2
**Shut** [1] - 26:5
**shut** [1] - 16:18
**sic** [2] - 101:12, 169:23
**sick** [4] - 3:21, 15:24, 25:3, 25:4
**sickened** [1] - 71:17
**side** [5] - 37:11, 119:22, 120:6, 182:22
**sided** [1] - 54:12
**sides** [1] - 128:18
**sideshow** [1] - 74:22
**sift** [1] - 118:6
**sign** [4] - 176:11, 178:25, 182:2
**signed** [2] - 49:8, 178:16
**significance** [1] - 123:24
**signing** [1] - 175:20
**silence** [1] - 124:8

**silent** [2] - 124:4, 124:12
**silly** [1] - 41:7
**similar** [2] - 107:19, 129:14
**similarity** [1] - 140:20
**similarly** [3] - 122:18, 137:20, 140:15
**simple** [9] - 5:15, 25:9, 51:12, 60:22, 60:24, 110:25, 113:5, 114:17, 119:17
**simply** [10] - 23:13, 31:6, 88:21, 107:22, 121:23, 145:20, 148:22, 168:16, 169:12, 177:21
**sincerely** [1] - 46:23
**single** [13] - 18:17, 18:18, 20:3, 22:24, 23:1, 39:12, 39:14, 39:15, 39:18, 48:3, 71:4, 112:22, 140:11
**sinister** [1] - 86:5
**sins** [1] - 25:12
**sit** [2] - 40:10, 68:13
**site** [14] - 9:16, 11:11, 11:15, 11:21, 12:24, 14:18, 15:5, 16:4, 17:16, 18:9, 18:18, 19:9, 30:3, 160:13
**sites** [1] - 17:23
**siting** [1] - 28:19
**sitting** [15] - 3:21, 14:6, 28:20, 34:21, 45:1, 52:3, 53:24, 53:25, 54:18, 56:14, 56:20, 75:1, 93:13, 109:8, 110:9
**situation** [7] - 33:16, 33:18, 33:23, 73:16, 98:24, 98:25, 180:7
**six** [8] - 5:3, 17:12, 19:25, 40:20, 46:10, 114:10, 118:24, 135:17
**Sixty** [1] - 48:3
**size** [1] - 126:22
**skill** [1] - 133:7
**skilled** [1] - 57:19
**skills** [1] - 51:8
**skip** [1] - 28:23
**skipped** [1] - 34:20
**slate** [1] - 119:9
**sleep** [1] - 44:22
**sleeping** [3] - 34:17, 77:15, 77:16
**slide** [2] - 42:16, 69:8
**slides** [1] - 63:17
**slight** [1] - 139:18

**slightly** [1] - 103:11
**slowed** [1] - 40:7
**slowly** [1] - 115:10
**slut** [1] - 73:7
**small** [3] - 6:14, 50:24, 132:20
**smarter** [2] - 99:1, 99:11
**smartphone** [2] - 81:14
**smelled** [1] - 111:1
**so-called** [1] - 128:21
**sober** [2] - 52:6, 52:10
**social** [1] - 4:13
**Social** [1] - 49:23
**sold** [1] - 90:17
**sole** [6] - 116:7, 116:21, 148:13, 148:14, 155:13, 155:14
**solely** [6] - 117:16, 118:4, 148:21, 148:23, 177:5, 177:11
**someone** [12] - 6:5, 6:11, 15:10, 42:20, 45:9, 50:21, 66:7, 93:5, 126:3, 142:21, 172:1, 181:20
**something's** [1] - 50:22
**sometime** [3] - 42:23, 44:18, 94:23
**sometimes** [6] - 9:20, 9:21, 58:12, 59:23, 63:10, 107:16
**somewhat** [1] - 45:19
**somewhere** [2] - 23:8, 60:14
**son** [8] - 3:15, 3:20, 33:24, 35:17, 36:5, 54:23, 55:2, 157:13
**soon** [4] - 7:25, 13:17, 113:24
**sorry** [9] - 55:10, 55:23, 60:15, 68:8, 68:21, 68:25, 69:2, 93:24, 108:3
**sort** [2] - 2:13, 63:11
**sorts** [1] - 63:4
**sound** [5] - 19:24, 20:1, 50:10, 93:14, 112:4
**sounds** [1] - 6:10
**source** [1] - 91:25
**speaking** [2] - 2:13, 106:3
**Special** [28] - 1:16, 1:17, 9:23, 14:8, 23:17, 23:19, 23:25,

29:21, 30:25, 31:21, 43:1, 47:17, 51:16, 51:21, 55:15, 59:5, 62:9, 64:11, 66:4, 66:5, 66:6, 67:3, 69:14, 74:20, 96:25, 104:23, 110:10, 111:3
**special** [5] - 42:10, 133:7, 143:18, 143:25, 174:22
**specialist** [1] - 98:6
**specific** [12] - 39:20, 41:22, 61:22, 64:3, 120:15, 120:21, 129:19, 139:2, 151:22, 167:15, 172:7, 176:7
**specifically** [10] - 57:1, 57:2, 127:2, 144:15, 152:23, 157:2, 157:10, 158:10, 159:7, 173:23
**speculate** [2] - 83:10, 83:21
**speculation** [3] - 83:7, 84:20, 88:21
**spend** [7] - 31:16, 31:23, 77:3, 96:16, 96:23, 97:3
**spends** [3] - 11:17, 59:9, 60:9
**spent** [10] - 15:12, 31:22, 60:7, 62:4, 85:18, 96:21, 96:24, 97:1, 97:15, 182:25
**spoken** [1] - 137:25
**spokesperson** [1] - 178:13
**spoon** [1] - 28:7
**Sr** [12] - 21:13, 21:15, 22:6, 27:13, 34:19, 42:12, 54:21, 55:6, 62:6, 64:19, 65:14, 65:15
**Sr.'s** [2] - 27:22, 82:14
**staff** [1] - 79:6
**stairs** [2] - 45:14, 46:5, 93:1
**stand** [31] - 10:21, 38:14, 40:24, 41:3, 41:25, 42:1, 45:8, 47:25, 50:2, 51:6, 53:6, 67:6, 68:13, 68:17, 68:20, 74:14, 74:19, 77:22, 82:11, 85:8, 102:21, 103:13, 103:19, 104:5, 115:2,

117:11, 124:1, 143:3, 143:4
**Standard** [1] - 11:10
**standards** [1] - 90:3
**standing** [3] - 2:14, 50:12, 68:19
**stands** [8] - 36:17, 36:18, 63:13, 79:16, 126:20, 176:18, 183:25, 184:2
**start** [9] - 4:19, 34:6, 79:1, 79:4, 115:1, 115:12, 143:10, 181:3, 183:16
**started** [3] - 64:11, 121:3, 182:10
**startled** [1] - 20:12
**starts** [3] - 14:18, 52:20, 65:1
**stash** [1] - 45:9
**state** [13] - 5:18, 116:4, 134:14, 134:15, 134:16, 134:20, 149:25, 154:4, 163:18, 163:19, 163:24, 169:21, 178:7
**statement** [38] - 31:19, 42:4, 42:19, 51:21, 52:8, 52:9, 56:3, 56:9, 59:11, 69:9, 69:13, 74:14, 74:19, 74:21, 74:22, 74:25, 76:13, 91:8, 91:24, 93:18, 95:23, 110:20, 110:21, 111:22, 121:19, 121:20, 121:21, 123:13, 123:15, 132:4, 132:7, 132:9, 132:13, 132:17, 132:25, 133:1, 163:4
**statements** [27] - 4:14, 35:18, 39:16, 65:21, 71:5, 74:13, 75:8, 86:15, 89:6, 89:7, 93:4, 95:13, 97:9, 102:22, 108:13, 109:16, 110:12, 116:17, 122:18, 123:10, 124:4, 124:7, 124:11, 138:12, 139:5, 139:6, 174:13
**States** [25] - 52:2, 54:19, 64:10, 117:6, 136:23, 153:8, 154:9, 156:22, 156:25, 157:1, 157:3, 157:4,

157:14, 157:17, 158:2, 158:18, 161:21, 162:10, 165:17, 165:20, 165:24, 167:6, 168:18, 168:21, 169:1

**states** [2] - 72:4, 163:17

**STATES** [3] - 1:1, 1:3, 1:8

**station** [1] - 101:15

**statute** [1] - 136:23, 153:7, 156:12, 157:13, 161:22, 165:3, 166:16, 168:19, 168:20, 170:20, 170:25

**statutes** [1] - 165:19

**stay** [4] - 62:18, 68:20, 115:2, 182:7

**stayed** [6] - 9:20, 9:21, 33:1, 33:2

**stays** [4] - 11:6, 11:15, 17:17, 179:16

**steal** [8] - 43:23, 77:15, 77:16, 90:17, 99:15, 164:2, 164:4

**steals** [1] - 45:9

**stenographic** [1] - 185:17

**stenotype** [1] - 1:21

**step** [6] - 92:23, 151:20, 152:1, 152:3, 152:12, 179:15

**steps** [1] - 45:24

**stiffed** [1] - 49:6

**still** [16] - 15:25, 18:3, 31:20, 38:9, 38:13, 45:23, 47:1, 68:12, 78:3, 96:13, 96:14, 97:12, 112:8, 148:12, 149:21, 162:9

**stipulated** [1] - 154:6

**stipulation** [2] - 122:5, 156:7

**stipulations** [1] - 122:3

**stocky** [1] - 9:11

**stole** [4] - 5:10, 35:24, 164:1, 164:4

**stolen** [1] - 90:18

**stone** [1] - 52:9

**stop** [5] - 15:21, 15:25, 16:1, 72:25, 77:19

**Stop** [1] - 72:21

**stopped** [8] - 14:25,

26:25, 31:8, 44:21, 61:12, 96:10, 99:2, 113:16

**stops** [1] - 49:25

**store** [1] - 16:9

**story** [11] - 39:15, 69:24, 70:10, 70:19, 78:13, 88:23, 97:11, 106:19, 106:23, 109:7, 111:16

**straight** [1] - 63:22

**straightforward** [1] - 126:24

**strange** [1] - 110:25

**stranger** [1] - 29:24

**strangers** [1] - 4:3

**Street** [13] - 1:24, 8:12, 16:4, 16:7, 21:20, 44:20, 48:5, 74:7, 91:17, 92:4, 92:7, 92:11, 100:2

**street** [1] - 104:5

**stressed** [2] - 25:16, 35:23

**stretch** [1] - 143:5

**strike** [1] - 126:3

**struggling** [1] - 104:3

**studio** [1] - 10:13

**stuff** [4] - 10:20, 61:18, 78:9, 91:22

**stumble** [1] - 61:7

**subject** [8] - 85:11, 127:7, 128:20, 136:23, 153:7, 157:14, 165:19, 168:20

**submitted** [1] - 48:6

**Subpart** [1] - 165:20

**subpoenaed** [2] - 63:5, 64:10

**subsequent** [1] - 111:16

**substance** [12] - 106:25, 135:20, 135:22, 136:20, 136:22, 137:7, 137:15, 143:15, 146:9, 146:13, 146:15, 146:20

**substances** [3] - 136:9, 137:1, 137:15

**substantial** [6] - 148:5, 148:11, 151:20, 152:1, 152:3, 152:12

**substantive** [1] - 151:9

**succeed** [2] - 171:23, 172:24

**succeeds** [1] - 176:24

**success** [1] - 172:18

**successful** [1] - 4:16

**succession** [1] - 17:24

**suddenly** [1] - 180:17

**sufficient** [11] - 39:3, 119:10, 139:19, 140:11, 141:4, 150:13, 160:14, 161:13, 163:25, 170:12, 172:12

**suggest** [7] - 85:13, 89:11, 102:4, 103:5, 107:15, 110:13, 127:19

**suggesting** [1] - 87:7

**suggestion** [2] - 88:17, 143:9

**suited** [1] - 73:10

**summaries** [3] - 123:4, 123:5, 123:8

**summarize** [1] - 136:9

**summarized** [2] - 85:10, 176:22

**summary** [1] - 129:6

**summations** [1] - 128:1

**Sunday** [1] - 65:16

**supervised** [1] - 166:1

**supplier** [3] - 9:13, 9:15, 31:25

**supplying** [1] - 88:19

**supposedly** [2] - 65:2, 65:7

**surprised** [1] - 109:8

**surrounding** [3] - 134:2, 135:5, 163:5

**surviving** [1] - 81:10

**suspect** [1] - 125:23

**suspicion** [1] - 124:19

**sustain** [5] - 119:14, 133:21, 153:16, 157:22, 171:3

**sustained** [1] - 117:19

**sway** [1] - 127:12

**swayed** [1] - 118:3

**swear** [2] - 180:5, 180:12

**swearing** [1] - 60:15

**sweat** [1] - 65:3

**sweating** [2] - 30:16, 94:18

**sweats** [1] - 34:24

**sweaty** [3] - 20:13, 21:4, 35:23

**sweetheart** [1] - 45:16

**sworn** [3] - 116:15, 122:1, 181:22

**sympathy** [3] - 118:3, 118:9, 118:16

**symptoms** [1] - 105:25

**system** [2] - 49:20, 180:15

**T**

**T's** [1] - 183:22

**table** [12] - 3:17, 34:21, 52:3, 52:10, 53:25, 54:18, 56:20, 103:8, 104:8, 109:2, 109:8, 111:13

**talks** [3] - 32:14, 84:14, 85:23

**tangible** [1] - 162:13

**tape** [5] - 47:16, 75:10, 108:14, 114:21, 114:22

**taped** [1] - 122:22

**Tariek** [7] - 13:25, 14:16, 29:9, 66:10, 66:14, 70:8, 88:1

**Tarrell** [18] - 14:1, 14:16, 15:1, 33:4, 33:6, 66:10, 66:14, 87:19, 87:23, 88:1, 88:2, 88:4, 88:10, 88:16, 88:18, 110:5

**tax** [1] - 2:22

**taxpayer** [1] - 49:11

**technician** [1] - 47:24

**techniques** [2] - 120:15, 120:22

**tedious** [1] - 143:6

**television** [2] - 114:15, 175:24

**temple** [1] - 90:9

**ten** [12] - 9:25, 36:15, 36:17, 47:15, 53:15, 61:4, 64:15, 70:25, 71:7, 72:2, 81:2, 178:6

**ten-minute** [2] - 36:15, 81:2

**ten-year-old** [1] - 53:15

**Teresa** [1] - 1:14

**term** [9] - 124:15, 147:22, 153:2, 153:10, 153:19, 154:4, 154:8, 154:12, 162:13

**terms** [9] - 114:20, 157:20, 173:6, 174:25, 175:15, 178:1, 179:8, 180:24, 182:4

**Terrell** [1] - 29:9

**terrible** [2] - 22:11,

112:12

**Terrill** [35] - 8:9, 13:13, 21:13, 21:15, 21:16, 21:17, 21:20, 22:6, 22:25, 25:3, 27:13, 27:22, 34:19, 35:7, 39:11, 41:18, 42:12, 54:21, 55:6, 62:6, 63:8, 64:18, 65:13, 65:14, 65:15, 80:16, 82:10, 82:14, 82:18, 82:24, 83:1, 105:16, 108:6

**test** [4] - 41:23, 62:19, 180:16

**tested** [2] - 42:12, 105:25

**testified** [46] - 9:2, 9:4, 9:6, 9:10, 25:5, 27:3, 27:13, 27:15, 29:1, 29:3, 39:4, 40:17, 41:1, 43:1, 44:20, 48:5, 53:5, 66:6, 74:7, 74:13, 82:11, 83:1, 83:15, 88:9, 91:17, 92:11, 93:16, 94:17, 95:18, 98:8, 105:13, 105:24, 105:25, 107:10, 111:5, 115:14, 125:4, 125:17, 125:24, 125:25, 126:11, 126:16, 126:18, 127:9, 127:23, 131:24

**testifies** [3] - 58:19, 66:18, 130:23

**testify** [18] - 23:12, 68:2, 99:10, 105:6, 105:21, 123:17, 123:18, 123:25, 124:24, 127:11, 127:12, 127:20, 129:21, 130:9, 131:2, 133:6, 133:15, 166:18

**testifying** [4] - 106:16, 128:25, 129:1, 133:11

**testimony** [96] - 4:12, 8:4, 9:16, 19:12, 24:25, 29:15, 36:8, 40:14, 40:16, 42:1, 82:14, 83:14, 84:2, 85:2, 85:14, 85:17, 86:16, 88:7, 88:8, 89:2, 89:3, 89:10, 89:13, 89:15, 98:4, 100:19, 101:23, 102:19, 102:23,

102:24, 104:15,
106:22, 107:15,
108:5, 109:14,
110:16, 111:2,
113:12, 113:13,
114:3, 115:13,
115:17, 115:25,
116:10, 116:15,
120:13, 121:5,
122:1, 124:4,
125:13, 125:16,
125:19, 127:6,
127:14, 127:17,
127:22, 128:8,
128:9, 128:10,
128:12, 128:15,
128:23, 129:5,
129:8, 129:18,
129:25, 130:2,
130:8, 130:10,
130:11, 130:24,
130:25, 131:6,
131:10, 131:13,
131:18, 131:21,
131:22, 131:25,
132:3, 132:6,
132:11, 132:14,
132:15, 133:3,
133:9, 133:13,
133:14, 147:10,
147:13, 147:15,
176:4, 176:5, 176:8,
176:9

**testing** [1] - 180:16

**tests** [1] - 41:24

**Texas** [2] - 70:15, 78:4

**text** [6] - 15:19, 81:11,
98:9, 98:11, 98:13,
98:14

**texted** [2] - 81:14,
81:15

**texting** [3] - 15:16,
30:20, 83:12

**THE** [38] - 1:1, 1:1,
1:8, 2:3, 2:7, 2:9,
2:18, 2:21, 36:14,
36:18, 36:21, 36:23,
37:18, 37:19, 37:21,
68:19, 68:22, 69:1,
69:3, 78:21, 79:16,
79:19, 79:21, 79:25,
80:5, 114:12,
179:19, 180:2,
180:4, 180:20,
180:22, 181:9,
181:11, 182:18,
183:6, 183:12,
183:21, 184:2

**theme** [1] - 105:15

**themselves** [3] -

128:5, 152:11,
180:17

**theories** [1] - 81:22

**theory** [10] - 41:13,
42:17, 43:20, 44:23,
81:24, 82:2, 82:4,
82:19, 87:16, 103:5

**thereafter** [1] - 7:21

**thereby** [1] - 141:16

**therefore** [6] - 125:3,
127:14, 130:9,
130:16, 145:22,
172:25

**they've** [2] - 116:18,
124:15

**thick** [1] - 43:4

**thief** [1] - 49:19

**thin** [1] - 66:22

**thinking** [5] - 53:11,
56:2, 63:7, 118:9,
170:5

**thinks** [2] - 98:25,
99:11

**third** [16] - 26:10, 52:9,
72:1, 144:20, 147:1,
149:20, 149:23,
153:23, 156:4,
158:13, 159:6,
161:16, 163:1,
163:9, 169:7, 169:25

**thoughts** [1] - 71:23

**threat** [4] - 162:25,
163:3, 163:5, 163:13

**threatened** [4] - 74:9,
162:19, 162:22,
163:7

**threatening** [1] -
162:5

**threatens** [1] - 161:25

**three** [22] - 3:17, 5:22,
6:16, 12:6, 14:17,
17:22, 39:5, 52:7,
56:19, 62:14, 65:10,
78:22, 101:21,
146:23, 156:25,
158:18, 158:20,
181:14, 181:15,
181:24, 183:1

**threw** [2] - 16:15,
91:17

**throughout** [5] - 3:4,
87:21, 92:5, 95:11,
123:21

**throw** [3] - 22:13,
73:23, 105:9

**thrown** [1] - 64:22

**tickets** [1] - 10:18

**ticking** [1] - 71:22

**tidy** [1] - 38:2

**Tiera's** [1] - 69:11

**Tiffany** [31] - 11:18,
11:24, 12:8, 12:12,
14:21, 15:17, 20:11,
20:17, 20:24, 21:4,
30:5, 32:24, 39:9,
46:21, 68:2, 68:3,
75:20, 75:23, 75:24,
76:3, 77:6, 83:2,
93:21, 93:22, 94:14,
95:6, 98:18, 106:19,
108:9

**Tiffany's** [11] - 15:8,
20:8, 20:18, 21:10,
30:16, 31:5, 32:20,
32:23, 35:22, 70:3,
96:7

**tighter** [1] - 70:12

**timing** [2] - 107:9,
107:19

**tipped** [1] - 8:16

**tips** [1] - 86:15

**Title** [3] - 153:8,
157:14, 161:20

**title** [2] - 10:9, 168:21

**today** [6] - 4:17, 36:10,
87:21, 93:4, 95:12,
116:18

**today's** [1] - 78:17

**together** [8] - 8:2,
15:11, 32:14,
137:19, 138:15,
140:21, 179:16,
181:7

**toilet** [1] - 73:23

**token** [1] - 117:9

**tomorrow** [6] - 17:6,
100:6, 100:7,
164:25, 183:6,
183:24

**Tone** [30] - 3:15, 5:11,
6:5, 6:23, 7:5, 7:10,
18:5, 19:11, 26:12,
28:16, 30:13, 35:20,
63:22, 74:10, 90:9,
90:19, 95:7, 109:22,
111:2, 113:8,
113:20, 114:9

**tonight** [4] - 14:13,
164:24, 165:1,
179:13

**Tony** [18] - 4:21, 8:1,
8:7, 8:23, 8:25, 9:6,
9:7, 9:24, 9:25, 10:2,
10:17, 13:10, 18:21,
31:8, 31:12, 64:19,
76:8, 76:9

**Tony's** [1] - 77:17

**Tonya** [27] - 9:14,
22:6, 22:25, 24:15,
25:6, 27:21, 34:20,

39:11, 51:23, 52:9,
63:10, 63:11, 64:6,
64:22, 65:6, 65:14,
65:25, 80:16,
105:16, 111:12,
111:14, 111:19,
111:25, 112:4,
112:13, 112:25,
113:4

**Tonya's** [7] - 24:19,
27:7, 27:10, 27:11,
51:24, 51:25, 52:3

**took** [22] - 3:24, 3:25,
7:23, 16:14, 30:1,
40:3, 44:25, 60:18,
61:2, 61:4, 63:13,
74:14, 74:21, 76:16,
77:9, 85:5, 94:1,
99:24, 135:6,
151:25, 162:11,
162:18

**top** [3] - 12:17, 16:11,
32:1

**topic** [1] - 102:3

**torched** [1] - 60:21

**torture** [1] - 166:12

**tossed** [1] - 16:9

**total** [2] - 52:12,
118:24

**totality** [1] - 113:7

**totally** [1] - 94:16

**touched** [1] - 48:2

**toward** [2] - 127:5,
152:1

**towards** [3] - 44:8,
127:4, 152:3

**tower** [10] - 15:1, 15:2,
42:25, 43:14, 46:19,
89:8, 95:2, 99:6,
108:5

**towers** [6] - 15:3,
35:21, 44:7, 88:12,
93:20, 93:22

**town** [1] - 62:18

**Towson** [1] - 47:20

**toxic** [5] - 71:11,
71:13, 71:25, 72:5,
74:11

**trade** [1] - 23:3

**trafficker** [1] - 39:7

**trafficking** [15] - 6:7,
6:8, 39:20, 136:1,
156:16, 156:20,
156:23, 157:16,
157:25, 158:7,
158:9, 158:16,
158:24, 159:2, 172:3

**tragic** [2] - 3:11, 5:14,
49:18

**trail** [2] - 4:4

**train** [2] - 64:24, 64:25

**training** [1] - 133:8

**transcript** [12] - 54:4,
54:15, 56:22, 56:23,
59:20, 74:16, 74:17,
75:10, 82:13, 85:6,
107:14, 185:17

**transcription** [1] -
1:21

**transcripts** [1] - 75:9

**transfer** [1] - 150:1

**transferred** [1] -
162:15

**transported** [1] -
153:14

**trapped** [1] - 53:11

**trash** [1] - 109:6

**traveling** [4] - 9:17,
9:18, 43:6, 43:7

**travels** [1] - 11:21

**treason** [1] - 166:9

**treated** [1] - 73:4

**treatment** [1] - 128:25

**trial** [31] - 36:7, 82:12,
85:18, 86:3, 87:22,
95:12, 97:15,
103:18, 115:12,
115:25, 116:17,
117:17, 119:8,
120:13, 121:2,
122:4, 123:22,
124:14, 124:23,
124:25, 127:16,
129:13, 129:17,
130:13, 131:24,
132:6, 132:11,
132:14, 132:15,
141:22, 181:19

**TRIAL** [1] - 1:5

**tried** [14] - 4:6, 4:8,
4:14, 7:1, 17:22,
18:8, 38:24, 51:1,
73:12, 73:22, 82:23,
101:1, 103:2, 104:20

**tries** [2] - 25:19, 94:9

**trigger** [2] - 89:21,
90:10

**trouble** [1] - 8:23

**true** [23] - 23:13, 29:8,
31:6, 84:8, 85:18,
89:1, 89:20, 97:19,
98:5, 99:18, 111:17,
111:18, 118:10,
119:25, 121:20,
121:21, 121:23,
122:6, 122:7

**truly** [2] - 38:16

**trust** [1] - 2:21

**trustworthy** [1] - 39:4

**truth** [27] - 22:18,

23:10, 25:9, 29:16, 50:8, 51:6, 51:7, 51:10, 51:11, 51:15, 58:12, 59:1, 63:23, 66:9, 78:14, 85:12, 86:8, 90:20, 112:21, 113:5, 121:21, 124:9, 125:18, 126:13, 128:23, 129:4
**truthful** [4] - 62:7, 111:19, 126:7, 126:24
**truthfully** [2] - 105:6, 129:1
**try** [10] - 21:17, 38:23, 53:19, 53:21, 82:14, 104:25, 126:21, 131:16, 182:10
**trying** [14] - 10:8, 10:9, 13:5, 13:6, 37:12, 42:10, 43:21, 52:19, 59:24, 97:7, 126:4, 126:23, 164:24
**TUESDAY** [1] - 1:9
**Tuesday** [2] - 11:17, 14:22
**turn** [5] - 7:13, 77:12, 114:1, 114:6, 129:25
**turned** [7] - 18:7, 37:4, 37:5, 81:2, 91:22, 99:1, 113:15
**turning** [2] - 99:3, 112:24
**TV** [1] - 39:8
**TVs** [4] - 45:19, 45:20, 45:22, 45:23
**twice** [8] - 13:14, 29:4, 29:7, 33:18, 50:13, 66:14, 74:13, 105:12
**two** [59] - 6:5, 9:8, 11:4, 11:5, 21:21, 24:2, 31:4, 31:10, 33:11, 39:22, 40:20, 48:18, 56:3, 56:19, 59:9, 59:10, 59:15, 60:7, 60:9, 64:9, 65:5, 69:25, 70:24, 73:3, 73:24, 74:2, 75:2, 82:7, 88:15, 95:25, 100:4, 101:24, 103:9, 107:3, 107:17, 107:19, 114:18, 121:1, 121:3, 137:5, 137:8, 137:12, 137:25, 145:13, 151:16, 156:23, 158:9, 163:17, 178:2, 181:18,

182:20, 182:25, 183:19
**type** [1] - 145:11
**types** [2] - 121:1, 142:2

## U

**U.S** [1] - 56:14
**Uber/hack** [1] - 39:6
**Uber/hack-driver** [1] - 39:6
**uh-oh** [1] - 63:7
**ultimate** [1] - 108:23
**unable** [1] - 47:6
**unanimous** [6] - 174:7, 176:19, 177:1, 177:3, 177:25, 178:23
**unanimously** [7] - 119:12, 158:21, 173:4, 173:7, 173:9, 174:21
**unanswered** [1] - 107:6
**Unc** [2] - 33:20, 59:23
**uncle** [8] - 22:5, 22:6, 24:23, 54:21, 55:13, 56:5, 56:15
**Uncle** [8] - 21:13, 21:16, 22:5, 26:24, 28:14, 33:12, 35:7
**unclear** [2] - 87:21, 106:20
**uncontradicted** [6] - 85:2, 85:16, 85:17, 91:3, 110:25
**under** [21] - 27:19, 54:16, 56:19, 56:20, 59:7, 68:4, 88:24, 101:14, 102:22, 108:17, 116:1, 118:2, 123:17, 125:16, 131:24, 141:8, 142:8, 148:19, 155:19, 161:13, 170:25
**undercover** [3] - 104:25, 105:4, 105:10
**underlying** [1] - 123:5
**understandably** [1] - 123:14
**understatement** [1] - 74:11
**understood** [1] - 124:7
**undertaken** [1] - 145:23
**undertaking** [1] -

141:16
**unfavorable** [1] - 129:16
**unfortunately** [2] - 43:7, 45:17
**uniformed** [1] - 47:7
**UNITED** [3] - 1:1, 1:3, 1:8
**United** [25] - 52:2, 54:19, 64:10, 117:6, 136:23, 153:8, 154:9, 156:22, 156:24, 157:1, 157:3, 157:4, 157:14, 157:17, 158:2, 158:18, 161:20, 162:10, 165:17, 165:19, 165:24, 167:6, 168:18, 168:21, 169:1
**unknown** [1] - 136:18
**unlawful** [18] - 134:5, 137:5, 137:12, 138:1, 138:15, 139:1, 139:17, 141:3, 141:11, 141:14, 141:17, 142:3, 142:20, 153:9, 162:4, 166:4, 168:22, 169:18
**unlawfully** [8] - 6:16, 156:19, 163:8, 165:11, 166:13, 169:3, 169:9, 169:15
**unless** [7] - 2:13, 33:21, 60:19, 100:3, 119:10, 150:7, 181:4
**unlike** [2] - 55:24, 84:11
**unlikely** [1] - 150:20
**unnamed** [2] - 33:1, 33:2
**unnecessary** [1] - 123:6
**unspoken** [1] - 137:25
**unsure** [1] - 106:17
**untrue** [1] - 124:11
**unusual** [1] - 45:20
**up** [107] - 3:5, 4:9, 5:17, 8:14, 8:15, 8:17, 8:19, 9:4, 9:13, 9:19, 10:15, 10:18, 10:22, 13:5, 13:17, 13:18, 13:24, 14:5, 15:24, 16:8, 16:14, 16:17, 21:12, 22:21, 23:5, 24:7, 25:6, 26:5, 27:8, 28:10, 29:6, 33:18, 34:16,

34:24, 34:25, 35:10, 38:15, 41:4, 42:7, 43:11, 43:22, 44:4, 49:8, 50:11, 51:6, 52:1, 52:13, 54:20, 57:3, 57:8, 57:14, 57:15, 57:16, 58:6, 58:7, 59:17, 59:18, 61:1, 61:22, 61:24, 62:8, 62:24, 63:22, 65:3, 65:4, 68:13, 69:8, 72:11, 72:12, 73:10, 75:22, 75:24, 76:2, 76:23, 77:3, 77:9, 81:11, 85:5, 86:14, 86:17, 88:10, 90:1, 90:22, 91:20, 91:22, 92:9, 92:12, 95:2, 95:9, 98:18, 100:11, 100:22, 101:6, 104:9, 107:8, 108:9, 111:16, 112:24, 126:20, 126:22, 128:23, 146:5
**Upmanor** [3] - 3:14, 16:23, 20:4
**upset** [2] - 65:8, 78:7
**upstairs** [4] - 3:20, 24:17, 65:10, 92:21
**uses** [3] - 65:16, 65:17, 157:17
**utilize** [1] - 120:15

## V

**Valentine's** [2] - 7:15, 76:5
**value** [2] - 121:9, 162:14
**variety** [1] - 92:10
**various** [3] - 48:16, 49:22, 125:12
**venture** [3] - 172:18, 172:23, 172:24
**verbally** [1] - 163:3
**verdict** [36] - 36:11, 36:13, 113:6, 113:24, 115:1, 116:23, 117:15, 118:10, 118:12, 118:16, 118:25, 119:1, 119:5, 143:18, 143:22, 143:23, 143:25, 146:1, 173:11, 174:23, 174:25, 175:15, 175:20, 176:19, 176:24, 176:25, 177:2,

177:23, 177:25, 178:17, 178:20, 178:24, 179:3, 179:4, 179:8, 182:13
**verified** [1] - 42:20
**verify** [1] - 179:21
**versions** [1] - 103:12
**versus** [3] - 59:2, 82:9, 107:3
**victim** [12] - 23:16, 35:21, 35:25, 88:25, 113:19, 157:10, 163:21, 173:12, 173:13, 173:17, 173:22, 174:2
**victim's** [3] - 35:24, 99:8, 162:18
**victims** [4] - 19:13, 22:10, 97:4, 166:17
**victims'** [2] - 6:11, 6:13
**video** [17] - 47:21, 47:22, 47:23, 48:17, 74:15, 77:12, 77:13, 77:23, 101:8, 101:9, 101:16, 101:21, 101:22, 102:2, 108:15
**videocamera** [2] - 101:24, 102:1
**view** [4] - 113:6, 127:6, 177:20, 179:24, 182:18, 183:3, 183:7, 183:8
**viewed** [2] - 128:14, 132:1
**viewing** [2] - 108:19, 114:3
**views** [2] - 177:7, 177:10
**violating** [1] - 146:16
**violation** [11] - 23:15, 157:2, 157:4, 157:5, 161:20, 162:2, 162:10, 166:1, 167:6, 168:18, 168:25
**violence** [23] - 136:2, 156:15, 156:25, 157:15, 157:25, 158:10, 158:17, 159:7, 159:9, 160:18, 160:25, 161:18, 162:1, 162:6, 162:19, 162:21, 162:24, 163:1, 163:8, 163:14, 172:3, 173:24, 177:13
**violent** [1] - 112:17

**visit** [2] - 33:10, 52:20
**visiting** [1] - 12:6
**visitor's** [1] - 52:15
**visits** [3] - 33:11, 52:12, 52:18
**voicemail** [1] - 57:25
**Voir** [1] - 178:5
**voluntarily** [7] - 5:25, 95:15, 123:14, 133:24, 138:18, 155:24, 160:1
**voluntary** [1] - 95:14
**vouched** [1] - 62:5
**vs** [1] - 1:4
**vulnerable** [1] - 80:24

## W

**wait** [5] - 75:23, 79:11, 79:12, 100:9, 166:6
**waiting** [4] - 71:21, 77:24, 77:25
**waits** [1] - 45:19
**waived** [1] - 75:16
**waking** [1] - 34:24
**walk** [7] - 3:20, 8:5, 8:14, 45:13, 81:2
**walked** [5] - 3:13, 3:16, 17:10, 32:2
**walking** [3] - 17:13, 45:1, 99:8
**walks** [2] - 67:7, 87:9
**wall** [1] - 46:9
**wallet** [2] - 59:3, 59:5
**Wane** [86] - 8:9, 8:13, 8:17, 9:10, 9:12, 11:19, 12:1, 13:13, 13:20, 13:24, 19:2, 19:3, 19:5, 19:6, 20:9, 21:12, 21:15, 22:7, 22:10, 23:5, 23:7, 24:5, 24:14, 24:22, 25:5, 25:15, 25:21, 26:4, 26:6, 26:8, 26:10, 26:15, 26:19, 30:15, 33:12, 33:23, 33:25, 39:11, 43:6, 53:19, 53:22, 55:10, 55:15, 56:10, 56:21, 57:22, 58:2, 58:18, 59:17, 59:18, 60:22, 60:23, 61:11, 62:14, 64:13, 65:14, 65:16, 65:18, 65:19, 80:16, 95:4, 100:19, 100:22, 100:24, 100:25, 105:15, 105:16, 105:21, 105:23, 106:3, 106:6, 106:9,

106:20, 107:6, 107:7, 107:9, 107:18, 107:22, 108:4, 108:21, 108:23, 109:7, 109:25, 113:2
**wane** [1] - 56:15
**Wane's** [4] - 24:25, 100:16, 100:19, 108:5
**Wanes** [1] - 100:18
**wants** [11] - 13:7, 14:6, 15:24, 31:17, 68:2, 69:20, 75:7, 76:23, 82:10, 82:17, 98:1
**ward** [1] - 59:10
**warn** [1] - 131:25
**Warwick** [3] - 14:24, 30:2, 94:5
**wastebasket** [1] - 109:10
**watch** [6] - 31:19, 108:15, 108:16, 108:18, 108:19
**watched** [2] - 39:8, 82:6
**watching** [1] - 3:22
**water** [2] - 60:16, 60:20
**wavered** [1] - 26:15
**ways** [4] - 22:10, 40:20, 90:6, 161:23
**weakness** [1] - 104:7
**weapon** [10] - 152:22, 155:1, 155:25, 159:23, 160:2, 160:7, 160:8, 160:9, 160:17, 161:1
**wear** [1] - 24:1
**Weaver** [31] - 1:16, 9:23, 14:8, 23:18, 23:19, 23:25, 29:21, 30:25, 31:21, 47:17, 51:16, 51:22, 55:15, 59:5, 62:9, 63:20, 64:4, 64:6, 64:11, 66:4, 66:6, 66:7, 67:4, 69:14, 74:21, 96:25, 104:23, 110:10, 111:3
**week** [10] - 9:3, 9:22, 9:25, 76:6, 85:18, 96:6, 97:11, 109:20, 181:19
**weeks** [14] - 19:20, 47:6, 59:9, 59:10, 59:15, 73:3, 73:24, 95:25, 101:21, 103:9, 121:3,

182:20, 183:1
**weigh** [4] - 121:13, 127:6, 130:10, 177:3
**weighed** [1] - 132:1
**weighing** [2] - 121:14, 133:9
**weight** [11] - 91:19, 92:17, 116:8, 121:9, 123:15, 129:7, 130:12, 131:8, 131:14, 131:22, 133:1
**welcome** [1] - 37:2
**well-prepared** [1] - 38:2
**west** [2] - 14:23, 93:25
**West** [1] - 11:21
**WHALEN** [5] - 2:8, 68:11, 180:3, 180:21, 183:9
**Whalen** [7] - 1:14, 38:8, 67:9, 68:10, 69:6, 111:22, 112:9
**whatsoever** [2] - 61:8, 87:17
**white** [2] - 45:2, 76:20
**whoa** [1] - 75:23
**whole** [9] - 60:4, 60:5, 61:9, 63:5, 66:12, 84:25, 85:1, 97:15
**wholly** [1] - 177:11
**whopper** [1] - 60:12
**wide** [4] - 45:5, 66:18, 66:19, 66:21
**Wilde** [1] - 43:1
**Wilder** [4] - 9:6, 33:5, 67:12, 83:15
**willful** [2] - 134:8, 166:7
**willfully** [6] - 133:23, 134:4, 137:9, 138:18, 138:24, 163:7
**willfulness** [2] - 134:14, 135:4
**William** [1] - 1:15
**Williams** [16] - 8:4, 8:24, 9:2, 10:6, 19:19, 33:5, 39:7, 41:9, 71:9, 80:17, 91:10, 91:15, 99:20, 99:21, 99:23
**willing** [3] - 97:7, 99:21, 141:17
**Winchester** [1] - 153:5
**wind** [1] - 3:5
**wire** [1] - 24:1
**wired** [2] - 59:17, 59:18
**wisest** [1] - 181:18

**wish** [4] - 38:1, 132:3, 146:5, 183:10
**wished** [1] - 172:22
**witness** [106] - 4:12, 7:4, 22:16, 36:7, 38:14, 39:4, 40:23, 40:24, 41:16, 41:25, 42:1, 42:21, 45:8, 47:24, 50:2, 51:6, 53:6, 54:8, 63:12, 63:13, 63:14, 66:17, 67:6, 71:4, 71:12, 74:14, 74:19, 77:22, 82:11, 85:8, 85:11, 86:23, 88:23, 91:11, 102:21, 103:13, 103:16, 103:18, 103:19, 103:20, 104:13, 105:7, 105:8, 111:19, 111:20, 112:25, 115:14, 119:19, 121:17, 121:20, 121:21, 124:1, 125:16, 125:17, 125:20, 125:21, 125:22, 125:23, 125:24, 125:25, 126:1, 126:2, 126:3, 126:6, 126:8, 126:9, 126:12, 126:14, 126:15, 126:17, 127:4, 127:9, 127:12, 127:14, 127:19, 129:2, 129:9, 129:13, 129:19, 130:1, 130:4, 130:6, 130:25, 131:11, 131:15, 131:17, 131:21, 131:23, 132:1, 132:4, 132:11, 132:13, 132:17, 132:20, 133:6, 133:15, 136:3, 165:2, 168:9, 175:16
**WITNESS** [1] - 185:2
**witness's** [11] - 113:13, 125:19, 126:9, 126:19, 127:21, 129:14, 129:22, 132:6, 133:2, 133:10, 133:13
**witnesses** [84] - 4:1, 4:4, 13:13, 22:8, 22:15, 22:20, 24:20, 25:13, 28:13, 36:6, 36:8, 39:11, 40:17,

42:21, 48:16, 50:5, 55:4, 55:5, 55:17, 56:20, 60:24, 64:18, 65:13, 71:6, 81:20, 82:3, 84:5, 86:12, 87:4, 87:6, 87:8, 87:17, 90:14, 90:20, 90:21, 90:24, 94:15, 101:24, 102:4, 102:10, 102:14, 102:15, 102:16, 103:3, 103:4, 103:17, 103:21, 103:23, 104:16, 104:18, 105:14, 105:15, 109:19, 112:16, 112:21, 112:22, 113:19, 116:9, 116:15, 116:19, 117:15, 119:20, 119:23, 119:24, 120:4, 120:5, 120:6, 120:11, 120:14, 122:2, 125:2, 125:9, 125:14, 127:2, 127:3, 127:6, 127:8, 127:23, 128:1, 128:4, 129:8, 133:4
**witnesses'** [1] - 122:16
**woefully** [1] - 38:25
**woke** [2] - 34:25, 65:3
**woken** [1] - 104:9
**woman** [8] - 29:6, 42:17, 46:12, 65:20, 68:4, 71:24, 76:18, 97:22
**women** [4] - 32:11, 97:13, 100:4, 113:25
**word** [7] - 6:3, 54:3, 85:3, 85:9, 98:5, 156:1, 160:3
**words** [15] - 71:12, 80:24, 84:14, 88:13, 90:1, 93:9, 94:3, 105:11, 107:13, 126:21, 134:22, 135:2, 137:21, 138:10, 162:22
**worker** [1] - 139:3
**world** [2] - 25:10, 81:17
**worn** [1] - 2:12
**worried** [3] - 59:2, 77:2, 95:15
**worry** [2] - 26:5, 65:11
**worth** [2] - 27:17, 100:23
**wrapped** [1] - 68:1

**wrist** [1] - 3:17
**writing** [2] - 137:21, 176:10
**written** [1] - 178:16

## X

**Xfinity** [1] - 101:14

## Y

**y'all** [2] - 41:6, 68:13
**yard** [1] - 73:11
**year** [17] - 38:12, 49:7, 53:15, 75:6, 100:3, 106:15, 152:21, 153:2, 153:11, 153:20, 154:4, 154:9, 154:12, 157:13, 165:5, 165:15
**years** [21] - 31:18, 33:9, 36:3, 40:4, 41:20, 45:17, 64:15, 70:25, 71:2, 72:20, 73:25, 78:4, 78:14, 82:8, 82:20, 108:17, 173:13, 174:4, 178:5, 178:6
**yell** [1] - 100:5
**yelling** [2] - 47:15, 72:3
**yells** [1] - 17:5
**yield** [1] - 177:21
**yo** [5] - 15:22, 55:17, 73:9, 73:16, 73:19
**Yo** [3] - 15:23, 28:9, 63:22
**York** [1] - 54:10
**young** [2] - 53:2, 59:14
**younger** [1] - 173:13
**yourself** [6] - 37:8, 118:5, 128:21, 130:16, 172:20, 177:14
**yourselves** [2] - 126:6, 138:21

## Z

**zero** [1] - 19:4

## §

**§1111** [2] - 157:8, 165:18
**§1111(a** [1] - 167:7
**§1512** [1] - 165:20
**§1951(a** [1] - 157:3

**§846** [1] - 136:24
**§921** [1] - 154:9
**§924(c** [1] - 157:14
**§924(c)** [1] - 157:5