```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                        NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,)   CRIMINAL CASE NO.
            Plaintiff,        )   RDB-20-139
 4                           )
            vs.              )
 5                           )   JURY TRIAL DAY 9
     ANDRE RICARDO BRISCOE,   )   TONYA HARRIS (CONT.)
 6          Defendant.       )   JEREMY MONKERS
     _____)   JEFFREY KELLY
 7

 8               BEFORE THE HONORABLE RICHARD D. BENNETT
                    UNITED STATES DISTRICT JUDGE
 9                     FRIDAY, JUNE 3, 2022
                       BALTIMORE, MARYLAND
10
     For the Plaintiff:
11     Dana Brusca, AUSA

12     Paul Budlow, AUSA

13
     For the Defendant:
14     Teresa Whalen, Esq.

15     William Purpura, Esq.

16
     Also Present:  Javon Weaver, Special Agent ATF
17
       Jeffrey Kelly, Special Agent, FBI
18
       Andrew Murray, Paralegal
19
       Robert Cadle, Paralegal
20

21       (Computer-aided transcription of stenotype notes.)
     _____
22
                         Reported by:
23
                      Melissa L. Clark, RPR
24            Federal Official Court Reporter
               101 W. Lombard Street, 4th Floor
25                Baltimore, Maryland  21201
```

```
1                    P R O C E E D I N G S
2          (10:16 a.m.)
3              THE CLERK:  The United States District Court for the
4      District of Maryland is now in session.  The Honorable Richard
5      D. Bennett is presiding.
6              THE COURT:  Good morning, everyone.  We're going to
7      continue with the trial.  We have to put something on the
8      record just so we're clear.  There were some events this
9      morning.  You all may be seated for a moment.
10         Good morning to everyone.
11         Melissa, good morning to you.
12         This morning the United States Marshal Service called
13     chambers to report that the Defendant, Andre Briscoe, was
14     refusing to be transmitted from -- transported from the
15     Chesapeake Detention Facility to the courthouse for trial.
16     And I directed the Marshal Service to transport him here.  And
17     my law clerk, Mr. Adam Demetriou, informed both Defense
18     counsel and Government counsel of this fact and that I ordered
19     that he be brought over.
20         And he has -- it is now 20 after 10:00.  We were trying
21     to get started at 9:30 here.  He, in fact, then agreed to be
22     brought over, and I made sure that counsel, his counsel had an
23     opportunity to speak with him in the lockup area on the sixth
24     floor before we continued with the proceedings here today, and
25     apparently Mr. Briscoe is now ready to proceed.  He's seated
```

1       here as he was throughout the trial all last week and this

2       week, and we're ready to proceed.

3           Is that a correct summary from the point of view of the

4       Defense counsel?

5               **MR. PURPURA:**  It is.  Thank you, Your Honor.

6               **THE COURT:**  All right.  So that's where we are, and

7       I won't explain to the jury that we're starting late because

8       of Mr. Briscoe's refusal to come.  I'm just going to indicate

9       that there were some logistical issues that arose today, and

10      we apologize and we're just starting later than planned.

11          Is that agreeable to the Defense?

12              **MR. PURPURA:**  Yes.  Thank you.

13              **THE COURT:**  All right.  Anything else from the

14      Government's point of view on this?

15              **MS. BRUSCA:**  No, Your Honor.

16              **THE COURT:**  And then Tonya Harris will be brought

17      back in as soon as we get the jury, and she will be re-sworn.

18          We're ready to proceed with cross-examination; correct,

19      Mr. Purpura.

20              **MR. PURPURA:**  We are.  Thank you.

21              **THE COURT:**  And good morning to all of you.

22              **MR. BUDLOW:**  Morning.

23              **THE CLERK:**  All rise for the jury.

24          (Jury enters courtroom 10:19 a.m.)

25              **THE COURT:**  Good morning, everyone.  And I want to

1    apologize to all of you for having you get here at 9:30, and

2    it's now almost 10:30, 25 after 10:00.

3         We had some logistical issues that arose, and there is

4    nothing we could do about it in terms of getting proceeded.

5    It's a long story, but we had some logistical issues here with

6    court personnel here at the courthouse, and so we're just

7    starting now when we start.

8         We're going to go -- we'll take about a half an hour

9    break for lunch some time around lunchtime, depending upon how

10   the pace works out, and then we'll stop at a quarter after

11   3:00 today.  That's generally the schedule.

12        So with that, we will call in -- Tonya Harris will return

13   to the witness stand.

14        Good morning, Ms. Harris.  If you'll come forward,

15   please.

16        Thank you very much, and if you'll come forward to the

17   witness box.  And Mr. Gurevich, we will re-swear the witness.

18        **THE CLERK:**  Yes, Your Honor.

19        Please raise your right hand for me.

20        **TONYA HARRIS**, having been duly sworn, was examined and

21   testified as follows:

22        **THE WITNESS:**  I do.

23        **THE CLERK:**  You may have a seat.  And can you just

24   please restate your name for the record.

25        **THE WITNESS:**  Tonya Harris.

```
 1                    THE CLERK:   Thank you.
 2                    THE COURT:   All right.  You may proceed.
 3          Good morning, Ms. Harris.
 4          You may proceed, Mr. Purpura with cross-examination.
 5                 C R O S S  - E X A M I N A T I O N
 6   BY MR. PURPURA:
 7   Q.   Ms. Harris, I want to take you back, as we have so often
 8   in your testimony, back to June 5th, 2015.
 9   A.   Okay.
10   Q.   And, again, that's the day of the raid at your apartment;
11   correct?
12   A.   Yes.
13   Q.   You indicated -- I'm sorry, you have to speak nice and
14   clear and loud.
15   A.   Yes.
16   Q.   Okay.  Thank you.
17          You indicated that on this date you were pregnant and you
18   were there with your boyfriend in your bedroom; correct?
19   A.   Yes.
20   Q.   And you were not just pregnant, you were just about
21   almost ready to have the baby.  Is that fair to say?
22   A.   Yes.
23   Q.   And when you heard the knocking, was it a loud knock at
24   the door?
25   A.   Yes.
```

```
 1    Q.   Obviously did it startle you?

 2    A.   Yes.

 3    Q.   Concerned you?

 4    A.   Yes.

 5    Q.   And you came out as quick as you can to see what's going

 6    on.  Is that fair to say?

 7    A.   Yes.

 8    Q.   And what you -- at that point, you indicated you saw the

 9    police, the Cambridge Police, in your the apartments; is that

10    correct?

11    A.   Yes.

12    Q.   You also -- you saw Andre Briscoe there, right?

13    A.   Yes.

14    Q.   And you thought, right away, that he wasn't here last

15    night.  I'm not sure how he got here today; correct?

16    A.   Yes.

17    Q.   All right.  And when you saw him, he was -- the first

18    time you saw him, I'm asking you, that morning, he was in the

19    front room where the couch was?

20    A.   Yes.

21    Q.   Was he seated on the couch?

22    A.   Yes.

23    Q.   Now, your -- I'm trying to picture the bedrooms in your

24    house.  Are all of the bedrooms on one side of the house?

25    A.   No.
```

1    Q.   Okay.  And the master bedroom, where is that?

2    A.   It's --

3    Q.   Off of the living room where Mr. Briscoe was, where is

4    the master bedroom?

5    A.   In the back to the left.

6    Q.   Okay.  And bedrooms, the other two bedrooms, where are

7    they?

8    A.   One is in the middle, you can look straight to the living

9    room.  And the other one is on the right.

10   Q.   Okay.  And at no time, at least when you were there, did

11   you see Mr. Briscoe run, either to the master bedroom or the

12   number 1 or number 2 bedrooms just mentioned; did you?

13   A.   No.

14   Q.   And when you saw Mr. Briscoe, he wasn't standing on the

15   couch; was he?

16   A.   No.

17   Q.   Now, I'm going to take you just to after the raid, and

18   you mentioned your brother, who is Terrill Harris, Junior;

19   correct?

20   A.   Yes.

21   Q.   And his nickname is Fatman; correct?

22   A.   Yes.

23   Q.   Right after the raid, you've testified that your brother

24   came back to your apartment; correct?

25   A.   Yes.

1    Q.   Did you see where your brother went?  Were you there when

2    he came into the apartment?

3    A.   Yes, I was.

4    Q.   Where did your brother go?

5    A.   He went off into the bedroom where my father sleeps.

6    Q.   Where your father sleeps?

7    A.   Yes.

8    Q.   And at that point, you said he came back out; correct?

9    A.   Yes.

10   Q.   You didn't see him holding anything in his hands; did

11   you?

12   A.   No, I did not.

13   Q.   But he said something to you; correct?

14   A.   Yes.

15   Q.   And he said something to the effect that, "I got it.

16   Don't worry"?

17   A.   "They didn't find it."

18   Q.   "They didn't find it"?

19   A.   Uh-huh.

20   Q.   And did he show you what they didn't find?

21   A.   No, I didn't ask.  I didn't care.  I just wanted him out

22   my house.

23   Q.   This is June, right?

24   A.   Yes.

25   Q.   So I would assume that it's fairly warm at that time of

```
 1   the year; correct?

 2   A.   Uh-huh.

 3   Q.   So he wasn't wearing an overcoat or a heavy coat on; was

 4   he?

 5   A.   No, he wasn't.

 6   Q.   He was probably just wearing jeans and T-shirt, right?

 7   A.   Yes.

 8   Q.   And didn't have anything in his hands?

 9   A.   No.

10   Q.   Did he -- could you see anything in his pockets?

11   A.   I didn't look.

12   Q.   All right.  Well, there was nothing that caught your

13   attention like a big bulge like the size of a tennis ball in

14   his pocket; did it?

15   A.   I didn't look.  I wasn't looking at his pocket.  I just

16   -- I was really angry at the moment.

17   Q.   So you were angry, but you didn't see anything?

18   A.   No.

19   Q.   And we're talking about Terrill Harris, Jr., Fatman.  Is

20   he still with -- he's still living; correct?

21   A.   Yes, he is.

22   Q.   And he's still living in Maryland; correct?

23   A.   Yes, he is.

24   Q.   And I'm not going to ask you where, but you know where

25   he's living; correct?
```

1    A.   No, I don't.

2    Q.   You don't know now where he's living?

3    A.   No.

4    Q.   But you do know that he's around, right?

5    A.   Yes.

6    Q.   This may be minor, but I'm just going to ask you about

7    it.  You testified before this jury that there was a time when

8    Andre Briscoe asked you for some money.

9         Do you remember that?

10   A.   Yes.

11   Q.   And you remembered that because, I believe you indicated,

12   that you just -- it was income tax time; you got some money

13   back?

14   A.   Yes.

15   Q.   And at that point, you were working -- still out working

16   at McDonald's; correct?

17   A.   Yes.

18   Q.   And you're supporting how many children?

19   A.   At the time, it was three, but now it's four.

20            **THE COURT:**  Keep your voice up please into the

21   microphone.  Thank you.

22            **THE WITNESS:**  At the time it was three, but now it's

23   four.

24   **BY MR. PURPURA:**

25   Q.   But back then when Mr. Briscoe asked you for the money,

```
 1    it was three children at the time; correct?
 2    A.   Two.  I was pregnant with the third.
 3    Q.   Two.  So you were supporting two children and yourself,
 4    right?
 5    A.   Yes.
 6    Q.   You didn't have a lot of extra money.  Is that fair to
 7    say?
 8    A.   Correct.
 9    Q.   And you indicated to the jury that Mr. Briscoe -- I think
10    the sum you said was -- do you remember what you said?  1200?
11    A.   It was like 1200, yes.
12    Q.   That's -- no matter if you have money or you don't have
13    money, that's a fairly large amount of money; would you agree?
14    A.   Yes.
15    Q.   That's something you would, kind of, remember, correct,
16    that you gave Andre Briscoe $1200 of your hard-earned money;
17    correct?
18    A.   Yes, uh-huh.
19    Q.   Well, then I just -- then when you testified before the
20    United States Grand Jury on August 19th, 2020, you were
21    basically asked the same questions about this money?
22    A.   Uh-huh.
23    Q.   You kind of remember that?
24    A.   Yes.
25    Q.   You've had the opportunity in the past to review your
```

```
 1    Grand Jury; correct?

 2    A.   Yes.

 3              MR. PURPURA:   Counsel, page 8.  Defense exhibit --

 4              THE COURT:   This is Defense exhibit what number,

 5    Mr. Purpura?

 6              MR. PURPURA:   129.

 7              THE COURT:   I'm sorry, 120- --

 8              MR. PURPURA:   129.

 9              THE COURT:   Okay.  Thank you.

10        This is for identification; correct?

11              MR. PURPURA:   Well, no, it's for admission.  It's

12    coming into evidence.

13              THE COURT:   That's fine.  Defense Exhibit 29 [sic]

14    is his Grand Jury transcript; is that right?

15              MR. PURPURA:   Right.

16              THE COURT:   All right.  Defense Exhibit 29 -- I'm

17    sorry, 129.

18              MR. PURPURA:   Thank you.

19    BY MR. PURPURA:

20    Q.   And the question was, "And did you give Poo 500?"  And

21    your response was, "I think I did.  Yeah, I might have," okay.

22    And above that, it says -- you say, "He wanted 500."  Do you

23    remember that?

24    A.   Yes, I do.

25    Q.   So when you testified before the United States Grand Jury
```

```
 1    under oath --
 2    A.   Uh-huh.
 3    Q.   -- back on August 19th, 2020, the sum was 500 and now
 4    1200; correct?
 5    A.   Yes.  But can I add to that, though?
 6    Q.   You'll get a chance to add to it.
 7         At no other time in the Grand Jury did you indicate it
 8    was $1200; did you?
 9    A.   No, I didn't.
10    Q.   Now, you've met Agent Weaver before; correct?
11    A.   Uh-huh.
12    Q.   And you've met other police who have been involved in
13    this investigation; correct?
14    A.   Yes.
15    Q.   Obviously you know Sergeant Howard, then, I think,
16    Corporal Howard; correct?
17    A.   Uh-huh, yes.
18    Q.   And other agents here and some of the agents that have,
19    you know, been in some of the proffers with you, so have all
20    of the agents, have they all treated you respectfully and
21    courteously, with courtesy?
22    A.   Yes.
23    Q.   Okay.  You've met Ms. Brusca; is that correct?
24    A.   Yes.
25    Q.   Okay.  She was quirky?
```

```
 1    A.    Yes.
 2    Q.    And Ms. Brusca has always been polite and courteous with
 3    you; is that correct?
 4    A.    Yes.
 5    Q.    Easy questions?
 6    A.    Uh-huh.
 7    Q.    And you had a conversation with Ms. Whalen; correct?
 8    A.    Yes.
 9    Q.    You've never met Ms. Whalen before; correct?
10    A.    No, I haven't.
11    Q.    And Ms. Whalen was polite and courteous as well in your
12    conversations; correct?
13    A.    Yes, she was.
14    Q.    And other than just seeing you in the hallway, probably
15    yesterday, you and I have never met before; have we?
16    A.    Correct.
17    Q.    Government's Exhibit 17.8.
18              JURY MEMBER:  Excuse me, are we supposed to be
19    seeing this?
20              THE COURT:  The screen is not on, Mr. Gurevich, for
21    the jury.  Thank you.  Is it up now, okay?  Good.  Thank you
22    very much.
23              MR. PURPURA:  Go back just because the screen was
24    out.  Defense Exhibit 129, we're putting that back up again so
25    that the jury can see it.  Thank you.  I'll move on.
```

1    **BY MR. PURPURA:**

2    Q.   Government's Exhibit 17.8, your father, your mother;

3    correct?

4    A.   Yes.

5    Q.   Terrill Harris, Sr., your father; Louise Martin, your

6    mother, right?

7    A.   Yes.

8    Q.   And Ms. Martin, she is still in Maryland; correct?

9    A.   Yes.

10   Q.   We've mentioned your brother, Fatman, and your twin is

11   Tony; correct?

12   A.   Yes.

13   Q.   You do know, obviously, Wane Briscoe; correct?

14   A.   Yes.

15   Q.   You know that Wane is somewhat close to your mother,

16   right?

17   A.   Yes.

18   Q.   Boug?  And you do know that both your mother and father

19   were used, unfortunately, as testers of drugs; is that

20   correct?

21   A.   Yes.

22   Q.   And the -- as far as the relationship between Ms. Martin

23   and Wane Briscoe, you do know that your mother would accompany

24   Mr. Briscoe when he traveled in particular to Hurlock,

25   Maryland, when he was going to pick up drugs; correct?

```
 1    A.    Yes.

 2    Q.    And the reason, to your knowledge, that your mother went

 3    there was she was, kind of, cover for Wane Briscoe, Jr.,

 4    right?

 5    A.    Not cover.  She would put the drugs in her vagina, yes.

 6    Q.    Well, that's pretty covered.  I didn't want to be that

 7    specific, but, in fact, Wane would give the drugs to your

 8    mother to hide in a very private place so that he would not

 9    get caught; correct?

10    A.    Yes.

11    Q.    The slang term of that is a mule, right, if you know?

12    A.    I guess.  Sure.

13    Q.    Do you know how long Wane used your mother in that

14    capacity?

15    A.    No, I don't.

16    Q.    It was for a period of time; correct?

17    A.    Yes.

18    Q.    And I mentioned Hurlock.  You're familiar with Hurlock;

19    correct?

20    A.    Yes, I do.  Yes, I am.

21    Q.    And that's where they would go; is that correct?

22    A.    Not that I recall.  I thought it was Delaware, but --

23    Q.    Either Delaware or Hurlock, right?

24    A.    Yes.

25    Q.    Back, again, to June 5th, 2015, the day of the raid.  The
```

1    day of the raid, Defense Exhibit 47A and B, counsel would --

2    do you recognize this Advice of Rights?

3    A.   Yes.

4    Q.   So you see the date June 5th, 2015.

5                **MR. PURPURA:**   Your Honor, this is Government --

6    Defense Exhibit 47A.

7    **BY MR. PURPURA:**

8    Q.   June 5th, 2015, right?

9    A.   Yes.

10   Q.   This is your signature here.  Tonya Harris; correct?

11   A.   Yes.

12   Q.   You were read your Miranda warnings at that time;

13   correct?

14   A.   Yes, I was.

15   Q.   Is it kind of frightening?

16   A.   I thought I was going to go into labor, yes.

17   Q.   Excuse me?

18   A.   Yes, I thought I was going to go into labor, yes.

19   Q.   You were pregnant, thought you were going to go into

20   labor, and you were at the -- was it the police station in

21   Cambridge?

22   A.   No, I don't believe so.  I thought it was at my house.  I

23   don't remember.

24   Q.   Actually, you're right.  It was at your house, and some

25   officer's reading your Miranda warnings; correct?

```
 1    A.    Yes.

 2    Q.    Defense Exhibit 47B -- and they asked you to give a

 3    written statement; correct?

 4    A.    Uh-huh.

 5    Q.    And you gave them a written statement; is that correct?

 6    A.    Yes.

 7    Q.    This is your handwriting?

 8    A.    Yes.

 9    Q.    And, again, this is your signature at the bottom;

10    correct?

11    A.    Yes.

12    Q.    We'll just read it.  "From the time I got up this

13    morning, it was around 7:50.  I put my kids on the bus.  No

14    one was in my house at this time but me and my child's

15    father."  That's accurate, basically; correct?

16    A.    Uh-huh.

17    Q.    You have to say yes or no.

18    A.    Yes.

19    Q.    "But the drugs that was found, I don't know who those

20    were," and that's correct, right?

21    A.    Yes.

22    Q.    "I have no one selling out of my house.  I was asked if

23    anyone gets high.  Yes, my dad do get high;" correct?

24    A.    Yes.

25    Q.    So in that statement, you never indicated that your
```

```
 1    brother Fatman came back and retrieved something from your
 2    house; did you?
 3    A.   This was at my house; correct?
 4    Q.   This is at your house?
 5    A.   So I said Terrill came after everyone left.  So why would
 6    I put that in that statement, sir?
 7    Q.   Fair enough.  Fair enough.
 8         Did you ever call the Cambridge Police afterwards and
 9    say, "Wait a second.  I want to add on to my statement" --
10    A.   No, I did not.
11    Q.   -- "that my brother came back here and picked up
12    something that may be drugs"?
13    A.   Not on that particular day, but I did let the Cambridge
14    Police know that Terrill did come back to my house.  I spoke
15    to Officer Dickerson.
16    Q.   Not in the year of 2015?
17    A.   I'm not sure, but I did let Officer Dickerson know.
18    Q.   Not in the year 2016?  Ma'am, it wasn't until 2020 that
19    you spoke to the police again?
20    A.   Again, you're wrong.  I spoke to Officer Dickerson.
21    Q.   Well, maybe we'll see that on redirect.
22         So at least at that point, it's not in here, and you made
23    no comment immediately afterwards to Cambridge Police or
24    anyone else; correct?
25    A.   About the drugs, no, I did not.
```

```
 1          Do you have that I did go to the station?
 2   Q.   Excuse me, ma'am.  There's no question.
 3   A.   Okay.  Well --
 4   Q.   Thank you.
 5          There came a time when you spoke to Special Agent Weaver.
 6   Do you remember that?  It was May 26 of 2020.
 7   A.   Yes.
 8   Q.   And that conversation was recorded and you are well aware
 9   it was recorded; correct?
10   A.   Yes.
11   Q.   And you've reviewed a copy of that transcript, I would
12   assume, with Agent Weaver and the prosecution; correct?
13   A.   Yes.
14   Q.   So if I may, at that point, do you recall that the agent
15   read you, again, your Miranda warnings?
16   A.   Not that I recall offhand.  He might have.  I don't
17   remember.
18   Q.   Well, let me ask you to take a look, please, at Defense
19   Exhibit No. 48 for identification only, page 1.
20          THE COURT:  Defendant's Exhibit 48.  This is a
21   Miranda warning from May 26; is that correct?
22          MR. PURPURA:  No, it's not.
23          THE COURT:  Okay.  Well, identify it.
24          MR. PURPURA:  This is a copy of the transcript of
25   the interview of 5/26.
```

```
 1              THE COURT:  Okay.
 2    BY MR. PURPURA:
 3    Q.   Does that help?  Of course this is about two years ago.
 4    A.   Okay.  Yes.
 5    Q.   Does that help refresh your recollection?
 6    A.   Uh-huh.
 7    Q.   And the uh-huh means?
 8    A.   Yes.
 9    Q.   In fact, Weaver, Special Agent Weaver, excuse me, read
10    you your Miranda warnings; correct?
11    A.   Yes.
12    Q.   And at that point, he also said to you, "I'm not here to
13    charge you right now."  Do you remember that?
14    A.   I don't remember that, but...
15    Q.   Can I approach you again?
16    A.   Sure.
17              MR. PURPURA:  Your Honor, approaching with the same
18    document, same page.
19    BY MR. PURPURA:
20    Q.   Bottom of the page, line 44.
21              THE COURT:  This is Defendant's Exhibit 48 again.
22              MR. PURPURA:  Yes.
23              MR. BUDLOW:  For identification only?
24              MR. PURPURA:  Yes.
25              THE WITNESS:  Okay.
```

1      **MR. PURPURA:**  Thank you.

2   **BY MR. PURPURA:**

3   Q.   So do you remember what the agent said after he indicated

4   he was going to read you your Miranda rights that, "I'm not

5   here to charge you right now.  I'm not gonna.  I'm not here to

6   lock you up at all?"

7   A.   Yes.

8   Q.   Do you remember that?

9   A.   Yes.

10  Q.   That still had to make you a little concerned when he

11  said, "I'm not here to charge you right now"?

12  A.   No, because I know I didn't do anything.  I wasn't

13  concerned.

14  Q.   Now, you told the jury about the first time you met Jen

15  and Kiara they were together; is that right?

16  A.   Yes.

17  Q.   And did you -- you didn't know Jen before then?

18  A.   No, I never met her before they brought her to my house.

19  Q.   And you never met Kiara before that either?

20  A.   No.

21  Q.   And at that point, you were, kind of, upset, I think --

22  and I don't blame you.  Strangers were in your house.  You

23  worked hard all day, right?

24  A.   Yes.

25  Q.   And I believe what you indicated when you first saw them

```
 1      was, I guess, pointing to Kiara, and I'll just use your words,

 2      "Who the F is this bitch"?

 3   A.    To both of them, yes, that's what I said.

 4   Q.    Because you were annoyed?

 5   A.    Yes, I just got off work and he had people in my house.

 6   Q.    Fair enough.

 7         And did you later meet Jennifer again?

 8   A.    Yes.

 9   Q.    And did you -- did you talk to Jennifer and --

10   A.    No.

11   Q.    You said that her son came over?

12   A.    At my grandmother's house.

13   Q.    At your grandmother's house?

14   A.    Yes.

15   Q.    Well, were you there?

16   A.    When I dropped my children off, yes.

17   Q.    Did you talk to Jennifer at that time at all?

18   A.    No.  Her son and my son were just playing.

19   Q.    That's just when you met her son?

20   A.    Yes.

21   Q.    Did Andre have a girlfriend at the time by the name of

22      Jonice?

23   A.    Not at --

24   Q.    2015.

25   A.    I'm not sure, because I know he was messing with Andrea.
```

```
 1    He was living with Andrea.
 2    Q.   Did you call one of his girlfriends, shorty?
 3    A.   Yes.  Shorty is just a term, so I don't know.
 4    Q.   It could be any girlfriend?
 5    A.   Yeah, any girl.
 6    Q.   Taking you back and talking to Agent Weaver, and this is,
 7    again, back on May 26, 2020, Agent Weaver asked you if there
 8    were any drugs, extra drugs inside your house.
 9         Now, this, again, is May 26, 2020, and your response was,
10    "Nobody got nothing.  No drugs out of my house, no."
11    A.   That's what I said, yes.
12    Q.   Okay.  And he went on to say, "Okay.  Are you sure?"  And
13    your response was, "Positive."  Do you remember that?
14    A.   Yes.  Yes, he caught me in a lie.
15    Q.   And that was May 26th of 2020?
16    A.   Yes.
17    Q.   That's completely different what you told me and the jury
18    about seeing Fatman, your brother --
19    A.   Yes.
20    Q.   -- with something which may or may not have been drugs
21    coming out --
22    A.   When you just said that I just said yes, "He caught me in
23    a lie" is what I said to you, right?  Yes.  I said, "Yes, he
24    caught me in a lie."  And when he came back and asked me do I
25    remember the conversation with Officer Dickerson is when I
```

```
 1    told him, yeah, what -- I told him, "I don't remember what I
 2    told him, but yeah."
 3    Q.   So the bottom line is, four years later, it wasn't until
 4    May 26, 2020, when Special Agent Weaver talks to you that you
 5    absolutely, you're saying, lied to him at least three times in
 6    a short little conversation, right?
 7    A.   Yes.
 8    Q.   In that conversation, you did tell Agent Weaver about
 9    Tony dealing with Jennifer.  I think you even said that she
10    was his plug; correct?
11    A.   Yes.
12    Q.   And that is accurate; correct?
13    A.   Yes.
14    Q.   You also indicated, I think, in your testimony the very
15    first time that you heard about the death of Jennifer through
16    a Facebook --
17    A.   Post that Kiara made, yes.
18    Q.   -- posting by Kiara; correct?
19    A.   Yes.
20    Q.   You were asked again May 26, 2020, if you heard what
21    might have happened to Jennifer and her child; remember?
22    A.   Yes.
23    Q.   And, basically, what you said, without telling me,
24    telling us, but you gave a couple different ideas of what
25    could have happened to her; correct?
```

```
 1   A.   Yes, I don't -- I'm -- sure.

 2   Q.   Like her roommate did it?

 3   A.   I said her roommate did it?

 4   Q.   Do you remember that?

 5   A.   No, I don't.  Can I see that?

 6   Q.   Do you remember telling Agent Weaver that, quite frankly,

 7   you didn't give an F about her, meaning Jennifer?

 8   A.   I don't think those were my words.  I was like --

 9   Q.   Let me -- hold on --

10   A.   -- I really --

11   Q.   Excuse me.

12   A.   -- didn't care.

13            THE REPORTER:  Wait a minute.

14            MR. BUDLOW:  Objection.

15            THE COURT:  Sustained.  Sustained.

16        This is not testimony under oath; correct?  This is a

17   statement taken by the officer.  Is that correct, Mr. Purpura?

18            MR. PURPURA:  It's a recorded statement.

19            THE COURT:  A recorded statement.  Is the statement

20   under oath or not?

21            MR. PURPURA:  It is not.

22            THE COURT:  All right.  Then you may proceed

23   accordingly consistent with the rules of evidence.

24   BY MR. PURPURA:

25   Q.   The question is, do you remember saying, "But like -- but
```

```
 1    her, I don't give a fuck about her."
 2         Just yes or no, do you remember saying that?
 3    A.   Yes.
 4    Q.   Okay.  And then Agent Weaver, again, asked you again on
 5    May 26th, 2020, "Do you know who did this?  Any information on
 6    who did this?"  And your responses was, "I'm -- "It's, like,
 7    to be honest, if I knew for a fact that Tone or Yo,"
 8    referencing Andre, did it, I'd tell you straight up, they did
 9    it."
10         Do you remember saying that?
11    A.   Yes.
12    Q.   You didn't tell Agent Weaver at that time about that
13    dream that you told the jury about where supposedly -- and
14    then Andre's confession to you that, "I did it.  I did it.  I
15    did it" three times; did you?
16    A.   No, not at the time, no.
17    Q.   Do you remember when Agent Weaver, again, May 26th, 2020,
18    was asking you about nightmares?
19         Do you remember that?
20    A.   Yes.
21    Q.   Let me take a step back.  Mr. Briscoe, you indicated, is
22    about ten years older than you?
23    A.   Yes.
24    Q.   Okay.  Do you know -- have you ever met Andre's
25    biological mother?
```

```
 1    A.   Yes.
 2    Q.   Okay.  And do you know where Andre was living from --
 3    from your own personal knowledge, you don't know where Andre
 4    was living until you were, what, five years old?
 5    A.   Yes, we all lived together.
 6    Q.   But you don't know where he was before then; do you?
 7    A.   No.
 8    Q.   You don't know if he was living in Georgia or anywhere
 9    else; do you?
10    A.   No.
11    Q.   You don't know what may or may not have happened to him
12    while he was living in these other areas; do you?
13    A.   No.
14    Q.   You were asked about the nightmares by Agent Weaver and
15    -- Special Agent Weaver, excuse me, and at that point, May 26,
16    2020, do you recall that your responses was, "He always got
17    the crazy nightmares"?
18    A.   I don't remember saying that, but...
19              MR. PURPURA:  May I approach, Your Honor?
20              THE COURT:  Certainly.
21    BY MR. PURPURA:
22    Q.   Defense Exhibit 48 just for identification.
23              MR. PURPURA:  Counsel, page 30.
24    BY MR. PURPURA:
25    Q.   Now, does that refresh your recollection as to what you
```

```
 1    said?

 2    A.    Yes.

 3    Q.    So when I asked you, do you remember telling Special

 4    Agent Weaver that Andre, "He always got crazy nightmares," now

 5    you remember telling him that; is that correct?

 6    A.    Yes.

 7    Q.    And then Agent Weaver wanted to know what were the

 8    nightmares about; do you remember that?

 9    A.    Yes.

10    Q.    And you said, "No, I don't remember that.  I just

11    remember he said nightmare about the girl biting his dick

12    off;" is that right?

13    A.    I said biting his dick off or grabbing his dick.

14    Q.    Do you recall saying biting his dick off?

15    A.    I thought I said grabbing or something like that.

16              MR. PURPURA:  May I approach, again, Your Honor, if

17    I may?

18              THE COURT:  Yes.  Certainly.

19              THE WITNESS:  Okay.

20    BY MR. PURPURA:

21    Q.    Does that refresh your recollection --

22    A.    Yes.

23    Q.    -- that you say, "I don't remember that.  I just remember

24    he said he had a nightmare about the girl biting his dick

25    off"?
```

1    A.   Yes.

2    Q.   And then you, kind of, fleshed out in more detail as to

3    what this dream was.  And, again, this is on May 26, 2020.

4    And do you recall saying, "And he was -- um, he like -- well,

5    I be -- be keep having dreams about Shorty."  And I was like,

6    "Why?"  And he was like, "Having dreams she bit my dick off."

7    And I was like -- and I looked at him, and he looked at me and

8    I said, "What you just F-ing said is silly."  And he goes

9    like, "Yeah, she damn near bit my dick off."  And then "I,"

10   meaning you, "just burst out laughing."

11        Do you remember saying that?

12   A.   Yes.

13   Q.   And at that point, you said you got up and you went to

14   bed.

15        Do you remember that?

16   A.   Yes.

17   Q.   You didn't say that your boyfriend was there and you left

18   and you were crying.  You said you got up after bursting out

19   laughing and you went to bed.

20        Do you remember that?

21   A.   Yes.

22   Q.   5/26/2020?

23   A.   Yes.  Uh-huh, yes.

24   Q.   Agent -- Special Agent Weaver went on to clarify.  "Now,

25   when you said Shorty, who do you think he was referring to?"

```
1    Do you remember responding, "That crazy bitch he was with at
2    the time, Jonice"?
3    A.    Jonice, not Jonice.
4    Q.    Jonice, right?
5    A.    Uh-huh.
6    Q.    The agent went on to say, "Any other nightmares?"  And
7    you response was "Never," right?
8    A.    Yes.
9    Q.    That was May 26th of 2020; correct?
10   A.    Uh-huh, yes.
11   Q.    Now, in between May 26th of 2020 and when you, again,
12   spoke and had a recorded conversation with Special Agent
13   Weaver, did you talk with your father, Terrill Harris, Sr.,
14   your brother, Tony Harris, and George Briscoe?
15        Do you remember talking with them in between 5/26 and the
16   July 21st, the next time?
17   A.    My father was living with me at the time, so I'm pretty
18   sure I had a conversation with him.
19   Q.    And some of the conversation dealt with what was going on
20   with --
21             MR. BUDLOW:  Objection.  I don't know what that
22   question --
23             THE COURT:  Sustained.  Sustained.  Rephrase the
24   question, please.
25   BY MR. PURPURA:
```

```
 1    Q.   Without exactly saying what the conversations were, you
 2    do recall having -- or do you recall having conversations with
 3    your father and others about the murder?
 4              MR. BUDLOW:  Objection.  Again, timeframe.
 5              THE COURT:  Sustained.
 6              MR. PURPURA:  Judge, the timeframe is very clear,
 7    between May 26th of 2020 --
 8              THE COURT:  You don't have to give a speech, just
 9    clarify the question.
10              MR. PURPURA:  I'm asking.  I'm asking.
11              THE COURT:  If I'm not clear, then he's not clear,
12    so just answer the question.  What is the timeframe?  Rephrase
13    your question.
14    BY MR. PURPURA:
15    Q.   Between May 26 of 2020, when you first had had a recorded
16    conversation with Special Agent Weaver and you were talking
17    about Jonice or Jonice biting off his dick and the July 21st,
18    2020, second conversation with Special Agent Weaver, that's
19    the timeframe I'm talking about.
20         Are we okay, you and I?
21    A.   Yes.
22    Q.   Okay.  And during that timeframe, you spoke with others
23    about what was going on involving the murder; correct?
24    A.   Yes.
25    Q.   You talked to your dad about two weeks before you spoke
```

1    to Special Agent Weaver about this; correct?

2    A.    My dad lives with me, so I spoke with him every day.

3    Q.    But about this in particular, correct; what the rumors

4    are or what's going on around, right?

5    A.    Not rumors, but yes, I spoke to him about it.

6    Q.    And you heard information involving what Tony knew and

7    what George knew; correct?

8    A.    No, I didn't hear information about what they knew.  I

9    know what I knew.

10    Q.    And you heard and you learned that Kizzy -- and Kizzy is

11    Andrew Molock; correct?

12    A.    Yes.

13    Q.    You heard that Kizzy had been talking with the Feds, and

14    the time period, again, is May 25th to July 21st, in between

15    you heard that; correct?

16    A.    Yes.

17    Q.    And you were concerned because you said, "Well, damn.

18    Like, what do I have to do with this situation?"

19          Do you remember that?

20    A.    That's what I did say, yes.

21    Q.    And that's because Kizzy was throwing your name into

22    this; correct?

23    A.    Not really.  I knew why my name was in it.  It wasn't

24    because of her.  I knew why my name was in it.

25    Q.    Don't you remember saying, "Like, my name had come up a

```
 1      lot, I guess.  Well, damn, like"?  Do you remember that?
 2      A.   Yes.
 3      Q.   That concerned you that your name was coming up a lot,
 4      right?
 5      A.   Not really.  I knew why it was coming up.
 6      Q.   And you told that to Special Agent Weaver; correct?
 7      A.   Yes.
 8      Q.   And then after that, you have the -- strike that.
 9           Let me take one step back.
10           Defense Exhibit 123, do you recognize that man?
11      A.   Yes.
12      Q.   Who is it?
13      A.   Junior.  Wane Briscoe.
14      Q.   And you call him Junior, right?
15      A.   Yes.
16      Q.   Now, Junior has been growing his hair since what age?
17      About nine, ten years old?
18      A.   Yes.
19      Q.   Right around this time, what happened to his hair?
20      A.   He cut it off.
21      Q.   Do you know why he cut it off?
22      A.   Because he didn't want to be nobody bitch when he went to
23      jail.
24      Q.   Now, in the July 21st, '20 recorded conversation with
25      Special Agent Weaver, that's when you talk about not only
```

```
 1    Jonice, but you now start talking about Jen; is that correct?
 2    A.   Yes.
 3           MR. PURPURA:  Government Exhibit 18.11T.  It's a
 4    transcript exhibit, Your Honor, and I have no objection to it
 5    coming into evidence.
 6           THE COURT:  All right.  Government's Exhibit 18.11.
 7           MR. BUDLOW:  I don't know what it is.
 8           MR. PURPURA:  You gave it to me.
 9    (Counsel confer.)
10           MR. BUDLOW:  No objection.
11           THE COURT:  What exhibit number is this?
12           MR. PURPURA:  It's Government's Exhibit 18.11.
13           THE COURT:  Government's Exhibit 18.11.
14           MR. PURPURA:  Thank you.
15    BY MR. PURPURA:
16    Q.   And now after those --
17           THE COURT:  It now is admitted into evidence over no
18    objection by the Government.
19    BY MR. PURPURA:
20    Q.   Now, after those conversations, you speak to Agent Weaver
21    and your memory of the dreams has changed; correct?
22           MR. BUDLOW:  Objection.
23           THE WITNESS:  Yes.
24           THE COURT:  Overruled.
25           MR. BUDLOW:  I'll withdraw.
```

```
1              THE COURT:  Overruled.
2     BY MR. PURPURA:
3     Q.   I'm going to read it, and just follow along with me.
4     "We've absolutely, absolutely -- Tonya, you know, what I'm
5     completely understanding and know what you're saying.  I want
6     to take you one -- just back to one more point earlier that
7     we're talking about.  You told me back in February," and I'm
8     just going to skip a little bit.  And your response here to
9     Tonya, "We was" -- "We was talking about the girl Jonice,
10    Jonice.  And he was just like, Man, that bitch is crazy."
11    Weaver says, "Right."  He was like -- he was like, "I be
12    having dreams about that in my fucking sleep."  Weaver goes,
13    "Uh-huh."  And then you go on to say, I was like, "Who?"  And
14    he was like, "Jonice."  And then I was like, "Oh.  I said,
15    Well, that happens when you fuck with crazy bitches."  And he
16    was like, "Man."  He was like, "Man."
17             And now here's where it changes, "Man, like" --
18             MR. BUDLOW:  Objection.
19             THE COURT:  Sustained.
20             MR. PURPURA:  I'm sorry.
21    BY MR. PURPURA:
22    Q.   "Man, like, I woke up this morning in a real big sweat,
23    yo."  And I was like, "Damn, she got you like that?"  And he
24    was like, "Nah.  He was like, I was -- I had a dream that Jen
25    just reached up and grabbed my nuts."  Weaver goes, "Uh-huh.
```

1    "I was like -- I was like, "What was you F-ing her or

2    something?  Why the F would she be grabbing your nuts?"

3    Weaver goes, "Right."  And according to you, Andre Briscoe now

4    says, and I was like, "What you killed her?"  And I was like,

5    "What you -- what you -- what you, you got to be a monster to

6    do that.  I was like, "You ain't that -- you ain't that type

7    of person."  He was like, "I did do it."  I was like, "You did

8    what?"  Then he was like, "Oh, I did it."  And I was like --

9    "My baby dad, he was telling me to come on, let's go."  I got

10    up and I left.

11        Special Agent Weaver continues the questioning, "So he

12    said it twice to you.  Just be clear he said, I did it?"

13    "Yeah, he said he did do it."

14        Weaver.  Okay.  You got up and left and what, I'm sorry,

15    said, "I did do it."  And what did do you?  I was like, "You

16    had to be a monster."  He was like, "I did do it."  Weaver,

17    okay.  And I got up cause, like, you know, he was drinking and

18    he was crying.  When he got drunk, he always get emotions,

19    right?  Tonya.  "He's crazy as a fuck when he drink."  Weaver,

20    "Okay."  Tonya.  "I just got up and I left.  I was like, you

21    know, I ain't dealing with you right now.  "So I got up and I

22    left a little bit, and I just remember getting in the car

23    crying, my baby daddy was like.  What's wrong?"  I was, like,

24    "Nothing.  I was like just don't worry about it."  I was like,

25    "Just don't worry about it.  I was like, "Just don't worry

1    about it" like that or whatever, Special Agent Weaver,

2    "Right."

3         And the next day he came over I forgot why he came.  I

4    guess they was going to get a haircut.  He came to your

5    apartment.  Yeah, okay.  Him and my baby dad was going to get

6    a haircut together.  And I thought I was, like, "Yo, remember

7    what you said to me?"  And he was like, "What?"  I was like,

8    "You told me you um, like, you hurt that little boy."

9         Special Agent Weaver, "Right."  He was like, he just

10   looked down.  I was like, "You don't remember telling me

11   that?"  He was like, "Nah," and just brushed it off.  I just

12   left it at that."

13        That's what your transcript shows when you speak to

14   Special Agent Weaver in July 21st of 2020; correct?

15   A.   Yes.

16   Q.   You don't tell Special Agents Weaver that -- this time --

17   that you went to bed and you were laughing, right?

18   A.   No.

19   Q.   You spoke -- you tell Agent Weaver now, a couple months

20   later, that, in fact, you were crying, right?

21   A.   Yes.

22   Q.   And that your boyfriend was there and you left with your

23   boyfriend; correct?

24   A.   Yes, he was outside waiting.

25   Q.   What's your boyfriend's name?

```
 1    A.    Ronnell Bivens.

 2    Q.    Excuse me?

 3    A.    Ronnell Bivens.

 4    Q.    Is Ronnell Bivens -- I shouldn't ask personal questions,

 5    but is he still around?

 6    A.    He's in jail, but yeah, he's around.

 7    Q.    He can be located, right?

 8    A.    Yes.

 9    Q.    And then on your direct, you indicated that on the same

10    day you learned -- apparently, on the same day, July 21st,

11    that was also the birthday of the little boy, Tone Tone;

12    correct?

13    A.    Yes.

14    Q.    And that's the same day you had that, kind of, smell and

15    that premonition?

16    A.    I learned it during our phone call, that it was his

17    birthday at the end, I think he said.

18    Q.    You heard it through -- Special Agent Weaver told you

19    that?

20    A.    Yes, that it's his birthday.

21    Q.    But that's the same day that you said to the jury that

22    you had that smell and that feeling; correct?

23    A.    Yes.

24    Q.    I'm just going to show you what now has been marked as --

25              MR. BUDLOW:  May I see it before you show it?
```

```
 1              MR. PURPURA:  Sure.

 2         (Counsel confer.)

 3    BY MR. PURPURA:

 4    Q.   Do you actually know when Tone Tone's birthday is?

 5    A.   No, I didn't know until --

 6    Q.   So you don't know if it's July 27th, which the -- you

 7    don't know if it's July 27th or July 21st; do you?

 8    A.   No.

 9    Q.   Well, regardless if it is July 27th or July 21st, when

10    July 21st and July 27th came up in 2016, did you call Special

11    Agent Weaver?

12    A.   2016?

13    Q.   Yes, 2016.

14         You didn't call Special Agent Weaver until -- or have

15    contact with Special Agent Weaver until 2020; correct?

16    A.   Yes.

17    Q.   Okay.  So we have 2016, 2017, 2018, 2019, 2020 before the

18    contact.  That's five years, right?

19    A.   Yes.

20              MR. BUDLOW:  Your Honor, Court's indulgence.

21         (Counsel confer.)

22              MR. PURPURA:  Your Honor, there is a stipulation if

23    the Court will accept it --

24              THE COURT:  Certainly.

25              MR. PURPURA:  -- that the birth date for the child
```

```
 1   is July --
 2              THE COURT:  K.B., Jr. [sic]?
 3              MR. PURPURA:  Correct.
 4              THE COURT:  Yes.
 5              MR. PURPURA:  It's July 27th, and that's 2007.
 6              MR. BUDLOW:  Agreed.
 7              THE COURT:  All right.  K.B., Jr., the victim, was
 8   born on July 27, 2007.  So stipulated.  Is that correct?
 9              MR. PURPURA:  Government?
10              THE COURT:  The Government; is that correct?  K.B.,
11   Jr., was born on July 27, 2007.  Is that correct?
12              MR. BUDLOW:  Yes.
13              THE COURT:  All right.  The date of his birth is so
14   stipulated.  That's one of the -- that's probably the only
15   time, ladies and gentlemen, what a lawyer says is evidence, is
16   when there is an agreement and a stipulation.  So you can
17   accept that fact as true.  Other than that, as you'll hear at
18   the end of the case, what lawyers say in their questions and
19   arguments is not evidence, but just then, that was evidence,
20   because it's agreed upon, so it's a stipulation.
21              MR. PURPURA:  Placing Government's Exhibit 17.8 back
22   on the screen again.
23   BY MR. PURPURA:
24   Q.  The conversation which you told Special Agent Weaver
25   about on May 26th of 2020 or the conversation that you told
```

| | |
|---|---|
| 1 | Special Agent Weaver about on July 21st of 2020, was anyone |
| 2 | else around to hear that conversation? |
| 3 | A.   When me and Mr. Weaver talked? |
| 4 | Q.   No, when you and Andre Briscoe talked. |
| 5 | A.   No. |
| 6 | Q.   Now, to your knowledge, has your brother Tony Harris been |
| 7 | charged, federally or in state court, with a drug conspiracy |
| 8 | involving Andre Briscoe? |
| 9 | A.   No, not to my knowledge. |
| 10 | Q.   To your knowledge, has Terrill Harris, Jr., Fatman, the |
| 11 | man who supposedly picked up the drugs, been charged in state |
| 12 | court or Federal court with the drug conspiracy? |
| 13 | A.   Not to my knowledge, but I don't talk to him. |
| 14 | Q.   To your knowledge, has Wane Briscoe been charged? |
| 15 | A.   I don't talk to him either, so I wouldn't know. |
| 16 | Q.   Has your father been charged? |
| 17 | A.   No. |
| 18 | Q.   Have you been charged? |
| 19 | A.   No. |
| 20 | **MR. PURPURA:**  Thank you.  I have no further |
| 21 | questions. |
| 22 | **THE COURT:**  Thank you, Mr. Purpura. |
| 23 | Redirect, Mr. Budlow? |
| 24 | **MR. PURPURA:**  Just give me one second to clear my |
| 25 | materials away. |

```
 1              R E D I R E C T   E X A M I N A T I O N
 2    BY MR. BUDLOW:
 3    Q.   And none of those people confessed to the murder of
 4    Jennifer Jeffrey to you; did they?
 5    A.   No, they did not.
 6    Q.   So Mr. Purpura said to you that you would get a chance to
 7    add to your answer about the 500 versus 1200, so I assume he
 8    meant on redirect.  So could you provide some explanation as
 9    to why you said 500 in Grand Jury, but then you did say 1200
10    both today and yesterday?
11    A.   Yes.  Because around that time, a lot of them borrowed
12    money from me.  George, when we did the -- George borrowed the
13    five and Poo borrowed the 12.  I got $8,000 back on my tax
14    time, and I was living in income-based housing.  I was only
15    paying $325 a month, so I really didn't -- it wasn't hurting
16    me to loan them the money knowing I was going to get it back.
17    I worked every day, paycheck every two weeks.
18    Q.   And you answered a couple questions about speaking to a
19    police officer with the last name of Dickerson relating to
20    Fatman coming back in the house and taking drugs?
21    A.   Yes.
22    Q.   And did you tell Dickerson that?
23    A.   Yes, I did.
24    Q.   And did you speak to that -- do you know his title?  I
25    don't know.  Is it Corporal Dickerson?
```

```
 1    A.    Um --
 2    Q.    We'll just call him Mr. Dickerson.  Did you speak to Mr.
 3    Dickerson --
 4               MR. PURPURA:  Your Honor, can we get a timeframe.
 5               THE COURT:  Sustained.  Please timeframe, if you
 6    will.
 7    BY MR. BUDLOW:
 8    Q.    After.  At any time after Fatman took the -- came in your
 9    house --
10    A.    Yes.
11    Q.    -- did you talk to Police Officer Dickerson?
12    A.    I did.
13    Q.    And do you know about when that was, approximately?
14    A.    If I'm not mistaken, I was still pregnant with Ryan, so
15    it was still in June.
16    Q.    And did you continue to speak to him over a period of
17    time?
18    A.    Yes, I did.
19    Q.    For roughly how long?
20    A.    In the two -- up until Ronnell came home, or a couple
21    months after.
22    Q.    And did that include providing information about Fatman
23    coming into your house after the search?
24    A.    Yes.
25    Q.    I believe this is Defense Exhibit 47B.  And the Defense
```

```
 1    highlighted a portion for you, I believe it's right here,

 2    where it says, "The drugs that was found, I don't know who" --

 3    what's that says?

 4    A.    "Who they were."

 5    Q.    "Who they were," and then he highlighted.  "I have no one

 6    selling out my house."  I was asked if anyone get high,

 7    "yes" --

 8    A.    My dad do.

 9    Q.    -- "my dad do get high."

10          Is everything that I just read true?

11    A.    Yes.

12    Q.    And to be clear, this was before Fatman came back in the

13    house and said, "See, they didn't find it?"

14    A.    Correct.  They told me they found drugs in my house when

15    they searched it.

16    Q.    You mentioned the name Andre earlier.  I just want to

17    clarify.  Does she have a nickname?

18    A.    Kizzy, and I call her mom because she used to date my

19    father.

20    Q.    You also mentioned learning about the murders on a

21    Facebook post; is that right?

22    A.    Yes.

23    Q.    Was the Facebook post linked to a news article?

24    A.    Not that I remember, but it was pictures?

25    Q.    Pictures of?
```

1   A.   Kiara and Jennifer and Kiara and the baby.

2   Q.   And a couple of questions about nightmares.  I want to

3   take you back to your first recorded statement with Special

4   Agent Weaver when you did not discuss the Defendant telling

5   you, "I did it"; okay?

6   A.   Yes.

7   Q.   You did discuss a nightmare; correct?

8   A.   Yes.

9   Q.   Without reference to, or aside from the woman that you

10  indicated the Defendant was dreaming about, was what you said

11  about those nightmares otherwise true?

12  A.   Yes.

13  Q.   Why did you say Jonice?

14  A.   Jonice.

15  Q.   Why did you say Jonice, not Jen?

16  A.   When I took my original statement?

17  Q.   Yes.

18  A.   Because I didn't know if he was coming home or not, and I

19  just was afraid.  You know, it's a confrontation.  That's

20  going to be a confrontation.  Why was you telling people

21  something I told you.  That's a confrontation I didn't want.

22  Q.   It was intentional?

23  A.   Yes.  And I believe I told him that.  I said, "I'm sorry,

24  I lied to you.  I know I lied to you."

25  Q.   So between the first recorded statement in May and the

```
 1   second recorded statement in July, had your memory changed?
 2   A.   No, my memory didn't change.  I just -- I felt like it
 3   was wrong.  I know I lied and I needed to tell the truth.
 4   Like, I didn't gain nothing from it.  I'm not gaining
 5   anything, but I'm going to tell the truth just for the little
 6   boy.
 7   Q.   And you -- say the last again.
 8   A.   For the little boy, I'm going to tell the truth.  Like, I
 9   have a son.
10   Q.   You testified on cross-examination about a comment that
11   your cousin Junior made to you about the reasons that he cut
12   his hair?
13   A.   Yes.
14   Q.   Do you remember testifying about that?
15   A.   Yes.
16   Q.   And do you know that because he told you that?
17   A.   No, it was -- no.
18   Q.   Somebody else told you that?
19   A.   Yes.
20   Q.   And did it relate to Junior's conduct with the Defendant?
21   A.   Yes.
22            MR. BUDLOW:   Court's indulgence.
23   BY MR. BUDLOW:
24   Q.   I want to show you your Grand Jury testimony, which I
25   believe is --
```

```
 1              MR. BUDLOW:  Was this now a Defense exhibit or that
 2      was a transcript?
 3              MR. PURPURA:  That was the transcript.
 4              MR. BUDLOW:  Do we have an exhibit --
 5              MR. MURRAY:  19.6.
 6              MR. BUDLOW:  19.6.
 7              THE COURT:  What is --
 8              MR. BUDLOW:  19.6, Your Honor.
 9              THE COURT:  Government's Exhibit 19.6?
10      BY MR. BUDLOW:
11      Q.   I'm going to read the question to you and I'd ask you
12      to --
13              MR. PURPURA:  Do you have the date, please?
14              MR. BUDLOW:  The date of the Grand Jury testimony.
15      BY MR. BUDLOW:
16      Q.   So do you remember testifying in the Grand Jury on
17      Wednesday, August the 19th, 2020?
18      A.   Yes.
19      Q.   You were under oath then like you're under oath now?
20      A.   Yes.
21      Q.   I'm going to read you the question.  I'd ask you to read
22      your answers.  And you said, "Why would you be dreaming about
23      Jen, what -- what did you kill her or something?"  What was
24      your answer?
25      A.   And he was like, "Yeah."  And I was like, "You would have
```

1    to be a monster to do that."  And he just said, "Cuz, I did

2    it."  And I was like --

3    Q.   And then the question is, "He said I did do it."  Is that

4    what he said?

5    A.   "Yes."  I was like "Um, yes."  I'm sorry.

6    Q.   Then the next question was, "You were crying?"

7         What was your answer?

8    A.   Yeah.

9    Q.   Can you read your answer?

10   A.   "I didn't cry because of the dream.  Just the thought of

11   the kid, you know, and then the next day I asked him, and he

12   act like he never talked to me --

13   Q.   Now, I --

14   A.   -- if I was crazy.

15   Q.   Now, I apologize for doing this out of order.  But that

16   was after you had already testified just moments or really

17   pages, I guess, earlier.  So I want to go through that with

18   you briefly, starting on page 23 where the question was, "And

19   Poo came over?"  What was your answer?

20   A.   "Yes, he was drinking.  Him and his girlfriend were

21   drinking.  She was at Amber house getting her hair done, and

22   Poo came over my house.  Me and Amber live the next building

23   over -- Amber lived the next building over."

24   Q.   And then the question was, "Okay.  And his girlfriend's

25   name was?"

1    A.    Jonice.

2    Q.    And then the question was, "So it was just after -- you

3    and Poo in the house at that point?"

4    A.    Yes.

5    Q.    Sorry.  "So it was just you and Poo in the house at that

6    point?"

7    A.    Yes.

8    Q.    And then the question was, "What happened?"  And what was

9    your answer?

10   A.    "We were sitting down at the table and he was basically

11   telling me how crazy Jonice was."  And he was like, "This

12   bitch be on my nuts."  And then he was like, "I keep waking up

13   in sweats and having dreams.  In the dream, I was woke up

14   because Jen was clutching my nuts."  And I was like, "Why you

15   dreaming about Jen?"  I was like, "What?  You killed her or

16   something?"  And he was like, "Yeah."  And I was like, "No,

17   you didn't.  You got to be -- you got to be -- you would have

18   to be a fuckin monster to do something like that."

19   Q.    Go ahead.

20   A.    And he was like, "I did it."  And I was like, "Cuz, you

21   would have to be a fuckin monster to do that."

22   Q.    And then on -- do you recall during that Grand Jury

23   testimony you also discussed why you came forward in July with

24   this additional information?

25   A.    Yes.

1    Q.   All right.  I'm going to read -- I'll read this at this

2    time.  The question was, "Why did you come forward at that

3    point?"  Your answer was, "Honestly, it was only 5:00 in the

4    morning, and it was, like, a smell that came, like, when you

5    have a baby, there's a certain smell that you have when you

6    smell that newborn baby, and it was -- that scent was -- I

7    just smelled that scent, and I don't know why.  I know I

8    wasn't pregnant, but something told me to text him at 12:00

9    in the morning.  It was about the court date or something like

10   that, and I remember telling him that I needed to talk to him.

11   I called him while I was -- before I left for work.  I had to

12   be at work at 7:00, so I called him before I left for work.

13   While I was at work, I spoke with him and when I got off work,

14   I spoke."

15        "During that conversation, were you fully truthful?"  And

16   then your answer was, "Yes."

17             **MR. BUDLOW:**  Your Honor, at this time, the

18   Government will play -- I'm going to ask the Grand Jury

19   jurors --

20             **THE COURT:**  The jurors.

21             **MR. BUDLOW:**  Thank you.  Old habit.

22             **THE COURT:**  You're referring to Grand Jury

23   testimony.

24             **MR. BUDLOW:**  Actually referring to a transcript of

25   a -- a partial transcript of a recording.  This is

```
 1        Government's Exhibit 18.11T.
 2               THE COURT:  Government's Exhibit 18.11T.
 3        Government's Exhibit 18.11 will be admitted into evidence.
 4        Government's Exhibit 1811T is just for identification only.
 5        It's the transcripts.
 6           Mr. Budlow, along with the transcript, it is very
 7        beneficial to the jury -- they have the TV screens.  You can
 8        put it on the ELMO as well so people can see it as well, I
 9        would think.
10               MR. BUDLOW:  Your Honor, the way the system is
11        designed, you can't --
12               THE COURT:  You can't do both.  Okay.  I'm sorry,
13        you're correct.  That's right.  I'm sorry.
14               MR. PURPURA:  Your Honor, now there's an objection.
15        There's an objection.
16               THE COURT:  Yes.  Your objection is to the tape
17        itself, Government's Exhibit 18.11?
18               MR. PURPURA:  It's not proper redirect.  I read this
19        whole transcript in direct examination, so it's already out.
20               THE COURT:  Yes, right.
21               MR. PURPURA:  What's the purpose?  There is no
22        redirect here on this?
23               THE COURT:  Well, it's under 611, the Court's
24        latitude.
25               MR. PURPURA:  Absolutely.
```

 1          **THE COURT:**  I've given you great latitude, Mr.

 2    Purpura, and I've given the Government the same latitude.

 3    You've all been given great latitude.

 4          **MR. PURPURA:**  I have.

 5          **THE COURT:**  So as you've been given latitude, the

 6    Government has been given latitudes as well.

 7          **MR. PURPURA:**  Very well.  Thank you, Judge.

 8          **THE COURT:**  So your objection is overruled.

 9       (Recording played but not reported.)

10  **BY MR. BUDLOW:**

11  Q.   Now, Ms. Harris, you were asked questions on

12  cross-examination about conversations with your family between

13  the May interview with Ms. -- with Special Agent Weaver and

14  the July interview with Special Agent Weaver.

15       Do you recall that?

16  A.   Yes.

17  Q.   And you live with a lot of those members of your family?

18  A.   Yes.

19  Q.   And those that don't live with you are at your house

20  often?

21  A.   Yes.

22  Q.   And you did testify that sometimes the topic of the

23  investigation into the murders of Jennifer Jeffrey and K.B.,

24  III did come up?

25  A.   Yes.

```
 1   Q.   Did anyone tell you to make up a lie about the Defendant
 2   confessing to you?
 3   A.   No.
 4   Q.   Do you have any reason to lie about your cousin Andre
 5   Briscoe?
 6   A.   No, because that was -- that was my brother.  Tony and
 7   Fats are -- we not close the way me and him was close.  He's
 8   Ryan's godfather, that was my brother.  So no, I have no
 9   reason to lie on him, nothing to gain from it.
10           MR. BUDLOW:   Thank you, Ms. Harris.
11       Your Honor, no further questions.
12           THE COURT:   Thank you.
13       Any recross, Mr. Purpura, on these topics?  Again.  I'll
14   give you latitude, Mr. Purpura.  Go right ahead.
15           MR. PURPURA:   Judge, thank you.
16           R E C R O S S  -  E X A M I N A T I O N
17   BY MR. PURPURA:
18   Q.   Just a few questions, I promise you.
19   A.   Okay.
20   Q.   Mr. Budlow asked you where the conversations about the
21   nightmares, were they similar on May 26th and then again when
22   it was changed on July 121st, and I think you agreed with
23   them.  You said, "Yeah."
24       Do you remember -- he asked you this, "Do you remember
25   that"?
```

```
 1    A.    Yes.

 2    Q.    So it was kind of leading in nature, but he wanted you to

 3    say yes and you said yes; correct?  He said it was --

 4    A.    I don't think it was leading.  He asked me a question and

 5    I answered it.

 6              THE COURT:  Keep your voice up, please, into the

 7    microphone.  Mr. Purpura, keep your voice up a little bit.

 8    You're going off microphone sometimes.

 9              MR. PURPURA:  Sorry, Judge.

10              THE COURT:  Thank you.

11    BY MR. PURPURA:

12    Q.    Were the conversations similar?

13    A.    Yes.

14    Q.    Okay.  In one conversation, May 26th, you talk about

15    Jonice?

16    A.    Jonice.

17    Q.    Jonice, excuse me.  Not Jen, right?

18    A.    Yes.

19    Q.    Or Jennifer; correct?

20          In that conversation, you also talk about Jonice biting

21    off Andre's dick; correct?

22    A.    Yes.

23    Q.    And then on July 21st, you're adding on Jen grabbing

24    Andre's balls; correct?

25    A.    I didn't add on.  I just let him know what the
```

1    conversation led to.  That's how our conversation led.

2    Q.   But you didn't say that back on --

3    A.   No, I did not.

4    Q.   -- in May; correct?

5    A.   I left out a part of our conversation --

6    Q.   You did?

7    A.   -- basically, yes.

8    Q.   And we spoke, and I won't get into it again about what

9    intervened, that means happened between May and July and some

10   of those factors you were talking to family members as you

11   already agreed to; correct?

12   A.   Yes, but before that I --

13   Q.   Hold on.  Please just answer --

14          **THE COURT:**  Let her answer the question.

15          **THE WITNESS:**  Before that, I told Officer Dickerson

16   -- before the story about Jonice, I told Officer Dickerson the

17   dream that he had.

18   **BY MR. PURPURA:**

19   Q.   Well, let's --

20   A.   And this was years prior to this incident.

21   Q.   Where is Officer Dickerson today; do you know?

22   A.   I don't know.

23   Q.   He's still working; isn't he?

24   A.   Yes, he is.

25   Q.   He's still in Cambridge; correct?

```
1    A.   Yes, he is.

2    Q.   You know --

3    A.   I'm pretty sure that conversation was recorded, too.

4    Q.   Recorded as well, so the Government should have that;

5    correct?

6    A.   You should too.

7    Q.   Well, I don't.

8              MR. BUDLOW:   Objection.

9    BY MR. PURPURA:

10   Q.   So Agent Dickerson, you believe, recorded that

11   conversation; correct?

12   A.   I don't know if he did or not, but I'm pretty sure he

13   did.

14   Q.   You just said he did.

15   A.   I said I'm pretty sure he recorded that conversation,

16   too.

17   Q.   Well, there's --

18   A.   I'm not a 100 percent sure.  He didn't say, "Ms. Harris,

19   I'm recording this conversation."

20   Q.   There should be a report then memorializing that.  Don't

21   you agree with me?

22   A.   Yes.

23   Q.   You read a lot of reports in this case, right?

24   A.   Yes.

25   Q.   Not once did the Government give you a Dickerson report
```

1    saying what you're saying; did they?

2    A.   Well, when Detective Weaver talked to me, he said,

3    "Ms. Harris, do you know anything about a dream?"  So that

4    would assume he knew that I knew about a dream that Andre had.

5    So I'm pretty sure Dickerson let them know that I told him

6    about the dream because he didn't just come up with it out the

7    air.

8    Q.   You know Special Agent Weaver, he talked to more people

9    than just you, right?

10   A.   But I was --

11   Q.   Hold on, please.

12   A.   Dickerson was the only one that I told that to, so yes,

13   I'm sure of that.

14   Q.   That's a yes; correct?

15   A.   Yes.

16   Q.   So you don't know where he got his information from; do

17   you?

18   A.   He got -- it came from Dickerson because Dickerson was

19   the only one I told that story to.

20   Q.   Well, then maybe Special Agent Weaver will tell us that.

21            MR. BUDLOW:  Objection.  Move to strike.

22            THE COURT:  That will be moved.  It's stricken.

23   Stricken.  That's not a question.  It's a comment.

24            MR. PURPURA:  Just a couple more questions.

25   BY MR. PURPURA:

```
 1    Q.   We spoke on cross-examination earlier about Kizzy Andrea

 2    Molock; correct?

 3    A.   Yes.

 4    Q.   And you were asked a few questions about Kizzy Andrea

 5    Molock by Mr. Budlow; correct?

 6    A.   Yes.

 7    Q.   And you agreed with me that you were -- that you heard,

 8    in between May and July, that Kizzy had been talking to the

 9    Feds; correct?

10    A.   Everyone talked to them, so yes.

11    Q.   Okay.  And you were -- at least you heard that your name

12    had come up a lot; correct?

13    A.   Yes.

14    Q.   And that had to concern you; correct?

15    A.   No, because I didn't sell drugs.  I mean --

16    Q.   Now, the -- Mr. Budlow asked you if you have any reason

17    to lie.  Do you remember that?

18    A.   Yes.

19    Q.   Any reason to exaggerate; correct?

20    A.   Yes.

21    Q.   And I asked you on direct if any other family members

22    have been arrested; correct?

23    A.   Yes.

24    Q.   And you said no; is that correct?

25    A.   Yes.
```

```
 1              MR. PURPURA:  I have no further questions.

 2              THE COURT:  Thank you, Mr. Purpura.

 3         You may step down, Ms. Harris.  You shouldn't discuss

 4    your testimony with anyone in the event that you're called

 5    back to the witness stand.

 6              THE WITNESS:  Okay.

 7              THE COURT:  Thank you very much.

 8         All right.  The next Government witness, Mr. Budlow?

 9              MR. BUDLOW:  Your Honor, the next witness is Jeremy

10    Monkres.  And he's a rather lengthy -- well, I guess he's a --

11              THE COURT:  I'm sorry, what?

12              MR. BUDLOW:  He's not short in terms of the Court's

13    plan for a mid-morning break.  I just want to let you know

14    he's not short.

15              THE COURT:  We're not going to be taking a

16    mid-morning break.  I think we're just going to keep rolling

17    through, and we're going to take one break, basically, a half

18    an hour break for lunch, as I discussed with the jury, because

19    we got to stop at a quarter after 3:00, so...

20              THE CLERK:  Sir, can you just raise your right hand

21    for me, please.

22         JEREMY MONKRES, having been duly sworn, was examined and

23    testified as follows:

24              THE WITNESS:  I do.

25              THE CLERK:  You can have a seat.
```

```
 1           And while speaking clearly into the microphone, can you
 2     please state and spell your full name for the record.
 3                THE WITNESS:  Yes.  Jeremy Monkres, J-e-r-e-m-y,
 4     M-o-n-k-r-e-s.
 5                THE COURT:  Mr. Monkres, the standing orders of this
 6     Court provide that masks are to be worn in all public areas of
 7     the courthouse with the exception that in the courtroom, in
 8     the discretion of the Presiding Judge, masks may be pulled
 9     down while one is speaking or testifying, or even taken off if
10     one has been fully vaccinated, meaning they've had two
11     vaccinations or one J&J vaccination.  It doesn't necessarily
12     relate to boosters.
13           Have you been fully vaccinated?
14                THE WITNESS:  I have, Your Honor.
15                THE COURT:  All right.  Then you're free to pull
16     your mask down while testifying.  You do not have to, but
17     you're free to pull your mask down or take it off, if you so
18     desire.
19                THE WITNESS:  Thank you, Your Honor.
20                D I R E C T   E X A M I N A T I O N
21     BY MR. BUDLOW:
22     Q.   Good morning, Mr. Monkres.
23     A.   Good morning.
24     Q.   And if you want to take it off if it's more comfortable,
25     you can.  You can also leave it that way.  It's however you
```

```
 1       want.
 2            How are you employed?
 3       A.   I am employed by the Baltimore Police Department in the
 4       firearms analysis unit as a forensic scientist II.
 5       Q.   Are you a forensic -- I'm sorry, are you a firearms
 6       examiner?
 7       A.   Yes, that is a -- the forensic scientist II is my
 8       technical job title.  Firearm examiner actually describes what
 9       I do.
10       Q.   All right.  Can you give us an overview of what your
11       duties are as a firearms examiner?
12       A.   In the firearms analysis unit, we examine any firearms
13       related evidence that's recovered during the investigation of
14       a crime, so firearms, ammunition, fired ammunition components
15       like cartridge cases and bullets.
16            For firearms, we're doing operability examinations,
17       determining what the make, model, serial number of the firearm
18       is, is it in working condition, doing a -- if it has an
19       obliterated serial number, doing a serial number restoration
20       on it.
21            Ammunition, I will mostly just take inventory of what
22       ammunition is present, how many rounds, what headstands, what
23       calibers, that kind of thing.
24            And then with fired ammunition components, with bullets
25       and cartridge cases, it's examining them and determining how
```

```
 1   many firearms were involved in the incident.  So if you have

 2   ten cartridge cases, were they all fired from one gun, were

 3   they fired from two guns, from three guns.  And if there is a

 4   suspect weapon available, were any of the items fired with

 5   that firearm.

 6   Q.   And do you also act as a co-examiner?

 7   A.   I do, yes.  I co-examine cases for my fellow examiners.

 8   They co-examine my work.  It's a quality assurance measure to

 9   determine that we're putting out good and accurate results,

10   so -- so an examiner will finish their examination, hand me

11   their evidence, and I perform pretty much the exact same

12   examination that they did.

13        The only difference is with firearms, the examiner will

14   be the one who test fires the weapon.  The co-examiner

15   typically will witness the weapon being test fired, but won't

16   actually fire it themselves.

17             MR. PURPURA:  We'll stipulate to the witness's

18   expertise.

19             THE COURT:  All right.  Thank you very much.  You

20   may -- this witness -- anything further on that, Mr. --

21             MR. BUDLOW:  Your Honor, I'll shorten it, but I do

22   have a few areas of fact to get into.

23             THE COURT:  Okay.  That's fine.  Go right ahead.

24             MR. BUDLOW:  I appreciate the stipulation.

25             THE COURT:  Anyway, Mr. Monkres is being proffered
```

```
 1    as an expert in forensic firearms examination.  And as I've

 2    indicated with other prior expert witnesses, you judge his

 3    credibility in your own mind, whatever, but he's allowed to

 4    give an opinion because he is an expert as I've indicated with

 5    the other expert witnesses.

 6         But you may continue, Mr. Budlow.

 7            MR. BUDLOW:  Thank you.  And I'll try to do it a

 8    little bit quicker given the stipulation.

 9    BY MR. BUDLOW:

10    Q.   Mr. Monkres, you used various computers to help assist in

11    the comparison of ammunition?

12    A.   We use computers to document our examinations and any

13    comparisons that we've made.

14    Q.   All right.  Specifically, I'm referring to the systems

15    IBIS and NIBIN.

16    A.   So we have a system that we use for linking cases

17    together that we did not know were previously linked.  Those

18    are IBIS, the Integrated Ballistic Identification System,

19    which uploads the images of cartridge cases to NIBIN, the

20    National Integrated Ballistic Information Network.  By

21    uploading -- by scanning cartridges cases and the service

22    contours on them and uploading those images to the database,

23    the database will return a list of potential candidates that

24    were then able to determine whether any incidents happened to

25    be linked that we were unaware were linked before.
```

1   Q.   And, Mr. Monkres, you've been employed by the Baltimore

2   Police Department since 2018 as a firearm examiner?

3   A.   That's correct, yes.

4   Q.   And then you were a firearms examiner with the

5   Connecticut Department of Emergency Services for five years

6   prior to that?

7   A.   That's correct, yes.

8   Q.   Okay.  Could you just give us a brief overview on two

9   areas, one is, what is firearms identification?  And also what

10  makes that identification possible so the members of the jury

11  understand how the science works?

12  A.   So firearms identification is the discipline of forensic

13  science that -- the primary thing we're concerned with is

14  determining whether two items were fired from the same

15  firearm.

16       How we're able to do that is when a firearm is

17  manufactured, the manufacturer, based on how they manufacture

18  it, they impart it with two things.  They impart it with class

19  characteristics, which is based on choices that they make, and

20  then the machining processes involved.  The cutting away of

21  metal and foreign parts give it individual characteristics

22  from microscopic imperfections on the firearm's working

23  surface.  Those imperfections create microscopic markings that

24  are individual characteristics that we're able to compare.

25       When we have agreement -- when two items have agreement

1    of class characteristics -- all their class characteristics

2    and sufficient agreement of their individual characteristics,

3    we're able to identify them as having been fired from the same

4    firearm.

5        Likewise, if we have two items with different class

6    characteristics or with significant disagreements of the

7    individual characteristics, that would allow us to make an

8    elimination, saying two items were not fired from the same

9    firearm.

10   Q.   And the microscopic imperfections that are left on the

11   firearm based on the tooling process are unique to each

12   firearm?

13   A.   That's correct, yes.

14   Q.   And have you ever been qualified in the Court as an

15   expert in firearms identification previously?  And if so, how

16   many times?

17   A.   I've been qualified as a firearms expert in Court a total

18   of 50 times:  Six were in Connecticut, once in Federal court,

19   and five in various state courts up there.  The other 44 times

20   have been since working for Baltimore.

21   Q.   All right.  Showing you on the screen what's marked for

22   identification as a Government's exhibit, 2.34.  Can you,

23   using this exhibit, explain the components of a live

24   cartridge, and what happens to the cartridge when it is fired

25   from a firearm?

1    A.    So a single unit of ammunition is called a cartridge.  A

2    lot of people call it a bullet.  The proper term is actually a

3    cartridge.  And a cartridge has four pieces.  It has the

4    bullet, which travels down the barrel of the firearm and hits

5    the target.  It has the propellant, or the gunpowder, which

6    burns, creates a lot of gas.  It creates pressure to push the

7    bullet out of the barrel.  It has a primer, which is a small

8    amount of primary explosive that is struck by the firing pin

9    of the firearm.  It detonates, ignites the gunpowder, which

10   then creates the gas to push the bullet out of the barrel, and

11   then it has the cartridge case, which holds all four other

12   things together.

13   Q.    All right.  And just for the record on Government's

14   Exhibit 2.34, at the top is the full cartridge?

15   A.    That's correct, yes.

16   Q.    And then all of the components are split up and

17   identified underneath?

18   A.    That's correct, yes.

19   Q.    What happens to a shell casing when a live cartridge is

20   fired from a semiautomatic handgun?

21   A.    So a semiautomatic firearm works by holding the

22   cartridges in a magazine.  When the magazine was loading into

23   the firearm, the slide is pulled backward and then travels

24   forward under spring tension.  That causes the slide of the

25   firearm to strip the top cartridge off the magazine.  It then

 1       loads it into the chamber of the firearm.

 2             When the firearm is fired, that gas pressure that's

 3       created from the burning of the gunpowder and pushes the

 4       bullet out of the barrel, that also pushes back on the

 5       cartridge case.  It causes the slide to travel rearward, and

 6       the cartridge case is extracted and ejected from the firearm,

 7       kicked out.  The slide then travels forward again under the

 8       same spring tension.  It strips the next cartridge off the top

 9       of the magazine, loads in the chamber, and the firearm's ready

10       to be fired again.

11       Q.   So a semiautomatic firearm, bullets fired or cartridges

12       fired, shell casing is ejected out outside of the gun?

13       A.   If it's working correctly, yes.

14       Q.   Revolver, the cartridge casing stays inside the cylinder?

15       A.   Yes.  A revolver holds its ammunition within a cylinder.

16       That's a permanent part of the firearm.  So you load each --

17       you load a cartridge into each chamber of the cylinder.

18       Whenever the cylinder then brings a cartridge into line with

19       the barrel of the firearm, it's discharged, the cylinder

20       rotates again, and the weapon is fired again.  After that

21       first one was fired, that cartridge case stays in the cylinder

22       until it is manually removed.

23             **MR. BUDLOW:**  Mr. Gurevich, would you mind clearing

24       the screen.

25             (Counsel confer.)

1    **BY MR. BUDLOW:**

2    Q.   Could you discuss how -- well, let me ask you.  How do

3    you compare an ejected shell casing to a suspected firearm?

4    A.   So when we have cartridge cases and a suspect weapon, the

5    first thing we'll do is perform operability examination on the

6    weapon.  Make sure that everything looks okay, that it seems

7    to be working properly.  If that's the case, we will then test

8    fire ammunition from our laboratory ammunition stock.  If it

9    discharges, that means that it's operable.

10        We then compare the test fires that were created to the

11   evidence cartridge cases.  And if there's agreement of the

12   class characteristics, meaning they have the same type of

13   marks on the retrace, the same shape of firing pin, and

14   sufficient agreement of the individual markings, then we're

15   able to identify the cartridge cases of having been fired from

16   the suspect weapon based on comparing the test fires.

17   Q.   And what is -- can you explain what a rifle is?  And let

18   me back up.  Rifling is relevant for comparing a projectile or

19   bullet to a suspect firearm, right?

20   A.   That's correct, yes.

21   Q.   So can you first explain what rifling is?

22   A.   So most barrels, or the barrels of most firearms have

23   what is called rifling inside of them.  The rifling is a

24   series of raised and lowered portions called lands and

25   grooves.  That digging of the bullet imparts spin to it and

1    give it stability in flight.

2         Just like when a quarterback is throwing a pass and he

3    puts a tight spiral on it to hit the receiver he's trying to

4    hit, the rifling digs into the bullet, gives it spin, and

5    makes it fly straight towards the target that you're aiming

6    at.

7    Q.   And what -- oh, go ahead.  Sorry.

8    A.   That the contact between the rifling and the bullet

9    leaves marks on the bullet surface and we're able to compare

10   those marks to make an identification or elimination.

11   Q.   And you do that by comparing the evidence at the scene,

12   so a projectile to a test fired projectile?

13   A.   Correct.  Just in the same way that we compare test fire

14   cartridge cases to evidence cartridge cases, we will test fire

15   bullets into our water tank.  It's a very large tank, about

16   the length of one of these tables or so.  The water stops the

17   bullets without deforming them and allows us to have exemplars

18   to compare to evidence bullets that were recovered.

19   Q.   And you also mentioned something called class

20   characteristics.  Can you just briefly describe, what are some

21   examples of what class characteristics are?

22   A.   So class characteristics are features the firearm have

23   that are determined by the manufacturer.  They make decisions

24   and those decisions give a firearm class characteristics.

25        So the most immediate one is, what size ammunition does

1    the manufacturer want the gun to fire.

2         Ammunition comes in all different sizes, from .22 up to

3    the largest one that conventional firearm would fire would be

4    .50 BMG, which is like a massive machine gun.  That caliber,

5    how big the ammunition is, that's a class characteristic.  The

6    -- what shape they want the firing pin to be, they could make

7    it hemispherical so that the end of it is kind of, like, half

8    the ball.  They can make it elliptical so it's more of an oval

9    shape.  That's a class characteristic.

10        In the barrel of the firearm, if the barrel has rifling,

11   the manufacturer gets to decide how many lands and grooves are

12   in that barrel, does it have right-hand twists, or does it

13   have left-hand twists.  All of those things are class

14   characteristics.  All of those things are something the

15   manufacturer has to decide before they make the firearm, and

16   it allows us to easily and quickly eliminate items that could

17   not have been fired from the same firearm.

18        If I have two bullets, and one's a 9 millimeter and one

19   is a .45, those couldn't have been fired from the same

20   firearm.  If they're both 9 millimeters, but one has five

21   lands and grooves with right-hand twists, one has six lands

22   and grooves with left-hand twists, those couldn't be fired

23   from the same firearm.

24   Q.   All right.  So, Mr. Monkres, we may need to get into more

25   of that later, but for now, let's jump to the evidence in this

1   case.

2       Did you, and other firearms examiners from the Baltimore

3   Police Department, examine evidence under Baltimore City Case

4   No. 8-150511120?

5   A.   Yes.

6   Q.   And when was that?  When were those examinations?

7   A.   Some of those examinations took place in 2015.

8   Additionally, there were other examinations in 2018 and 2022.

9   Q.   And to be clear, you started when?

10  A.   In 2018.

11  Q.   So you didn't do the 2015 -- you weren't involved in the

12  2015 examination?

13  A.   I was not, no.

14  Q.   But you've reviewed the case files?

15  A.   That's correct, yes.

16  Q.   And you did the 2018 and 2022 examinations?

17  A.   I did, yes.

18  Q.   And were reports submitted under all of those

19  examinations under the case number with the findings?

20  A.   Yes, they were.

21  Q.   I want to show you the firearms evidence first that was

22  recovered from the residence, and I'm also going to show you

23  on the screen Government's Exhibit 1.27, which is photographs

24  of the same items that I'm going to bring to you.

25       All right.  Showing you -- I'd like to just have you go

```
 1        through the various pieces of Government's evidence there,
 2        starting with 1.1 and 1.2.
 3              Tell us what those are.
 4        A.   So 1.1 and 1.2 are a .45 auto Winchester fired cartridge
 5        case.
 6        Q.   And 1.31 and 1.4?
 7        A.   1.3 and 1.4 are both bullet jacket fragments.
 8        Q.   And what does that mean, bullet jacket fragments?
 9        A.   So the bullet of a cartridge can be composed many
10        different ways, but the most common way that most ammunition
11        nowadays -- a bullet is a lead core with a softer metal jacket
12        wrapped around it.
13              When a bullet hits a target, the high velocity and the
14        quick stopping of hitting that target often causes damage to
15        the projectile.  And so when the projectile breaks apart, it
16        becomes fragments.  So in this case, each of these is just a
17        piece of a bullet jacket, so they're a bullet jacket fragment.
18        Q.   Okay.  Just 1.5 for now, and, again, this was found on
19        the kitchen floor?
20        A.   Yes, 1.5 is a lead bullet core.
21        Q.   1.8 also, which is on the right of the screen, also from
22        the kitchen?
23        A.   Yes, 1.8 is another Winchester .45 auto cartridge case.
24        Q.   Now, back to 1.6 from the bedroom, from the upstairs
25        bedroom on the bed?
```

1    A.    Yes.  1.6 is a fired .45 auto bullet.

2    Q.    1.7, again.  From the bed, in the upstairs bedroom?

3    A.    1.7 is another Winchester .45 auto cartridge case.

4    Q.    1.11 from the -- again, from the upstairs bedroom.  And

5    1.13?

6    A.    1.11 is another Winchester .45 auto cartridge case.  And

7    then 1.13 is a second .45 auto fired bullet.

8    Q.    And could you go to 1.15, and that would be the shell

9    casing also found in the sheets?

10   A.    Yes, 1.15 was another .45 auto cartridge case.

11   Q.    And then 1.14?  And this would be from the Office of the

12   Chief Medical Examiner.

13   A.    Yes, 1.14 was another .45 bullet in two pieces, the

14   jacket and the core are separated.

15   Q.    So as to all of those items that you've just described,

16   can you just -- generally speaking, what are they?

17   A.    So the -- altogether we -- the lab received a total of

18   six .45 auto fired cartridge cases, three .45-caliber fired

19   bullets, two bullet jacket fragments, and a lead bullet core.

20   Q.    And those are all components of ammunition; is that

21   correct?

22   A.    That's correct, yes.

23   Q.    Let's talk about the shell casings first.  Were all of

24   the shell casings examined?  And what was the result of the

25   examination?

A.    Yes, all six of the .45 auto cartridge cases were

examined, and they were all identified as having been fired

from the same firearm.

Q.    And were they all manufactured by Winchester .45-caliber

with the same class characteristics?

A.    They were all .45 auto, they all have a Winchester head

stamp, and they all had a hemispherical finding pin

impression, meaning that's half of a ball shape, and they all

had parallel retrace marks, meaning that the marks from the

retrace are, kind of, like lines that just go across the

primer.

Q.    And so your conclusion is that all six shell casings that

you -- that were examined were fired out of one firearm?

A.    Yes, I identified them all as having been fired from the

same firearm.

Q.    And were photographs taken as a demonstrative of your

microscopic comparison?

A.    Yes, photographs were taken during the examination of

these items.

Q.    Showing you page 1 of Government's Exhibit 2.30, can you

tell us what we're looking at?

A.    So this is a photograph that was taken of two of the

cartridge cases.  We give the items designations to help us

know what item we're talking about.  For the cartridge cases,

they're given the letter Q, which means question, because we

 1    don't know where it came from, and then a number.

 2        So the cartridge cases were numbered Q1 through Q6.  Here

 3    on the left is the cartridge case that was designated Q5 and

 4    on the right it's Q6.  What this is a photograph of is

 5    photographs of the retrace marks and the comparison between

 6    them.  The area of agreement is circled in red.  And if you

 7    look, you can -- there is a line that splits the two images,

 8    essentially here and runs all the way up through the center.

 9    Q.   And I'm going to zoom in.  The line is now right here in

10    the middle of the circle.

11    A.   So that line is a split.  We do our comparisons on a

12    comparison microscope.  It's two compound microscopes joined

13    by an optical bridge, so you can put one cartridge case on

14    this stand, one cartridge case on that stand.  It goes up to a

15    single set of oculars and allows us to view them side by side.

16    So that line is where the image of one cartridge case stops

17    and the next one starts.  It's the split between the two

18    stages.

19    Q.   All right.  Mr. Monkres, I'd ask you now to turn your

20    attention to the exhibits in front of you that are the three

21    bullets and the one bullet jacket, which are Government's

22    Exhibits 1.6, 1.4, 1.13 and 1.14.

23              **MR. BUDLOW:**  And Your Honor, for the record, 1.4 was

24    found in the kitchen.  1.6 was found in the bed.  1.13 was

25    found -- was a projectile that was found under the bed.

1          **THE COURT:**  On the bedroom floor.

2          **MR. BUDLOW:**  Yes.  Thank you.  And 1.14 was from the

3    Office of the Chief Medical Examiner.

4          **THE COURT:**  The bullet from the head of one of the

5    victims?

6          **MR. BUDLOW:**  Yes.  Ms. Jeffrey.

7          **THE COURT:**  Yes.

8    **BY MR. BUDLOW:**

9    Q.   So I've now said it, but what you have in front of you

10   are three bullets and one bullet jacket?

11   A.   Yes.

12   Q.   And did you examine those or were those examined to

13   determine whether or not they were fired from one firearm?

14   A.   They were examined, and the three bullets and the one

15   bullet jacket, which was given designation BJF2, were

16   identified as having been fired from the same firearm.

17   Q.   And they also had the same class characteristics?

18   A.   They did.  The three bullets were all .45-caliber

19   bullets.  And all of the bullets had left-hand twist rifling.

20   For the three intact bullets, they were all -- or not intact,

21   for the three bullets, it was able to be determined that they

22   all had actually six lands and grooves with a left-hand twist.

23   The bullet jacket's fragment, BJF2, doesn't have the entirety

24   of the bullet jacket, so we can't say how many it originally

25   had, but they do all have the same left-hand twists.

1    Q.    So in addition to the class characteristics, you also put

2    them under a microscope to make your comparisons and

3    conclusions?

4    A.    That's correct.

5    Q.    And then did you take a photograph as a demonstrative of

6    your microscopic comparisons?

7    A.    Photographs were taken in these examinations, yes.

8    Q.    Showing you Government's Exhibit 2.30, page 3, is this

9    that photograph?

10   A.    This is one of the photographs that was taken, yes.

11   Q.    Can you describe what we're looking at?

12   A.    So this is a photograph of the -- of one of the bullets,

13   Q3, that was designated Q3B.  So bullets are designated with Q

14   for question, because we don't know where it came from, a

15   number and then B to specify that's a bullet.

16         So in the photograph, this is a photograph of the groove

17   impression, as well as part of a land impression.  So it shows

18   the agreement of markings on this area, as well as some

19   continued agreement down in the land impression across the

20   bottom.

21   Q.    Did you also examine a very small .22 firearm?

22   A.    A .22-caliber firearm was received in this case, yes.

23   Q.    And was it test fired?

24   A.    It was, yes.

25   Q.    And was it operable?

```
1    A.    It was found to be operable.

2    Q.    And was there ammunition that's consistent with that

3    firearm that was also seized and examined?

4    A.    Yes.

5    Q.    And were those .22 WMR Winchester cartridges?

6    A.    I believe they were, yes.

7    Q.    And so those cartridges, two of which were recovered from

8    the front bedroom, would they fire out of that firearm?

9    A.    All of the live cartridges that were received --

10         (Alarm interruption.)

11         THE WITNESS:  -- were compatible with the received

12   firearm.

13   BY MR. BUDLOW:

14   Q.    And that firearm, were you able to determine what its

15   capacity is, or how many cartridges it could hold?

16   A.    It is a Derringer pistol.  It has two barrels.  It has to

17   be manually opened and reloaded every time, so it can only

18   hold two cartridges.

19         MR. BUDLOW:  Your Honor, at that time I would be --

20   I'm going to read a stipulation.  This is marked as

21   Government's Exhibit 20.3, and I will read the stipulation at

22   this time.

23         THE COURT:  This is -- Government Exhibit 20.3 is a

24   stipulation agreed upon.

25         Is that correct, Ms. Whalen?
```

1          **MS. WHALEN:**  It is, Your Honor.

2          **MR. BUDLOW:**  It reads as follows:  "The parties

3     stipulate and agree that on or about May 16, 2018, Keith

4     Campbell possessed the Para Ordinance .45-caliber firearm

5     bearing serial number RK8433, which is also Government's

6     Exhibit No. 1.27, while inside a convenience store located at

7     2103 West Pratt Street, Baltimore, Maryland.  And it was

8     recovered on that date by members of the Baltimore Police

9     Department.  Keith Campbell was incarcerated continuously from

10    August 4th, 2014, to the November 9th, 2017."

11         This stipulation is admissible into evidence, and it's

12    signed by the -- by counsel for the parties.

13         **THE COURT:**  All right.  That is a stipulation.  You

14    also will have that item back into evidence from which you can

15    read.  Again, there is -- the only time what a lawyer says is

16    evidence, if it's an agreed stipulation between both the

17    Defendant and the Government, and you may accept it as such.

18         **MR. BUDLOW:**  Thank you, Your Honor.

19    **BY MR. BUDLOW:**

20    Q.   Showing you now Government's Exhibit 1.28.  I will clear

21    some of this out of your way.

22         Take a look at that when you get a chance.  Tell us if

23    that was examined by members of the Firearms Identification

24    Unit.

25         **THE COURT:**  That's Government's Exhibit 1.28; is

1    that correct, Mr. Budlow?

2              **MR. BUDLOW:**  Yes.

3              **THE COURT:**  Okay.  Thank you.

4    **BY MR. BUDLOW:**

5    Q.   What is that?

6    A.   This was a Para Ordinance Model P1245 .45 auto firearm

7    that I received and examined for operability.

8    Q.   So .45-caliber?

9    A.   Correct.

10   Q.   And you said it's a semiautomatic?

11   A.   That's correct, yes.

12   Q.   When were you asked to determine its operability?

13   A.   In 2018, I think it was August 2018.

14   Q.   And did you determine its operability?

15   A.   I did.  I examined the firearm.  Documented, the make,

16   the model, the serial number, its caliber.  Didn't find any

17   obvious defects on it, took it to our test fire range, loaded

18   it with stock ammunition.  I was able to test fire it and

19   determine that the firearm was operable.

20   Q.   Meaning what?  What did it do?

21   A.   Meaning that it's -- by everything I can tell, it's in

22   perfect working order.  If you put ammunition into it, it will

23   discharge.

24   Q.   And when a firearm is recovered and test fired, what do

25   you do as a routine matter with the test fired shell casing?

1    A.    After -- when we examined firearms for operability, we,

2    as part of our -- well, not as part of our examination, as a

3    matter of practice, we -- for semiautomatic firearms, we will

4    load a test fired cartridge case into the IBIS system that I

5    talked about before and have those images uploaded to NIBIN

6    and review any candidates that are returned as potential

7    links.

8    Q.    And did that happen with test fired cartridge casings for

9    Government's Exhibit 1.28?

10   A.    It did, yes.

11   Q.    And what happened when you uploaded the test fired

12   cartridge casings into that computer system?

13   A.    Based on the reviewed candidates, and my viewing of the

14   images from the correlation list that NIBIN produced, it

15   seemed that a cartridge case that had been entered under the

16   2015 case number -- I can't remember it off the top of my head

17   right now -- 8-150511120 -- when a cartridge case had been

18   entered under that case was a potential candidates, and based

19   on my viewing of the images, it seemed likely that they could

20   be potentially linked and that an examination needed to be

21   performed.

22   Q.    And then what did you do?

23   A.    I retrieved the evidence from the evidence control unit,

24   brought it up into the unit and conducted an examination of

25   test fires from the .45 auto pistol to the evidence items.

1    Q.   And very broadly, how did you do that?  How did you make

2    that comparison?

3    A.   In the same way that the cartridge cases are compared, I

4    produced test fires with the pistol.  Compared them to each

5    other on the microscope to see what kind of marks this gun is

6    making.  What are -- like, what's the level of agreement I

7    need to be looking for, because if I want to identify items

8    with this gun, then I need to know what kind of marks it

9    makes.

10        After that, I compared each of the evidence items to the

11   test fire cartridge cases and the test fired bullets.  And I

12   identified all of the items as having been fired with that

13   firearm.

14   Q.   So as to the six shell casings that you testified earlier

15   that were all fired from one firearm, what's your conclusion

16   as to whether or not they were fired from Government's

17   Exhibit 1.28?

18   A.   I identified all six cartridge cases as having been fired

19   with the Para Ordinance .45 auto.

20   Q.   And then there was three bullets that you testified about

21   earlier.  One was from Ms. Jeffrey's head, one was from the

22   bed, and one was from the floor, and also a bullet jacket

23   fragment you said all were fired from the same firearm.

24        Were you able to determine whether or not they were fired

25   from 1. -- Government's Exhibit 1.28, the .45 that you have up

1      there?

2      A.   I was able to identify all three bullets and the bullet

3      jacket fragment from the 2015 case as having been fired with

4      the .45 auto pistol.

5           **MR. BUDLOW:**  Court's indulgence.

6      **BY MR. BUDLOW:**

7      Q.   Showing you now Government's Exhibit page 2, is this a

8      demonstrative photograph that you took comparing one of the

9      shell casings from the scene to one of the test fired shell

10     casings from that .45?

11     A.   It is, yes.

12     Q.   And is it similar in design as the other image you showed

13     us earlier compared two cartridge cases?

14     A.   It serves a similar purpose, yes.  In the photograph,

15     you're able to see one of the evidence cartridge cases, Q5,

16     specifically on the left.  On the right is one of the test

17     fires that I created with the .45 auto pistol, and you can see

18     it's a little easier to see the line in this photo because the

19     firing pin impression on the left, kind of, forms a little bit

20     of a gap, but you can see the agreement of the parallel marks

21     from one side to the other.

22     Q.   All right.  Now, moving to page 4 of the same exhibit, is

23     this a demonstrative photograph you took, showing a projectile

24     fired from that .45 with one of the projectiles from the

25     scene?

1    A.    It is, yes.

2    Q.    And can you try to orient the jury in this photograph as

3    to what we're looking at?

4    A.    So this is a photograph of the land impressions of the

5    bullets, and on the left is the bullet jacket fragment, BJF2.

6    On the right hand side is, again, another test fire from the

7    .45 auto.  And the line travels down the center here, and in

8    the center portion here is where I'm looking and making my

9    comparison.

10   Q.    And, again, your conclusion?

11   A.    That the three bullets and the bullet jacket fragment

12   were fired with the Para Ordinance .45 auto.

13   Q.    And as to all of the tests that you've discussed, was

14   there both a primary examiner and co-examiner?

15   A.    There was, yes.

16   Q.    And after the co-examiner -- after the examiner completes

17   the process and reaches a conclusion, what information is

18   given to the co-examiner about the first examiner's results?

19   A.    None.

20   Q.    And then were all of the examinations in this case

21   verified?

22   A.    They were, yes.

23         **MR. BUDLOW:**  Court's indulgence, please.

24         That's all I have, Your Honor.

25         **THE COURT:**  Thank you.

 1          Cross-examination, Mr. Purpura or Ms. Whalen?

 2               **MR. WHALEN:**  No questions.  Thank you.

 3               **THE COURT:**  No questions.

 4          Thank you very much.  And with that, Mr. Monkres, you are

 5     excused.  You should not discuss your testimony with anyone in

 6     the event you are called back to the witness stand.  Thank you

 7     very much.

 8               **THE WITNESS:**  Thank you, Your Honor.

 9               **MR. BUDLOW:**  Your Honor, I have two additional

10     stipulations that I could read at this time.

11               **THE COURT:**  All right.  And, again, these are

12     stipulations that have also been typed and are exhibits that

13     the jury will have back with them in the jury room.  Correct,

14     Mr. Budlow?

15               **MR. BUDLOW:**  Yes, Your Honor.

16               **THE COURT:**  All right.  Go ahead.

17               **MR. BUDLOW:**  The first one is marked as Government's

18     Exhibit 20.1 and reads as follows:  "The parties stipulate and

19     agree that prior to May 27, 2015, the Defendant, Andre

20     Briscoe, had been convicted of a crime punishable by

21     imprisonment for a term exceeding one year, as defined in 18

22     U.S.C. §921, and that the Defendant knew prior to May 27th,

23     2015, that he had been convicted of a crime punishable by

24     imprison for a term exceeding one year.

25          The Defendant's civil rights following that conviction,

including his right to possess a firearm, have not since been

restored."  That stipulation is signed by counsel for the

parties.

          **THE COURT:**  And that's Government's Exhibit 20.1?

          **MR. BUDLOW:**  Yes.

          **THE COURT:**  As to that, ladies and gentlemen, that

is an element of one of the offenses with which Mr. Briscoe

has been charged, as being a felon in possession of a firearm,

meaning he had a prior conviction, the punishment for which

was more than one year in prison, and he was not allowed to

have a firearm.  That is -- that's the only significance of

that, is that that conviction exists, and there is a

stipulation as to that.  You should not concern yourself with

what the conviction was for.  It's an -- it's just that the

conviction exists, and that is an element of an offense, and

there is no dispute, and the Defendant had so stipulated.

     Correct from the point of view of the Defense?

          **MS. WHALEN:**  Yes, Your Honor.

          **THE COURT:**  Thank you.  All right.

     Go ahead, Mr. Budlow.

          **MR. BUDLOW:**  Next, Your Honor, is Government's

Exhibit 20.2.  "The parties stipulate and agree that the

following items were manufactured outside of the state of

Maryland, the Para Ordinance Model P12 .45-caliber pistol

bearing serial number RK8433, which is Government Exhibit's

1    Number 1.28, recovered in Baltimore City, Maryland, on May 16,

2    2018, by the Baltimore Police Department.  And the six rounds

3    of .45-caliber Winchester brand ammunition, components of

4    which were recovered by the Baltimore Police Department on

5    May 28th, 2015, from 103 Upmanor Road, Baltimore, Maryland.

6    And also from the Office of the Chief Medical Examiner,

7    Government's Exhibit No. 1.1, 1.2, 1.3, 1.4, 1.5, 1.6, 1.7,

8    1.8, 1.11, 1.13, and 1.14.  As such, both the firearm and the

9    ammunition traveled in interstate commerce prior to May 28th,

10   2015."

11              THE COURT:  Thank you, Mr. Budlow.

12              MR. BUDLOW:  I'm sorry, Your Honor.  There is a

13   little more.  I was just getting my bearings.

14        "Agents from the Bureau of Alcohol, Tobacco, Firearms,

15   and Explosives examined the above firearm and ammunition and

16   determined that the firearm is designed to expel projectile by

17   the action of an explosive, and the ammunition is designed for

18   use in any firearm.  As such, the firearm and ammunition meet

19   the definitions respectfully of a firearm and ammunition set

20   forth in Section 921A of Title 18 of the United States Code."

21        Thank you, Your Honor.  That is the two stipulations.

22              THE COURT:  Thank you, Mr. Budlow.

23        And, again, that has to do with jurisdictional

24   requirements as to one of the elements in terms of the

25   interstate nexus of the firearm and/or the ammunition, just

1    for jurisdictional purposes.  And there's no dispute about

2    that.  And, indeed, I don't really need to instruct you at any

3    length on the law on that.  That element has been satisfied.

4         Correct from the point of view of the Defense.

5              **MS. WHALEN:**  Yes, Your Honor.

6              **THE COURT:**  Thank you very much.

7              **MR. BUDLOW:**  Your Honor, just a suggestion.  This

8    might be a good time --

9              **THE COURT:**  Yes, this might be an appropriate --

10   this is where we will take our lunch break, our quick lunch

11   break.

12        Let me just go through the schedule here.  The

13   Government's calling one more witness.  Is that right,

14   Mr. Budlow?

15             **MR. BUDLOW:**  Yes, Your Honor.

16             **THE COURT:**  All right.  And that will be Special

17   Agent Jeffrey Kelly; is that right?

18             **MR. BUDLOW:**  Yes.

19             **THE COURT:**  Okay.  All right.  So we're going to

20   take a break here for lunch.

21        How long do you think Agent Kelly will be on the witness

22   stand?

23             **MS. BRUSCA:**  Maybe half hour, 40 minutes, Your

24   Honor.

25             **THE COURT:**  Okay.  All right.  I think then we can

1    have 45 minutes for lunch.  We take 45 minutes for lunch.

2    We're going to do our best to start again at 1 o'clock.  It's

3    a quarter after 12:00 now.  We'll take a 45-minute lunch

4    break, then we'll start at 1 o'clock, and then we'll have one

5    more witness today, and then I have some legal issues I have

6    to address with the lawyers.

7          So you'll be leaving today probably before 3 o'clock.  So

8    that will be the day.  That will be our schedule for the day.

9          So with that, we will stand in recess for 45 minutes.

10          **THE CLERK:**  All rise.  Court stands in recess.

11          (Jury exits courtroom 12:14 p.m.)

12          (Lunch recess.)

13          **THE CLERK:**  This Court resumes its session.  The

14    Honorable Richard D. Bennett, presiding.

15          **THE COURT:**  Good afternoon, everyone.  Before we

16    bring the jury in to receive the next witness -- you all may

17    be seated for a minute here.

18          I have a note that was written directly to me by the

19    Defendant.  We already started 50 minutes late because the

20    record reflects the Defendant refused to come to the

21    courthouse, and we had to send the marshals to get him.  We

22    are not going to delay proceedings based upon a letter he's

23    decided to send to me, because we have to keep the case

24    moving.

25          I've marked this as Court Exhibit No. 4.  It will be

```
 1        placed under seal.  It relates to some viewpoint of one of his
 2        lawyers.  I've given a -- provided a copy to Defense counsel.
 3        Defense counsel has aptly noted that this really is more of an
 4        attorney inquiry, and so it should not be shared with the
 5        Government.
 6             And my view is, we will proceed with the Government's
 7        witness, Jeffrey Kelly.  The Government will then rest its
 8        case.  We'll deal with Rule 29 motions, and then we'll be
 9        ready to proceed on Monday morning with the Defense case.  And
10        this issue with respect to this note can be addressed by
11        Defense counsel with their client sometime again today.
12             Government have any problem with that?
13             MR. BUDLOW:  No, Your Honor.  I was just wondering
14        if I could make a request.  We do plan on resting our case.
15        We haven't had a chance to go through the evidence list
16        meticulously.  Could we do that provisionally subject to --
17             THE COURT:  Sure.  Sure.
18             MR. BUDLOW:  -- just moving additional evidence?
19             THE COURT:  You'll rest provisionally.  If there's
20        any -- you know, just -- and we'll deal with Rule 29 motions,
21        then you can cross the Ts and dot Is.  There's a considerable
22        amount of evidence, that's certainly a fair request,
23        Mr. Budlow, and the Government can do that.
24             And I'm sure the Defense concurs, correct, Ms. Whalen
25        with that?
```

```
 1              MS. WHALEN:  That's fine, Your Honor.

 2              THE COURT:  Mr. Gurevich, if you'll make this an

 3      exhibit here and seal it.

 4         And Defense counsel's received a copy; correct, Ms.

 5      Whalen?

 6         Mr. Purpura?

 7              MR. PURPURA:  Judge, we have and I believe it's been

 8      resolved, but...

 9              THE COURT:  Well, we'll see.  I didn't really want

10      to delve into that --

11              MR. PURPURA:  Thank you.

12              THE COURT:  -- but I'm not going to delay

13      proceedings --

14              MR. PURPURA:  Right.

15              THE COURT:  -- any more on that.

16         And with that, I think we're ready to bring the jury in

17      and then call Special Agent Jeffrey Kelly.  And then once we

18      finish with that, we'll have Rule 29 motions, and we should be

19      able to wind up by a quarter after 3:00 today.  Thank you very

20      much.

21              THE CLERK:  All rise for the jury.

22         (Jury enters courtroom 1:16 p.m.)

23              THE COURT:  Good afternoon, again.  Sorry we're not

24      getting started quite as early as we hoped.  I didn't mean to

25      rush you all.  We had some other logistical things we had to
```

```
 1    deal with, but we're ready to move ahead.
 2           And with that, the Government's next witness, Ms. Brusca.
 3               MS. BRUSCA:  Thank you, Your Honor.
 4        The Government calls Special Agent Jeffrey Kelly.
 5               THE COURT:  Mr. Kelly, if you'll come forward,
 6    please.  Stand and be sworn.
 7               THE CLERK:  Raise your right hand for me.
 8        JEFFREY KELLY, having been duly sworn, was examined and
 9    testified as follows:
10               THE WITNESS:  I do.
11               THE CLERK:  You may have a seat.  And while speaking
12    clearly into the microphone, can you please state and spell
13    your full name for the record.
14               THE WITNESS:  Jeffrey Kelly, J-e-f-f-r-e-y,
15    K-e-l-l-y.
16               THE COURT:  Mr. Kelly, you're probably aware of the
17    standing orders that this Court requires that masks are to be
18    worn in all public areas of the courthouse with the exception
19    of in the courtroom, in the discretion of the Presiding Judge,
20    masks may be taken off or pulled down if one has been fully
21    vaccinated.  So I inquire of witnesses as to their vaccination
22    status.
23           Have you been fully vaccinated, sir?
24               THE WITNESS:  I have Your Honor.
25               THE COURT:  You have?
```

1              **THE WITNESS:**  Yes.

2              **THE COURT:**  All right.  Then you can pull your mask

3      down while testifying; you don't have to, but you can, and

4      take your mask off, and we will proceed.

5          Ms. Brusca?

6              **MS. BRUSCA:**  Thank you, Your Honor.

7                  D I R E C T   E X A M I N A T I O N

8      BY MS. BRUSCA:

9      Q.   Agent Kelly, where do you work?

10     A.   Federal Bureau of Investigation.

11     Q.   And what's your position with the -- that's the FBI to

12     the rest of us?

13     A.   Yes, FBI.  I'm a special agent.

14     Q.   And how long have you been a special agent?

15     A.   I've been a special agent for three years now.

16     Q.   And what types of cases have you investigated during that

17     time?

18     A.   Investigated violent crimes committed by drug trafficking

19     organizations and violent criminal enterprises.

20     Q.   And have you been involved in the investigation of the

21     Defendant, Andre Briscoe?

22     A.   I have.

23     Q.   For how long?

24     A.   A little bit over a year now.

25     Q.   Were you the first FBI agent involved in the case?

```
 1    A.   I was not.
 2    Q.   As part of the FBI's support of the investigation, have
 3    you and other members of the FBI obtained and reviewed records
 4    from Facebook accounts?
 5    A.   Yes, I have.
 6    Q.   And how are those records obtained?
 7    A.   We obtained search warrants for subject accounts.
 8    Q.   And can you summarize the different Facebook accounts
 9    from which you've obtained data?
10    A.   Yes, we obtained the Facebook account for Jennifer
11    Jeffrey, two of Andre Briscoe's accounts, and two of Kiara
12    Haynes's accounts.
13    Q.   And just taking a step back, in the course of your work
14    for the FBI, generally, have you become familiar with social
15    media records?
16    A.   Yes, I have.
17    Q.   And have you used social media records in your
18    investigations?
19    A.   Yes, I have.
20    Q.   And what sorts of -- what sorts of information do social
21    media records provide?
22    A.   They provide a variety of information to confirm the
23    identity of the individuals, usually have to put -- use their
24    information such as their address, e-mails, phone numbers,
25    their social circle.  They post photographs, communicate with
```

```
 1    the messengers that usually come with that platform.

 2         A lot of these platforms have their own private messaging

 3    or telephone calling-type system, which is encrypted, so it's

 4    not the usual way in which law enforcement can intercept.

 5    Q.   And do many of the apps also retain information like

 6    metadata associated with things like photos and videos?

 7    A.   Yes, it obtains metadata which usually has location data

 8    as far as where photographs are usually taken or posted from.

 9    Q.   And dates and times and the like?

10    A.   That's correct.

11    Q.   And were you able to identify or confirm some of these

12    types of details with respect to the Defendant, Kiara Haynes,

13    and the victim, Jennifer Jeffrey in this case?

14    A.   Yes, I have.

15    Q.   All right.  Let's start with Jennifer Jeffrey's Facebook

16    account, Government's 12.1, and this is a two-page exhibit.

17    Can you tell us what type of information is contained in

18    Government's Exhibit 12.1?

19    A.   So on this exhibit, it has the e-mail address that was

20    used to create the account, which is seen at the top.  The

21    vanity name, Jennifer Browne 10.  I'm sorry.

22    Q.   No, that's good.  You're good.

23    A.   Registration date is at the bottom, June 25th, 2010.

24    Q.   And the registration date is what, when the account was

25    opened?
```

1    A.   Yes, that's correct.

2    Q.   And on page 2, what type of information is there?

3    A.   The gender of the user who created the accounts.  In this

4    case, it was Jennifer Jeffrey, she's a female, and her date of

5    birth.

6    Q.   Which was?

7    A.   January 3rd, 1984.

8    Q.   And did Jennifer Jeffrey have profile pictures associated

9    with this particular account?

10   A.   I don't believe she did.

11   Q.   Were there other photographs of the user of the account

12   that you found in the records?

13   A.   Yes, there was.

14   Q.   And let me put up Exhibit 12.9.  Was this one of the

15   photographs that was contained in Ms. Jeffrey's account?

16   A.   Yes, it was.

17   Q.   And which one is Ms. Jeffreys -- excuse me -- Ms.

18   Jeffrey?

19   A.   She's photographed right there in the center with the

20   white tank top.

21   Q.   And going to page 2, do the records provide a date and

22   time that this photograph was uploaded?

23   A.   Yes, this is an example of the metadata.  It has the

24   album name, which is mobile uploads, the date and time that it

25   was uploaded, and the author is the user that uploaded the

```
 1    photograph.

 2    Q.    Jennifer Jeffrey Browne?

 3    A.    That's correct.

 4    Q.    And was there a -- there's a title with this particular

 5    photograph?

 6    A.    Yes, it's labeled title, but that's basically known as

 7    the caption of the photo.

 8    Q.    Now, going back to the photo, in addition to Jennifer

 9    Jeffrey, is there another individual relevant to the

10    investigation in this photo?

11    A.    Yes, that's Ms. Kiara Haynes.  She's to Jennifer's left.

12    If you're looking at the photo, she's on the right-hand side.

13    Q.    Right there (indicating.)

14    A.    Yes.

15    Q.    What was the date range for the records you were able to

16    obtain for Jennifer Jeffrey's account?

17    A.    January 2015 to June of 2015.

18    Q.    And did you obtain records that were later than that

19    date, just not user initiated?

20    A.    That's correct, yes.

21    Q.    So when you said you obtained records for the account, is

22    that -- the ending date was June 15th or even later?

23    A.    When I say June 2015, I'm referring to activity that was

24    performed by that account that the user of the account

25    initiated.
```

1    Q.   Okay.  And then it included -- did it include things like
2    people posting on Jennifer's Facebook page after she was found
3    dead?
4    A.   That's correct, yes.
5    Q.   Okay.  Turning to Ms. Kiara Haynes and her two accounts,
6    I'm going to show you Exhibit 12.2.  And can you tell us about
7    this account for Kiara Haynes?
8    A.   Yes.  At the top, it has the different names that her
9    Facebook account during this time went by, Kiara Haynes, Kiara
10   Gardner, Kiara Haynes Gardner, the e-mail account with which
11   she used to register the account.
12   Q.   That's larrykiara@yahoo.com?
13   A.   Larrykiara@yahoo, the vanity name, Kiara Haynes 1, and
14   then the registration date at the bottom, August 3rd, 2009.
15   Q.   And that's, again, the date that this Facebook account
16   was opened?
17   A.   That's correct, yes.
18   Q.   And who is Larry to Kiara?
19   A.   That's her father.
20   Q.   And what's Larry's last name, if you know?
21   A.   Haynes.
22   Q.   And on page 2 of the Kiara Haynes 1 account, can you tell
23   us the phone number associated with the account?
24   A.   (410) 873-5607.
25   Q.   What does unverified mean?

```
1    A.   It just means that the website may not have -- the user
2    may not have taken whatever necessary steps to verify the
3    phone number.
4    Q.   Like confirm a text message or something?
5    A.   Yes.
6    Q.   And the city for the account?
7    A.   Baltimore, Maryland.
8    Q.   Going to page 3, what is this picture?
9    A.   That's the profile picture for this subject account, and
10   that's Ms. Kiara Haynes in the photograph.
11   Q.   What was the date range of records that you were able to
12   obtain for the Kiara Haynes 1 account?
13   A.   I believe for this account it was January of 2015 to
14   January of 2020.
15   Q.   And I'm going to show you Government's 12.11.  And can
16   you tell us what Government's 12.11 is?
17   A.   These are individual Facebook messages that Ms. Haynes
18   had with an individual going by Tony Holmes, yeah.
19   Q.   And the bottom e-mail -- bottom message, excuse me, who
20   is the author?
21   A.   For the last message?
22   Q.   Yes.
23   A.   Ms. Kiara Haynes.
24   Q.   What does the body of the message say?
25   A.   "Damn, you call me straight up (410) 878-5607."
```

1    Q.   And what was the date that the user of the Kiara Haynes

2    Gardner account sent this message?

3    A.   February 21st, 2015.

4    Q.   Now, when you obtain Facebook records through a search

5    warrant, what's the format that the records come in?

6    A.   Comes in a PD -- a zip file.  It has a PDF, which is

7    everything that will return in the account, but it's not in

8    chronological order.  It's broken up into messages, likes,

9    pokes, statuses.  And then in a separate folder, it will have

10   the media with it.

11   Q.   And in the case of the Kiara Haynes 1 account, can you

12   give us an idea of how voluminous the records are?

13   A.   I'm sorry.  Can you repeat that?

14   Q.   Sure.  In the case of the Kiara Haynes account, this

15   first account from January '15 to January '20, can you give us

16   the size of how voluminous those records were?  How big?

17   A.   I'm not sure of the exact number of pages, but it was

18   five years worth of data, so it was well over --

19   Q.   Tens of thousands?

20   A.   Yes.

21   Q.   And were you able to review every single one of those

22   tens of thousands of messages?

23   A.   As best as I could, yes.

24   Q.   Did you use things like keywords and date range?

25   A.   Yes, I used find, searching for certain things that

```
 1    pertained to this case.
 2    Q.    And did you create some summaries of those records to
 3    help us digest them from tens of thousands to more focused
 4    records?
 5    A.    Yes, I have.
 6    Q.    We'll come back to those in a second, but let's turn now
 7    to Government's 12.3.  And what is this account?
 8    A.    So this was the second account that was obtained for
 9    Kiara Haynes.  Once again, at the top has the e-mail address
10    associated with it, the vanity name and the registration date.
11    Q.    Which was what?
12    A.    January 15, 2020.
13    Q.    And so the first account, you said, went -- the records
14    ranged from about 2015 in January to 2020 in January.  And at
15    that time, did it appear to you based on your review that
16    Kiara stopped using the first account and began using this
17    second account?
18    A.    Yes, that's accurate.
19    Q.    And on page 2, what's there?
20    A.    That's, once again, the profile picture for Kiara Haynes
21    with the metadata of the date it was uploaded and the author
22    who posted it.
23    Q.    All right.  And now turning to the Facebook accounts
24    associated with the Defendant, Andre Briscoe, I'm going to
25    pull up Government's 12.0.  And can you tell us the vanity
```

1   name on this account?

2   A.   Andre.Briscoe.7.

3   Q.   And what was the registration date, the date it was

4   opened?

5   A.   August 23rd, 2011.

6   Q.   And the city of the user?

7   A.   Baltimore, Maryland.

8   Q.   On page 2 of the exhibit?

9   A.   Those are three of the phone numbers that were associated

10  with the account, and I believe they were all verified or

11  states they were all verified, with the top one showing the

12  date and time in which it was verified.

13  Q.   And for the bottom two, what was the cell phone there?

14  A.   (443) 621-2413.

15  Q.   And on the third page, what metadata or user initiated

16  data was included for the date of birth of this account?

17  A.   October 5th, 1983.

18  Q.   And was that the Defendant's birthday?

19  A.   Yes.

20  Q.   And pages 4, 5, and 6, what are all of those?

21  A.   Those are different profile pictures that were posted to

22  the account during the time.

23  Q.   And what was the date that this last one was uploaded?

24  A.   January 26, 2015.

25  Q.   Now, what were the dates of the records obtained for this

1    Andre Briscoe account?

2    A.   I believe this one record obtained was between

3    January 2020 to September of 2018.

4    Q.   You said January of 2020.  Did you mean January 2015?

5    A.   Oh, I'm sorry, yes.  2015, yes, sorry.

6    Q.   That's okay.

7         And you said the records ended about when?

8    A.   September of 2018.

9    Q.   And turning to Exhibit 12.4, can you tell us the vanity

10   name for this account?

11   A.   Andre.Briscoe.315.

12   Q.   And the registration date?

13   A.   January 29, 2020.

14   Q.   And going to page 2, the date of birth provided for the

15   user of this account?

16   A.   October 5th, 1982.

17   Q.   That appears to be off a year from the Defendant's date

18   of birth?

19   A.   That's correct.

20   Q.   And then the photo?  Profile pic?

21   A.   Yes, that's the profile picture that was associated with

22   this account.

23   Q.   All right.  Now, you testified earlier that with respect

24   to the records in this case, they were in the tens of

25   thousands of records when we talk about each account; is that

```
1    correct?

2    A.   Yes.

3    Q.   And so many more for the five accounts that you obtained;

4    is that correct?

5    A.   I'm sorry, I missed that.

6    Q.   So we had five accounts, each of which was big?

7    A.   Yes.  Yes.

8    Q.   And turning to 12.5, can you tell us what Exhibit 12.5

9    is?

10   A.   This is a table put together going through all of the

11   different accounts showing the interactions between Jennifer

12   Jeffrey, Andre Briscoe -- or Jennifer Jeffrey with Andre

13   Briscoe, Kiara Haynes, and Tony Harris.

14   Q.   And so these messages were collected from Jeffrey's

15   account?

16   A.   Yes.

17   Q.   As well as the other three -- or I guess other two

18   individuals for whom we had Facebook accounts?

19   A.   Yes, I believe this one is between Jeffrey and Haynes.  I

20   need to see them to scroll through more.

21   Q.   Did you collect, in the course of your investigation, the

22   Facebook records for Tony Harris?

23   A.   No.

24   Q.   So looking at this table then and going to January 2015,

25   is it -- is that about when all of the records for all of the
```

```
 1   accounts started?

 2   A.   Yes.  Yes.

 3   Q.   Okay.  And on January 1st, 2015, what did Jeffrey do?

 4   A.   Searched for Kiara Haynes.

 5   Q.   And on March 14th, 2015, what did the records reflect

 6   from Ms. Jeffrey's account?

 7   A.   Ms. Jeffrey accepted a friend request from Kiara Haynes.

 8   Q.   And on March 16, 2015, what did Ms. Jeffrey search on her

 9   Facebook account?

10   A.   She searched for Tony Harris.

11   Q.   And in this particular exhibit, when the word Harris is

12   used, is that a reference to Tony Harris in particular?

13   A.   Yes, that's correct.

14   Q.   Was this March 16, 2015, date the first time that Tony

15   Harris appeared chronologically in Ms. Jeffrey's Facebook

16   records?

17   A.   Yes.

18   Q.   And then continuing on through the rest of March, what

19   does Ms. Jeffrey do in connection with the four folks we're

20   talking about, her, Mr. Briscoe, the Defendant; Kiara Haynes,

21   and Tony Harris?

22   A.   She interacted with the accounts, whether it's through

23   liking their posts or searching them.

24   Q.   And so there are underlying messages, for example, on

25   March 17th and March 18th, where you may, in fact, have the
```

```
 1    content of the message in the records?

 2    A.   Yes.

 3    Q.   But just for ease of reference, you just summarized them

 4    here?

 5    A.   Yes.

 6    Q.   And turning to page 2, March 22nd, 2015, what's reflected

 7    on that date?

 8    A.   The Defendant liked a photo of Jennifer Jeffrey.

 9    Q.   And so the interactions continue throughout March until

10    the end of March, is that correct, among these four folks?

11    A.   Yes.

12    Q.   And on April 1, 2015, what did Kiara Haynes do?

13    A.   She tagged a photograph of Jennifer Jeffrey with the

14    caption, "Out with the girls."  And there was another female

15    in that photograph.

16    Q.   And I'm going to show you Government's 12.8.  Was this

17    the photograph posted by Ms. Haynes?

18    A.   Yes, it was.

19    Q.   And down at the bottom there, what was the caption of the

20    photograph?

21    A.   "Out with the girls."

22    Q.   And going back to 12.5 and continuing on until April

23    where we just were, does Ms. Jeffrey begin to interact more

24    regularly with the Defendant?

25    A.   Yes.
```

```
 1    Q.   And in particular, on April 4th, she searches for
 2    Mr. Briscoe?
 3    A.   Yes, at, I believe, that's 8:07 a.m.
 4    Q.   And they continue on through April, the four folks
 5    interacting on Facebook until 4/19/2015 when Ms. Haynes does
 6    what?
 7    A.   She posts several photographs where she appeared to be
 8    inside of a car with Jennifer's son Tone Tone.
 9    Q.   And I'm going to put up Government's 12.10.  You've seen
10    these before.  Are these the photographs that Ms. Haynes
11    posted?
12    A.   Yes.
13    Q.   And at 4:19, the same day a little later in the evening,
14    did -- Ms. Jeffrey posted a photo of herself with Haynes and
15    other individuals?
16    A.   Yes, she did.
17    Q.   And I'm going to show you Government's Exhibit 12.9, and
18    was that the photo Ms. Jeffrey posted?
19    A.   Yes, that was the photograph that was shown earlier.
20    Q.   Moving into May, at some point, does Jennifer Jeffrey
21    delete Kiara Haynes as a friend from her Facebook account?
22    A.   Yes, on May 1st.
23    Q.   And after that point, do there continue to be posts and
24    messages in both Jennifer's account and Kiara Haynes's one
25    account that seemed to refer to one another?
```

```
1    A.   Yes, they were referring to each other, yes.

2    Q.   Were they explicit references?

3    A.   Yes.

4    Q.   Sometimes they -- Kiara said, oh, this is about Jennifer

5    and Jennifer said, this is about Kiara?

6    A.   They never used actual specific names, no tagging, but it

7    was inferred who they were referring to in the post.

8    Q.   And can you tell us what some of these messages related

9    to, the content of them?

10   A.   There was an argument over $20.  Yeah, it was definitely

11   over $20, and there was a feud going on about that.

12   Q.   On May 8th, what happened with respect to Jeffrey's

13   Facebook account?

14   A.   Jennifer Jeffrey accepted a friend request from Tony

15   Harris.

16   Q.   And after Ms. Haynes had been deleted as a friend, did

17   Jeffrey interact with her directly on Facebook again?

18   A.   I don't believe so.

19   Q.   And now turning to the remaining pages of Exhibit 12.5,

20   what were the last searches involving Tony Harris and the

21   Defendant, Andre Briscoe, that Ms. Jeffrey performed?

22   A.   She searched for Tony Harris.

23   Q.   At what time and what date?

24   A.   7:47 a.m. on May 27th.

25   Q.   I'm going to put up Government's 12.6.  And can you tell
```

```
 1    us what kind of information is summarized in Government's

 2    12.6?

 3    A.   This is all of the Facebook activity between May 26th and

 4    May 27th for Jennifer Jeffrey.  This is any interaction she

 5    had or just any type of activity in general on her account

 6    during that time frame.

 7    Q.   So the prior exhibit we looked at was all activity, but

 8    with respect to only certain other users; is that correct?

 9    A.   Yes, just the interaction between those individuals.

10    Q.   The Defendant, Kiara Haynes, and Tony Harris?

11    A.   Correct.

12    Q.   And this exhibit is all activity with any user beginning

13    at 10:15 p.m. on May 26, 2015, and continuing on to May 27,

14    2015?

15    A.   Yes.

16    Q.   And over that time period, were those three individuals

17    in that -- I don't know -- I guess almost 12-hour time period,

18    13-hour time period, were the Defendant and Tony Harris

19    reflected in Ms. Jeffrey's Facebook account?

20    A.   Yes.

21    Q.   At what time?

22    A.   10:15 p.m.

23    Q.   And what did Ms. Jeffrey do?

24    A.   I'm sorry, she searched for Tony Harris.  Then again the

25    next day at 5:38 a.m. searched for Tony Harris, 12:59 p.m.,
```

```
 1    4:54 p.m.
 2    Q.   She again did what?
 3    A.   All of those were searches for Tony Harris.
 4    Q.   And at 11:59 p.m. on May 26, 2015?
 5    A.   She liked a post that was owned by Andre Briscoe.
 6    Q.   And at 7:47 a.m. on the morning of May 27, 2015?
 7    A.   A search for Tony Harris.
 8    Q.   And when was the last activity on Ms. Jeffrey's Facebook
 9    account?
10    A.   11:38 a.m.
11    Q.   And was that the last user initiated activity prior to
12    the time of her body being discovered on May 28th?
13    A.   Yes, that's correct.
14    Q.   11:38 a.m.?
15    A.   Yes.
16    Q.   Now, turning to Government's 12.7, can you tell us the
17    sort of information that's summarized in Government's 12.7?
18    A.   This is the Facebook activity just between Kiara Haynes
19    and Andre Briscoe.
20    Q.   And I see at the bottom this is a 27-page exhibit.  Is
21    there a lot of activity?
22    A.   In this time frame, yes.
23    Q.   And what time frame was it?
24    A.   I believe it was from February -- actually, February 2015
25    until -- if I can check my notes.
```

1          I believe it was all the way until January of 2020.

2     Q.   Continuing --

3     A.   From May -- sorry, May of 2020.

4     Q.   Okay.  So 27 pages reflecting five years of interactions,

5     about?

6     A.   Yes.

7     Q.   And beginning with the first entry on February 2015, can

8     you tell us what the records reflect?

9     A.   Ms. Haynes posted a status on having a fun night with her

10    family and meeting her new cousins, specifically a new cousin

11    last night, Andre Briscoe.

12    Q.   And how about two days later on February 17?

13    A.   She then sent a friend request to Andre Briscoe.

14    Q.   And turning to page 2 and focusing only on particular

15    posts so that Judge Bennett can make his wedding.

16         **THE COURT:**  I beg your pardon?

17         **MS. BRUSCA:**  I said focusing just on particular

18    posts.  It was a poor joke, I said, to make sure we're not

19    here all day.

20    **BY MS. BRUSCA:**

21    Q.   Looking at March 1st.

22    A.   Yes.  She posted the status, "I love my cousin Andre

23    Briscoe.  I'm so glad I met you, cousin.  My heart."

24    Q.   And then down on March 9th, 2015, can you please read the

25    post that Ms. Haynes made?

```
 1    A.   "Woke up in whack ass Baltimore when all of the real

 2    people who love me when I'm around or not is from Eastern

 3    Shore.  Back in Baltimore where they say they love you, then

 4    talk about you as soon as you leave.  In Baltimore where your

 5    boyfriend and cousin become best friends and start lying for

 6    each other.  Take me back to the Shore with Haynes, Harris,

 7    and Briscoe, real in tears that's the life for me."

 8    Q.   And two days later on March 11th, there was a message

 9    from who?

10    A.   Andre Briscoe messages Kiara Hayes and said --

11    Q.   Yes.  What did he say?

12    A.   "Love you, Cuz.  I miss you."

13    Q.   Turning to page 3 at 6:52 a.m., what message did Kiara

14    Haynes send?

15    A.   "I miss you, too, cousin.  I'm just waking up.  I love

16    you."

17    Q.   And turning to March 17th, what did Ms. Haynes post as

18    her status update?

19    A.   "On my way to see my cousins Tony Harris, Andre Briscoe."

20    Q.   And so the post was "OMW"?

21    A.   Yes, OMW.  Sorry.

22    Q.   Which you understand to be "on my way"?

23    A.   On my way, yes.

24    Q.   Page 4 at 4:47 p.m.?

25    A.   Andre Briscoe messaged Kiara Haynes telling her to call.
```

1    Q.  And down on page 5 at 4/16/2015, what did Kiara Haynes

2    write?

3    A.  "Had so much fun with my cousin today.  I swear I love

4    you all.  Haynes, Briscoe, Harris, Dixon.  I love all so much,

5    even the ones I ain't meet yet or talk to as much.  I would

6    ride for each and every one of y'all.  My bloodline's strong."

7    Q.  And then now turning, specifically, to May of 2015.  Can

8    you approximate about -- well, strike that.

9    When we were looking at Exhibit 12.5, was this around the

10    same time in May that Jennifer Jeffrey deleted Kiara Haynes

11    from her account?

12    A.  Yes.

13    Q.  Or deleted her as a friend, I should say?

14    A.  Yes, on May 1st.

15    Q.  And then jumping ahead to May 9th, Ms. Haynes did what?

16    A.  She removed Andre Briscoe from her friends list.

17    Q.  And then on 5/25/2015, were there a series of messages

18    between the Defendant and Kiara Haynes?

19    A.  Yes, and a friend request.

20    Q.  Go ahead and put up Government's 12.12.  It's a little

21    easier to reed.  Can you read those messages starting from the

22    top and identifying the user and date and time of each

23    message?

24    A.  May 25, 2015, at 16:04 UTC time, Andre Briscoe wrote,

25    "Call my phone ASAP or call my grandma phone (443) 439-9226."

```
 1     Q.   And just, 16 UTC is about what?

 2     A.   I think it's about four hours ahead.

 3     Q.   I guess it could be a little bit later if it was daylight

 4     savings?

 5     A.   Yes, it depends on the -- yeah.

 6     Q.   But it would be about noon?

 7     A.   Correct.

 8     Q.   And then ten -- at 16:11 or 12:11, what does the

 9     Defendant say?

10     A.   "Call back."

11     Q.   And Kiara Haynes responds what?

12     A.   "I called both phones.  Call me (410) 878-5607."

13     Q.   And then finally on May 25th, 2015, at approximately

14     12:35 p.m., what does the Defendant say?

15     A.   "I'm on my way."

16     Q.   And turning back to the Exhibit 12.7, page 6, we just

17     looked at the messages on May 25th.  I'm going to show you

18     Government's Exhibit 12.18.  Is there a gap in the Defendant's

19     Facebook activity around this time?

20     A.   Yes, there is.

21     Q.   And you said that there was a gap in the Defendant's

22     Facebook records?

23     A.   Yes.

24     Q.   From when to when is that gap?

25     A.   I would have to go to my notes, but I believe it was
```

```
 1      between very early in the morning on the 27th and not until

 2      late on the 28th.

 3      Q.   So looking at page 1 of Government's Exhibit 12.18 --

 4                JUROR:  Are we supposed to see this?

 5      BY MS. BRUSCA:

 6      Q.   -- and is this more like the format in which the Facebook

 7      records are received?

 8      A.   That's exactly how it's received, yes.

 9      Q.   And so moving from the top, which is earliest in time,

10      and just looking at the time and date of the activity, about

11      when is the first activity?

12      A.   So during the time conversion, that would actually be on

13      May 26th at around 11:53 at night.

14      Q.   And then the second entry?

15      A.   Same exact time.

16      Q.   11:53 p.m. on the 26th?

17      A.   Correct.

18      Q.   And, again, 11:53 p.m. on the 26th?

19      A.   Yes.

20      Q.   11:54 on the 26th?

21      A.   Yes.

22      Q.   And we'll just keep going, 11:54; is that correct?

23      A.   Yep.

24      Q.   And then 11:54 again?

25      A.   Yes, 11:54.  Yes, sorry.
```

1    Q.   And keep going.

2    A.   11:55.

3    Q.   What's next?

4    A.   I can't -- I can't see that.  11:55.

5    Q.   And turning to page 2, we'll skip the next couple until

6    we see a big change, but at the bottom of page 2 or so we're

7    at 11 what?

8    A.   I need you to slide up, please.  Sorry.  We're about

9    11:59 on the 26th, p.m.

10   Q.   And then at page 3 at the top?

11   A.   That would be 12:16 a.m. on the 27th.  And then there is

12   no activity until 11:00 a.m. on the 28th.

13   Q.   So from 12:16 a.m. on May 27, 2015, until, you said,

14   about 11:04 a.m. on the morning of May 28, 2015 --

15   A.   Yes.

16   Q.   -- there's no Facebook activity?

17   A.   There's no Facebook activity.

18   Q.   And then just to keep it chronological, I'm going to put

19   up Government's Exhibit 12.15.  Can you tell us the date and

20   time of this picture?

21   A.   It was a photograph posted on May 29th, 2015.

22   Q.   At approximately what time?

23   A.   3:26 in the morning, Eastern.

24   Q.   I'm going to go to page 2.  And do you recognize the

25   individuals in this photograph based on your investigation and

```
 1      involvement so far?

 2      A.   Yes.  Yes, I do.

 3      Q.   And can you identify them?

 4      A.   This individual identified as Wane Briscoe, Andre

 5      Briscoe.

 6      Q.   I'll go to page 2.

 7      A.   Tony Harris, and I believe that was -- went by Fatman.

 8      Q.   And then turning to Government's 12.16, what's the date

 9      and time of this post?

10      A.   June 4th, 2015.

11      Q.   And who is pictured in this exhibit?

12      A.   Andre Briscoe.

13      Q.   And what's the location?

14      A.   That's at the Greenwood Apartments.

15      Q.   This is the day before the search warrant at Tonya

16      Harris's house?

17      A.   That's correct.

18      Q.   And that picture is at Tonya Harris's house?

19      A.   It's at the -- it's at the apartment complex.  I can't

20      confirm if that's in front of the specific door.

21      Q.   Got you.  Thank you.

22           And going back to 12.7.  Going back to 12 --

23           (Counsel confer.)

24      BY MS. BRUSCA:

25      Q.   And so going back to Exhibit 12.7, page 6, skipping ahead
```

```
 1      to June -- there's May 31st and then June 7th, what's the next
 2      post?
 3      A.   Ms. Haynes likes multiple posts by Mr. Briscoe.
 4      Q.   And did the communications between the Defendant and
 5      Kiara Haynes sort of continue with the regularity and then
 6      some gaps every now and again for the next few years?
 7      A.   Yes, they did.
 8      Q.   And then on page 17, can you tell us what happened on
 9      May 27th of 2015 -- 2015?
10      A.   I'm sorry, what was that?
11      Q.   Just tell us what activity there is on May 27, 2017.
12      A.   Oh, Kiara --
13               THE COURT:  May 27, 2000- --
14               MS. BRUSCA:  '17, Your Honor.
15               THE COURT:  '17.
16               THE WITNESS:  Kiara Haynes searched for Andre
17      Briscoe.
18      BY MS. BRUSCA:
19      Q.   And then the next morning or next day at 1:02 p.m., what
20      happens?
21      A.   Andre Briscoe messaged Kiara Haynes saying, "What's up,
22      girl?"
23      Q.   And then following the message?
24      A.   Andre Briscoe called Kiara Haynes, but shows there was no
25      answer.
```

```
1     Q.   And then 8 seconds later at 1:04:08?

2     A.   Andre Briscoe sent Kiara Haynes a voice message.

3     Q.   And was the content of that voice message contained in

4     the records?

5     A.   No.

6     Q.   And then continuing on, on May 28th for several rows it

7     happens?

8     A.   There's a back and forth between liking each other's

9     photos, messaging each other and reacting to different posts.

10    Q.   And again, continuing on this -- there continues to be

11    interactions between the Defendant and Ms. Haynes over the

12    years?

13    A.   That's correct.

14    Q.   And jumping ahead finally to page 26, is there a gap in

15    the records from August 2018 to February 20th --

16    A.   Yes.

17    Q.   -- or excuse me, February 2020?

18    A.   Yes, there is.

19    Q.   And that was while the Defendant wasn't using Facebook?

20    A.   Correct.

21    Q.   Now, turning to January 2020, the Defendant -- have you,

22    during the course of your investigation, become aware of a

23    phone call that the Defendant made to his grandmother?

24    A.   Yes, I did.

25    Q.   What date was that?
```

1    A.    January 3rd, 2020.

2    Q.    And was there a search warrant conducted on that date as

3    well?

4    A.    Yes, there was.

5    Q.    And what was that search?

6    A.    It was the search of Wane Briscoe's house.

7    Q.    And this account you previously testified was opened on

8    January 29th, 2020, this Andre Briscoe account?

9    A.    The one account was, yes.

10   Q.    The one -- the only one that was active, I guess.

11   A.    The one that had records starting -- going to that time,

12   yes.

13   Q.    And where was Mr. Briscoe in January to February of 2020?

14   A.    He was incarcerated.

15   Q.    And about when was he released?

16   A.    I know his mandatory release was February 1st, and I

17   believe his last attempted jail call was around January 26th.

18   Q.    Sometime between January 26th and February 1st?

19   A.    That's correct.

20   Q.    But this particular account was opened on January 29th?

21   A.    Yes.

22   Q.    And starting on February 7th, 2020, can you describe the

23   Defendant's Facebook activity?

24   A.    Andre Briscoe started searching different -- different

25   names that Ms. Kiara Haynes could have been going by for her

1    Facebook account, in an attempt to possibly --

2    Q.   Well, do you know what -- that's okay.  Just describe the

3    activity.

4    A.   He was searching for Kiara Haynes, different varieties of

5    her name.

6    Q.   And on February 8th, 2020?

7    A.   He waved at Kiara Haynes.

8    Q.   And on February 9th, 2020?

9    A.   He sent a friend request for Kiara Haynes, which was

10   neither accepted or --

11   Q.   And continuing on February 9th, 2020?

12   A.   Messaged Kiara Haynes saying, "Cuz."

13   Q.   On February 25th, 2020?

14   A.   Liked a post by Kiara Haynes.

15   Q.   February 25th, 2020?

16   A.   Searched Kiara Haynes Gardner twice.

17   Q.   And February 25, 2020?

18   A.   Informed Kiara Haynes that, "I'm home.  Everybody got my

19   mail."

20   Q.   And on February 25th, 2020?

21   A.   Mr. Briscoe sent a message to the user Chipo Blackwell.

22   Q.   What did he say?

23   A.   "Brother, the girl, Kiara Haynes, is my cousin.  She

24   missing.  Her page is deactivated.  You are the only one on

25   Facebook, on FB.  If you have any information on her or can

1    reach her, tell her I'm home.  She know me as Poo and my real

2    name.  If you can help, please help.  Peace."

3    Q.   And on March 10th, 2020?

4    A.   Kiara Haynes searched for Briscoe twice.

5    Q.   And on March 11th, 2020?

6    A.   Mr. Briscoe posted a photo with Kiara -- posted a photo

7    of Kiara Haynes with the text "Kiara Haynes, my cousin."

8    Q.   And then between March 11th and May 18th, if you could

9    summarize the Defendant's Facebook activity?

10   A.   Once again, he searched multiple varieties of Kiara

11   Haynes's name to include Kiara Briscoe.  And then on May 18th,

12   he sent Haynes a friend's request, which was rejected, and

13   then sent another message to her saying, "Call me, Cuz."

14   Q.   And just to be clear, Agent Kelly, the Defendant had

15   other Facebook activity, but this particular summary is only

16   of his interaction with Kiara Haynes?

17   A.   That's correct.  Yes.

18           **MS. BRUSCA:**  No further questions.

19           **THE COURT:**  Thank you, Ms. Brusca.

20       Cross-examination, Ms. Whalen?

21           **MS. WHALEN:**  Thank you.

22           **MS. BRUSCA:**  Oh, actually, Your Honor.

23           **THE COURT:**  I'm sorry?  Go ahead.

24           **MS. BRUSCA:**  Is that okay?  I'm sorry.  I forgot one

25   thing.

1      **THE COURT:**  Yes, go ahead.

2   **BY MS. BRUSCA:**

3   Q.   Agent Kelly, you thought you were done, but I actually

4   have one quick thing unrelated to Facebook, which is why I

5   forgot.

6        Agent Kelly, during this investigation, are you aware

7   that Jennifer Jeffrey's flip phone was recovered from her home

8   at 103 Upmanor Road on May 28, 2015, the day her body was

9   discovered?

10  A.   Yes.

11  Q.   And I'm going to put up Government's Exhibit 8.8, and are

12  these the records for (410) 908-8308 from May 26th, 2015, to

13  May 28th, 2015?

14  A.   Yes, they are.

15  Q.   And that's the number assigned to Jennifer Jeffrey's flip

16  phone?

17  A.   That's correct.

18  Q.   And turning to page 2, can you tell us the date and time

19  of the last outgoing call from Ms. Jeffrey's flip phone?

20  A.   May 27th, 2015, at 11:40 a.m.

21  Q.   And what number did she call?

22  A.   (443) 225-8945.

23  Q.   And do you know who that number was associated with in

24  2015?

25  A.   I believe it was Tony Harris.

1    Q.   And following that call, for the next number of hours,

2    there isn't another outgoing call, and Ms. Jeffrey, the first

3    911 call reporting her body was at 8:16 a.m. on May 28th,

4    2015; is that correct?

5    A.   Yeah, that's correct.

6    Q.   So with respect to Ms. Jeffrey's flip phone, did you

7    conduct a review of it and analyze the records in it and

8    compare it to the toll that's here on Government's 8.8?

9    A.   Yes, I did.

10   Q.   And what did you determine?

11   A.   That these records are accurate.

12   Q.   And could you tell whether the calls after 11:40 a.m.

13   that came into Ms. Jeffrey's flip phone were answered or not?

14   A.   They were not answered.

15   Q.   And how could you tell?

16   A.   I was able to compare the different numbers that were

17   calling into the phone compared to the missed calls that were

18   actually on the phone.

19   Q.   So the call would reflect some sort of symbol to show

20   that a call had not been answered?

21   A.   Yes.

22   Q.   So, for example, putting up just for demonstrative

23   purposes, Government's 7.24, what is Government's 7.24?

24   A.   I need the photograph.

25   Q.   Oh, sorry.

1          What's Government's 7.24?

2    A.   That's a picture of the flip phone with missed calls.

3    Q.   And so the right arrow reflects the missed call?

4    A.   Yes, that's the symbol for a missed call.

5    Q.   And as you scrolled physically through the phone, you

6    were able to identify the number and time of each missed call?

7    A.   Yes.

8    Q.   And were you able to confirm that all but two of the

9    calls reflected on Government's Exhibit 8.8 from 11:40 a.m. on

10   the 27th until 8:11 a.m. on the 28th were missed calls except

11   for two?

12   A.   Yes, that's correct.

13   Q.   And what were those two calls?  Were you able to figure

14   it out?

15   A.   Yes, those were two jail calls from Kester Browne.

16   Q.   To who?

17   A.   Ms. Jennifer Jeffrey's flip phone.

18   Q.   And how were you able to determine that?

19   A.   I was able to look up Kester Browne's jail call history

20   and compare it to the phone records and missed calls on her

21   device.

22   Q.   So is that the number (713) 489-7846 in the record?

23   A.   I can't see it, but I know from reviewing it, yes, that's

24   correct.

25   Q.   And so you were able to look at the records from Kester

1  Browne's jail calls because those are maintained in the

2  database?

3  A.   Yes, that's correct.

4  Q.   And for the two calls not on Jennifer Jeffrey's physical

5  device, you were able to confirm that those calls to the phone

6  were not answered?

7  A.   Yes, they were not.

8  Q.   So to summarize, after 11:40 a.m. on May 27, 2015, until

9  8:11 a.m. on May 28th, 2015, were any of the calls reflected

10  in Government's 8.8 answered?

11  A.   No, they were not.

12         **MS. BRUSCA:**  No further questions.  Thank you, Your

13  Honor.

14         **THE COURT:**  Thank you, Ms. Brusca.

15      Now cross-examination, Ms. Whalen?

16         **MS. WHALEN:**  Thank you, Your Honor.

17         C R O S S - E X A M I N A T I O N

18  **BY MS. WHALEN:**

19  Q.   You were testifying, Special Agent --

20         **THE COURT:**  Can you pull the microphone over so we

21  can hear you?

22         **MS. WHALEN:**  Sure.

23         **THE COURT:**  Thank you.

24  **BY MS. WHALEN:**

25  Q.   You were testifying about having reviewed Kiara Haynes's

1    Facebook accounts, and there was interaction in the month of

2    May with -- or on her account that indicated she was having an

3    argument with Jennifer Jeffrey; is that right?

4    A.   Yes, that's correct.

5    Q.   And the argument, at least in one post, related to a debt

6    of $20; correct?

7    A.   Yes.

8    Q.   And do you remember how many posts there were referencing

9    this particular argument?

10   A.   I don't have a specific number, no.

11   Q.   More than one?

12   A.   Possibly, yes.

13   Q.   And do you recall for how long a period of time in terms

14   of days or hours was this argument going back and forth or at

15   least just being displayed in a post on Facebook?

16   A.   It might have been a day or two.  I'm not positive.

17   Q.   And do you recall who she was sending -- if that's the

18   correct term, posting to or sending to discussing the $20

19   debt?

20   A.   I believe it was just her general status.

21   Q.   All right.  So that anybody who had access to her page

22   could see about this argument, right?

23   A.   Yes.

24   Q.   And do you recall if there was more than an argument over

25   the $20 bill that was reflected in her Facebook posts?

```
 1    A.   I'm sorry, can you repeat that?
 2    Q.   Were there any other topics that appeared to be arguments
 3    that she was having with Jennifer Jeffrey that were reflected
 4    in her Facebook posts?
 5    A.   Not that I can recall.
 6    Q.   Now, I'm going to show you what has been marked already
 7    and we've seen, Defendant's -- no, excuse me, this would be
 8    Government's Exhibit 12.0, and it's page 5.
 9         First, let me zoom that in.  That appears to be a picture
10    of Mr. Briscoe; correct?
11    A.   Yes, it does.
12    Q.   And I don't know if you can see from the zooming -- let
13    me go out a little bit -- there is some facial hair there;
14    correct?
15    A.   Yes, it appears to be, yes.
16    Q.   And then let's go down to the bottom, and if you can let
17    us know, this is a profile picture; correct?
18    A.   Yes.
19    Q.   And it indicates that it was uploaded on January 22nd,
20    2015; correct?
21    A.   Correct.
22    Q.   Now, let's take a look at Government's Exhibit 12.11,
23    page 1.  And this is Kiara Haynes Gardner's Facebook account;
24    correct?
25    A.   Yes, it is.
```

1    Q.   And she is sending out on February 21st, 2015, a message;

2    correct?

3    A.   Correct.

4    Q.   So you can post things on your page for those of us who

5    are not Facebook users, but you can also send messages to

6    other people, your friends, for instance, right?

7    A.   Correct.

8    Q.   This was Tony Holmes, right?

9    A.   Yes.

10   Q.   And she is saying, "Call me, yo.  I was trying to see if

11   there is some perc up there.  I could pay you to bring them or

12   I could catch a hack," right?

13   A.   Yes.

14   Q.   And you interpret that to mean Percocet, right?

15   A.   I can't tell exactly what she was asking for, but...

16   Q.   Are you familiar with perc is a shortened term for

17   Percocet on the street?

18   A.   Yes, I am.  Yes.

19   Q.   All right.  Thank you.

20          **MS. WHALEN:**  Court's indulgence.

21   **BY MS. WHALEN:**

22   Q.   In Government's Exhibit 12.12, let me show you that,

23   Agent Kelly.

24          Now, again, this is from Kiara Haynes Gardner's Facebook

25   account; correct?

```
1    A.   Yes.

2    Q.   And down here, I'll point to this particular message,

3    September 18th of 2015, Ms. Haynes says, "I talk to you every

4    day, but I miss you so much," right?

5    A.   Yes.

6    Q.   And that is going to -- a message, actually, to the

7    account listed for Andre Briscoe, right?

8    A.   Correct.

9    Q.   Now, I'm going to show you what's marked as Defendant's

10   Exhibit 121.  And you did say there were thousands, I mean,

11   thousands and thousands of records, especially these accounts

12   that were up to, like, five years in records; correct?

13   A.   Correct.  Yeah.

14   Q.   And so Kiara Haynes's Facebook account, I'll show you

15   page 16900 -- I said that wrong -- 16971.

16   A.   You mean 16 thousand?

17   Q.   There is a reason I'm a lawyer and not an accountant.

18        All right.  All the way down at the bottom of the page --

19   and you, of course, reviewed what Kiara Haynes's account was

20   after the murder and especially relating to someone like

21   Danielle Wilder, right?

22   A.   Yes.

23   Q.   And Danielle Wilder is the sister of Jennifer Jeffrey;

24   correct?

25   A.   Correct.
```

1    Q.   Now, you see in the very bottom of this page, Kiara

2    Haynes reaches out to Danielle.  Okay.  Hopefully, we can all

3    see that.

4         Can you see it?

5    A.   I can.

6    Q.   All right.  Wonderful.

7         And she indicates in her message to Ms. Wilder, "I'm so

8    sorry I missed the funeral that Friday.  My cousin was

9    supposed to be paying for me to get back, and they all got

10   locked up that morning.  I was stuck down here with" -- let's

11   see if I got the right page here.  I think that's the end of

12   that particular post.

13        And do you remember there being a back and forth in the

14   messaging between Ms. Haynes and Ms. Wilder?

15   A.   I do, yes.

16   Q.   And let me show you on the next page 16972.  We'll again

17   go down to the bottom.  Well, let's start at the top here,

18   right here (indicating.)

19   A.   I'm sorry, which one are you pointing at?

20   Q.   I'm sorry, right here (indicating.)

21   A.   By Ms. Wilder?

22   Q.   Yes, it's 7/2/2015.  Ms. Wilder posts or messages to

23   Ms. Haynes, "What do you think?  You're not going to jail?"

24   And Ms. Gardner responds, in a fairly lengthy message.

25   Ms. Haynes Gardner, She says, "That's F'd up, Danielle.  You

1  really think that?"  And, "No, I know I'm not going to jail

2  because I ain't do no shit like that.  The F is wrong with

3  you?  And that's crazy you think that I would hurt Jen, let

4  alone Tone Tone.  You just broke my heart, and I don't know

5  what to say.  I hope y'all find whoever did it.  The F, you

6  just really F'd my head up.  I can't believe you, man.  Why

7  would you think that about me?  Yeah, we wasn't speaking, man.

8  Told them people everything I knew.  I can't believe you.  I

9  know you hurt and don't know what to think, but to think that

10  hurts me."

11       Do you recall that message back and forth?

12  A.   Yes, I do.

13  Q.   And down at the next messaging, Ms. Haynes Gardner says,

14  "That's why I had to stay away because I know you all was

15  pointing fingers at my peoples, but me, though, why?"

16       So if you jump down to this shorter post here, Ms. Wilder

17  says, "Well, why would you stay around them more than ever?

18  That's odd.  Just saying."  And then Ms. Wilder explains

19  again, "They come around and her life ends over a couple of

20  dollars."

21       All right.  I'm going to jump to page 16974, which is the

22  fourth page in the exhibit, and ask you to look at this

23  messaging between the two, again, Danielle Wilder and

24  Ms. Haynes.  We're now on July 30 of 2015.  And does Ms.

25  Wilder in the messaging record say, "Check my timeline.  Got a

```
 1   message for you BooBoo."

 2   A.   Yes, she does.

 3   Q.   And she's saying that, again, to Kiara Haynes; correct?

 4   A.   Yes.

 5   Q.   And then Ms. Wilder said, "Wait.  Didn't post yet."  And

 6   Ms. Haynes responds, "You really need to stop.  I'm going

 7   straight to the police with this bullshit, like right now."

 8   And then she says -- or first of all, was that correct?

 9   A.   That is what it says, yes.

10   Q.   And then she says, "You're insane.  Never murdered no one

11   in my life, but I am going to law because this shit you say or

12   you say about me is serious.  And while you accusing, whoever

13   really did it looking at this shit laughing."

14        That's what she was saying again to Ms. Wilder in

15   response to whatever Ms. Wilder posted, right?

16   A.   Yes.

17   Q.   Did you ever learn what it was that Ms. Wilder posted

18   that got Ms. Haynes upset?

19   A.   No, we did not have the content for Ms. Wilder's

20   accounts.

21   Q.   Now, turning to Government's 12.7, you showed that the

22   Government highlighted certain interactions between the Kiara

23   Haynes Facebook account and the Andre Briscoe Facebook

24   account, right?

25   A.   That's correct.
```

```
 1    Q.   I'm going to direct your attention to March 1st of 2015,
 2    which is page 2 of this exhibit.
 3    A.   Sorry, you said March what?
 4    Q.   March 1st.
 5    A.   Okay.
 6    Q.   And right here in the center -- Ms. Haynes posted a
 7    status in which she tagged Mr. Briscoe, "I love my cousin
 8    Andre Briscoe.  I'm so glad I met you, cousin.  My heart"?
 9    A.   That's correct.
10    Q.   Now, I think you testified on Direct Examination that it
11    was May 9th of 2015 when Ms. Haynes removed Mr. Briscoe from
12    her friend list, right?
13    A.   I believe that's correct.  I would have to check, but
14    yes.
15    Q.   And do you recall -- I think you were in the courtroom
16    when Ms. Haynes testified; is that correct?
17    A.   I was in and out of court.
18    Q.   Do you remember being here, I believe it was, yesterday
19    morning when I played some jail calls with Ms. Haynes?
20    A.   Yes, I was.
21    Q.   All right.  And there were two different clips from jail
22    calls.  Do you remember that?
23    A.   Yes, I do.
24    Q.   And the second set of clips when -- was on May 9th of
25    2015.  Does that ring a bell?
```

```
 1    A.   I'm not -- I don't recall the date being played during

 2    the jail call, but...

 3    Q.   And do you specifically remember now in -- when you were

 4    preparing this compiled list of Kiara Haynes and Andre Briscoe

 5    posts or contacts on Facebook, that in 2017, after Ms. Haynes

 6    searched for Mr. Briscoe and they appeared to have found each

 7    other, do you remember that there were some postings in

 8    October 2017 where Mr. Briscoe tells Kiara Haynes something to

 9    the effect of, "Call me after 5:00.  I'm at work"?

10    A.   I believe so, yes.

11    Q.   And then do you remember after that, Ms. Haynes said she

12    was broke, down on her luck or -- I'm paraphrasing now, but

13    down on her luck, broke, needed money?

14    A.   Yes.

15    Q.   And I think it was on two different occasions in October

16    of 2017; is that correct?

17    A.   I'm not sure how many times, but I recall, yes.

18    Q.   It's reflected in this exhibit; correct?

19    A.   Yes.

20    Q.   And do you remember that Mr. Briscoe sent her a Visa

21    account number for her to use?

22    A.   Yes.

23    Q.   And in November of 2015, do you remember Ms. Haynes

24    saying Happy Thanksgiving to Mr. Briscoe and telling him he's

25    the best cousin a girl could ever ask for?
```

1    A.   I don't recall that.

2    Q.   Okay.  All right.  Let's look at May 9th -- excuse me,

3    November 9th.  I'm sorry, I may have the wrong date.  I

4    apologize to you.

5         On November 26 of 2015, right in the center of the page,

6    Agent Kelly, Ms. Haynes tells Mr. Briscoe, "Happy Thanksgiving

7    to the best cousin a girl could ask for.  More like my

8    brother."

9    A.   Yes, that's correct.

10   Q.   "Unconditional love from family is everything.  I love

11   you, Cuz.  Enjoy your day."

12   A.   That's correct.

13        **MS. WHALEN:**  Thank you, Agent Kelly.  That's all the

14   questions that I have.

15        **THE COURT:**  Thank you, Ms. Whalen.

16        Is there any redirect, Ms. Brusca?

17        **MS. BRUSCA:**  Just one question, Your Honor.

18        R E C R O S S  -  E X A M I N A T I O N

19   **BY MS. BRUSCA:**

20   Q.   Agent Kelly, Ms. Whalen asked you about a post on

21   September 18th, 2015, from Ms. Haynes to Briscoe's account

22   that said, "I talk to you every day, but I miss you so much."

23   In September of 2015, was Andre Briscoe still incarcerated for

24   the arrest at Tonya Harris's house?

25   A.   I believe so, yes.

1          **MS. BRUSCA:**  No further questions.

2          **THE COURT:**  All right.  Thank you, Ms. Brusca.

3      Agent Kelly, you may step down.  You're a case agent, so

4  you may return to your chair.  Thank you very much.

5          **THE WITNESS:**  Thank you, sir.

6          **THE COURT:**  And with that, I think that concludes

7  the presentation of any witness testimony today, and we have

8  some other matters to address.

9      Is that correct?  That's the last witness for today, Ms.

10 Brusca?

11         **MS. BRUSCA:**  Correct.  Thank you.

12         **THE COURT:**  So with that, ladies and gentlemen, you

13 all are released for the day, and we'll see you Monday

14 morning, and we're going to do our very best to start at 9:30

15 on Monday morning.  So see you Monday at 9:30.  You have a

16 nice weekend, and obviously, again, don't discuss the case

17 with anyone during the weekend.

18     Thank you very much.

19     (Jury exits courtroom 2:26 p.m.)

20         **THE COURT:**  All right, Counsel.  Again, you can

21 formally rest before the jury Monday morning, but I think that

22 we can, for purposes now, have the Government rest without

23 prejudice to crossing Ts and dotting Is as to exhibits Monday

24 morning.

25     The Defense has no objection to that, do you, Ms. Whalen

```
 1    or Mr. Purpura?
 2              MS. WHALEN:  No, sir.
 3              THE COURT:  So with that, the -- I gather the
 4    Defense is now moving for a Rule 29 motion by the Defendant, I
 5    gather, although Rule 29(c)(1)(3) of the Federal Rules of
 6    Criminal Procedure indicates that a Defendant is not required
 7    to move for a judgment of acquittal at the conclusion of the
 8    Government's case and may await a jury verdict.  The
 9    Government -- the Defense can certainly do so.
10        Is the Defense now filing a Rule 29 motion as to all six
11    counts, Ms. Whalen?
12              MS. WHALEN:  Yes, Your Honor.
13              THE COURT:  All right.  So just for the record,
14    there is a motion pending before the Court.  The standard
15    obviously here is, essentially, that under Rule 29(a) after
16    the Government closes its evidence -- and we'll treat it as
17    being closed right now, correct, Ms. Brusca, from your point
18    of view --
19              MS. BRUSCA:  Correct, Your Honor.
20              THE COURT:  -- although it's not the formal closing,
21    for purposes of scheduling here, we're dealing with it in this
22    way.
23        The Court, on the Defendant's motion, must enter a
24    judgment of acquittal of any offense which the evidence is
25    insufficient to sustain on a conviction.  If the Court denies
```

1    a motion for a judgment of acquittal at the conclusion of the

2    Government's case, the Defendant may still offer evidence

3    without having -- without having in any way waived any right

4    to file a Rule 29 motion.

5         Obviously, under Rule 29, the Government is allowed the

6    benefit of all reasonable inferences from the facts proven to

7    those sought to be established.  As I've already mentioned

8    earlier in these proceedings, *United States versus Tresvant*,

9    T-r-e-s-v-a-n-t, at 677 F.2d 1018, Fourth Circuit opinion,

10   1982, as well as the *United States versus Wolfson*, a Fourth

11   Circuit opinion in 1997 at 115 F.3d 1185.  I would note that

12   in the *Wilson* case, the Fourth Circuit noted that the

13   uncorroborated testimony of a single witness, even when that

14   witness is an accomplice or co-Defendant or informant, is

15   enough evidence to deny a Rule 29 motion.

16        The question before the Court at this stage is whether,

17   upon view of the evidence in the light most favorable to the

18   Government, any rational trier of facts could find the

19   Defendant guilty beyond a reasonable doubt.  So that is

20   essentially -- it is within the province of the jury to judge

21   the credibility of witnesses, but any -- and it's up to the

22   jury to resolve any contradictions in the evidence.

23        So that is the standard to be applied.  The Defendant

24   here in this case has been indicted and charged in total of --

25   just a second here -- a total of six counts.  And I'll be glad

```
 1        to hear from you on your motion, Ms. Whalen, and I'll hear

 2        from the Government in response.

 3               MS. WHALEN:  Thank you, Your Honor.

 4               THE COURT:  You can address that right now.

 5               MS. WHALEN:  Your Honor, as to Count 1 and well in

 6        general we're making --

 7               THE COURT:  Why don't you pull that microphone

 8        closer, and pick it up a little bit here.

 9               MS. WHALEN:  Would it be easier if I get closer?

10               THE COURT:  It probably would be.  Some of these

11        microphones are working well and others don't seem to be

12        working so well, I don't know why.

13               MS. WHALEN:  As to all counts, Your Honor, I am

14        raising a sufficiency of the evidence argument, and we'll

15        submit on that.

16            As to Counts 1 and 2, which are the drug counts,

17        conspiracy to distribute heroin and Count 2 is possession with

18        intent on May 27, 2015, of heroin --

19               THE COURT:  Yes.

20               MS. WHALEN:  -- there are a couple of arguments

21        relating to whether the Government has met its burden at this

22        stage.  The first is that as Your Honor may recall, the

23        evidence is that this was -- and the Government made great

24        pains to try to track what was, they believe, robbed from

25        Ms. Jeffrey, and taken from her home, and then where it ended
```

1    up.  And all of that appears to be evidence of not heroin, but

2    of liquid Percocet, a different drug altogether.

3         Just for the record, I will note that there is an

4    argument that it's a factual impossibility to complete the

5    crimes, both crimes, but I'll move on to the really bid other

6    argument, which is that in terms of argument, that in the

7    conspiracy itself, the Government has to prove that the

8    co-conspirators conspired with a purposes, and that purpose

9    was to distribute heroin.  And clearly in this case -- and

10   that there was an agreement to carry out in the object of the

11   conspiracy, which was to distribute heroin.

12        In this case, the Government's evidence is that CJ

13   Williams and Jennifer Jeffrey, that their part of the

14   agreement was they were going to distribute liquid Percocet,

15   and     Mr. Briscoe, in the taking the facts in the light

16   most favorable to the Government, Mr. Briscoe's agreement was

17   to distribute heroin.

18        So we think they have failed to meet that particular

19   element of the conspiracy that there was a meeting of the

20   minds of the parties, and so we would move to dismiss that

21   both -- well really, the conspiracy count on that particular

22   argument.

23        The next argument is a little bit more difficult for me

24   to articulate, but essentially in the 924J counts, which is

25   the use of a firearm resulting in death, the elements are

1   essentially that there was a firearm used.

2           **THE COURT:**  You're referring to Count 4?

3           **MS. WHALEN:**  Yes, Count 4, and I believe it may also

4   be --

5           **THE COURT:**  And Count 5.

6           **MS. WHALEN:**  -- Count 5.

7           **THE COURT:**  Count 4 and Count 5.

8           **MS. WHALEN:**  So the three basic elements, use of the

9   firearm during and in relation to a drug trafficking or a

10  crime of violence, and resulting in death as designed as 18

11  U.S.C. §1111, the murder statute.

12      The murder statute includes felony murder, and that can

13  be committed by robbery resulting in death.  So that is a

14  possible method, and maybe the most likely method in which the

15  Government would proceed on these counts.

16      Robbery is not defined in the statute, and because it's

17  not defined in the statute, the most -- more recent law that's

18  come out regarding generic crimes, and definition of generic

19  crimes, and I would cite to or point to a Ninth Circuit case,

20  it's US versus Reza or Reza-Ramos.  And that's at 996 F.3rd

21  176, 4th Circuit 2021 -- no, Ninth Circuit, I'm sorry.

22      The circuit there held that in a similar context where a

23  rob -- in that case it was a burglary, and it was not defined,

24  and you needed to use the generic language for the burglary,

25  and it was held that a burglary did not meet the test for that

1    particular statute.

2         So the same, in this case, if you use the generic term

3    for robbery, and also in the Ramos Reza case, you were -- the

4    Ninth Circuit found that you were, sort of, confined to

5    federal definitions, not state definitions.  So in this

6    argument is that in robbery, you have to use the Hobbs Act

7    Robbery definition.  And Hobbs Act Robbery has been found by

8    United States versus Green to not be a generic offense.  And

9    so our argument is that the Government cannot prove, because

10   of the felony murder elements aren't satisfied under

11   Section 111, that -- they can't prove the element that is

12   necessary to prove, which is that it's resulting in death

13   under Section 111.

14        I know that sounded very convoluted, and I have to give

15   credit to Paresh Patel, who tried to walk me through this

16   argument, but I do see his case is -- I see I gave the wrong

17   cite for Reza-Ramos, and I could give that cite.  I gave the

18   Green cite with the Fourth Circuit cite, but Reza-Ramos is 816

19   F.3rd 1110 2016 9th Circuit.

20        So thank you, Your Honor, those are our specific

21   arguments.

22             **THE COURT:**  Thank you very much, Ms. Whalen.

23             **MS. WHALEN:**  Oh, and I do just want to point out

24   while I'm up here.  There is an issue relating to our motion

25   to dismiss counts filed at -- first filed at ECF-11, and then

```
 1    we filed a supplemental before the third superseding
 2    indictment, and that was Document 24.  And so I can address
 3    that after the Rule 29, if you like, but I just wanted to
 4    highlight that I would like to argue that briefly.
 5              THE COURT:  Related to which count was that?
 6              MS. WHALEN:  This was relating to the statute of
 7    limitations.
 8              THE COURT:  Statute of limitations.
 9              MS. WHALEN:  So it would apply to Count 1, Count 2,
10    and then it would apply to the 924J counts in terms of using
11    the drug counts as a predicate offense, I believe.  Not a
12    crime of violence, but the drug predicate.
13              THE COURT:  Well, I suspected that will wait another
14    day, Ms. Whalen.  Thank you very much.
15         Ms. Brusca or Mr. Budlow, I will be glad to hear from
16    you.
17              MS. BRUSCA:  Thank you, Your Honor.
18         So just addressing --
19              THE COURT:  You have to get on the microphone or the
20    podium or something, because you're fading out there.
21              MS. BRUSCA:  Is that better, Your Honor.
22              THE COURT:  Better.  Yes.  You were not on the mic
23    before.  Go ahead.
24              MS. BRUSCA:  But now it's good.
25              THE COURT:  You're on the microphone, yes.
```

1          **MS. BRUSCA:**  Perfect.  So just taking these

2     arguments in turn, but first I would say, the Government

3     believes we've put in evidence sufficient to find beyond a

4     reasonable doubt the Defendant guilty of all of the crimes of

5     which he is charged.

6          In particular, if we start with the conspiracy charge,

7     there has been substantial evidence in the form of witness

8     testimony, the Defendant's own statements, jail calls that the

9     Defendant was dealing heroin, not only with Jennifer Jeffrey

10    and CJ Williams, but also all of his cousins, including Tony

11    Harris, including Wane Briscoe, including his Uncle Terrill

12    Harris, including his Uncle Alfred Harris and so on and so

13    forth.

14         So even if you bought into the argument that there is no

15    meeting of the minds between Jennifer Jeffrey and the

16    Defendant, which we think is not accurate, there would be

17    still many people with whom he conspired to deal heroin.

18         I also point out that there is abundant Fourth Circuit

19    case law, which I'm happy to send to the Court and counsel

20    afterward, if you prefer, that makes clear that you can commit

21    both conspiracy to distribute narcotics, and attempt to

22    distribute narcotics, even if the substance at issue is fake.

23         So for example, folks can conspire with FBI agents who

24    are giving them fake drugs.

25         **THE COURT:**  That's really not an issue here.

1          **MS. BRUSCA:**  Okay.  Right.  Thank you.

2          **THE COURT:**  I don't think we need to go off on that.

3          **MS. BRUSCA:**  And then turning to Counts 4 and 5, I

4    will say I'm not sure I quite followed the Defendant's

5    argument, but here there are three predicate crimes.  There is

6    drug trafficking conspiracy as charged in Count 1, drug

7    trafficking as charged in Count 2, and a Hobbs Act Robbery, as

8    charged only as part of the 924J.

9          The use of a firearm in furtherance of that resulting in

10   murder.  There are many different kinds of murder referenced

11   in Section 1111, including a premeditated killing, which is

12   what we have here, regardless of whether it's robbery of any

13   kind, and I don't think that the felony murder reference a

14   needs to be satisfied for that crime to be committed as I

15   understand the argument.

16         With respect to the statute of limitations, it's not

17   relevant to 924J, which has no statue of limitations because

18   it has a penalty -- it's a capital-eligible --

19         **THE COURT:**  Yes.

20         **MS. BRUSCA:**  -- offense.

21         Thank you, Your Honor.

22         **THE COURT:**  That's why I said with statute of

23   limitations, we wait certainly for another day.

24         **MS. BRUSCA:**  Okay.

25         **MS. WHALEN:**  One quick thing that was brought up.

1    The Government says there's Fourth Circuit cases, and I

2    raised, just for the record, a factual impossibility and

3    didn't argue it.  But I did want to point out -- because of

4    those cases, that talk about the necessity of what to prove

5    regarding the substance.  But I did want to point out there is

6    one case, it is *U.S. versus Austin* 765 Fed App'x.  I'm not

7    sure how I'm supposed to say that, other than App'x.  And had

8    it's 920, a 2019 case.

9         I point that out because in response to if you prove

10   liquid Percocet but you charge heroin.  The Court there held

11   that it's not an element, the type of drug is not an element,

12   but from there has to be proof of possession of some

13   controlled substance.  And in this case, there is no testimony

14   at all, nor is there, I double checked the lab sheets, there

15   is nothing to indicate whether either percocet or heroin are

16   controlled substance.  And so I wanted to point that case out

17   and argue to Your Honor that it's different than the cases

18   where there is proof of some drug of heroin, for instance, and

19   yet they were talking about a fake drug or fake drug and they

20   were thinking it was heroin.  It's a little different factual

21   scenario.

22        Thank you.

23             **THE COURT:**  Thank you very much, Ms. Whalen.  I've

24   summarized the standard to apply.  And applying the analysis

25   to the six counts with which the Defendant is charged here.

1    First of all, as to conspiracy to distribute and possess with

2    intent to distribute 100 grams or more of heroin, as charged

3    inviolate in Count 1, which would be in violation of 21 United

4    States Code §846, that motion will be denied.

5        The Fourth Circuit has held that conviction for

6    conspiracy to distribute narcotics under Section 846 requires

7    proof beyond a reasonable doubt of three elements.  First, an

8    agreement between two or more persons to engage in conduct

9    that violates Federal drug law, here to distribute or

10   possession narcotics with intent to distribute.

11       Secondly, the Defendant's knowledge of the conspiracy.

12   And third, the Defendant's knowing and voluntary participation

13   in the conspiracy as has been summarized by the Fourth Circuit

14   in the *United States versus Kellam*, K-e-l-l-a-m, 568 F.3d 125,

15   a Fourth Circuit opinion in 2008 or 2009, certiorari was

16   denied by the Supreme Court.  And that entire scenario of

17   cases has been summarized by the Fourth Circuit, *United States*

18   *versus Hickman* at 626 F.3d 756, a Fourth Circuit opinion in

19   2010.

20       In this case, there is clearly sufficient evidence for

21   this motion to be denied.  CJ Williams, Jennifer Jeffrey's

22   roommate and supplier of narcotics testified that he helped

23   Jennifer, "cook up" her prescription liquid Percocet to supply

24   to Tony Harris.

25       Wane Briscoe, Jr., testified that he assisted the

1    Defendant, Andre Briscoe and Tony Harris in selling heroin,

2    which they obtained from Jennifer, and a stocky guy wearing a

3    Muslim cap.

4        Third, Alfred Harris, III testified that he knew the

5    Defendant, Andre Briscoe, to sell heroin, and that he received

6    heroin from the Defendant.  And furthermore, there's evidence

7    that the Defendant himself admitted in recorded statements to

8    law enforcement in 2015 and 2020 that he was getting work from

9    Jennifer, Jennifer Jeffrey.

10       And finally, on this point, Tonya Harris testified that

11   the Defendant, Andre Briscoe, told her that Jennifer was his

12   and Tony Harris's plug, or supplier of narcotics.

13       So there's clearly sufficient evidence here for the

14   denial of the Rule 29 motion as to Count 1.  As to Count 2,

15   possession with intent to distribute heroin in violation of

16   21 United States Code §84(a)1.  Count 2, the third superseding

17   indictment charges on or about March 27, 2015, the Defendant

18   possessed heroin.

19       As the Fourth Circuit has stated, most recently in *United

20   States versus Rock*, an opinion of the Fourth Circuit, I think,

21   if I'm not mistaken, it was this week, has noted that we set

22   up the elements of possession with intent to distribute a

23   controlled substance as one.  Possession of the narcotic

24   controlled substance.  Two, knowledge of the possession and

25   three, intent to distribute the narcotic as was summarized in

1    *United States versus Randall* 171 F.3d 195, Fourth Circuit in

2    1999.

3         In this case, and I think it's all been summarized as

4    recently as this week by the Fourth Circuit in that *United*

5    *States versus Rock* opinion at -- it's Fourth Circuit Case No.

6    20-4369.

7         In this case, Kiara Haynes testified that on May 27,

8    2015, she saw the Defendant, Mr. Briscoe, with heroin in a

9    black plastic bag when he returned to her apartment after the

10   murders of Jennifer Jeffrey and K.B., Jr.

11        She further testified that Mr. Briscoe, the Defendant,

12   gave her a share of narcotics for herself and a share for the

13   cousin who loaned her the firearm that the Defendant is

14   alleged to have used in the murders.

15        Brianna Street testified that she saw a black corner

16   store bag at the address of 103 Upmanor Road in the late

17   evening, early morning hours of May 26th into May 27, 2015,

18   and Ms. Street testified that the bag was full, but that she

19   did not want to look to see what was in it.  And Wane Briscoe

20   testified that on May 27, 2015, he met the Defendant Andre

21   Briscoe at Tiffany Jackson's house in the Perkins Projects and

22   saw Mr. Briscoe with heroin and chunks and gel capsules.

23        Wane Briscoe also testified that the individual, Terrill

24   Harris, Jr., identified as Fatman informed him that the

25   Defendant wanted he, Wane Briscoe to help sell the drugs the

1    Defendant took from Jennifer Jeffrey.  So the motion is denied

2    as to Count 2 of the indictment.

3        As to Count 3, possession of a firearm and ammunition by

4    a felon in violation of 18 United States Code §(g)(1), the

5    elements are clearly set forth that the Defendant was

6    convicted, and knew that he had been so convicted in any court

7    of a crime punishable by imprisonment for a term exceeding one

8    year.  There's been a stipulation as to that.  The stipulation

9    that's referenced by Government's Exhibit 20.1.  And the

10   element also that the Defendant knowingly possessed a firearm

11   as charged, and third that the possession charged was

12   affecting interstate commerce.  And the first two elements

13   have clearly been stipulated to with respect to the Government

14   Exhibit 20.1.

15       I would note that in addition to the stipulation that is

16   reflected by 20.1, that the parties have also stipulated that

17   the firearm at issue, the Para Ordinance model .45-caliber

18   pistol, which I believe is reflected by Government's

19   Exhibit 1.28.  If I'm not mistaken, that is the exhibit

20   number, is it not, Mr. Budlow, I believe?

21           **MR. BUDLOW:**  Of the gun, yes.

22           **THE COURT:**  Yes, of the gun, of the firearm that

23   there is a -- that the parties have stipulated that as to that

24   firearm stipulation -- second stipulation, Government's

25   Exhibit 20.2, that the firearm and ammunition traveled in

1      interstate commerce prior to May 28, 2015.

2           Kiara Haynes furthermore testified that she arranged for

3      her incarcerated cousin, Tariek Powell, to loan her a firearm

4      to commit a robbery for the purpose of obtaining, "Boy," which

5      she testified is a street term for heroin.  And Haynes also

6      testified that Martin DaShields drove her and the Defendant

7      Mr. Briscoe to pick up the gun, and that the gun she obtained

8      was a .45-caliber weapon and firearm.

9           Kiara Haynes further testified that on the morning of

10     May 27, 2015, when Mr. Briscoe left her apartment to go to

11     Jennifer Jeffrey's house to commit the robbery, he was

12     carrying the gun in a blue and white Rainbow bag, and that, I

13     believe, is a retail chain store selling women's clothing.

14          Further, she testified that in the evening on May 27,

15     2015, she went to Tiffany Jackson's house to retrieve the gun

16     from the Defendant, and in light of the stipulations that had

17     been entered into reflected by, not only Government

18     Exhibits 20.1 and 20.2, but also 20.3, the elements have been

19     satisfied as to Count 3, and the motion is denied.

20          As to Count 4, use, carry, and discharging of a firearm

21     during and in relation to a drug trafficking crime and crime

22     of violence, causing the death of a person in violation of 18

23     United States Code §924(c) and §9249(j)(1), specifically

24     Count 4, the murder of Jennifer Jeffrey and Count 4, the

25     murder of K.B., Jr., the seven-year-old boy as charged in

1    Count 5.

2        The particular Section 924(c) prohibits using, using or

3    carrying a firearm during and in relating to any crime of

4    violence or drug trafficking crime.  And in turn punishment in

5    924(j) in turn punishes a person who, in the course of a

6    violation of Subsection C causes the death of a person through

7    the use of the firearm.

8        Therefore, the conduct elements of 924(j) violations are

9    one, the use of a firearm to cause the death of a person.  And

10   two, the Commission of a 924(c) violation as has been

11   described and explained by the Supreme Court in *United States*

12   *versus Rodriguez Marino* 526 U.S. 275, the Supreme Court

13   opinion in 1999, as well as is referenced by the Fourth

14   Circuit in the *United States versus Smith* 452 F.3rd 323, a

15   Fourth Circuit opinion in 2006.

16       I would also note that the Fourth Circuit is held that a

17   substantive Hobbs Act Robbery qualifies as a valid 924(c)

18   predicate crime of violence in March of this year in *United*

19   *States versus Ogun*, O-g-u-n, Case Nos. 16-7450 and 20-6578 in

20   the Fourth Circuit docket.

21       In this case, Kiara Haynes testified that the Defendant

22   went over to Jennifer Jeffrey's house on May 27, 2015, to rob

23   her of narcotics and kill her with a .45-caliber firearm.

24       Haynes has testified that after the Defendant returned to

25   her apartments, he admitted that he had shot both Jennifer and

1    her son, K.B., and he returned to Ms. Haynes's apartment,

2    according to Ms. Haynes, with the gun, and a black bag full of

3    narcotic.

4        Wane Briscoe testified that the Defendant told him that

5    he, Andre Briscoe, intended to rob Jennifer of 250 grams of

6    heroin.  Wane Briscoe also testified that the Defendant told

7    him that he, Andre Briscoe, shot and killed Jennifer Jeffrey

8    and K.B.

9        Tonya Harris, testified that the Defendant confessed to

10   her that he killed Jennifer and K.B.

11       And Dr. Dean from the Office of the Chief Medical

12   Examiner testified that both Jennifer and K.B. died by

13   homicide from gunshot wounds.  And there is circumstantial

14   cell site location information placing the Defendant in the

15   area of Jennifer's house around the time of the murders.

16       The Defendant's phone was the last to connect with

17   Jennifer Jeffrey's phone before the death, and the Defendant's

18   cell phone made no calls to Jennifer's cell phone after the

19   time of the murders.

20       All of that is sufficient evidence to clearly compel the

21   denial of the motion the under Rule 29 as to Counts 4 and 5.

22       With respect to Count 6, killing a witness to prevent

23   communication to law enforcement in violation of 18 United

24   States Code §1512(a)(1)(C) and §1512(a)(3)(A), specifically

25   it's murder of K.B., Jr.  To sustain a conviction on that

1  count, the Government must prove one, a killing.  Two,

2  committed with particular intent, namely an intent to prevent

3  a communication about the commission or possible commission of

4  a Federal offense to a Federal law enforcement officer or

5  judge, as has been summarized by the Supreme Court in the

6  *Fowler* at 563 U.S. 668, an opinion of the Supreme Court in

7  2011, as that has been more fully summarized by the Fourth

8  Circuit in United States versus Ramos Cruz, 667 F.3d, a Fourth

9  Circuit opinion 2012.

10        It's been noted that that prosecution under

11  §1512(a)(1)(C) includes killings that occur before the victim

12  has had any communication with law enforcement officers,

13  citing the *Fowler* case in support of that proposition.  And

14  specifically noting that the Government need not prove that a

15  federal investigation was in progress at the time the

16  Defendant committed witness tampering murder.

17        As the Fourth Circuit has noted, essentially, in the

18  *Fowler* case, the Fourth Circuit summarized in United States

19  versus Smith in 2013 Fowler held that the witness tampering

20  statute §1512 requires the Government to show a reasonable

21  likelihood, that had the victim communicated with law

22  enforcement officers, at least one of the communications would

23  have reached a Federal officer.

24        In defining the reasonable likelihood standard, the

25  Supreme Court explained that the Government need not show that

1    such a communication, had it occurred, would have been Federal

2    beyond a reasonable doubt.  Nor even that it was more likely

3    than not, but the Government is required to show that the

4    likelihood of the communication to a Federal officer was more

5    than remote, outlandish, or simply hypothetical, and the

6    Government has clearly met that standard.

7         In this case, the evidence thus far before the Court is

8    that Dr. Dean testified that K.B. died by homicide after

9    having been shot multiple times.

10        Wane Briscoe testified that the Defendant told him that

11   he shot K.B. because he could identify him.  Alfred Harris,

12   III testified that the Defendant confessed that he killed K.B.

13   because he could identify him.  And Detective Lewis testified

14   that it is common for Baltimore Police Officers to work in

15   coordination with Federal authorities on murder cases

16   involving a nexus to drug and firearm activity.

17        So for that reason, the motion is denied as to the -- the

18   Rule 29 motion is denied as well as to Count 6.

19        I would also note that with respect to the matter of

20   special findings that are listed with respect to the

21   indictment and the charge in the indictment, the Government

22   must prove that the victim, K.B. was younger than 14 years of

23   age at the time of the Defendant's commission of the crime,

24   and that clearly there's evidence to support that.

25        That the victim, K.B. died as a result of the offense,

1    there is clearly evidence to support that.  Also, the special

2    findings that must be proved by the Government, is that the

3    Defendant, Andre Briscoe, in the course of committing the

4    offense, intentionally killed the victim, K.B., there is

5    clearly evidence of that that he inflicted upon K.B. such

6    injury resulting in death, that he intentionally participated

7    in that act, contemplating that K.B., life would be taken, and

8    that he intentionally and specifically engaged in an act of

9    violence knowing that the act created a grave risk of death to

10   the person.

11       All of that has clearly been established in terms of

12   meeting any standards under Rule 29.  And furthermore, the

13   evidence clearly indicates that the Defendant, Andre Briscoe,

14   himself was 18 years or older at the time of the offense.  And

15   in this case, there has been evidence of the murder of K.B.

16   on May 27, 2015, and the parties have stipulated that K.B. was

17   born in 2007, and was thus clearly under the age of 14 at the

18   time of the murder.

19       Dr. Dean confirmed that K.B. died by homicide as a result

20   of gunshot wounds, and there has been evidence from Alfred

21   Harris, III, and Wane Briscoe, that the Defendant, Andre

22   Briscoe, intentionally shot and killed K.B. because K.B.

23   could recognize him.  And Kiara Haynes and Tonya Harris also

24   testified that the Defendant, Mr. Briscoe, admitted that he

25   shot and killed K.B.  And several of the Defendant's family

1    members have testified as to his age.

2        So for all of those reasons, the Rule 29 motion of the

3    Defendant is denied.  It will be more formally -- the

4    Government will formally close its case Monday morning, and

5    then we will proceed with the Defense case in this matter, and

6    to the extent that there is any communication from the

7    Defendant to the Court that was at lunchtime today, that note

8    was given to Defense counsel to address any desires by the

9    Defendant with respect to what witnesses would be called next

10   week.

11       Is there anything further from the point of view of the

12   Government in this matter, Mr. Budlow?

13       **MR. BUDLOW:**  A couple of quick matters, Your Honor.

14   I was hoping that the Court would ask the Defense to provide,

15   at that time, the way the Government, a lineup --

16       **THE COURT:**  Yes, I'm going to get there.  Right.

17       **MR. BUDLOW:**  Along those lines, I would also ask if

18   there is any witness statement under Rule 29 the Government

19   has previously requested that we be provided with Defense

20   witness statements.

21       **THE COURT:**  You mean reverse Jencks?

22       **MR. BUDLOW:**  Yes.

23       **THE COURT:**  Okay.  Sure.

24       **MR. BUDLOW:**  Also, the other thing I'd ask, I'll

25   just put it all there at once and I'll let you deal with it.

```
1    If the Defense has an expected length of their cases, I know
2    they can't discuss or deny whether or not the Defendant is
3    going to testify, but the reason I ask is I'd like to be able
4    to plan for the rest of the day, including potential rebuttal,
5    as well as closing.
6         And then my final question is, if for some reason on
7    Monday, the Defense doesn't call any witnesses, which I
8    understand sometimes can happen, would the Court be expecting
9    the parties to be prepared to close on Monday if that happens.
10           THE COURT:  No, I'm not going to expect the -- I'm
11   not going to expect anybody to close on Monday.
12           MR. BUDLOW:  Okay.  Thank you.
13           THE COURT:  So that that will solve some of that
14   issue.
15        So anything else from the point of view of the
16   Government?
17           MR. BUDLOW:  No, Your Honor.
18           MS. BRUSCA:  No Your Honor.
19           THE COURT:  All right.  Anything else from the point
20   of view of the Defense before we get into the scheduling?
21           MS. WHALEN:  No.
22           THE COURT:  All right.  With respect to witness
23   lists, the Government has been supplying witness lists, and
24   I'd like for the Defense to give the Government the list of
25   witnesses which it intends to call on Monday, and you don't
```

1    need to notify me right now, but you definitely need to give

2    it to them, so then I can get it Monday morning.

3              **MS. WHALEN:**  Happy to share that, Your Honor.  And

4    some of the witnesses they already know, because we've been

5    communicating about that.

6              **THE COURT:**  Okay.  That's fine.

7              **MS. WHALEN:**  And --

8              **THE COURT:**  You have your witnesses all lined up,

9    make sure they're all lined up for the whole day in terms of

10   we have to all day, so I don't want to be hearing that a

11   witness is not here.  Any witnesses you want to call, we have

12   to make sure they're all ready to go here and ready on Monday.

13             **MS. WHALEN:**  Thank you, Your Honor.  And we have, I

14   think --

15             **THE COURT:**  And also reverse Jencks -- the defense

16   is aware of its reverse Jencks obligations, is there any

17   reverse Jencks to your knowledge?

18             **MS. WHALEN:**  I think we've put this in writing.  And

19   again, I told Mr. Budlow this morning there's no -- or

20   yesterday, there's no Jencks.

21             **THE COURT:**  There is no reverse Jencks.

22             **MS. WHALEN:**  That's correct.

23             **THE COURT:**  All right.  What else did you want to

24   question, Mr. Budlow, about in terms of scheduling?

25             **MR. BUDLOW:**  Expected length of their case.

1          **THE COURT:**  Oh, that's right.  I mean, I'm not going

2     to --

3          **MS. WHALEN:**  We can get back with Mr. Budlow as soon

4     as we know.

5          **THE COURT:**  Well, that's fine.  The point is that we

6     also have to allow time for a charge conference.  We've taken

7     the instructions -- we try to narrow them as best we can.  And

8     on some of these with stipulations, I'm just going to indicate

9     certain something is stipulated.  I'm not going to view all of

10    the verbiage with the elements with the defense, and we can --

11    we're going to try to get these instructions down as workable

12    as we can.

13         And in terms of the charge conference timing, I think

14    it's going to certainly take a couple of hours, I would think,

15    it usually always does, and so that's got to be factored in as

16    well in this matter.

17         And I think that that's about it.  We'll start promptly

18    at 9:30 on Monday.  We seem to have had a propensity for

19    having e-mails to chambers box over the weekend.  Mr.

20    Demetriou knows to check that out, and I would ask that at

21    this -- I know that that's going to be inevitable, but I don't

22    want to get it at 8 o'clock on a Sunday night, okay.  That's

23    really not fair to stuff.

24         We have one evidence of -- I believe there's one e-mail

25    that we got that was 4 o'clock in the morning, I'm not sure.

1    I'm sure it was meant for Judge Hollander, not for me.

2              **MR. BUDLOW:**  I'm sure she read it as it came in.

3              **THE COURT:**  We're laughing here in court.  I always

4    say any time -- you know, Judge Hollander is the only member

5    of this court that looks at e-mails at 4 o'clock in the

6    morning.  And if I get any, I send them to her, because she's

7    the one that still awake looking at e-mails at 4 o'clock in

8    the morning.

9         So I think we've covered -- anything else we need to do?

10   I know you all have worked very hard the last two weeks, and I

11   thank you for pushing forward on this.  And we will -- we'll

12   call it a day unless there is anything else, this Court stands

13   adjourned for the day.

14        Thank you all very much.

15             **THE CLERK:**  All rise.  Court stands adjourned.

16        (Court adjourned at 3:03 p.m.)

17

18

19

20

21

22

23

24

25

```
1                    I N D E X   P A G E

2    WITNESS:                                    PAGE

3    TONYA HARRIS (CONT.)

4      By Mr. Purpura                           5, 54

5      By Mr. Budlow                              43

6    JEREMY MONKERS

7      By Ms. Brusca                              61

8    JEFFREY KELLY

9      By Ms. Brusca                           94, 134

10     By Ms. Whalen                             127

11
                           K E Y
12
     K.        = Kester
13
     K.B.      = Kester Brown
14
     K.B., III = Kester Brown, III
15

16

17   REPORTER NOTE:  Quotation marks are used for clarity and do
                      not necessarily reflect a direct quote.
18

19

20          I, Melissa L. Clark, RPR, do hereby certify that the

21   foregoing is a correct transcript from the stenographic record

22   of proceedings in the above-entitled matter.

23

24          _____/S/_____
                     Melissa L. Clark
25                Official Court Reporter
```